ACCEPTED
04-14-00829-CV
FOURTH COURT OF APPEALS
SAN ANTONIO, TEXAS
12/24/2014 9:26:35 PM
KEITH HOTTLE
CLERK

**ORAL ARGUMENT REQUESTED**

No. 04-14-00829-CV

FILED IN
4th COURT OF APPEALS
SAN ANTONIO, TEXAS
12/31/2014 4:25:35 PM
KEITH E. HOTTLE
Clerk

IN THE COURT OF APPEALS
FOR THE FOURTH JUDICIAL DISTRICT OF TEXAS
AT SAN ANTONIO

Western Rim Property Services, Inc.,

*Appellant,*

v.

Paula Bazan-Garcia,

*Appellee.*

ON APPEAL FROM THE COUNTY COURT AT LAW NO. CC# 03 OF
BEXAR COUNTY, TEXAS, CAUSE NO. 2014CV01064

**APPELLANT'S OPENING BRIEF**

**BAKER BOTTS L.L.P.**
Jennifer M. Trulock
State Bar No. 90001515
jennifer.trulock@bakerbotts.com
2001 Ross Avenue, Suite 600
Dallas, Texas 75201-2980
(214) 953-6500
(214) 953-6503 (Facsimile)

**BAKER BOTTS L.L.P.**
Stephanie F. Cagniart
State Bar No. 24079786
stephanie.cagniart@bakerbotts.com
98 San Jacinto Boulevard, Suite 1500
Austin, Texas 78701-4078
(512) 322-2500
(512) 322-2501 (Facsimile)

Attorneys for Appellant Western Rim Property Services, Inc.

# Identity of Parties and Counsel

Appellant                    Western Rim Property Services

Counsel for Appellant        BAKER BOTTS L.L.P.
                             Jennifer M. Trulock
                             State Bar No. 90001515
                             2001 Ross Avenue
                             Suite 600
                             Dallas, Texas 75201

                             Stephanie F. Cagniart
                             State Bar No. 24079786
                             98 San Jacinto Blvd
                             Suite 1500
                             Austin, Texas 78701


Appellee                     Paula Bazan-Garcia

Counsel for Appellee         The Espinoza Law Firm, PLLC
                             Javier Espinoza
                             State Bar No. 24036534
                             Josue Garza
                             State Bar No. 24072737
                             503 E. Ramsay
                             Suite 103
                             San Antonio, Texas 78216

# Table of Contents

**Page**

Identity of Parties and Counsel ................................................................................. i

Table of Authorities .................................................................................................. iv

Statement of the Case................................................................................................ vii

Issue Presented.......................................................................................................... viii

Statement of Facts......................................................................................................1

    I.      Bazan-Garcia agreed to arbitrate her disputes with WRPS. .................1

    II.    Despite the parties' agreement to arbitrate their disputes, Bazan-Garcia files a lawsuit against WRPS in state court...................3

Standard of Review ....................................................................................................4

Summary of the Argument..........................................................................................6

Argument....................................................................................................................7

    I.      The trial court erred in refusing to compel arbitration because Bazan-Garcia agreed to arbitrate her disputes with WRPS. .................7

        A.    WRPS proved that Bazan-Garcia agreed to arbitrate her disputes with WRPS. ................................................................8

        B.    WRPS proved that Bazan-Garcia's claims fall within the scope of her agreement to arbitrate..........................................10

    II.    The trial court abused its discretion by denying WRPS's motion to compel arbitration on the grounds that the parties' agreement was unconscionable, because that defense is itself subject to arbitration. ...............................................................................12

        A.    The parties' arbitration agreement clearly and unmistakably delegated issues of arbitrability to the arbitrator..................................................................................13

ii

B.      Bazan-Garcia is bound to arbitrate her unconscionability defense because she failed to prove that the delegation clause was invalid. .....................................................17

III.   In the alternative, the trial court erred in denying WRPS's motion to compel arbitration because Bazan-Garcia did not prove that the parties' arbitration agreement is unconscionable.........20

A.      Legal Standard ........................................................20

B.      Bazan-Garcia failed to prove that arbitration under the parties' agreement would be more expensive than litigation, and effectively prevent her from vindicating her statutory rights. ...............................................22

1.      Bazan-Garcia failed to prove that arbitrating her claims is likely to cost upwards of $20,000. ..................23

2.      Under the parties' agreement, WRPS will bear almost all of the costs of arbitration. ..............................26

C.      An arbitration agreement cannot be found unconscionable based on provisions that the arbitrator is empowered to modify. ................................................28

IV.   If any provision of the arbitration agreement is unconscionable, this Court should sever it and enforce the remainder of the agreement. ...............................................................32

Conclusion and Prayer for Relief........................................................33

Certificate of Compliance .................................................................35

Certificate of Service ........................................................................35

Index to Appendix.............................................................................36

# Table of Authorities

**Page(s)**

**CASES**

*Aspen Tech., Inc. v. Shasha,*
    253 S.W.3d 857 (Tex. App.—Houston [14th Dist.] 2008, no pet.) .............23, 24

*Burlington Res. Oil & Gas Co. LP v. San Juan Basin Royalty Trust,*
    249 S.W.3d 34 (Tex. App.—Houston [1st Dist.] 2007, pet. denied) .................16

*Cantella & Co., Inc. v. Goodwin,*
    924 S.W.2d 943 (Tex. 1996) .......................................................................5, 10

*Contec Corp. v. Remote Solution, Co., Ltd.,*
    398 F.3d 205 (2d Cir. 2005) ..............................................................................15

*D.R. Horton-Tex., Ltd. v. Dragseth,*
    02-12-000435, 2013 WL 3377121 (Tex. App.—Fort Worth July 3, 2013,
    no pet.) ................................................................................................................5

*Ernst & Young LLP v. Martin,*
    278 S.W.3d 497 (Tex. App.—Houston [14th Dist.] 2009, no pet.) .............13, 17

*Forest Oil Corp. v. McAllen,*
    268 S.W.3d 51 (Tex. 2008)...........................................................6, 8, 12, 13, 20

*Garcia v. Huerta,*
    340 S.W.3d 864 (Tex. App.—San Antonio 2011, pet. denied)...........................5

*Gilmer v. Interstate/Johnson Lane Corp.,*
    500 U.S. 20 (1991)............................................................................................28

*Green Tree Fin. Corp.-Ala. v. Randolph,*
    531 U.S. 79 (2000)................................................................................22, 23, 24

*Haddock v. Quinn,*
    287 S.W.3d 158 (Tex. App.—Fort Worth 2009, pet. denied)...........................16

*Hoover Slovacek LLP v. Walton,*
    206 S.W.3d 557 (Tex. 2006) ............................................................................20

*Howsam v. Dean Witter Reynolds, Inc.*,
   537 U.S. 79 (2002) ........................................................................13

*IHS Acquisition No. 171, Inc. v. Beatty-Ortiz*,
   387 S.W.3d 799 (Tex. App.—El Paso 2012, no pet.) ........................................19

*In re Dallas Peterbilt, L.L.P.*,
   196 S.W.3d 161 (Tex. 2006) ...............................................................10

*In re FirstMerit Bank, N.A.*,
   52 S.W.3d 749 (Tex. 2001)...............................................8, 23, 29, 31

*In re Halliburton Co.*,
   80 S.W.3d 566 (Tex. 2002)........................................................8, 10

*In re J.D. Edwards World Solutions Co.*,
   87 S.W.3d 546 (Tex. 2002)...........................................................5, 8

*In re Olshan Found. Repair Co., LLC*,
   328 S.W.3d 883 (Tex. 2010) .................................... 6, 20, 21, 22, 23, 25, 27, 28

*In re Palm Harbor Homes, Inc.*,
   195 S.W.3d 672 (Tex. 2006) .................................................................9

*In re Poly-America, L.P.*,
   262 S.W.3d 337 (Tex. 2008) ........................ 5, 20, 21, 22, 28, 29, 30, 31, 32, 33

*In re Rubiola*,
   334 S.W.3d 220 (Tex. 2011) ...............................................................10

*In re Weekley Homes, L.P.*,
   180 S.W.3d 127 (Tex. 2005) ...............................................................13

*J.M. Davidson, Inc. v. Webster*,
   128 S.W.3d 223 (Tex. 2003) .................................................................4

*Jack B. Anglin Co., Inc. v. Tipps*,
   842 S.W.2d 266 (Tex. 1992) ..........................................................8, 27

*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*,
   473 U.S. 614 (1985)...........................................................................21

*Palm Harbor Homes, Inc. v. McCoy*,
    944 S.W.2d 716 (Tex. App.—Fort Worth 1997, no writ) ....................................5

*Petrofac, Inc. v. Dyn McDermott Petroleum Operations Co.*,
    687 F.3d 671 (5th Cir. 2012) .......................................................................15

*Prudential Sec. Inc. v. Marshall*,
    909 S.W.2d 896 (Tex. 1995) ........................................................................10

*Rent-A-Center, West v. Jackson*,
    561 U.S. 63 (2010)..........................................................13, 17, 18, 19, 20

*Saxa Inc. v. DFD Architecture Inc.*,
    312 S.W.3d 224 (Tex. App.—Dallas 2010, pet. denied)............................14, 15

*Ski River Dev., Inc. v. McCalla*,
    167 S.W.3d 121 (Tex. App.—Waco 2005, pet. denied) ...................................31

*Venture Cotton Co-op v. Freeman*,
    435 S.W.3d 222 (Tex. 2014) ...........................................21, 22, 32, 33

**STATUTES**

9 U.S.C. § 2 ......................................................................................................13

Tex. Civ. Prac. & Rem. Code § 171.001 ....................................................................8

Tex. Civ. Prac. & Rem. Code § 171.001(b)........................................................5, 13

Tex. Civ. Prac. & Rem. Code § 171.002(a)(4) .........................................................16

Tex. Civ. Prac. & Rem. Code § 171.021(c)........................................................5, 12

Tex. Civ. Prac. & Rem. Code § 171.025(a)..............................................................8

**OTHER AUTHORITIES**

AAA Employment Rules .................................................................................*passim*

Restatement (Second) of Contracts § 208 (1981)...................................................32

Tex. R. App. P. 9.4..............................................................................................35

**Statement of the case**

This is an accelerated interlocutory appeal from denial of a motion to compel arbitration. Plaintiff-Appellee Paula Bazan-Garcia ("Bazan-Garcia"), who worked as an at-will employee for Defendant-Appellant Western Rim Property Services ("WRPS"), agreed in and after her initial employment agreement that any dispute between her and WRPS would be resolved by binding arbitration. Bazan-Garcia also agreed that any dispute over the validity and enforceability of the parties' arbitration agreement would be decided by the arbitrator, not by the court. Despite these promises, Bazan-Garcia sued WRPS on various claims arising from her employment and termination, *see* CR 9–13, all of which fall within the scope of the parties' arbitration agreement, *see* App. 3–13.[1]

After Bazan-Garcia refused to submit her claims to arbitration in accordance with the agreement, WRPS moved to compel arbitration in the trial court. CR 16–70. The trial court denied WRPS's motion on November 17, 2014. App. 1. WRPS timely filed its notice of accelerated interlocutory appeal on November 24, 2014. CR 156–57. On December 3, 2014, this Court granted WRPS's Emergency Motion to Stay Proceedings in the trial court pending resolution of this appeal.

---

[1] The Clerk's Record is referred to herein as "CR," the Supplemental Clerk's Record as "Supp. CR," the Reporter's Record as "RR," and the Appendix as "App."

## Issue Presented

Did the trial court err by denying WRPS's motion to compel arbitration, where it was undisputed that Bazan-Garcia agreed to arbitrate her disputes with WRPS, where Bazan-Garcia's only challenge to the arbitration agreement was based on an unconscionability defense that the parties also agreed would be decided by the arbitrator rather than the court, and where Bazan-Garcia failed to prove that she would not be able to vindicate her statutory rights in the forum of arbitration?

**Statement of Facts**

**I.     Bazan-Garcia agreed to arbitrate her disputes with WRPS.**

Paula Bazan-Garcia was employed as a housekeeper by WRPS from September 26, 2011 until October 22, 2013. CR 32. Both upon hire and during her employment with WRPS, Bazan-Garcia signed and assented to several written agreements. *See* CR 32–33. Among these agreements were an Employee Acknowledgement Form ("Acknowledgement") and an Arbitration Agreement ("Arbitration Agreement"), both of which contained mandatory and binding arbitration provisions. App. 3, 4.

The Acknowledgement stated that Bazan-Garcia had received a copy of WRPS's Employee Handbook, and that she understood that "it [was her] responsibility to read and comply with the policies contained in this handbook and any revisions made to it." App. 4. The Employee Handbook included a section entitled "Problem Resolution." App. 12. It had an arbitration provision stating:

> Problems, disputes, or claims not resolved through [voluntary internal dispute] resolution steps are subject to final and binding arbitration. The arbitration proceeding will be conducted under the Employment Dispute Resolution Rules of the American Arbitration Association [(the "AAA Rules")].

App. 13. This same provision was included in every version of the Employee Handbook in place during Bazan-Garcia's employment. *See* CR 33, 53, 63, 70. Bazan-Garcia signed the Acknowledgement on September 20, 2011. App. 4.

1

Bazan-Garcia signed the Arbitration Agreement on September 27, 2011. App. 3. The agreement was clearly entitled "Arbitration Agreement," and also stated that disputes between Bazan-Garcia and WRPS would be decided by binding arbitration under the AAA Rules:

> [O]ther than a worker's compensation claim covered by insurance, no dispute between [WRPS] and the undersigned which is in any way related to the employment of the undersigned, including but not limited to a claim for wrongful termination, discrimination and/or harassment, and worker's compensation not covered by insurance, shall be the subject of a lawsuit filed in any state or federal court. Instead, any such dispute shall be submitted to arbitration in accordance with the rules of the American Arbitration Association ("AAA").

*Id*. Under the AAA Rules, "[t]he arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope or validity of the arbitration agreement." AAA Rule 6(a) (App. 30).[2] The Arbitration Agreement also specified that "[e]ach party to arbitration shall be entitled to take only one deposition," and that "[a]ny arbitration relating to any dispute covered by this Agreement shall be arbitrated in Dallas County, Texas." App. 3.

---

[2] AAA Employment Rules are available online at https://www.adr.org/aaa/ShowProperty?nodeId=/UCM/ADRSTG_004362.

2

On October 22, 2013, WRPS terminated Bazan-Garcia's employment. CR 32. Because Bazan-Garcia's employment was "at-will," WRPS could terminate it "at any time without a cause or reason." CR 35.

## II. Despite the parties' agreement to arbitrate their disputes, Bazan-Garcia files a lawsuit against WRPS in state court.

More than eight months after her termination, on July 1, 2014, Bazan-Garcia initiated this lawsuit in Bexar County Court at Law. CR 9. In her Original Petition, Bazan-Garcia alleged that WRPS's stated reasons for terminating her employment were pretextual. CR 11. The real reason for her discharge, she claimed, was that she had sustained and notified WRPS of an "on-the-job injury and/or initiated the filing of a workers' compensation claim." CR 11. WRPS answered with a general denial on September 12, 2014. CR 14–15. Bazan-Garcia then served her initial discovery requests on WRPS, including 72 requests for production, 23 interrogatories, and 13 requests for admission. Supp. CR 10–35.

Shortly after receiving Bazan-Garcia's discovery requests, WRPS sent a copy of Bazan-Garcia's signed arbitration agreement to Bazan-Garcia's counsel and demanded that Bazan-Garcia submit her claims to arbitration in accordance with her agreement. CR 30. Bazan-Garcia refused, and WRPS filed a Motion to Compel Arbitration on October 16, 2014. CR 16. WRPS also filed a Motion for Protective Order from Discovery, asking the trial court for relief from the obligation to respond to Bazan-Garcia's burdensome discovery requests until the

3

court decided whether arbitration was required. Supp. CR 4–8. In her response brief and supporting affidavits, Bazan-Garcia did not dispute that she had agreed to arbitrate her disputes with WRPS. Instead, she claimed that the arbitration agreement was unconscionable and therefore unenforceable. CR 72–97.

The trial court held a hearing on WRPS's motion to compel arbitration and motion for a protective order, found the arbitration agreement was unconscionable, *see* RR 18, and denied WRPS's motions on November 17, 2014 on that ground, *see* App. 1. On November 19, 2014, Bazan-Garcia filed her First Amended Petition, alleging for the first time that WRPS interfered with Bazan-Garcia's attempts to exercise her rights under the Family Medical Leave Act ("FMLA"), and/or terminated her employment in retaliation for invoking those rights. CR 150.

WRPS timely filed this accelerated interlocutory appeal on November 24, 2014. CR 156–57. On December 3, 2014, this Court stayed all proceedings pending in the trial court "until further order of this court."

### Standard of Review

Arbitration agreements are contracts and "interpreted under traditional contract principles." *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 227 (Tex. 2003). "[O]n appeals of orders denying arbitration under the Texas Arbitration Act ("TAA"), [the court] appl[ies] a no-evidence standard to the trial court's factual

4

determinations and a de novo standard to legal determinations." *Garcia v. Huerta*, 340 S.W.3d 864, 868 (Tex. App.—San Antonio 2011, pet. denied). Because "a presumption exists in favor of agreements to arbitrate . . . [c]ourts must resolve any doubts about an agreement to arbitrate in favor of arbitration." *Cantella & Co., Inc. v. Goodwin*, 924 S.W.2d 943, 944 (Tex. 1996) (internal citations omitted).

If a claim is subject to an arbitration agreement, then "the trial court has no discretion but to compel arbitration and stay its own proceedings" until arbitration is complete. *In re J.D. Edwards World Solutions Co.*, 87 S.W.3d 546, 549 (Tex. 2002); *see also* Tex. Civ. Prac. & Rem. Code § 171.021(c) (App. 67). The party opposing arbitration has the heavy burden of proving that "grounds exist at law or equity for [the arbitration agreement's] revocation . . . such as fraud or unconscionability." *Palm Harbor Homes, Inc. v. McCoy*, 944 S.W.2d 716, 721 (Tex. App.—Fort Worth 1997, no writ); *see also* Tex. Civ. Prac. & Rem. Code § 171.001(b) (App. 66). "Because a trial court has no discretion to determine what the law is or to apply the law incorrectly, its clear failure to properly analyze or apply the law of unconscionability constitutes an abuse of discretion." *D.R. Horton-Tex., Ltd. v. Dragseth*, 02-12-000435, 2013 WL 3377121, at *3 (Tex. App.—Fort Worth July 3, 2013, no pet.) (citing *In re Poly-America, L.P.*, 262 S.W.3d 337, 348 (Tex. 2008)).

Generally, the trial court is empowered to decide challenges to the validity of an arbitration agreement. *Forest Oil Corp. v. McAllen*, 268 S.W.3d 51, 61 (Tex. 2008). However, if the parties' arbitration agreement clearly and unmistakably delegates questions regarding the agreement's validity and enforceability to the arbitrator, the court must enforce that provision. *Id.* If the trial court refuses to do so, the court of appeals has "no discretion but to direct the trial court to compel arbitration [of that issue] and stay [the] litigation." *Id.*

## Summary of the Argument

Arbitration agreements are favored by Texas public policy and must be enforced by the courts. *In re Olshan Found. Repair Co., LLC*, 328 S.W.3d 883, 892 (Tex. 2010). The evidence is uncontroverted that Bazan-Garcia agreed to arbitrate her disputes with WRPS. In addition, the parties expressly agreed that the arbitrator rather than the court would decide any question regarding the validity of their arbitration agreement—including the unconscionability defense that Bazan-Garcia raised before the trial court. Under these circumstances, the trial court had no discretion but to grant WRPS's motion to compel arbitration and stay the litigation. Its failure to do so here is clear error.

Additionally, even if Bazan-Garcia's unconscionability defense to arbitration could have been considered by the trial court, it was without merit. Bazan-Garcia claimed that under the parties' agreement, arbitration would be

6

prohibitively costly and prevent her from vindicating her statutory rights. In making her case, Bazan-Garcia entirely disregarded provisions of the contract that contradicted her interpretation, as well as the fact that the arbitrator can modify the complained-of provisions. Her arguments have already been rejected in similar cases by the Texas Supreme Court and Texas courts of appeals, and should have been rejected by the trial court. Finally, even if this Court concludes that it has the authority to consider Bazan-Garcia's defense and finds that one or more of the agreement's provisions is unconscionable, it is required to sever that provision so that the remainder of the arbitration agreement can be enforced.

Because WRPS met its burden of proving that the parties agreed to arbitrate this dispute, and because Bazan-Garcia failed to prove any valid defense to arbitration, this Court must reverse the judgment of the trial court and order it to compel arbitration of Bazan-Garcia's claims.

**Argument**

I. **The trial court erred in refusing to compel arbitration because Bazan-Garcia agreed to arbitrate her disputes with WRPS.**

WRPS presented uncontroverted evidence to the trial court that (1) Bazan-Garcia agreed to arbitrate her disputes with WRPS, and (2) all of Bazan-Garcia's claims fell within the scope of this agreement. *See infra* at 7–12. Bazan-Garcia did not contest any of this evidence, or deny that she signed and assented to the written arbitration agreements. Under the TAA, the trial court therefore had no

7

discretion to refuse to compel arbitration in this case. *See J.D. Edwards World Solutions*, 87 S.W.3d at 549; Tex. Civ. Prac. & Rem. Code § 171.001 (App. 66). Its refusal to do so denied WRPS the benefit of its bargain, and was error as a matter of law. *See Jack B. Anglin Co., Inc. v. Tipps*, 842 S.W.2d 266, 271 (Tex. 1992).

## A. WRPS proved that Bazan-Garcia agreed to arbitrate her disputes with WRPS.

Texas and federal policy strongly favor arbitration agreements. *Tipps*, 842 S.W.2d at 268. Under the TAA, if the party seeking to compel arbitration shows that the parties entered into a written and valid arbitration agreement and that their dispute falls within the scope of the agreement, "the '[trial] court has no discretion but to compel arbitration and stay its own proceedings.'" *Forest Oil, 268 S.W.3d at 56 n.14* (quoting *In re FirstMerit Bank, N.A.*, 52 S.W.3d 749, 753–54 (Tex. 2001)); Tex. Civ. Prac. & Rem. Code § 171.025(a) (App. 68) ("The court shall stay a proceeding that involves an issue subject to arbitration if an order for arbitration or an application for that order is made under this subchapter."). This rule extends to arbitration provisions that are incorporated by reference into the agreement. *See In re Halliburton Co., 80 S.W.3d 566, 569 (Tex. 2002)*.

It is undisputed that Bazan-Garcia agreed to the written arbitration provisions contained in the Arbitration Agreement and incorporated by reference in the Acknowledgement. Bazan-Garcia signed the Arbitration Agreement on

8

September 27, 2011. App. 3. The contract was clearly entitled "Arbitration Agreement," and contained an express provision stating that, other than a worker's compensation claim covered by insurance, all disputes between WRPS and Bazan-Garcia "shall be submitted to arbitration in accordance with the rules of the American Arbitration Association." *Id.* By presenting a signed copy of the Arbitration Agreement to the trial court, WRPS proved the existence of an arbitration agreement between the parties. *In re Palm Harbor Homes, Inc.*, 195 S.W.3d 672, 676 (Tex. 2006) ("Because the [defendant] presented a signed arbitration agreement to the court . . . and the [plaintiffs] have presented no evidence that they did not sign the agreement, we conclude that, as a matter of law, the existence of an arbitration agreement among the parties was established.").

WRPS also presented a signed and uncontroverted copy of the Acknowledgement to the trial court. *See* App. 4. The Acknowledgement was signed by Bazan-Garcia on September 20, 2011, and represented that she had received the Employee Handbook and "underst[oo]d that it [was her] responsibility to read and comply with the policies contained in this handbook and any revisions made to it." *Id.* The Employee Handbook contained an arbitration provision stating that any "[p]roblems, disputes, or claims not resolved through [voluntary internal dispute] resolution steps are subject to final and binding arbitration." App. 13. By signing the Acknowledgement that incorporated by reference the

9

Employee Handbook's policies, Bazan-Garcia accepted the Handbook's arbitration provision. *See In re Dallas Peterbilt, L.L.P.*, 196 S.W.3d 161, 163 (Tex. 2006) (holding that an at-will employee who signed an acknowledgement form stating he had "received and carefully read or been given the opportunity to read" a summary of the employer's arbitration policy had assented to arbitration); *Halliburton*, 80 S.W.3d at 569 (holding that an at-will employee who accepted an agreement that incorporated an arbitration provision by reference had assented to arbitrate his disputes with his employer).

## B.    WRPS proved that Bazan-Garcia's claims fall within the scope of her agreement to arbitrate.

WRPS also proved, and Bazan-Garcia did not dispute, that all of Bazan-Garcia's claims in this litigation fall within the scope of the arbitration provisions contained in the Arbitration Agreement and Acknowledgement.

"When deciding whether claims fall within an arbitration agreement, courts employ a strong presumption in favor of arbitration." *In re Rubiola*, 334 S.W.3d 220, 225 (Tex. 2011) (citing *Cantella & Co*, 924 S.W.2d at 944). "The policy in favor of arbitration agreements is so compelling that a court should not deny arbitration *unless it can be said with positive assurance* that an arbitration clause is *not* susceptible of an interpretation which would cover the dispute at issue. *Id.* (quoting *Prudential Sec. Inc. v. Marshall*, 909 S.W.2d 896, 899 (Tex. 1995)) (emphasis in original).

10

In her Original Petition, Bazan-Garcia alleged that she was wrongfully discharged by WRPS after she notified WRPS of an "on-the-job injury and/or initiated the filing of a workers' compensation claim." CR 11. In her Amended Petition, filed after the trial court denied WRPS's motion to compel arbitration, Bazan-Garcia also alleged that WRPS prevented her from exercising her FMLA rights and/or "terminated her [employment] in retaliation for invoking her FMLA rights." CR 150.

The arbitration provision in the parties' Arbitration Agreement clearly encompasses these disputes. It states that "other than a worker's compensation claim covered by insurance, no dispute between [WRPS] and [Bazan-Garcia] which is in any way related to the employment of [Bazan-Garcia], including but not limited to a claim for wrongful termination . . . shall be the subject of a lawsuit filed in any state or federal court." App. 3. Both of Bazan-Garcia's claims are related to her employment and expressly allege she was wrongfully terminated, and neither are a "worker's compensation claim covered by insurance." These claims must therefore be submitted to arbitration under the express terms of the Arbitration Agreement.

Bazan-Garcia's claims are also within the scope of the Employee Handbook's arbitration provision, incorporated by reference into the Acknowledgement. Pursuant to that provision, Bazan-Garcia agreed that she

11

would arbitrate any "[p]roblems, disputes, or claims not resolved through [voluntary internal dispute] resolution steps." App. 13. None of the claims alleged by Bazan-Garcia in this litigation have been resolved through WRPS's voluntary internal dispute resolution process.

WRPS met its burden before the trial court by proving that the parties agreed to arbitrate their disputes, and that all of Bazan-Garcia's claims are within the scope of that agreement. Under the TAA, this Court must therefore reverse and remand this case for the trial court to compel arbitration of Bazan-Garcia's claims. *See Forest Oil*, 268 S.W.3d at 56, 61; Tex. Civ. Prac. & Rem. Code § 171.021(c) (App. 67).

## II. The trial court abused its discretion by denying WRPS's motion to compel arbitration on the grounds that the parties' agreement was unconscionable, because that defense is itself subject to arbitration.

Bazan-Garcia raised a single challenge against arbitration: she argued that the parties' agreement is substantively unconscionable because it limits discovery, requires both parties to pay some arbitration costs, and requires arbitration to take place in Dallas County, Texas. CR 72. At the hearing the trial court agreed with Bazan-Garcia, *see* RR 18, and subsequently denied WRPS's motion to compel arbitration on this ground, *see* App. 1. But the parties' arbitration agreement clearly and unmistakably empowered the *arbitrator*—not the court—to decide any issues of arbitrability, including whether the arbitration

agreement is unconscionable. The trial court was therefore required under the TAA to compel arbitration of Bazan-Garcia's unconscionability defense, and abused its discretion by denying WRPS's motion on this ground. *See Ernst & Young LLP v. Martin*, 278 S.W.3d 497, 500 (Tex. App.—Houston [14th Dist.] 2009, no pet.) ("[A]n arbitration clause that reallocates traditional court functions to the arbitrator is enforceable and cannot serve as a basis for denying a motion to compel arbitration.").

## A. The parties' arbitration agreement clearly and unmistakably delegated issues of arbitrability to the arbitrator.

Under the TAA, like under the FAA, a party may revoke a written arbitration agreement "only on a ground that exists at law or in equity for the revocation of a contract," such as fraud or unconscionability. Tex. Civ. Prac. & Rem. Code § 171.001(b) (App. 66); *see also Forest Oil*, 268 S.W.3d at 56 n.12; 9 U.S.C. § 2 (FAA savings clause). The default rule is that the court decides such "gateway questions of arbitrability." *Rent-A-Center, West v. Jackson*, 561 U.S. 63, 68–69 (2010) (internal quotation marks omitted). However, the parties can delegate these issues to the arbitrator rather than the court, so long as the agreement "clearly and unmistakably" demonstrates that this was the parties' intent. *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 79 (2002); *see also In re Weekley Homes, L.P.*, 180 S.W.3d 127, 130 (Tex. 2005). Because "[t]he issue of arbitrability is subject to virtually identical analysis under either the FAA or the

13

TAA," courts may rely on authorities applying either statute in evaluating an agreement. *Saxa Inc. v. DFD Architecture Inc.*, 312 S.W.3d 224, 229 n.4 (Tex. App.—Dallas 2010, pet. denied).

"When, as here, parties agree to a broad arbitration clause and explicitly incorporate rules that empower an arbitrator to decide issues of arbitrability, the incorporation serves as clear and unmistakable evidence of the parties' intent to delegate such issues to an arbitrator." *Saxa*, 312 S.W.3d at 230. In *Saxa*, for example, the parties agreed to arbitrate "any claim, dispute or other matter" related to their contract, "in accordance with the Construction Industry Arbitration Rules of the American Arbitration Association." *Id.* at 226 (modification omitted). The AAA Construction Rules contain a delegation clause empowering the arbitrator "to rule on his or her own jurisdiction, including any objections with respect to the existence, scope or validity of the arbitration agreement." *Id.* at 228–29.

Because the parties' broad arbitration agreement incorporated the AAA Rules, the court of appeals held that the parties' arbitrability dispute—in that case, whether joinder was permissible—had to be decided by the arbitrator rather than the court. *Id.* at 230. It emphasized that a majority of courts have reached this same conclusion. *Id.* (collecting cases); *see also Aspri Inv., LLC*, 04-10-00573-CV, 2011 WL 3849487, at *9 (Tex. App.—San Antonio 2011, pet. dism'd)

14

(enforcing the AAA Rules' delegation clause because incorporating the Rules into an agreement to arbitrate all disputes related to the parties' lease "constitutes clear and unmistakable evidence of the parties' intent to delegate issues of arbitration to the arbitrator"); *Petrofac, Inc. v. Dyn McDermott Petroleum Operations Co.*, 687 F.3d 671, 675 (5th Cir. 2012) ("We agree with most of our sister circuits that the express adoption of the [AAA] rules presents clear and unmistakable evidence that the parties agreed to arbitrate arbitrability.").

The same result is required here. The AAA Employment Rules contain a delegation clause that is identical to the one enforced in *Saxa*: "[t]he arbitrator shall have the power to rule on his or her own jurisdiction, including any objections to the existence, scope or validity of the arbitration agreement." AAA Rule 6(a) (App. 30). The Employee Handbook, incorporated by reference into the Acknowledgement, states that all "[p]roblems, disputes, or claims not resolved through [voluntary internal dispute] resolution steps are subject to final and binding arbitration . . . conducted under the Employment Dispute Resolution Rules of the American Arbitration Association." App. 13. *See Contec Corp. v. Remote Solution, Co., Ltd.*, 398 F.3d 205, 208 (2d Cir. 2005) (agreement clearly and unmistakably delegated issues of arbitrability to the arbitrator by requiring parties to use "best efforts" to resolve their dispute or submit it to arbitration under the AAA Rules). The Arbitration Agreement provides that "to resolve in a speedy and

15

inexpensive way any legal controversy which may arise," the parties must arbitrate any dispute "which is in any way related to the employment of [Bazan-Garcia] . . . in accordance with the rules of the American Arbitration Association." App 3. Only a "worker's compensation claim covered by insurance" is exempt, *see id.*, as such claims cannot be the subject of an arbitration agreement under state law. *See* Tex. Civ. Prac. & Rem. Code § 171.002(a)(4).

Bazan-Garcia and WRPS entered into agreements with broad arbitration provisions that incorporated all of the AAA Employment Rules, including the delegation clause. The parties did not reserve the right to seek judicial relief for a broad array of claims, or specify that the AAA Rules would only apply to their agreement in a limited manner. *Compare with Burlington Res. Oil & Gas Co. LP v. San Juan Basin Royalty Trust*, 249 S.W.3d 34, 42–43 (Tex. App.—Houston [1st Dist.] 2007, pet. denied) (holding agreement did not incorporate delegation clause where parties agreed to arbitrate only certain "audit disputes" and specified the agreement's terms controlled over the AAA Rules in the event of a conflict); *Haddock v. Quinn*, 287 S.W.3d 158, 174–75 (Tex. App.—Fort Worth 2009, pet. denied) (holding agreement did not delegate arbitrability to arbitrator because it only incorporated the AAA Rules "to the extent not inconsistent" with the agreement and specified in detail the procedures and scope of arbitration (internal quotation marks omitted)). Consequently, Bazan-Garcia

16

and WRPS clearly and unmistakably agreed that the arbitrator rather than the court would decide any arbitrability disputes between them, and the trial court abused its discretion by refusing to enforce that bargain. *See Ernst & Young LLP*, 278 S.W.3d at 501 (granting mandamus relief where trial court failed to enforce an unchallenged delegation clause).

## B. Bazan-Garcia is bound to arbitrate her unconscionability defense because she failed to prove that the delegation clause was invalid.

Because she agreed to delegate issues of arbitrability to the arbitrator, Bazan-Garcia could only have the trial court decide her unconscionability defense if she proved that the delegation clause itself was invalid and unenforceable. *Rent-A-Center*, 561 U.S. 63. Instead, Bazan-Garcia focused on proving the merits of her unconscionability defense, *see* CR 72–82, and erroneously claimed that the trial court could decide that issue because her petition alleged a statutory cause of action, *see* RR 13. Neither of these grounds allows Bazan-Garcia to avoid the delegation clause in her agreements.

Bazan-Garcia's unconscionability defense is nearly identical to one raised by the plaintiff in *Rent-A-Center*, which the U.S. Supreme Court held had to be decided by the arbitrator rather than the court. *See* 561 U.S. 63. The plaintiff in *Rent-A-Center* filed a statutory employment-discrimination lawsuit against his former employer, and opposed arbitration on the grounds that the agreement was unconscionable because it limited discovery and required the parties to split the

17

costs of arbitration. *Id.* at 74. The parties' arbitration agreement included a provision delegating issues of arbitrability to the arbitrator. *Id.* at 66. Despite this provision, the U.S. Court of Appeals for the Ninth Circuit held that "the threshold question of unconscionability [was] for the court" to decide. *Id.* at 67.

The Supreme Court reversed. *Id.* at 74–76. Because a "delegation provision is an agreement to arbitrate threshold issues concerning the arbitration agreement" and must be enforced like any other contract, the plaintiff could only avoid it by proving that the clause *itself* was invalid. *Id.* at 69–70. Before the trial court, however, the plaintiff focused solely on proving the merits of his unconscionability defense. *Id.* at 73–74 (explaining that plaintiff "did not make any arguments specific to the delegation provision; [instead] he argued that the fee-sharing and discovery procedures rendered the *entire* Agreement invalid") (emphasis in original). Consequently, the Supreme Court held that the trial court was required to compel arbitration of the plaintiff's unconscionability defense. *Id.* at 75. It refused to consider a challenge to the delegation provision that the plaintiff raised for the first time in his brief to the Supreme Court, on the grounds that it was "too late." *Id.* at 75–76.

Like the plaintiff in *Rent-A-Center*, Bazan-Garcia opposed WRPS's motion to compel arbitration on the grounds that the agreement limited the parties' access to discovery and required them to split arbitration costs, and is therefore

unconscionable. *See* CR 72. But even though WRPS's motion discussed and analyzed the delegation clause that was incorporated into the parties' arbitration agreement, *see* CR 25–28, Bazan-Garcia's response did not address that clause at all. Instead, Bazan-Garcia focused solely on the merits of her unconscionability defense. *See* CR 72–82. Because Bazan-Garcia failed to prove that the delegation clause is invalid, she is bound to that agreement. *See Rent-A-Center*, 561 U.S. at 74.

In addition, Bazan-Garcia cannot avoid arbitration based on the statutory nature of her claims. At the hearing, Bazan-Garcia suggested that the trial court was not required to enforce the delegation clause because her asserted causes of action are based on a statute. *See* RR 13. But Bazan-Garcia has failed to identify any case in which a court refused to enforce a delegation clause on the grounds that the party opposing arbitration was asserting statutory claims, and WRPS is aware of no such authority. To the contrary, the claims that the plaintiff filed against his employer in *Rent-A-Center* were statutory in nature, and that fact had no bearing on the Court's decision to enforce the delegation clause. *See* 561 U.S. at 74–75; *see also IHS Acquisition No. 171, Inc. v. Beatty-Ortiz*, 387 S.W.3d 799, 808 (Tex. App.—El Paso 2012, no pet.) (enforcing delegation clause in arbitration agreement in case where plaintiff alleged gender-discrimination claims against employer).

"[A] trial court has no discretion to determine what the law is or to apply the law incorrectly." *Poly-America*, 262 S.W.3d at 349. The law in this area is clear: a court has no discretion to refuse to enforce an unchallenged delegation clause. *See Rent-A-Center*, 561 U.S. at 75–76; *Forest Oil*, 268 S.W.3d at 61 (holding that because the arbitration agreement's delegation clause was "not challenged on any legal or public policy grounds," the Court had "no discretion but to direct the court to compel arbitration and stay [this] litigation"). If Bazan-Garcia believes that the arbitration agreement is unconscionable, she can still make that argument. In accordance with her agreements, however, she must do so in the forum of arbitration.

## III. In the alternative, the trial court erred in denying WRPS's motion to compel arbitration because Bazan-Garcia did not prove that the parties' arbitration agreement is unconscionable.

A party opposing arbitration on the grounds of unconscionability bears the heavy burden of proving this defense. *In re Olshan Found. Repair Co., LLC*, 328 S.W.3d 883, 893 (Tex. 2010). Bazan-Garcia failed to meet that rigorous standard. Arbitration of her claims was therefore required, even if the trial court had authority to consider the merits of this defense.

### A. Legal Standard

"Whether a contract is . . . unconscionable at the time it is formed is a question of law." *Poly-America*, 262 S.W.3d at 349 (citing *Hoover Slovacek LLP*

20

*v. Walton*, 206 S.W.3d 557, 562 (Tex. 2006)).  "In general, a contract will be found unconscionable if it is grossly one-sided." *Id.* at 348; *see also Venture Cotton Co-op v. Freeman*, 435 S.W.3d 222, 228 (Tex. 2014) ("One of the earliest decisions to apply the defense described an unconscionable contract as one that 'no man in his senses and not under delusion would make on the one hand, and as no honest and fair man would accept on the other.'") (internal citation omitted).  Because arbitration is a favored method of dispute resolution, the Texas Supreme Court has cautioned that courts "'should be wary of setting the bar for holding arbitration clauses unconscionable too low' as that would undermine the 'liberal federal policy favoring arbitration agreements.'" *Venture Cotton*, 435 S.W.3d at 232 (quoting *Olshan*, 328 S.W.3d at 893).

"Agreements to arbitrate disputes between employers and employees are generally enforceable under Texas law; there is nothing per se unconscionable about an agreement to arbitrate employment disputes and, in fact, Texas law has historically favored agreements to resolve such disputes by arbitration." *Poly-America*, 262 S.W.3d at 348.  Nor is there anything inherently unconscionable about an agreement to arbitrate a statutory claim.  "When parties agree to arbitrate a statutory claim, 'a party does not forego the substantive rights afforded by the statute; it only submits to their resolution in an arbitral, rather than a judicial, forum.'" *Venture Cotton*, 435 S.W.3d at 229 (quoting *Mitsubishi Motors Corp. v.*

21

*Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 628 (1985)). Thus, "an arbitration agreement covering statutory claims is valid so long as the arbitration agreement does not waive substantive rights and remedies of the statute and the arbitration procedures are fair so that the employee may effectively vindicate his statutory right." *Id.* (quoting *Poly-America*, 262 S.W.3d at 352).

**B.      Bazan-Garcia failed to prove that arbitration under the parties' agreement would be more expensive than litigation, and effectively prevent her from vindicating her statutory rights.**

Bazan-Garcia claims that the parties' agreement requires her to split the costs of arbitration equally with WRPS, and that AAA arbitration of her claims could cost upward of $20,000. CR 77–78. She contends that this would effectively force her to abandon these claims, because she cannot "risk incurring a substantial debt exceeding $10,000.00 in arbitrator fees." CR 81.

In assessing whether an arbitration agreement is unconscionable, the court must determine whether the cost of arbitration would effectively prevent the claimant from pursuing and vindicating her statutory rights. *Poly-America*, 262 S.W.3d at 356. The agreement may be "unconscionable if 'the existence of large arbitration costs could preclude a litigant from effectively vindicating his or her federal [or state] statutory rights in the arbitral forum.'" *Olshan*, 328 S.W.3d at 892 (quoting *Green Tree Fin. Corp.-Ala. v. Randolph*, 531 U.S. 79, 90 (2000)) (internal modifications omitted). Because arbitration is favored, it is not enough

for the claimant to show there is a "risk" that arbitration will be prohibitively expensive. *Id.* at 892. Instead, "[t]he party opposing arbitration bears the burden to show that the costs of arbitration render it unconscionable . . . [by] 'showing the likelihood of incurring such costs.'" *Id.* at 893 (quoting *Green Tree*, 531 U.S. at 92); *see also FirstMerit Bank*, 52 S.W.3d at 757 ("Because the record contains no specific evidence that the [plaintiffs] will actually be charged excessive arbitration fees, we conclude that there is legally insufficient evidence that the plaintiffs would be denied access to arbitration based on excessive costs."). In making this determination, "a comparison of the total cost of [arbitration and litigation] is the most important factor." *Olshan*, 328 S.W.3d at 894–95.

### 1. Bazan-Garcia failed to prove that arbitrating her claims is likely to cost upwards of $20,000.

Bazan-Garcia estimated that arbitration in this case would cost more than $20,000, based on the costs of three allegedly similar arbitrations that were conducted through the AAA. CR 85–94. The parties' agreement, however, does not require them to pursue arbitration through the AAA; it only states that arbitration will be conducted "in accordance with" and "under" the AAA Rules. App. 3, 13. "Under this language, the AAA may administer the arbitration, but the parties are not required to have the arbitration administered by the AAA." *Aspen Tech., Inc. v. Shasha*, 253 S.W.3d 857, 864 (Tex. App.—Houston [14th Dist.] 2008, no pet.). Moreover, evidence of what costs were incurred by other parties in

23

other arbitrations is, by itself, legally insufficient to meet Bazan-Garcia's burden of proving what arbitration will cost her in this particular case.

In *Shasha*, the parties entered into an arbitration agreement stating that arbitration would be "in accordance with the [AAA] Rules." 253 S.W.3d at 864. In support of its argument that arbitration would prohibitively expensive, the plaintiff presented evidence showing what amounts were likely to be charged by the AAA and AAA arbitrators. *Id.* The court of appeals found that this evidence was "legally insufficient to support the trial court's implied finding that [the plaintiff] satisfied his burden of providing specific evidence showing a likelihood that he would be denied access to arbitration based on excessive arbitration costs," since the parties were not obligated to arbitrate through the AAA. *Id.* The court of appeals held the trial court had abused its discretion by denying the defendant's motion to compel arbitration on this basis. *Id.* at 865. Bazan-Garcia's evidence in support of her unconscionability defense is also "legally insufficient," as it similarly presumes that arbitration will take place through the AAA. *See also Green Tree*, 531 U.S. at 91 n.6 (holding that plaintiff failed to provide any "basis on which to ascertain the actual costs and fees to which she would be subject in arbitration" because she "failed to make any factual showing that the [AAA] would conduct the arbitration, or that, if it did, she would be charged the filing fee or arbitrator's fee that she identified").

24

In addition, Bazan-Garcia's evidence was inadequate because it relied entirely on fees that other parties have incurred. In *Olshan*, the plaintiffs argued that arbitration would be prohibitively costly, and in support of this claim "provided two invoices from the AAA for arbitration in, as the [plaintiffs] allege, 'similar cases' to show the likelihood of excessive litigation costs." 328 S.W.3d at 897. The Supreme Court held that "[m]erely showing that other claimants have incurred arbitration costs of some amount falls well short of specific evidence that these particular parties will be charged excessive fees." *Id.* The Court also noted that there was no evidence that the plaintiffs had "made any effort to reduce the likely charges through requests for fee waivers, pro bono, arbitrators, or even simply requesting a one arbitrator panel." *Id.* Because "[s]ubstantive unconscionability threatens to become the exception that swallows the rule if all that must be done to avoid arbitration is to assume the most expensive possible scenario," the Court concluded that "there is no legally sufficient evidence that [the arbitration] fees prevent the [plaintiffs] from effectively pursuing their claim in the arbitral forum." *Id.* at 897. Like the plaintiffs in *Olshan*, Bazan-Garcia's evidence consisted entirely of invoices from other arbitrations, *see* CR 85–95, and therefore did not support the trial court's finding that the parties' agreement was unconscionable.

25

### 2. Under the parties' agreement, WRPS will bear almost all of the costs of arbitration.

Regardless of what the overall cost of arbitrating her claims may be, Bazan-Garcia's contention that she will be forced to bear half of these costs is directly contradicted by the terms of the parties' agreement. The Employee Handbook, on which Bazan-Garcia relies, states that "[e]mployees who choose to use the arbitration process to resolve a problem will be expected to share the cost of the arbitration proceeding with WRPS, LP." App. 13. This provision does not require the parties to equally split the costs of arbitration, and Bazan-Garcia provides no authority in support of her interpretation of this language.

Moreover, pursuant to the AAA Rules that the parties agreed to, arbitration costs under an employer-promulgated plan such as the one at issue in this case are almost entirely borne by the employer, rather than divided evenly between the parties. *See* App. 45–47. Bazan-Garcia is only required to pay an initial filing fee—$200 if she files with the AAA—and may also have to pay additional fees if she postpones or cancels a scheduled hearing, as well as bear any expenses for witnesses that she chooses to produce at the hearing. AAA Rule 45 (App. 43); AAA Rule 48(i) (App. 45); AAA Rule 48(iii) (App. 47). These administrative fees may be "defer[red] or reduce[d]" if Bazan-Garcia shows that they would cause her "extreme hardship." AAA Rule 43 (App. 43). WRPS, in contrast, will be responsible for paying a non-refundable filing fee in the amount of

26

$1,350.  WRPS must also pay all fees associated with the hearings, and all of the arbitrator's fees and expenses.  AAA Rule 48(i)–(iii) (App. 45–47).

The AAA Rules are controlling over any allegedly contrary provision in the parties' arbitration agreement, and would therefore defeat Bazan-Garcia's unconscionability argument even if her reading of the Employee Handbook's cost-sharing clause was correct.  *See* AAA Rule 1 (App. 28) (arbitrator must apply AAA Rules if "an adverse material inconsistency exists between the arbitration agreement and these rules").  Far from causing Bazan-Garcia to "risk incurring a substantial debt exceeding $10,000.00," CR 82, therefore, the agreement only requires Bazan-Garcia to pay a filing fee of $200.00—less than the fee she paid to file this lawsuit in state court, *see id.* at 81 (stating that Bazan-Garcia paid 280.00 in expenses to file her lawsuit in state court).  Even that small fee could be avoided or reduced if Bazan-Garcia shows that it would be overly burdensome, *see* AAA Rule 43 (App. 43), or files the arbitration outside of the AAA.  Furthermore, by pursuing her claims in arbitration rather than litigation, Bazan-Garcia could decrease her overall expenses by avoiding lengthy and expensive discovery and appeals.  *See Olshan*, 328 S.W.3d at 894 ("The desire to avoid steep litigation expenses—including the costs of longer proceedings, more complicated appeals on the merits, discovery, investigations, fees, and expert witnesses—is the purpose of arbitration in the first place." (citing *Tipps*, 842 S.W.2d at 272–73)).

Because Bazan-Garcia failed to prove that arbitration will be more costly than litigation and thereby prevent her from vindicating her statutory rights, she failed to show that the arbitration agreement is unconscionable. *See Olshan, 328 S.W.3d at 894–95*.

**C.     An arbitration agreement cannot be found unconscionable based on provisions that the arbitrator is empowered to modify.**

Bazan-Garcia took issue with three provisions in the parties' agreement: (1) the requirement that the parties "share" some costs of arbitration, (2) the prohibition on either party taking more than one deposition; and (3) conducting the arbitration hearing in Dallas County, Texas. CR 72. None of these provisions is inherently unconscionable, and Bazan-Garcia does not claim they are. *See, e.g., Poly-America,* 262 S.W.3d at 355–56 (holding that "fee-splitting provisions that operate to prohibit an employee from fully and effectively vindicating statutory rights are not enforceable," but declining to hold that fee-splitting or fee-sharing agreements are "unenforceable per se"); *see also id.* at 357 (enforcing an arbitration agreement limiting the parties to one deposition each because the plaintiff failed to prove it was "insufficient to allow [him] a fair opportunity to present his claims" (quoting *Gilmer v. Interstate/Johnson Lane Corp.,* 500 U.S. 20, 31 (1991)). Moreover, if circumstances cause any of these provisions to become unconscionable, the arbitrator has the power to modify them.

The trial court therefore abused its discretion by finding that the arbitration is unconscionable.

As a matter of law, an agreement is not unconscionable if its potentially objectionable provisions can be modified by the arbitrator. In *Poly-America*, for example, the parties entered into an agreement that required them to equally split the costs of arbitration up to a particular amount, and limited the amount of discovery that each party could pursue, including only allowing each side to take "one oral deposition of no more than six hours." 262 S.W.3d at 344. Like Bazan-Garcia, the plaintiff in *Poly-America* alleged that his employer had wrongfully discharged him in retaliation for filing a workers' compensation claim, and opposed arbitration on the grounds that the agreement's cost-splitting provisions and discovery limitations would effectively prevent him from vindicating his statutory rights. *Id.*

The Supreme Court rejected both of these challenges. The parties' agreement "specifically provide[d] that the arbitrator may modify unconscionable terms." *Id.* at 357. As a result, at this stage of the proceedings the plaintiff could not show a likelihood that he would be forced to pay the complained-of costs, or unable to obtain necessary discovery. *Id.* at 357–58 (describing the plaintiff's arguments as "speculative"); *see also FirstMerit Bank, N.A.*, 52 S.W.3d at 757 (holding plaintiffs failed to prove arbitration agreement was unconscionable

29

because "the AAA may, in the event of extreme hardship on the part of any party, defer or reduce the administrative fees"). The Court also emphasized that the arbitrator, rather than the court, "is better situated to assess" whether the cost or discovery provisions in the agreement would hinder the plaintiff's ability to vindicate his statutory rights, and "to modify the contract's terms accordingly." *Poly-America*, 262 S.W.3d at 357–58.

For the reasons given by the Supreme Court in *Poly-America*, Bazan-Garcia cannot prove that any of the provisions she complains of make the arbitration agreement unconscionable. Under the AAA Rules, Bazan-Garcia is only required to pay an initial filing fee, while WRPS must pay virtually all other expenses of arbitration. *See* App. 45–47. If paying the $200 filing fee would cause Bazan-Garcia "extreme hardship," then the AAA may "defer or reduce" it. AAA Rule 43 (App. 43). Likewise, limiting each party to taking one deposition is not unconscionable, since "[t]he arbitrator shall have the authority to order such discovery, by way of deposition, interrogatory, document production, or otherwise, as the arbitrator considers necessary to a full and fair exploration of the issues in dispute, consistent with the expedited nature of arbitration." AAA Rule 9 (App. 32). Finally, the agreement's venue provision is not unconscionable because the arbitrator may ultimately decide the locale of the arbitration, "having regard for the

30

contentions of the parties and the circumstances of the arbitration." AAA Rule 10 (App. 32).[3]

An arbitration agreement is unconscionable only if it is "so one-sided that it is unconscionable under the circumstances existing when the parties made the contract," *FirstMerit Bank*, 52 S.W.3d at 757, and "sufficiently shocking or gross to compel the court to intercede." *Ski River Dev., Inc. v. McCalla*, 167 S.W.3d 121, 136 (Tex. App.—Waco 2005, pet. denied). The agreements between Bazan-Garcia and WRPS do not meet this standard. They incorporate the AAA Rules and are typical for arbitration agreements between employers and their employees, as well as similar to those upheld by the Supreme Court in *Poly-America*. Indeed, it will be less expensive for Bazan-Garcia to arbitrate her claims than to try (and appeal) those claims in state court, *see infra* at Part III.B., and she will also have the opportunity to ask the arbitrator to change any objectionable cost, discovery, and venue provisions, *see infra* at Part III.C. By finding such an agreement unconscionable, the trial court abused its discretion, and its judgment must be reversed. *See Poly-America*, 262 S.W.3d at 349.

---

[3]    In addition, none of these provisions is "one-sided," which is generally required for a provision to be deemed unconscionable. *See In re FirstMerit Bank, N.A.*, 52 S.W.3d 749, 757 (Tex. 2001).

**IV.  If any provision of the arbitration agreement is unconscionable, this Court should sever it and enforce the remainder of the agreement.**

Finally, if this Court concludes that any of the arbitration agreement's terms is unconscionable, then it should sever that term and remand the case for the trial court to compel arbitration under the remainder of the agreement.

"[W]here a term rather than the entire contract is unconscionable, the appropriate remedy is ordinarily to deny effect to the unconscionable term." *Venture Cotton*, 435 S.W.3d at 230 (quoting Restatement (Second) of Contracts § 208 cmt. g (1981)) (internal modification omitted); *see also Poly-America*, 262 S.W.3d at 360 ("An illegal or unconscionable provision of a contract may generally be severed so long as it does not constitute the essential purpose of the agreement.").  In *Venture Cotton*, the issue was whether a provision in an arbitration agreement that prohibited the plaintiff from recovering attorneys' fees under the Texas Deceptive Trade Practices Act was unconscionable.  The Texas Supreme Court held that if the provision was unconscionable, then the court of appeals should have severed it and enforced the remainder of the agreement, even though the defendant had not requested this remedy from the trial court.  435 S.W.3d at 230 (explaining that on interlocutory appeal, "[c]onservation of time and resources recommend that we consider the issue now because nothing prevents [the defendant] from urging severance in the trial court and, if denied, from renewing its complaint in yet another interlocutory appeal").

Bazan-Garcia claims that three provisions in the parties' arbitration agreement are unconscionable: the cost-sharing provision, the limitation on depositions, and the venue clause. None of these provisions constitutes the "essential purpose of the agreement," *Poly-America*, 262 S.W.3d at 360, which is "to resolve in a speedy and inexpensive way, any legal controversy that may arise," App. 3. Consequently, if any or all of these provisions is found to be unconscionable, it must be severed so that the remainder of the arbitration agreement can be enforced. *See Venture Cotton*, 435 S.W.3d at 230–31 (holding that "the court of appeals erred in declining to sever the objectionable limitation" from the arbitration agreement).

## Conclusion and Prayer for Relief

For the reasons set forth above, WRPS respectfully requests the Court reverse the trial court's Order denying WRPS's motion to compel arbitration, and direct the trial court to compel arbitration of all of Bazan-Garcia's claims and abate this litigation.

Respectfully submitted,

**BAKER BOTTS L.L.P.**

By: */s/ Jennifer M. Trulock*
    Jennifer M. Trulock
    State Bar No. 90001515
    2001 Ross Avenue, Suite 600
    Dallas, Texas 75201
    (214) 953-6500  Telephone
    (214) 953-6503  Facsimile
    jennifer.trulock@bakerbotts.com

    Stephanie F. Cagniart
    State Bar No. 24079786
    98 San Jacinto Boulevard, Suite 1500
    Austin, Texas 78701-4078
    (512) 322-2500  Telephone
    (512) 322-2501  Facsimile
    stephanie.cagniart@bakerbotts.com

**ATTORNEYS FOR APPELLANT
WESTERN RIM PROPERTY
SERVICES, INC.**

## Certificate of Compliance

This brief complies with the type-volume limitations of Tex. R. App. P. 9.4, as it contains 7,637 words, excluding the parts of the brief exempted by Rule 9.4(i)(1).

/s/ Stephanie F. Cagniart
Stephanie F. Cagniart

## Certificate of Service

I hereby certify that on December 24, 2014, a copy of the foregoing was served by the Court's CM/ECF electronic service and by electronic mail on the following parties:

Javier Espinoza
Josue F. Garza
The Espinoza Law Firm, PLLC
503 E. Ramsey, Ste. 103
San Antonio, Texas 78216
210-229-1302 (Facsimile)
josue@espinozafirm.com

/s/ Stephanie F. Cagniart
Stephanie F. Cagniart

**Index to Appendix**

A.   Trial Court's Order Concerning Defendant's Motion to Compel Arbitration and Motion for Protective Order  (App. 1–2)

B.   Arbitration Agreement  (App. 3)

C.   Employee Acknowledgement Form  (App. 4)

D.   Employee Handbook, WRPS, LP  (App. 5–13)

E.   Employment Arbitration Rules and Mediation Procedures, American Arbitration Association  (App. 14–65)

F.   Tex. Civ. Prac. & Rem. Code §§ 171.001, 171.021 and 171.025  (App. 66–68)

# APPENDIX

# EXHIBIT A

# 2014CV01064

E-FILED
Bexar County, County Clerk
Gerard Rickhoff
Accepted Date:11/10/2014 9:10:58 AM
Accepted By: Leticia Silva
Leticia Silva
Deputy Clerk

CAUSE NO. 2014CV01064

| | | |
|---|---|---|
| PAULA BAZAN-GARCIA, | § | IN THE COUNTY COURT |
| | § | |
| Plaintiff. | § | |
| | § | |
| v. | § | AT LAW NO. 03 |
| | § | |
| WESTERN RIM PROPERTY SERVICES, | § | |
| INC. | § | |
| | § | |
| Defendant | § | BEXAR COUNTY, TEXAS |

## ORDER CONCERNING DEFENDANT'S MOTION TO COMPEL ARBITRATION AND MOTION FOR PROTECTIVE ORDER

On this the 6th day of November 2014 came to be heard Defendant's Motion to Compel Arbitration and Motion for Protective Order. The Court having considered the Motions and all applicable arguments, case law and evidence is of the opinion that the arbitration policy contained in Defendant's dispute resolution policy is unconscionable and unenforceable.

IT IS THEREFORE ORDERED, ADJUDGED AND DECREED that Defendant's Motion to Compel Arbitration is hereby in all things DENIED.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that Defendant's Motion for Protective Order is hereby in all things DENIED.

SIGNED and ENTERED this the ___ day of _____, 2014.

_____
HON. JUDGE PRESIDING

APPROVED AS TO FORM:

13

144

JOSUE F. GARZA
Espinoza Law Firm, PLLC
Attorneys for Plaintiff
503 E. Ramsey, Ste. 103
San Antonio, Texas 78216

JENNIFER . TRULOCK
STEPHANIE F. CAGNIART
98 San Jacinto Boulevard, Suite 1500
Austin, Texas 78701-4078

14

145

# EXHIBIT B

## ARBITRATION AGREEMENT

It is in the interest of WRPS III, LP and their employees to resolve in a speedy and inexpensive way, any legal controversy that may arise. Therefore, other than a worker's compensation claim covered by insurance, no dispute between the companies and the undersigned which is in any way related to the employment of the undersigned, including but not limited to a claim for wrongful termination, discrimination and/or harassment, and worker's compensation not covered by insurance, shall be the subject of a lawsuit filed in any state or federal court. Instead, any such dispute shall be submitted to arbitration in accordance with the rules of the American Arbitration Association ("AAA"). Prior to the filing of any such proceeding, the filing party shall give twenty (20) days prior written notice.

Each party to arbitration shall be entitled to take only one deposition. Any arbitration relating to any dispute covered by this Agreement shall be arbitrated in Dallas County, Texas.

At the conclusion of the arbitration, the arbitrator shall make such findings of fact and state the evidentiary basis of such finding. The Arbitrator shall also issue a ruling and explain how the findings of fact justify his ruling. Any court of competent jurisdiction shall enter judgment on the arbitration award and shall review the award as permitted by law.

BY: _____

Marcus D Hiles
President
WRPS III, LP

Date: _____9/7/06_____

By: _____

Date: _____9-27-11_____

39

# EXHIBIT C



*WRPS III, LP*
*Employee Handbook WRPS III, LP*

EMPLOYEE ACKNOWLEDGEMENT FORM

The employee handbook describes important information about WRPS III, LP, and I understand that I should consult the Human Resources Department regarding any questions not answered in the handbook.

I have entered into my employment relationship with WRPS III, LP voluntarily and acknowledge that there is no specified length of employment. Accordingly, either I or WRPS III, LP can terminate the relationship at will, with or without cause, at any time, so long as there is no violation of applicable federal or state law.

Since the information, policies, and benefits described here are necessarily subject to change, I acknowledge that revisions to the handbook may occur, except to WRPS III, LP's policy of employment-at-will. All such changes will be communicated through official notices, and I understand that revised information may supersede, modify, or eliminate existing policies. Only the chief executive officer of WRPS III, LP has the ability to adopt any revisions to the policies in this handbook.

Furthermore, I acknowledge that this handbook is neither a contract of employment nor a legal document. I have received the handbook, and I understand that it is my responsibility to read and comply with the policies contained in this handbook and any revisions made to it.

EMPLOYEE'S NAME (printed): *Paula C. Bazan-Garcia*

EMPLOYEE'S SIGNATURE: *Paula C. L. Garcia*

DATE: *Sept 20, 2011*

1
App.004

# EXHIBIT D



# Employee Handbook
# WRPS, LP

10/01/2011

45

App.005



**WRPS, LP**

## Table of Contents

| No. | Policy | Effective Date: | Revision Date: | Page |
|-----|--------|-----------------|----------------|------|
| **INTRODUCTION** | | | | |
| 020 | Employee Welcome Message | 12/1/1999 | 1/1/2006 | 1 |
| 030 | Organization Description | 12/1/1999 | 1/1/2006 | 2 |
| 040 | Introductory Statement | 12/1/1999 | 1/1/2006 | 3 |
| 051 | Employee Acknowledgement Form | 12/1/1999 | 1/1/2006 | 4 |
| **EMPLOYMENT** | | | | |
| 101 | Nature of Employment | 12/1/1999 | 1/1/2000 | 5 |
| 102 | Employee Relations | 12/1/1999 | 1/1/2006 | 6 |
| 103 | Equal Employment Opportunity | 12/1/1999 | 1/1/2006 | 7 |
| 104 | Business Ethics and Conduct | 12/1/1999 | 1/1/2006 | 8 |
| 107 | Immigration Law Compliance | 12/1/1999 | 1/1/2000 | 9 |
| 108 | Conflicts of Interest | 12/1/1999 | 1/1/2006 | 10 |
| 110 | Outside Employment | 12/1/1999 | 1/1/2006 | 11 |
| 112 | Non-Disclosure | 12/1/1999 | 1/1/2006 | 12 |
| 114 | Disability Accommodation | 12/1/1999 | 1/1/2006 | 13 |
| 180 | Personal Relationships in the Workplace | 11/19/2004 | 1/1/2006 | 14 |
| **EMPLOYMENT STATUS & RECORDS** | | | | |
| 201 | Employment Categories | 12/1/1999 | 1/1/2006 | 16 |
| 202 | Access to Personnel Files | 12/1/1999 | 1/1/2006 | 18 |
| 203 | Employment Reference Checks | 12/1/1999 | 1/1/2000 | 19 |
| 204 | Personnel Data Changes | 12/1/1999 | 1/1/2006 | 20 |
| 205 | Introductory Period | 12/1/1999 | 1/1/2006 | 21 |
| 208 | Employment Applications | 12/1/1999 | 1/1/2006 | 22 |
| 209 | Performance Evaluation | 12/1/1999 | 1/1/2006 | 23 |
| 210 | Job Descriptions | 12/1/1999 | 1/1/2006 | 24 |
| 280 | Confidentiality of Salary | 12/1/1999 | 1/1/2006 | 25 |
| **EMPLOYEE BENEFIT PROGRAMS** | | | | |
| 301 | Employee Benefits | 12/1/1999 | 1/1/2006 | 26 |
| 303 | Vacation Benefits | 12/1/1999 | 10/1/2009 | 27 |
| 304 | Child Care Benefits | 12/1/1999 | 1/1/2006 | 29 |
| 305 | Holidays | 12/1/1999 | 1/1/2006 | 30 |

App.006



**WRPS, LP**

| | | | | |
|---|---|---|---|---|
| 307 | Sick Leave Benefits | 12/1/1999 | 10/1/2009 | 31 |
| 308 | Time Off to Vote | 12/1/1999 | 1/1/2006 | 33 |
| 309 | Bereavement Leave | 12/1/1999 | 1/1/2006 | 34 |
| 310 | Relocation Benefits | 12/1/1999 | 1/1/2006 | 35 |
| 311 | Jury Duty | 12/1/1999 | 1/1/2006 | 36 |
| 312 | Witness Duty | 12/1/1999 | 1/1/2006 | 37 |
| 313 | Benefits Continuation (COBRA) | 12/1/1999 | 1/1/2006 | 38 |
| 314 | Educational Assistance | 12/1/1999 | 1/1/2006 | 39 |
| 316 | Health Insurance | 12/1/1999 | 1/1/2006 | 40 |
| 317 | Life Insurance | 12/1/1999 | 1/1/2006 | 41 |
| 320 | 401(k) Savings Plan | 12/1/1999 | 1/1/2006 | 42 |
| 326 | Flexible Spending Account (FSA) | 12/1/1999 | 1/1/2006 | 43 |
| 328 | Partnership Participation Units | 12/1/1999 | 1/1/2006 | 44 |
| 330 | Annual Incentive Trip | 12/1/1999 | 1/1/2006 | 45 |

**TIMEKEEPING/PAYROLL**

| | | | | |
|---|---|---|---|---|
| 401 | Timekeeping | 12/1/1999 | 1/1/2000 | 46 |
| 403 | Paydays | 12/1/1999 | 1/1/2000 | 47 |
| 405 | Employment Termination | 12/1/1999 | 1/1/2006 | 48 |
| 407 | Severance Pay | 12/1/1999 | 1/1/2006 | 49 |
| 409 | Administrative Pay Corrections | 12/1/1999 | 1/1/2006 | 50 |
| 410 | Pay Deductions and Setoffs | 12/1/1999 | 1/1/2006 | 51 |

**WORK CONDITIONS & HOURS**

| | | | | |
|---|---|---|---|---|
| 502 | Work Schedules | 12/1/1999 | 1/1/2006 | 52 |
| 504 | Use of Phone and Mail Systems | 12/1/1999 | 1/1/2006 | 53 |
| 505 | Smoking | 12/1/1999 | 1/1/2006 | 54 |
| 506 | Rest and Meal Periods | 12/1/1999 | 1/1/2006 | 55 |
| 507 | Overtime | 12/1/1999 | 1/1/2006 | 56 |
| 512 | Business Travel Expenses | 12/1/1999 | 1/1/2009 | 57 |
| 514 | Visitors in the Workplace | 12/1/1999 | 1/1/2006 | 58 |
| 516 | Computer and Email Usage | 12/1/1999 | 1/1/2006 | 60 |
| 517 | Internet Usage | 12/1/1999 | 1/1/2006 | 61 |
| 522 | Workplace Violence Prevention | 12/1/1999 | 1/1/2006 | 63 |
| 526 | Cell Phone Usage | 12/1/1999 | 1/1/2006 | 65 |

**LEAVES OF ABSENCE**

| | | | | |
|---|---|---|---|---|
| 601 | Medical Leave | 12/1/1999 | 1/1/2006 | 66 |

App.007



**WRPS, LP**

| 602 | Family Leave | 12/1/1999 | 1/1/2006 | 68 |
| 605 | Military Leave | 1/1/2006 | 1/1/2000 | 70 |

EMPLOYEE CONDUCT & DISCIPLINARY ACTION

| 701 | Employee Conduct and Work Rules | 12/1/1999 | 1/1/2006 | 71 |
| 702 | Drug and Alcohol Use | 12/1/1999 | 1/1/2000 | 73 |
| 703 | Sexual and Other Unlawful Harassment | 12/1/1999 | 1/1/2006 | 74 |
| 704 | Attendance and Punctuality | 12/1/1999 | 1/1/2000 | 76 |
| 705 | Personal Appearance | 12/1/1999 | 1/1/2000 | 77 |
| 706 | Return of Property | 12/1/1999 | 1/1/2000 | 78 |
| 708 | Resignation | 12/1/1999 | 1/1/2000 | 79 |
| 714 | Drug Testing | 12/1/1999 | 1/1/2006 | 80 |
| 716 | Progressive Discipline | 12/1/1999 | 1/1/2006 | 81 |
| 718 | Problem Resolution | 12/1/1999 | 1/1/2006 | 83 |
| 720 | Casual Days | 12/1/1999 | 1/1/2006 | 85 |

MISCELLANEOUS

| 800 | Life-Threatening Illnesses in the Workplace | 12/1/1999 | 1/1/2006 | 87 |
| 806 | Suggestion Program | 12/1/1999 | 1/1/2006 | 88 |

App.008



# WRPS, LP
## WRPS, LP

Welcome new employee!

On behalf of your colleagues, I welcome you to WRPS, LP and wish you every success here.

We believe that each employee contributes directly to WRPS, LP's growth and success, and we hope you will take pride in being a member of our team.

This handbook was developed to describe some of the expectations of our employees and to outline the policies, programs, and benefits available to eligible employees. Employees should familiarize themselves with the contents of the employee handbook as soon as possible, for it will answer many questions about employment with WRPS, LP.

We hope that your experience here will be challenging, enjoyable, and rewarding. Again, welcome!

Sincerely,


Marcus D. Hiles
Chairman and CEO

1

App.009



# *WRPS, LP*
**WRPS, LP**

ORGANIZATION DESCRIPTION

Western Rim Property Services currently manages over 6,000 apartment homes in Texas. These apartment homes include luxury, moderate, and affordable housing communities. Currently Western Rim has in excess of 1,200 LIHTC apartments with its major growth emphasis consisting of luxury AAA properties. Whatever your needs, Western Rim has a home to satisfy your requirements.

The Mansion trademark is the brand name for its AAA luxury units. These properties are unmatched in their amenities such as attached garages, marble baths with Jacuzzi tubs, granite kitchens, Berber carpet, and upgraded kitchen appliances. The most spectacular clubhouses in the industry, which include full impact aerobics floors, free weight and exercise room, stadium seating theater rooms, pool tables, tanning beds, saunas and an outside pool area that is beyond belief. Our philosophy is not that we are renting living space but are instead marketing a life style.

. . . . . . . . . .

Western Rim Properties are on the cutting edge of design. Many are regularly referenced in the industry publications and are finalist for national awards such as the 1998 National Award "Pillars of the Industry" for best signage (Mansions by Vineyard) and 1999 National Apartment Association's "Pillars of the Industry" for best brochure (Mansions by the Lake).

2

App.010



# *WRPS, LP*
## WRPS, LP

INTRODUCTORY STATEMENT

This handbook is designed to acquaint you with WRPS, LP and provide you with information about working conditions, employee benefits, and some of the policies affecting your employment. You should read, understand, and comply with all provisions of the handbook. It describes many of your responsibilities as an employee and outlines the programs developed by WRPS, LP to benefit employees. One of our objectives is to provide a work environment that is conducive to both personal and professional growth.

No employee handbook can anticipate every circumstance or question about policy. As WRPS, LP continues to grow, the need may arise and WRPS, LP reserves the right to revise, supplement, or rescind any policies or portion of the handbook from time to time as it deems appropriate, in its sole and absolute discretion. The only exception to any changes is our employment-at-will policy permitting you or WRPS, LP to end our relationship for any reason at any time. Employees will, of course, be notified of such changes to the handbook as they occur.

3

51

App.011



*WRPS, LP*
**WRPS, LP**

## 718 Problem Resolution
Effective Date: 12/1/1999
Revision Date: 8/1/2006

WRPS, LP is committed to providing the best possible working conditions for its employees. Part of this commitment is encouraging an open and frank atmosphere in which any problem, complaint, suggestion, or question receives a timely response from WRPS, LP supervisors and management.

WRPS, LP strives to ensure fair and honest treatment of all employees. Supervisors, managers, and employees are expected to treat each other with mutual respect. Employees are encouraged to offer positive and constructive criticism.

If employees disagree with established rules of conduct, policies, or practices, they can express their concern through the problem resolution procedure. No employee will be penalized, formally or informally, for voicing a complaint with WRPS, LP in a reasonable, business-like manner, or for using the problem resolution procedure.

If a situation occurs when employees believe that a condition of employment or a decision affecting them is unjust or inequitable, they are encouraged to make use of the following steps. The employee may discontinue the procedure at any step.

1. Employee presents problem promptly to immediate supervisor within 3 calendar days, after incident occurs. If supervisor is unavailable or employee believes it would be inappropriate to contact that person, employee may present problem to the Human Resources Department or any other member of management.

2. Supervisor responds to problem during discussion or within 3 calendar days, after consulting with appropriate management, when necessary. Supervisor documents discussion.

3. Employee presents problem to the Human Resources Department within 3 calendar days, if problem is unresolved.

4. Human Resources Department counsels and advises employee, assists in putting problem in writing, visits with employee's manager(s), if necessary, and directs employee to the President for review of problem.

5. Employee presents problem to the President in writing.

83

App.012



# *WRPS, LP*
## WRPS, LP

6. The President reviews and considers problem. The President informs employee of decision within 3 calendar days, and forwards copy of written response to the Human Resources Department for employee's file. The President has full authority to make any adjustment deemed appropriate to resolve the problem. This decision is final and binding on all parties and may not be discussed or complained about again.

Problems, disputes, or claims not resolved through the preceding problem resolution steps are subject to final and binding arbitration. The arbitration proceeding will be conducted under the Employment Dispute Resolution Rules of the American Arbitration Association. The decision or award of the Arbitrator made under these rules is exclusive, final, and binding on parties, their beneficiaries, executors, administrators, successors, and assigns. <u>Every</u> employee must sign the attached Arbitration Agreement. This is an absolute requirement.

Employees who choose to use the arbitration process to resolve a problem will be expected to share the cost of the arbitration proceeding with WRPS, LP. A complete description of the arbitration procedure is available from the Human Resources Department for review.

Not every problem can be resolved to everyone's total satisfaction, but only through understanding and discussion of mutual problems can employees and management develop confidence in each other. This confidence is important to the operation of an efficient and harmonious work environment, and helps to ensure everyone's job security.

84

53

App.013

# EXHIBIT E



# Employment

## Arbitration Rules & Mediation Procedures



Available online at **adr.org/employment**

Rules Amended and Effective November 1, 2009
Fee Schedule Amended and Effective May 15, 2013

## Regional Vice Presidents and Directors

**States: Delaware, District of Columbia, Maryland, New Jersey, Pennsylvania, West Virginia**
Kenneth Egger
Vice President
Phone: 215.731.2281
Email: EggerK@adr.org

**States: Connecticut, Maine, Massachusetts, New Hampshire, New York, Vermont**
Ann Lesser, Esq.
Vice President
Phone: 212.484.4084
Email: LesserA@adr.org

**States: Alabama, Arkansas, Florida, Georgia, Mississippi, North Carolina, South Carolina, Virginia**
Charles Dorsey
Director
Phone: 866.686.6024
Email: DorseyC@adr.org

**States: Illinois, Indiana, Iowa, Kansas, Kentucky, Michigan, Minnesota, Missouri, Nebraska, North Dakota, Ohio, South Dakota, Tennessee, Wisconsin**
Jan Holdinski
Vice President
Phone: 248.352.5509
Email: HoldinskiJ@adr.org

**States: Alaska, Arizona, California, Colorado, Hawaii, Idaho, Montana, Nevada, Oregon, Utah, Washington, Wyoming**
John English
Vice President
Phone: 619.239.3051
Email: EnglishJ@adr.org

**States: Rhode Island**
Heather Santo
Director
Phone: 866.293.4053
Email: SantoH@adr.org

**States: Louisiana, New Mexico, Oklahoma, Texas**
Molly Bargenquest
Vice President
Phone: 972.702.8222
Email: BargenquestM@adr.org

## Case Management Vice Presidents and Directors

Molly Bargenquest
Vice President
Phone: 972.702.8222
Email: BargenquestM@adr.org
**Administers cases in AR, IL, IA, KS, LA, MN, MS, MO, NE, ND, OK, SD, TX, WI**

Patrick Tatum
Director
Phone: 559.490.1905
Email: TatumP@adr.org
**Administers cases in AK, AZ, CA, CO, HI, ID, MT, NV, NM, OR, UT, WA, WY**

Charles Dorsey
Director
Phone: 866.686.6024
Email: DorseyC@adr.org
**Administers cases in FL, GA**

Heather Santo
Director
Phone: 866.293.4053
Email: SantoH@adr.org
**Administers cases in AL, CT, DC, DE, IN, KY, MA, MD, ME, MI, NC, NH, NJ, NY, OH, PA, RI, SC, TN, VA, VT, WV**

# Table of Contents

Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Role of the American Arbitration Association® . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Legal Basis of Employment ADR . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

The Fairness Issue: The Due Process Protocol . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

AAA's Employment ADR Rules . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

AAA's Policy on Employment ADR . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Notification . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Costs of Employment Arbitration . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Designing an ADR Program . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11


Alternative Dispute Resolution Options . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

    Open Door Policy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

    Ombuds . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

    Peer Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

    Internal Mediation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

    Fact-Finding . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

    Arbitration . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14


Types of Disputes Covered . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Employment Arbitration Rules and Mediation Procedures . . . . . . . . . . . . . . . . . . . 15

    1. Applicable Rules of Arbitration . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

    2. Notification . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

    3. AAA as Administrator of the Arbitration . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

    4. Initiation of Arbitration . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

    5. Changes of Claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

    6. Jurisdiction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

    7. Administrative and Mediation Conferences . . . . . . . . . . . . . . . . . . . . . . . . . 18

    8. Arbitration Management Conference . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

    9. Discovery . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

    10. Fixing of Locale (the city, county, state, territory, and/or country of the Arbitration) 19

    11. Date, Time and Place (the physical site of the hearing within the designated locale) of Hearing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

    12. Number, Qualifications and Appointment of Neutral Arbitrators . . . . . . . . . . . . . . 20

    13. Party Appointed Arbitrators . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

14. Appointment of Chairperson by Party-Appointed Arbitrators or Parties. . . . . . . . . 21

15. Disclosure. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

16. Disqualification of Arbitrator . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

17. Communication with Arbitrator . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

18. Vacancies . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

19. Representation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

20. Stenographic Record . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

21. Interpreters . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

22. Attendance at Hearings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

23. Confidentiality . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

24. Postponements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

25. Oaths . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

26. Majority Decision. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

27. Dispositive Motions. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

28. Order of Proceedings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

29. Arbitration in the Absence of a Party or Representative . . . . . . . . . . . . . . . . . . . . 25

30. Evidence. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

31. Inspection. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

32. Interim Measures. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

33. Closing of Hearing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

34. Reopening of Hearing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

35. Waiver of Oral Hearing. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

36. Waiver of Objection/Lack of Compliance with These Rules . . . . . . . . . . . . . . . . . 28

37. Extensions of Time . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

38. Serving of Notice. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

39. The Award . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

40. Modification of Award. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

41. Release of Documents for Judicial Proceedings . . . . . . . . . . . . . . . . . . . . . . . . . . 29

42. Applications to Court . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

43. Administrative Fees. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

44. Neutral Arbitrator's Compensation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

45. Expenses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

46. Deposits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

47. Suspension for Non-Payment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

48. Interpretation and Application of Rules . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

Costs of Arbitration (including AAA Administrative Fees). . . . . . . . . . . . . . . . . . . . . . 31

**For Disputes Arising Out of Employer-Promulgated Plans***: . . . . . . . . . . . . . . . . . . . 32

(i) Filing Fees . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

(ii) Hearing Fees . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

(iii) Postponement/Cancellation Fees . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

(iv) Hearing Room Rental . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

(v) Abeyance Fee . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

(vi) Expenses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

**For Disputes Arising Out of Individually-Negotiated Employment Agreements
and Contracts:** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

**Administrative Fee Schedules (Standard and Flexible Fees)** . . . . . . . . . . . . . . . . . . 35

(i) Standard Fee Schedule . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

(ii) Refund Schedule for Standard Fee Schedule . . . . . . . . . . . . . . . . . . . . . . . . . 38

(iii) Flexible Fee Schedule . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

(iv) Hearing Room Rental . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

(v) Abeyance Fee . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

(vi) Expenses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

**For Disputes Proceeding Under the Supplementary Rules for Class Action
Arbitration ("Supplementary Rules"):** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

**Optional Rules for Emergency Measures of Protection** . . . . . . . . . . . . . . . . . . . . . 42

O-1. Applicability . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

O-2. Appointment of Emergency Arbitrator . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

O-3. Schedule . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

O-4. Interim Award . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

O-5. Constitution of the Panel . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

O-6. Security . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

O-7. Special Master . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

O-8. Costs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

Employment Mediation Procedures . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

    M-1. Agreement of Parties . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

    M-2. Initiation of Mediation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

    M-3. Fixing of Locale (the city, county, state, territory and, if applicable, country of the mediation) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

    M-4. Representation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

    M-5. Appointment of the Mediator . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

    M-6. Mediator's Impartiality and Duty to Disclose . . . . . . . . . . . . . . . . . . . . . . . . . 46

    M-7. Vacancies . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

    M-8. Duties and Responsibilities of the Mediator . . . . . . . . . . . . . . . . . . . . . . . . . 46

    M-9. Responsibilities of the Parties . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

    M-10. Privacy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

    M-11. Confidentiality . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

    M-12. No Stenographic Record . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

    M-13. Termination of Mediation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

    M-14. Exclusion of Liability . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

    M-15. Interpretation and Application of Procedures . . . . . . . . . . . . . . . . . . . . . . . . 49

    M-16. Deposits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

    M-17. Expenses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

    M-18. Cost of the Mediation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

# Employment Arbitration
Rules and Mediation Procedures



## Introduction

Federal and state laws reflecting societal intolerance for certain workplace conduct, as well as court decisions interpreting and applying those statutes, have redefined responsible corporate practice and employee relations. Increasingly, employers and employees face workplace disputes involving alleged wrongful termination, sexual harassment, or discrimination based on race, color, religion, sex, national origin, age and disability.

As courts and administrative agencies become less accessible to civil litigants, employers and their employees now see alternative dispute resolution ("ADR") as a way to promptly and effectively resolve workplace disputes. ADR procedures are becoming more common in contracts of employment, personnel manuals, and employee handbooks.

Increasingly, corporations and their employees look to the American Arbitration Association® as a resource in developing prompt and effective employment procedures for employment-related disputes.

These Rules have been developed for employers and employees who wish to use a private alternative to resolve their disputes, enabling them to have complaints heard by an impartial person with expertise in the employment field. These procedures benefit both the employer and the individual employee by making it possible to resolve disputes without extensive litigation.

## Role of the American Arbitration Association

The American Arbitration Association, founded in 1926, is a not-for-profit, public service organization dedicated to the resolution of disputes through mediation, arbitration, elections and other voluntary dispute resolution procedures. Millions of workers are now covered by employment ADR plans administered by the AAA®.

In addition, the AAA provides education and training, specialized publications, and research on all forms of dispute settlement. With 30 offices worldwide and cooperative agreements with arbitral institutions in 63 other nations, the American Arbitration Association is the nation's largest private provider of ADR services.

For over 80 years, the American Arbitration Association has set the standards for the development of fair and equitable dispute resolution procedures. The development of the *Employment Arbitration Rules and Mediation Procedures* and the reconstitution of a select and diverse roster of expert neutrals to hear and resolve disputes, are the most recent initiatives of the Association to provide private, efficient, and cost-effective procedures for out-of-court settlement of workplace disputes.

## Legal Basis of Employment ADR

Since 1990, Congress has twice re-affirmed the important role of ADR in the area of employment discrimination — in the Americans with Disabilities Act in 1990, and a year later in Section 118 of the Civil Rights Act of 1991.

The United States Supreme Court has also spoken on the importance of ADR in the employment context. In *Gilmer v. Interstate/Johnson Lane*, 500 U.S. 20, 111 S.Ct. 1647 (1991), the Supreme Court refused to invalidate Gilmer's agreement with the New York Stock Exchange that he would arbitrate disputes with his employer (Interstate/Johnson Lane) simply because he was obliged to sign it in order to work as a securities dealer whose trades were executed on the Exchange. Although the *Gilmer* Court found that the Age Discrimination in Employment Act did not preclude arbitration of age discrimination claims, it specifically declined to decide whether employment arbitration agreements were "contracts of employment" excluded under the Federal Arbitration Act.

The specific issue left open by *Gilmer* was decided 10 years later by the United States Supreme Court in *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 121 S. Ct. 1302, 149 L. Ed. 2d 234 (2001). In Circuit City, the Supreme Court concluded that except for transportation workers such as seamen or railroad workers, the FAA covers all contracts of employment and that the Act may be used to compel arbitration of employment-related claims. While Circuit City involved only state law claims, the Supreme Court had determined previously in Gilmer that federal age discrimination claims (and presumably other federal civil rights claims) were arbitrable under the FAA.

## The Fairness Issue: The Due Process Protocol

*The Due Process Protocol for Mediation and Arbitration of Statutory Disputes Arising Out of the Employment Relationship* was developed in 1995 by a special task force composed of individuals representing management, labor, employment, civil rights organizations, private administrative agencies, government, and the American Arbitration Association. The *Due Process Protocol*, which was endorsed by the Association in 1995, seeks to ensure fairness and equity in resolving workplace disputes. The *Due Process Protocol* encourages mediation and arbitration of statutory disputes, provided there are due process safeguards. It conveys the hope that ADR will reduce delays caused by the huge backlog of cases pending before administrative agencies and the courts. The *Due Process Protocol* "recognizes the dilemma inherent in the timing of an agreement to mediate and/or arbitrate statutory disputes" but does not take a position on whether an employer can require a pre-dispute, binding arbitration program as a condition of employment.

The *Due Process Protocol* has been endorsed by organizations representing a broad range of constituencies. They include the American Arbitration Association, the American Bar Association Labor and Employment Section, the American Civil Liberties Union, the Federal Mediation and Conciliation Service, the National Academy of Arbitrators, and the National Society of Professionals in Dispute Resolution. The National Employment Lawyers Association has endorsed the substantive provisions of the *Due Process Protocol*.

It has been incorporated into the *Report of the United States Secretary of Labor's Task Force in Excellence in State and Local Government* and cited with approval in numerous court opinions.

## AAA's Employment ADR Rules

On June 1, 1996, the Association issued *National Rules for the Resolution of Employment Disputes* (now known as the *Employment Arbitration Rules and Mediation Procedures*). The rules reflected the guidelines outlined in the *Due Process Protocol* and were based upon the AAA's *California Employment Dispute Resolution Rules*, which were developed by a committee of employment management and plaintiff attorneys, retired judges and arbitrators, in addition to Association executives. The revised rules were developed for employers and employees who wish to use a private alternative to resolve their disputes. The rules enabled parties to have complaints heard by an impartial person of

their joint selection, with expertise in the employment field. Both employers and individual employees benefit by having experts resolve their disputes without the costs and delay of litigation. The rules included procedures which ensure due process in both the mediation and arbitration of employment disputes. After a year of use, the rules were amended to address technical issues.

## AAA's Policy on Employment ADR

The AAA's policy on employment ADR is guided by the state of existing law, as well as its obligation to act in an impartial manner. In following the law, and in the interest of providing an appropriate forum for the resolution of employment disputes, the Association administers dispute resolution programs which meet the due process standards as outlined in its *Employment Arbitration Rules and Mediation Procedures* and the *Due Process Protocol*. If the Association determines that a dispute resolution program on its face substantially and materially deviates from the minimum due process standards of the *Employment Arbitration Rules and Mediation Procedures* and the *Due Process Protocol*, the Association may decline to administer cases under that program. Other issues will be presented to the arbitrator for determination.

## Notification

If an employer intends to utilize the dispute resolution services of the Association in an employment ADR plan, it shall, at least 30 days prior to the planned effective date of the program: (1) notify the Association of its intention to do so; and (2) provide the Association with a copy of the employment dispute resolution plan. If an employer does not comply with this requirement, the Association reserves the right to decline its administrative services. Copies of all plans should be sent to the American Arbitration Association, 725 South Figueroa Street, Suite 2400, Los Angeles, CA 90017; FAX: 213.622.6199.

## Costs of Employment Arbitration

These Rules contain two separate and distinct arbitration costs sections; one for disputes arising out of employer-promulgated plans and the other for disputes arising out of individually-negotiated employment agreements and contracts. When the arbitration is filed, the AAA makes an initial administrative determination as to whether the dispute arises from an employer-promulgated plan or an individually-negotiated employment agreement or contract. This

determination is made by reviewing the documentation provided to the AAA by the parties, including, but not limited to, the demand for arbitration, the parties' arbitration program or agreement, and any employment agreements or contracts between the parties.

When making its determination on the applicable costs of arbitration section in a given arbitration, the AAA's review is focused on two primary issues. The first component of the review focuses on whether the arbitration program and/or agreement between the individual employee and the employer is one in which it appears that the employer has drafted a standardized arbitration clause with its employees. The second aspect of the review focuses on the ability of the parties to negotiate the terms and conditions of the parties' agreement.

If a party disagrees with the AAA's initial determination, the parties may bring the issue to the attention of the arbitrator for a final determination.

## Designing an ADR Program

The guiding principle in designing a successful employment ADR system is that it must be fair in fact and perception. The American Arbitration Association has considerable experience in administering and assisting in the design of employment ADR plans, which gives it an informed perspective on how to effectively design ADR systems, as well as the problems to avoid. Its guidance to those designing employment ADR systems is summarized as follows:

» The American Arbitration Association encourages employers to consider the wide range of legally-available options to resolve workplace disputes outside the courtroom.

» A special emphasis is placed by the Association on encouraging the development of in-house dispute resolution procedures, such as open door policies, ombuds, peer review and internal mediation.

» The Association recommends an external mediation component to resolve disputes not settled by the internal dispute resolution process.

» Programs which use arbitration as a final step may employ:

  • pre-dispute, voluntary final and binding arbitration;

  • pre-dispute, mandatory nonbinding arbitration;

  • pre-dispute, mandatory final and binding arbitration; or

  • post-dispute, voluntary final and binding arbitration.

» Although the AAA administers binding arbitration systems that have been required as a condition of initial or continued employment, such programs must be consistent with the Association's *Employment Arbitration Rules and Mediation Procedures*.

Specific guidance on the responsible development and design of employment ADR systems is contained in the Association's publication, *Resolving Employment Disputes: A Practical Guide*, which is available from the AAA's website, **www.adr.org.**

# Alternative Dispute Resolution Options

## Open Door Policy

Employees are encouraged to meet with their immediate manager or supervisor to discuss problems arising out of the workplace environment. In some systems, the employee is free to approach anyone in the chain of command.

## Ombuds

A neutral third party (either from within or outside the company) is designated to confidentially investigate and propose settlement of employment complaints brought by employees.

## Peer Review

A panel of employees (or employees and managers) works together to resolve employment complaints. Peer review panel members are trained in the handling of sensitive issues.

## Internal Mediation

A process for resolving disputes in which a neutral third person from within the company, trained in mediation techniques, helps the disputing parties negotiate a mutually acceptable settlement. Mediation is a nonbinding process in which the parties discuss their disputes with an impartial person who assists them in reaching a settlement. The mediator may suggest ways of resolving the dispute but may not impose a settlement on the parties.

## Fact-Finding

The investigation of a complaint by an impartial third person (or team) who examines the complaint and the facts and issues a nonbinding report. Fact-finding is particularly helpful for allegations of sexual harassment, where a fact-finding team, composed of one male and one female neutral, investigates the allegations and presents its findings to the employer and the employee.

## Arbitration

Arbitration is generally defined as the submission of disputes to one or more impartial persons for final and binding determination. It can be the final step in a workplace program that includes other dispute resolution methods. There are many possibilities for designing this final step.

They include:

»   **Pre-Dispute, Voluntary Final and Binding Arbitration**
    The parties agree in advance, on a voluntary basis, to use arbitration to resolve disputes and they are bound by the outcome.

»   **Pre-Dispute, Mandatory Nonbinding Arbitration**
    The parties must use the arbitration process to resolve disputes, but they are not bound by the outcome.

»   **Pre-Dispute, Mandatory Final and Binding Arbitration**
    The parties must arbitrate unresolved disputes and they are bound by the outcome.

»   **Post-Dispute, Voluntary Final and Binding Arbitration**
    The parties have the option of deciding whether to use final and binding arbitration after a dispute arises.

## Types of Disputes Covered

The dispute resolution procedures contained in this booklet were developed for arbitration agreements contained in employee personnel manuals, an employment application of an individual employment agreement, other types of employment agreements, or can be used for a specific dispute. They do not apply to disputes arising out of collective bargaining agreements or independent contractor agreements.

# Employment Arbitration Rules and Mediation Procedures

## 1. Applicable Rules of Arbitration

The parties shall be deemed to have made these rules a part of their arbitration agreement whenever they have provided for arbitration by the American Arbitration Association (hereinafter "AAA") or under its *Employment Arbitration Rules and Mediation Procedures* or for arbitration by the AAA of an employment dispute without specifying particular rules[*]. If a party establishes that an adverse material inconsistency exists between the arbitration agreement and these rules, the arbitrator shall apply these rules.

If, within 30 days after the AAA's commencement of administration, a party seeks judicial intervention with respect to a pending arbitration and provides the AAA with documentation that judicial intervention has been sought, the AAA will suspend administration for 60 days to permit the party to obtain a stay of arbitration from the court.These rules, and any amendment of them, shall apply in the form in effect at the time the demand for arbitration or submission is received by the AAA.

[*] *The National Rules for the Resolution of Employment Disputes* have been re-named the *Employment Arbitration Rules and Mediation Procedures.* Any arbitration agreements providing for arbitration under its *National Rules for the Resolution of Employment Disputes* shall be administered pursuant to these *Employment Arbitration Rules and Mediation Procedures.*

## 2. Notification

An employer intending to incorporate these rules or to refer to the dispute resolution services of the AAA in an employment ADR plan, shall, at least 30 days prior to the planned effective date of the program:

**a.** notify the Association of its intention to do so and,

**b.** provide the Association with a copy of the employment dispute resolution plan.

Compliance with this requirement shall not preclude an arbitrator from entertaining challenges as provided in Section 1. If an employer does not comply with this requirement, the Association reserves the right to decline its administrative services.

## 3. AAA as Administrator of the Arbitration

When parties agree to arbitrate under these rules, or when they provide for arbitration by the AAA and an arbitration is initiated under these rules, they thereby authorize the AAA to administer the arbitration. The authority and duties of the AAA are prescribed in these rules, and may be carried out through such of the AAA's representatives as it may direct. The AAA may, in its discretion, assign the administration of an arbitration to any of its offices.

## 4. Initiation of Arbitration

Arbitration shall be initiated in the following manner.

**a.** The parties may submit a joint request for arbitration.

**b.** In the absence of a joint request for arbitration:

**(i)** The initiating party (hereinafter "Claimant[s]") shall:

**(1)** File a written notice (hereinafter "Demand") of its intention to arbitrate at any office of the AAA, within the time limit established by the applicable statute of limitations. Any dispute over the timeliness of the demand shall be referred to the arbitrator. The filing shall be made in duplicate, and each copy shall include the applicable arbitration agreement. The Demand shall set forth the names, addresses, and telephone numbers of the parties; a brief statement of the nature of the dispute; the amount in controversy, if any; the remedy sought; and requested hearing location.

**(2)** Simultaneously provide a copy of the Demand to the other party (hereinafter "Respondent[s]").

**(3)** Include with its Demand the applicable filing fee, unless the parties agree to some other method of fee advancement.

**(ii)** The Respondent(s) may file an Answer with the AAA within 15 days after the date of the letter from the AAA acknowledging receipt of the Demand. The Answer shall provide the Respondent's brief response to the claim and the issues presented. The Respondent(s) shall make its filing in duplicate with the AAA, and simultaneously shall send a copy of the Answer to the Claimant. If no answering statement is filed within the stated time, Respondent will be deemed to deny the claim. Failure to file an answering statement shall not operate to delay the arbitration.

**(iii)** The Respondent(s):

**(1)** May file a counterclaim with the AAA within 15 days after the date of the letter from the AAA acknowledging receipt of the Demand. The filing shall be made in duplicate. The counterclaim shall set forth the nature of the claim, the amount in controversy, if any, and the remedy sought.

    **(2)** Simultaneously shall send a copy of any counterclaim to the Claimant.

    **(3)** Shall include with its filing the applicable filing fee provided for by these rules.

  **(iv)** The Claimant may file an Answer to the counterclaim with the AAA within 15 days after the date of the letter from the AAA acknowledging receipt of the counterclaim. The Answer shall provide Claimant's brief response to the counterclaim and the issues presented. The Claimant shall make its filing in duplicate with the AAA, and simultaneously shall send a copy of the Answer to the Respondent(s). If no answering statement is filed within the stated time, Claimant will be deemed to deny the counterclaim. Failure to file an answering statement shall not operate to delay the arbitration.

**c.** The form of any filing in these rules shall not be subject to technical pleading requirements.

## 5. Changes of Claim

Before the appointment of the arbitrator, if either party desires to offer a new or different claim or counterclaim, such party must do so in writing by filing a written statement with the AAA and simultaneously provide a copy to the other party(s), who shall have 15 days from the date of such transmittal within which to file an answer with the AAA. After the appointment of the arbitrator, a party may offer a new or different claim or counterclaim only at the discretion of the arbitrator.

## 6. Jurisdiction

**a.** The arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope or validity of the arbitration agreement.

**b.** The arbitrator shall have the power to determine the existence or validity of a contract of which an arbitration clause forms a part. Such an arbitration clause shall be treated as an agreement independent of the other terms of the contract. A decision by the arbitrator that the contract is null and void shall not for that reason alone render invalid the arbitration clause.

**c.** A party must object to the jurisdiction of the arbitrator or to the arbitrability of a claim or counterclaim no later than the filing of the answering statement to the claim or counterclaim that gives rise to the objection. The arbitrator may rule on such objections as a preliminary matter or as part of the final award.

## 7. Administrative and Mediation Conferences

Before the appointment of the arbitrator, any party may request, or the AAA, in its discretion, may schedule an administrative conference with a representative of the AAA and the parties and/or their representatives. The purpose of the

administrative conference is to organize and expedite the arbitration, explore its administrative aspects, establish the most efficient means of selecting an arbitrator, and to consider mediation as a dispute resolution option. There is no administrative fee for this service.

At any time after the filing of the Demand, with the consent of the parties, the AAA will arrange a mediation conference under its Mediation Procedures to facilitate settlement. The mediator shall not be any arbitrator appointed to the case, except by mutual written agreement of the parties. There is no additional filing fee for initiating a mediation under the AAA Mediation Procedures for parties to a pending arbitration.

## 8. Arbitration Management Conference

As promptly as practicable after the selection of the arbitrator(s), but not later than 60 days thereafter, an arbitration management conference shall be held among the parties and/or their attorneys or other representatives and the arbitrator(s). Unless the parties agree otherwise, the Arbitration Management Conference will be conducted by telephone conference call rather than in person. At the Arbitration Management Conference the matters to be considered shall include, without limitation:

a. the issues to be arbitrated;

b. the date, time, place, and estimated duration of the hearing;

c. the resolution of outstanding discovery issues and establishment of discovery parameters;

d. the law, standards, rules of evidence and burdens of proof that are to apply to the proceeding;

e. the exchange of stipulations and declarations regarding facts, exhibits, witnesses, and other issues;

f. the names of witnesses (including expert witnesses), the scope of witness testimony, and witness exclusion;

g. the value of bifurcating the arbitration into a liability phase and damages phase;

h. the need for a stenographic record;

i. whether the parties will summarize their arguments orally or in writing;

j. the form of the award;

k. any other issues relating to the subject or conduct of the arbitration;

l. the allocation of attorney's fees and costs;

m. the specification of undisclosed claims;

**n.**  the extent to which documentary evidence may be submitted at the hearing;

**o.**  the extent to which testimony may be admitted at the hearing telephonically, over the internet, by written or video-taped deposition, by affidavit, or by any other means;

**p.**  any disputes over the AAA's determination regarding whether the dispute arose from an individually-negotiated employment agreement or contract, or from an employer-promulgated plan (see Costs of Arbitration section).

The arbitrator shall issue oral or written orders reflecting his or her decision on the above matters and may conduct additional conferences when the need arises.

There is no AAA administrative fee for an Arbitration Management Conference.

## 9. Discovery

The arbitrator shall have the authority to order such discovery, by way of deposition, interrogatory, document production, or otherwise, as the arbitrator considers necessary to a full and fair exploration of the issues in dispute, consistent with the expedited nature of arbitration.

The AAA does not require notice of discovery related matters and communications unless a dispute arises. At that time, the parties should notify the AAA of the dispute so that it may be presented to the arbitrator for determination.

## 10. Fixing of Locale (the city, county, state, territory, and/or country of the Arbitration)

If the parties disagree as to the locale, the AAA may initially determine the place of arbitration, subject to the power of the arbitrator(s), after their appointment to make a final determination on the locale. All such determinations shall be made having regard for the contentions of the parties and the circumstances of the arbitration.

## 11. Date, Time and Place (the physical site of the hearing within the designated locale) of Hearing

The arbitrator shall set the date, time, and place for each hearing. The parties shall respond to requests for hearing dates in a timely manner, be cooperative in scheduling the earliest practicable date, and adhere to the established hearing schedule. The AAA shall send a notice of hearing to the parties at least 10 days in advance of the hearing date, unless otherwise agreed by the parties.

## 12. Number, Qualifications and Appointment of Neutral Arbitrators

**a.** If the arbitration agreement does not specify the number of arbitrators or the parties do not agree otherwise, the dispute shall be heard and determined by one arbitrator.

**b.** Qualifications

   **i.** Neutral arbitrators serving under these rules shall be experienced in the field of employment law.

   **ii.** Neutral arbitrators serving under these rules shall have no personal or financial interest in the results of the proceeding in which they are appointed and shall have no relation to the underlying dispute or to the parties or their counsel that may create an appearance of bias.

   **iii.** The roster of available arbitrators will be established on a non-discriminatory basis, diverse by gender, ethnicity, background, and qualifications.

   **iv.** The AAA may, upon request of a party within the time set to return their list or upon its own initiative, supplement the list of proposed arbitrators in disputes arising out of individually-negotiated employment contracts with persons from the Commercial Roster, to allow the AAA to respond to the particular need of the dispute. In multi-arbitrator disputes, at least one of the arbitrators shall be experienced in the field of employment law.

**c.** If the parties have not appointed an arbitrator and have not provided any method of appointment, the arbitrator shall be appointed in the following manner:

   **i.** Shortly after it receives the Demand, the AAA shall send simultaneously to each party a letter containing an identical list of names of persons chosen from the Employment Dispute Resolution Roster. The parties are encouraged to agree to an arbitrator from the submitted list and to advise the AAA of their agreement.

   **ii.** If the parties are unable to agree upon an arbitrator, each party to the dispute shall have 15 days from the transmittal date in which to strike names objected to, number the remaining names in order of preference, and return the list to the AAA. If a party does not return the list within the time specified, all persons named therein shall be deemed acceptable.

   **iii.** From among the persons who have been approved on both lists, and in accordance with the designated order of mutual preference, the AAA shall invite the acceptance of an arbitrator to serve. If the parties fail to agree on any of the persons named, or if acceptable arbitrators are unable to act, or if for any other reason the appointment cannot be made from the submitted list, the AAA shall have the power to make the appointment from among other members of the panel without the submission of additional lists.

## 13. Party Appointed Arbitrators

**a.** If the agreement of the parties names an arbitrator or specifies a method of appointing an arbitrator, that designation or method shall be followed.

**b.** Where the parties have agreed that each party is to name one arbitrator, the arbitrators so named must meet the standards of Section R-16 with respect to impartiality and independence unless the parties have specifically agreed pursuant to Section R-16(a) that the party-appointed arbitrators are to be non-neutral and need not meet those standards. The notice of appointment, with the name, address, and contact information of the arbitrator, shall be filed with the AAA by the appointing party. Upon the request of any appointing party, the AAA shall submit a list of membersof the National Roster from which the party may, if it so desires, make the appointment.

**c.** If the agreement specifies a period of time within which an arbitrator shall be appointed and any party fails to make the appointment within that period, the AAA shall make the appointment.

**d.** If no period of time is specified in the agreement, the AAA shall notify the party to make the appointment. If within 15 days after such notice has been sent, an arbitrator has not been appointed by a party, the AAA shall make the appointment.

## 14. Appointment of Chairperson by Party-Appointed Arbitrators or Parties

**a.** If, pursuant to Section R-13, either the parties have directly appointed arbitrators, or the arbitrators have been appointed by the AAA, and the parties have authorized them to appoint a chairperson within a specified time and no appointment is made within that time or any agreed extension, the AAA may appoint the chairperson.

**b.** If no period of time is specified for appointment of the chairperson and the party-appointed arbitrators or the parties do not make the appointment within 15 days from the date of the appointment of the last party-appointed arbitrator, the AAA may appoint the chairperson.

**c.** If the parties have agreed that their party-appointed arbitrators shall appoint the chairperson from the National Roster, the AAA shall furnish to the party-appointed arbitrators, in the manner provided in Section R-12, a list selected from the National Roster, and the appointment of the chairperson shall be made as provided in that Section.

## 15. Disclosure

**a.** Any person appointed or to be appointed as an arbitrator shall disclose to the AAA any circumstance likely to give rise to justifiable doubt as to the arbitrator's impartiality or independence, including any bias or any financial or personal interest in the result of the arbitration or any past or present relationship with the parties or their representatives. Such obligation shall remain in effect throughout the arbitration.

**b.** Upon receipt of such information from the arbitrator or another source, the AAA shall communicate the information to the parties and, if it deems it appropriate to do so, to the arbitrator and others.

**c.** In order to encourage disclosure by arbitrators, disclosure of information pursuant to this Section R-15 is not to be construed as an indication that the arbitrator considers that the disclosed circumstance is likely to affect impartiality or independence.

## 16. Disqualification of Arbitrator

**a.** Any arbitrator shall be impartial and independent and shall perform his or her duties with diligence and in good faith, and shall be subject to disqualification for:

   **i.** partiality or lack of independence,

   **ii.** inability or refusal to perform his or her duties with diligence and in good faith, and

   **iii.** any grounds for disqualification provided by applicable law. The parties may agree in writing, however, that arbitrators directly appointed by a party pursuant to Section R-13 shall be nonneutral, in which case such arbitrators need not be impartial or independent and shall not be subject to disqualification for partiality or lack of independence.

**b.** Upon objection of a party to the continued service of an arbitrator, or on its own initiative, the AAA shall determine whether the arbitrator should be disqualified under the grounds set out above, and shall inform the parties of its decision, which decision shall be conclusive.

## 17. Communication with Arbitrator

**a.** No party and no one acting on behalf of any party shall communicate *ex parte* with an arbitrator or a candidate for arbitrator concerning the arbitration, except that a party, or someone acting on behalf of a party, may communicate *ex parte* with a candidate for direct appointment pursuant to Section R-13 in order to advise the candidate of the general nature of the controversy and of the anticipated proceedings and to discuss the candidate's qualifications, availability, or independence in relation to the parties or to discuss the suitability of candidates for selection as a third arbitrator where the parties or party-designated arbitrators are to participate in that selection.

**b.** Section R-17(a) does not apply to arbitrators directly appointed by the parties who, pursuant to Section R-16(a), the parties have agreed in writing are non-neutral. Where the parties have so agreed under Section R-16(a), the AAA shall as an administrative practice suggest to the parties that they agree further that Section R-17(a) should nonetheless apply prospectively.

## 18. Vacancies

If for any reason an arbitrator is unable to perform the duties of the office, the AAA may, on proof satisfactory to it, declare the office vacant. Vacancies shall be filled in accordance with applicable provisions of these Rules.

In the event of a vacancy in a panel of neutral arbitrators after the hearings have commenced, the remaining arbitrator or arbitrators may continue with the hearing and determination of the controversy, unless the parties agree otherwise.

In the event of the appointment of a substitute arbitrator, the panel of arbitrators shall determine in its sole discretion whether it is necessary to repeat all or part of any prior hearings.

## 19. Representation

Any party may be represented by counsel or other authorized representatives. For parties without representation, the AAA will, upon request, provide reference to institutions which might offer assistance. A party who intends to be represented shall notify the other party and the AAA of the name and address of the representative at least 10 days prior to the date set for the hearing or conference at which that person is first to appear. If a representative files a Demand or an Answer, the obligation to give notice of representative status is deemed satisfied.

## 20. Stenographic Record

Any party desiring a stenographic record shall make arrangements directly with a stenographer and shall notify the other parties of these arrangements at least three days in advance of the hearing. The requesting party or parties shall pay the cost of the record. If the transcriptis agreed by the parties, or determined by the arbitrator to be the official record of the proceeding, it must be provided to the arbitrator and made available to the other parties for inspection, at a date, time, and place determined by the arbitrator.

## 21. Interpreters

Any party wishing an interpreter shall make all arrangements directly with the interpreter and shall assume the costs of the service.

## 22. Attendance at Hearings

The arbitrator shall have the authority to exclude witnesses, other than a party, from the hearing during the testimony of any other witness. The arbitrator also shall have the authority to decide whether any person who is not a witness may attend the hearing.

## 23. Confidentiality

The arbitrator shall maintain the confidentiality of the arbitration and shall have the authority to make appropriate rulings to safeguard that confidentiality, unless the parties agree otherwise or the law provides to the contrary.

## 24. Postponements

The arbitrator: (1) may postpone any hearing upon the request of a party for good cause shown; (2) must postpone any hearing upon the mutual agreement of the parties; and (3) may postpone any hearing on his or her own initiative.

## 25. Oaths

Before proceeding with the first hearing, each arbitrator shall take an oath of office. The oath shall be provided to the parties prior to the first hearing. The arbitrator may require witnesses to testify under oath administered by any duly qualified person and, if it is required by law or requested by any party, shall do so.

## 26. Majority Decision

All decisions and awards of the arbitrators must be by a majority, unless the unanimous decision of all arbitrators is expressly required by the arbitration agreement or by law.

## 27. Dispositive Motions

The arbitrator may allow the filing of a dispositive motion if the arbitrator determines that the moving party has shown substantial cause that the motion is likely to succeed and dispose of or narrow the issues in the case.

## 28. Order of Proceedings

A hearing may be opened by: (1) recording the date, time, and place of the hearing; (2) recording the presence of the arbitrator, the parties, and their

representatives, if any; and (3) receiving into the record the Demand and the Answer, if any. The arbitrator may, at the beginning of the hearing, ask for statements clarifying the issues involved.

The parties shall bear the same burdens of proof and burdens of producing evidence as would apply if their claims and counterclaims had been brought in court.

Witnesses for each party shall submit to direct and cross examination.

With the exception of the rules regarding the allocation of the burdens of proof and going forward with the evidence, the arbitrator has the authority to set the rules for the conduct of the proceedings and shall exercise that authority to afford a full and equal opportunity to all parties to present any evidence that the arbitrator deems material and relevant to the resolution of the dispute. When deemed appropriate, the arbitrator may also allow for the presentation of evidence by alternative means including web conferencing, internet communication, telephonic conferences and means other than an in-person presentation of evidence. Such alternative means must still afford a full and equal opportunity to all parties to present any evidence that the arbitrator deems material and relevant to the resolution of the dispute and when involving witnesses, provide that such witness submit to direct and cross-examination.

The arbitrator, in exercising his or her discretion, shall conduct the proceedings with a view toward expediting the resolution of the dispute, may direct the order of proof, bifurcate proceedings, and direct the parties to focus their presentations on issues the decision of which could dispose of all or part of the case.

Documentary and other forms of physical evidence, when offered by either party, may be received in evidence by the arbitrator.

The names and addresses of all witnesses and a description of the exhibits in the order received shall be made a part of the record.

## 29. Arbitration in the Absence of a Party or Representative

Unless the law provides to the contrary, the arbitration may proceed in the absence of any party or representative who, after due notice, fails to be present or fails to obtain a postponement. An award shall not be based solely on the default of a party. The arbitrator shall require the party who is in attendance to present such evidence as the arbitrator may require for the making of the award.

## 30. Evidence

The parties may offer such evidence as is relevant and material to the dispute and shall produce such evidence as the arbitrator deems necessary to an understanding and determination of the dispute. All evidence shall be taken in the presence of all of the arbitrators and all of the parties, except where any party or arbitrator is absent, in default, or has waived the right to be present, however "presence" should not be construed to mandate that the parties and arbitrators must be physically present in the same location.

An arbitrator or other person authorized by law to subpoena witnesses or documents may do so upon the request of any party or independently.

The arbitrator shall be the judge of the relevance and materiality of the evidence offered, and conformity to legal rules of evidence shall not be necessary. The arbitrator may in his or her discretion direct the order of proof, bifurcate proceedings, exclude cumulative or irrelevant testimony or other evidence, and direct the parties to focus their presentations on issues the decision of which could dispose of all or part of the case. All evidence shall be taken in the presence of all of the arbitrators and all of the parties, except where any party is absent, in default, or has waived the right to be present.

If the parties agree or the arbitrator directs that documents or other evidence may be submitted to the arbitrator after the hearing, the documents or other evidence shall be filed with the AAA for transmission to the arbitrator, unless the parties agree to a different method of distribution. All parties shall be afforded an opportunity to examine such documents or other evidence and to lodge appropriate objections, if any.

## 31. Inspection

Upon the request of a party, the arbitrator may make an inspection in connection with the arbitration. The arbitrator shall set the date and time, and the AAA shall notify the parties. In the event that one or all parties are not present during the inspection, the arbitrator shall make an oral or written report to the parties and afford them an opportunity to comment.

## 32. Interim Measures

At the request of any party, the arbitrator may grant any remedy or relief that would have been available to the parties had the matter been heard in court, as stated in Rule 39(d), Award.

A request for interim measures addressed by a party to a judicial authority shall not be deemed incompatible with the agreement to arbitrate or a waiver of the right to arbitrate.

## 33. Closing of Hearing

The arbitrator shall specifically inquire of all parties whether they have any further proofs to offer or witnesses to be heard. Upon receiving negative replies or if satisfied that the record is complete, the arbitrator shall declare the hearing closed.

If briefs are to be filed, the hearing shall be declared closed as of the final date set by the arbitrator for the receipt of briefs. If documents are to be filed as provided in Rule 30 and the date set for their receipt is later than that set for the receipt of briefs, the later date shall be the date of closing the hearing. The time limit within which the arbitrator is required to make the award shall commence to run, in the absence of other agreements by the parties, upon closing of the hearing.

## 34. Reopening of Hearing

The hearing may be reopened by the arbitrator upon the arbitrator's initiative, or upon application of a party for good cause shown, at any time before the award is made. If reopening the hearing would prevent the making of the award within the specific time agreed on by the parties in the contract(s) out of which the controversy has arisen, the matter may not be reopened unless the parties agree on an extension of time. When no specific date is fixed in the contract, the arbitrator may reopen the hearing and shall have 30 days from the closing of the reopened hearing within which to make an award.

## 35. Waiver of Oral Hearing

The parties may provide, by written agreement, for the waiver of oral hearings. If the parties are unable to agree as to the procedure, upon the appointment of the arbitrator, the arbitrator shall specify a fair and equitable procedure.

## 36. Waiver of Objection/Lack of Compliance with These Rules

Any party who proceeds with the arbitration after knowledge that any provision or requirement of these rules has not been complied with, and who fails to state objections thereto in writing or in a transcribed record, shall be deemed to have waived the right to object.

## 37. Extensions of Time

The parties may modify any period of time by mutual agreement. The AAA or the arbitrator may for good cause extend any period of time established by these Rules, except the time for making the award. The AAA shall notify the parties of any extension.

## 38. Serving of Notice

**a.** Any papers, notices, or process necessary or proper for the initiation or continuation of an arbitration under these rules, for any court action in connection therewith, or for the entry of judgment on any award made under these rules may be served on a party by mail addressed to the party, or its representative at the last known address or by personal service, in or outside the state where the arbitration is to be held, provided that reasonable opportunity to be heard with regard to the dispute is or has been granted to the party.

**b.** The AAA, the arbitrator, and the parties may also use overnight delivery or electronic facsimile transmission (fax), to give the notices required by these rules. Where all parties and the arbitrator agree, notices may be transmitted by electronic mail (e-mail), or other methods of communication.

**c.** Unless otherwise instructed by the AAA or by the arbitrator, any documents submitted by any party to the AAA or to the arbitrator shall simultaneously be provided to the other party or parties to the arbitration.

## 39. The Award

**a.** The award shall be made promptly by the arbitrator and, unless otherwise agreed by the parties or specified by law, no later than 30 days from the date of closing of the hearing or, if oral hearings have been waived, from the date of the AAA's transmittal of the final statements and proofs to the arbitrator. Three additional days are provided if briefs are to be filed or other documents are to be transmitted pursuant to Rule 30.

**b.** An award issued under these rules shall be publicly available, on a cost basis. The names of the parties and witnesses will not be publicly available, unless a party expressly agrees to have its name made public in the award.

**c.** The award shall be in writing and shall be signed by a majority of the arbitrators and shall provide the written reasons for the award unless the parties agree otherwise. It shall be executed in the manner required by law.

**d.** The arbitrator may grant any remedy or relief that would have been available to the parties had the matter been heard in court including awards of attorney's fees and costs, in accordance with applicable law. The arbitrator shall, in the award, assess arbitration fees, expenses, and compensation as provided in Rules 43, 44, and 45 in favor of any party and, in the event any administrative fees or expenses are due the AAA, in favor of the AAA, subject to the provisions contained in the Costs of Arbitration section.

**e.** If the parties settle their dispute during the course of the arbitration and mutually request, the arbitrator may set forth the terms of the settlement in a consent award.

**f.** The parties shall accept as legal delivery of the award the placing of the award or a true copy thereof in the mail, addressed to a party or its representative at the last known address, personal service of the award, or the filing of the award in any manner that may be required by law.

**g.** The arbitrator's award shall be final and binding.

## 40. Modification of Award

Within 20 days after the transmittal of an award, any party, upon notice to the other parties, may request the arbitrator to correct any clerical, typographical, technical, or computational errors in the award. The arbitrator is not empowered to redetermine the merits of any claim already decided. The other parties shall be given 10 days to respond to the request. The arbitrator shall dispose of the request within 20 days after transmittal by the AAA to the arbitrator of the request and any response thereto. If applicable law requires a different procedural time frame, that procedure shall be followed.

## 41. Release of Documents for Judicial Proceedings

The AAA shall, upon the written request of a party, furnish to the party, at that party's expense, certified copies of any papers in the AAA's case file that may be required in judicial proceedings relating to the arbitration.

## 42. Applications to Court

**a.** No judicial proceeding by a party relating to the subject matter of the arbitration shall be deemed a waiver of the party's right to arbitrate.

**b.** Neither the AAA nor any arbitrator in a proceeding under these rules is or shall be considered a necessary or proper party in judicial proceedings relating to the arbitration.

**c.** Parties to these procedures shall be deemed to have consented that judgment upon the arbitration award may be entered in any federal or state court having jurisdiction.

d. Parties to an arbitration under these rules shall be deemed to have consented that neither the AAA nor any arbitrator shall be liable to any party in any action for damages or injunctive relief for any act or omission in connection with any arbitration under these rules.

## 43. Administrative Fees

As a not-for-profit organization, the AAA shall prescribe filing and other administrative fees to compensate it for the cost of providing administrative services. The AAA administrative fee schedule in effect at the time the demand for arbitration or submission agreement is received shall be applicable.

AAA fees shall be paid in accordance with the Costs of Arbitration Section (see page 33-43).

The AAA may, in the event of extreme hardship on any party, defer or reduce the administrative fees. (To ensure that you have the most current information, see our website at **www.adr.org**).

## 44. Neutral Arbitrator's Compensation

Arbitrators shall charge a rate consistent with the arbitrator's stated rate of compensation. If there is disagreement concerning the terms of compensation, an appropriate rate shall be established with the arbitrator by the AAA and confirmed to the parties.

Any arrangement for the compensation of a neutral arbitrator shall be made through the AAA and not directly between the parties and the arbitrator. Payment of the arbitrator's fees and expenses shall be made by the AAA from the fees and moneys collected by the AAA for this purpose.

Arbitrator compensation shall be borne in accordance with the Costs of Arbitration section.

## 45. Expenses

Unless otherwise agreed by the parties or as provided under applicable law, the expenses of witnesses for either side shall be borne by the party producing such witnesses.

All expenses of the arbitrator, including required travel and other expenses, and any AAA expenses, as well as the costs relating to proof and witnesses produced at the direction of the arbitrator shall be borne in accordance with the Costs of Arbitration section.

## 46. Deposits

The AAA may require deposits in advance of any hearings such sums of money as it deems necessary to cover the expenses of the arbitration, including the arbitrator's fee, if any, and shall render an accounting and return any unexpended balance at the conclusion of the case.

## 47. Suspension for Non-Payment

If arbitrator compensation or administrative charges have not been paid in full, the AAA may so inform the parties in order that one of them may advance the required payment. If such payments are not made, the arbitrator may order the suspension or termination of the proceedings. If no arbitrator has yet been appointed, the AAA may suspend or terminate the proceedings.

## 48. Interpretation and Application of Rules

The arbitrator shall interpret and apply these rules as they relate to the arbitrator's powers and duties. When there is more than one arbitrator and a difference arises among them concerning the meaning or application of these Rules, it shall be resolved by a majority vote. If that is not possible, either an arbitrator or a party may refer the question to the AAA for final decision. All other procedures shall be interpreted and applied by the AAA.

## Costs of Arbitration (including AAA Administrative Fees)

This Costs of Arbitration section contains two separate and distinct sub-sections. Initially, the AAA shall make an administrative determination as to whether the dispute arises from an employer-promulgated plan or an individually-negotiated employment agreement or contract.

If a party disagrees with the AAA's determination, the parties may bring the issue to the attention of the arbitrator for a final determination. The arbitrator's determination will be made on documents only, unless the arbitrator deems a hearing is necessary.

# For Disputes Arising Out of Employer-Promulgated Plans*:

Arbitrator compensation is not included as part of the administrative fees charged by the AAA. Arbitrator compensation is based on the most recent biography sent to the parties prior to appointment. The employer shall pay the arbitrator's compensation unless the employee, post dispute, voluntarily elects to pay a portion of the arbitrator's compensation. Arbitrator compensation, expenses as defined in section (iv) below, and administrative fees are not subject to reallocation by the arbitrator(s) except upon the arbitrator's determination that a claim or counterclaim was filed for purposes of harassment or is patently frivolous.

*Pursuant to Section 1284.3 of the California Code of Civil Procedure, consumers with a gross monthly income of less than 300% of the federal poverty guidelines are entitled to a waiver of arbitration fees and costs, exclusive of arbitrator fees. This law applies to all consumer agreements subject to the California Arbitration Act, and to all consumer arbitrations conducted in California. If you believe that you meet these requirements, you must submit to the AAA a declaration under oath regarding your monthly income and the number of persons in your household. Please contact Case Filing Services at 877-495-4185 if you have any questions regarding the waiver of administrative fees. (Effective January 1, 2003.)

A party making a demand for treatment of a claim, counterclaim, or additional claim as a collective action arbitration will be subject to the administrative fees as outlined in the standard and flexible fee schedules below. Arbitrator compensation is not included as a part of the administrative fees charged by the AAA. Arbitrator compensation in cases involving a collective action claim will be charged in accordance with the determination as to whether the dispute arises from an employer-promulgated plan or an individually negotiated employment agreement or contract.

## (i) Filing Fees

**Cases Filed by Employee Against Employer**

In cases before a single arbitrator, a non-refundable filing fee capped in the amount of $200 is payable in full by the employee when a claim is filed, unless the plan provides that the employee pay less. A non-refundable fee in the amount of $1350 is payable in full by the employer, unless the plan provides that the employer pay more.

In cases before three or more arbitrators, a non-refundable filing fee capped in the amount of $200 is payable in full by the employee when a claim is filed, unless the plan provides that the employee pay less. A non-refundable fee in the amount of $1,800 is payable in full by the employer, unless the plan provides that the employer pay more.

The employer's share is due as soon as the employee meets his or her filing requirements, even if the matter settles.

There shall be no filing fee charged for a counterclaim. If a determination is made that the dispute arises out of an individually-negotiated employment agreement, the filing fee for a counterclaim will be charged in accordance with the fee schedules below for disputes arising out of individually negotiated employment agreements.

The above fee schedule will also apply where the employer files on behalf of the employee pursuant to the terms of the employer promulgated plan.

**Cases Filed by Employer Against Employee**

In cases before a single arbitrator, a non-refundable fee in the amount of $1,550 is payable in full by the employer.

In cases before three or more arbitrators, a non-refundable fee in the amount of $2,000 is payable in full by the employer.

There shall be no filing fee charged for a counterclaim. If a determination is made that the dispute arises out of an individually-negotiated employment agreement, the filing fee for a counterclaim will be charged in accordance with the fee schedules below for disputes arising out of individually-negotiated employment agreements.

(ii) Hearing Fees

For each day of hearing held before a single arbitrator, an administrative fee of $350 is payable by the employer.

For each day of hearing held before a multi-arbitrator panel, an administrative fee of $500 is payable by the employer.

There is no AAA hearing fee for the initial Arbitration Management Conference.

## (iii) Postponement/Cancellation Fees

A fee of $150 is payable by a party causing a postponement of any hearing scheduled before a single arbitrator.

A fee of $250 is payable by a party causing a postponement of any hearing scheduled before a multi-arbitrator panel.

## (iv) Hearing Room Rental

The hearing fees described above do not cover the rental of hearing rooms. The AAA maintains hearing rooms in most offices for the convenience of the parties. Check with the administrator for availability and rates. Hearing room rental fees will be borne by the employer.

## (v) Abeyance Fee

Parties on cases held in abeyance for one year will be assessed an annual abeyance fee of $300. A case may only be held in abeyance after the initial filing fees have been paid. If a party refuses to pay the assessed fee, the other party or parties may pay the entire fee on behalf of all parties, otherwise the matter will be administratively closed.

## (vi) Expenses

All expenses of the arbitrator, including required travel and other expenses, and any AAA expenses, as well as the costs relating to proof and witnesses produced at the direction of the arbitrator, shall be borne by the employer.

## For Disputes Arising Out of Individually-Negotiated Employment Agreements and Contracts:

The AAA's Fee Schedule, as modified below, will apply to disputes arising out of individually-negotiated employment agreements and contracts, even if such agreements and contracts reference or incorporate an employer-promulgated plan. Arbitrator compensation is not included as part of the administrative fees charged by the AAA. Arbitrator compensation is based on the most recent biography sent to the parties prior to appointment.

# Administrative Fee Schedules (Standard and Flexible Fee)

The AAA has two administrative fee options for parties filing claims or counterclaims, the Standard Fee Schedule and Flexible Fee Schedule. The Standard Fee Schedule has a two-payment schedule, and the Flexible Fee Schedule has a three-payment schedule which offers lower initial filing fees, but potentially higher total administrative fees of approximately 12% to 19% for cases that proceed to a hearing. The administrative fees of the AAA are based on the amount of the claim or counterclaim. Arbitrator compensation is not included in this schedule. Unless the parties agree otherwise, arbitrator compensation and administrative fees are subject to allocation by the arbitrator in the award.

In an effort to make arbitration costs reasonable for consumers, the AAA has a separate fee schedule for consumer-related disputes. Please refer to Section C-8 of the Supplementary Procedures for Consumer-Related Disputes when filing a consumer-related claim. Note that the Flexible Fee Schedule is not available on cases administered under these supplementary procedures.

The AAA applies the Supplementary Procedures for Consumer-Related Disputes to arbitration clauses in agreements between individual consumers and businesses where the business has a standardized, systematic application of arbitration clauses with customers and where the terms and conditions of the purchase of standardized, consumable goods or services are non-negotiable or primarily non-negotiable in most or all of its terms, conditions, features, or choices. The product or service must be for personal or household use. The AAA will have the discretion to apply or not to apply the Supplementary Procedures and the parties will be able to bring any disputes concerning the application or non-application to the attention of the arbitrator. Consumers are not prohibited from seeking relief in a small claims court for disputes or claims within the scope of its jurisdiction, even in consumer arbitration cases filed by the business.

**Fees for incomplete or deficient filings:** Where the applicable arbitration agreement does not reference the AAA, the AAA will attempt to obtain the agreement of the other parties to the dispute to have the arbitration administered by the AAA. However, where the AAA is unable to obtain the agreement of the parties to have the AAA administer the arbitration, the AAA will administratively close the case and will not proceed with the administration of the arbitration. In these cases, the AAA will return the filing fees to the filing party, less the amount specified in the fee schedule below for deficient filings.

Rules Amended and Effective November 1, 2009. Fee Schedule Amended and Effective May 15, 2013.    EMPLOYMENT RULES   35 **35**

App.048

Parties that file demands for arbitration that are incomplete or otherwise do not meet the filing requirements contained in these Rules shall also be charged the amount specified below for deficient filings if they fail or are unable to respond to the AAA's request to correct the deficiency.

**Fees for additional services:** The AAA reserves the right to assess additional administrative fees for services performed by the AAA beyond those provided for in these Rules which may be required by the parties' agreement or stipulation.

## (i) Standard Fee Schedule

An Initial Filing Fee is payable in full by a filing party when a claim, counterclaim, or additional claim is filed. A Final Fee will be incurred for all cases that proceed to their first hearing. This fee will be payable in advance at the time that the first hearing is scheduled. This fee will be refunded at the conclusion of the case if no hearings have occurred. However, if the Association is not notified at least 24 hours before the time of the scheduled hearing, the Final Fee will remain due and will not be refunded.

These fees will be billed in accordance with the following schedule:

| AMOUNT OF CLAIM | INITIAL FILING FEE | FINAL FEE |
|---|---|---|
| Above $0 to $10,000 | $775 | $200 |
| Above $10,000 to $75,000 | $975 | $300 |
| Above $75,000 to $150,000 | $1,850 | $750 |
| Above $150,000 to $300,000 | $2,800 | $1,250 |
| Above to $300,000 to $500,000 | $4,350 | $1,750 |
| Above to $500,000 to $1,000,000 | $6,200 | $2,500 |
| Above $1,000,000 to $5,000,000 | $8,200 | $3,250 |
| Above $5,000,000 to $10,000,000 | $10,200 | $4,000 |
| Above $10,000,000 | Base fee of $12,800 plus .01% of the amount above $10,000,000 Fee Capped at $65,000 | $6,000 |
| Nonmonetary claims[1] | $3,350 | $1,250 |
| Collective Action Claims[2] | $3,350 | $1,250 |
| Deficient Claim Filing Fee[3] | $350 | |
| Additional Services[4] | | |

[1] *This fee is applicable when a claim or counterclaim is not for a monetary amount. Where a monetary claim amount is not known, parties will be required to state a range of claims or be subject to a filing fee of $10,200.*

[2] *This fee is applicable where a party makes a demand for treatment of a claim, counterclaim, or additional claim as a collective action arbitration.*

[3] *The Deficient Claim Filing Fee shall not be charged in cases filed by a consumer in an arbitration governed by the Supplementary Procedures for the Resolution of Consumer-Related Disputes, or in cases filed by an Employee who is submitting their dispute to arbitration pursuant to an employer promulgated plan.*

[4] *The AAA may assess additional fees where procedures or services outside the Rules sections are required under the parties' agreement or by stipulation.*

Rules Amended and Effective November 1, 2009. Fee Schedule Amended and Effective May 15, 2013.

Fees are subject to increase if the amount of a claim or counterclaim is modified after the initial filing date. Fees are subject to decrease if the amount of a claim or counterclaim is modified before the first hearing.

The minimum fees for any case having three or more arbitrators are $2,800 for the Initial Filing Fee, plus a $1,250 Final Fee. Expedited Procedures are applied in any case where no disclosed claim or counterclaim exceeds $75,000, exclusive of interest and arbitration costs.

Parties on cases filed under either the Flexible Fee Schedule or the Standard Fee Schedule that are held in abeyance for one year will be assessed an annual abeyance fee of $300. A case may only be held in abeyance after the filing fees have been paid. If a party refuses to pay the assessed fee, the other party or parties may pay the entire fee on behalf of all parties, otherwise the matter will be administratively closed.

For more information, please contact your local AAA office, case management center, or our Customer Service desk at 1-800-778-7879.

## (ii) Refund Schedule for Standard Fee Schedule

The AAA offers a refund schedule on filing fees connected with the Standard Fee Schedule. For cases with claims up to $75,000, a minimum filing fee of $350 will not be refunded. For all other cases, a minimum fee of $600 will not be refunded. Subject to the minimum fee requirements, refunds will be calculated as follows:

> 100% of the filing fee, above the minimum fee, will be refunded if the case is settled or withdrawn within five calendar days of filing.

> 50% of the filing fee, will be refunded if the case is settled or withdrawn between six and 30 calendar days of filing.

> 25% of the filing fee will be refunded if the case is settled or withdrawn between 31 and 60 calendar days of filing.

***No refund will be made once an arbitrator has been appointed (this includes one arbitrator or a three-arbitrator panel). No refunds will be granted on awarded cases.***

**Note:** The date of receipt of the demand for arbitration with the AAA will be used to calculate refunds of filing fees for both claims and counterclaims.

A non-refundable Initial Filing Fee is payable in full by a filing party when a claim, counterclaim, or additional claim is filed. Upon receipt of the Demand for Arbitration, the AAA will promptly initiate the case and notify all parties as well as establish the due date for filing of an Answer, which may include a Counterclaim. In order to proceed with the further administration of the arbitration and appointment of the arbitrator(s), the appropriate, non-refundable Proceed Fee outlined below must be paid.

If a Proceed Fee is not submitted within ninety (90) days of the filing of the Claimant's Demand for Arbitration, the Association will administratively close the file and notify all parties.

***No refunds or refund schedule will apply to the Filing or Proceed Fees once received.***

The Flexible Fee Schedule below also may be utilized for the filing of counterclaims. However, as with the Claimant's claim, the counterclaim will not be presented to the arbitrator until the Proceed Fee is paid.

A Final Fee will be incurred for all claims and/or counterclaims that proceed to their first hearing. This fee will be payable in advance when the first hearing is scheduled, but will be refunded at the conclusion of the case if no hearings have occurred. However, if the Association is not notified of a cancellation at least 24 hours before the time of the scheduled hearing, the Final Fee will remain due and will not be refunded.

All fees will be billed in accordance with the following schedule:

| AMOUNT OF CLAIM | INITIAL FILING FEE | PROCEED FEE | FINAL FEE |
|---|---|---|---|
| Above $0 to $10,000 | $400 | $475 | $200 |
| Above $10,000 to $75,000 | $625 | $500 | $300 |
| Above $75,000 to $150,000 | $850 | $1,250 | $750 |
| Above $150,000 to $300,000 | $1,000 | $2,125 | $1,250 |
| Above to $300,000 to $500,000 | $1,500 | $3,400 | $1,750 |
| Above to $500,000 to $1,000,000 | $2,500 | $4,500 | $2,500 |
| Above $1,000,000 to $5,000,000 | $2,500 | $6,700 | $3,250 |
| Above $5,000,000 to $10,000,000 | $3,500 | $8,200 | $4,000 |
| Above $10,000,000 | $4,500 | $10,300 plus .01% of claim amount over $10,000,000 up to $65,000 | $6,000 |
| Nonmonetary [1] | $2,000 | $2,000 | $1,250 |
| Collective Action Claims[2] | $2,000 | $2,000 | $1,250 |
| Deficient Claim Filing Fee | $350 | | |
| Additional Services[3] | | | |

[1] This fee is applicable when a claim or counterclaim is not for a monetary amount. Where a monetary claim amount is not known, parties will be required to state a range of claims or be subject to a filing fee of $3,500 and a proceed fee of $8,200.

[2] This fee is applicable where a party makes a demand for treatment of a claim, counterclaim, or additional claim as a collective action arbitration.

[3] The AAA reserves the right to assess additional administrative fees for services performed by the AAA beyond those provided for in these Rules and which may be required by the parties' agreement or stipulation.

For more information, please contact your local AAA office, case management center, or our Customer Service desk at 1-800-778-7879. All fees are subject to increase if the amount of a claim or counterclaim is modified after the initial filing date. Fees are subject to decrease if the amount of a claim or counterclaim is modified before the first hearing.

The minimum fees for any case having three or more arbitrators are $1,000 for the Initial Filing Fee; $2,125 for the Proceed Fee; and $1,250 for the Final Fee.

Under the Flexible Fee Schedule, a party's obligation to pay the Proceed Fee shall remain in effect regardless of any agreement of the parties to stay, postpone or otherwise modify the arbitration proceedings. Parties that, through mutual agreement, have held their case in abeyance for one year will be assessed an annual abeyance fee of $300. If a party refuses to pay the assessed fee, the other party or parties may pay the entire fee on behalf of all parties, otherwise the matter will be closed.

**Note:** The date of receipt by the AAA of the demand for arbitration will be used to calculate the ninety (90) day time limit for payment of the Proceed Fee.

There is no Refund Schedule in the Flexible Fee Schedule.

(iv) Hearing Room Rental

The fees described above do not cover the cost of hearing rooms, which are available on a rental basis. Check with the AAA for availability and rates.

(v) Abeyance Fee

Parties on cases filed under the Standard Fee Schedule that are held in abeyance for one year will be assessed an annual abeyance fee of $300. A case may only be held in abeyance after the filing fees have been paid. If a party refuses to pay the assessed fee, the other party or parties may pay the entire fee on behalf of all parties, otherwise the matter will be administratively closed.

(vi) Expenses

All expenses of the arbitrator, including required travel and other expenses, and any AAA expenses, as well as the costs relating to proof and witnesses produced at the direction of the arbitrator, shall be borne equally by the parties.

## For Disputes Proceeding Under the Supplementary Rules for Class Action Arbitration ("Supplementary Rules"):

The AAA's Administered Fee Schedule, as listed in Section 11 of the Supplementary Rules for Class Action Arbitration, shall apply to disputes proceeding under the Supplementary Rules.

## Optional Rules for Emergency Measures of Protection

### O-1. Applicability

Where parties by special agreement or in their arbitration clause have adopted these rules for emergency measures of protection, a party in need of emergency relief prior to the constitution of the panel shall notify the AAA and all other parties in writing of the nature of the relief sought and the reasons why such relief is required on an emergency basis. The application shall also set forth the reasons why the party is entitled to such relief. Such notice may be given by facsimile transmission, or other reliable means, but must include a statement certifying that all other parties have been notified or an explanation of the steps taken in good faith to notify other parties.

### O-2. Appointment of Emergency Arbitrator

Within one business day of receipt of notice as provided in Section O-1, the AAA shall appoint a single emergency arbitrator from a special AAA panel of emergency arbitrators designated to rule on emergency applications. The emergency arbitrator shall immediately disclose any circumstance likely, on the basis of the facts disclosed in the application, to affect such arbitrator's impartiality or independence. Any challenge to the appointment of the emergency arbitrator must be made within one business day of the communication by the AAA to the parties of the appointment of the emergency arbitrator and the circumstances disclosed.

### O-3. Schedule

The emergency arbitrator shall as soon as possible, but in any event within two business days of appointment, establish a schedule for consideration of the application for emergency relief. Such schedule shall provide a reasonable opportunity to all parties to be heard, but may provide for proceeding by telephone conference or on written submissions as alternatives to a formal hearing.

## O-4. Interim Award

If after consideration the emergency arbitrator is satisfied that the party seeking the emergency relief has shown that immediate and irreparable loss or damage will result in the absence of emergency relief, and that such party is entitled to such relief, the emergency arbitrator may enter an interim award granting the relief and stating the reasons therefore.

## O-5. Constitution of the Panel

Any application to modify an interim award of emergency relief must be based on changed circumstances and may be made to the emergency arbitrator until the panel is constituted; thereafter such a request shall be addressed to the panel. The emergency arbitrator shall have no further power to act after the panel is constituted unless the parties agree that the emergency arbitrator is named as a member of the panel.

## O-6. Security

Any interim award of emergency relief may be conditioned on provision by the party seeking such relief of appropriate security.

## O-7. Special Master

A request for interim measures addressed by a party to a judicial authority shall not be deemed incompatible with the agreement to arbitrate or a waiver of the right to arbitrate. If the AAA is directed by a judicial authority to nominate a special master to consider and report on an application for emergency relief, the AAA shall proceed as provided in Section O-1 of this article and the references to the emergency arbitrator shall be read to mean the special master, except that the special master shall issue a report rather than an interim award.

## O-8. Costs

The costs associated with applications for emergency relief shall be apportioned in the same manner as set forth in the Costs of Arbitration section.

# Employment Mediation Procedures

## M-1. Agreement of Parties

Whenever, by stipulation or in their contract, the parties have provided for mediation or conciliation of existing or future disputes under the auspices of the American Arbitration Association (AAA) or under these procedures, the parties and their representatives, unless agreed otherwise in writing, shall be deemed to have made these procedures, as amended and in effect as of the date of filing of a request for mediation, a part of their agreement and designate the AAA as the administrator of their mediation.

The parties by mutual agreement may vary any part of these procedures including, but not limited to, agreeing to conduct the mediation via telephone or other electronic or technical means.

## M-2. Initiation of Mediation

Any party or parties to a dispute may initiate mediation under the AAA's auspices by making a Request for Mediation to any of the AAA's regional offices or case management centers via telephone, email, regular mail or fax. Requests for Mediation may also be filed online via AAA WebFile at **www.adr.org.**

The party initiating the mediation shall simultaneously notify the other party or parties of the request. The initiating party shall provide the following information to the AAA and the other party or parties as applicable:

    **i.** A copy of the mediation provision of the parties' contract or the parties' stipulation to mediate.

    **ii.** The names, regular mail addresses, email addresses (if available), and telephone numbers of all parties to the dispute and representatives, if any, in the mediation.

    **iii.** A brief statement of the nature of the dispute and the relief requested.

    **iv.** Any specific qualifications the mediator should possess.

Where there is no preexisting stipulation or contract by which the parties have provided for mediation of existing or future disputes under the auspices of the AAA, a party may request the AAA to invite another party to participate in "mediation by voluntary submission". Upon receipt of such a request, the AAA will contact the other party or parties involved in the dispute and attempt to obtain a submission to mediation.

## M-3. Fixing of Locale (the city, county, state, territory and, if applicable, country of the mediation)

i. When the parties' agreement to mediate is silent with respect to locale and the parties are unable to agree upon a locale, the AAA shall have the authority to consider the parties' arguments and determine the locale.

ii. When the parties' agreement to mediate requires a specific locale, absent the parties' agreement to change it, the locale shall be that specified in the agreement to mediate.

iii. If the reference to a locale in the agreement to mediate is ambiguous, the AAA shall have the authority to consider the parties' arguments and determine the locale.

## M-4. Representation

Any party may participate without representation (pro-se), or by any representative of that party's choosing, or by counsel, unless such choice is prohibited by applicable law. A party intending to have representation shall notify the other party and the AAA of the name, telephone number and address, and email address if available of the representative.

## M-5. Appointment of the Mediator

Parties may search the online profiles of the AAA's Panel of Mediators at **www.adr.org/mediation** in an effort to agree on a mediator. If the parties have not agreed to the appointment of a mediator and have not provided any other method of appointment, the mediator shall be appointed in the following manner:

i. Upon receipt of a request for mediation, the AAA will send to each party a list of mediators from the AAA's Panel of Mediators. The parties are encouraged to agree to a mediator from the submitted list and to advise the AAA of their agreement.

ii. If the parties are unable to agree upon a mediator, each party shall strike unacceptable names from the list, number the remaining names in order of preference, and return the list to the AAA. If a party does not return the list within the time specified, all mediators on the list shall be deemed acceptable to that party. From among the mediators who have been mutually approved by the parties, and in accordance with the designated order of mutual preference, the AAA shall invite a mediator to serve.

iii. If the parties fail to agree on any of the mediators listed, or if acceptable mediators are unable to serve, or if for any other reason the appointment cannot be made from the submitted list, the AAA shall have the authority to make the appointment from among other members of the Panel of Mediators without the submission of additional lists.

## M-6. Mediator's Impartiality and Duty to Disclose

AAA mediators are required to abide by the Model Standards of Conduct for Mediators in effect at the time a mediator is appointed to a case. Where there is a conflict between the Model Standards and any provision of these Mediation Procedures, these Mediation Procedures shall govern. The Standards require mediators to (i) decline a mediation if the mediator cannot conduct it in an impartial manner, and (ii) disclose, as soon as practicable, all actual and potential conflicts of interest that are reasonably known to the mediator and could reasonably be seen as raising a question about the mediator's impartiality.

Prior to accepting an appointment, AAA mediators are required to make a reasonable inquiry to determine whether there are any facts that a reasonable individual would consider likely to create a potential or actual conflict of interest for the mediator. AAA mediators are required to disclose any circumstance likely to create a presumption of bias or prevent a resolution of the parties' dispute within the time-frame desired by the parties. Upon receipt of such disclosures, the AAA shall immediately communicate the disclosures to the parties for their comments.

The parties may, upon receiving disclosure of actual or potential conflicts of interest of the mediator, waive such conflicts and proceed with the mediation. In the event that a party disagrees as to whether the mediator shall serve, or in the event that the mediator's conflict of interest might reasonably be viewed as undermining the integrity of the mediation, the mediator shall be replaced.

## M-7. Vacancies

If any mediator shall become unwilling or unable to serve, the AAA will appoint another mediator, unless the parties agree otherwise, in accordance with section M-5.

## M-8. Duties and Responsibilities of the Mediator

i.  The mediator shall conduct the mediation based on the principle of party self-determination. Self-determination is the act of coming to a voluntary, uncoerced decision in which each party makes free and informed choices as to process and outcome.

ii. The mediator is authorized to conduct separate or ex parte meetings and other communications with the parties and/or their representatives, before, during, and after any scheduled mediation conference. Such communications may be conducted via telephone, in writing, via email, online, in person or otherwise.

iii. The parties are encouraged to exchange all documents pertinent to the relief requested. The mediator may request the exchange of memoranda on issues, including the underlying interests and the history of the parties' negotiations. Information that a party wishes to keep confidential may be sent to the mediator, as necessary, in a separate communication with the mediator.

iv. The mediator does not have the authority to impose a settlement on the parties but will attempt to help them reach a satisfactory resolution of their dispute. Subject to the discretion of the mediator, the mediator may make oral or written recommendations for settlement to a party privately or, if the parties agree, to all parties jointly.

v. In the event a complete settlement of all or some issues in dispute is not achieved within the scheduled mediation session(s), the mediator may continue to communicate with the parties, for a period of time, in an ongoing effort to facilitate a complete settlement.

vi. The mediator is not a legal representative of any party and has no fiduciary duty to any party.

vii. The mediator shall set the date, time, and place for each session of the mediation conference. The parties shall respond to requests for conference dates in a timely manner, be cooperative in scheduling the earliest practicable date, and adhere to the established conference schedule. The AAA shall provide notice of the conference to the parties in advance of the conference date, when timing permits.

## M-9. Responsibilities of the Parties

The parties shall ensure that appropriate representatives of each party, having authority to consummate a settlement, attend the mediation conference.

Prior to and during the scheduled mediation conference session(s) the parties and their representatives shall, as appropriate to each party's circumstances, exercise their best efforts to prepare for and engage in a meaningful and productive mediation.

## M-10. Privacy

Mediation sessions and related mediation communications are private proceedings. The parties and their representatives may attend mediation sessions. Other persons may attend only with the permission of the parties and with the consent of the mediator.

## M-11. Confidentiality

Subject to applicable law or the parties' agreement, confidential information disclosed to a mediator by the parties or by other participants (witnesses) in the course of the mediation shall not be divulged by the mediator. The mediator shall maintain the confidentiality of all information obtained in the mediation, and all records, reports, or other documents received by a mediator while serving in that capacity shall be confidential.

The mediator shall not be compelled to divulge such records or to testify in regard to the mediation in any adversary proceeding or judicial forum.

The parties shall maintain the confidentiality of the mediation and shall not rely on, or introduce as evidence in any arbitral, judicial, or other proceeding the following, unless agreed to by the parties or required by applicable law:

i. Views expressed or suggestions made by a party or other participant with respect to a possible settlement of the dispute;

ii. Admissions made by a party or other participant in the course of the mediation proceedings;

iii. Proposals made or views expressed by the mediator; or

iv. The fact that a party had or had not indicated willingness to accept a proposal for settlement made by the mediator.

## M-12. No Stenographic Record

There shall be no stenographic record of the mediation process.

## M-13. Termination of Mediation

The mediation shall be terminated:

i. By the execution of a settlement agreement by the parties; or

ii. By a written or verbal declaration of the mediator to the effect that further efforts at mediation would not contribute to a resolution of the parties' dispute; or

iii. By a written or verbal declaration of all parties to the effect that the mediation proceedings are terminated; or

iv. When there has been no communication between the mediator and any party or party's representative for 21 days following the conclusion of the mediation conference.

## M-14. Exclusion of Liability

Neither the AAA nor any mediator is a necessary party in judicial proceedings relating to the mediation. Neither the AAA nor any mediator shall be liable to any party for any error, act or omission in connection with any mediation conducted under these procedures. Parties to a mediation under these procedures may not call the mediator, the AAA or AAA employees as a witness in litigation or any other proceeding relating to the mediation. The mediator, the AAA and AAA employees are not competent to testify as witnesses in any such proceeding.

## M-15. Interpretation and Application of Procedures

The mediator shall interpret and apply these procedures insofar as they relate to the mediator's duties and responsibilities. All other procedures shall be interpreted and applied by the AAA.

## M-16. Deposits

Unless otherwise directed by the mediator, the AAA will require the parties to deposit in advance of the mediation conference such sums of money as it, in consultation with the mediator, deems necessary to cover the costs and expenses of the mediation and shall render an accounting to the parties and return any unexpended balance at the conclusion of the mediation.

## M-17. Expenses

All expenses of the mediation, including required traveling and other expenses or charges of the mediator, shall be borne equally by the parties unless they agree otherwise. The expenses of participants for either side shall be paid by the party requesting the attendance of such participants.

## M-18. Cost of the Mediation

There is no filing fee to initiate a mediation or a fee to request the AAA to invite parties to mediate.

The cost of mediation is based on the hourly or daily mediation rate published on the mediator's AAA profile. This rate covers both mediator compensation and an allocated portion for the AAA's services. There is a four-hour or one half-day minimum charge for a mediation conference. Expenses referenced in Section M-17 may also apply.

If a matter submitted for mediation is withdrawn or cancelled or results in a settlement after the request to initiate mediation is filed but prior to the mediation conference the cost is $200 plus any mediator time and charges incurred. These costs shall be borne by the initiating party unless the parties agree otherwise.

If you have questions about mediation costs or services visit **www.adr.org/mediation** or contact your local AAA office.

*© 2013 American Arbitration Association, Inc. All rights reserved. These Rules are the copyrighted property of the American Arbitration Association (AAA) and are intended to be used in conjunction with the AAA's administrative services. Any unauthorized use or modification of these Rules may violate copyright laws and other applicable laws. Please contact 800.778.7879 or websitemail@adr.org for additional information.*

App.064

## Regional Vice Presidents and Directors

**States: Delaware, District of Columbia, Maryland, New Jersey, Pennsylvania, West Virginia**
Kenneth Egger
Vice President
Phone: 215.731.2281
Email: EggerK@adr.org

**States: Connecticut, Maine, Massachusetts, New Hampshire, New York, Vermont**
Ann Lesser, Esq.
Vice President
Phone: 212.484.4084
Email: LesserA@adr.org

**States: Alabama, Arkansas, Florida, Georgia, Mississippi, North Carolina, South Carolina, Virginia**
Charles Dorsey
Director
Phone: 866.686.6024
Email: DorseyC@adr.org

**States: Illinois, Indiana, Iowa, Kansas, Kentucky, Michigan, Minnesota, Missouri, Nebraska, North Dakota, Ohio, South Dakota, Tennessee, Wisconsin**
Jan Holdinski
Vice President
Phone: 248.352.5509
Email: HoldinskiJ@adr.org

**States: Alaska, Arizona, California, Colorado, Hawaii, Idaho, Montana, Nevada, Oregon, Utah, Washington, Wyoming**
John English
Vice President
Phone: 619.239.3051
Email: EnglishJ@adr.org

**States: Rhode Island**
Heather Santo
Director
Phone: 866.293.4053
Email: SantoH@adr.org

**States: Louisiana, New Mexico, Oklahoma, Texas**
Molly Bargenquest
Vice President
Phone: 972.702.8222
Email: BargenquestM@adr.org

## Case Management Vice Presidents and Directors

Molly Bargenquest
Vice President
Phone: 972.702.8222
Email: BargenquestM@adr.org
**Administers cases in AR, IL, IA, KS, LA, MN, MS, MO, NE, ND, OK, SD, TX, WI**

Patrick Tatum
Director
Phone: 559.490.1905
Email: TatumP@adr.org
**Administers cases in AK, AZ, CA, CO, HI, ID, MT, NV, NM, OR, UT, WA, WY**

Charles Dorsey
Director
Phone: 866.686.6024
Email: DorseyC@adr.org
**Administers cases in FL, GA**

Heather Santo
Director
Phone: 866.293.4053
Email: SantoH@adr.org
**Administers cases in AL, CT, DC, DE, IN, KY, MA, MD, ME, MI, NC, NH, NJ, NY, OH, PA, RI, SC, TN, VA, VT, WV**



AMERICAN ARBITRATION ASSOCIATION®

800.778.7879 | websitemail@adr.org | adr.org



# EXHIBIT F

Vernon's Texas Statutes and Codes Annotated
  Civil Practice and Remedies Code (Refs & Annos)
    Title 7. Alternate Methods of Dispute Resolution (Refs & Annos)
      Chapter 171. General Arbitration (Refs & Annos)
        Subchapter A. General Provisions (Refs & Annos)

V.T.C.A., Civil Practice & Remedies Code § 171.001

§ 171.001. Arbitration Agreements Valid

Currentness

(a) A written agreement to arbitrate is valid and enforceable if the agreement is to arbitrate a controversy that:

  (1) exists at the time of the agreement; or

  (2) arises between the parties after the date of the agreement.

(b) A party may revoke the agreement only on a ground that exists at law or in equity for the revocation of a contract.

**Credits**
Amended by Acts 1997, 75th Leg., ch. 165, § 5.01, eff. Sept. 1, 1997.

Notes of Decisions (636)

V. T. C. A., Civil Practice & Remedies Code § 171.001, TX CIV PRAC & REM § 171.001
Current through the end of the 2013 Third Called Session of the 83rd Legislature

End of Document                                     © 2014 Thomson Reuters. No claim to original U.S. Government Works.

App.066

Vernon's Texas Statutes and Codes Annotated
    Civil Practice and Remedies Code (Refs & Annos)
        Title 7. Alternate Methods of Dispute Resolution (Refs & Annos)
            Chapter 171. General Arbitration (Refs & Annos)
                Subchapter B. Proceedings to Compel or Stay Arbitrations (Refs & Annos)

V.T.C.A., Civil Practice & Remedies Code § 171.021

§ 171.021. Proceeding to Compel Arbitration

Currentness

(a) A court shall order the parties to arbitrate on application of a party showing:

(1) an agreement to arbitrate; and

(2) the opposing party's refusal to arbitrate.

(b) If a party opposing an application made under Subsection (a) denies the existence of the agreement, the court shall summarily determine that issue. The court shall order the arbitration if it finds for the party that made the application. If the court does not find for that party, the court shall deny the application.

(c) An order compelling arbitration must include a stay of any proceeding subject to Section 171.025.

**Credits**
Added by Acts 1997, 75th Leg., ch. 165, § 5.01, eff. Sept. 1, 1997.

Notes of Decisions (138)

V. T. C. A., Civil Practice & Remedies Code § 171.021, TX CIV PRAC & REM § 171.021
Current through the end of the 2013 Third Called Session of the 83rd Legislature

End of Document

© 2014 Thomson Reuters. No claim to original U.S. Government Works.

Vernon's Texas Statutes and Codes Annotated
  Civil Practice and Remedies Code (Refs & Annos)
    Title 7. Alternate Methods of Dispute Resolution (Refs & Annos)
      Chapter 171. General Arbitration (Refs & Annos)
        Subchapter B. Proceedings to Compel or Stay Arbitrations (Refs & Annos)

V.T.C.A., Civil Practice & Remedies Code § 171.025

§ 171.025. Stay of Related Proceeding

Currentness

(a) The court shall stay a proceeding that involves an issue subject to arbitration if an order for arbitration or an application for that order is made under this subchapter.

(b) The stay applies only to the issue subject to arbitration if that issue is severable from the remainder of the proceeding.

**Credits**
Added by Acts 1997, 75th Leg., ch. 165, § 5.01, eff. Sept. 1, 1997.

Notes of Decisions (5)

V. T. C. A., Civil Practice & Remedies Code § 171.025, TX CIV PRAC & REM § 171.025
Current through the end of the 2013 Third Called Session of the 83rd Legislature

# 2014CV01064

E-FILED
Bexar County, County Clerk
Gerard Rickhoff
Accepted Date:11/10/2014 9:10:58 AM
Accepted By: Leticia Silva
Leticia Silva
Deputy Clerk

CAUSE NO. 2014CV01064

| | | |
|---|---|---|
| PAULA BAZAN-GARCIA, | § | IN THE COUNTY COURT |
| | § | |
| Plaintiff. | § | |
| | § | |
| v. | § | AT LAW NO. 03 |
| | § | |
| WESTERN RIM PROPERTY SERVICES, | § | |
| INC. | § | |
| | § | |
| Defendant | § | BEXAR COUNTY, TEXAS |

## ORDER CONCERNING DEFENDANT'S MOTION TO COMPEL ARBITRATION AND MOTION FOR PROTECTIVE ORDER

On this the 6th day of November 2014 came to be heard Defendant's Motion to Compel Arbitration and Motion for Protective Order. The Court having considered the Motions and all applicable arguments, case law and evidence is of the opinion that the arbitration policy contained in Defendant's dispute resolution policy is unconscionable and unenforceable.

IT IS THEREFORE ORDERED, ADJUDGED AND DECREED that Defendant's Motion to Compel Arbitration is hereby in all things DENIED.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that Defendant's Motion for Protective Order is hereby in all things DENIED.

SIGNED and ENTERED this the ___ day of _____, 2014.

_____
HON. JUDGE PRESIDING

APPROVED AS TO FORM:

13

JOSUE F. GARZA
Espinoza Law Firm, PLLC
Attorneys for Plaintiff
503 E. Ramsey, Ste. 103
San Antonio, Texas 78216

JENNIFER . TRULOCK
STEPHANIE F. CAGNIART
98 San Jacinto Boulevard, Suite 1500
Austin, Texas 78701-4078

14

App.002



*WRPS, LP*
**WRPS, LP**

## 718 Problem Resolution
Effective Date: 12/1/1999
Revision Date: 8/1/2006

WRPS, LP is committed to providing the best possible working conditions for its employees. Part of this commitment is encouraging an open and frank atmosphere in which any problem, complaint, suggestion, or question receives a timely response from WRPS, LP supervisors and management.

WRPS, LP strives to ensure fair and honest treatment of all employees. Supervisors, managers, and employees are expected to treat each other with mutual respect. Employees are encouraged to offer positive and constructive criticism.

If employees disagree with established rules of conduct, policies, or practices, they can express their concern through the problem resolution procedure. No employee will be penalized, formally or informally, for voicing a complaint with WRPS, LP in a reasonable, business-like manner, or for using the problem resolution procedure.

If a situation occurs when employees believe that a condition of employment or a decision affecting them is unjust or inequitable, they are encouraged to make use of the following steps. The employee may discontinue the procedure at any step.

1. Employee presents problem promptly to immediate supervisor within 3 calendar days, after incident occurs. If supervisor is unavailable or employee believes it would be inappropriate to contact that person, employee may present problem to the Human Resources Department or any other member of management.

2. Supervisor responds to problem during discussion or within 3 calendar days, after consulting with appropriate management, when necessary. Supervisor documents discussion.

3. Employee presents problem to the Human Resources Department within 3 calendar days, if problem is unresolved.

4. Human Resources Department counsels and advises employee, assists in putting problem in writing, visits with employee's manager(s), if necessary, and directs employee to the President for review of problem.

5. Employee presents problem to the President in writing.

83



# WRPS, LP
**WRPS, LP**

6. The President reviews and considers problem. The President informs employee of decision within 3 calendar days, and forwards copy of written response to the Human Resources Department for employee's file. The President has full authority to make any adjustment deemed appropriate to resolve the problem. This decision is final and binding on all parties and may not be discussed or complained about again.

Problems, disputes, or claims not resolved through the preceding problem resolution steps are subject to final and binding arbitration. The arbitration proceeding will be conducted under the Employment Dispute Resolution Rules of the American Arbitration Association. The decision or award of the Arbitrator made under these rules is exclusive, final, and binding on parties, their beneficiaries, executors, administrators, successors, and assigns. <u>Every</u> employee must sign the attached Arbitration Agreement. This is an absolute requirement.

Employees who choose to use the arbitration process to resolve a problem will be expected to share the cost of the arbitration proceeding with WRPS, LP. A complete description of the arbitration procedure is available from the Human Resources Department for review.

Not every problem can be resolved to everyone's total satisfaction, but only through understanding and discussion of mutual problems can employees and management develop confidence in each other. This confidence is important to the operation of an efficient and harmonious work environment, and helps to ensure everyone's job security.

84

App.013

# Employment Arbitration Rules and Mediation Procedures

## 1. Applicable Rules of Arbitration

The parties shall be deemed to have made these rules a part of their arbitration agreement whenever they have provided for arbitration by the American Arbitration Association (hereinafter "AAA") or under its *Employment Arbitration Rules and Mediation Procedures* or for arbitration by the AAA of an employment dispute without specifying particular rules[*]. If a party establishes that an adverse material inconsistency exists between the arbitration agreement and these rules, the arbitrator shall apply these rules.

If, within 30 days after the AAA's commencement of administration, a party seeks judicial intervention with respect to a pending arbitration and provides the AAA with documentation that judicial intervention has been sought, the AAA will suspend administration for 60 days to permit the party to obtain a stay of arbitration from the court.These rules, and any amendment of them, shall apply in the form in effect at the time the demand for arbitration or submission is received by the AAA.

[*] *The National Rules for the Resolution of Employment Disputes* have been re-named the *Employment Arbitration Rules and Mediation Procedures.* Any arbitration agreements providing for arbitration under its *National Rules for the Resolution of Employment Disputes* shall be administered pursuant to these *Employment Arbitration Rules and Mediation Procedures.*

## 2. Notification

An employer intending to incorporate these rules or to refer to the dispute resolution services of the AAA in an employment ADR plan, shall, at least 30 days prior to the planned effective date of the program:

**a.** notify the Association of its intention to do so and,

**b.** provide the Association with a copy of the employment dispute resolution plan.

Compliance with this requirement shall not preclude an arbitrator from entertaining challenges as provided in Section 1. If an employer does not comply with this requirement, the Association reserves the right to decline its administrative services.

## ARBITRATION AGREEMENT

It is in the interest of WRPS III, LP and their employees to resolve in a speedy and inexpensive way, any legal controversy that may arise. Therefore, other than a worker's compensation claim covered by insurance, no dispute between the companies and the undersigned which is in any way related to the employment of the undersigned, including but not limited to a claim for wrongful termination, discrimination and/or harassment, and worker's compensation not covered by insurance, shall be the subject of a lawsuit filed in any state or federal court. Instead, any such dispute shall be submitted to arbitration in accordance with the rules of the American Arbitration Association ("AAA"). Prior to the filing of any such proceeding, the filing party shall give twenty (20) days prior written notice.

Each party to arbitration shall be entitled to take only one deposition. Any arbitration relating to any dispute covered by this Agreement shall be arbitrated in Dallas County, Texas.

At the conclusion of the arbitration, the arbitrator shall make such findings of fact and state the evidentiary basis of such finding. The Arbitrator shall also issue a ruling and explain how the findings of fact justify his ruling. Any court of competent jurisdiction shall enter judgment on the arbitration award and shall review the award as permitted by law.

BY: _____
Marcus D Hiles
President
WRPS III, LP

Date: _____9/7/06_____

By: _____

Date: _____9-27-11_____

    **(2)** Simultaneously shall send a copy of any counterclaim to the Claimant.

    **(3)** Shall include with its filing the applicable filing fee provided for by these rules.

  **(iv)** The Claimant may file an Answer to the counterclaim with the AAA within 15 days after the date of the letter from the AAA acknowledging receipt of the counterclaim. The Answer shall provide Claimant's brief response to the counterclaim and the issues presented. The Claimant shall make its filing in duplicate with the AAA, and simultaneously shall send a copy of the Answer to the Respondent(s). If no answering statement is filed within the stated time, Claimant will be deemed to deny the counterclaim. Failure to file an answering statement shall not operate to delay the arbitration.

**c.** The form of any filing in these rules shall not be subject to technical pleading requirements.

## 5. Changes of Claim

Before the appointment of the arbitrator, if either party desires to offer a new or different claim or counterclaim, such party must do so in writing by filing a written statement with the AAA and simultaneously provide a copy to the other party(s), who shall have 15 days from the date of such transmittal within which to file an answer with the AAA. After the appointment of the arbitrator, a party may offer a new or different claim or counterclaim only at the discretion of the arbitrator.

## 6. Jurisdiction

**a.** The arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope or validity of the arbitration agreement.

**b.** The arbitrator shall have the power to determine the existence or validity of a contract of which an arbitration clause forms a part. Such an arbitration clause shall be treated as an agreement independent of the other terms of the contract. A decision by the arbitrator that the contract is null and void shall not for that reason alone render invalid the arbitration clause.

**c.** A party must object to the jurisdiction of the arbitrator or to the arbitrability of a claim or counterclaim no later than the filing of the answering statement to the claim or counterclaim that gives rise to the objection. The arbitrator may rule on such objections as a preliminary matter or as part of the final award.

## 7. Administrative and Mediation Conferences

Before the appointment of the arbitrator, any party may request, or the AAA, in its discretion, may schedule an administrative conference with a representative of the AAA and the parties and/or their representatives. The purpose of the

# ARBITRATION AGREEMENT

It is in the interest of WRPS III, LP and their employees to resolve in a speedy and inexpensive way, any legal controversy that may arise. Therefore, other than a worker's compensation claim covered by insurance, no dispute between the companies and the undersigned which is in any way related to the employment of the undersigned, including but not limited to a claim for wrongful termination, discrimination and/or harassment, and worker's compensation not covered by insurance, shall be the subject of a lawsuit filed in any state or federal court. Instead, any such dispute shall be submitted to arbitration in accordance with the rules of the American Arbitration Association ("AAA"). Prior to the filing of any such proceeding, the filing party shall give twenty (20) days prior written notice.

Each party to arbitration shall be entitled to take only one deposition. Any arbitration relating to any dispute covered by this Agreement shall be arbitrated in Dallas County, Texas.

At the conclusion of the arbitration, the arbitrator shall make such findings of fact and state the evidentiary basis of such finding. The Arbitrator shall also issue a ruling and explain how the findings of fact justify his ruling. Any court of competent jurisdiction shall enter judgment on the arbitration award and shall review the award as permitted by law.

BY: _____

Marcus D. Hiles
President
WRPS III, LP

Date: _____9/7/06_____

By: _____

Date: _____9-27-11_____

App.003



*WRPS III, LP*
*Employee Handbook WRPS III, LP*


EMPLOYEE ACKNOWLEDGEMENT FORM


The employee handbook describes important information about WRPS III, LP, and I understand that I should consult the Human Resources Department regarding any questions not answered in the handbook.

I have entered into my employment relationship with WRPS III, LP voluntarily and acknowledge that there is no specified length of employment. Accordingly, either I or WRPS III, LP can terminate the relationship at will, with or without cause, at any time, so long as there is no violation of applicable federal or state law.

Since the information, policies, and benefits described here are necessarily subject to change, I acknowledge that revisions to the handbook may occur, except to WRPS III, LP's policy of employment-at-will. All such changes will be communicated through official notices, and I understand that revised information may supersede, modify, or eliminate existing policies. Only the chief executive officer of WRPS III, LP has the ability to adopt any revisions to the policies in this handbook.

Furthermore, I acknowledge that this handbook is neither a contract of employment nor a legal document. I have received the handbook, and I understand that it is my responsibility to read and comply with the policies contained in this handbook and any revisions made to it.

EMPLOYEE'S NAME (printed): *Paula C. Bazan-Garcia*

EMPLOYEE'S SIGNATURE: *Paula C. L. Garcia*

DATE: *Sept 20, 2011*



# Employee Handbook
# WRPS, LP

10/01/2011

App.005



**WRPS, LP**

## Table of Contents

| No. | Policy | Effective Date: | Revision Date: | Page |
|-----|--------|-----------------|----------------|------|
| **INTRODUCTION** | | | | |
| 020 | Employee Welcome Message | 12/1/1999 | 1/1/2006 | 1 |
| 030 | Organization Description | 12/1/1999 | 1/1/2006 | 2 |
| 040 | Introductory Statement | 12/1/1999 | 1/1/2006 | 3 |
| 051 | Employee Acknowledgement Form | 12/1/1999 | 1/1/2006 | 4 |
| | | | | |
| **EMPLOYMENT** | | | | |
| 101 | Nature of Employment | 12/1/1999 | 1/1/2000 | 5 |
| 102 | Employee Relations | 12/1/1999 | 1/1/2006 | 6 |
| 103 | Equal Employment Opportunity | 12/1/1999 | 1/1/2006 | 7 |
| 104 | Business Ethics and Conduct | 12/1/1999 | 1/1/2006 | 8 |
| 107 | Immigration Law Compliance | 12/1/1999 | 1/1/2000 | 9 |
| 108 | Conflicts of Interest | 12/1/1999 | 1/1/2006 | 10 |
| 110 | Outside Employment | 12/1/1999 | 1/1/2006 | 11 |
| 112 | Non-Disclosure | 12/1/1999 | 1/1/2006 | 12 |
| 114 | Disability Accommodation | 12/1/1999 | 1/1/2006 | 13 |
| 180 | Personal Relationships in the Workplace | 11/19/2004 | 1/1/2006 | 14 |
| | | | | |
| **EMPLOYMENT STATUS & RECORDS** | | | | |
| 201 | Employment Categories | 12/1/1999 | 1/1/2006 | 16 |
| 202 | Access to Personnel Files | 12/1/1999 | 1/1/2006 | 18 |
| 203 | Employment Reference Checks | 12/1/1999 | 1/1/2000 | 19 |
| 204 | Personnel Data Changes | 12/1/1999 | 1/1/2006 | 20 |
| 205 | Introductory Period | 12/1/1999 | 1/1/2006 | 21 |
| 208 | Employment Applications | 12/1/1999 | 1/1/2006 | 22 |
| 209 | Performance Evaluation | 12/1/1999 | 1/1/2006 | 23 |
| 210 | Job Descriptions | 12/1/1999 | 1/1/2006 | 24 |
| 280 | Confidentiality of Salary | 12/1/1999 | 1/1/2006 | 25 |
| | | | | |
| **EMPLOYEE BENEFIT PROGRAMS** | | | | |
| 301 | Employee Benefits | 12/1/1999 | 1/1/2006 | 26 |
| 303 | Vacation Benefits | 12/1/1999 | 10/1/2009 | 27 |
| 304 | Child Care Benefits | 12/1/1999 | 1/1/2006 | 29 |
| 305 | Holidays | 12/1/1999 | 1/1/2006 | 30 |



**WRPS, LP**

| | | | | |
|---|---|---|---|---|
| 307 | Sick Leave Benefits | 12/1/1999 | 10/1/2009 | 31 |
| 308 | Time Off to Vote | 12/1/1999 | 1/1/2006 | 33 |
| 309 | Bereavement Leave | 12/1/1999 | 1/1/2006 | 34 |
| 310 | Relocation Benefits | 12/1/1999 | 1/1/2006 | 35 |
| 311 | Jury Duty | 12/1/1999 | 1/1/2006 | 36 |
| 312 | Witness Duty | 12/1/1999 | 1/1/2006 | 37 |
| 313 | Benefits Continuation (COBRA) | 12/1/1999 | 1/1/2006 | 38 |
| 314 | Educational Assistance | 12/1/1999 | 1/1/2006 | 39 |
| 316 | Health Insurance | 12/1/1999 | 1/1/2006 | 40 |
| 317 | Life Insurance | 12/1/1999 | 1/1/2006 | 41 |
| 320 | 401(k) Savings Plan | 12/1/1999 | 1/1/2006 | 42 |
| 326 | Flexible Spending Account (FSA) | 12/1/1999 | 1/1/2006 | 43 |
| 328 | Partnership Participation Units | 12/1/1999 | 1/1/2006 | 44 |
| 330 | Annual Incentive Trip | 12/1/1999 | 1/1/2006 | 45 |

**TIMEKEEPING/PAYROLL**

| | | | | |
|---|---|---|---|---|
| 401 | Timekeeping | 12/1/1999 | 1/1/2000 | 46 |
| 403 | Paydays | 12/1/1999 | 1/1/2000 | 47 |
| 405 | Employment Termination | 12/1/1999 | 1/1/2006 | 48 |
| 407 | Severance Pay | 12/1/1999 | 1/1/2006 | 49 |
| 409 | Administrative Pay Corrections | 12/1/1999 | 1/1/2006 | 50 |
| 410 | Pay Deductions and Setoffs | 12/1/1999 | 1/1/2006 | 51 |

**WORK CONDITIONS & HOURS**

| | | | | |
|---|---|---|---|---|
| 502 | Work Schedules | 12/1/1999 | 1/1/2006 | 52 |
| 504 | Use of Phone and Mail Systems | 12/1/1999 | 1/1/2006 | 53 |
| 505 | Smoking | 12/1/1999 | 1/1/2006 | 54 |
| 506 | Rest and Meal Periods | 12/1/1999 | 1/1/2006 | 55 |
| 507 | Overtime | 12/1/1999 | 1/1/2006 | 56 |
| 512 | Business Travel Expenses | 12/1/1999 | 1/1/2009 | 57 |
| 514 | Visitors in the Workplace | 12/1/1999 | 1/1/2006 | 58 |
| 516 | Computer and Email Usage | 12/1/1999 | 1/1/2006 | 60 |
| 517 | Internet Usage | 12/1/1999 | 1/1/2006 | 61 |
| 522 | Workplace Violence Prevention | 12/1/1999 | 1/1/2006 | 63 |
| 526 | Cell Phone Usage | 12/1/1999 | 1/1/2006 | 65 |

**LEAVES OF ABSENCE**

| | | | | |
|---|---|---|---|---|
| 601 | Medical Leave | 12/1/1999 | 1/1/2006 | 66 |

App.007



**WRPS, LP**

| 602 | Family Leave | 12/1/1999 | 1/1/2006 | 68 |
| 605 | Military Leave | 1/1/2006 | 1/1/2000 | 70 |

EMPLOYEE CONDUCT & DISCIPLINARY ACTION

| 701 | Employee Conduct and Work Rules | 12/1/1999 | 1/1/2006 | 71 |
| 702 | Drug and Alcohol Use | 12/1/1999 | 1/1/2000 | 73 |
| 703 | Sexual and Other Unlawful Harassment | 12/1/1999 | 1/1/2006 | 74 |
| 704 | Attendance and Punctuality | 12/1/1999 | 1/1/2000 | 76 |
| 705 | Personal Appearance | 12/1/1999 | 1/1/2000 | 77 |
| 706 | Return of Property | 12/1/1999 | 1/1/2000 | 78 |
| 708 | Resignation | 12/1/1999 | 1/1/2000 | 79 |
| 714 | Drug Testing | 12/1/1999 | 1/1/2006 | 80 |
| 716 | Progressive Discipline | 12/1/1999 | 1/1/2006 | 81 |
| 718 | Problem Resolution | 12/1/1999 | 1/1/2006 | 83 |
| 720 | Casual Days | 12/1/1999 | 1/1/2006 | 85 |

MISCELLANEOUS

| 800 | Life-Threatening Illnesses in the Workplace | 12/1/1999 | 1/1/2006 | 87 |
| 806 | Suggestion Program | 12/1/1999 | 1/1/2006 | 88 |



# *WRPS, LP*
## WRPS, LP

Welcome new employee!

On behalf of your colleagues, I welcome you to WRPS, LP and wish you every success here.

We believe that each employee contributes directly to WRPS, LP's growth and success, and we hope you will take pride in being a member of our team.

This handbook was developed to describe some of the expectations of our employees and to outline the policies, programs, and benefits available to eligible employees. Employees should familiarize themselves with the contents of the employee handbook as soon as possible, for it will answer many questions about employment with WRPS, LP.

We hope that your experience here will be challenging, enjoyable, and rewarding. Again, welcome!

Sincerely,


Marcus D. Hiles
Chairman and CEO

1



# *WRPS, LP*
**WRPS, LP**

## ORGANIZATION DESCRIPTION

Western Rim Property Services currently manages over 6,000 apartment homes in Texas. These apartment homes include luxury, moderate, and affordable housing communities. Currently Western Rim has in excess of 1,200 LIHTC apartments with its major growth emphasis consisting of luxury AAA properties. Whatever your needs, Western Rim has a home to satisfy your requirements.

The Mansion trademark is the brand name for its AAA luxury units. These properties are unmatched in their amenities such as attached garages, marble baths with Jacuzzi tubs, granite kitchens, Berber carpet, and upgraded kitchen appliances. The most spectacular clubhouses in the industry, which include full impact aerobics floors, free weight and exercise room, stadium seating theater rooms, pool tables, tanning beds, saunas and an outside pool area that is beyond belief. Our philosophy is not that we are renting living space but are instead marketing a life style.

. . . . . . . . . .

Western Rim Properties are on the cutting edge of design. Many are regularly referenced in the industry publications and are finalist for national awards such as the 1998 National Award "Pillars of the Industry" for best signage (Mansions by Vineyard) and 1999 National Apartment Association's "Pillars of the Industry" for best brochure (Mansions by the Lake).

2

App.010



# WRPS, LP
## WRPS, LP

### INTRODUCTORY STATEMENT

This handbook is designed to acquaint you with WRPS, LP and provide you with information about working conditions, employee benefits, and some of the policies affecting your employment. You should read, understand, and comply with all provisions of the handbook. It describes many of your responsibilities as an employee and outlines the programs developed by WRPS, LP to benefit employees. One of our objectives is to provide a work environment that is conducive to both personal and professional growth.

No employee handbook can anticipate every circumstance or question about policy. As WRPS, LP continues to grow, the need may arise and WRPS, LP reserves the right to revise, supplement, or rescind any policies or portion of the handbook from time to time as it deems appropriate, in its sole and absolute discretion. The only exception to any changes is our employment-at-will policy permitting you or WRPS, LP to end our relationship for any reason at any time. Employees will, of course, be notified of such changes to the handbook as they occur.

3

App.011



*WRPS, LP*
**WRPS, LP**

## 718 Problem Resolution
Effective Date: 12/1/1999
Revision Date: 8/1/2006

WRPS, LP is committed to providing the best possible working conditions for its employees. Part of this commitment is encouraging an open and frank atmosphere in which any problem, complaint, suggestion, or question receives a timely response from WRPS, LP supervisors and management.

WRPS, LP strives to ensure fair and honest treatment of all employees. Supervisors, managers, and employees are expected to treat each other with mutual respect. Employees are encouraged to offer positive and constructive criticism.

If employees disagree with established rules of conduct, policies, or practices, they can express their concern through the problem resolution procedure. No employee will be penalized, formally or informally, for voicing a complaint with WRPS, LP in a reasonable, business-like manner, or for using the problem resolution procedure.

If a situation occurs when employees believe that a condition of employment or a decision affecting them is unjust or inequitable, they are encouraged to make use of the following steps. The employee may discontinue the procedure at any step.

1. Employee presents problem promptly to immediate supervisor within 3 calendar days, after incident occurs. If supervisor is unavailable or employee believes it would be inappropriate to contact that person, employee may present problem to the Human Resources Department or any other member of management.

2. Supervisor responds to problem during discussion or within 3 calendar days, after consulting with appropriate management, when necessary. Supervisor documents discussion.

3. Employee presents problem to the Human Resources Department within 3 calendar days, if problem is unresolved.

4. Human Resources Department counsels and advises employee, assists in putting problem in writing, visits with employee's manager(s), if necessary, and directs employee to the President for review of problem.

5. Employee presents problem to the President in writing.

App.012



*WRPS, LP*
**WRPS, LP**

6. The President reviews and considers problem. The President informs employee of decision within 3 calendar days, and forwards copy of written response to the Human Resources Department for employee's file. The President has full authority to make any adjustment deemed appropriate to resolve the problem. This decision is final and binding on all parties and may not be discussed or complained about again.

Problems, disputes, or claims not resolved through the preceding problem resolution steps are subject to final and binding arbitration. The arbitration proceeding will be conducted under the Employment Dispute Resolution Rules of the American Arbitration Association. The decision or award of the Arbitrator made under these rules is exclusive, final, and binding on parties, their beneficiaries, executors, administrators, successors, and assigns. Every employee must sign the attached Arbitration Agreement. This is an absolute requirement.

Employees who choose to use the arbitration process to resolve a problem will be expected to share the cost of the arbitration proceeding with WRPS, LP. A complete description of the arbitration procedure is available from the Human Resources Department for review.

Not every problem can be resolved to everyone's total satisfaction, but only through understanding and discussion of mutual problems can employees and management develop confidence in each other. This confidence is important to the operation of an efficient and harmonious work environment, and helps to ensure everyone's job security.

84

**n.** the extent to which documentary evidence may be submitted at the hearing;

**o.** the extent to which testimony may be admitted at the hearing telephonically, over the internet, by written or video-taped deposition, by affidavit, or by any other means;

**p.** any disputes over the AAA's determination regarding whether the dispute arose from an individually-negotiated employment agreement or contract, or from an employer-promulgated plan (see Costs of Arbitration section).

The arbitrator shall issue oral or written orders reflecting his or her decision on the above matters and may conduct additional conferences when the need arises.

There is no AAA administrative fee for an Arbitration Management Conference.

## 9. Discovery

The arbitrator shall have the authority to order such discovery, by way of deposition, interrogatory, document production, or otherwise, as the arbitrator considers necessary to a full and fair exploration of the issues in dispute, consistent with the expedited nature of arbitration.

The AAA does not require notice of discovery related matters and communications unless a dispute arises. At that time, the parties should notify the AAA of the dispute so that it may be presented to the arbitrator for determination.

## 10. Fixing of Locale (the city, county, state, territory, and/or country of the Arbitration)

If the parties disagree as to the locale, the AAA may initially determine the place of arbitration, subject to the power of the arbitrator(s), after their appointment to make a final determination on the locale. All such determinations shall be made having regard for the contentions of the parties and the circumstances of the arbitration.

## 11. Date, Time and Place (the physical site of the hearing within the designated locale) of Hearing

The arbitrator shall set the date, time, and place for each hearing. The parties shall respond to requests for hearing dates in a timely manner, be cooperative in scheduling the earliest practicable date, and adhere to the established hearing schedule. The AAA shall send a notice of hearing to the parties at least 10 days in advance of the hearing date, unless otherwise agreed by the parties.



*WRPS III, LP*
*Employee Handbook WRPS III, LP*

EMPLOYEE ACKNOWLEDGEMENT FORM

The employee handbook describes important information about WRPS III, LP, and I understand that I should consult the Human Resources Department regarding any questions not answered in the handbook.

I have entered into my employment relationship with WRPS III, LP voluntarily and acknowledge that there is no specified length of employment. Accordingly, either I or WRPS III, LP can terminate the relationship at will, with or without cause, at any time, so long as there is no violation of applicable federal or state law.

Since the information, policies, and benefits described here are necessarily subject to change, I acknowledge that revisions to the handbook may occur, except to WRPS III, LP's policy of employment-at-will. All such changes will be communicated through official notices, and I understand that revised information may supersede, modify, or eliminate existing policies. Only the chief executive officer of WRPS III, LP has the ability to adopt any revisions to the policies in this handbook.

Furthermore, I acknowledge that this handbook is neither a contract of employment nor a legal document. I have received the handbook, and I understand that it is my responsibility to read and comply with the policies contained in this handbook and any revisions made to it.

EMPLOYEE'S NAME (printed): Paula C. Bazan-Garcia

EMPLOYEE'S SIGNATURE: Paula C. B. Garcia

DATE: Sept 20, 2011

**d.** Parties to an arbitration under these rules shall be deemed to have consented that neither the AAA nor any arbitrator shall be liable to any party in any action for damages or injunctive relief for any act or omission in connection with any arbitration under these rules.

## 43. Administrative Fees

As a not-for-profit organization, the AAA shall prescribe filing and other administrative fees to compensate it for the cost of providing administrative services. The AAA administrative fee schedule in effect at the time the demand for arbitration or submission agreement is received shall be applicable.

AAA fees shall be paid in accordance with the Costs of Arbitration Section (see page 33-43).

The AAA may, in the event of extreme hardship on any party, defer or reduce the administrative fees. (To ensure that you have the most current information, see our website at **www.adr.org**).

## 44. Neutral Arbitrator's Compensation

Arbitrators shall charge a rate consistent with the arbitrator's stated rate of compensation. If there is disagreement concerning the terms of compensation, an appropriate rate shall be established with the arbitrator by the AAA and confirmed to the parties.

Any arrangement for the compensation of a neutral arbitrator shall be made through the AAA and not directly between the parties and the arbitrator. Payment of the arbitrator's fees and expenses shall be made by the AAA from the fees and moneys collected by the AAA for this purpose.

Arbitrator compensation shall be borne in accordance with the Costs of Arbitration section.

## 45. Expenses

Unless otherwise agreed by the parties or as provided under applicable law, the expenses of witnesses for either side shall be borne by the party producing such witnesses.

# For Disputes Arising Out of Employer-Promulgated Plans*:

Arbitrator compensation is not included as part of the administrative fees charged by the AAA. Arbitrator compensation is based on the most recent biography sent to the parties prior to appointment. The employer shall pay the arbitrator's compensation unless the employee, post dispute, voluntarily elects to pay a portion of the arbitrator's compensation. Arbitrator compensation, expenses as defined in section (iv) below, and administrative fees are not subject to reallocation by the arbitrator(s) except upon the arbitrator's determination that a claim or counterclaim was filed for purposes of harassment or is patently frivolous.

*Pursuant to Section 1284.3 of the California Code of Civil Procedure, consumers with a gross monthly income of less than 300% of the federal poverty guidelines are entitled to a waiver of arbitration fees and costs, exclusive of arbitrator fees. This law applies to all consumer agreements subject to the California Arbitration Act, and to all consumer arbitrations conducted in California. If you believe that you meet these requirements, you must submit to the AAA a declaration under oath regarding your monthly income and the number of persons in your household. Please contact Case Filing Services at 877-495-4185 if you have any questions regarding the waiver of administrative fees. (Effective January 1, 2003.)

A party making a demand for treatment of a claim, counterclaim, or additional claim as a collective action arbitration will be subject to the administrative fees as outlined in the standard and flexible fee schedules below. Arbitrator compensation is not included as a part of the administrative fees charged by the AAA. Arbitrator compensation in cases involving a collective action claim will be charged in accordance with the determination as to whether the dispute arises from an employer-promulgated plan or an individually negotiated employment agreement or contract.

## (i) Filing Fees

### Cases Filed by Employee Against Employer

In cases before a single arbitrator, a non-refundable filing fee capped in the amount of $200 is payable in full by the employee when a claim is filed, unless the plan provides that the employee pay less. A non-refundable fee in the amount of $1350 is payable in full by the employer, unless the plan provides that the employer pay more.

In cases before three or more arbitrators, a non-refundable filing fee capped in the amount of $200 is payable in full by the employee when a claim is filed, unless the plan provides that the employee pay less. A non-refundable fee in the amount of $1,800 is payable in full by the employer, unless the plan provides that the employer pay more.

# For Disputes Arising Out of Employer-Promulgated Plans[*]:

Arbitrator compensation is not included as part of the administrative fees charged by the AAA. Arbitrator compensation is based on the most recent biography sent to the parties prior to appointment. The employer shall pay the arbitrator's compensation unless the employee, post dispute, voluntarily elects to pay a portion of the arbitrator's compensation. Arbitrator compensation, expenses as defined in section (iv) below, and administrative fees are not subject to reallocation by the arbitrator(s) except upon the arbitrator's determination that a claim or counterclaim was filed for purposes of harassment or is patently frivolous.

[*] *Pursuant to Section 1284.3 of the California Code of Civil Procedure, consumers with a gross monthly income of less than 300% of the federal poverty guidelines are entitled to a waiver of arbitration fees and costs, exclusive of arbitrator fees. This law applies to all consumer agreements subject to the California Arbitration Act, and to all consumer arbitrations conducted in California. If you believe that you meet these requirements, you must submit to the AAA a declaration under oath regarding your monthly income and the number of persons in your household. Please contact Case Filing Services at 877-495-4185 if you have any questions regarding the waiver of administrative fees. (Effective January 1, 2003.)*

A party making a demand for treatment of a claim, counterclaim, or additional claim as a collective action arbitration will be subject to the administrative fees as outlined in the standard and flexible fee schedules below. Arbitrator compensation is not included as a part of the administrative fees charged by the AAA. Arbitrator compensation in cases involving a collective action claim will be charged in accordance with the determination as to whether the dispute arises from an employer-promulgated plan or an individually negotiated employment agreement or contract.

## (i) Filing Fees

### Cases Filed by Employee Against Employer

In cases before a single arbitrator, a non-refundable filing fee capped in the amount of $200 is payable in full by the employee when a claim is filed, unless the plan provides that the employee pay less. A non-refundable fee in the amount of $1350 is payable in full by the employer, unless the plan provides that the employer pay more.

In cases before three or more arbitrators, a non-refundable filing fee capped in the amount of $200 is payable in full by the employee when a claim is filed, unless the plan provides that the employee pay less. A non-refundable fee in the amount of $1,800 is payable in full by the employer, unless the plan provides that the employer pay more.

The employer's share is due as soon as the employee meets his or her filing requirements, even if the matter settles.

There shall be no filing fee charged for a counterclaim. If a determination is made that the dispute arises out of an individually-negotiated employment agreement, the filing fee for a counterclaim will be charged in accordance with the fee schedules below for disputes arising out of individually negotiated employment agreements.

The above fee schedule will also apply where the employer files on behalf of the employee pursuant to the terms of the employer promulgated plan.

## Cases Filed by Employer Against Employee

In cases before a single arbitrator, a non-refundable fee in the amount of $1,550 is payable in full by the employer.

In cases before three or more arbitrators, a non-refundable fee in the amount of $2,000 is payable in full by the employer.

There shall be no filing fee charged for a counterclaim. If a determination is made that the dispute arises out of an individually-negotiated employment agreement, the filing fee for a counterclaim will be charged in accordance with the fee schedules below for disputes arising out of individually-negotiated employment agreements.

### (ii) Hearing Fees

For each day of hearing held before a single arbitrator, an administrative fee of $350 is payable by the employer.

For each day of hearing held before a multi-arbitrator panel, an administrative fee of $500 is payable by the employer.

There is no AAA hearing fee for the initial Arbitration Management Conference.

### (iii) Postponement/Cancellation Fees

A fee of $150 is payable by a party causing a postponement of any hearing scheduled before a single arbitrator.

A fee of $250 is payable by a party causing a postponement of any hearing scheduled before a multi-arbitrator panel.

### (iv) Hearing Room Rental

The hearing fees described above do not cover the rental of hearing rooms. The AAA maintains hearing rooms in most offices for the convenience of the parties. Check with the administrator for availability and rates. Hearing room rental fees will be borne by the employer.

### (v) Abeyance Fee

Parties on cases held in abeyance for one year will be assessed an annual abeyance fee of $300. A case may only be held in abeyance after the initial filing fees have been paid. If a party refuses to pay the assessed fee, the other party or parties may pay the entire fee on behalf of all parties, otherwise the matter will be administratively closed.

### (vi) Expenses

All expenses of the arbitrator, including required travel and other expenses, and any AAA expenses, as well as the costs relating to proof and witnesses produced at the direction of the arbitrator, shall be borne by the employer.

## For Disputes Arising Out of Individually-Negotiated Employment Agreements and Contracts:

The AAA's Fee Schedule, as modified below, will apply to disputes arising out of individually-negotiated employment agreements and contracts, even if such agreements and contracts reference or incorporate an employer-promulgated plan. Arbitrator compensation is not included as part of the administrative fees charged by the AAA. Arbitrator compensation is based on the most recent biography sent to the parties prior to appointment.

### (iii) Postponement/Cancellation Fees

A fee of $150 is payable by a party causing a postponement of any hearing scheduled before a single arbitrator.

A fee of $250 is payable by a party causing a postponement of any hearing scheduled before a multi-arbitrator panel.

### (iv) Hearing Room Rental

The hearing fees described above do not cover the rental of hearing rooms. The AAA maintains hearing rooms in most offices for the convenience of the parties. Check with the administrator for availability and rates. Hearing room rental fees will be borne by the employer.

### (v) Abeyance Fee

Parties on cases held in abeyance for one year will be assessed an annual abeyance fee of $300. A case may only be held in abeyance after the initial filing fees have been paid. If a party refuses to pay the assessed fee, the other party or parties may pay the entire fee on behalf of all parties, otherwise the matter will be administratively closed.

### (vi) Expenses

All expenses of the arbitrator, including required travel and other expenses, and any AAA expenses, as well as the costs relating to proof and witnesses produced at the direction of the arbitrator, shall be borne by the employer.

## For Disputes Arising Out of Individually-Negotiated Employment Agreements and Contracts:

The AAA's Fee Schedule, as modified below, will apply to disputes arising out of individually-negotiated employment agreements and contracts, even if such agreements and contracts reference or incorporate an employer-promulgated plan. Arbitrator compensation is not included as part of the administrative fees charged by the AAA. Arbitrator compensation is based on the most recent biography sent to the parties prior to appointment.

---

Vernon's Texas Statutes and Codes Annotated
    Civil Practice and Remedies Code (Refs & Annos)
      Title 7. Alternate Methods of Dispute Resolution (Refs & Annos)
        Chapter 171. General Arbitration (Refs & Annos)
          Subchapter A. General Provisions (Refs & Annos)

V.T.C.A., Civil Practice & Remedies Code § 171.001

§ 171.001. Arbitration Agreements Valid

Currentness

(a) A written agreement to arbitrate is valid and enforceable if the agreement is to arbitrate a controversy that:

(1) exists at the time of the agreement; or

(2) arises between the parties after the date of the agreement.

(b) A party may revoke the agreement only on a ground that exists at law or in equity for the revocation of a contract.

**Credits**
Amended by Acts 1997, 75th Leg., ch. 165, § 5.01, eff. Sept. 1, 1997.

Notes of Decisions (636)

V. T. C. A., Civil Practice & Remedies Code § 171.001, TX CIV PRAC & REM § 171.001
Current through the end of the 2013 Third Called Session of the 83rd Legislature

---

**End of Document**

© 2014 Thomson Reuters. No claim to original U.S. Government Works.

---

App.066

Vernon's Texas Statutes and Codes Annotated
  Civil Practice and Remedies Code (Refs & Annos)
    Title 7. Alternate Methods of Dispute Resolution (Refs & Annos)
      Chapter 171. General Arbitration (Refs & Annos)
        Subchapter B. Proceedings to Compel or Stay Arbitrations (Refs & Annos)

V.T.C.A., Civil Practice & Remedies Code § 171.021

§ 171.021. Proceeding to Compel Arbitration

Currentness

(a) A court shall order the parties to arbitrate on application of a party showing:

  (1) an agreement to arbitrate; and

  (2) the opposing party's refusal to arbitrate.

(b) If a party opposing an application made under Subsection (a) denies the existence of the agreement, the court shall summarily determine that issue. The court shall order the arbitration if it finds for the party that made the application. If the court does not find for that party, the court shall deny the application.

(c) An order compelling arbitration must include a stay of any proceeding subject to Section 171.025.

**Credits**
Added by Acts 1997, 75th Leg., ch. 165, § 5.01, eff. Sept. 1, 1997.

Notes of Decisions (138)

V. T. C. A., Civil Practice & Remedies Code § 171.021, TX CIV PRAC & REM § 171.021
Current through the end of the 2013 Third Called Session of the 83rd Legislature

---

**End of Document**
© 2014 Thomson Reuters. No claim to original U.S. Government Works.

App.067

---

Vernon's Texas Statutes and Codes Annotated
    Civil Practice and Remedies Code (Refs & Annos)
        Title 7. Alternate Methods of Dispute Resolution (Refs & Annos)
            Chapter 171. General Arbitration (Refs & Annos)
                Subchapter B. Proceedings to Compel or Stay Arbitrations (Refs & Annos)

V.T.C.A., Civil Practice & Remedies Code § 171.025

§ 171.025. Stay of Related Proceeding

Currentness

(a) The court shall stay a proceeding that involves an issue subject to arbitration if an order for arbitration or an application for that order is made under this subchapter.

(b) The stay applies only to the issue subject to arbitration if that issue is severable from the remainder of the proceeding.

**Credits**
Added by Acts 1997, 75th Leg., ch. 165, § 5.01, eff. Sept. 1, 1997.

Notes of Decisions (5)

V. T. C. A., Civil Practice & Remedies Code § 171.025, TX CIV PRAC & REM § 171.025
Current through the end of the 2013 Third Called Session of the 83rd Legislature

---

**End of Document**
© 2014 Thomson Reuters. No claim to original U.S. Government Works.

App.068



# *WRPS, LP*
## WRPS, LP

Welcome new employee!

On behalf of your colleagues, I welcome you to WRPS, LP and wish you every success here.

We believe that each employee contributes directly to WRPS, LP's growth and success, and we hope you will take pride in being a member of our team.

This handbook was developed to describe some of the expectations of our employees and to outline the policies, programs, and benefits available to eligible employees. Employees should familiarize themselves with the contents of the employee handbook as soon as possible, for it will answer many questions about employment with WRPS, LP.

We hope that your experience here will be challenging, enjoyable, and rewarding. Again, welcome!

Sincerely,


Marcus D. Hiles
Chairman and CEO

1

App.009



# *WRPS, LP*
**WRPS, LP**

## ORGANIZATION DESCRIPTION

Western Rim Property Services currently manages over 6,000 apartment homes in Texas. These apartment homes include luxury, moderate, and affordable housing communities. Currently Western Rim has in excess of 1,200 LIHTC apartments with its major growth emphasis consisting of luxury AAA properties. Whatever your needs, Western Rim has a home to satisfy your requirements.

The Mansion trademark is the brand name for its AAA luxury units. These properties are unmatched in their amenities such as attached garages, marble baths with Jacuzzi tubs, granite kitchens, Berber carpet, and upgraded kitchen appliances. The most spectacular clubhouses in the industry, which include full impact aerobics floors, free weight and exercise room, stadium seating theater rooms, pool tables, tanning beds, saunas and an outside pool area that is beyond belief. Our philosophy is not that we are renting living space but are instead marketing a life style.

. . . . . . . . . .

Western Rim Properties are on the cutting edge of design. Many are regularly referenced in the industry publications and are finalist for national awards such as the 1998 National Award "Pillars of the Industry" for best signage (Mansions by Vineyard) and 1999 National Apartment Association's "Pillars of the Industry" for best brochure (Mansions by the Lake).

2



# WRPS, LP
**WRPS, LP**

## INTRODUCTORY STATEMENT

This handbook is designed to acquaint you with WRPS, LP and provide you with information about working conditions, employee benefits, and some of the policies affecting your employment. You should read, understand, and comply with all provisions of the handbook. It describes many of your responsibilities as an employee and outlines the programs developed by WRPS, LP to benefit employees. One of our objectives is to provide a work environment that is conducive to both personal and professional growth.

No employee handbook can anticipate every circumstance or question about policy. As WRPS, LP continues to grow, the need may arise and WRPS, LP reserves the right to revise, supplement, or rescind any policies or portion of the handbook from time to time as it deems appropriate, in its sole and absolute discretion. The only exception to any changes is our employment-at-will policy permitting you or WRPS, LP to end our relationship for any reason at any time. Employees will, of course, be notified of such changes to the handbook as they occur.

3



# *WRPS, LP*
## WRPS, LP

## 718 Problem Resolution
Effective Date: 12/1/1999
Revision Date: 8/1/2006

WRPS, LP is committed to providing the best possible working conditions for its employees. Part of this commitment is encouraging an open and frank atmosphere in which any problem, complaint, suggestion, or question receives a timely response from WRPS, LP supervisors and management.

WRPS, LP strives to ensure fair and honest treatment of all employees. Supervisors, managers, and employees are expected to treat each other with mutual respect. Employees are encouraged to offer positive and constructive criticism.

If employees disagree with established rules of conduct, policies, or practices, they can express their concern through the problem resolution procedure. No employee will be penalized, formally or informally, for voicing a complaint with WRPS, LP in a reasonable, business-like manner, or for using the problem resolution procedure.

If a situation occurs when employees believe that a condition of employment or a decision affecting them is unjust or inequitable, they are encouraged to make use of the following steps. The employee may discontinue the procedure at any step.

1. Employee presents problem promptly to immediate supervisor within 3 calendar days, after incident occurs. If supervisor is unavailable or employee believes it would be inappropriate to contact that person, employee may present problem to the Human Resources Department or any other member of management.

2. Supervisor responds to problem during discussion or within 3 calendar days, after consulting with appropriate management, when necessary. Supervisor documents discussion.

3. Employee presents problem to the Human Resources Department within 3 calendar days, if problem is unresolved.

4. Human Resources Department counsels and advises employee, assists in putting problem in writing, visits with employee's manager(s), if necessary, and directs employee to the President for review of problem.

5. Employee presents problem to the President in writing.

83

App.012



# WRPS, LP
**WRPS, LP**

6. The President reviews and considers problem. The President informs employee of decision within 3 calendar days, and forwards copy of written response to the Human Resources Department for employee's file. The President has full authority to make any adjustment deemed appropriate to resolve the problem. This decision is final and binding on all parties and may not be discussed or complained about again.

Problems, disputes, or claims not resolved through the preceding problem resolution steps are subject to final and binding arbitration. The arbitration proceeding will be conducted under the Employment Dispute Resolution Rules of the American Arbitration Association. The decision or award of the Arbitrator made under these rules is exclusive, final, and binding on parties, their beneficiaries, executors, administrators, successors, and assigns. <u>Every</u> employee must sign the attached Arbitration Agreement. This is an absolute requirement.

Employees who choose to use the arbitration process to resolve a problem will be expected to share the cost of the arbitration proceeding with WRPS, LP. A complete description of the arbitration procedure is available from the Human Resources Department for review.

Not every problem can be resolved to everyone's total satisfaction, but only through understanding and discussion of mutual problems can employees and management develop confidence in each other. This confidence is important to the operation of an efficient and harmonious work environment, and helps to ensure everyone's job security.

App.013

10. Throughout Plaintiff's employment with Defendant, Plaintiff consistently was told she was doing a good job. Plaintiff seldom--if ever--received any negative evaluations. Plaintiff was never written up for any serious violations while employed by Defendant.

11. Plaintiff had a good attendance record until March 20, 2013, when she suffered an on-the-job injury. Plaintiff promptly notified her supervisor of her injury and upon information and belief, a workers' compensation claim was filed.

12. On or about June 4, 2013, Plaintiff was prohibited from working by her doctor as a result of the injury she sustained while working in the course and scope of her employment. Because Plaintiff was being taken off work pending surgery, in addition to being prohibited from working by her doctor, Plaintiff requested to take FMLA leave and submitted the paperwork to Defendant's corporate office.

13. Plaintiff was released to return to work on light duty on or about August 19, 2013; however, Plaintiff was prohibited from working by Defendant, who claimed to not have any light duty positions.

14. On or about October 22, 2013, soon after Plaintiff was released on full duty, Defendant terminated Plaintiff for a pre-textual reason.

15. As a result of her discharge and the company's continuing refusal to reinstate her, Plaintiff has suffered substantial economic losses and severe mental anguish, and she will continue to suffer such losses in the future.

### WORKERS' COMPENSATION RETALIATION

16. Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 16 as if those allegations were set forth verbatim.

17. Plaintiff alleges that Defendant, violated Section 451.001 of the Texas Labor Code by discharging Plaintiff because she notified her employer of her on-the-job injury and/or initiated the filing of a workers' compensation claim in good faith, and by not reinstating her.

ORIGINAL PETITION AND REQUEST FOR DISCLOSURE

18. Plaintiff seeks the maximum damages allowed by Section 451.002 of the Texas Labor Code and at common law.

19. Plaintiff's injuries resulted from Defendant's fraud and/or malice as set forth in Tex. Civ. Prac. & Rem. Code § 41.001 et seq. Accordingly, Plaintiff is entitled to an award of exemplary damages in accordance with Texas law.

FAMILY MEDICAL LEAVE ACT VIOLATION

20. Pleading in the alternative and without waiving the foregoing, Plaintiff rellages the allegations contained in Paragraphs 1 through 20 as if fully stated herein.

21. Plaintiff has satisfied all jurisdictional prerequisites in connection with her claim under the Family Medical Leave Act ("FMLA"), 29 U.S.C. §§ 2601 et. seq.

22. Defendant is an "employer" as defined by the FMLA in 29 U.S.C. § 2611(4).

23. During the time that Plaintiff was employed by Defendant, she was an "eligible employee" as defined by the FMLA in 29 U.S.C. § 2611(2).

24. While Plaintiff was employed by Defendant, Plaintiff had an illness that can be defined as a "serious health condition" under the FMLA as outlined in 29 U.S.C. § 2611(11).

25. Plaintiff was entitled to medical leave for her serious health condition as provided for in the FMLA (in 29 U.S.C. § 2612(a)(1)(C)) without fear of retaliation.

26. Plaintiff attempted to exercise her FMLA rights and Defendant illegitimately interference and denied Plaintiff's right to exercise her FMLA rights.

27. In the alternative and without waving the foregoing, Plaintiff alleges that Defendant terminated Plaintiff in retaliation for invoking her FMLA rights. Plaintiff suffered an adverse employment action as a result of her termination by Defendant.

E-FILED
Bexar County, County Clerk
Gerard Rickhoff
Accepted Date:10/16/2014 8:08:46 AM
Accepted By: Marylou Gaylord

Deputy Clerk

## CAUSE NO. 2014CV01064

| | | |
|---|---|---|
| PAULA BAZAN-GARCIA, | § | IN THE COUNTY COURT |
| | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | AT LAW NO. CC# 03 |
| | § | |
| WESTERN RIM PROPERTY | § | |
| SERVICES INC., | § | |
| | § | |
| Defendant. | § | BEXAR COUNTY, TEXAS |

### DEFENDANT WESTERN RIM PROPERTY SERVICES, INC.'S MOTION TO COMPEL ARBITRATION

#### I. SUMMARY OF THE ARGUMENT

When Plaintiff Paula Bazan-Garcia ("Bazan-Garcia") accepted employment with WRPS III, LP ("WRPS"), she agreed to arbitrate any future dispute with WRPS related to her employment, including a claim for wrongful termination. In addition, Bazan-Garcia agreed that the arbitrator—not the court—would have authority to resolve any controversy over whether a particular dispute is subject to arbitration. Despite this, Bazan-Garcia has filed a lawsuit against WRPS alleging that she was wrongfully terminated, and has refused to submit her claim to arbitration. Bazan-Garcia's claim falls within the scope of the parties' valid arbitration agreement, and any challenge to the arbitrability of the dispute must be decided by the arbitrator. WRPS therefore respectfully requests that this Court compel arbitration, and abate and stay this lawsuit until the arbitration proceeding is complete.

#### II. FACTUAL BACKGROUND

Paula Bazan-Garcia worked as a housekeeper for WRPS from September 26, 2011 until October 22, 2013. Aff. at ¶ 2. As an at-will employee, Bazan-Garcia agreed to, signed, and submitted multiple forms to WRPS. Aff. ¶ 3. These forms included an Arbitration

**DEFENDANT WRPS'S**
**MOTION TO COMPEL ARBITRATION**

Page 1

16

E-FILED
Bexar County, County Clerk
Gerard Rickhoff
Accepted Date:10/16/2014 8:08:46 AM
Accepted By: Marylou Gaylord
_____
Deputy Clerk

## CAUSE NO. 2014CV01064

| | | |
|---|---|---|
| PAULA BAZAN-GARCIA, | § | IN THE COUNTY COURT |
| | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | AT LAW NO. CC# 03 |
| | § | |
| WESTERN RIM PROPERTY | § | |
| SERVICES INC., | § | |
| | § | |
| Defendant. | § | BEXAR COUNTY, TEXAS |

## DEFENDANT WESTERN RIM PROPERTY SERVICES, INC.'S MOTION TO COMPEL ARBITRATION

### I. SUMMARY OF THE ARGUMENT

When Plaintiff Paula Bazan-Garcia ("Bazan-Garcia") accepted employment with WRPS III, LP ("WRPS"), she agreed to arbitrate any future dispute with WRPS related to her employment, including a claim for wrongful termination. In addition, Bazan-Garcia agreed that the arbitrator—not the court—would have authority to resolve any controversy over whether a particular dispute is subject to arbitration. Despite this, Bazan-Garcia has filed a lawsuit against WRPS alleging that she was wrongfully terminated, and has refused to submit her claim to arbitration. Bazan-Garcia's claim falls within the scope of the parties' valid arbitration agreement, and any challenge to the arbitrability of the dispute must be decided by the arbitrator. WRPS therefore respectfully requests that this Court compel arbitration, and abate and stay this lawsuit until the arbitration proceeding is complete.

### II. FACTUAL BACKGROUND

Paula Bazan-Garcia worked as a housekeeper for WRPS from September 26, 2011 until October 22, 2013. Aff. at ¶ 2. As an at-will employee, Bazan-Garcia agreed to, signed, and submitted multiple forms to WRPS. Aff. ¶ 3. These forms included an Arbitration

**DEFENDANT WRPS'S**
**MOTION TO COMPEL ARBITRATION** Page 1

16

Agreement ("Arbitration Agreement") and an Employee Acknowledgement Form ("Acknowledgement"). Aff. ¶ 3(b)-(c); *see also* Aff. Exhs. B & C.

The Arbitration Agreement expressly provided that disputes between Bazan-Garcia and WRPS would be decided by binding arbitration, in accordance with the rules of the American Arbitration Association ("AAA"):

> [O]ther than a worker's compensation claim covered by insurance, no dispute between [WRPS] and the undersigned which is in any way related to the employment of the undersigned, including but not limited to a claim for wrongful termination, discrimination and/or harassment, and worker's compensation not covered by insurance, shall be the subject of a lawsuit filed in any state or federal court. Instead, any such dispute shall be submitted to arbitration in accordance with the rules of the American Arbitration Association ("AAA").

Aff. Exh. C. The agreement specified that any arbitration would occur in Dallas County, Texas. *Id.* Bazan-Garcia signed the Arbitration Agreement on September 27, 2011. *Id.*

Bazan-Garcia also signed the Acknowledgement. Aff. at ¶ 3(b); Aff. Exh. B. The Acknowledgement represented that Bazan-Garcia had received a copy of the Employee Handbook, and understood that "it [was her] responsibility to read and comply with the policies contained in this handbook and any revisions made to it." Aff. Exh. B.

The Employee Handbook contained an arbitration provision. *See* Aff. Exh. F. Section 718, entitled "Problem Resolution," stated: "Problems, disputes, or claims not resolved through [voluntary internal] resolution steps are subject to final and binding arbitration. The arbitration proceeding will be conducted under the Employment Dispute Resolution Rules of the American Arbitration Association." Aff. Exh. F at 84. The arbitration provision also "requir[ed]" every employee to "sign the attached Arbitration Agreement." *Id.* Garcia-Bazan signed the Arbitration Agreement on September 27, 2011. Aff. Exh. C.

In addition, the Acknowledgement stated that revisions could be made to the Employee Handbook that "supersede, modify, or eliminate existing policies." Aff. Exh. B. While Bazan-Garcia was employed by WRPS, the Employee Handbook was revised several times. *See* Aff. Exhs. G & H. Every version of the Employee Handbook in place during Bazan-Garcia's employment with WRPS contained the same arbitration provision as the one described above. *See* Aff. Exh. F at 84; Aff. Exh. G at 85; Aff. Exh. H at 87. Bazan-Garcia also signed and returned to WRPS acknowledgements stating she had received addendums to the Employee Handbooks and understood it was her responsibility "to read and comply with the revision that has been made." Exhs. D & E.

As an at-will employee, Bazan-Garcia could "quit [her] employment at any time without a cause or reason," and WRPS could terminate her employment "at any time without a cause or reason." Aff. Ex. A. Bazan-Garcia's employment with WRPS was terminated on October 22, 2013. Aff. at ¶ 2. On July 1, 2014, Bazan-Garcia initiated this lawsuit, alleging that WRPS discharged her from employment because she had notified WRPS of an "on-the-job injury and/or initiated the filing of a workers' compensation claim." Orig. Pet. at ¶ 17. WRPS answered with a general denial on September 12, 2014. Orig. Ans. at 1.

By signing the Arbitration Agreement and Acknowledgement, and by beginning and continuing her employment with WRPS after receiving notice of the those agreements' terms, Bazan-Garcia agreed to arbitrate all of the claims alleged in her Original Petition. Bazan-Garcia is bound by those agreements.

## III. ARGUMENT AND AUTHORITIES

**A.    The Texas Arbitration Act governs this dispute and requires, at a minimum, that trial of this action be stayed until arbitration is complete.**

Bazan-Garcia is a Texas resident and WRPS is a Texas-based company, and their contractual relationship was based in San Antonio, Texas. Orig. Pet. at ¶ 3. Their arbitration agreement does not fall into one of the categories that is excluded from coverage by the Texas Arbitration Act ("TAA"). *See* Tex. Civ. Prac. & Rem. Code § 171.002 (excluding certain arbitration agreements from the statute). Consequently, these agreements are governed by the TAA. *See id.* at §§ 171.001 *et seq.*

Texas and federal policy strongly favor arbitration agreements. *Jack B. Anglin Co., Inc. v. Tipps*, 842 S.W.2d 266, 268 (Tex. 1992). Under the TAA, "[i]f a trial court finds that the claim falls within the scope of a valid arbitration agreement, the 'court has no discretion but to compel arbitration and stay its own proceedings.'" *Forest Oil Corp. v. McAllen*, 268 S.W.3d 51, 56 (Tex. 2008) (quoting *In re FirstMerit Bank, N.A.*, 52 S.W.3d 749, 753-54 (Tex. 2001)); *see also* Tex. Civ. Prac. & Rem. Code §§ 171.021(c) ("An order compelling arbitration must include a stay of any proceeding subject to Section 171.025."); *id.* at § 171.025(a) ("The court shall stay a proceeding that involves an issue subject to arbitration if an order for arbitration or an application for that order is made under this subchapter.").

In deciding whether to compel arbitration, the trial court must resolve the following issues: "(1) whether a valid, enforceable arbitration agreement exists, and (2) if so, whether the claims asserted fall within the scope of that agreement." *Henry v. Gonzalez*, 18 S.W.3d 684, 688 (Tex. App.—San Antonio 2000, pet. dism'd by agr.). Unless the party resisting arbitration shows there is a material issue of disputed fact that requires an evidentiary hearing, the trial court "may summarily decide whether to compel arbitration on the basis of affidavits,

pleadings, discovery, and stipulations." *Jack B. Anglin*, 842 S.W.2d at 269. The court may generally also "rel[y] interchangeably on cases that discuss the [Federal Arbitration Act ("FAA")] and [the] TAA," because "many of the underlying substantive principles are the same." *Forest Oil Corp.*, 268 S.W.3d at 56 n. 10.

As explained below, WRPS and Bazan-Garcia entered into a valid arbitration agreement, and all of the claims asserted by Garcia against WRPS are within the scope of that agreement. The Court must therefore compel arbitration, and stay this lawsuit until that proceeding is complete.

**B.      The agreement to arbitrate this dispute is valid.**

When deciding whether arbitration is mandatory under the TAA, the Court must first determine whether the parties have a valid arbitration agreement. *Henry*, 18 S.W.3d at 688. This is a question of law. *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 227 (Tex. 2003). "Arbitration agreements are interpreted under traditional contract principles." *Id.*; *see also Garcia v. Huerta*, 340 S.W.3d 864, 869 (Tex. App.—San Antonio 2011, pet. denied) ("Under both the FAA and the TAA, we apply ordinary state contract law principles in order to decide whether a valid arbitration agreement exists.").

**1.      Bazan-Garcia agreed to arbitrate this dispute by signing the arbitration agreement.**

Assent is an essential element of contractual formation. A party who signs a contract "must be held to have known what words were used in the contract and to have known their meaning, and he must also be held to have known and fully comprehended the legal effect of the contract." *In re Big 8 Food Stores, Ltd.*, 166 S.W.3d 869, 878 (Tex. App.—El Paso 2005, no pet.) (quoting *Nguyen Ngoc Giao v. Smith & Lamm, P.C.*, 714 S.W.2d 144, 146 (Tex. App.—Houston [1st Dist.] 1986, no writ)). Consequently, a party's "signature on a written contract is

'strong evidence' that the party unconditionally assented to its terms." *Id.* (holding that the arbitration agreement plaintiff signed with her employer was enforceable, even though she claimed she was "rushed" into signing the agreement and did not understand its terms).

The Texas Supreme Court has held that proving a plaintiff signed an arbitration agreement establishes the agreement's existence as a matter of law. In *In re Palm Harbor Homes, Inc.*, the plaintiffs signed two documents containing arbitration agreements. 195 S.W.3d 672, 676 (Tex. 2006). Nonetheless, they argued they should not be bound by those agreements because

> [1] the documents were not explained to them; [2] they were told that the documents were necessary to complete the purchase; [3] they were unaware that they had signed arbitration agreements; . . . [4] the [defendant] did not sign the arbitration agreements; and [5] they were unaware of what arbitration entailed and did not voluntarily waive their right to a jury trial.

*Id.* The Supreme Court held that this was insufficient to disprove the existence of the arbitration agreement and show it was invalid. "Because the [defendant] presented a signed arbitration agreement to the court . . . and the [plaintiffs] have presented no evidence that they did not sign the agreement, we conclude that, as a matter of law, the existence of an arbitration agreement among the parties was established." *Id.* at 676.

Bazan-Garcia signed the Arbitration Agreement on September 27, 2011. Aff. Exh. C. That agreement provided that, other than certain worker's compensation claim disputes, all disputes between WRPS and Bazan-Garcia "shall be submitted to arbitration in accordance with the rules of the American Arbitration Association." *Id.* Bazan-Garcia also signed the Employee Acknowledgement form, which represented that she would comply with the Employee Handbook. Aff. Exh. B. The Employee Handbook also required the parties to submit their disputes "to final and binding arbitration." Aff. Exh. F at 84; *see also In re Halliburton Co.*, 80

S.W.3d 566, 569 (Tex. 2002) (holding that an employee who accepted an agreement that incorporated an arbitration provision by reference had accepted that arbitration provision). Bazan-Garcia is therefore bound to arbitrate her disputes with WRPS pursuant to a valid arbitration agreement.

**2. Bazan-Garcia also agreed to arbitrate this dispute because she commenced and continued employment with WRPS after receiving notice of its arbitration policy.**

In addition, "[a]n at-will employee who receives notice of an employer's arbitration policy and continues or commences employment accepts the terms of the agreement as a matter of law." *D.R. Horton, Inc. v. Brooks*, 207 S.W.3d 862, 867 (Tex. App.—Houston [14th Dist.] 2006, no pet.) (citing *In re Halliburton Co.*, 80 S.W.3d 566, 56 (Tex. 2002)). This applies to arbitration agreements that are incorporated by reference into another contract, because a party who signs a contract is responsible for ensuring that it knows and accepts the terms of that contract. *See In re Merrill Lynch Trust Co. FSB*, 235 S.W.3d 185, 190 (Tex. 2007) ("Additionally, the plaintiffs' testimony that they failed to read the arbitration provisions until this dispute arose is not a valid ground for setting aside their signed agreements."); *In re December Nine Co., Ltd.*, 225 S.W.3d 693, 702 (Tex. App.—El Paso 2006, no pet.) (enforcing incorporated arbitration provisions even though employees did not receive copies of the incorporated documents, since employees presented no evidence that they were actually prevented from obtaining copies).

When the plaintiff in *In re Dallas Peterbilt, Ltd., L.L.P.* began his at-will employment, he received a summary of his employer's dispute resolution program, as well as an acknowledgment form stating he had "received and carefully read or been given the opportunity to read the [Summary]." 196 S.W.3d 161, 163 (Tex. 2006) (modification in original). The plaintiff signed the form, and began working for the employer. *Id.* The Texas Supreme Court

held that the employee had received notice of the arbitration policy from the acknowledgement form, and that "by signing the acknowledgement form and commencing his employment, [plaintiff] accepted the [arbitration] agreement as a matter of law." *Id.* He was therefore bound to arbitrate his dispute with his employer. *Id.*; *see also In re Autotainment Partners Ltd. P'ship*, 183 S.W.3d 532, 535-36 (Tex. App.—Houston [14th Dist.] 2006, no pet.) (employee who signed acknowledgement stating she had "received a copy of the [employer's] Program, received training on the Program, and understood such a Program was in use" had "agreed to the terms contained in the Program documents," including an arbitration agreement).

Like the plaintiffs in *Dallas Peterbilt* and *Autotainment Partners*, Bazan-Garcia accepted the arbitration agreement contained in the Employee Handbook by beginning and continuing to work for WRPS after she had notice of that agreement. At the time she accepted employment, Bazan-Garcia received and signed the Acknowledgement. Aff. Exh. B. In that acknowledgement, she expressly represented that she had "received the handbook," and that she understood it was her "responsibility to read and comply with the policies contained this handbook and any revisions to it." *Id.* The Employee Handbook required Bazan-Garcia to sign the separate Arbitration Agreement, which she did on September 27, 2011. Aff. Exh. C. It also contained its own arbitration agreement, stating that disputes not resolved internally "are subject to final and binding arbitration . . . under the Employment Dispute Resolution Rules of the American Arbitration Association." Aff. Exh. F at 84. This provision was not conditioned on Bazan-Garcia signing the separate and additional Arbitration Agreement. *See id.*; *In re AdvancePCS Health, L.P.*, 172 S.W.3d 603, 606 (Tex. 2002) ("[N]either the FAA nor Texas law requires that arbitration clauses be signed, so long as they are written and agreed to by the parties.").

Bazan-Garcia began working for WRPS after receiving notice of the Employee Handbook's arbitration agreement through the Acknowledgement. Aff. at ¶ 2; Aff. Exh. B. She continued working for, and accepting payment from, WRPS for fifteen months. Aff. at ¶ 2. During this period, Bazan-Garcia also received addenda to the Employee Handbook informing her of revisions, and signed those addenda acknowledging that it was her responsibility to comply with all of the Employee Handbook's provisions. Aff. Exhs. D & E. All of the versions of the Employee Handbook that were in place during Bazan-Garcia's employment included the same arbitration clause, requiring the parties to submit any "[p]roblems, disputes, or claims . . . to final and binding arbitration . . . under the Employment Dispute Resolution Rules of the American Arbitration Association." *See* Aff. Exh. F at 84; Aff. Exh. G at 85; Aff. Exh. H at 87. Having agreed to the terms of the Employee Handbook through her signature and conduct, Bazan-Garcia is bound to its arbitration provision.

## C. Bazan-Garcia's claims fall within the scope of the agreement to arbitrate.

The second and final inquiry in determining whether arbitration of a party's claims is mandatory under the TAA is whether those claims fall within the scope of the parties' arbitration agreement. If they do, the Court must compel arbitration. *Henry*, 18 S.W.3d at 688.

"When deciding whether claims fall within an arbitration agreement, courts employ a strong presumption in favor of arbitration." *In re Rubiola*, 334 S.W.3d 220, 225 (Tex. 2011). Thus, the court "must resolve any doubts about the scope of an arbitration agreement in favor of arbitration." *Dennis v. Coll. Station Hosp., L.P.*, 169 S.W.3d 282, 285 (Tex. App.— Waco 2005, pet. denied). "The policy in favor of compelling arbitration agreements is so compelling that a court should not deny arbitration *unless it can be said with positive assurance* that an arbitration clause is *not* susceptible of an interpretation which would cover the dispute at

issue." *In re Rubiola*, 334 S.W.3d at 225 (quoting *Prudential Sec. Inc. v. Marshall*, 909 S.W.2d 896, 899 (Tex. 1995)).

Bazan-Garcia claims she was wrongfully discharged by WRPS after allegedly notifying WRPS of an "on-the-job injury and/or initiat[ing] the filing of a workers' compensation claim." Orig. Pet. at ¶ 17. The parties' agreement clearly encompasses that dispute. The Arbitration Agreement states that "other than a worker's compensation claim covered by insurance, no dispute between [WRPS] and the undersigned which is in any way related to the employment of the undersigned, *including but not limited to a claim for wrongful termination* . . . shall be the subject of a lawsuit filed in any state or federal court." Aff. Exh. C (emphasis added). Bazan-Garcia is making a claim for wrongful termination, and is not making a claim for worker's compensation. The Arbitration Agreement expressly requires arbitration of the wrongful termination claim, which is therefore within the scope of the agreement.

The arbitration provision contained in the Employee Handbook also clearly covers the parties' dispute. That provision states that "[p]roblems, disputes, or claims not resolved through [voluntary internal] resolution steps are subject to final and binding arbitration." Aff. Exh. F at 84. Bazan-Garcia's claim was not resolved through a voluntary internal resolution process, and therefore falls within the scope of the arbitration agreement.

Because the TAA requires the arbitration of all disputes in this case, the Court must compel arbitration and stay this lawsuit. *See Forest Oil*, 268 S.W.3d at 56; Tex. Civ. Prac. & Rem. Code § 171.021(c).

**D.      Any defenses to arbitration raised by Bazan-Garcia must be decided by the arbitrator rather than the Court.**

If Bazan-Garcia raises any defense to arbitration, including any argument about the existence, validity, or enforceability of the parties' arbitration agreements, that challenge

must be decided by the arbitrator and not the Court. Bazan-Garcia therefore cannot avoid arbitration on any of those grounds.

The default rule is that the court decides issues of substantive arbitrability, such as the validity of the arbitration agreement. *Forest Oil*, 268 S.W.3d at 61. However, the parties may agree to have those issues decided by the arbitrator instead, so long as the agreement "clearly and unmistakably" demonstrates that this was the parties' intent. *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 79 (2002); *see also Saxa Inc. v. DFD Architecture Inc.*, 312 S.W.3d 224, 229 n. 4 (Tex. App.—Dallas 2010, pet. denied) (explaining that the trial court could rely on FAA and TAA precedents in analyzing whether the parties had delegated issues of arbitrability to the arbitrator, because it "is subject to a virtually identical analysis under either" statute).

Such a delegation clause can empower the arbitrator to decide, among other things, whether the agreement is valid, binding and enforceable against a particular plaintiff, illusory, unconscionable, or sufficiently broad to cover the parties' dispute. *See, e.g., Rent-A-Center, West, Inc. v. Jackson*, 130 S. Ct. 2772, 2775, 2779 (2010) (delegation clause empowered arbitrator to decide whether arbitration agreement was unconscionable); *Forest Oil*, 268 S.W.3d at 61 (delegation clause empowered arbitrator to decide whether the parties' dispute was within the scope of the arbitration agreement); *IHS Acquisitions No. 171, Inc. v. Beatty-Ortiz*, 387 S.W.3d 799, 808 (Tex. App.—El Paso 2012, no pet.) (delegation clause empowered arbitrator to decide whether arbitration agreement was illusory); *Saxa*, 312 S.W.3d at 229 (delegation clause empowered arbitrator to decide whether joinder of parties was proper under the arbitration agreement). In deciding a motion to compel arbitration, the trial court has no discretion to refuse to enforce a clause that authorizes the arbitrator to decide these issues. *Ernst & Young LLP v.*

*Martin*, 278 S.W.3d 497, 500 (Tex. App.—Houston [14th Dist.] 2009, no pet.) ("[A]n arbitration clause that reallocates traditional court functions to the arbitrator is enforceable and cannot serve as a basis for denying a motion to compel arbitration.").

The Arbitration Agreement and the Employee Handbook clearly and unmistakably vest jurisdiction over arbitrability to the arbitrator. The Arbitration Agreement specifies that arbitration will occur "in accordance with the rules of the American Arbitration Association." Aff. Exh. C. The Employee Handbook states that "[t]he arbitration proceeding will be conducted under the Employment Dispute Resolution Rules of the American Arbitration Association." Aff. Exh. F at 84. Under the AAA's Rules for employment cases, "[t]he arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope or validity of the arbitration agreement." AAA Employment Arbitration Rules at 17, ¶ 6(a).[1]

A provision that incorporates the AAA Rules clearly and unmistakably delegates substantive arbitrability to the arbitrator. *See Saxa Inc.*, 312 S.W.3d at 229. In *Saxa*, for example, the parties' arbitration agreement provided that "any claim, dispute or other matter in question arising out of or related to" the contract "shall be subject to arbitration." *Id.* In addition, the agreement stated that arbitration would occur in accordance with the AAA's Construction Industry Arbitration Rules, which give the arbitrator power "to rule on his or her own jurisdiction, including any objections with respect to the existence, scope or validity of the arbitration agreement." *Id.* at 228-29. The Court compelled arbitration of the parties' dispute over arbitrability—in that case, whether the joinder of parties was appropriate. "When, as here, the parties agree to a broad arbitration clause and explicitly incorporate rules that empower an

---

[1] A copy of the AAA Employment Arbitration Rules & Mediation Procedures is available at https://www.adr.org/aaa/ShowProperty?nodeId=/UCM/ADRSTG_004362&revision=latestreleased.

arbitrator to decide issues of arbitrability, the incorporation serves as clear and unmistakable evidence of the parties' intent to delegate such issues to an arbitrator." *Id.* at 230. The Court emphasized that a majority of courts have reached this same conclusion. *Id.* (collecting cases); *see also Petrofac, Inc. v. Dyn McDermott Petroleum Operations Co.*, 687 F.3d 671, 675 (5th Cir. 2012) ("We agree with most of our sister circuits that the express adoption of the [the AAA] rules presents clear and unmistakable evidence that the parties agreed to arbitrate arbitrability.").

Bazan-Garcia assented to an arbitration agreement that empowers the arbitrator to decide arbitrability because the Arbitration Agreement and the Employee Handbook incorporate the AAA Rules' delegation provision—the same provision at issue in *Saxa*. *See* Aff. Exh. C; Aff. Exh. F at 84. This delegation provision does not prohibit Bazan-Garcia from raising any challenges to the parties' arbitration agreement, including challenges based on the validity of the parties' signatures, the scope of the agreement, any alleged waiver of arbitration by WRPS, or whether the agreement is illusory or unconscionable. It does, however, require Bazan-Garcia to pursue these challenges in the forum of arbitration, not the court.

## IV. Prayer

WRPS prays that the Court grant its Motion to Compel Arbitration and abate and stay all proceedings in this lawsuit until arbitration has been completed.

Respectfully submitted,

**BAKER BOTTS L.L.P.**


By: */s/ Jennifer M. Trulock*

Jennifer M. Trulock
State Bar No. 90001515
2001 Ross Avenue, Suite 600
Dallas, Texas 75201
(214) 953-6500  Telephone
(214) 953-6503  Facsimile
jennifer.trulock@bakerbotts.com

Stephanie F. Cagniart
98 San Jacinto Boulevard, Suite 1500
Austin, Texas 78701-4078
(512) 322-2500  Telephone
(512) 322-2501  Facsimile
stephanie.cagniart@bakerbotts.com

**ATTORNEYS FOR DEFENDANT WESTERN RIM PROPERTY SERVICES, INC.**

## CERTIFICATE OF CONFERENCE

I certify that on September 23, 2014 and on October 15, 2014, I conferred by e-mail with Josue Garza, counsel for Plaintiff, regarding this motion. Mr. Garza stated on both dates that Plaintiff opposes the relief requested in this motion.

/s/ Stephanie F. Cagniart
Stephanie F. Cagniart

## CERTIFICATE OF SERVICE

I certify that on this the 15th day of October, 2014, a copy of the foregoing was served by certified mail, return receipt requested, and by facsimile on the following counsel for Plaintiff:

Javier Espinoza
Steven Sachs
Josue F. Garza
The Espinoza Law Firm, PLLC
503 E. Ramsey, Ste. 103
San Antonio, Texas 78216
210-229-1302 (Facsimile)

/s/ Stephanie F. Cagniart
Stephanie F. Cagniart

# EXHIBIT 1

| PAULA BAZAN-GARCIA, | § | IN THE COUNTY COURT |
| | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | AT LAW NO. CC# 03 |
| | § | |
| WESTERN RIM PROPERTY | § | |
| SERVICES INC., | § | |
| | § | |
| Defendant. | § | BEXAR COUNTY, TEXAS |

## AFFIDAVIT OF CHARLES D. SMITH

Before me, the undersigned authority, personally appeared Charles D. Smith, who, being duly sworn, testified as follows:

1. My name is Charles D. "Doug" Smith. I am over the age of 18, of sound mind, and competent to testify to the matters stated in this Affidavit. I have personal knowledge of the facts set forth in this Affidavit, and all of these facts are true.

2. Paula Bazan-Garcia was employed as a housekeeper by WRPS III, LP from September 26, 2011 to October 22, 2013.

3. I am the custodian of the records of WRPS III, LP. In Bazan-Garcia's personnel file are located the following documents:

    a. An At-Will Employee Agreement, a true and correct copy of which is attached to this Affidavit as Exhibit A.

    b. An Employee Acknowledgement Form, a true and correct copy of which is attached to this Affidavit as Exhibit B.

    c. An Arbitration Agreement, a true and correct copy of which is attached to this Affidavit as Exhibit C.

    d. Two Employee Handbook Addendum forms, true and correct copies of which are attached to this Affidavit as Exhibits D & E.

4.     True and correct copies of the Employee Handbooks that were used by WRPS III, LP during Bazan-Garcia's employment are also attached to this Affidavit as Exhibits F, G, & H.

5.     The documents attached to this Affidavit as Exhibits A through H are kept by WRPS III, LP in the regular course of business, and it was the regular course of business of WRPS III, LP for an employee or representative of WRPS III, LP, who had knowledge of the event recorded to keep copies of these documents in WRPS III, LP's personnel files. The records attached hereto are the original or exact duplicates of the original.

FURTHER, AFFIANT SAYETH NOT.

_____
Charles D. Smith

**SUBSCRIBED AND SWORN TO BEFORE ME** by Charles D. Smith on this 15th day of October, 2014.

_____
Notary Public in and for the State of Texas



CHERYL ANN NUGENT
Notary Public, State of Texas
My Commission Expires
August 30, 2016

**AFFIDAVIT OF CHARLES D. SMITH**                                        **Page 2**

# AFFIDAVIT

# EXHIBIT A

## WRPS III, LP
## AT-WILL EMPLOYEE AGREEMENT

To:     WRPS III, LP employee

I hereby acknowledge that WRPS III, LP has given me ample private time to sit and review the Company's Policy and Procedure Handbook dated August 1, 2006. I understand clearly all the statements made in this handbook and will comply with all the rules and regulations of the Company set forth in this handbook along with those that I learn of during my employment. I understand clearly that failure to do so may result in my suspension or discharge.

I recognize that I am an "at will" employee and that I can quit my employment at any time without a cause or reason, and the Company may terminate my employment at any time without a cause or reason. I realize that the various "causes" for termination listed in this handbook are not exclusive; rather, they illustrate reasons when termination is appropriate. Termination may be appropriate for many other reasons not specifically listed herein.

_____
Employee's Signature

Sept. 20, 2011
Date

_____
Employee's Printed Name

35

# AFFIDAVIT

# EXHIBIT B



*WRPS III, LP*
*Employee Handbook WRPS III, LP*

EMPLOYEE ACKNOWLEDGEMENT FORM

The employee handbook describes important information about WRPS III, LP, and I understand that I should consult the Human Resources Department regarding any questions not answered in the handbook.

I have entered into my employment relationship with WRPS III, LP voluntarily and acknowledge that there is no specified length of employment. Accordingly, either I or WRPS III, LP can terminate the relationship at will, with or without cause, at any time, so long as there is no violation of applicable federal or state law.

Since the information, policies, and benefits described here are necessarily subject to change, I acknowledge that revisions to the handbook may occur, except to WRPS III, LP's policy of employment-at-will. All such changes will be communicated through official notices, and I understand that revised information may supersede, modify, or eliminate existing policies. Only the chief executive officer of WRPS III, LP has the ability to adopt any revisions to the policies in this handbook.

Furthermore, I acknowledge that this handbook is neither a contract of employment nor a legal document. I have received the handbook, and I understand that it is my responsibility to read and comply with the policies contained in this handbook and any revisions made to it.

EMPLOYEE'S NAME (printed): Paula C. Bazan -Garcia

EMPLOYEE'S SIGNATURE: Paula C. B. Garcia

DATE: Sept 20, 2011

# AFFIDAVIT
# EXHIBIT C

## ARBITRATION AGREEMENT

It is in the interest of WRPS III, LP and their employees to resolve in a speedy and inexpensive way, any legal controversy that may arise. Therefore, other than a worker's compensation claim covered by insurance, no dispute between the companies and the undersigned which is in any way related to the employment of the undersigned, including but not limited to a claim for wrongful termination, discrimination and/or harassment, and worker's compensation not covered by insurance, shall be the subject of a lawsuit filed in any state or federal court. Instead, any such dispute shall be submitted to arbitration in accordance with the rules of the American Arbitration Association ("AAA"). Prior to the filing of any such proceeding, the filing party shall give twenty (20) days prior written notice.

Each party to arbitration shall be entitled to take only one deposition. Any arbitration relating to any dispute covered by this Agreement shall be arbitrated in Dallas County, Texas.

At the conclusion of the arbitration, the arbitrator shall make such findings of fact and state the evidentiary basis of such finding. The Arbitrator shall also issue a ruling and explain how the findings of fact justify his ruling. Any court of competent jurisdiction shall enter judgment on the arbitration award and shall review the award as permitted by law.

BY: _____
Marcus D Hiles
President
WRPS III, LP

Date: _____ 9/7/06 _____

By: _____

Date: _____ 9-27-11 _____

39

# AFFIDAVIT
# EXHIBIT D



## WRPS III , LP
WRPS III, LP

December 28, 2012

**EMPLOYEE HANDBOOK ADDENDUM**

The attached addendum describes important information about WRPS III, LP. I understand that I should consult the Human Resources Department regarding any questions.

I acknowledge that I have received the addendum and I understand that it is my responsibility to read and comply with the revision that has been made.

EMPLOYEE'S NAME (printed): Paula Baran Garcia

EMPLOYEE'S SIGNATURE: _____

DATE: 1-2-13

4

# AFFIDAVIT

# EXHIBIT E



## WRPS III , LP
WRPS III, LP

March 1, 2013

## EMPLOYEE HANDBOOK ADDENDUM

The attached addendum describes important information about WRPS III, LP. I understand that I should consult the Human Resources Department regarding any questions.

I acknowledge that I have received the addendum and I understand that it is my responsibility to read and comply with the revision that has been made.

EMPLOYEE'S NAME (printed): _Paula Bazan-Garcia_

EMPLOYEE'S SIGNATURE: _Paul B Cam_

DATE: _3-1-13_

4

# AFFIDAVIT

# EXHIBIT F



# Employee Handbook
# WRPS, LP

10/01/2011



**WRPS, LP**

## Table of Contents

| No. Policy | Effective Date: | Revision Date: | Page |
|---|---|---|---|
| **INTRODUCTION** | | | |
| 020 Employee Welcome Message | 12/1/1999 | 1/1/2006 | 1 |
| 030 Organization Description | 12/1/1999 | 1/1/2006 | 2 |
| 040 Introductory Statement | 12/1/1999 | 1/1/2006 | 3 |
| 051 Employee Acknowledgement Form | 12/1/1999 | 1/1/2006 | 4 |
| | | | |
| **EMPLOYMENT** | | | |
| 101 Nature of Employment | 12/1/1999 | 1/1/2000 | 5 |
| 102 Employee Relations | 12/1/1999 | 1/1/2006 | 6 |
| 103 Equal Employment Opportunity | 12/1/1999 | 1/1/2006 | 7 |
| 104 Business Ethics and Conduct | 12/1/1999 | 1/1/2006 | 8 |
| 107 Immigration Law Compliance | 12/1/1999 | 1/1/2000 | 9 |
| 108 Conflicts of Interest | 12/1/1999 | 1/1/2006 | 10 |
| 110 Outside Employment | 12/1/1999 | 1/1/2006 | 11 |
| 112 Non-Disclosure | 12/1/1999 | 1/1/2006 | 12 |
| 114 Disability Accommodation | 12/1/1999 | 1/1/2006 | 13 |
| 180 Personal Relationships in the Workplace | 11/19/2004 | 1/1/2006 | 14 |
| | | | |
| **EMPLOYMENT STATUS & RECORDS** | | | |
| 201 Employment Categories | 12/1/1999 | 1/1/2006 | 16 |
| 202 Access to Personnel Files | 12/1/1999 | 1/1/2006 | 18 |
| 203 Employment Reference Checks | 12/1/1999 | 1/1/2000 | 19 |
| 204 Personnel Data Changes | 12/1/1999 | 1/1/2006 | 20 |
| 205 Introductory Period | 12/1/1999 | 1/1/2006 | 21 |
| 208 Employment Applications | 12/1/1999 | 1/1/2006 | 22 |
| 209 Performance Evaluation | 12/1/1999 | 1/1/2006 | 23 |
| 210 Job Descriptions | 12/1/1999 | 1/1/2006 | 24 |
| 280 Confidentiality of Salary | 12/1/1999 | 1/1/2006 | 25 |
| | | | |
| **EMPLOYEE BENEFIT PROGRAMS** | | | |
| 301 Employee Benefits | 12/1/1999 | 1/1/2006 | 26 |
| 303 Vacation Benefits | 12/1/1999 | 10/1/2009 | 27 |
| 304. Child Care Benefits | 12/1/1999 | 1/1/2006 | 29 |
| 305 Holidays | 12/1/1999 | 1/1/2006 | 30 |



**WRPS, LP**

| 307 | Sick Leave Benefits | 12/1/1999 | 10/1/2009 | 31 |
| 308 | Time Off to Vote | 12/1/1999 | 1/1/2006 | 33 |
| 309 | Bereavement Leave | 12/1/1999 | 1/1/2006 | 34 |
| 310 | Relocation Benefits | 12/1/1999 | 1/1/2006 | 35 |
| 311 | Jury Duty | 12/1/1999 | 1/1/2006 | 36 |
| 312 | Witness Duty | 12/1/1999 | 1/1/2006 | 37 |
| 313 | Benefits Continuation (COBRA) | 12/1/1999 | 1/1/2006 | 38 |
| 314 | Educational Assistance | 12/1/1999 | 1/1/2006 | 39 |
| 316 | Health Insurance | 12/1/1999 | 1/1/2006 | 40 |
| 317 | Life Insurance | 12/1/1999 | 1/1/2006 | 41 |
| 320 | 401(k) Savings Plan | 12/1/1999 | 1/1/2006 | 42 |
| 326 | Flexible Spending Account (FSA) | 12/1/1999 | 1/1/2006 | 43 |
| 328 | Partnership Participation Units | 12/1/1999 | 1/1/2006 | 44 |
| 330 | Annual Incentive Trip | 12/1/1999 | 1/1/2006 | 45 |

TIMEKEEPING/PAYROLL

| 401 | Timekeeping | 12/1/1999 | 1/1/2000 | 46 |
| 403 | Paydays | 12/1/1999 | 1/1/2000 | 47 |
| 405 | Employment Termination | 12/1/1999 | 1/1/2006 | 48 |
| 407 | Severance Pay | 12/1/1999 | 1/1/2006 | 49 |
| 409 | Administrative Pay Corrections | 12/1/1999 | 1/1/2006 | 50 |
| 410 | Pay Deductions and Setoffs | 12/1/1999 | 1/1/2006 | 51 |

WORK CONDITIONS & HOURS

| 502 | Work Schedules | 12/1/1999 | 1/1/2006 | 52 |
| 504 | Use of Phone and Mail Systems | 12/1/1999 | 1/1/2006 | 53 |
| 505 | Smoking | 12/1/1999 | 1/1/2006 | 54 |
| 506 | Rest and Meal Periods | 12/1/1999 | 1/1/2006 | 55 |
| 507 | Overtime | 12/1/1999 | 1/1/2006 | 56 |
| 512 | Business Travel Expenses | 12/1/1999 | 1/1/2009 | 57 |
| 514 | Visitors in the Workplace | 12/1/1999 | 1/1/2006 | 58 |
| 516 | Computer and Email Usage | 12/1/1999 | 1/1/2006 | 60 |
| 517 | Internet Usage | 12/1/1999 | 1/1/2006 | 61 |
| 522 | Workplace Violence Prevention | 12/1/1999 | 1/1/2006 | 63 |
| 526 | Cell Phone Usage | 12/1/1999 | 1/1/2006 | 65 |

LEAVES OF ABSENCE

| 601 | Medical Leave | 12/1/1999 | 1/1/2006 | 66 |



**WRPS, LP**

| | | | | |
|---|---|---|---|---|
| 602 | Family Leave | 12/1/1999 | 1/1/2006 | 68 |
| 605 | Military Leave | 1/1/2006 | 1/1/2000 | 70 |

EMPLOYEE CONDUCT & DISCIPLINARY ACTION

| | | | | |
|---|---|---|---|---|
| 701 | Employee Conduct and Work Rules | 12/1/1999 | 1/1/2006 | 71 |
| 702 | Drug and Alcohol Use | 12/1/1999 | 1/1/2000 | 73 |
| 703 | Sexual and Other Unlawful Harassment | 12/1/1999 | 1/1/2006 | 74 |
| 704 | Attendance and Punctuality | 12/1/1999 | 1/1/2000 | 76 |
| 705 | Personal Appearance | 12/1/1999 | 1/1/2000 | 77 |
| 706 | Return of Property | 12/1/1999 | 1/1/2000 | 78 |
| 708 | Resignation | 12/1/1999 | 1/1/2000 | 79 |
| 714 | Drug Testing | 12/1/1999 | 1/1/2006 | 80 |
| 716 | Progressive Discipline | 12/1/1999 | 1/1/2006 | 81 |
| 718 | Problem Resolution | 12/1/1999 | 1/1/2006 | 83 |
| 720 | Casual Days | 12/1/1999 | 1/1/2006 | 85 |

MISCELLANEOUS

| | | | | |
|---|---|---|---|---|
| 800 | Life-Threatening Illnesses in the Workplace | 12/1/1999 | 1/1/2006 | 87 |
| 806 | Suggestion Program | 12/1/1999 | 1/1/2006 | 88 |



# *WRPS, LP*
## WRPS, LP

Welcome new employee!

On behalf of your colleagues, I welcome you to WRPS, LP and wish you every success here.

We believe that each employee contributes directly to WRPS, LP's growth and success, and we hope you will take pride in being a member of our team.

This handbook was developed to describe some of the expectations of our employees and to outline the policies, programs, and benefits available to eligible employees. Employees should familiarize themselves with the contents of the employee handbook as soon as possible, for it will answer many questions about employment with WRPS, LP.

We hope that your experience here will be challenging, enjoyable, and rewarding. Again, welcome!

Sincerely,


Marcus D. Hiles
Chairman and CEO

1



# WRPS, LP
**WRPS, LP**

## ORGANIZATION DESCRIPTION

Western Rim Property Services currently manages over 6,000 apartment homes in Texas. These apartment homes include luxury, moderate, and affordable housing communities. Currently Western Rim has in excess of 1,200 LIHTC apartments with its major growth emphasis consisting of luxury AAA properties. Whatever your needs, Western Rim has a home to satisfy your requirements.

The Mansion trademark is the brand name for its AAA luxury units. These properties are unmatched in their amenities such as attached garages, marble baths with Jacuzzi tubs, granite kitchens, Berber carpet, and upgraded kitchen appliances. The most spectacular clubhouses in the industry, which include full impact aerobics floors, free weight and exercise room, stadium seating theater rooms, pool tables, tanning beds, saunas and an outside pool area that is beyond belief. Our philosophy is not that we are renting living space but are instead marketing a life style.

. . . . . . . . . .

Western Rim Properties are on the cutting edge of design. Many are regularly referenced in the industry publications and are finalist for national awards such as the 1998 National Award "Pillars of the Industry" for best signage (Mansions by Vineyard) and 1999 National Apartment Association's "Pillars of the Industry" for best brochure (Mansions by the Lake).

2



# WRPS, LP
## WRPS, LP

### INTRODUCTORY STATEMENT

This handbook is designed to acquaint you with WRPS, LP and provide you with information about working conditions, employee benefits, and some of the policies affecting your employment. You should read, understand, and comply with all provisions of the handbook. It describes many of your responsibilities as an employee and outlines the programs developed by WRPS, LP to benefit employees. One of our objectives is to provide a work environment that is conducive to both personal and professional growth.

No employee handbook can anticipate every circumstance or question about policy. As WRPS, LP continues to grow, the need may arise and WRPS, LP reserves the right to revise, supplement, or rescind any policies or portion of the handbook from time to time as it deems appropriate, in its sole and absolute discretion. The only exception to any changes is our employment-at-will policy permitting you or WRPS, LP to end our relationship for any reason at any time. Employees will, of course, be notified of such changes to the handbook as they occur.

3



## *WRPS, LP*
**WRPS, LP**

## **718** Problem Resolution
Effective Date: 12/1/1999
Revision Date: 8/1/2006

WRPS, LP is committed to providing the best possible working conditions for its employees. Part of this commitment is encouraging an open and frank atmosphere in which any problem, complaint, suggestion, or question receives a timely response from WRPS, LP supervisors and management.

WRPS, LP strives to ensure fair and honest treatment of all employees. Supervisors, managers, and employees are expected to treat each other with mutual respect. Employees are encouraged to offer positive and constructive criticism.

If employees disagree with established rules of conduct, policies, or practices, they can express their concern through the problem resolution procedure. No employee will be penalized, formally or informally, for voicing a complaint with WRPS, LP in a reasonable, business-like manner, or for using the problem resolution procedure.

If a situation occurs when employees believe that a condition of employment or a decision affecting them is unjust or inequitable, they are encouraged to make use of the following steps. The employee may discontinue the procedure at any step.

1. Employee presents problem promptly to immediate supervisor within 3 calendar days, after incident occurs. If supervisor is unavailable or employee believes it would be inappropriate to contact that person, employee may present problem to the Human Resources Department or any other member of management.

2. Supervisor responds to problem during discussion or within 3 calendar days, after consulting with appropriate management, when necessary. Supervisor documents discussion.

3. Employee presents problem to the Human Resources Department within 3 calendar days, if problem is unresolved.

4. Human Resources Department counsels and advises employee, assists in putting problem in writing, visits with employee's manager(s), if necessary, and directs employee to the President for review of problem.

5. Employee presents problem to the President in writing.

83



## WRPS, LP
**WRPS, LP**

6. The President reviews and considers problem. The President informs employee of decision within 3 calendar days, and forwards copy of written response to the Human Resources Department for employee's file. The President has full authority to make any adjustment deemed appropriate to resolve the problem. This decision is final and binding on all parties and may not be discussed or complained about again.

Problems, disputes, or claims not resolved through the preceding problem resolution steps are subject to final and binding arbitration. The arbitration proceeding will be conducted under the Employment Dispute Resolution Rules of the American Arbitration Association. The decision or award of the Arbitrator made under these rules is exclusive, final, and binding on parties, their beneficiaries, executors, administrators, successors, and assigns. Every employee must sign the attached Arbitration Agreement. This is an absolute requirement.

Employees who choose to use the arbitration process to resolve a problem will be expected to share the cost of the arbitration proceeding with WRPS, LP. A complete description of the arbitration procedure is available from the Human Resources Department for review.

Not every problem can be resolved to everyone's total satisfaction, but only through understanding and discussion of mutual problems can employees and management develop confidence in each other. This confidence is important to the operation of an efficient and harmonious work environment, and helps to ensure everyone's job security.

84

53

# AFFIDAVIT
# EXHIBIT G



# Employee Handbook
# WRPS III, LP

09/21/2012



**WRPS III, LP**

## Table of Contents

| No. Policy | Effective Date: | Revision Date: | Page |
|---|---|---|---|
| **INTRODUCTION** | | | |
| Employee Welcome Message | 12/1/1999 | 1/1/2006 | 1 |
| Organization Description | 12/1/1999 | 1/1/2006 | 2 |
| Introductory Statement | 12/1/1999 | 1/1/2006 | 3 |
| Employee Acknowledgement Form | 12/1/1999 | 1/1/2006 | 4 |
| | | | |
| **EMPLOYMENT** | | | |
| 101 Nature of Employment | 12/1/1999 | 1/1/2000 | 5 |
| 102 Employee Relations | 12/1/1999 | 1/1/2006 | 6 |
| 103 Equal Employment Opportunity | 12/1/1999 | 1/1/2006 | 7 |
| 104 Business Ethics and Conduct | 12/1/1999 | 1/1/2006 | 8 |
| 107 Immigration Law Compliance | 12/1/1999 | 1/1/2000 | 9 |
| 108 Conflicts of Interest | 12/1/1999 | 1/1/2006 | 10 |
| 110 Outside Employment | 12/1/1999 | 1/1/2006 | 12 |
| 112 Non-Disclosure | 12/1/1999 | 1/1/2006 | 13 |
| 114 Disability Accommodation | 12/1/1999 | 1/1/2006 | 14 |
| 180 Personal Relationships in the Workplace | 11/19/2004 | 1/1/2006 | 15 |
| **EMPLOYMENT STATUS & RECORDS** | | | |
| 201 Employment Categories | 12/1/1999 | 1/1/2006 | 17 |
| 202 Access to Personnel Files | 12/1/1999 | 1/1/2006 | 19 |
| 203 Employment Reference Checks | 12/1/1999 | 1/1/2000 | 20 |
| 204 Personnel Data Changes | 12/1/1999 | 1/1/2006 | 21 |
| 205 Introductory Period | 12/1/1999 | 1/1/2006 | 22 |
| 208 Employment Applications | 12/1/1999 | 1/1/2006 | 23 |
| 209 Performance Evaluation | 12/1/1999 | 1/1/2006 | 24 |
| 210 Job Descriptions | 12/1/1999 | 1/1/2006 | 25 |
| 280 Confidentiality of Salary | 12/1/1999 | 1/1/2006 | 26 |
| **EMPLOYEE BENEFIT PROGRAMS** | | | |
| 301 Employee Benefits | 12/1/1999 | 1/1/2006 | 27 |
| 303 Vacation Benefits | 12/1/1999 | 10/1/2009 | 28 |
| 304 Child Care Benefits | 12/1/1999 | 1/1/2006 | 30 |



**WRPS III, LP**

| 305 | Holidays | 12/1/1999 | 1/1/2006 | 31 |
| 307 | Sick Leave Benefits | 12/1/1999 | 10/1/2009 | 32 |
| 308 | Time Off to Vote | 12/1/1999 | 1/1/2006 | 34 |
| 309 | Bereavement Leave | 12/1/1999 | 1/1/2006 | 35 |
| 310 | Relocation Benefits | 12/1/1999 | 1/1/2006 | 36 |
| 311 | Jury Duty | 12/1/1999 | 1/1/2006 | 37 |
| 312 | Witness Duty | 12/1/1999 | 1/1/2006 | 38 |
| 313 | Benefits Continuation (COBRA) | 12/1/1999 | 1/1/2006 | 39 |
| 314 | Educational Assistance | 12/1/1999 | 1/1/2006 | 40 |
| 316 | Health Insurance | 12/1/1999 | 1/1/2006 | 41 |
| 317 | Life Insurance | 12/1/1999 | 1/1/2006 | 42 |
| 320 | 401(k) Savings Plan | 12/1/1999 | 1/1/2006 | 43 |
| 326 | Flexible Spending Account (FSA) | 12/1/1999 | 1/1/2006 | 44 |
| 328 | Partnership Participation Units | 12/1/1999 | 1/1/2006 | 45 |
| 330 | Annual Incentive Trip | 12/1/1999 | 1/1/2006 | 46 |

**TIMEKEEPING/PAYROLL**

| 401 | Timekeeping | 12/1/1999 | 1/1/2000 | 47 |
| 403 | Paydays | 12/1/1999 | 1/1/2000 | 48 |
| 405 | Employment Termination | 12/1/1999 | 1/1/2006 | 49 |
| 407 | Severance Pay | 12/1/1999 | 1/1/2006 | 50 |
| 409 | Administrative Pay Corrections | 12/1/1999 | 1/1/2006 | 51 |
| 410 | Pay Deductions and Setoffs | 12/1/1999 | 1/1/2006 | 52 |

**WORK CONDITIONS & HOURS**

| 502 | Work Schedules | 12/1/1999 | 1/1/2006 | 53 |
| 504 | Use of Phone and Mail Systems | 12/1/1999 | 1/1/2006 | 54 |
| 505 | Smoking | 12/1/1999 | 1/1/2006 | 55 |
| 506 | Meal Periods | 12/1/1999 | 1/1/2006 | 56 |
| 507 | Overtime | 12/1/1999 | 1/1/2006 | 57 |
| 512 | Business Travel Expenses | 12/1/1999 | 1/1/2006 | 58 |
| 514 | Visitors in the Workplace | 12/1/1999 | 1/1/2006 | 60 |
| 516 | Computer and Email Usage | 12/1/1999 | 1/1/2006 | 61 |
| 517 | Internet Usage | 12/1/1999 | 1/1/2006 | 62 |
| 522 | Workplace Violence Prevention | 12/1/1999 | 1/1/2006 | 64 |
| 526 | Cell Phone Usage | 12/1/1999 | 1/1/2006 | 66 |

**LEAVES OF ABSENCE**

| 601 | Medical Leave | 12/1/1999 | 1/1/2006 | 67 |



*WRPS III, LP*

| | | | | |
|---|---|---|---|---|
| 602 | Family Leave | 12/1/1999 | 1/1/2006 | 69 |
| 605 | Military Leave | 1/1/2006 | 1/1/2000 | 71 |

**EMPLOYEE CONDUCT & DISCIPLINARY ACTION**

| | | | | |
|---|---|---|---|---|
| 701 | Employee Conduct and Work Rules | 12/1/1999 | 1/1/2006 | 72 |
| 702 | Drug and Alcohol Use | 12/1/1999 | 1/1/2000 | 74 |
| 703 | Sexual and Other Unlawful Harassment | 12/1/1999 | 1/1/2006 | 75 |
| 704 | Attendance and Punctuality | 12/1/1999 | 1/1/2000 | 77 |
| 705 | Personal Appearance | 12/1/1999 | 1/1/2000 | 78 |
| 706 | Return of Property | 12/1/1999 | 1/1/2000 | 79 |
| 708 | Resignation | 12/1/1999 | 1/1/2000 | 80 |
| 714 | Drug Testing | 12/1/1999 | 1/1/2006 | 81 |
| 716 | Progressive Discipline | 12/1/1999 | 1/1/2006 | 82 |
| 718 | Problem Resolution | 12/1/1999 | 1/1/2006 | 84 |
| 720 | Casual Days | 12/1/1999 | 1/1/2006 | 86 |

**MISCELLANEOUS**

| | | | | |
|---|---|---|---|---|
| 800 | Life-Threatening Illnesses in the Workplace | 12/1/1999 | 1/1/2006 | 88 |
| 806 | Suggestion Program | 12/1/1999 | 1/1/2006 | 89 |



# *WRPS III , LP*
## WRPS III, LP

Welcome new employee!

On behalf of your colleagues, I welcome you to WRPS III, LP and wish you every success here.

We believe that each employee contributes directly to WRPS III, LP's growth and success, and we hope you will take pride in being a member of our team.

This handbook was developed to describe some of the expectations of our employees and to outline the policies, programs, and benefits available to eligible employees. Employees should familiarize themselves with the contents of the employee handbook as soon as possible, for it will answer many questions about employment with WRPS III, LP.

We hope that your experience here will be challenging, enjoyable, and rewarding. Again, welcome!

Sincerely,


Marcus D. Hiles
Chairman and CEO

1



# WRPS III , LP
## WRPS III, LP

### ORGANIZATION DESCRIPTION

Western Rim Property Services currently manages over 6,000 apartment homes in Texas. These apartment homes include luxury, moderate, and affordable housing communities. Currently Western Rim has in excess of 1,200 LIHTC apartments with its major growth emphasis consisting of luxury AAA properties. Whatever your needs, Western Rim has a home to satisfy your requirements.

The Mansion trademark is the brand name for its AAA luxury units. These properties are unmatched in their amenities such as attached garages, marble baths with Jacuzzi tubs, granite kitchens, Berber carpet, and upgraded kitchen appliances. The most spectacular clubhouses in the industry, which include full impact aerobics floors, free weight and exercise room, stadium seating theater rooms, pool tables, tanning beds, saunas and an outside pool area that is beyond belief. Our philosophy is not that we are renting living space but are instead marketing a life style.

. . . . . . . . . .

Western Rim Properties are on the cutting edge of design. Many are regularly referenced in the industry publications and are finalist for national awards such as the 1998 National Award "Pillars of the Industry" for best signage (Mansions by Vineyard) and 1999 National Apartment Association's "Pillars of the Industry" for best brochure (Mansions by the Lake).

2



# *WRPS III , LP*
## WRPS III, LP

INTRODUCTORY STATEMENT

This handbook is designed to acquaint you with WRPS III, LP and provide you with information about working conditions, employee benefits, and some of the policies affecting your employment. You should read, understand, and comply with all provisions of the handbook. It describes many of your responsibilities as an employee and outlines the programs developed by WRPS III, LP to benefit employees. One of our objectives is to provide a work environment that is conducive to both personal and professional growth.

No employee handbook can anticipate every circumstance or question about policy. As WRPS III, LP continues to grow, the need may arise and WRPS III, LP reserves the right to revise, supplement, or rescind any policies or portion of the handbook from time to time as it deems appropriate, in its sole and absolute discretion. The only exception to any changes is our employment-at-will policy permitting you or WRPS III, LP to end our relationship for any reason at any time. Employees will, of course, be notified of such changes to the handbook as they occur.

3



# *WRPS III , LP*
WRPS III, LP

## 718 Problem Resolution
Effective Date: 12/1/1999
Revision Date: 8/1/2006

WRPS III, LP is committed to providing the best possible working conditions for its employees. Part of this commitment is encouraging an open and frank atmosphere in which any problem, complaint, suggestion, or question receives a timely response from WRPS III, LP supervisors and management.

WRPS III, LP strives to ensure fair and honest treatment of all employees. Supervisors, managers, and employees are expected to treat each other with mutual respect. Employees are encouraged to offer positive and constructive criticism.

If employees disagree with established rules of conduct, policies, or practices, they can express their concern through the problem resolution procedure. No employee will be penalized, formally or informally, for voicing a complaint with WRPS III, LP in a reasonable, business-like manner, or for using the problem resolution procedure.

If a situation occurs when employees believe that a condition of employment or a decision affecting them is unjust or inequitable, they are encouraged to make use of the following steps. The employee may discontinue the procedure at any step.

1. Employee presents problem promptly to immediate supervisor within 3 calendar days, after incident occurs. If supervisor is unavailable or employee believes it would be inappropriate to contact that person, employee may present problem to the Human Resources Department or any other member of management.

2. Supervisor responds to problem during discussion or within 3 calendar days, after consulting with appropriate management, when necessary. Supervisor documents discussion.

3. Employee presents problem to the Human Resources Department within 3 calendar days, if problem is unresolved.

4. Human Resources Department counsels and advises employee, assists in putting problem in writing, visits with employee's manager(s), if necessary, and directs employee to the President for review of problem.

5. Employee presents problem to the President in writing.

84



# *WRPS III , LP*
## WRPS III, LP

6. The President reviews and considers problem. The President informs employee of decision within 3 calendar days, and forwards copy of written response to the Human Resources Department for employee's file. The President has full authority to make any adjustment deemed appropriate to resolve the problem. This decision is final and binding on all parties and may not be discussed or complained about again.

Problems, disputes, or claims not resolved through the preceding problem resolution steps are subject to final and binding arbitration. The arbitration proceeding will be conducted under the Employment Dispute Resolution Rules of the American Arbitration Association. The decision or award of the Arbitrator made under these rules is exclusive, final, and binding on both parties, their beneficiaries, executors, administrators, successors, and assigns. Every employee must sign the attached Arbitration Agreement. This is an absolute requirement.

Employees who choose to use the arbitration process to resolve a problem will be expected to share the cost of the arbitration proceeding with WRPS III, LP. A complete description of the arbitration procedure is available from the Human Resources Department for review.

Not every problem can be resolved to everyone's total satisfaction, but only through understanding and discussion of mutual problems can employees and management develop confidence in each other. This confidence is important to the operation of an efficient and harmonious work environment, and helps to ensure everyone's job security.

# AFFIDAVIT

# EXHIBIT H



# Employee Handbook
# WRPS, LP

05/01/2013



# WRPS, LP
**WRPS, LP**

Welcome new employee!

On behalf of your colleagues, I welcome you to WRPS, LP and wish you every success here.

We believe that each employee contributes directly to WRPS, LP's growth and success, and we hope you will take pride in being a member of our team.

This handbook was developed to describe some of the expectations of our employees and to outline the policies, programs, and benefits available to eligible employees. Employees should familiarize themselves with the contents of the employee handbook as soon as possible, for it will answer many questions about employment with WRPS, LP.

We hope that your experience here will be challenging, enjoyable, and rewarding. Again, welcome!

Sincerely,


Marcus D. Hiles
Chairman and CEO

1



# *WRPS, LP*
**WRPS, LP**

ORGANIZATION DESCRIPTION

Western Rim Property Services currently manages over 6,000 apartment homes in Texas. These apartment homes include luxury, moderate, and affordable housing communities. Currently Western Rim has in excess of 1,200 LIHTC apartments with its major growth emphasis consisting of luxury AAA properties. Whatever your needs, Western Rim has a home to satisfy your requirements.

The Mansion trademark is the brand name for its AAA luxury units. These properties are unmatched in their amenities such as attached garages, marble baths with Jacuzzi tubs, granite kitchens, Berber carpet, and upgraded kitchen appliances. The most spectacular clubhouses in the industry, which include full impact aerobics floors, free weight and exercise room, stadium seating theater rooms, pool tables, tanning beds, saunas and an outside pool area that is beyond belief. Our philosophy is not that we are renting living space but are instead marketing a life style.

. . . . . . . . .

Western Rim Properties are on the cutting edge of design. Many are regularly referenced in the industry publications and are finalist for national awards such as the 1998 National Award "Pillars of the Industry" for best signage (Mansions by Vineyard) and 1999 National Apartment Association's "Pillars of the Industry" for best brochure (Mansions by the Lake).

2



# *WRPS, LP*
## WRPS, LP

## INTRODUCTORY STATEMENT

This handbook is designed to acquaint you with WRPS, LP and provide you with information about working conditions, employee benefits, and some of the policies affecting your employment. You should read, understand, and comply with all provisions of the handbook. It describes many of your responsibilities as an employee and outlines the programs developed by WRPS, LP to benefit employees. One of our objectives is to provide a work environment that is conducive to both personal and professional growth.

No employee handbook can anticipate every circumstance or question about policy. As WRPS, LP continues to grow, the need may arise and WRPS, LP reserves the right to revise, supplement, or rescind any policies or portion of the handbook from time to time as it deems appropriate, in its sole and absolute discretion. The only exception to any changes is our employment-at-will policy permitting you or WRPS, LP to end our relationship for any reason at any time. Employees will, of course, be notified of such changes to the handbook as they occur.

3



# WRPS, LP
WRPS, LP

## 718 Problem Resolution
Effective Date: 12/1/1999
Revision Date: 8/1/2006

WRPS, LP is committed to providing the best possible working conditions for its employees. Part of this commitment is encouraging an open and frank atmosphere in which any problem, complaint, suggestion, or question receives a timely response from WRPS, LP supervisors and management.

WRPS, LP strives to ensure fair and honest treatment of all employees. Supervisors, managers, and employees are expected to treat each other with mutual respect. Employees are encouraged to offer positive and constructive criticism.

If employees disagree with established rules of conduct, policies, or practices, they can express their concern through the problem resolution procedure. No employee will be penalized, formally or informally, for voicing a complaint with WRPS, LP in a reasonable, business-like manner, or for using the problem resolution procedure.

If a situation occurs when employees believe that a condition of employment or a decision affecting them is unjust or inequitable, they are encouraged to make use of the following steps. The employee may discontinue the procedure at any step.

1. Employee presents problem promptly to immediate supervisor within 3 calendar days, after incident occurs. If supervisor is unavailable or employee believes it would be inappropriate to contact that person, employee may present problem to the Human Resources Department or any other member of management.

2. Supervisor responds to problem during discussion or within 3 calendar days, after consulting with appropriate management, when necessary. Supervisor documents discussion.

3. Employee presents problem to the Human Resources Department within 3 calendar days, if problem is unresolved.

4. Human Resources Department counsels and advises employee, assists in putting problem in writing, visits with employee's manager(s), if necessary, and directs employee to the President for review of problem.

5. Employee presents problem to the President in writing.

86



## *WRPS, LP*
### WRPS, LP

6. The President reviews and considers problem. The President informs employee of decision within 3 calendar days, and forwards copy of written response to the Human Resources Department for employee's file. The President has full authority to make any adjustment deemed appropriate to resolve the problem. This decision is final and binding on all parties and may not be discussed or complained about again.

Problems, disputes, or claims not resolved through the preceding problem resolution steps are subject to final and binding arbitration. The arbitration proceeding will be conducted under the Employment Dispute Resolution Rules of the American Arbitration Association. The decision or award of the Arbitrator made under these rules is exclusive, final, and binding on parties, their beneficiaries, executors, administrators, successors, and assigns. Every employee must sign the attached Arbitration Agreement. This is an absolute requirement.

Employees who choose to use the arbitration process to resolve a problem will be expected to share the cost of the arbitration proceeding with WRPS, LP. A complete description of the arbitration procedure is available from the Human Resources Department for review.

Not every problem can be resolved to everyone's total satisfaction, but only through understanding and discussion of mutual problems can employees and management develop confidence in each other. This confidence is important to the operation of an efficient and harmonious work environment, and helps to ensure everyone's job security.

87

issue." *In re Rubiola*, 334 S.W.3d at 225 (quoting *Prudential Sec. Inc. v. Marshall*, 909 S.W.2d 896, 899 (Tex. 1995)).

Bazan-Garcia claims she was wrongfully discharged by WRPS after allegedly notifying WRPS of an "on-the-job injury and/or initiat[ing] the filing of a workers' compensation claim." Orig. Pet. at ¶ 17. The parties' agreement clearly encompasses that dispute. The Arbitration Agreement states that "other than a worker's compensation claim covered by insurance, no dispute between [WRPS] and the undersigned which is in any way related to the employment of the undersigned, *including but not limited to a claim for wrongful termination* . . . shall be the subject of a lawsuit filed in any state or federal court." Aff. Exh. C (emphasis added). Bazan-Garcia is making a claim for wrongful termination, and is not making a claim for worker's compensation. The Arbitration Agreement expressly requires arbitration of the wrongful termination claim, which is therefore within the scope of the agreement.

The arbitration provision contained in the Employee Handbook also clearly covers the parties' dispute. That provision states that "[p]roblems, disputes, or claims not resolved through [voluntary internal] resolution steps are subject to final and binding arbitration." Aff. Exh. F at 84. Bazan-Garcia's claim was not resolved through a voluntary internal resolution process, and therefore falls within the scope of the arbitration agreement.

Because the TAA requires the arbitration of all disputes in this case, the Court must compel arbitration and stay this lawsuit. *See Forest Oil*, 268 S.W.3d at 56; Tex. Civ. Prac. & Rem. Code § 171.021(c).

**D.** **Any defenses to arbitration raised by Bazan-Garcia must be decided by the arbitrator rather than the Court.**

If Bazan-Garcia raises any defense to arbitration, including any argument about the existence, validity, or enforceability of the parties' arbitration agreements, that challenge

must be decided by the arbitrator and not the Court. Bazan-Garcia therefore cannot avoid arbitration on any of those grounds.

The default rule is that the court decides issues of substantive arbitrability, such as the validity of the arbitration agreement. *Forest Oil*, 268 S.W.3d at 61. However, the parties may agree to have those issues decided by the arbitrator instead, so long as the agreement "clearly and unmistakably" demonstrates that this was the parties' intent. *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 79 (2002); *see also Saxa Inc. v. DFD Architecture Inc.*, 312 S.W.3d 224, 229 n. 4 (Tex. App.—Dallas 2010, pet. denied) (explaining that the trial court could rely on FAA and TAA precedents in analyzing whether the parties had delegated issues of arbitrability to the arbitrator, because it "is subject to a virtually identical analysis under either" statute).

Such a delegation clause can empower the arbitrator to decide, among other things, whether the agreement is valid, binding and enforceable against a particular plaintiff, illusory, unconscionable, or sufficiently broad to cover the parties' dispute. *See, e.g., Rent-A-Center, West, Inc. v. Jackson*, 130 S. Ct. 2772, 2775, 2779 (2010) (delegation clause empowered arbitrator to decide whether arbitration agreement was unconscionable); *Forest Oil*, 268 S.W.3d at 61 (delegation clause empowered arbitrator to decide whether the parties' dispute was within the scope of the arbitration agreement); *IHS Acquisitions No. 171, Inc. v. Beatty-Ortiz*, 387 S.W.3d 799, 808 (Tex. App.—El Paso 2012, no pet.) (delegation clause empowered arbitrator to decide whether arbitration agreement was illusory); *Saxa*, 312 S.W.3d at 229 (delegation clause empowered arbitrator to decide whether joinder of parties was proper under the arbitration agreement). In deciding a motion to compel arbitration, the trial court has no discretion to refuse to enforce a clause that authorizes the arbitrator to decide these issues. *Ernst & Young LLP v.*

*Martin*, 278 S.W.3d 497, 500 (Tex. App.—Houston [14th Dist.] 2009, no pet.) ("[A]n arbitration clause that reallocates traditional court functions to the arbitrator is enforceable and cannot serve as a basis for denying a motion to compel arbitration.").

The Arbitration Agreement and the Employee Handbook clearly and unmistakably vest jurisdiction over arbitrability to the arbitrator. The Arbitration Agreement specifies that arbitration will occur "in accordance with the rules of the American Arbitration Association." Aff. Exh. C. The Employee Handbook states that "[t]he arbitration proceeding will be conducted under the Employment Dispute Resolution Rules of the American Arbitration Association." Aff. Exh. F at 84. Under the AAA's Rules for employment cases, "[t]he arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope or validity of the arbitration agreement." AAA Employment Arbitration Rules at 17, ¶ 6(a).[1]

A provision that incorporates the AAA Rules clearly and unmistakably delegates substantive arbitrability to the arbitrator. *See Saxa Inc.*, 312 S.W.3d at 229. In *Saxa*, for example, the parties' arbitration agreement provided that "any claim, dispute or other matter in question arising out of or related to" the contract "shall be subject to arbitration." *Id.* In addition, the agreement stated that arbitration would occur in accordance with the AAA's Construction Industry Arbitration Rules, which give the arbitrator power "to rule on his or her own jurisdiction, including any objections with respect to the existence, scope or validity of the arbitration agreement." *Id.* at 228-29. The Court compelled arbitration of the parties' dispute over arbitrability—in that case, whether the joinder of parties was appropriate. "When, as here, the parties agree to a broad arbitration clause and explicitly incorporate rules that empower an

---

[1] A copy of the AAA Employment Arbitration Rules & Mediation Procedures is available at https://www.adr.org/aaa/ShowProperty?nodeId=/UCM/ADRSTG_004362&revision=latestreleased.

arbitrator to decide issues of arbitrability, the incorporation serves as clear and unmistakable evidence of the parties' intent to delegate such issues to an arbitrator." *Id.* at 230. The Court emphasized that a majority of courts have reached this same conclusion. *Id.* (collecting cases); *see also Petrofac, Inc. v. Dyn McDermott Petroleum Operations Co.*, 687 F.3d 671, 675 (5th Cir. 2012) ("We agree with most of our sister circuits that the express adoption of the [the AAA] rules presents clear and unmistakable evidence that the parties agreed to arbitrate arbitrability.").

Bazan-Garcia assented to an arbitration agreement that empowers the arbitrator to decide arbitrability because the Arbitration Agreement and the Employee Handbook incorporate the AAA Rules' delegation provision—the same provision at issue in *Saxa*. *See* Aff. Exh. C; Aff. Exh. F at 84. This delegation provision does not prohibit Bazan-Garcia from raising any challenges to the parties' arbitration agreement, including challenges based on the validity of the parties' signatures, the scope of the agreement, any alleged waiver of arbitration by WRPS, or whether the agreement is illusory or unconscionable. It does, however, require Bazan-Garcia to pursue these challenges in the forum of arbitration, not the court.

## IV. Prayer

WRPS prays that the Court grant its Motion to Compel Arbitration and abate and stay all proceedings in this lawsuit until arbitration has been completed.

**2014CV01064**

E-FILED
Bexar County, County Clerk
Gerard Rickhoff
Accepted Date:11/5/2014 4:29:41 PM
Accepted By: Elizabeth Torres
_____/s/ Elizabeth Torres_____
Deputy Clerk

CAUSE NO. 2014CV01064

| | | |
|---|---|---|
| PAULA BAZAN-GARCIA, | § | IN THE COUNTY COURT |
| | § | |
| Plaintiff. | § | |
| | § | |
| v. | § | AT LAW NO. 03 |
| | § | |
| WESTERN RIM PROPERTY SERVICES, | § | |
| INC. | § | |
| | § | |
| Defendant. | § | BEXAR COUNTY, TEXAS |

## PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO COMPEL ARBITRATION, REQUEST FOR AN EVIDENTIARY HEARING, AND MOTION FOR SANCTIONS

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW Plaintiff PAULA BAZAN-GARCIA and files her Response in Opposition

to Defendant Western Rim Property Services, Inc.'s Motion to Compel Arbitration, Request for an

Evidentiary Hearing, and Motion for Sanctions on same, and in support of same would respectfully

show the Court as follows:

### I. RELIEF REQUESTED

Defendant's Motion to Compel Arbitration should be **DENIED** because the alleged

Arbitration Agreement is unconscionable for the following reasons:

1. The Arbitration Agreement limits Plaintiff's ability to utilize discovery procedures permitted by the Texas Rules of Civil Procedure, and severely limits Plaintiff's ability to meet her burden of proof;
2. The Arbitration Agreement imposes excessive cost upon Plaintiff by requiring Plaintiff to split the cost of the arbitration fees with the Defendant; and
3. The Arbitration Agreement imposes excessive cost upon Plaintiff by requiring Plaintiff to arbitrate her claims in Dallas County.

Therefore, it is wholly within this Court's discretion to DENY Defendant's Motion to

Compel Arbitration.

1

72

E-FILED
Bexar County, County Clerk
Gerard Rickhoff
Accepted Date:11/5/2014 4:29:41 PM
Accepted By: Elizabeth Torres
_____/s/ Elizabeth Torres_____
Deputy Clerk

CAUSE NO. 2014CV01064

| | | |
|---|---|---|
| PAULA BAZAN-GARCIA, | § | IN THE COUNTY COURT |
| | § | |
| Plaintiff. | § | |
| | § | |
| v. | § | AT LAW NO. 03 |
| | § | |
| WESTERN RIM PROPERTY SERVICES, | § | |
| INC. | § | |
| | § | |
| Defendant. | § | BEXAR COUNTY, TEXAS |

## PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO COMPEL ARBITRATION, REQUEST FOR AN EVIDENTIARY HEARING, AND MOTION FOR SANCTIONS

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW Plaintiff PAULA BAZAN-GARCIA and files her Response in Opposition

to Defendant Western Rim Property Services, Inc.'s Motion to Compel Arbitration, Request for an

Evidentiary Hearing, and Motion for Sanctions on same, and in support of same would respectfully

show the Court as follows:

### I. RELIEF REQUESTED

Defendant's Motion to Compel Arbitration should be **DENIED** because the alleged

Arbitration Agreement is unconscionable for the following reasons:

1. The Arbitration Agreement limits Plaintiff's ability to utilize discovery procedures permitted by the Texas Rules of Civil Procedure, and severely limits Plaintiff's ability to meet her burden of proof;
2. The Arbitration Agreement imposes excessive cost upon Plaintiff by requiring Plaintiff to split the cost of the arbitration fees with the Defendant; and
3. The Arbitration Agreement imposes excessive cost upon Plaintiff by requiring Plaintiff to arbitrate her claims in Dallas County.

Therefore, it is wholly within this Court's discretion to DENY Defendant's Motion to

Compel Arbitration.

1

Submit Date:11/5/2014 4:06:30 PM

## II. BRIEF BACKGROUND

At all times relevant to this cause of action Plaintiff was employed by Defendant and was working in the course and scope of her employment. Defendant is an employer that is a "subscriber" to the workers' compensation system at all times material to this action. On or about October 22, 2013, soon after Plaintiff sustained an on-the-job injury and filed a workers' compensation claim, Plaintiff was terminated for a pre-textual reason.

Prior to filing suit in this case, on or about December 9, 2013, Plaintiff sent a letter to Defendant, requesting any existing arbitration agreement be produced to counsel within thirty days, so that Plaintiff may evaluate any existing arbitration agreement and file her suit in the proper forum. Plaintiff's counsel never received a response, so, months later, Plaintiff filed this action in the County Court of Bexar County, Texas. On or about September 12, 2014, Plaintiff received Defendant's Original Answer, which did not include a request for the Court to compel arbitration. It was not until October 15, 2014, that Defendant filed its Motion to Compel Arbitration.

Subsequently, it was discovered that as a prerequisite to Plaintiff's employment with Defendant, Plaintiff was given an Arbitration Agreement. The Agreement provides the following selected provisions:

> "Each Party to arbitration shall be entitled to take only one deposition. Any arbitration relating to any dispute covered by this Agreement shall be arbitrated in Dallas County, Texas." *See* Defendant's Motion to Compel Arbitration, Exhibit C.

In addition, Defendant's Employee Handbook, which contains the Arbitration Agreement, requires Plaintiff to split the costs of the arbitration. The Handbook states, "[e]mployees who choose to use the arbitration process to resolve a problem will be expected to share the cost of the arbitration proceeding with WRPS, LP." *See* Defendant's Motion to Compel Arbitration, Exhibit G.

2

Plaintiff argues that these provisions make the Arbitration Agreement unconscionable because it (1) is one-sided and significantly limits the discovery tools available to Plaintiff had Plaintiff's case been brought in a Bexar County Court; (2) requires Plaintiff to split the astronomical cost of arbitration and incur substantial debt in order to proceed with her case; and (3) requires Plaintiff to conduct arbitration in Dallas County, Texas, which further requires Plaintiff to incur substantial additional debt to continue with her case. For these reasons, Plaintiff respectfully request this Court deny Defendant's Motion to Compel Arbitration.

Should this Court grant Defendant's Motion to Compel Arbitration, Plaintiff respectfully requests this Court grant Plaintiff costs and attorneys' fees stemming from Defendant's failure to provide this Arbitration Agreement prior to the time of filing suit. Plaintiff attempted to discover this information prior to filing suit in order to avoid incurring these costs and, due to Defendant's failure to respond, Plaintiff incurred approximately $261.34 in filing fees, $85.00 in process serving fees, and $750.00 in attorneys' fees. As a sanction for Defendant's conduct, Plaintiff requests a total amount of $1,096.34 be awarded to Plaintiff to cover the costs incurred.

### III. ARGUMENTS AND AUTHORITIES

### A. REQUEST FOR EVIDENTIARY HEARING ON DISPUTED FACTS

A party seeking to compel arbitration must first establish the existence of an arbitration agreement and show the claims raised fall within the scope of the agreement. *See J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 227 (Tex. 2003); *In re Oakwood Mobile Homes, Inc.*, 987 S.W.2d 571, 573 (Tex. 1999); *In re Bunzl USA, Inc.*, 155 S.W.3d 202, 209 (Tex. App.—El Paso 2004). The party moving for arbitration must show that the claim is subject to a valid arbitration agreement. *In re Odyssey Health care, Inc.* 310 S.W.3d 419, 422 (Tex. 2010). When a party resists arbitration, the trial court must determine whether a valid arbitration agreement exists. *Id.*; TEX. CIV. PRAC. & REM. CODE § 171.021.

3

74

The trial court may summarily decide whether to compel arbitration on the basis of affidavits, pleadings, discovery, and stipulations. However, if the material facts necessary to determine the issue are controverted, by an opposing affidavit or otherwise admissible evidence, the trial court must conduct an evidentiary hearing to determine the disputed material facts. *Houston Pipe Line Co., L.P. v. O'Conner & Hewitt, Ltd.*, 269 S.W.3d 90, 99 (Tex. App.—Corpus Christi 2008); TEX. CIV. PRAC. & REM. CODE § 171.021; *In re Bunzl USA, Inc.*, 155 S.W.3d 202, 209 (Tex. App.—El Paso 2004).

There are numerous disputed material facts that go directly to the question whether there is an enforceable agreement to arbitrate. Plaintiff accordingly requests an evidentiary hearing, and further requests the Court to allow limited discovery prior to the evidentiary hearing on issues related to whether there is an enforceable agreement to arbitrate in this case, as more fully described below.

## B.    ARBITRATION AND SUBSTANTIVE UNCONSCIONABILITY

Under Texas law, as with any other contract, agreements to arbitrate are valid unless grounds exist at law or in equity for revocation of the agreement. *In re Poly-America, L.P.*, 262 S.W.3d 337, 348 (Tex. 2008). The burden of proving such a ground—such as fraud, unconscionability or voidness under public policy—falls on the party opposing the contract. *Id.* Agreements to arbitrate disputes between employers and employees are generally enforceable under Texas law. There is nothing *per se* unconscionable about an agreement to arbitrate employment disputes and, in fact, Texas law has historically favored agreements to resolve such disputes by arbitration. *See Advance PCS*, 172 S.W.3d at 608; *EZ Pawn Corp. v. Mancias*, 934 S.W.2d 87, 90 (Tex. 1996); *Cantella & Co. v. Goodwin*, 924 S.W.2d 943, 944 (Tex. 1996). However, unconscionability is a defense to an arbitration agreement. *TMI, Inc. v. Brooks*, 225 S.W.3d 783, 792 (Tex. App.—Houston 14th Dist. 2007). Accordingly, an agreement to arbitrate is valid absent grounds for the revocation of a

4

contract, such as unconscionability. TEX. CIV. PRAC. & REM. CODE § 171.001 (Vernon 2005); *Olshan Found. Repair Co. v. Ayala*, 180 S.W.3d 212, 214-215 (Tex. App.—San Antonio 2005).

As a general rule, the term "unconscionability" describes a contract that is unfair because of its overall one-sidedness or the gross one-sidedness of one of its terms. *Id.* Nevertheless, "unconscionability" has no precise legal definition because it is not a concept but a determination to be made in light of a variety of factors. *Id.* Unconscionability is to be determined in light of a variety of factors, which aim to prevent oppression and unfair surprise; in general, a contract will be found unconscionable if it is grossly one-sided. *See* Dan B. Dobbs, 2 LAW OF REMEDIES 703, 706 (2d ed. 1993); *see also* RESTATEMENT (SECOND) OF CONTRACTS § 208, cmt. a (1979). Whether a contract is contrary to public policy or unconscionable at the time it is formed is a question of law. *Hoover Slovacek LLP v. Walton*, 206 S.W.3d 557, 562 (Tex. 2006).

Courts may consider both substantive and procedural unconscionability when evaluating the validity of an arbitration provision. *In re Halliburton Co.*, 80 S.W.3d 566, 572 (Tex. 2002). "Substantive unconscionability refers to the fairness of the arbitration provision itself, whereas procedural unconscionability refers to the circumstances surrounding adoption of the arbitration provision." *In re Palm Harbor Homes, Inc.*, 195 S.W.3d 672, 677 (Tex. 2006).

a) LIMITING PLAINTIFF'S ABILITY TO UTILIZE DISCOVERY PROCEDURES PERMITTED BY THE TEXAS RULES OF CIVIL PROCEDURE IS SUBSTANTIVELY UNCONSCIONABLE

The Texas Supreme Court has held that "where the underlying substantive right is not waivable, *ex ante* limitations on discovery that unreasonably impede effective prosecution of such rights are likewise unenforceable." *In re Poly-America*, 262 S.W.3d at 358. In this case, since Plaintiff bears the burden of proof in this case, the Agreement's limitation on discovery to only permit one deposition, severely handicaps Plaintiff's ability to litigate her claims. This case is currently being conducted under a level two-discovery plan. Therefore, Should Plaintiff be able to litigate her claims

5

in state court, Plaintiff would be permitted up to 50 hours of deposition time to examine Defendant's supervisors, Authorized Representative, and experts. The Arbitration Agreement that Defendant seeks to enforce, limits Plaintiff to only one deposition. Therefore, if Plaintiff choses to depose her former supervisor or Defendant's Authorized Representative, Plaintiff must forgo deposing any expert(s) designated by Defendant. In addition, Plaintiff will be unable to establish the circumstantial evidence of retaliation with just one deposition. *See* Exhibit A, Affidavit of Javier Espinoza.

These limitations again have been placed to limit the employee's claims while not inhibiting Defendant's ability to defend these suits. Generally, an employer in workers' compensation retaliation cases will only take the deposition of the plaintiff and usually do not rely on the documents produced by the plaintiff in defending cases. Rather, it is the aggrieved employee that must rely on the discovery process, including depositions, in order to sustain the required burden of proof in these cases.

Because Plaintiff can reasonably show that these limitations will severely limit Plaintiff's ability to meet her burden of proof in this case, this provision of the Agreement is unconscionable. *See In re Poly-America*, 262 S.W.3d at 358.

### b) PROHIBITIVELY EXCESSIVE COSTS TO INJURED EMPLOYEE IS SUBSTANTIVELY UNCONSCIONABLE.

The United States and Texas Supreme Court have recognized that the excessive costs of arbitration might, under certain circumstances, render an arbitration agreement substantively unconscionable. *Olshan Found. Repair Co. v. Ayala*, 180 S.W.3d 212, 215 (Tex. App.—San Antonio 2005); *see also Green Tree Fin. Corp. v. Randolph*, 531 U.S. 79, 91(2000); *In re First Merit Bank, N.A.*, 52 S.W.3d 749, 745 (Tex. 2001).

The Arbitration Agreement in this case requires Plaintiff to split the costs of the arbitration with Defendant and to arbitrate her claims in Dallas, County. *See* Exhibit A, Affidavit of Javier

6

Espinoza and Invoices of the American Arbitration Association.[1] As a $12.98 per hour wage-earner, Plaintiff would demonstrate she is not financially able to bear the costs and risk, and therefore will probably not pursue her claim in arbitration should she be compelled to submit her claim before an arbitrator in Dallas, County rather than state court. *See* Exhibit B, Affidavit of Paula Bazan-Garcia. The costs incurred by Plaintiff in arbitration are significantly higher than those that would be incurred if Plaintiff continued with his claims in this judicial forum. *See* Exhibit A, Affidavit of Javier Espinoza. Plaintiff's out-of-pocket expenses in state court are minimal, at most. The cost of taking a risk of incurring a debt exceeding $10,000.00, is a cost significantly too high for the Plaintiff to bear. *See* Exhibit B, Affidavit of Paula Bazan-Garcia.

The United States Supreme Court recognized in *Green Tree Financial Corp – Ala. v. Randolph* that "the existence of large arbitration costs could preclude a litigant . . . from effectively vindicating her federal statutory rights in an arbitral forum." *Green Tree Financial Corp – Ala. v. Randolph*, 531 U.S. 79, 90 (2000). When looking at the facts in this particular case, it is evident that the potential costs arising from this claim would be so high as to prohibit Plaintiff from being able to assert her claims in arbitration.

One purpose behind arbitration is to avoid large litigation expenses, particularly the costs for longer proceedings, complicated appeals, discovery, investigations, fees and expert witnesses. *In re Olshan Found. Repair Co. L.L.C.* 328 S.W.3d 883, 895 (Tex. 2010). The Texas Supreme Court has further recognized that although arbitration is intended to be less expensive and more efficient alternative to litigation, when the costs imposed by an arbitration agreement are excessive and effectively prevent a party from asserting his or her rights in an arbitration proceeding, the arbitration agreement may be substantively unconscionable. *Id.* Additionally, the United States

---

[1] In a one-day arbitration conducted by this law firm, the arbitration costs exceeded $23,479.00. This firm has also conducted arbitrations in three similar employment cases where the costs were $22,225.00 and 20,470.00, respectively. *See* Exhibit A, Affidavit of Javier Espinoza.

7

Supreme Court has held that statutory claims may be arbitrated "so long as the prospective litigant effectively may vindicate [his or her] statutory cause of action in the arbitral forum." *Green Tree*, 531 U.S. at 90 (citing *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 28 (1991)). Further, an arbitration agreement may render a contract substantively unconscionable if "the existence of large arbitration costs could preclude a litigant . . . from effectively vindicating [his or her] federal statutory rights in the arbitral forum." *Id.; see also In re Poly-America*, 262 S.W.3d at 355-57; *FirstMerit Bank*, 52 S.W.3d at 756 (citing *Green Tree*, 531 U.S. at 91).

When "a party seeks to invalidate an arbitration agreement on the ground that arbitration would be prohibitively expensive, that party bears the burden of showing the likelihood of incurring such costs."*Green Tree*, 531 U.S. at 92. The courts likewise require some evidence that a complaining party will likely incur arbitration costs in such an amount as to deter enforcement of statutory rights in the arbitral forum. *See In re Olshan Found. Repair Co. L.L.C.* 328 S.W.3d 883, 895 (Tex.2010).

The Court in *Green Tree* did not explain how detailed the showing of prohibitive expense need to be in order to invalidate an arbitration agreement. *Green Tree*, 531 U.S. at 92 ("How detailed the showing of prohibitive expense must be before the party seeking arbitration must come forward with contrary evidence is a matter we need not discuss . . . "). However, a number of federal courts of appeals, relying on *Green Tree*, have applied a *case-by-case analysis* of the effect the arbitration clause has on a particular plaintiff's ability to effectively vindicate his or her rights. *See, e.g., Musnick v. King Motor Co. of Fort Lauderdale*, 325 F.3d 1255, 1259 (11th Cir. 2003) ("Since *Green Tree*, all but one of the other Circuits that have reconsidered this issue have applied a similar case-by-case approach."); *Blair v. Scott Specialty Gases*, 283 F.3d 595, 609-10 (3d Cir. 2002); *Bradford v. Rockwell Semiconductor Sys., Inc.*, 238 F.3d 549, 556 (4th Cir. 2001); *LaPrade v. Kidder, Peabody & Co., Inc.*, 246 F.3d 702, 708, (D.C. Cir. 2001). *But see Circuit City Stores, Inc. v. Adams*, 279 F.3d 889, 895 (9th Cir. 2002) (holding that plaintiff employees should not "have to pay either unreasonable costs or <u>any</u> arbitrators' fees or expenses as a

8

condition of access to the arbitration forum"). Courts across the country have universally condemned the use of fee-splitting agreements in employment contracts that have the effect of deterring potential litigants from vindicating their statutory rights in an arbitral forum. *See Green Tree*, 531 U.S. at 90-91. Some courts have gone so far as to find fee-sharing agreements unenforceable *per se. See, e.g., Cole v. Burns Int 'l Sec. See also Servs.*, 105 F.3d 1465, 1483-85 (D.C. Cir. 1995), *cited in Halliburton*, 80 S.W.3d at 572; *Shankle v. B-G Maint. Mgmt. of Colo., Inc.*, 163 F.3d 1230, 1233-35 (10th Cir. 1999); *Paladino v. Avnet Computer Techs., Inc.*, 134 F.3d 1054, 1062 (11th Cir. 1998). Courts reason that "an employee can never be required, as a condition of employment, to pay an arbitrator's compensation in order to secure the resolution of statutory claims ... [T]his would surely deter the bringing of arbitration and constitute a de facto forfeiture of statutory rights." *Cole*, 105 F.3d at 1468.

The court in *Cole* reasoned that an employee can *never* be required, as a condition of employment, to pay an arbitrator's compensation in order to secure the resolution of statutory claims under Title VII any more than an employee can be made to pay a judge's salary. *Cole*, 105 F.3d at 1468. The Court further reasoned that, if there is any risk that an arbitration agreement can be construed to require this result, it would surely deter the bringing of arbitration and constitute a de facto forfeiture of the employee's statutory rights. The only way that an arbitration agreement of the sort at issue here can be lawful is if the employer assumes responsibility for the payment of the arbitrator's compensation. *Id.*

The Fourth Circuit's approach in *Bradford v. Rockwell Semiconductor Systems, Inc.* is particularly instructive in determining that the proper analysis "evaluates whether the arbitral forum in a particular case is an adequate and accessible substitute to litigation." *In re Olshan Found. Repair Co., L.L.C.*, 328 S.W.3d 883, 893-894 (Tex.2010) affirmatively citing *Bradford v. Rockwell Semiconductor Systems, Inc.*, 238 F.3d 549, 556 (4th Cir. 2001). That inquiry requires "a case-by-case analysis that

9

80

focuses, among other things, upon the claimant's ability to pay the arbitration fees and costs, the expected cost differential between arbitration and litigation in court, and whether that cost differential is so substantial as to deter the bringing of claims." *In re Olshan Found. Repair Co., L.L.C.,* 328 S.W.3d 883, 893-894 (Tex.2010). The key factor is not where the cost to pursue the claim goes, but what the total cost to the claimant to pursue the claim is. *Id.*

Requiring Plaintiff to risk incurring a substantial debt exceeding $10,000.00, in arbitrators' fees compared to merely incurring $280.00 in expenses for filing the claim in state court, in order to bring her statutory wrongful termination claim against her employer is a strong deterrent from bringing her claims. *See* Exhibit B, Affidavit of Paula Bazan-Garcia. In addition, the deterrent effect of the Arbitration Agreement in this case is only increased by the fact that Plaintiff will have to incur even more expenses by conducting the Arbitration in Dallas County. *See* Exhibit B, Affidavit of Paula Bazan-Garcia. Therefore, Defendant's Motion to Compel Arbitration should be denied.

If it is determined that Plaintiff must bring her lawsuit against her employer in arbitration in Dallas County, and risk having to pay over $10,000.00 in arbitrator fees, Plaintiff has stated that she will probably not continue with her claim. *See* Exhibit B, Affidavit of Paula Bazan-Garcia. Since there is a risk that Plaintiff be required to pay the arbitration fees, the alleged Agreement is substantively unconscionable and unenforceable. In addition, the risk of incurring such a prohibitively excessive debt and the evidence of expected cost differential between brining her claim in state court versus the arbitral forum deters Plaintiff employee from vindicating her statutory rights, exacerbating the substantive unconscionability of the purported Agreement, and therefore making it unenforceable under Texas law.

### III. CONCLUSION

The one-sided Arbitration Agreement is unconscionable under current Texas standards when considering the sophistication of both parties. The agreement requires Plaintiff to split the

10

81

cost of the Arbitration and risk incurring debt in excess of $10,000. Moreover, the Arbitration Agreement requires Plaintiff incur even more debt by conducting the arbitration in Dallas County. Furthermore, when considering the additional discovery limitations, it is obvious that the Agreement was drafted and designed to favor Defendant over its unsophisticated, uneducated employees and should therefore also be considered unconscionable by this Court. For these reasons, Defendant's Motion to Compel Arbitration should be denied, and Plaintiff should be permitted to continue to pursue her statutory claims against Defendant in this forum.

## IV. PRAYER

**WHEREFORE PREMISES CONSIDERED**, Plaintiff preys that an evidentiary hearing be set and that the Judge deny Defendant's Motion to Compel Arbitration and for such further relief that Plaintiff may show is justly entitled.

Respectfully submitted,

THE ESPINOZA LAW FIRM, PLLC
Attorneys for Claimant
503 E. Ramsey, Ste. 103
San Antonio, Texas 78216
210.229.1300 t
210.229.1302 f
www.espinozafirm.com

JAVIER ESPINOZA
Texas Bar No. 24036534
Steven Sachs
Texas Bar No. 24074995
JOSUE F. GARZA
Texas Bar No. 24072737

11

# 2014CV01064

E-FILED
Bexar County, County Clerk
Gerard Rickhoff
Accepted Date:11/5/2014 4:29:41 PM
Accepted By: Elizabeth Torres
_____/s/ Elizabeth Torres_____
Deputy Clerk

CAUSE NO. 2014CV01064

| | | |
|---|---|---|
| PAULA BAZAN-GARCIA, | § | IN THE COUNTY COURT |
| | § | |
| Plaintiff. | § | |
| | § | |
| v. | § | AT LAW NO. 03 |
| | § | |
| WESTERN RIM PROPERTY SERVICES, | § | |
| INC. | § | |
| | § | |
| Defendant. | § | BEXAR COUNTY, TEXAS |

## PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO COMPEL ARBITRATION, REQUEST FOR AN EVIDENTIARY HEARING, AND MOTION FOR SANCTIONS

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW Plaintiff PAULA BAZAN-GARCIA and files her Response in Opposition

to Defendant Western Rim Property Services, Inc.'s Motion to Compel Arbitration, Request for an

Evidentiary Hearing, and Motion for Sanctions on same, and in support of same would respectfully

show the Court as follows:

### I. RELIEF REQUESTED

Defendant's Motion to Compel Arbitration should be **DENIED** because the alleged

Arbitration Agreement is unconscionable for the following reasons:

1. The Arbitration Agreement limits Plaintiff's ability to utilize discovery procedures permitted by the Texas Rules of Civil Procedure, and severely limits Plaintiff's ability to meet her burden of proof;
2. The Arbitration Agreement imposes excessive cost upon Plaintiff by requiring Plaintiff to split the cost of the arbitration fees with the Defendant; and
3. The Arbitration Agreement imposes excessive cost upon Plaintiff by requiring Plaintiff to arbitrate her claims in Dallas County.

Therefore, it is wholly within this Court's discretion to DENY Defendant's Motion to

Compel Arbitration.

72

1

## II. BRIEF BACKGROUND

At all times relevant to this cause of action Plaintiff was employed by Defendant and was working in the course and scope of her employment. Defendant is an employer that is a "subscriber" to the workers' compensation system at all times material to this action. On or about October 22, 2013, soon after Plaintiff sustained an on-the-job injury and filed a workers' compensation claim, Plaintiff was terminated for a pre-textual reason.

Prior to filing suit in this case, on or about December 9, 2013, Plaintiff sent a letter to Defendant, requesting any existing arbitration agreement be produced to counsel within thirty days, so that Plaintiff may evaluate any existing arbitration agreement and file her suit in the proper forum. Plaintiff's counsel never received a response, so, months later, Plaintiff filed this action in the County Court of Bexar County, Texas. On or about September 12, 2014, Plaintiff received Defendant's Original Answer, which did not include a request for the Court to compel arbitration. It was not until October 15, 2014, that Defendant filed its Motion to Compel Arbitration.

Subsequently, it was discovered that as a prerequisite to Plaintiff's employment with Defendant, Plaintiff was given an Arbitration Agreement. The Agreement provides the following selected provisions:

> "Each Party to arbitration shall be entitled to take only one deposition. Any arbitration relating to any dispute covered by this Agreement shall be arbitrated in Dallas County, Texas." *See* Defendant's Motion to Compel Arbitration, Exhibit C.

In addition, Defendant's Employee Handbook, which contains the Arbitration Agreement, requires Plaintiff to split the costs of the arbitration. The Handbook states, "[e]mployees who choose to use the arbitration process to resolve a problem will be expected to share the cost of the arbitration proceeding with WRPS, LP." *See* Defendant's Motion to Compel Arbitration, Exhibit G.

2

73

Plaintiff argues that these provisions make the Arbitration Agreement unconscionable because it (1) is one-sided and significantly limits the discovery tools available to Plaintiff had Plaintiff's case been brought in a Bexar County Court; (2) requires Plaintiff to split the astronomical cost of arbitration and incur substantial debt in order to proceed with her case; and (3) requires Plaintiff to conduct arbitration in Dallas County, Texas, which further requires Plaintiff to incur substantial additional debt to continue with her case. For these reasons, Plaintiff respectfully request this Court deny Defendant's Motion to Compel Arbitration.

Should this Court grant Defendant's Motion to Compel Arbitration, Plaintiff respectfully requests this Court grant Plaintiff costs and attorneys' fees stemming from Defendant's failure to provide this Arbitration Agreement prior to the time of filing suit. Plaintiff attempted to discover this information prior to filing suit in order to avoid incurring these costs and, due to Defendant's failure to respond, Plaintiff incurred approximately $261.34 in filing fees, $85.00 in process serving fees, and $750.00 in attorneys' fees. As a sanction for Defendant's conduct, Plaintiff requests a total amount of $1,096.34 be awarded to Plaintiff to cover the costs incurred.

### III. ARGUMENTS AND AUTHORITIES

#### A. REQUEST FOR EVIDENTIARY HEARING ON DISPUTED FACTS

A party seeking to compel arbitration must first establish the existence of an arbitration agreement and show the claims raised fall within the scope of the agreement. *See J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 227 (Tex. 2003); *In re Oakwood Mobile Homes, Inc.*, 987 S.W.2d 571, 573 (Tex. 1999); *In re Bunzl USA, Inc.*, 155 S.W.3d 202, 209 (Tex. App.—El Paso 2004). The party moving for arbitration must show that the claim is subject to a valid arbitration agreement. *In re Odyssey Health care, Inc.* 310 S.W.3d 419, 422 (Tex. 2010). When a party resists arbitration, the trial court must determine whether a valid arbitration agreement exists. *Id.;* TEX. CIV. PRAC. & REM. CODE § 171.021.

3

74

The trial court may summarily decide whether to compel arbitration on the basis of affidavits, pleadings, discovery, and stipulations. However, if the material facts necessary to determine the issue are controverted, by an opposing affidavit or otherwise admissible evidence, the trial court must conduct an evidentiary hearing to determine the disputed material facts. *Houston Pipe Line Co., L.P. v. O'Conner & Hewitt, Ltd.*, 269 S.W.3d 90, 99 (Tex. App.—Corpus Christi 2008); TEX. CIV. PRAC. & REM. CODE § 171.021; *In re Bunzl USA, Inc.*, 155 S.W.3d 202, 209 (Tex. App.—El Paso 2004).

There are numerous disputed material facts that go directly to the question whether there is an enforceable agreement to arbitrate. Plaintiff accordingly requests an evidentiary hearing, and further requests the Court to allow limited discovery prior to the evidentiary hearing on issues related to whether there is an enforceable agreement to arbitrate in this case, as more fully described below.

## B. ARBITRATION AND SUBSTANTIVE UNCONSCIONABILITY

Under Texas law, as with any other contract, agreements to arbitrate are valid unless grounds exist at law or in equity for revocation of the agreement. *In re Poly-America, L.P.*, 262 S.W.3d 337, 348 (Tex. 2008). The burden of proving such a ground—such as fraud, unconscionability or voidness under public policy—falls on the party opposing the contract. *Id.* Agreements to arbitrate disputes between employers and employees are generally enforceable under Texas law. There is nothing *per se* unconscionable about an agreement to arbitrate employment disputes and, in fact, Texas law has historically favored agreements to resolve such disputes by arbitration. *See Advance PCS*, 172 S.W.3d at 608; *EZ Pawn Corp. v. Mancias*, 934 S.W.2d 87, 90 (Tex. 1996); *Cantella & Co. v. Goodwin*, 924 S.W.2d 943, 944 (Tex. 1996). However, unconscionability is a defense to an arbitration agreement. *TMI, Inc. v. Brooks*, 225 S.W.3d 783, 792 (Tex. App.—Houston 14th Dist. 2007). Accordingly, an agreement to arbitrate is valid absent grounds for the revocation of a

4

contract, such as unconscionability. TEX. CIV. PRAC. & REM. CODE § 171.001 (Vernon 2005); *Olshan Found. Repair Co. v. Ayala*, 180 S.W.3d 212, 214-215 (Tex. App.—San Antonio 2005).

As a general rule, the term "unconscionability" describes a contract that is unfair because of its overall one-sidedness or the gross one-sidedness of one of its terms. *Id.* Nevertheless, "unconscionability" has no precise legal definition because it is not a concept but a determination to be made in light of a variety of factors. *Id.* Unconscionability is to be determined in light of a variety of factors, which aim to prevent oppression and unfair surprise; in general, a contract will be found unconscionable if it is grossly one-sided. *See* Dan B. Dobbs, 2 LAW OF REMEDIES 703, 706 (2d ed. 1993); *see also* RESTATEMENT (SECOND) OF CONTRACTS § 208, cmt. a (1979). Whether a contract is contrary to public policy or unconscionable at the time it is formed is a question of law. *Hoover Slovacek LLP v. Walton*, 206 S.W.3d 557, 562 (Tex. 2006).

Courts may consider both substantive and procedural unconscionability when evaluating the validity of an arbitration provision. *In re Halliburton Co.*, 80 S.W.3d 566, 572 (Tex. 2002). "Substantive unconscionability refers to the fairness of the arbitration provision itself, whereas procedural unconscionability refers to the circumstances surrounding adoption of the arbitration provision." *In re Palm Harbor Homes, Inc.*, 195 S.W.3d 672, 677 (Tex. 2006).

a) LIMITING PLAINTIFF'S ABILITY TO UTILIZE DISCOVERY PROCEDURES PERMITTED BY THE TEXAS RULES OF CIVIL PROCEDURE IS SUBSTANTIVELY UNCONSCIONABLE

The Texas Supreme Court has held that "where the underlying substantive right is not waivable, *ex ante* limitations on discovery that unreasonably impede effective prosecution of such rights are likewise unenforceable." *In re Poly-America*, 262 S.W.3d at 358. In this case, since Plaintiff bears the burden of proof in this case, the Agreement's limitation on discovery to only permit one deposition, severely handicaps Plaintiff's ability to litigate her claims. This case is currently being conducted under a level two-discovery plan. Therefore, Should Plaintiff be able to litigate her claims

5

in state court, Plaintiff would be permitted up to 50 hours of deposition time to examine Defendant's supervisors, Authorized Representative, and experts. The Arbitration Agreement that Defendant seeks to enforce, limits Plaintiff to only one deposition. Therefore, if Plaintiff choses to depose her former supervisor or Defendant's Authorized Representative, Plaintiff must forgo deposing any expert(s) designated by Defendant. In addition, Plaintiff will be unable to establish the circumstantial evidence of retaliation with just one deposition. *See* Exhibit A, Affidavit of Javier Espinoza.

These limitations again have been placed to limit the employee's claims while not inhibiting Defendant's ability to defend these suits. Generally, an employer in workers' compensation retaliation cases will only take the deposition of the plaintiff and usually do not rely on the documents produced by the plaintiff in defending cases. Rather, it is the aggrieved employee that must rely on the discovery process, including depositions, in order to sustain the required burden of proof in these cases.

Because Plaintiff can reasonably show that these limitations will severely limit Plaintiff's ability to meet her burden of proof in this case, this provision of the Agreement is unconscionable. *See In re Poly-America*, 262 S.W.3d at 358.

b) PROHIBITIVELY EXCESSIVE COSTS TO INJURED EMPLOYEE IS SUBSTANTIVELY UNCONSCIONABLE.

The United States and Texas Supreme Court have recognized that the excessive costs of arbitration might, under certain circumstances, render an arbitration agreement substantively unconscionable. *Olshan Found. Repair Co. v. Ayala*, 180 S.W.3d 212, 215 (Tex. App.—San Antonio 2005); *see also Green Tree Fin. Corp. v. Randolph*, 531 U.S. 79, 91(2000); *In re First Merit Bank, N.A.*, 52 S.W.3d 749, 745 (Tex. 2001).

The Arbitration Agreement in this case requires Plaintiff to split the costs of the arbitration with Defendant and to arbitrate her claims in Dallas, County. *See* Exhibit A, Affidavit of Javier

6

Espinoza and Invoices of the American Arbitration Association.[1] As a $12.98 per hour wage-earner, Plaintiff would demonstrate she is not financially able to bear the costs and risk, and therefore will probably not pursue her claim in arbitration should she be compelled to submit her claim before an arbitrator in Dallas, County rather than state court. *See* Exhibit B, Affidavit of Paula Bazan-Garcia. The costs incurred by Plaintiff in arbitration are significantly higher than those that would be incurred if Plaintiff continued with his claims in this judicial forum. *See* Exhibit A, Affidavit of Javier Espinoza. Plaintiff's out-of-pocket expenses in state court are minimal, at most. The cost of taking a risk of incurring a debt exceeding $10,000.00, is a cost significantly too high for the Plaintiff to bear. *See* Exhibit B, Affidavit of Paula Bazan-Garcia.

The United States Supreme Court recognized in *Green Tree Financial Corp – Ala. v. Randolph* that "the existence of large arbitration costs could preclude a litigant . . . from effectively vindicating her federal statutory rights in an arbitral forum." *Green Tree Financial Corp – Ala. v. Randolph*, 531 U.S. 79, 90 (2000). When looking at the facts in this particular case, it is evident that the potential costs arising from this claim would be so high as to prohibit Plaintiff from being able to assert her claims in arbitration.

One purpose behind arbitration is to avoid large litigation expenses, particularly the costs for longer proceedings, complicated appeals, discovery, investigations, fees and expert witnesses. *In re Olshan Found. Repair Co. L.L.C.* 328 S.W.3d 883, 895 (Tex. 2010). The Texas Supreme Court has further recognized that although arbitration is intended to be less expensive and more efficient alternative to litigation, when the costs imposed by an arbitration agreement are excessive and effectively prevent a party from asserting his or her rights in an arbitration proceeding, the arbitration agreement may be substantively unconscionable. *Id.* Additionally, the United States

---

[1] In a one-day arbitration conducted by this law firm, the arbitration costs exceeded $23,479.00. This firm has also conducted arbitrations in three similar employment cases where the costs were $22,225.00 and 20,470.00, respectively. *See* Exhibit A, Affidavit of Javier Espinoza.

7

Supreme Court has held that statutory claims may be arbitrated "so long as the prospective litigant effectively may vindicate [his or her] statutory cause of action in the arbitral forum." *Green Tree*, 531 U.S. at 90 (citing *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 28 (1991)). Further, an arbitration agreement may render a contract substantively unconscionable if "the existence of large arbitration costs could preclude a litigant . . . from effectively vindicating [his or her] federal statutory rights in the arbitral forum." *Id.; see also In re Poly-America*, 262 S.W.3d at 355-57; *FirstMerit Bank*, 52 S.W.3d at 756 (citing *Green Tree*, 531 U.S. at 91).

When "a party seeks to invalidate an arbitration agreement on the ground that arbitration would be prohibitively expensive, that party bears the burden of showing the likelihood of incurring such costs." *Green Tree*, 531 U.S. at 92. The courts likewise require some evidence that a complaining party will likely incur arbitration costs in such an amount as to deter enforcement of statutory rights in the arbitral forum. *See In re Olshan Found. Repair Co. L.L.C.* 328 S.W.3d 883, 895 (Tex.2010).

The Court in *Green Tree* did not explain how detailed the showing of prohibitive expense need to be in order to invalidate an arbitration agreement. *Green Tree*, 531 U.S. at 92 ("How detailed the showing of prohibitive expense must be before the party seeking arbitration must come forward with contrary evidence is a matter we need not discuss . . ."). However, a number of federal courts of appeals, relying on *Green Tree*, have applied a *case-by-case analysis* of the effect the arbitration clause has on a particular plaintiff's ability to effectively vindicate his or her rights. *See, e.g., Musnick v. King Motor Co. of Fort Lauderdale*, 325 F.3d 1255, 1259 (11th Cir. 2003) ("Since *Green Tree*, all but one of the other Circuits that have reconsidered this issue have applied a similar case-by-case approach."); *Blair v. Scott Specialty Gases*, 283 F.3d 595, 609-10 (3d Cir. 2002); *Bradford v. Rockwell Semiconductor Sys., Inc.*, 238 F.3d 549, 556 (4th Cir. 2001); *LaPrade v. Kidder, Peabody & Co., Inc.*, 246 F.3d 702, 708, (D.C. Cir. 2001). *But see Circuit City Stores, Inc. v. Adams*, 279 F.3d 889, 895 (9th Cir. 2002) (holding that plaintiff employees should not "have to pay either unreasonable costs or any arbitrators' fees or expenses as a

8

condition of access to the arbitration forum"). Courts across the country have universally condemned the use of fee-splitting agreements in employment contracts that have the effect of deterring potential litigants from vindicating their statutory rights in an arbitral forum. *See Green Tree*, 531 U.S. at 90-91. Some courts have gone so far as to find fee-sharing agreements unenforceable *per se*. *See, e.g., Cole v. Burns Int 'l Sec. See also Servs.*, 105 F.3d 1465, 1483-85 (D.C. Cir. 1995), *cited in Halliburton*, 80 S.W.3d at 572; *Shankle v. B-G Maint. Mgmt. of Colo., Inc.*, 163 F.3d 1230, 1233-35 (10th Cir. 1999); *Paladino v. Avnet Computer Techs., Inc.*, 134 F.3d 1054, 1062 (11th Cir. 1998). Courts reason that "an employee can never be required, as a condition of employment, to pay an arbitrator's compensation in order to secure the resolution of statutory claims . . . [T]his would surely deter the bringing of arbitration and constitute a de facto forfeiture of statutory rights." *Cole*, 105 F.3d at 1468.

The court in *Cole* reasoned that an employee can *never* be required, as a condition of employment, to pay an arbitrator's compensation in order to secure the resolution of statutory claims under Title VII any more than an employee can be made to pay a judge's salary. *Cole*, 105 F.3d at 1468. The Court further reasoned that, if there is any risk that an arbitration agreement can be construed to require this result, it would surely deter the bringing of arbitration and constitute a de facto forfeiture of the employee's statutory rights. The only way that an arbitration agreement of the sort at issue here can be lawful is if the employer assumes responsibility for the payment of the arbitrator's compensation. *Id.*

The Fourth Circuit's approach in *Bradford v. Rockwell Semiconductor Systems, Inc.* is particularly instructive in determining that the proper analysis "evaluates whether the arbitral forum in a particular case is an adequate and accessible substitute to litigation." *In re Olshan Found. Repair Co., L.L.C.*, 328 S.W.3d 883, 893-894 (Tex.2010) affirmatively citing *Bradford v. Rockwell Semiconductor Systems, Inc.*, 238 F.3d 549, 556 (4th Cir. 2001). That inquiry requires "a case-by-case analysis that

9

focuses, among other things, upon the claimant's ability to pay the arbitration fees and costs, the expected cost differential between arbitration and litigation in court, and whether that cost differential is so substantial as to deter the bringing of claims." *In re Olshan Found. Repair Co., L.L.C.*, 328 S.W.3d 883, 893-894 (Tex.2010). The key factor is not where the cost to pursue the claim goes, but what the total cost to the claimant to pursue the claim is. *Id.*

Requiring Plaintiff to risk incurring a substantial debt exceeding $10,000.00, in arbitrators' fees compared to merely incurring $280.00 in expenses for filing the claim in state court, in order to bring her statutory wrongful termination claim against her employer is a strong deterrent from bringing her claims. *See* Exhibit B, Affidavit of Paula Bazan-Garcia. In addition, the deterrent effect of the Arbitration Agreement in this case is only increased by the fact that Plaintiff will have to incur even more expenses by conducting the Arbitration in Dallas County. *See* Exhibit B, Affidavit of Paula Bazan-Garcia. Therefore, Defendant's Motion to Compel Arbitration should be denied.

If it is determined that Plaintiff must bring her lawsuit against her employer in arbitration in Dallas County, and risk having to pay over $10,000.00 in arbitrator fees, Plaintiff has stated that she will probably not continue with her claim. *See* Exhibit B, Affidavit of Paula Bazan-Garcia. Since there is a risk that Plaintiff be required to pay the arbitration fees, the alleged Agreement is substantively unconscionable and unenforceable. In addition, the risk of incurring such a prohibitively excessive debt and the evidence of expected cost differential between brining her claim in state court versus the arbitral forum deters Plaintiff employee from vindicating her statutory rights, exacerbating the substantive unconscionability of the purported Agreement, and therefore making it unenforceable under Texas law.

### III. CONCLUSION

The one-sided Arbitration Agreement is unconscionable under current Texas standards when considering the sophistication of both parties. The agreement requires Plaintiff to split the

10

81

cost of the Arbitration and risk incurring debt in excess of $10,000. Moreover, the Arbitration Agreement requires Plaintiff incur even more debt by conducting the arbitration in Dallas County. Furthermore, when considering the additional discovery limitations, it is obvious that the Agreement was drafted and designed to favor Defendant over its unsophisticated, uneducated employees and should therefore also be considered unconscionable by this Court. For these reasons, Defendant's Motion to Compel Arbitration should be denied, and Plaintiff should be permitted to continue to pursue her statutory claims against Defendant in this forum.

## IV. PRAYER

**WHEREFORE PREMISES CONSIDERED**, Plaintiff preys that an evidentiary hearing be set and that the Judge deny Defendant's Motion to Compel Arbitration and for such further relief that Plaintiff may show is justly entitled.

Respectfully submitted,

THE ESPINOZA LAW FIRM, PLLC
Attorneys for Claimant
503 E. Ramsey, Ste. 103
San Antonio, Texas 78216
210.229.1300 t
210.229.1302 f
www.espinozafirm.com

JAVIER ESPINOZA
Texas Bar No. 24036534
Steven Sachs
Texas Bar No. 24074995
JOSUE F. GARZA
Texas Bar No. 24072737

11

## CERTIFICATE OF SERVICE

I hereby certify that on this $\underline{5}$ <sup>th</sup> day of November 2014, a true and correct copy of the foregoing was DELIVERED, MAILED or FAXED to:

Jennifer . Trulock
Stephanie F. Cagniart
98 San Jacinto Boulevard, Suite 1500
Austin, Texas 78701-4078
512.322.2500
512.322.2501

JOSUE F. GARZA

12

83

# Exhibit A

<u>AFFIDAVIT</u>

STATE OF TEXAS       §
                            §
COUNTY OF BEXAR      §

BEFORE ME, the undersigned authority, on this day personally appeared JAVIER ESPINOZA, who is personally known to me and being first duly sworn according to law upon this oath deposed and said:

"My name is JAVIER ESPINOZA. I am over the age of twenty-one and am fully competent in all respects to make this affidavit. The facts stated in this affidavit are within my personal knowledge and are true and correct.

I am the lead attorney for Plaintiff Paula Bazan-Garcia in the present case. My firm recently arbitrated a similar case alleging violations of §451 of the Texas Labor Code styled *Marco Cortez v. Nabors Completion and Production Service Co.* with the American Arbitration Association (AAA). Attached hereto as Exhibit 1 is a copy of the invoice for said arbitration, which lasted three days, in the amount of $23,479.00. Furthermore, my firm has previously arbitrated other labor cases with the AAA that were similar in nature, complexity and amount of witnesses as Ms. Bazan-Garcia's case. Attached hereto as Exhibit 2 is the invoice for the case styled *Christine Torres v. Stagg Restaurants, LLC*, Cause No. 70-160-00850-11 before the American Arbitration Association. The Torres case was arbitrated for two days and the charges for said arbitration were $20,225.00. Lastly, in 2011, my firm also arbitrated another similar case for three days with the AAA styled, *Anthony Castillo v. HEB*, Cause No. 70-160-00432-10. Attached hereto as Exhibit 3 is the invoice for that arbitration for a total amount of $20,470.00.

The amount of damages claimed in the above referenced arbitrations and the difficulty of those cases is very similar to Ms. Bazan-Garcia's claim against Western Rim Property Services, Inc. The arbitrations all took place in San Antonio, TX so the invoices were solely for the arbitrator expense, not for any travel, witness expenses or any other expenses required for Plaintiff to present their cases. The invoices were all paid by the employer in those arbitrations, exclusive of the initial minimal filing fee paid by the Plaintiff.

If Ms. Bazan-Garcia is required to arbitrate her case through a similar arbitration association, the cost for the arbitration and litigation process will reasonably exceed $10,000.00 solely for the Plaintiff's share— this is assuming the costs are split equally. The cost potentially incurred by Ms. Bazan-Garcia in arbitration compared to those that would be incurred if Plaintiff continued with her claims in the judicial forum are astronomically higher and cost prohibitive. Plaintiff's out-of-pocket expenses in state court are minimal, at most they include a filing fee under $300.00 and all hearings in court and trial are free to the parties. Conversely, in arbitration, every time there is a hearing on status and scheduling conferences or discovery disputes and pre-trial matters, the arbitrator's time is charged to the party responsible for payment according to the agreement. According to the terms of the arbitration agreement, Ms. Bazan-Garcia would be partially responsible for part of these costs. In addition, Ms. Bazan-Garcia would also have to incur substantial traveling and lodging expenses if the arbitration takes place in Dallas County.

I do not believe that Ms. Bazan-Garcia has the financial resources to risk going forward with her claims if it were determined that Ms. Bazan-Garcia must file her claim through arbitration rather than the state court and that the provisions of the purported arbitration agreement in this case are a strong deterrent to potential claimants. Enforcement of the purported arbitration agreement would serve a strong injustice to the Plaintiff in this case.

Furthermore, the discovery limitations included in the arbitration agreement are severe and would impede my client's ability to litigate her claims. In workers' compensation retaliation cases, I usually take two to four depositions: (1) The supervisor who terminated the Plaintiff; (2) the Defendant's designated authorized representative; (3) any witnesses to the injury; and (4) any witnesses to the termination. According

1

to the Texas Supreme Court in *Continental Coffee Prods. Co. v. Cazarez*, 937 S.W.2d 444 (Tex. 1996), retaliation can be proved through the following types of circumstantial evidence: (1) knowledge of the compensation claim; (2) expression of a negative attitude toward the employee's injured condition; (3) failure to adhere to established company policies; (4) discriminatory treatment in comparison to similarly situated employees; and (5) evidence that the stated reason for the discharge was false. In workers' compensation retaliation cases, this type of circumstantial evidence of retaliation cannot be obtained through just one deposition. Plaintiff would be forced to choose whether to depose a corporate representative that would list, explain and elaborate on the Defendant's injury and termination policies, the supervisor(s) responsible for the actual termination, or the witnesses that would corroborate the Plaintiff's allegations. On the contrary, Defendant would only have to depose the Plaintiff to find out his evidence and then could file a no-evidence summary judgment motion. This would be grossly unfair to the Plaintiff, especially since the Plaintiff carries the burden of proof on her allegations. This same principle is true for proving the other elements of circumstantial evidence of retaliation listed by the Court in *Cazarez*.

Moreover, these depositions are separate and aside from the deposition of any experts designated by the Defendant. The arbitration agreement in this case would preclude our office from effectively litigating this case and providing adequate representation because it limits the plaintiff to only one deposition, including experts. Therefore, if Defendant designates an expert, Plaintiff would be forced to depose the expert at the expense of deposing any of the fact witnesses. This provision of the purported arbitration agreement is also a strong deterrent to potential claims because it limits the potential plaintiff's ability to investigate and meet her required burden of proof.

For these reasons, I strongly believe that the purported arbitration agreement is substantively unconscionable and should be unenforceable.

Further affiant says naught."

_____
JAVIER ESPINOZA

SWORN TO AND SUBSCRIBED BEFORE ME on this the 5th _____th day of November, 2014.

_____
NOTARY PUBLIC in and for the
State of Texas

My commission expires:

MARISOL CASON
Notary Public, State of Texas
My Commission Expires
June 19, 2018

# Exhibit 1

 **AMERICAN ARBITRATION ASSOCIATION®** | INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION®

13727 Noel Road, Suite 700
Dallas, TX 75240
Telephone: (972)702-8222
Fax: (855)267-4082



| Statement Date | Amount Currently Due |
|---|---|
| 05-Nov-14 | $0.00 |
| Case No. | |
| 70-20-1300-0014-2-LB | |

Payment is due upon Receipt

# Detail Invoice/Statement

Nabors Completion and Production Services
Company
515 West Greens Road
Suite 1200
Houston, Texas 77967

Representing: Nabors Completion and Production Service Co.
Re: Marco Cortez
Vs.
Nabors Completion and Production Service
Co.

Please detach and return with Payment to Above Address

Please Indicate Case No. on Check

---

 **AMERICAN ARBITRATION ASSOCIATION®** | INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION®

13727 Noel Road, Suite 700
Dallas, TX 75240
Telephone: (972)702-8222
Fax: (855)267-4082

Nabors Completion and Production Service
Company
515 West Greens Road
Suite 1200
Houston, Texas 77967

Representing: Nabors Completion and Production Service
Co.
Re: Marco Cortez
Vs.
Nabors Completion and Production Service
Co.

| Statement Date | Case #: USD | Previous Balance | Credits | New Charges | Statement Balance |
|---|---|---|---|---|---|
| 05-Nov-14 | 70-20-1300-0014 | $0.00 | $0.00 | $0.00 | $0.00 |

| Date | Ref # | Description | Amount | Credits | Balance | Due Date |
|---|---|---|---|---|---|---|
| 09-Jun-2014 | 11030009 | Filing Fee - Claim due at case closing for services incurred | $950.00 | | $0.00 | 09-Jun-2014 |
| 09-Jun-2014 | | Allocation | | $950.00 | | |
| 09-Jun-2014 | 11029954 | Arbitrator's Compensation | $2,604.00 | | $0.00 | 09-Jun-2014 |
| 09-Jun-2014 | | Cancellation | | $258.65 | | |
| 13-Aug-2014 | | Allocation | | $1,745.35 | | |
| 09-Jun-2014 | | Allocation | | $600.00 | | |
| 07-Jan-2014 | 10586014 | Administrative Fee for Hearing - DATE: 03/27/2014 | $300.00 | | $0.00 | 07-Jan-2014 |
| 28-Jan-2014 | | Billed in Error | | $300.00 | | |
| 07-Jan-2014 | 10586013 | Administrative Fee for Hearing - DATE: 03/26/2014 | $300.00 | | $0.00 | 07-Jan-2014 |
| 28-Jan-2014 | | Billed in Error | | $300.00 | | |
| 07-Jan-2014 | 10586012 | Administrative Fee for Hearing - DATE: 03/25/2014 | $300.00 | | $0.00 | 07-Jan-2014 |
| 09-Jun-2014 | | Allocation | | -$600.00 | | |
| 10-Feb-2014 | | Allocation | | $900.00 | | |
| 01-Oct-2013 | 10546010 | Administrative Fee for Hearing - DATE: 02/05/2014 | $300.00 | | $0.00 | 01-Oct-2013 |
| 14-Oct-2013 | | Billed in Error | | $300.00 | | |
| 01-Oct-2013 | 10546009 | Administrative Fee for Hearing - DATE: 02/04/2014 | $300.00 | | $0.00 | 01-Oct-2013 |
| 14-Oct-2013 | | Billed in Error | | $300.00 | | |
| 01-Oct-2013 | 10546008 | Postponement of 2 hearing(s): 11/13/2013,11/14/2013 | $75.00 | | $0.00 | 01-Oct-2013 |
| 31-Oct-2013 | | Allocation | | $75.00 | | |
| 12-Apr-2013 | 10467952 | Your Share of the Neutral Compensation Deposit covering 16 hours of Study | $4,800.00 | | $0.00 | 12-Apr-2013 |
| 09-May-2013 | | Allocation | | $4,800.00 | | |
| 12-Apr-2013 | 10467951 | Your Share of the Neutral | $7,200.00 | | $0.00 | 12-Apr-2013 |



**AMERICAN ARBITRATION ASSOCIATION·**

INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION·

13727 Noel Road, Suite 700
Dallas, TX 75240
Telephone: (972)702-8222
Fax: (855)267-4082

| Statement Date | Amount Currently Due |
|---|---|
| 05-Nov-14 | $0.00 |

| Case |
|---|
| 70-20-1300-0014-2-LB |

Payment is due upon Receipt

| | | | | | | |
|---|---|---|---|---|---|---|
| 09-May-2013 | | Compensation Deposit covering 4 days of Hearing<br><br>Allocation | | $7,200.00 | | |
| 12-Apr-2013 | 10467950 | Your Share of the Neutral Compensation Deposit covering 16 hours of Preliminary Matters | $4,800.00 | | $0.00 | 12-Apr-2013 |
| 09-May-2013 | | Allocation | | $4,800.00 | | |
| 11-Apr-2013 | 10467730 | Administrative Fee for Hearing - DATE: 11/14/2013 | $300.00 | | $0.00 | 11-Apr-2013 |
| 09-May-2013 | | Allocation | | $300.00 | | |
| 11-Apr-2013 | 10467729 | Administrative Fee for Hearing - DATE: 11/13/2013 | $300.00 | | $0.00 | 11-Apr-2013 |
| 09-May-2013 | | Allocation | | $300.00 | | |
| 17-Jan-2013 | 10429204 | Initial Administrative Fee | $950.00 | | $0.00 | 17-Jan-2013 |
| 09-Jun-2014 | | Cancellation | | $950.00 | | |
| 12-Feb-2013 | | Allocation | | $950.00 | | |
| 09-Jun-2014 | | Allocation | | -$950.00 | | |

**Remarks** For any inquiries please call: (800)804-9308

Please mail check to    13727 Noel Road, Suite 700
Dallas, TX 75240
Telephone: (972)702-8222
Fax: (855)267-4082

| Statement Balance | Balance Currently Due |
|---|---|
| $0.00 | $0.00 |

Please Indicate Case No. on check

$23,479.00

# Exhibit 2



**American Arbitration Association**
*Dispute Resolution Services Worldwide*

13455 Noel Road - Suite 1750
Dallas, TX 75240

| PAY BY DATE | AMOUNT DUE |
|---|---|
| 12/21/2012 | 17250.00 |

| CASE # |
|---|
| 70-160-00850-11 02 LRB-R |

## INVOICE/STATEMENT

Payment Due Upon Receipt

Grant E. Adami III
Adami Shuffield Schelhing and Burns
9311 San Pedro
Suite 900
San Antonio TX 78216

Representing Stagg Restaurants, LLC
Re: Christine Torres

---

**Please Detach and Return with Payment to the Above Address**     **Please Indicate Case No. on check**

**American Arbitration Association**
*Dispute Resolution Services Worldwide*

13455 Noel Road - Suite 1750
Dallas, TX 75240

NAME   Grant E. Adami III
Adami Shuffield Schelhing and Burns
9311 San Pedro
Suite 900
San Antonio TX 78216

Representing Stagg Restaurants, LLC
Re: Christine Torres

| STMT DATE | CASE# | PREVIOUS BALANCE | CURRENT CREDITS | NEW CHANGES | TOTAL BALANCE DUE |
|---|---|---|---|---|---|
| 12/21/2012 | 70-160-00850-11 02 LRB-R | 0.00 | 2975.00- | 20225.00 | 17250.00 |

| DATE | REF# | DESCRIPTION | AMOUNT | CREDITS | BALANCE |
|---|---|---|---|---|---|
| 01/04/2012 | 10288376 | Initial Administrative Fee | 975.00 | | |
| 01/05/2012 | 26195 | Payment recvd from : Rcvd., Chk# 003026193 | | 975.00- | |
| 02/10/2012 | 10285872 | Your Share of the Neutral Compensation Deposit covering 8 hours of Preliminary Matters | 2000.00 | | |
| 03/09/2012 | 10009 | Payment recvd from : Stagg Restaurants | | 2000.00- | |
| 03/05/2012 | 10285387 | Administrative Fee for Hearing -DATE: 01/21/2013 | 300.00 | | |
| | | | | | 300.00 |
| 03/05/2012 | 10285388 | Administrative Fee for Hearing -DATE: 01/22/2013 | 300.00 | | |
| | | | | | 300.00 |
| 03/05/2012 | 10285389 | Administrative Fee for Hearing -DATE: 01/23/2013 | 300.00 | | |
| | | | | | 300.00 |
| 10/11/2012 | 10387752 | Your Share of the Neutral Compensation Deposit covering 3 hours of Preliminary Matters | 750.00 | | |
| | | | | | 750.00 |
| 10/31/2012 | 10395224 | Your Share of the Neutral Compensation Deposit covering 3 days of Hearing | 7500.00 | | |
| | | | | | 7500.00 |
| 10/31/2012 | 10395225 | Your Share of the Neutral Compensation Deposit covering 24 hours of Study | 7500.00 | | |
| | | | | | 7500.00 |

Remarks:   For any inquiry please call: 800-804-9306
This is a full statement showing all financial activity on this case.

| TOTAL BALANCE DUE | 17250.00 |
|---|---|

Please Indicate Case No. on check

| INVOICE SUMMARY: | | NET BILLED | NET PAID | NET DUE |
|---|---|---|---|---|
| | INITIAL/COUNTER-CLAIM FEES | 975.00 | 975.00 | 0.00 |
| | HEARING/POSTPONEMENT/ROOM/PROCESSING FEES | 900.00 | 0.00 | 900.00 |
| | REALLOCATION AT CASE END FEES | 0.00 | 0.00 | 0.00 |
| | NEUTRAL COMPENSATION/EXPENSES | 18350.00 | 2000.00 | 16350.00   EIN: 13-0429745 |

91

 **American Arbitration Association**
*Dispute Resolution Services Worldwide*

13455 Noel Road - Suite 1750
Dallas, TX 75240



| STMT DATE | AMOUNT DUE |
|-----------|------------|
| 12/31/2012 | 17250.00 |

| CASE # |
|--------|
| 70-160-00060-11 02 LRB-R |

Payment Due Upon Receipt

## INVOICE/STATEMENT

Grant E. Adami III
Adami Shuffield Schelling and Burns
9311 San Pedro
Suite 900
San Antonio TX 78216

Representing Stagg Restaurants, LLC
Re: Christine Torres

---

Please Detach and Return with Payment to the Above Address    Please Indicate Case No. on check

 **American Arbitration Association**
*Dispute Resolution Services Worldwide*

13455 Noel Road - Suite 1750
Dallas, TX 75240

NAME    Grant E. Adami III
Adami Shuffield Schelling and Burns
9311 San Pedro
Suite 900
San Antonio TX 78216

Representing Stagg Restaurants, LLC
Re: Christine Torres

| STMT DATE | CASE# | PREVIOUS BALANCE | CURRENT CREDITS | NEW CHARGES | TOTAL BALANCE DUE |
|-----------|-------|------------------|-----------------|-------------|-------------------|
| 12/31/2012 | 70-160-00060-11 02 LRB-R | 0.00 | 2075.00- | 20225.00 | 17250.00 |

| DATE | REF# | DESCRIPTION | AMOUNT | CREDITS | BALANCE |
|------|------|-------------|--------|---------|---------|
| 10/31/2012 | 10395226 | Your share of the arbitrator expense deposit | 600.00 | | 600.00 |

Remarks: For any inquiry please call: 800-804-9008
This is a full statement showing all financial activity on this case.

| | TOTAL BALANCE DUE | 17250.00 |

Please Indicate Case No. on check

| INVOICE SUMMARY: | NET BILLED | NET PAID | NET DUE |
|------------------|------------|----------|---------|
| INITIAL/COUNTER-CLAIM FEES | 975.00 | 975.00 | 0.00 |
| HEARING/POSTPONEMENT/ROOM/PROCESSING FEES | 900.00 | 0.00 | 900.00 |
| REALLOCATION AT CASE END FEES | 0.00 | 0.00 | 0.00 |
| NEUTRAL COMPENSATION/EXPENSES | 18350.00 | 2000.00 | 16350.00   EIN: 13-0429745 |

# Exhibit 3

**70-160-00432-10**
**H.E.B. Grocery Company, L.P.**

**Administrative Fees and Expenses:**

| | | |
|---|---|---|
| Filing Fees | $925.00 | |
| Case Services Fee | $0.00 | |
| Hearing Fees | $750.00 | |
| AAA Room Rental Fee | $0.00 | |
| Abeyance/Misc. AAA Fees | $0.00 | |
| Non-AAA Conference Room Expenses | $0.00 | |
| Misc Expenses | $0.00 | |
| Your Share of Administrative Fees and Expenses: | | $1,675.00 |
| Amount Paid for Administrative Fees and Expenses: | | $2,875.00 |
| Balance Administrative Fees and Expenses: | | ($1,200.00) |

**Neutral Compensation and Expenses:**

| | |
|---|---|
| Your Share of Neutral Compensation and Expenses: | $19,807.24 |
| Amount Paid for Neutral Compensation and Expenses: | $20,470.00 |
| Balance Neutral Compensation and Expenses: | ($662.76) |

| | |
|---|---|
| **Party Balance:** | **($1,862.76)** |

# Exhibit B

## AFFIDAVIT

STATE OF TEXAS §
§
COUNTY OF BEXAR §

BEFORE ME, the undersigned authority, on this day personally appeared PAULA BAZAN-GARCIA, who is personally known to me and being first duly sworn according to law upon this oath deposed and said:

"My name is PAULA BAZAN-GARCIA. I am over the age of twenty-one and am fully competent in all respects to make this affidavit. The facts stated in this affidavit are within my personal knowledge and are true and correct.

I am the plaintiff in this case. I worked for WESTERN RIM PROPERTY SERVICES, INC. I was hired in Bexar County, Texas and worked in Bexar County, Texas. On or about October 22, 2013, I was terminated from my job after filing a workers' compensation claim. I was terminated in Bexar County, Texas. I worked as a housekeeper for Western Rim Property Services, Inc. earning approx. $12.98 per hour. As a result of this termination, I am on an extremely tight budget, as it was difficult for me to find work after I was fired from Defendant. I reside in Bexar County, and I do not have any family or lodgings in Dallas County. I never had to travel to Dallas County in the course and scope of my employment at Western Rim Property, Services, Inc.

If it is determined that I must bring my lawsuit against my employer in arbitration, and risk having to pay over $10,000.00 in arbitrator fees, I will probably not continue with my claim. In addition, if it is determined that I must bring my lawsuit against my employer in arbitration in Dallas County, Texas, I will incur substantial additional expenses in travel and lodging, and I will probably not continue with my claim. This risk is too great for me and I do not have that type of money. I wish to sue my employer in state court for my wrongful termination because I cannot afford the cost of incurring such a substantial debt to arbitrate my claims in Dallas County.

In addition, I worked for Defendant in Bexar County, Texas. I was also injured and terminated in Bexar County, Texas. Therefore, the majority of the witnesses that my attorneys would call at trial are located in Bexar County, Texas. This includes some of my family members who may testify in my case. I do not believe that they will be able to afford the expense of traveling to Dallas County to testify at an arbitration hearing. Therefore, if my case is heard in Dallas County, I will not be able to call all the witnesses I would call if the case remained in Bexar County.

Further affiant says naught."


Paula Bazan-Garcia

96

SWORN TO AND SUBSCRIBED BEFORE ME on this the 4th day of November, 2014.

My commission expires:

June, 19, 2018

NOTARY PUBLIC in and for the
State of Texas

MARISOL CASON
Notary Public, State of Texas
My Commission Expires
June 19, 2018

in state court, Plaintiff would be permitted up to 50 hours of deposition time to examine Defendant's supervisors, Authorized Representative, and experts. The Arbitration Agreement that Defendant seeks to enforce, limits Plaintiff to only one deposition. Therefore, if Plaintiff choses to depose her former supervisor or Defendant's Authorized Representative, Plaintiff must forgo deposing any expert(s) designated by Defendant. In addition, Plaintiff will be unable to establish the circumstantial evidence of retaliation with just one deposition. *See* Exhibit A, Affidavit of Javier Espinoza.

These limitations again have been placed to limit the employee's claims while not inhibiting Defendant's ability to defend these suits. Generally, an employer in workers' compensation retaliation cases will only take the deposition of the plaintiff and usually do not rely on the documents produced by the plaintiff in defending cases. Rather, it is the aggrieved employee that must rely on the discovery process, including depositions, in order to sustain the required burden of proof in these cases.

Because Plaintiff can reasonably show that these limitations will severely limit Plaintiff's ability to meet her burden of proof in this case, this provision of the Agreement is unconscionable. *See In re Poly-America*, 262 S.W.3d at 358.

### b) PROHIBITIVELY EXCESSIVE COSTS TO INJURED EMPLOYEE IS SUBSTANTIVELY UNCONSCIONABLE.

The United States and Texas Supreme Court have recognized that the excessive costs of arbitration might, under certain circumstances, render an arbitration agreement substantively unconscionable. *Olshan Found. Repair Co. v. Ayala*, 180 S.W.3d 212, 215 (Tex. App.—San Antonio 2005); *see also Green Tree Fin. Corp. v. Randolph*, 531 U.S. 79, 91 (2000); *In re First Merit Bank, N.A.*, 52 S.W.3d 749, 745 (Tex. 2001).

The Arbitration Agreement in this case requires Plaintiff to split the costs of the arbitration with Defendant and to arbitrate her claims in Dallas, County. *See* Exhibit A, Affidavit of Javier

6

77

Espinoza and Invoices of the American Arbitration Association.[1] As a $12.98 per hour wage-earner, Plaintiff would demonstrate she is not financially able to bear the costs and risk, and therefore will probably not pursue her claim in arbitration should she be compelled to submit her claim before an arbitrator in Dallas, County rather than state court. *See* Exhibit B, Affidavit of Paula Bazan-Garcia. The costs incurred by Plaintiff in arbitration are significantly higher than those that would be incurred if Plaintiff continued with his claims in this judicial forum. *See* Exhibit A, Affidavit of Javier Espinoza. Plaintiff's out-of-pocket expenses in state court are minimal, at most. The cost of taking a risk of incurring a debt exceeding $10,000.00, is a cost significantly too high for the Plaintiff to bear. *See* Exhibit B, Affidavit of Paula Bazan-Garcia.

The United States Supreme Court recognized in *Green Tree Financial Corp – Ala. v. Randolph* that "the existence of large arbitration costs could preclude a litigant . . . from effectively vindicating her federal statutory rights in an arbitral forum." *Green Tree Financial Corp – Ala. v. Randolph*, 531 U.S. 79, 90 (2000). When looking at the facts in this particular case, it is evident that the potential costs arising from this claim would be so high as to prohibit Plaintiff from being able to assert her claims in arbitration.

One purpose behind arbitration is to avoid large litigation expenses, particularly the costs for longer proceedings, complicated appeals, discovery, investigations, fees and expert witnesses. *In re Olshan Found. Repair Co. L.L.C.* 328 S.W.3d 883, 895 (Tex. 2010). The Texas Supreme Court has further recognized that although arbitration is intended to be less expensive and more efficient alternative to litigation, when the costs imposed by an arbitration agreement are excessive and effectively prevent a party from asserting his or her rights in an arbitration proceeding, the arbitration agreement may be substantively unconscionable. *Id.* Additionally, the United States

---

[1] In a one-day arbitration conducted by this law firm, the arbitration costs exceeded $23,479.00. This firm has also conducted arbitrations in three similar employment cases where the costs were $22,225.00 and 20,470.00, respectively. *See* Exhibit A, Affidavit of Javier Espinoza.

7

focuses, among other things, upon the claimant's ability to pay the arbitration fees and costs, the expected cost differential between arbitration and litigation in court, and whether that cost differential is so substantial as to deter the bringing of claims." *In re Olshan Found. Repair Co., L.L.C.*, 328 S.W.3d 883, 893-894 (Tex.2010). The key factor is not where the cost to pursue the claim goes, but what the total cost to the claimant to pursue the claim is. *Id.*

Requiring Plaintiff to risk incurring a substantial debt exceeding $10,000.00, in arbitrators' fees compared to merely incurring $280.00 in expenses for filing the claim in state court, in order to bring her statutory wrongful termination claim against her employer is a strong deterrent from bringing her claims. *See* Exhibit B, Affidavit of Paula Bazan-Garcia. In addition, the deterrent effect of the Arbitration Agreement in this case is only increased by the fact that Plaintiff will have to incur even more expenses by conducting the Arbitration in Dallas County. *See* Exhibit B, Affidavit of Paula Bazan-Garcia. Therefore, Defendant's Motion to Compel Arbitration should be denied.

If it is determined that Plaintiff must bring her lawsuit against her employer in arbitration in Dallas County, and risk having to pay over $10,000.00 in arbitrator fees, Plaintiff has stated that she will probably not continue with her claim. *See* Exhibit B, Affidavit of Paula Bazan-Garcia. Since there is a risk that Plaintiff be required to pay the arbitration fees, the alleged Agreement is substantively unconscionable and unenforceable. In addition, the risk of incurring such a prohibitively excessive debt and the evidence of expected cost differential between brining her claim in state court versus the arbitral forum deters Plaintiff employee from vindicating her statutory rights, exacerbating the substantive unconscionability of the purported Agreement, and therefore making it unenforceable under Texas law.

### III. CONCLUSION

The one-sided Arbitration Agreement is unconscionable under current Texas standards when considering the sophistication of both parties. The agreement requires Plaintiff to split the

10

81

<u>AFFIDAVIT</u>

STATE OF TEXAS          §
                                        §

COUNTY OF BEXAR      §

BEFORE ME, the undersigned authority, on this day personally appeared JAVIER ESPINOZA, who is personally known to me and being first duly sworn according to law upon this oath deposed and said:

"My name is JAVIER ESPINOZA. I am over the age of twenty-one and am fully competent in all respects to make this affidavit. The facts stated in this affidavit are within my personal knowledge and are true and correct.

I am the lead attorney for Plaintiff Paula Bazan-Garcia in the present case. My firm recently arbitrated a similar case alleging violations of §451 of the Texas Labor Code styled *Marco Cortez v. Nabors Completion and Production Service Co.* with the American Arbitration Association (AAA). Attached hereto as Exhibit 1 is a copy of the invoice for said arbitration, which lasted three days, in the amount of $23,479.00. Furthermore, my firm has previously arbitrated other labor cases with the AAA that were similar in nature, complexity and amount of witnesses as Ms. Bazan-Garcia's case. Attached hereto as Exhibit 2 is the invoice for the case styled *Christine Torres v. Stagg Restaurants, LLC,* Cause No. 70-160-00850-11 before the American Arbitration Association. The Torres case was arbitrated for two days and the charges for said arbitration were $20,225.00. Lastly, in 2011, my firm also arbitrated another similar case for three days with the AAA styled, *Anthony Castillo v. HEB,* Cause No. 70-160-00432-10. Attached hereto as Exhibit 3 is the invoice for that arbitration for a total amount of $20,470.00.

The amount of damages claimed in the above referenced arbitrations and the difficulty of those cases is very similar to Ms. Bazan-Garcia's claim against Western Rim Property Services, Inc. The arbitrations all took place in San Antonio, TX so the invoices were solely for the arbitrator expense, not for any travel, witness expenses or any other expenses required for Plaintiff to present their cases. The invoices were all paid by the employer in those arbitrations, exclusive of the initial minimal filing fee paid by the Plaintiff.

If Ms. Bazan-Garcia is required to arbitrate her case through a similar arbitration association, the cost for the arbitration and litigation process will reasonably exceed $10,000.00 solely for the Plaintiff's share— this is assuming the costs are split equally. The cost potentially incurred by Ms. Bazan-Garcia in arbitration compared to those that would be incurred if Plaintiff continued with her claims in the judicial forum are astronomically higher and cost prohibitive. Plaintiff's out-of-pocket expenses in state court are minimal, at most they include a filing fee under $300.00 and all hearings in court and trial are free to the parties. Conversely, in arbitration, every time there is a hearing on status and scheduling conferences or discovery disputes and pre-trial matters, the arbitrator's time is charged to the party responsible for payment according to the agreement. According to the terms of the arbitration agreement, Ms. Bazan-Garcia would be partially responsible for part of these costs. In addition, Ms. Bazan-Garcia would also have to incur substantial traveling and lodging expenses if the arbitration takes place in Dallas County.

I do not believe that Ms. Bazan-Garcia has the financial resources to risk going forward with her claims if it were determined that Ms. Bazan-Garcia must file her claim through arbitration rather than the state court and that the provisions of the purported arbitration agreement in this case are a strong deterrent to potential claimants. Enforcement of the purported arbitration agreement would serve a strong injustice to the Plaintiff in this case.

Furthermore, the discovery limitations included in the arbitration agreement are severe and would impede my client's ability to litigate her claims. In workers' compensation retaliation cases, I usually take two to four depositions: (1) The supervisor who terminated the Plaintiff; (2) the Defendant's designated authorized representative; (3) any witnesses to the injury; and (4) any witnesses to the termination. According

1

to the Texas Supreme Court in *Continental Coffee Prods. Co. v. Cazarez*, 937 S.W.2d 444 (Tex. 1996), retaliation can be proved through the following types of circumstantial evidence: (1) knowledge of the compensation claim; (2) expression of a negative attitude toward the employee's injured condition; (3) failure to adhere to established company policies; (4) discriminatory treatment in comparison to similarly situated employees; and (5) evidence that the stated reason for the discharge was false. In workers' compensation retaliation cases, this type of circumstantial evidence of retaliation cannot be obtained through just one deposition. Plaintiff would be forced to choose whether to depose a corporate representative that would list, explain and elaborate on the Defendant's injury and termination policies, the supervisor(s) responsible for the actual termination, or the witnesses that would corroborate the Plaintiff's allegations. On the contrary, Defendant would only have to depose the Plaintiff to find out his evidence and then could file a no-evidence summary judgment motion. This would be grossly unfair to the Plaintiff, especially since the Plaintiff carries the burden of proof on her allegations. This same principle is true for proving the other elements of circumstantial evidence of retaliation listed by the Court in *Cazarez*.

Moreover, these depositions are separate and aside from the deposition of any experts designated by the Defendant. The arbitration agreement in this case would preclude our office from effectively litigating this case and providing adequate representation because it limits the plaintiff to only one deposition, including experts. Therefore, if Defendant designates an expert, Plaintiff would be forced to depose the expert at the expense of deposing any of the fact witnesses. This provision of the purported arbitration agreement is also a strong deterrent to potential claims because it limits the potential plaintiff's ability to investigate and meet her required burden of proof.

For these reasons, I strongly believe that the purported arbitration agreement is substantively unconscionable and should be unenforceable.

Further affiant says naught."

_____
JAVIER ESPINOZA

SWORN TO AND SUBSCRIBED BEFORE ME on this the 5th ____th day of November, 2014.

_____

My commission expires:

June 19, 2018

NOTARY PUBLIC in and for the
State of Texas

MARISOL CASON
Notary Public, State of Texas
My Commission Expires
June 19, 2018

2

# Exhibit 1

 

| AMERICAN ARBITRATION ASSOCIATION | INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION | 13727 Noel Road, Suite 700 Dallas, TX 75240 Telephone: (972)702-8222 Fax: (855)267-4082 |
|---|---|---|

# Detail Invoice/Statement

Nabors Completion and Production Services Company
515 West Greens Road
Suite 1200
Houston, Texas 77967

Representing: Nabors Completion and Production Service Co.
Re: Marco Cortez
Vs.
Nabors Completion and Production Service Co.

Please detach and return with Payment to Above Address

Please Indicate Case No. on Check



| AMERICAN ARBITRATION ASSOCIATION | INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION | 13727 Noel Road, Suite 700 Dallas, TX 75240 Telephone: (972)702-8222 Fax: (855)267-4082 |
|---|---|---|

Nabors Completion and Production Service Company
515 West Greens Road
Suite 1200
Houston, Texas 77967

Representing: Nabors Completion and Production Service Co.
Re: Marco Cortez
Vs.
Nabors Completion and Production Service Co.

| Statement Date | Case #, USD | Previous Balance | Credits | New Charges | Statement Balance |
|---|---|---|---|---|---|
| 05-Nov-14 | 70-20-1300-0014 | $0.00 | $0.00 | $0.00 | $0.00 |

| Date | Ref # | Description | Amount | Credits | Balance | Due Date |
|---|---|---|---|---|---|---|
| 09-Jun-2014 | 11030009 | Filing Fee - Claim due at case closing for services incurred | $950.00 | | $0.00 | 09-Jun-2014 |
| 09-Jun-2014 | | Allocation | | $950.00 | | |
| 09-Jun-2014 | 11029954 | Arbitrator's Compensation | $2,604.00 | | $0.00 | 09-Jun-2014 |
| 09-Jun-2014 | | Cancellation | | $258.65 | | |
| 13-Aug-2014 | | Allocation | | $1,745.35 | | |
| 09-Jun-2014 | | Allocation | | $600.00 | | |
| 07-Jan-2014 | 10586014 | Administrative Fee for Hearing - DATE: 03/27/2014 | $300.00 | | $0.00 | 07-Jan-2014 |
| 28-Jan-2014 | | Billed in Error | | $300.00 | | |
| 07-Jan-2014 | 10586013 | Administrative Fee for Hearing - DATE: 03/26/2014 | $300.00 | | $0.00 | 07-Jan-2014 |
| 28-Jan-2014 | | Billed in Error | | $300.00 | | |
| 07-Jan-2014 | 10586012 | Administrative Fee for Hearing - DATE: 03/25/2014 | $300.00 | | $0.00 | 07-Jan-2014 |
| 09-Jun-2014 | | Allocation | | -$600.00 | | |
| 10-Feb-2014 | | Allocation | | $900.00 | | |
| 01-Oct-2013 | 10546010 | Administrative Fee for Hearing - DATE: 02/05/2014 | $300.00 | | $0.00 | 01-Oct-2013 |
| 14-Oct-2013 | | Billed in Error | | $300.00 | | |
| 01-Oct-2013 | 10546009 | Administrative Fee for Hearing - DATE: 02/04/2014 | $300.00 | | $0.00 | 01-Oct-2013 |
| 14-Oct-2013 | | Billed in Error | | $300.00 | | |
| 01-Oct-2013 | 10546008 | Postponement of 2 hearing(s): 11/13/2013,11/14/2013 | $75.00 | | $0.00 | 01-Oct-2013 |
| 31-Oct-2013 | | Allocation | | $75.00 | | |
| 12-Apr-2013 | 10467952 | Your Share of the Neutral Compensation Deposit covering 16 hours of Study | $4,800.00 | | $0.00 | 12-Apr-2013 |
| 09-May-2013 | | Allocation | | $4,800.00 | | |
| 12-Apr-2013 | 10467951 | Your Share of the Neutral | $7,200.00 | | $0.00 | 12-Apr-2013 |

88



| Statement Date | Amount Currently Due |
|---|---|
| 05-Nov-14 | $0.00 |
| Case | |
| 70-20-1300-0014-2-LB | |

Payment is due upon Receipt

| | | | | | | |
|---|---|---|---|---|---|---|
| 09-May-2013 | | Compensation Deposit covering 4 days of Hearing<br>Allocation | | $7,200.00 | | |
| 12-Apr-2013 | 10467950 | Your Share of the Neutral Compensation Deposit covering 16 hours of Preliminary Matters | $4,800.00 | | $0.00 | 12-Apr-2013 |
| 09-May-2013 | | Allocation | | $4,800.00 | | |
| 11-Apr-2013 | 10467730 | Administrative Fee for Hearing - DATE: 11/14/2013 | $300.00 | | $0.00 | 11-Apr-2013 |
| 09-May-2013 | | Allocation | | $300.00 | | |
| 11-Apr-2013 | 10467729 | Administrative Fee for Hearing - DATE: 11/13/2013 | $300.00 | | $0.00 | 11-Apr-2013 |
| 09-May-2013 | | Allocation | | $300.00 | | |
| 17-Jan-2013 | 10429204 | Initial Administrative Fee | $950.00 | | $0.00 | 17-Jan-2013 |
| 09-Jun-2014 | | Cancellation | | $950.00 | | |
| 12-Feb-2013 | | Allocation | | $950.00 | | |
| 09-Jun-2014 | | Allocation | | -$950.00 | | |

Remarks    For any inquiries please call: (800)804-9308

Please mail check to      13727 Noel Road, Suite 700
Dallas, TX 75240
Telephone: (972)702-8222
Fax: (855)267-4082

| Statement Balance | Balance Currently Due |
|---|---|
| $0.00 | $0.00 |

Please Indicate Case No. on check

$23,479.00

# Exhibit 2



**American Arbitration Association**
*Dispute Resolution Services Worldwide*

13455 Noel Road - Suite 1750
Dallas, TX 75240

| PAY BY DATE | AMOUNT DUE |
|---|---|
| 12/21/2012 | 17250.00 |

| CASE # |
|---|
| 70-160-00850-11 02 LRB-R |

Payment Due Upon Receipt

# INVOICE/STATEMENT

Grant E. Adami III
Adami Shuffield Scheihing and Burns
9311 San Pedro
Suite 900
San Antonio TX 78216

Representing Stagg Restaurants, LLC
Re: Christine Torres

---

Please Detach and Return with Payment to the Above Address

Please Indicate Case No. on check

**American Arbitration Association**
*Dispute Resolution Services Worldwide*

13455 Noel Road - Suite 1750
Dallas, TX 75240

NAME  Grant E. Adami III
Adami Shuffield Scheihing and Burns
9311 San Pedro
Suite 900
San Antonio TX 78216

Representing Stagg Restaurants, LLC
Re: Christine Torres

| STMT DATE | CASE# | PREVIOUS BALANCE | CURRENT CREDITS | NEW CHANGES | TOTAL BALANCE DUE |
|---|---|---|---|---|---|
| 12/21/2012 | 70-160-00850-11 02 LRB-R | 0.00 | 2975.00- | 20225.00 | 17250.00 |

| DATE | REF# | DESCRIPTION | AMOUNT | CREDITS | BALANCE |
|---|---|---|---|---|---|
| 01/04/2012 | 10280376 | Initial Administrative Fee | 975.00 | | |
| 01/05/2012 | 26193 | Payment recvd from : Reed., Chk# 003026193 | | 975.00 - | |
| 02/10/2012 | 10285872 | Your Share of the Neutral Compensation Deposit covering 8 hours of Preliminary Matters | 2000.00 | | |
| 03/09/2012 | 10009 | Payment recvd from : Stagg Restaurants | | 2000.00 - | |
| 03/05/2012 | 10285387 | Administrative Fee for Hearing -DATE: 01/21/2013 | 300.00 | | |
| | | | | | 300.00 |
| 03/05/2012 | 10285388 | Administrative Fee for Hearing -DATE: 01/22/2013 | 300.00 | | |
| | | | | | 300.00 |
| 03/05/2012 | 10285389 | Administrative Fee for Hearing -DATE: 01/23/2013 | 300.00 | | |
| | | | | | 300.00 |
| 10/11/2012 | 10387752 | Your Share of the Neutral Compensation Deposit covering 3 hours of Preliminary Matters | 750.00 | | |
| | | | | | 750.00 |
| 10/31/2012 | 10395224 | Your Share of the Neutral Compensation Deposit covering 3 days of Hearing | 7500.00 | | |
| | | | | | 7500.00 |
| 10/31/2012 | 10395225 | Your Share of the Neutral Compensation Deposit covering 24 hours of Study | 7500.00 | | |
| | | | | | 7500.00 |

Remarks:  For any inquiry please call: 800-804-9308
This is a full statement showing all financial activity on this case.

| TOTAL BALANCE DUE | 17250.00 |
|---|---|

Please Indicate Case No. on check

| INVOICE SUMMARY: | | NET BILLED | NET PAID | NET DUE |
|---|---|---|---|---|
| | INITIAL/COUNTER-CLAIM FEES | 975.00 | 975.00 | 0.00 |
| | HEARING/POSTPONEMENT/ROOM/PROCESSING FEES | 900.00 | 0.00 | 900.00 |
| | REALLOCATION AT CASE END FEES | 0.00 | 0.00 | 0.00 |
| | NEUTRAL COMPENSATION/EXPENSES | 18350.00 | 2000.00 | 16350.00  EIN: 13-0429745 |

91

 **American Arbitration Association**
*Dispute Resolution Services Worldwide*

13455 Noel Road - Suite 1750
Dallas, TX 75240



## INVOICE/STATEMENT

Grant E. Adami III
Adami Shuffield Schelhing and Burns
9311 San Pedro
Suite 600
San Antonio TX 78216

Representing Stagg Restaurants, LLC
Re: Christine Torres

---

Please Detach and Return with Payment to the Above Address      Please Indicate Case No. on check

 **American Arbitration Association**
*Dispute Resolution Services Worldwide*

13455 Noel Road - Suite 1750
Dallas, TX 75240

NAME   Grant E. Adami III
Adami Shuffield Schelhing and Burns
9311 San Pedro
Suite 900
San Antonio TX 78216

Representing Stagg Restaurants, LLC
Re: Christine Torres

| STMT DATE | CASE# | PREVIOUS BALANCE | CURRENT CREDITS | NEW CHARGES | TOTAL BALANCE DUE |
| --- | --- | --- | --- | --- | --- |
| 12/21/2012 | 70-160-00060-11 02 LRB-R | 0.00 | 2075.00- | 20225.00 | 17250.00 |

| DATE | REF# | DESCRIPTION | AMOUNT | CREDITS | BALANCE |
| --- | --- | --- | --- | --- | --- |
| 10/31/2012 | 10395228 | Your share of the arbitrator expense deposit | 600.00 | | 600.00 |

Remarks: For any inquiry please call: 800-804-9008
This is a full statement showing all financial activity on this case.

**TOTAL BALANCE DUE** 17250.00

Please Indicate Case No. on check

| | NET BILLED | NET PAID | NET DUE |
| --- | --- | --- | --- |
| INVOICE SUMMARY: INITIAL/COUNTER-CLAIM FEES | 975.00 | 975.00 | 0.00 |
| HEARING/POSTPONEMENT/ROOM/PROCESSING FEES | 900.00 | 0.00 | 900.00 |
| REALLOCATION AT CASE END FEES | 0.00 | 0.00 | 0.00 |
| NEUTRAL COMPENSATION/EXPENSES | 18350.00 | 2000.00 | 16350.00  EIN: 13-0429745 |

# Exhibit 3

**70-160-00432-10**
**H.E.B. Grocery Company, L.P.**

**Administrative Fees and Expenses:**

| | | |
|---|---|---|
| Filing Fees | $925.00 | |
| Case Services Fee | $0.00 | |
| Hearing Fees | $750.00 | |
| AAA Room Rental Fee | $0.00 | |
| Abeyance/Misc. AAA Fees | $0.00 | |
| Non-AAA Conference Room Expenses | $0.00 | |
| Misc Expenses | $0.00 | |
| Your Share of Administrative Fees and Expenses: | | $1,675.00 |
| Amount Paid for Administrative Fees and Expenses: | | $2,875.00 |
| Balance Administrative Fees and Expenses: | | ($1,200.00) |

**Neutral Compensation and Expenses:**

| | |
|---|---|
| Your Share of Neutral Compensation and Expenses: | $19,807.24 |
| Amount Paid for Neutral Compensation and Expenses: | $20,470.00 |
| Balance Neutral Compensation and Expenses: | ($662.76) |

| | |
|---|---|
| **Party Balance:** | **($1,862.76)** |

## AFFIDAVIT

STATE OF TEXAS        §

                                    §

COUNTY OF BEXAR     §

BEFORE ME, the undersigned authority, on this day personally appeared JAVIER ESPINOZA, who is personally known to me and being first duly sworn according to law upon this oath deposed and said:

"My name is JAVIER ESPINOZA. I am over the age of twenty-one and am fully competent in all respects to make this affidavit. The facts stated in this affidavit are within my personal knowledge and are true and correct.

I am the lead attorney for Plaintiff Paula Bazan-Garcia in the present case. My firm recently arbitrated a similar case alleging violations of §451 of the Texas Labor Code styled *Marco Cortez v. Nabors Completion and Production Service Co.* with the American Arbitration Association (AAA). Attached hereto as Exhibit 1 is a copy of the invoice for said arbitration, which lasted three days, in the amount of $23,479.00. Furthermore, my firm has previously arbitrated other labor cases with the AAA that were similar in nature, complexity and amount of witnesses as Ms. Bazan-Garcia's case. Attached hereto as Exhibit 2 is the invoice for the case styled *Christine Torres v. Stagg Restaurants, LLC,* Cause No. 70-160-00850-11 before the American Arbitration Association. The Torres case was arbitrated for two days and the charges for said arbitration were $20,225.00. Lastly, in 2011, my firm also arbitrated another similar case for three days with the AAA styled, *Anthony Castillo v. HEB,* Cause No. 70-160-00432-10. Attached hereto as Exhibit 3 is the invoice for that arbitration for a total amount of $20,470.00.

The amount of damages claimed in the above referenced arbitrations and the difficulty of those cases is very similar to Ms. Bazan-Garcia's claim against Western Rim Property Services, Inc. The arbitrations all took place in San Antonio, TX so the invoices were solely for the arbitrator expense, not for any travel, witness expenses or any other expenses required for Plaintiff to present their cases. The invoices were all paid by the employer in those arbitrations, exclusive of the initial minimal filing fee paid by the Plaintiff.

If Ms. Bazan-Garcia is required to arbitrate her case through a similar arbitration association, the cost for the arbitration and litigation process will reasonably exceed $10,000.00 solely for the Plaintiff's share—this is assuming the costs are split equally. The cost potentially incurred by Ms. Bazan-Garcia in arbitration compared to those that would be incurred if Plaintiff continued with her claims in the judicial forum are astronomically higher and cost prohibitive. Plaintiff's out-of-pocket expenses in state court are minimal, at most they include a filing fee under $300.00 and all hearings in court and trial are free to the parties. Conversely, in arbitration, every time there is a hearing on status and scheduling conferences or discovery disputes and pre-trial matters, the arbitrator's time is charged to the party responsible for payment according to the agreement. According to the terms of the arbitration agreement, Ms. Bazan-Garcia would be partially responsible for part of these costs. In addition, Ms. Bazan-Garcia would also have to incur substantial traveling and lodging expenses if the arbitration takes place in Dallas County.

I do not believe that Ms. Bazan-Garcia has the financial resources to risk going forward with her claims if it were determined that Ms. Bazan-Garcia must file her claim through arbitration rather than the state court and that the provisions of the purported arbitration agreement in this case are a strong deterrent to potential claimants. Enforcement of the purported arbitration agreement would serve a strong injustice to the Plaintiff in this case.

Furthermore, the discovery limitations included in the arbitration agreement are severe and would impede my client's ability to litigate her claims. In workers' compensation retaliation cases, I usually take two to four depositions: (1) The supervisor who terminated the Plaintiff; (2) the Defendant's designated authorized representative; (3) any witnesses to the injury; and (4) any witnesses to the termination. According

1

to the Texas Supreme Court in *Continental Coffee Prods. Co. v. Cazarez*, 937 S.W.2d 444 (Tex. 1996), retaliation can be proved through the following types of circumstantial evidence: (1) knowledge of the compensation claim; (2) expression of a negative attitude toward the employee's injured condition; (3) failure to adhere to established company policies; (4) discriminatory treatment in comparison to similarly situated employees; and (5) evidence that the stated reason for the discharge was false. In workers' compensation retaliation cases, this type of circumstantial evidence of retaliation cannot be obtained through just one deposition. Plaintiff would be forced to choose whether to depose a corporate representative that would list, explain and elaborate on the Defendant's injury and termination policies, the supervisor(s) responsible for the actual termination, or the witnesses that would corroborate the Plaintiff's allegations. On the contrary, Defendant would only have to depose the Plaintiff to find out his evidence and then could file a no-evidence summary judgment motion. This would be grossly unfair to the Plaintiff, especially since the Plaintiff carries the burden of proof on her allegations. This same principle is true for proving the other elements of circumstantial evidence of retaliation listed by the Court in *Cazarez*.

Moreover, these depositions are separate and aside from the deposition of any experts designated by the Defendant. The arbitration agreement in this case would preclude our office from effectively litigating this case and providing adequate representation because it limits the plaintiff to only one deposition, including experts. Therefore, if Defendant designates an expert, Plaintiff would be forced to depose the expert at the expense of deposing any of the fact witnesses. This provision of the purported arbitration agreement is also a strong deterrent to potential claims because it limits the potential plaintiff's ability to investigate and meet her required burden of proof.

For these reasons, I strongly believe that the purported arbitration agreement is substantively unconscionable and should be unenforceable.

Further affiant says naught."

_____
JAVIER ESPINOZA

SWORN TO AND SUBSCRIBED BEFORE ME on this the 5th _____th day of November, 2014.

My commission expires:

June 19, 2018

NOTARY PUBLIC in and for the
State of Texas

MARISOL CASON
Notary Public, State of Texas
My Commission Expires
June 19, 2018

2

# Exhibit 1



AMERICAN ARBITRATION ASSOCIATION | INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION®

13727 Noel Road, Suite 700
Dallas, TX 75240
Telephone: (972)702-8222
Fax: (855)267-4082



| Statement Date | Amount Currently Due |
|---|---|
| 05-Nov-14 | $0.00 |

| Case # |
|---|
| 70-20-1300-0014-2-LB |

Payment is due upon Receipt

# Detail Invoice/Statement

Nabors Completion and Production Services Company
515 West Greens Road
Suite 1200
Houston, Texas 77967

Representing: Nabors Completion and Production Service Co.
Re: Marco Cortez
Vs.
Nabors Completion and Production Service Co.

Please detach and return with Payment to Above Address

Please Indicate Case No. on Check

---



AMERICAN ARBITRATION ASSOCIATION | INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION®

13727 Noel Road, Suite 700
Dallas, TX 75240
Telephone: (972)702-8222
Fax: (855)267-4082

Nabors Completion and Production Service Company
515 West Greens Road
Suite 1200
Houston, Texas 77967

Representing: Nabors Completion and Production Service Co.
Re: Marco Cortez
Vs.
Nabors Completion and Production Service Co.

| Statement Date | Case #, USD | Previous Balance | Credits | New Charges | Statement Balance |
|---|---|---|---|---|---|
| 05-Nov-14 | 70-20-1300-0014 | $0.00 | $0.00 | $0.00 | $0.00 |

| Date | Ref # | Description | Amount | Credits | Balance | Due Date |
|---|---|---|---|---|---|---|
| 09-Jun-2014 | 11030009 | Filing Fee - Claim due at case closing for services incurred | $950.00 | | $0.00 | 09-Jun-2014 |
| 09-Jun-2014 | | Allocation | | $950.00 | | |
| 09-Jun-2014 | 11029954 | Arbitrator's Compensation | $2,604.00 | | $0.00 | 09-Jun-2014 |
| 09-Jun-2014 | | Cancellation | | $258.65 | | |
| 13-Aug-2014 | | Allocation | | $1,745.35 | | |
| 09-Jun-2014 | | Allocation | | $600.00 | | |
| 07-Jan-2014 | 10586014 | Administrative Fee for Hearing - DATE: 03/27/2014 | $300.00 | | $0.00 | 07-Jan-2014 |
| 28-Jan-2014 | | Billed in Error | | $300.00 | | |
| 07-Jan-2014 | 10586013 | Administrative Fee for Hearing - DATE: 03/26/2014 | $300.00 | | $0.00 | 07-Jan-2014 |
| 28-Jan-2014 | | Billed in Error | | $300.00 | | |
| 07-Jan-2014 | 10586012 | Administrative Fee for Hearing - DATE: 03/25/2014 | $300.00 | | $0.00 | 07-Jan-2014 |
| 09-Jun-2014 | | Allocation | | -$600.00 | | |
| 10-Feb-2014 | | Allocation | | $900.00 | | |
| 01-Oct-2013 | 10546010 | Administrative Fee for Hearing - DATE: 02/05/2014 | $300.00 | | $0.00 | 01-Oct-2013 |
| 14-Oct-2013 | | Billed in Error | | $300.00 | | |
| 01-Oct-2013 | 10546009 | Administrative Fee for Hearing - DATE: 02/04/2014 | $300.00 | | $0.00 | 01-Oct-2013 |
| 14-Oct-2013 | | Billed in Error | | $300.00 | | |
| 01-Oct-2013 | 10546008 | Postponement of 2 hearing(s): 11/13/2013,11/14/2013 | $75.00 | | $0.00 | 01-Oct-2013 |
| 31-Oct-2013 | | Allocation | | $75.00 | | |
| 12-Apr-2013 | 10467952 | Your Share of the Neutral Compensation Deposit covering 16 hours of Study | $4,800.00 | | $0.00 | 12-Apr-2013 |
| 09-May-2013 | | Allocation | | $4,800.00 | | |
| 12-Apr-2013 | 10467951 | Your Share of the Neutral | $7,200.00 | | $0.00 | 12-Apr-2013 |



AMERICAN ARBITRATION ASSOCIATION·

INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION·

13727 Noel Road, Suite 700
Dallas, TX 75240
Telephone: (972)702-8222
Fax: (855)267-4082

| Statement Date | Amount Currently Due |
|---|---|
| 05-Nov-14 | $0.00 |

| Case |
|---|
| 70-20-1300-0014-2-LB |

Payment is due upon Receipt

| | | | | | | |
|---|---|---|---|---|---|---|
| | | Compensation Deposit covering 4 days of Hearing | | | | |
| 09-May-2013 | | Allocation | | $7,200.00 | | |
| 12-Apr-2013 | 10467950 | Your Share of the Neutral Compensation Deposit covering 16 hours of Preliminary Matters | $4,800.00 | | $0.00 | 12-Apr-2013 |
| 09-May-2013 | | Allocation | | $4,800.00 | | |
| 11-Apr-2013 | 10467730 | Administrative Fee for Hearing - DATE: 11/14/2013 | $300.00 | | $0.00 | 11-Apr-2013 |
| 09-May-2013 | | Allocation | | $300.00 | | |
| 11-Apr-2013 | 10467729 | Administrative Fee for Hearing - DATE: 11/13/2013 | $300.00 | | $0.00 | 11-Apr-2013 |
| 09-May-2013 | | Allocation | | $300.00 | | |
| 17-Jan-2013 | 10429204 | Initial Administrative Fee | $950.00 | | $0.00 | 17-Jan-2013 |
| 09-Jun-2014 | | Cancellation | | $950.00 | | |
| 12-Feb-2013 | | Allocation | | $950.00 | | |
| 09-Jun-2014 | | Allocation | | -$950.00 | | |

Remarks    For any inquiries please call: (800)804-9308

Please mail check to    13727 Noel Road, Suite 700
Dallas, TX 75240
Telephone: (972)702-8222
Fax: (855)267-4082

| Statement Balance | Balance Currently Due |
|---|---|
| $0.00 | $0.00 |

Please Indicate Case No. on check

$23,479.00

89

# Exhibit 2



**American Arbitration Association**
*Dispute Resolution Services Worldwide*

13455 Noel Road - Suite 1750
Dallas, TX 75240

| PAYMT DATE | AMOUNT DUE |
|---|---|
| 12/21/2012 | 17250.00 |

| CASE # |
|---|
| 70-160-00850-11 02 LRB-R |

Payment Due Upon Receipt

## INVOICE/STATEMENT

Grant E. Adami III
Adami Shuffield Scheihing and Burns
9311 San Pedro
Suite 900
San Antonio TX 78216

Representing Stagg Restaurants, LLC
Re: Christine Torres

---

**Please Detach and Return with Payment to the Above Address**     **Please Indicate Case No. on check**

**American Arbitration Association**
*Dispute Resolution Services Worldwide*

13455 Noel Road - Suite 1750
Dallas, TX 75240

NAME    Grant E. Adami III
Adami Shuffield Scheihing and Burns
9311 San Pedro
Suite 900
San Antonio TX 78216

Representing Stagg Restaurants, LLC
Re: Christine Torres

| STMT DATE | CASE# | PREVIOUS BALANCE | CURRENT CREDITS | NEW CHANGES | TOTAL BALANCE DUE |
|---|---|---|---|---|---|
| 12/21/2012 | 70-160-00850-11 02 LRB-R | 0.00 | 2975.00- | 20225.00 | 17250.00 |

| DATE | REF# | DESCRIPTION | AMOUNT | CREDITS | BALANCE |
|---|---|---|---|---|---|
| 01/04/2012 | 10288376 | Initial Administrative Fee | 975.00 | | |
| 01/05/2012 | 25193 | Payment recvd from : Reed., Chk# 003026193 | | 975.00- | |
| 02/10/2012 | 10285872 | Your Share of the Neutral Compensation Deposit covering 8 hours of Preliminary Matters | 2000.00 | | |
| 03/09/2012 | 10009 | Payment recvd from : Stagg Restaurants | | 2000.00- | |
| 03/05/2012 | 10285387 | Administrative Fee for Hearing -DATE: 01/21/2013 | 300.00 | | |
| | | | | | 300.00 |
| 03/05/2012 | 10285388 | Administrative Fee for Hearing -DATE: 01/22/2013 | 300.00 | | |
| | | | | | 300.00 |
| 03/05/2012 | 10285389 | Administrative Fee for Hearing -DATE: 01/23/2013 | 300.00 | | |
| | | | | | 300.00 |
| 10/11/2012 | 10387752 | Your Share of the Neutral Compensation Deposit covering 3 hours of Preliminary Matters | 750.00 | | |
| | | | | | 750.00 |
| 10/31/2012 | 10395224 | Your Share of the Neutral Compensation Deposit covering 3 days of Hearing | 7500.00 | | |
| | | | | | 7500.00 |
| 10/31/2012 | 10395225 | Your Share of the Neutral Compensation Deposit covering 24 hours of Study | 7500.00 | | |
| | | | | | 7500.00 |

Remarks:  For any inquiry please call: 800-804-9308
This is a full statement showing all financial activity on this case.

| TOTAL BALANCE DUE | 17250.00 |
|---|---|

Please Indicate Case No. on check

| INVOICE SUMMARY: | | NET BILLED | NET PAID | NET DUE |
|---|---|---|---|---|
| | INITIAL/COUNTER-CLAIM FEES | 975.00 | 975.00 | 0.00 |
| | HEARING/POSTPONEMENT/ROOM/PROCESSING FEES | 900.00 | 0.00 | 900.00 |
| | REALLOCATION AT CASE END FEES | 0.00 | 0.00 | 0.00 |
| | NEUTRAL COMPENSATION/EXPENSES | 18350.00 | 2000.00 | 16350.00   EIN: 13-0429745 |

91



American Arbitration Association
Dispute Resolution Services Worldwide

13455 Noel Road - Suite 1750
Dallas, TX 75240



## INVOICE/STATEMENT

Grant E. Adami III
Adami Shuffield Schelling and Burns
9311 San Pedro
Suite 900
San Antonio TX 78216

Representing Stagg Restaurants, LLC
Re: Christine Torres

Please Detach and Return with Payment to the Above Address          Please Indicate Case No. on check



American Arbitration Association
Dispute Resolution Services Worldwide

13455 Noel Road - Suite 1750
Dallas, TX 75240

NAME    Grant E. Adami III
Adami Shuffield Schelling and Burns
9311 San Pedro
Suite 900
San Antonio TX 78216

Representing Stagg Restaurants, LLC
Re: Christine Torres

| STMT DATE | CASE# | PREVIOUS BALANCE | CURRENT CREDITS | NEW CHARGES | TOTAL BALANCE DUE |
|---|---|---|---|---|---|
| 12/21/2012 | 70-160-00050-11 02 LRB-R | 0.00 | 2975.00- | 20225.00 | 17250.00 |

| DATE | REF# | DESCRIPTION | AMOUNT | CREDITS | BALANCE |
|---|---|---|---|---|---|
| 10/31/2012 | 10395228 | Your share of the arbitrator expense deposit | 600.00 | | 600.00 |

Remarks:   For any inquiry please call: 800-804-9008
This is a full statement showing all financial activity on this case.

| | TOTAL BALANCE DUE | 17250.00 |
|---|---|---|

Please indicate Case No. on check

| | | NET BILLED | NET PAID | NET DUE |
|---|---|---|---|---|
| INVOICE SUMMARY: | INITIAL/COUNTER-CLAIM FEES | 975.00 | 975.00 | 0.00 |
| | HEARING/POSTPONEMENT/ROOM/PROCESSING FEES | 600.00 | 0.00 | 900.00 |
| | REALLOCATION AT CASE END FEES | 0.00 | 0.00 | 0.00 |
| | NEUTRAL COMPENSATION/EXPENSES | 18350.00 | 2000.00 | 16350.00  EIN: 13-0429745 |

# Exhibit 3

**70-160-00432-10**
**H.E.B. Grocery Company, L.P.**

**Administrative Fees and Expenses:**

| | | |
|---|---|---|
| Filing Fees | $925.00 | |
| Case Services Fee | $0.00 | |
| Hearing Fees | $750.00 | |
| AAA Room Rental Fee | $0.00 | |
| Abeyance/Misc. AAA Fees | $0.00 | |
| Non-AAA Conference Room Expenses | $0.00 | |
| Misc Expenses | $0.00 | |
| Your Share of Administrative Fees and Expenses: | | $1,675.00 |
| Amount Paid for Administrative Fees and Expenses: | | $2,875.00 |
| Balance Administrative Fees and Expenses: | | ($1,200.00) |

**Neutral Compensation and Expenses:**

| | |
|---|---|
| Your Share of Neutral Compensation and Expenses: | $19,807.24 |
| Amount Paid for Neutral Compensation and Expenses: | $20,470.00 |
| Balance Neutral Compensation and Expenses: | ($662.76) |

| | |
|---|---|
| **Party Balance:** | ($1,862.76) |

E-FILED
Bexar County, County Clerk
Gerard Rickhoff
Accepted Date:7/1/2014 10:45:56 AM
Accepted By: Justin Longoria
Deputy Clerk Justin Longoria

CAUSE NO. 2014CV01064

| | | |
|---|---|---|
| PAULA BAZAN-GARCIA, | § | IN THE COUNTY COURT |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | AT LAW NO. CC# 03 |
| | § | |
| WESTERN RIM PROPERTY | § | |
| SERVICES INC., | § | |
| | § | |
| *Defendant.* | § | BEXAR COUNTY, TEXAS |

## PLAINTIFF'S ORIGINAL PETITION AND REQUEST FOR DISCLOSURE AND JURY DEMAND

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW PAULA BAZAN-GARCIA, (hereinafter referred to as "Plaintiff"), complaining of WESTERN RIM PROPERTY SERVICES, INC., (hereinafter referred to as "Defendant"), and for a cause of action would respectfully show unto the Court as follows:

### DISCOVERY

1.    *Discovery Control Plan.* Pursuant to Rule 190.3 of the Texas Rules of Civil Procedure, Discovery Control Plan Level Two governs this lawsuit.

2.    *Request For Disclosure.* Pursuant to Rule 194 of the Texas Rules of Civil Procedure, Defendant is requested to disclose, within 50 days of service of this request, the information described in Rule 194.2 of the Texas Rules of Civil Procedure.

### PARTIES

3.    Plaintiff is a resident of the State of Texas. She currently resides in Bexar County, Texas, and she has resided there at all times material to this lawsuit.

4.    Defendant is a private corporation organized under the laws of Texas, and its principal place of business is in Tarrant County, Texas, located at 2505 N. Highway 360, Suite 800, Grand Prairie, Tarrant County, Texas 75050 and may be served with process by serving its registered

ORIGINAL PETITION AND REQUEST FOR DISCLOSURE

Submit Date:6/25/2014 11:20:51 AM

agent, Matthew J. Hiles, at 2505 N. Highway 360, Suite 800, Grand Prairie, Texas 75050 and/or wherever any duly authorized agent may be found.

## MISNOMER/MISIDENTIFICATION

5.      In the event any parties are misnamed or are not included herein, it is Plaintiff's contention that such was a "misidentification," "misnomer" and/or such parties were "alter egos" of parties named herein. Alternatively, Plaintiff contends that such "corporate veils" should be pierced to hold such parties properly included in the interest of justice.

## JURISDICTION & VENUE

6.      This court has personal jurisdiction, both specific and general, over Defendant, because it does business in Bexar County, Texas and Defendant is amenable to service by a Texas court. Additionally, venue is proper in Bexar County because a substantial part of the events or omissions giving rise to Plaintiff's claim occurred in Bexar County. TEX. CIV. PRAC. & REM. CODE §15.002(a)(1).

7.      Plaintiff has suffered damages in an amount within the jurisdictional limits of this Court. Pursuant to Rule 47 of the Texas Rules of Civil Procedure, Plaintiff in good faith pleads the value of this case is over one hundred thousand dollars ($100,000.00) but less than two hundred thousand dollars ($200,000.00). Plaintiff reserves the right to amend these amounts if a jury awards an amount in excess of two hundred thousand dollars ($200,000.00).

## STATEMENT OF FACTS

8.      Defendant has been a "subscriber" of workers' compensation insurance at all times material to this action.

9.      Plaintiff was employed by Defendant since approximately September, 26, 2011 at Defendant's apartment complex, The Towers at TPC, located at 5505 TPC Parkway, San Antonio, Bexar County, Texas.

10. Throughout Plaintiff's employment with Defendant, Plaintiff consistently was told she was doing a good job. Plaintiff seldom--if ever--received any negative evaluations. Plaintiff was never written up for any serious violations while employed by Defendant.

11. Plaintiff had a good attendance record until March 20, 2013, when she suffered an on-the-job injury. Plaintiff promptly notified her supervisor of her injury and upon information and belief, a workers' compensation claim was filed.

12. On or about June 4, 2013, Plaintiff was prohibited from working by her doctor as a result of the injury she sustained while working in the course and scope of her employment. Because Plaintiff was being taken off work pending surgery, in addition to being prohibited from working by her doctor, Plaintiff requested to take FMLA leave and submitted the paperwork to Defendant's corporate office.

13. Plaintiff was released to return to work on light duty on or about August 19, 2013; however, Plaintiff was prohibited from working by Defendant, who claimed to not have any light duty positions.

14. On or about October 22, 2013, soon after Plaintiff was released on full duty, Defendant terminated Plaintiff for a pre-textual reason.

15. As a result of her discharge and the company's continuing refusal to reinstate her, Plaintiff has suffered substantial economic losses and severe mental anguish, and she will continue to suffer such losses in the future.

### WORKERS' COMPENSATION RETALIATION

16. Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 16 as if those allegations were set forth verbatim.

17. Plaintiff alleges that Defendant, violated Section 451.001 of the Texas Labor Code by discharging Plaintiff because she notified her employer of her on-the-job injury and/or initiated the filing of a workers' compensation claim in good faith, and by not reinstating her.

18. Plaintiff seeks the maximum damages allowed by Section 451.002 of the Texas Labor Code and at common law.

19. Plaintiff's injuries resulted from Defendant's fraud and/or malice as set forth in Tex. Civ. Prac. & Rem. Code § 41.001 et seq. Accordingly, Plaintiff is entitled to an award of exemplary damages in accordance with Texas law.

## REQUEST FOR RELIEF

20. Based on the foregoing, Plaintiff requests that Defendant appear and answer, and that on final trial of this lawsuit Plaintiff have final judgment against Defendant for the following relief:

a) All reasonable damages;

b) Lost earnings and employee benefits in the past;

c) Lost earnings and employee benefits that in reasonable probability will be lost in the future;

d) Compensatory damages, past and future (which may include emotional pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, and other non-pecuniary losses);

e) Exemplary damages;

f) Pre-judgment and post-judgment interest at the maximum amount allowed by law;

g) Costs of suit;

h) The award of such other and further relief, both at law and in equity, including injunctive relief and reinstatement, to which Plaintiff may be justly entitled.

## PRAYER

21. **WHEREFORE, PREMISES CONSIDERED,** Plaintiff requests that the Defendant be cited to appear and answer, and that upon final trial, Plaintiff have judgment against Defendant for all relief requested, for pre-judgment interest, for costs of this suit, punitive damages and for such other and further relief, general and special, at law or in equity, to which Plaintiff may be justly entitled.

Respectfully submitted,

THE ESPINOZA LAW FIRM, PLLC
503 E. Ramsey, Ste. 103
San Antonio, Texas 78216
210.229.1300 t
210.229.1302 f
www.espinozafirm.com

**JAVIER ESPINOZA**
Texas Bar No. 24036534
**STEVEN SACHS**
Texas Bar No. 24074995
**JOSUE F. GARZA**
Texas Bar No. 24072737

253 S.W.3d 857
Court of Appeals of Texas,
Houston (14th Dist.).

ASPEN TECHNOLOGY, INC., Appellant

v.

Abe SHASHA, Appellee.
In re Aspen Technology, Inc., Relator.

Nos. 14–07–00303–CV, 14–07–
00469–CV. | March 27, 2008.

**Synopsis**
**Background:** Former employee brought action against
employer, challenging payment of commissions. The 165th
District Court, Harris County, Elizabeth Ray, J., granted
employer's motion to compel arbitration, but on employee's
motion to clarify, enforced first of two arbitration agreements,
ordering arbitration in Texas. Employer appealed and
filed petition for writ of mandamus. Proceedings were
consolidated.

**Holdings:** The Court of Appeals, Kem Thompson Frost, J.,
held that:

[1] fact that trial court did not deny employer's motion to
compel did not deprive Court of Appeals of jurisdiction over
petition for writ of mandamus;

[2] employer did not retain a unilateral, unrestricted right
to modify or terminate the arbitration agreement, as would
render the agreement illusory; and

[3] agreement was not unconscionable because employee
failed to demonstrate a likelihood he would be denied access
to arbitration by excessive arbitration costs.

Writ granted.

West Headnotes (14)

[1] **Mandamus**

or vacation of judgment or order
**Mandamus**

proceedings other than actions

Modification

Civil

Mandamus relief was potentially available to
employer challenging trial court's decision
on employer's motion to compel arbitration,
pursuant to arbitration agreement governed by
the Federal Arbitration Act, although under the
Act, employer had an adequate remedy by law
by interlocutory appeal. 9 U.S.C.A. § 1 et seq.

2 Cases that cite this headnote

[2] **Alternative Dispute Resolution**

and statutory provisions and rules of court
**Commerce**


Constitutional

Arbitration

The Federal Arbitration Act applies to an
arbitration agreement in any contract involving
interstate commerce, to the full extent of
the Commerce Clause of the United States
Constitution. U.S.C.A. Const. Art. 1, § 8, cl. 3;
9 U.S.C.A. § 2.

Cases that cite this headnote

[3] **Mandamus**

proceedings other than actions

Civil

Mandamus relief is available when the trial
court clearly abuses its discretion by erroneously
denying a party its contracted-for arbitration
rights under the Federal Arbitration Act. 9
U.S.C.A. § 1 et seq.

3 Cases that cite this headnote

[4] **Mandamus**

of discretion

Matters

On mandamus review of factual issues, a trial court will be held to have abused its discretion only if the party requesting mandamus relief establishes that the trial court reasonably could have reached only one decision, and not the decision the trial court made.

1 Cases that cite this headnote

**[5]** **Mandamus**



of discretion

On mandamus review of issues of law, the trial court will be found to have abused its discretion if it clearly fails to analyze the law correctly or apply the law to the facts.

Cases that cite this headnote

**[6]** **Alternative Dispute Resolution**



To ascertain the parties' true intentions in an arbitration agreement, a court examines the entire agreement in an effort to harmonize and give effect to all provisions of the contract so that none will be rendered meaningless.

2 Cases that cite this headnote

**[7]** **Contracts**



in general

Whether a contract is ambiguous is a question of law for the court.

1 Cases that cite this headnote

**[8]** **Contracts**



of ambiguity

A contract is ambiguous when its meaning is uncertain and doubtful or is reasonably susceptible to more than one interpretation.

Cases that cite this headnote

**[9]** **Contracts**



Existence

of ambiguity

**Contracts**



Ambiguity

in general

Matters

When a written contract is worded such that it can be given a certain or definite legal meaning or interpretation, it is unambiguous, and the court construes it as a matter of law.

Cases that cite this headnote

**[10]** **Mandamus**



Civil

proceedings other than actions

**Mandamus**

Construction



Jurisdiction

and authority

Fact that trial court did not deny employer's motion to compel arbitration did not deprive the Court of Appeals of jurisdiction over employer's petition for writ of mandamus; trial court granted the motion to compel, but in response to employee's motion for reconsideration and clarification, ordered parties to arbitrate claim in Texas, impliedly finding that the second of two arbitration agreements was illusory and substantively unconscionable, thus denying employer its contracted-for arbitration rights under the second agreement, which was governed by the Federal Arbitration Act. 9 U.S.C.A. § 1 et seq.

Ambiguity

Cases that cite this headnote

**[11]** **Alternative Dispute Resolution**

Existence



In

general; formation of agreement

Under language of arbitration agreement stating that employer's vice president would "be responsible for the periodic review of the plan and may make revisions from time to time," employer did not retain a unilateral,

unrestricted right to modify or terminate the arbitration agreement, and therefore the arbitration agreement, as a matter of law, was not illusory.

1 Cases that cite this headnote

**[12]    Alternative Dispute Resolution**



general;  formation of agreement

If one party to an arbitration agreement retains a unilateral, unrestricted right to terminate, then the arbitration agreement is illusory and unenforceable.

Cases that cite this headnote

**[13]    Alternative Dispute Resolution**



Employee failed to demonstrate a likelihood that he would be denied access to arbitration by excessive arbitration costs, as would support trial court's finding that arbitration clause requiring arbitration in Boston was substantively unconscionable; even if American Arbitration Association (AAA) conducted and administered the arbitration and costs were allocated equally, as assumed by employee, cost to employee of $17,862 was not unconscionable in view of his asserted claim of between $300,000 and $500,000, and employee provided no evidence of his ability to pay at time the parties entered into the arbitration agreement.

1 Cases that cite this headnote

**[14]    Alternative Dispute Resolution**



A party seeking to invalidate an arbitration agreement on the ground that arbitration would be prohibitively expensive bears the burden of providing specific evidence showing a likelihood that he would incur excessive arbitration costs.

Cases that cite this headnote

**Attorneys and Law Firms**

**\*859**  Laura Gibson for Aspen Technology, Inc.

Mark G. Lazarz, Michael Todd Slobin, for Abe Shasha.

Panel consists of Chief Justice HEDGES and Justices ANDERSON and FROST.

In

Unconscionability

Evidence

**OPINION**

KEM THOMPSON FROST, Justice.

An employer and its employee entered into two arbitration agreements—one in which they did not specify the arbitration rules, arbitration site, or number of arbitrators and a subsequent agreement in which they specified a three-arbitrator panel in Boston, Massachusetts, in accordance with the commercial arbitration rules of the American Arbitration Association. The trial court compelled arbitration in Houston, Texas, before a single arbitrator under the first agreement but refused to compel arbitration under the second agreement, impliedly ruling that the second agreement is illusory and substantively unconscionable. We conclude mandamus relief is warranted. For the reasons explained below, we direct the trial court to vacate its orders compelling arbitration under the first agreement and to issue an order compelling arbitration under the second agreement. Given this ruling, the employer's interlocutory appeal is rendered moot.

**I. FACTUAL AND PROCEDURAL BACKGROUND**

Appellee/real party in interest Abe Shasha began his employment in December 2001, with the predecessor of appellant/relator Aspen Technology, Inc. At that time, Shasha signed an agreement regarding his employment, in which he and Aspen's predecessor agreed to arbitrate any and all disputes or controversies that might arise between Shasha and Aspen's predecessor, including without limitation employment disputes (hereinafter "2001 Agreement"). On October 28, 2005, Shasha signed an agreement regarding his incentive compensation for Aspen fiscal year 2006 (hereinafter "2006 Agreement"). In the 2006 Agreement, Shasha agreed that any legal action against Aspen would be settled exclusively by arbitration before a three- **\*860** member panel in Boston, Massachusetts in accordance with

the commercial arbitration rules of the American Arbitration Association (hereinafter "AAA").

Early in 2006, Shasha notified Aspen that he had a dispute regarding his commissions. In May 2006, Shasha resigned from his position with Aspen and soon thereafter filed suit against Aspen in the trial court below asserting contract and tort claims. Aspen filed a motion to compel arbitration, relying on both the 2001 Agreement and the 2006 Agreement. In response, Shasha admitted that he executed both the 2001 Agreement and the 2006 Agreement. Shasha argued that the arbitration provision in the 2006 Agreement replaced the arbitration provision in the 2001 Agreement. Shasha did not dispute that his claims fall within the scope of the arbitration clause in the 2006 Agreement; rather, Shasha asserted that this arbitration clause is unenforceable because (1) the clause is illusory given that Aspen allegedly retains a unilateral, unrestricted right to terminate this arbitration agreement; and (2) the clause imposes such exorbitant costs on Shasha that it is substantively unconscionable.

The trial court granted Aspen's motion to compel, ordered all claims to arbitration, and stayed the case pending the conclusion of the arbitration. However, the trial court's first order did not specify the site for the arbitration or the agreement under which the trial court ordered the parties to arbitrate the claims. Confusion arose as to whether the trial court had ordered arbitration under the 2006 Agreement. Aspen asserted that the trial court had ordered the parties to arbitrate the claims in Boston, Massachusetts, under the 2006 Agreement. Shasha filed a motion for reconsideration and clarification. In this motion, Shasha stated that the trial court's order was ambiguous as to whether the trial court had compelled the parties to arbitrate the claims under the 2001 Agreement or under the 2006 Agreement. Shasha asserted that he had no issue with the court to the extent it intended to compel arbitration under the 2001 Agreement. However, to the extent the trial court had ordered arbitration under the 2006 Agreement, Shasha moved the court to reconsider its rejection of the two grounds upon which Shasha had asserted that this arbitration agreement is unenforceable. Shasha requested the trial court to order the parties to arbitration under the 2001 Agreement in Houston, Texas, with a single arbitrator.

Aspen filed a response in opposition in which it argued that no clarification was necessary because the trial court already had ordered the parties to arbitrate in Boston, Massachusetts, under the 2006 Agreement. Aspen again presented argument

in support of its position that there is no merit in Shasha's two objections to the enforceability of the arbitration clause in the 2006 Agreement. Aspen asserted that the Federal Arbitration Act ("Federal Act") and the Texas Arbitration Act ("Texas Act") both mandate that Shasha's claims be arbitrated in Boston, Massachusetts before a panel of three arbitrators pursuant to the commercial arbitration rules of the AAA ("Commercial Rules") and that the proceedings in the trial court be stayed pending completion of arbitration. Aspen submitted to the trial court a proposed order denying Shasha's motion. In this proposed order, the trial court would compel arbitration in Boston, Massachusetts, before a panel of three arbitrators pursuant to the Commercial Rules and stay the proceedings in the trial court until the conclusion of the arbitration. Instead of signing this proposed order, the trial court signed an order in which it granted Shasha's motion and compelled arbitration in Houston, Texas, with a single **\*861** arbitrator under the 2001 Agreement. Aspen has appealed this order under section 171.098(a)(1) of the Texas Civil Practice and Remedies Code. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 171.098(a)(1) (Vernon 2005). Aspen also filed a petition for writ of mandamus. This court has consolidated these two proceedings.

## II. STANDARD OF REVIEW

**[1]** **[2]** **[3]** **[4]** **[5]** The Federal Act applies to an arbitration agreement in any contract involving interstate commerce, to the full extent of the Commerce Clause of the United States Constitution. *See* 9 U.S.C. § 2 (1999); *Allied–Bruce Terminix Co. v. Dobson,* 513 U.S. 265, 277–81, 115 S.Ct. 834, 839–41, 130 L.Ed.2d 753 (1995); *In re L & L Kempwood Assocs.,* 9 S.W.3d 125, 127 (Tex.1999). Shasha does not dispute that the Federal Act applies. The 2001 Agreement and the 2006 Agreement both involve interstate commerce, and therefore, the Federal Act applies. Mandamus relief is available when the trial court clearly abuses its discretion by erroneously denying a party its contracted-for arbitration rights under the Federal Act. *See In re D. Wilson Const. Co.,* 196 S.W.3d 774, 780–81 (Tex.2006) (orig. proceeding); *In re Igloo Prods. Corp.,* 238 S.W.3d 574, 577 (Tex.App.-Houston [14th Dist.] 2007, orig. proceeding [mand. denied] ). Therefore, Aspen's right to mandamus relief hinges on whether the trial court erred by refusing to compel arbitration under the 2006 Agreement.[1] On mandamus review of factual issues, a trial court will be held to have abused its discretion only if the party requesting mandamus relief establishes that the trial court reasonably could have

reached only one decision, and not the decision the trial court made. *Walker v. Packer,* 827 S.W.2d 833, 840 (Tex.1992) (orig. proceeding). Mandamus review of issues of law is less deferential. A trial court abuses its discretion if it clearly fails to analyze the law correctly or apply the law to the facts. *In re Cerberus Capital Mgmt., L.P.,* 164 S.W.3d 379, 382 (Tex.2005).

 [6]    [7]    [8]    [9]    In construing the 2006 Agreement, our primary concern is to ascertain and give effect to the intentions of the parties as expressed in the contract. *Kelley–Coppedge, Inc. v. Highlands Ins. Co.,* 980 S.W.2d 462, 464 (Tex.1998). To ascertain the parties' true intentions, we examine the entire agreement in an effort to harmonize and give effect to all provisions of the contract so that none will be rendered meaningless. *MCI Telecomms. Corp. v. Tex. Utils. Elec. Co.,* 995 S.W.2d 647, 652 (Tex.1999). Whether a contract is ambiguous is a question of law for the court. *Heritage Res., Inc. v. NationsBank,* 939 S.W.2d 118, 121 (Tex.1996). A contract is ambiguous when its meaning is  **\*862**  uncertain and doubtful or is reasonably susceptible to more than one interpretation. *Id.* However, when a written contract is worded such that it can be given a certain or definite legal meaning or interpretation, it is unambiguous, and the court construes it as a matter of law. *Am. Mfrs. Mut. Ins. Co. v. Schaefer,* 124 S.W.3d 154, 157 (Tex.2003).

### III. ISSUES AND ANALYSIS

#### A. Does this court lack mandamus jurisdiction because the trial court did not deny a motion to compel arbitration?

 [10]    Shasha first argues that this court lacks jurisdiction to consider Aspen's mandamus petition because the trial court allegedly did not deny Aspen's application to compel arbitration. According to Shasha, Aspen moved to compel arbitration under either the 2001 Agreement or the 2006 Agreement, and the trial court granted this request by compelling arbitration under the 2001 Agreement. Though Aspen based its motion to compel on both agreements, in response to Shasha's motion for reconsideration and clarification, Aspen relied on the 2006 Agreement and requested the trial court to order arbitration of Shasha's claims in Boston, before a panel of three arbitrators pursuant to the Commercial Rules. The trial court refused to do so, and instead, it ordered the parties to arbitrate the claims in Houston, with a single arbitrator under the 2001 Agreement. Mandamus relief is available if a trial court abuses its

discretion by erroneously denying a party its contracted-for arbitration rights under the Federal Act. *See In re D. Wilson Const. Co.,* 196 S.W.3d 774, 780–81. Impliedly finding that the arbitration clause in the 2006 Agreement is illusory and substantively unconscionable, the trial court denied Aspen its contracted-for arbitration rights under the 2006 Agreement, which is governed by the Federal Act. Therefore, this court has mandamus jurisdiction to consider whether the trial court clearly abused its discretion in so ruling. *See In re D. Wilson Const. Co.,* 196 S.W.3d 774, 780–81.

#### B. Did the trial court err by concluding that the arbitration clause in the 2006 Agreement is illusory?

 [11]    [12]    Shasha asserted in the trial court that the arbitration clause in the 2006 Agreement is illusory because Aspen allegedly retains a unilateral, unrestricted right to terminate this arbitration agreement. If one party to an arbitration agreement retains such a right, then the arbitration agreement is illusory and unenforceable. *See In re Palm Harbor Homes, Inc.,* 195 S.W.3d 672, 677 (Tex.2006). Shasha asserts that Aspen retains a unilateral, unrestricted right to terminate the arbitration provision in the 2006 Agreement based on the following language in that agreement:

> The incentive compensation plan administrator (Vice President of Worldwide Sales Operations) is responsible for the interpretation of the plan. If the meaning or interpretation of the plan wording requires clarification after consideration of all the facts, the Senior Vice President, Worldwide Sales and Business Development (SVP Sales) or his/her designee(s), if any [,] will issue a written ruling, which will be final. In addition, the SVP Sales will be responsible for the periodic review of the plan *and may make revisions from time to time.*

(emphasis added). The title of the 2006 Agreement is "Aspen Technology, Inc. FY 2006 Incentive Compensation Plan Global Account Manager (GAM)." In the 2006 Agreement, there is no definition of the term "plan." Shasha asserts that, under  **\*863**  the above language, the SVP Sales may make revisions to the 2006 Agreement from time to time. Presuming that the above language refers to the 2006

Agreement as "the plan," and presuming that the SVP Sales may review the 2006 Agreement and make revisions from time to time, this is not equivalent to stating that the SVP Sales has a unilateral, unrestricted right to terminate the arbitration provision in the 2006 Agreement. Under the 2006 Agreement, "[a]ny additional terms or conditions, or verbal or written agreements between [Shasha] and [Aspen] will not apply unless explicitly agreed to and approved in a signed writing by both the SVP Sales and [Shasha]."

We conclude that, under the unambiguous language of the 2006 Agreement, Aspen does not retain a unilateral, unrestricted right to modify or terminate the arbitration provision in that agreement; therefore, that arbitration provision, as a matter of law, is not illusory. *See In re Dillard Dept. Stores, Inc.,* 186 S.W.3d 514, 516 (Tex.2006) (holding that arbitration agreement did not give employer unilateral, unrestricted right to modify the arbitration agreement). The cases on which Shasha relies are not on point. *See J.M. Davidson, Inc. v. Webster,* 128 S.W.3d 223, 228–30 (Tex.2003) (concluding that it was unclear whether employer retained unilateral right to terminate arbitration agreement without notice in case in which agreement stated that the employer "reserves the right to unilaterally abolish or modify any personnel policy without prior notice"); *In re C & H News Co.,* 133 S.W.3d 642, 646 (Tex.App.-Corpus Christi 2003, orig. proceeding) (concluding agreement was illusory because it contained provision giving employer the ability to modify or delete provisions as the employer deems appropriate, with or without prior notification to employees); *Tenet Healthcare Ltd. v. Cooper,* 960 S.W.2d 386, 386–88 (Tex.App.-Houston [14th Dist.] 1998, pet. dism'd w.o.j.) (holding arbitration agreement contained in employee handbook was not supported by consideration, in case in which handbook stated that (1) it was not intended to constitute a legal contract with any employee because that could only occur with a written agreement executed by a facility executive director and (2) the employer reserved the right to amend or rescind any provision of the handbook as it deemed appropriate in its sole and absolute discretion). Therefore, the trial court clearly abused its discretion to the extent it concluded that the arbitration clause in the 2006 Agreement is illusory.

## C. Did the trial court err by concluding that the arbitration clause in the 2006 Agreement is substantively unconscionable?

**[13]    [14]**    Shasha asserted in the trial court that the arbitration clause in the 2006 Agreement imposes such exorbitant costs on him that it is substantively unconscionable. Under certain circumstances, arbitration costs could be so high that they preclude a litigant from effectively vindicating his rights through arbitration. *See Green Tree Fin. Corp. v. Randolph,* 531 U.S. 79, 90–92, 121 S.Ct. 513, 522–23, 148 L.Ed.2d 373 (2000). A party seeking to invalidate an arbitration agreement on the ground that arbitration would be prohibitively expensive bears the burden of providing specific evidence showing a likelihood that he would incur excessive arbitration costs. *See Green Tree Fin. Corp.,* 531 U.S. at 90–92, 121 S.Ct. at 522–23; *In re U.S. Home Corp.,* 236 S.W.3d 761, 764 (Tex.2007); *In re FirstMerit Bank, N.A.,* 52 S.W.3d 749, 756 (Tex.2001); *TMI, Inc. v. Brooks,* 225 S.W.3d 783, 796 (Tex.App.-Houston [14th Dist.] 2007, pet. denied).

 **\*864**  The 2006 Agreement is silent as to arbitration costs. In the trial court Shasha offered an affidavit from one of his lawyers. In this affidavit, Shasha's counsel testifies, in pertinent part, to the following:

- Based on his personal knowledge of the Commercial Rules and the AAA employment arbitration rules ("Employment Rules"), claims arbitrated under the Commercial Rules are significantly more costly to the employee/claimant than claims arbitrated under the Employment Rules. This is because under the Employment Rules, the employee/claimant is only responsible for a filing fee of $50–150; whereas under the Commercial Rules, the employee/claimant is responsible for the filing fee, the case service fee, and one-half of all the arbitrator fees unless the arbitration agreement states otherwise.

- The AAA's filing fee for this case would be $4,250, and the AAA case service fee would be $1,750. The AAA administration fee would be $325. Although arbitrator fees vary for each arbitrator, a "median estimate" is $305.50 per hour for each arbitrator based on ten arbitrator resumes for the Boston area from the AAA website. A conservative estimate of total arbitrator fees based on four days of work per arbitrator is $24,000 (32 hours x $250/hour per arbitrator).

- Shasha's air fare and hotel costs for an arbitration in Boston would be at least $2,700.

Presuming that arbitrations under the Commercial Rules are significantly more costly than arbitrations under the Employment Rules, this testimony alone does not provide

specific evidence as to Shasha's likely costs to arbitrate under the 2006 Agreement. Though Shasha's counsel provides projected fees for filing with the AAA, AAA case service, and AAA administration, this projection is based on the premise that the AAA would administer the arbitration.[2] However, the arbitration provision in the 2006 Agreement does not require that the AAA conduct or administer the arbitration; rather the provision states that arbitration shall be "in accordance with the [Commercial Rules]." Under this language, the AAA may administer the arbitration, but the parties are not required to have the arbitration administered by the AAA. *See TMI, Inc.,* 225 S.W.3d at 797. Although the party seeking to compel arbitration in *TMI, Inc.* presented evidence that arbitration under the same arbitration provision was available by a non-AAA arbitrator at a cost significantly lower that the costs of a AAA arbitration, such proof is not necessary for Shasha to be required to make a factual showing that the AAA would administer the arbitration. *See Green Tree Fin. Corp.,* 531 U.S. at 90 n. 6, 121 S.Ct. at 522 n. 6 (concluding that party asserting substantive unconscionability could not carry her burden of proof based on AAA fees unless she, made a factual showing, among other things, that the AAA would administer the arbitration).

As to arbitrator fees, again, Shasha's projected fees appear to be based on fees charged by AAA arbitrators. In addition, Shasha's counsel testifies that, under the Commercial Rules, absent agreement by the parties, Shasha must pay half of the arbitrator fees. However, under the Commercial Rules attached to counsel's affidavit, the arbitration panel in its final award **\*865** shall apportion the arbitration fees, expenses, and compensation among the parties in such amounts as the panel determines is appropriate.

We conclude that the evidence is legally insufficient to support the trial court's implied finding that Shasha satisfied his burden of providing specific evidence showing a likelihood that he would be denied access to arbitration based on excessive arbitration costs. *See Green Tree Fin. Corp.,* 531 U.S. at 90–92, 121 S.Ct. at 522–23; *In re U.S. Home Corp.,* 236 S.W.3d at 764; *In re FirstMerit Bank, N.A.,* 52 S.W.3d at 756–57; *TMI, Inc.,* 225 S.W.3d at 796. On the record before it, the only finding the trial court could have made was that Shasha did not satisfy this burden. By impliedly ruling to the contrary, the trial court clearly abused its discretion.

In addition, even presuming that the AAA would administer the arbitration and that the arbitration costs and fees would be allocated equally by the arbitration panel, Shasha's counsel

projected aggregate costs and fees of $30,325, which would make Shasha's portion $15,162.50. Presuming that the extra expense of traveling to Boston for the arbitration is $2,700 (the figure stated in the affidavit of Shasha's counsel) the total financial burden on Shasha would be $17,862.50. However, Shasha is asserting a claim of between $300,000 and $500,000, and Shasha's base salary, without commissions, when he entered into the 2006 Agreement was $120,000. Though Shasha provided his own affidavit, in which he states that the costs of pursuing his claim through arbitration in Boston under the 2006 Agreement would be extraordinary, oppressive, unaffordable, and would deprive him of the opportunity to litigate his claim, these conclusory statements are legally insufficient. *See, e.g., Green Tree Fin. Corp.,* 531 U.S. at 90 n. 6, 121 S.Ct. at 522 n. 6 (concluding that party's unsupported statement that she did not have the resources to pay the high costs of arbitration was insufficient). Shasha does state that he is currently paying for the university studies of his three children and that since he stopped working at Aspen he has been unable to find "equivalent fixed income work." However, we determine substantive unconscionability based on the circumstances existing when the parties entered into the contract in October 2005, and Shasha provided no evidence as to his finances or ability to pay $17,862.50 at this time.[3] *See In re FirstMerit Bank, N.A.,* 52 S.W.3d at 757.

Under the applicable standard of review, we conclude that the trial court clearly abused its discretion by impliedly ruling that the arbitration clause in the 2006 Agreement is substantively unconscionable.[4]

## IV. CONCLUSION

The Federal Act governs the arbitration clause in the 2006 Agreement. Therefore, this court has mandamus jurisdiction to consider whether the trial court erred in denying Aspen its contracted-for arbitration rights under the 2006 Agreement. The trial court clearly abused its discretion (1) by impliedly finding that the arbitration **\*866** clause in the 2006 Agreement is illusory; (2) by impliedly finding that the clause is substantively unconscionable; and (3) by refusing to order the parties to arbitrate the claims under the 2006 Agreement. Accordingly, we conditionally grant a writ of mandamus directing the trial court to vacate its orders compelling arbitration under the 2001 Agreement and to issue an order (1) compelling arbitration under the 2006 Agreement before a three-arbitrator panel in Boston, Massachusetts, in accordance with the Commercial Rules and (2) staying

the proceedings in the trial court pending completion of arbitration. We are confident the respected trial judge will comply with this opinion. Only in the unlikely event she fails to do so will the writ issue. Because we have granted this mandamus relief, we dismiss Aspen's interlocutory appeal as moot.

## Footnotes

1    In 1992, addressing whether a party is entitled to mandamus relief for wrongful denial of its arbitration rights under an agreement subject to the Federal Act, the Texas Supreme Court concluded that the Texas Act does not provide such a party the ability to assert an interlocutory appeal. *See Jack B. Anglin, Inc. v. Tipps,* 842 S.W.2d 266, 272–73 (Tex.1992). In 2006, the Texas Supreme Court decided that such a party can file an interlocutory appeal of the trial court's denial of a motion to compel arbitration under an agreement governed by the Federal Act. *See In re D. Wilson Const. Co.,* 196 S.W.3d 774, 778–80 (Tex.2006). It might appear that Aspen is not entitled to mandamus relief in this case because the Federal Act governs the Agreement and, under *In re D. Wilson Const. Co.,* Aspen has an adequate remedy at law by interlocutory appeal. *See id.* However, the Texas Supreme Court reaffirmed in *In re D. Wilson Const. Co.* that mandamus relief remains available when a party is erroneously denied its contracted-for arbitration rights under the Federal Act. *See In re D. Wilson Const. Co.,* 196 S.W.3d at 780–81. Therefore, we conclude that mandamus relief is still potentially available to Aspen.

2    Shasha's counsel attaches a copy of the Commercial Rules and the fee schedule for arbitrations conducted by the AAA, but the AAA fee schedule is not part of the Commercial Rules.

3    In any event, Shasha did not provide specific evidence in his affidavit that would prove his present ability to pay this amount.

4    Shasha relies on *In re Luna,* 175 S.W.3d 315, 319 (Tex.App.-Houston [1st Dist.] 2004, orig. proceeding [mand. pending] ). We are not bound by *In re Luna,* and, in any event, in that case, there was evidence establishing that arbitration would force the former employee to pay fees that amounted to one-half of his annual compensation. *See In re Luna,* 175 S.W.3d 315, 321 (Tex.App.-Houston [1st Dist.] 2004, orig. proceeding [mand. pending] ). Therefore, *In re Luna* is not on point.

© 2014 Thomson Reuters. No claim to original U.S. Government Works.

2011 WL 3849487
Only the Westlaw citation is currently available.

SEE TX R RAP RULE 47.2 FOR
DESIGNATION AND SIGNING OF OPINIONS.

**MEMORANDUM OPINION**
Court of Appeals of Texas,
San Antonio.

ASPRI INVESTMENTS, LLC, Appellant
v.
Maryam Begum AFEEF and
ENM Food Mart, Inc., Appellees.

No. 04–10–00573–CV.   |   Aug. 31,
2011.   |   Rehearing Overruled Oct. 27, 2011.

From the 73rd Judicial District Court, Bexar County, Texas,
Trial Court No. 2010–CI–03099; Solomon Casseb, III, Judge
Presiding.

**Attorneys and Law Firms**

Lori D. Massey, Samuel V. Houston, III, Ford & Massey,
P.C., San Antonio, TX, for Appellant.

George H. Spencer, Jr., Clemens & Spencer, P.C., San
Antonio, TX, for Appellees.

Sitting: PHYLIS J. SPEEDLIN, Justice, REBECCA
SIMMONS, Justice, STEVEN C. HILBIG, Justice.

**MEMORANDUM OPINION**

STEVEN C. HILBIG, Justice.

 **\*1**  Aspri Investments, LLC appeals the trial court's
judgment confirming an arbitration award in favor of Maryam
Begum Afeef and ENM Food Mart, Inc. We affirm.

**FACTUAL AND PROCEDURAL BACKGROUND**

The underlying dispute arose out of a commercial property
lease entered into in February 2005 between Aspri
Investments, LLC ("Aspri") as lessor and Maryam Begum
Afeef and ENM Food Mart, Inc. (collectively "ENM") as

lessees. The leased property was used as a convenience store,
gas station, and car wash.

On October 3, 2006, ENM attempted to exercise an option
to purchase the property in accordance with the terms of the
lease. However, Aspri contended ENM was in default of the
lease, and on October 6, sent ENM a notice to vacate the
premises and terminating the lease. On October 10, 2006,
Aspri filed a demand for arbitration of its claim for forcible
detainer with the American Arbitration Association. A few
days later, Aspri filed a lawsuit in Bexar County District
Court against ENM, Mrs. Afeef, and her son and store
manager, Ahmed "Tony" Afeef. The petition and attached
affidavit asserted that ENM owed past-due rent and that
Aspri owned or had a security interest in the inventory and
equipment in the store. Aspri sought damages, a temporary
restraining order, and permanent injunction. The trial court
issued a temporary restraining order on October 17, 2006,
that prohibited ENM from removing anything from the store
and from interfering with Aspri's possession. ENM filed
counterclaims for tortious interference with contract and
business relationships, conversion, malicious prosecution,
and wrongful injunction. ENM also requested the court abate
the proceedings for arbitration of all issues relating to the
lease. However, ENM asserted that its tort claims against
Aspri did not relate to the terms of the lease and were not
subject to arbitration. In November 2006, the district court
issued a temporary injunction, set the case for final trial on
April 2, 2007, and abated the case for arbitration. [1] Soon after
the suit was filed, Aspri filed a landlord's lien for unpaid rent
pursuant to sections 54.021 and 54.022 of the Texas Property
Code.

The arbitrator issued an award in March 2007, finding that
Aspri had no right to terminate the leasehold and that the lease
termination, eviction, and restraining order were wrongful.
The arbitrator found that Aspri breached the lease and was
not owed any past rent, but that ENM's attempt to exercise
the option was faulty. The arbitrator found that ENM had not
demanded arbitration of claims for damages and that issue
was not before the tribunal.

After the arbitration award was filed in the trial court, ENM
filed a jury demand on its counterclaims and a motion for
continuance of the April 2, 2007 trial setting in order to
conduct discovery on its claims for damages. After a lengthy
discussion at the April 2, 2007 hearing, the trial court denied
the motion for continuance and ruled that it would render
final judgment based on the arbitration award. The trial court's

judgment was signed the same day. The judgment recited the court was confirming the arbitration award by: declaring that Aspri's termination of the lease and eviction of ENM were wrongful and ENM's attempt to exercise the option was ineffective; awarding possession of the premises to ENM; and denying ENM's counterclaims. Aspri appealed the judgment and posted a $25,000 supersedeas bond to suspend issuance of a writ of possession. ENM did not appeal. In February, 2008, this court affirmed the judgment. The Supreme Court denied review in August 2008.

**\*2** After the Supreme Court denied review, Aspri sent ENM a letter purporting to tender possession of the premises and demanding payment of rent. However, Aspri did not deliver keys to the property and did not tender a return of any of ENM's property, equipment, or inventory which it had seized. Additionally, another tenant was in possession of the premises and demanded $150,000 to vacate. When ENM objected to the purported tender, Aspri sent a letter again stating the lease was terminated for nonpayment of rent.

On October 27, 2008, ENM filed a demand for arbitration, alleging wrongful eviction, wrongful injunction, failure to tender possession in compliance with prior arbitration award and judgment, breach of contract, fraud, theft, conversion, and intentional infliction of emotional distress. ENM sought lost profits, damages for loss of business reputation, the value of property, equipment, and inventory seized, mental anguish damages, exemplary damages, attorney's fees, and release of the lien Aspri filed during the first arbitration. Aspri filed a counterclaim for $20,000 in past due rents and for a declaration of its rights and responsibilities under the April 2, 2007 judgment. In addition, Aspri asserted that ENM's claims were barred by res judicata, by the statute of limitations, and because they were compulsory counterclaims in the previous arbitration and court proceeding. Aspri did not assert ENM had waived its right to arbitration nor did it attempt to stay the arbitration via a court proceeding.

Arbitration was conducted in November 2009 before a panel of three arbitrators. The panel issued a unanimous 24 page decision, including 131 findings of fact and 43 conclusions of law, on February 12, 2010. The panel found in ENM's favor on all claims except the claims for mental anguish damages, and considered and rejected all of Aspri's defenses. The award gave ENM an option of restoring the lease plus damages or damages only, and ordered Aspri to release the lien. ENM subsequently opted to recover damages only.

ENM filed suit in district court, seeking confirmation of the award. Aspri answered and filed a motion to vacate, correct, or modify the award. The trial court held an evidentiary hearing and later signed a judgment confirming the award. The judgment, which includes interest to the date of the judgment and attorney's fees awarded by the arbitration panel, is for $1,713,011.69. Aspri appeals the judgment, complaining the trial court erred in confirming and not vacating the award because (1) ENM waived its right to arbitrate any claims arising from the 2006 lease termination and eviction; (2) all claims arising out of the 2006 lease termination and eviction are barred by res judicata; (3) the arbitration panel exceeded its powers; and (4) the panel manifestly disregarded the law and committed gross mistake.

## FEDERAL ARBITRATION ACT OR
## TEXAS GENERAL ARBITRATION ACT?

The parties' lease contained an agreement to arbitrate. The agreement does not specify whether the Federal Arbitration Act ("FAA") or the Texas General Arbitration Act ("TAA") would govern; however, the lease contains a choice of law clause, providing that the laws of the State of Texas governs enforcement of the lease.

**\*3** The TAA applies to written agreements to arbitrate unless the agreement is excluded from coverage by section 171.002 of the Act. Tex. Civ. Prac. & Rem.Code Ann. §§ 171.001, 171.002 (West 2011). Neither party contends their agreement is excluded from coverage under the TAA. However, ENM argues that Texas law regarding enforcement of the arbitration award is preempted by the Federal Arbitration Act. We disagree. For the FAA to preempt the TAA, the agreement must involve interstate commerce **and** "state law must refuse to enforce [the] arbitration agreement that the FAA would enforce, either because (1) the TAA has expressly exempted the agreement from coverage, or (2) the TAA has imposed an enforceability requirement not found in the FAA." *In re D. Wilson Constr. Co.,* 196 S.W.3d 774, 780 (Tex.2006) (citations omitted); *see Nafta Traders, Inc. v. Quinn,* 339 S.W.3d 84, 97–98 (Tex.2011), *petition for cert. filed,*—— U.S.L.W. —— (U.S. Aug. 11, 2011) (No. 11–1188). The FAA does not preempt all inconsistent state laws relating to arbitration; rather it only "preempts state-law impediments to arbitration agreements." *Nafta,* 339 S.W.3d at 100. The only argument made in this appeal against enforcement of the arbitration agreement is Aspri's argument that ENM waived its right to arbitrate these claims. However,

because Texas law on waiver of arbitration is consistent with federal law, there is no preemption. *See Perry Homes v. Cull,* 258 S.W.3d 580, 595 (Tex.2008), *cert. denied,* 555 U.S. 1103, 129 S.Ct. 952, 173 L.Ed.2d 116 (2009) (in order to keep state and federal arbitration law consistent, court holds proof of waiver in arbitration context requires showing of prejudice).

Because the TAA applies to the parties' arbitration agreement and its application is not preempted by federal law, we apply the TAA in our review of the trial court's judgment.

### STANDARD OF REVIEW

We review de novo the trial court's judgment confirming an arbitration award "while giving strong deference to the arbitrator with respect to issues properly left to the arbitrator's resolution." *Xtria L.L.C. v. Int'l Ins. Alliance Inc.,* 286 S.W.3d 583, 591 (Tex.App.-Texarkana 2009, pet. denied); *see Centex/Vestal v. Friendship W. Baptist Church,* 314 S.W.3d 677, 683 (Tex.App.-Dallas 2010, pet. denied); *GJR Mgmt. Holdings, L.P. v. Jack Rous, Ltd.,* 126 S.W.3d 257, 262 (Tex.App.-San Antonio 2003, pet. denied). Judicial review of arbitration awards is "extraordinarily narrow." *E. Tex. Salt Water Disposal Co. v. Werline,* 307 S.W.3d 267, 271 (Tex.2010). Courts are to indulge all reasonable presumptions in favor of the award, and neither an arbitrator's mistake of fact or error in applying substantive law is ground for vacating an award. *CVN Group, Inc. v. Delgado,* 95 S.W.3d 234, 238 (Tex.2002); *Centex/Vestal,* 314 S.W.3d at 683.

### WAIVER

In its first issue, Aspri contends the trial court erred by failing to vacate the arbitration award on the ground that ENM waived any right to arbitrate the underlying dispute. The trial court's rejection of this argument is a question of law we review de novo. *Perry Homes,* 258 S.W.3d at 598 & n. 102.

**\*4** There is a strong presumption against waiver of arbitration. *In re D. Wilson,* 196 S.W.3d at 783. The burden is on the party seeking to have claims heard in a court instead of in arbitration to prove it has been prejudiced by the other party's substantial invocation of the judicial process. *Perry Homes,* 258 S.W.3d at 593–94. Aspri argues ENM waived its right to arbitrate by filing its claims in the first suit, asserting the claims should not be arbitrated, and demanding a jury trial. Aspri contends ENM turned to arbitration only after suffering

an adverse result in the first suit, and to allow arbitration at this late date is inherently unfair.

Waiver, in the context of arbitration, "relates to inherent unfairness—that is, a party's attempt to have it both ways by switching between litigation and arbitration to its own advantage." *Id.* at 597. ENM argues that Aspri engaged in the same inherently unfair conduct it accuses ENM of, and should not be allowed to raise a waiver argument for the first time after the arbitration award was rendered. We agree with ENM.

Aspri acquiesced to ENM's demand for arbitration of its damage claims. Although Aspri pled and pursued various procedural and merits-based defenses in the arbitration, it did not assert that ENM had waived a right to arbitrate any of its claims and took no action to have the claims adjudicated in court instead of arbitration. Instead, Aspri waited until after the entire arbitration proceedings had concluded and an adverse award entered, before asserting a right to judicial determination of the claims and defenses based on ENM's waiver.

Aspri contends it could raise waiver for the first time in its motion to vacate the arbitration award. However, in each of the cases it relies upon, waiver was urged to the court *before* the arbitration, either in response to a motion to compel arbitration or in a motion to stay or enjoin arbitration. *See, e.g., Perry Homes,* 258 S.W.3d at 584–85; *Haddock v. Quinn,* 287 S.W.3d 158, 167–68 (Tex.App.-Fort Worth 2009, mandamus denied & pet. denied). Aspri has not cited any cases in which a party was allowed to remain silent on waiver throughout the arbitration and then obtain a vacatur of an unfavorable arbitration award, claiming the case should be tried because arbitration was waived. Rather, Aspri cites *Holcim (Tex.) Ltd. P'ship v. Humboldt Wedag, Inc.,* 211 S.W.3d 796, 803 (Tex.App.-Waco 2006, no pet.) for the contention that waiver is an "issue of arbitrability" that it may raise in a motion to vacate without having first sought a stay of the arbitration. In *Holcim,* the party sought to vacate an arbitration award on the ground there was no agreement to arbitrate. The court held the issue could be raised in a motion to vacate the arbitration award even though no motion to stay had been filed. 211 S.W.3d at 802–03. The holding was based on section 171.088(a)(4) of the TAA, which authorizes vacatur of an arbitration award if "there was no agreement to arbitrate," provided "the party did not participate in the arbitration hearing without raising the objection ." *Id.* at 803; TEX. CIV. PRAC. & REM.CODE ANN. § 171.088(a)(4) (West 2011). Because the party had filed a motion in the

arbitration proceeding, seeking to bar the claims on the basis there was no arbitration agreement, the issue could be asserted in the motion to vacate. *Holcim,* 211 S.W.3d at 803. In contrast, Aspri did not assert that ENM had waived its right to arbitration in any of the arbitration pleadings contained in the record or in its oral arguments to the arbitration panel. Aspri never sought to stay or enjoin the arbitration or otherwise move ENM's claims from the arbitration forum to a judicial forum. Thus, even if a waiver argument is within the scope of section 171.088(a)(4), which we do not decide, it would not apply in this case because Aspri participated in the arbitration hearing without raising the objection.

**\*5** In conclusion we hold that, although ENM's pursuit of its counterclaims in the 2006 litigation may have been a waiver of its right to arbitrate those claims, Aspri waived its right to assert waiver by acquiescing in the 2009 arbitration without complaining of ENM's waiver and without seeking to have the claims adjudicated in a judicial forum.

### RES JUDICATA

The April 2, 2007 judgment denied ENM's counterclaims for damages arising out of the 2006 lease termination, eviction, TRO, and injunction. ENM did not appeal the judgment and the judgment became final. In its second issue on appeal, Aspri argues the trial court erred by failing to vacate the 2010 arbitration award because most of ENM's claims are barred by res judicata. Aspri contends that res judicata was an issue for the district court to decide, not the arbitration panel, and that Aspri conclusively established its res judicata defense in the trial court. Alternatively, Aspri argues the trial court erred in denying the motion to vacate because the arbitrators committed a gross mistake by ignoring the res judicata effect of the 2007 judgment and because the award violates fundamental Texas policy regarding the finality of judgments.

### A. Is the res judicata effect of the 2007 judgment decided by the court or the arbitration panel?

As a general rule, res judicata is an affirmative defense for the arbitrator to decide. *W. Dow Hamm III Corp. v. Millennium Income Fund, L.L.C.,* 237 S.W.3d 745, 754 (Tex.App.-Houston [1st Dist.] 2007, orig. proceeding); *see Howsam v. Dean Witter Reynolds, Inc.,* 537 U.S. 79, 84–85, 123 S.Ct. 588, 154 L.Ed.2d 491 (2002) (holding that unless arbitration agreement provides otherwise, court determines

only matters of substantive arbitrability, such as whether dispute falls within scope of arbitration provision; arbitrator determines matters of procedural arbitrability—those that "grow out of the dispute and bear on its final disposition," such as delay, time limits, notice, laches, and estoppel). Some courts have recognized a limited exception to the rule when the prior judgment arose from a court proceeding, rather than an arbitration. *See W. Dow Hamm,* 237 S.W.3d at 755. "The rationale for the prior-court-judgment exception is that a court is inherently empowered to protect the integrity and finality of its own prior judgment, and this policy outweighs even the strong policy in favor of arbitration." *Id.* However, when the prior judgment was simply a confirmation of an arbitration award, rather than a result of an independent court adjudication, the same institutional concerns are not present, and the application of res judicata remains an issue for the arbitrator. *Id.* at 756.

The parties disagree as to whether the 2007 judgment against ENM on its counterclaims was simply a confirmation of the arbitration award or the result of an independent court adjudication. Aspri contends ENM's claims were not decided in the first arbitration and that the district court independently adjudicated them; [2] ENM contends the trial court did not adjudicate its claims and merely confirmed what it believed the arbitrator had awarded. To decide this issue, we review the 2007 arbitration award, the record of the subsequent hearing in the trial court, and the 2007 judgment.

**\*6** When the first arbitration occurred, ENM had pending in the trial court various claims arising out of the lease termination and eviction. However, ENM had asserted in its trial court pleadings a desire to try those claims and did not demand arbitration of the claims or present them in the arbitration. The March 2007 arbitration award included findings that the lease termination and eviction were wrongful, but with respect to any damages incurred by ENM, the award stated:

> The issue of [ENM's] damages for the wrongful termination has not been submitted by demand and payment of the appropriate fee to the American Arbitration Association. Therefore, that issue is not properly before this tribunal.

> ...

> This Award is in full settlement of all claims submitted to this Arbitration. All damages, claims, or other relief requested by Claimants or Respondents which are not

expressly granted or awarded herein, are hereby expressly denied.

At the subsequent April 2, 2007 hearing in the trial court, ENM contended that its counterclaims had not been submitted to arbitration and remained pending in the district court, and that it was entitled to a continuance to conduct discovery. Aspri took the position that the counterclaims were compulsory in the arbitration and that the arbitrator found ENM had waived them by not submitting any evidence. After reviewing the award and hearing argument, the trial court construed the award as disposing of the entire case and stated:

> The Court is going to enter judgment based on the arbitrator's ruling that there was no right to terminate the lease; that the eviction of the respondent by the TRO was wrongful; that the respondent failed to bring forth damages to the arbitration tribunal; therefore, there are no damages.... That's what the arbitrator ruled in my opinion.

The 2007 judgment recites the court is "enter[ing] and confirm[ing] the Award of the Arbitrator as follows:" There follows four numbered paragraphs, one of which awards ENM possession of the premises, but otherwise denies its counterclaims. The judgment concludes by stating, "This is a Final Judgment. All other claims presented in the arbitration are expressly denied."

Although we agree with Aspri that ENM's counterclaims were not submitted or decided in the first arbitration, we disagree that the trial court independently adjudicated them. It is apparent from the record of the 2007 confirmation hearing and the judgment itself that the trial court construed the 2007 arbitration award as denying ENM's counterclaims, and the trial court purported simply to be confirming the award. That the court may have misinterpreted the award does not mean it independently adjudicated ENM's claims. Accordingly, this case comes within the general rule that the res judicata defense was for the arbitration panel to decide. *See id.* at 756.

### B. The arbitration panel's res judicata decision

In rendering its decision on Aspri's res judicata defense, the arbitration panel appears to have examined at least some of the pleadings from the first arbitration and district court suit, the 2007 arbitration award, the judgment confirming

that award, and the opinion on appeal.[3] The panel found that Aspri filed the first arbitration demand as a forcible detainer action and that the only issue in that arbitration was possession. It found that ENM's claims for damages were not compulsory counterclaims in the first arbitration and the arbitrator did not consider or dispose of the claims. The panel found the first arbitration resulted in the March 2007 award that Aspri wrongfully terminated the lease and wrongfully evicted ENM by temporary restraining order, and that the award in favor of ENM was confirmed by the district court on April 2, 2007. In addition, the panel found that ENM's claims for damages related to the termination of the lease and wrongful eviction were not tried on the merits in the district court, and that all those claims were matters for arbitration pursuant to the parties' agreement. The panel concluded that because the district court did not conduct a hearing on the merits on ENM's damage claims and those claims were matters for arbitration, the district court did not have authority (or "jurisdiction") to dispose of the claims. The panel also concluded that the 2007 judgment confirming the arbitration award "did not address the damage claims the subject of this arbitration."Based on these findings and conclusions, the arbitration panel declined to hold that res judicata barred ENM from pursuing its claims in the second arbitration.

### C. Did the trial court err in denying the motion to vacate because the panel made a gross mistake in deciding res judicata?

**\*7** Aspri argues the trial court erred in confirming the award and denying its motion to vacate because the arbitration panel committed a gross mistake by rejecting its res judicata defense. Under the TAA, a court must confirm an arbitration award on the application of a party unless a statutory ground for vacating, modifying, or correcting the award under section 171.088 or 171.091 is shown. TEX. CIV. PRAC. & REM.CODE ANN. § 171.087 (West 2011). However, the Texas courts of appeals recognize some common law defenses as being cumulative of the statutory grounds for vacatur. *See Collins v. TexMall, L.P.,* 297 S.W.3d 409, 415 (Tex.App.–2009 Fort Worth, no pet.); *Werline v. E. Tex. Salt Water Disposal Co., Inc.,* 209 S.W.3d 888, 897–98 (Tex.App.-Texarkana 2006), *aff'd,*307 S.W.3d 267 (Tex.2010); *GJR,* 126 S.W.3d at 263;*but see E. Tex. Salt Water Disposal Co., Inc. v. Werline,* 307 S.W.3d 267, 282 n. 7 (Tex.2010) (noting that court of appeals held arbitration award could be set aside under common law for fraud, misconduct, or gross mistake, but "express[ing] no opinion on

this issue"); *Callahan & Assocs. v. Orangefield Indep. Sch. Dist.,* 92 S.W.3d 841, 844 (Tex.2002) ( "assuming without deciding" party could attack arbitration award on common law ground of gross mistake, failure to award any damages was not gross mistake). [4]

The trial court must indulge every reasonable presumption in favor of upholding an arbitration award. *CVN Group,* 95 S.W.3d at 238. An arbitrator's failure to correctly apply the law will not justify vacating an arbitration award. *Id.;Xtria,* 286 S.W.3d at 591. The common law ground of gross mistake "does not mean an egregious mistake of fact or law."*Xtria,* 286 S.W.3d at 598. To set aside an arbitration award on the ground of gross mistake, there must be more; the record must show bad faith or failure to exercise honest judgment on the part of an arbitrator. *See id.;Werline,* 209 S.W.3d at 898.

It is clear from the arbitration hearing record and the panel's lengthy written decision that it gave serious consideration to the parties' contentions, evidence, and arguments. The arbitration panel did not ignore Aspri's res judicata defense, but gave it serious consideration. Nothing in the record suggests the panel made its decision in bad faith or failed to exercise honest judgment. Moreover, although Aspri conclusorily urged the panel to bar ENM's claims on res judicata grounds in its pleading and argument, nothing in the record Aspri filed in the trial court shows that it provided the arbitrators relevant law on res judicata or substantive guidance on how to apply the law to the facts of this case. The trial court should not overturn an arbitration award rendered after honest consideration given to claims and defenses presented to it, no matter how erroneous. *See Xtria,* 286 S.W.3d at 598; *Werline,* 209 S.W.3d at 898. Accordingly, we hold the trial court did not err in denying the motion to vacate on this ground.

### D. Did the trial court err in denying the motion to vacate the award because the award violates public policy ?

**\*8** Aspri next argues the trial court should have vacated the arbitration award because it violates fundamental Texas public policy. In *CVN Group,* the Texas Supreme Court assumed, but did not decide, that a common law challenge to an arbitration award on the ground it violates public policy is not preempted by the TAA. 95 S.W.3d at 237–38. Subject to that assumption, the court held that "an arbitration award cannot be set aside on public policy grounds except in an extraordinary case in which the award clearly violates carefully articulated, fundamental policy."*CVN Group,* 95

S.W.3d at 239. Because of the strong policy in favor of enforcing arbitration awards, any claim that an award should be vacated for violating public policy "must be carefully scrutinized to protect the arbitration award from unwarranted judicial interference."*Id.* at 239.

To justify overturning an arbitration award on public policy grounds, the policy must be well-defined and dominant. *See id.* at 238–39 (citing *W.R. Grace & Co. v. Local Union 759,* 461 U.S. 757, 766, 103 S.Ct. 2177, 76 L.Ed.2d 298 (1983)). If the arbitrator "wholly disregard[s]" such a policy and makes an arbitration award "in direct contravention of the policy, the award might be set aside. *Id.* at 239.But when the facts are disputed and the issue is submitted to the arbitrator, "an arbitrator's mere disagreement with a judge" about the application of the law does not violate public policy. *Id.*

In *CVN,* the petitioner contended the arbitration award violated homestead protections found in the Texas Constitution. *Id.* The court agreed that the homestead is given special protection in the Texas Constitution and the Texas Property Code, and that an arbitration award that wholly contravened those protections would violate public policy. *Id.* The court also noted that an award based on a claim arising out of an illegal transaction would violate public policy. *Id.* at 237 (citing *Smith v. Gladney,* 128 Tex. 354, 98 S.W.2d 351, 351 (1936)); *see also Symetra Nat'l Life Ins. Co. v. Rapid Settlements, Ltd.,* No. 14–07–00880–CV, 2009 WL 1057339, at \*3 (Tex.App.-Houston [14th Dist.] Apr. 21, 2009, no pet.)(mem.op.) (vacating arbitration award that required transfer of structured settlement payment without court approval, in direct contravention of Texas Structured Settlement Protection Act); *Lee v. Daniels & Daniels,* 264 S.W.3d 273, 279–81 (Tex.App.-San Antonio 2008, pet. denied) (vacating award enforcing provision in attorney services contract that allowed recovery of fee prohibited by Texas Disciplinary Rules of Professional Conduct); *Lee v. El Paso County,* 965 S.W.2d 668, 673 (Tex.App.-El Paso 1998, pet. denied) (affirming trial court's order vacating arbitration award that directly conflicted with Texas constitutional provision that prohibits granting extra compensation for services already rendered).

We recognize that the common law doctrine of res judicata is rooted in public policies favoring the finality of judgments and disfavoring seriatim litigation. *See Frost Nat'l Bank v. Fernandez,* 315 S.W.3d 494, 510 (Tex.2010), *cert. denied,*—— U.S. ——, 131 S.Ct. 1017, 178 L.Ed.2d 829 (2011); *Hallco Texas, Inc. v. McMullen County,* 221 S.W.3d

50, 60 (Tex.2006). Although res judicata is public policy in the sense that it is well-defined, it "must at times be weighed against competing interests and other public policy, and must, on occasion, yield to other policies." *Sullivan v. State,* 572 S.W.2d 778, 784 (Tex.Civ.App.-El Paso 1978, writ ref'd n.r.e.).

**\*9** We do not believe that under the circumstances of this case the common law policy of res judicata dominates over Texas policy enacted into law in the TAA in favor of enforcing agreements to arbitrate disputes and enforcing arbitration awards except in extraordinarily narrow circumstances. The arbitration award does not arise out of an illegal transaction and does not award anything or require any act that violates the Texas Constitution or any legislative enactment. The decision of what res judicata effect to give the prior confirmed arbitration award was a matter of procedural arbitrability that was committed to the arbitration panel for decision. *See W. Dow Hamm,* 237 S.W.3d at 755–56. Under these circumstances, we will not hold that the award, made after the arbitration panel gave due consideration to the res judicata defense, violates public policy merely because this court may disagree with how the panel applied the law.

### DID THE ARBITRATION PANEL EXCEED ITS POWERS?

In its next issue, Aspri argues the trial court erred in denying its motion to vacate the award pursuant to section 171.088(a)(3)(A) of the TAA because the arbitration panel exceeded its powers. Aspri contends the arbitration panel exceeded its powers by arbitrating issues not related to the lease and beyond the scope of the arbitration agreement.

The scope of the arbitration is a matter of substantive arbitrability for a court to decide unless the parties clearly agreed otherwise. *See Howsam,* 537 U.S. at 84; *Burlington Res. Oil & Gas Co. LP v. San Juan Basin Royalty Trust,* 249 S.W.3d 34, 39 (Tex.App.-Houston [1st Dist.] 2007, pet. denied). Here, the lease's arbitration provision requires all controversies and claims arising out of or relating to the lease or its breach to be arbitrated in accordance with the rules of the American Arbitration Association. Those rules, which were introduced into evidence at the confirmation hearing in the trial court, provide that the arbitrator "shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope or validity of the arbitration agreement." Most courts have concluded that where the parties' agreement did not limit the issues to be arbitrated or the applicability of the AAA rules, incorporation of the AAA rules constitutes clear and unmistakable evidence of the parties' intent to delegate issues of arbitrability to the arbitrator. *See Haddock,* 287 S.W.3d at 172–73 (discussing cases); *Burlington,* 249 S.W.3d at 40–42 (same). We conclude the parties agreed to submit arbitrability issues to the arbitrators.

Because the arbitration panel had the primary power to decide the scope of arbitration, the court's standard for reviewing the panel's decision on that matter is the same as the standard used in reviewing the panel's decision on substantive matters. *First Options of Chicago, Inc. v. Kaplan,* 514 U.S. 938, 943, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995). That is, the trial court reviews the panel's determination with great deference, indulging all reasonable presumptions in favor of the panel's decision. *See CVN Group,* 95 S.W.3d at 238; *Roe v. Ladymon,* 318 S.W.3d 502, 511 (Tex. App–Dallas 2010, no pet.). Any doubts concerning the scope of what is arbitrable should be resolved in favor of arbitration. *Centex/Vestal,* 314 S.W.3d at 684.

**\*10** The scope of the arbitration panel's authority begins with the arbitration agreement, in which Aspri and ENM agreed the lease was subject to arbitration and that any "controversy or claim arising out of or relating to this agreement or the breach of this agreement" would be settled by arbitration. The agreement is very broad, encompasses a wide range of disputes, and the language used is construed "as evidencing the parties' intent to be inclusive rather than exclusive." *See Centex/Vestal,* 314 S.W.3d at 685. Moreover, the parties may, by their oral and written submissions to the arbitrator, broaden the scope of the arbitrators' authority. In this case, at the end of the arbitration, after all the evidence had been presented, one of Aspri's attorneys emphatically asked the panel to decide all of the issues between the parties:

> These parties need a ruling on all the issues, and I think this panel has the power to do that. And we are asking the panel to render all relief that's possibly due at law or in equity so that all the issues between the parties are resolved.

Finally, it is evident from the award that the parties made written submissions to the panel that were not included in the record filed in the trial court. We presume the omitted portions of the record support the award. *See In re Chestnut*

*Energy Partners, Inc.,* 300 S.W.3d 386, 401 (Tex.App.-Dallas 2009, pet. denied).

Aspri contends the arbitration panel exceeded its powers by awarding damages related to a lien that arose from a note to a third party, awarding an "offset" for amounts unrelated to the lease, and by "entertaining claims of Tony Afeef—a nonparty—and treating him as if he was owner of ENM."The panel awarded damages for loss of business reputation and lost profits caused in part by Aspri's wrongful filing and failure to remove a lien. Aspri asserts this issue is unrelated to the lease and adjudicates the rights of third parties. Aspri contends the lien arose out of a note ENM gave to a third party in 2005, when ENM assumed the lease. As part of the transaction, ENM signed a note and granted a security interest to the third party. The note and security interest were later assigned to Aspri. Aspri argues the arbitrators exceeded their powers by awarding damages "resulting from the filing of a lien for the debt owed under the ... note."Regardless of the actual legal basis for any lien, Aspri filed a landlord's lien in the real property records during the first arbitration pursuant to sections 54.021 and 54.022 of the Texas Property Code. The lien statement asserted that ENM owed Aspri past-due rent and attorney's fees totaling over $40,000. During the presentation of evidence, one of the arbitrators stated that the lien should have "gone away" if the eviction was wrongful and ENM did not owe rent. Aspri's attorney responded, "I completely agree." The panel found that Aspri did not remove or release the lien after the 2007 arbitration award declared that ENM did not owe Aspri any rent or attorney's fees, and that such failure to act was wrongful and was intended to harm ENM.

 **\*11**  Aspri also contends that approximately $160,000 of the arbitration award was for amounts unrelated to the lease or its breach. The panel found as a matter of fact that when Aspri terminated the lease in 2006, Aspri owed ENM $116,119.61 "related to the Business and this Lease"; that Aspri had agreed to offset this amount against rents owed under the lease and/or the purchase price pursuant to the lease's purchase option; that Aspri did not dispute the amount of the offset; and that, as of the date of the award, Aspri had not paid any of this amount to ENM or offset it against any amounts Aspri claimed was due it. Aspri does not directly challenge any of the arbitration panel's findings of fact in its briefs, and at oral argument of this appeal, Aspri's attorney stated it was not contesting any of the findings of fact. The arbitration panel could rationally have concluded that both these matters arose out of or were related to the lease or its breach, and

Aspri failed to show the trial court erred by not deferring to the arbitration panel's determinations that these matters were issues the parties agreed to arbitrate.

Lastly, Aspri contends the arbitrators determined Tony Afeef's individual rights and obligations and adjudicated his individual tort claims. [5] The arbitration award does not adjudicate any causes of action by or against Tony Afeef, individually, nor does it award any sum of money to him. Aspri suggests that the $50,000 punitive damage award was based solely on torts committed against Afeef. We disagree. Although the panel found that Aspri intentionally inflicted emotional distress against Maryam Begum Afeef and "the corporate representative" Tony Afeef, it found that damages had not been proven and none were awarded. The panel's award of exemplary damages is supported by its unchallenged findings and conclusions that Aspri committed theft and conversion and that ENM proved fraud by clear and convincing evidence.

We conclude that Aspri has not shown grounds for the trial court to do anything other than defer to the arbitration panel's determinations about the scope of the arbitration, and we hold the trial court did not err in failing to vacate on the ground the arbitrators exceeded their powers.

### DID THE ARBITRATION PANEL COMMIT GROSS MISTAKE?

In its final issue, Aspri argues the trial court erred by not vacating the award for gross mistake. Aspri challenges the competence and sufficiency of the evidence supporting the damage awards and concludes "the panel obviously sought to punish Mr. Virani" (Aspri's agent).

As discussed above, a party challenging an arbitration award on the ground of gross mistake has the burden of demonstrating the arbitrators acted in bad faith or failed to exercise honest judgment. *Xtria,* 286 S.W.3d at 598; *Werline,* 209 S.W.3d at 898; *Pheng Inv., Inc. v. Rodriquez,* 196 S.W.3d 322, 330–31 (Tex.App.Fort Worth 2006, no pet.)."Gross mistake results in a decision that is arbitrary and capricious;" whereas "a judgment rendered after honest consideration given to conflicting claims, no matter how erroneous, is not arbitrary or capricious."*Xtria* at 598.An arbitrator's decision is arbitrary and capricious if it is the product of "willful and unreasoning action, action without consideration and in disregard of the facts and circumstances of the case."*Grand*

*Int'l Bhd. Of Locomotive Eng'rs v. Wilson,* 341 S.W.2d 206, 211 (Tex.Civ.App.-Fort Worth 1960, writ ref'd n.r.e.).

**\*12** The arbitration panel's extensive findings of fact set forth in detail the evidence it relied upon and the qualifications of the witnesses whose testimony it relied on, and explains how it arrived at its conclusions. The reporter's record of the arbitration and panel's written decision evidence an attempt to ascertain disputed facts and to justly decide the claims and defenses presented in a fair hearing. *See Pheng,* 196 S.W.3d at 330–31. That Aspri may disagree with the panel's credibility determinations or the weight to be given to particular evidence does not render the panel's decision arbitrary and capricious, evidence bad faith, or show a failure to exercise honest judgment. Aspri's arguments amount to nothing more than challenges to the legal and factual sufficiency of the evidence and alleged errors in the application of the substantive law, which we have no power to review. *See id.;Crossmark, Inc. v. Hazar,* 124 S.W.3d 422, 435 (Tex.App.-Dallas 2004, pet. denied); *J.J. Gregory Gourmet Servs., Inc. v. Anton's Imp. Co.,* 927 S.W.2d 31, 35 (Tex.App.-Houston [1st Dist.] 1995, no writ). Aspri has not pointed to anything other than the result as evidence of bad faith or bad motive. It did not establish gross mistake and the trial court therefore did not err in denying the motion to vacate on that ground.

For these reasons, we affirm the trial court's judgment.

Footnotes

1   The trial court's 2006 order abating the case for arbitration is not in the record.

2   Aspri took the opposite position in the 2007 hearing on confirmation of the award, convincing the trial court that the arbitrator had denied ENM's counterclaims on the merits for failure to present evidence of damages.

3   Aspri filed an incomplete record of the arbitration in the trial court. Although a reporter's record of the testimony and oral arguments presented at the arbitration was filed, no exhibit volume was filed in the trial court and only some of the arbitration pleadings were filed. The reporter's record of the arbitration includes an exhibit list. However, the list does not specifically identify each document admitted before the panel. Some of the descriptions are generic, e.g., "judgment," "claim summary," and others reflect exhibits were admitted in clusters, e.g., "Notices and approvals," "Previous Arbitration: # 70115E68506 Certified Copy of AAA Documents,""District court Bexar County Court Orders."Aspri filed numerous documents and pleadings as exhibits to its pleadings in the trial court and at the confirmation hearing. However, it did not establish which of these were before the arbitration panel. Nor did Aspri identify what additional, unfiled, documents and pleadings were before the arbitration panel.

4   ENM briefly questions whether the arbitration award is subject to challenge on common law grounds following the United States Supreme Court decision in *Hall St. Assocs., LLC. v. Mattel, Inc.,* 552 U.S. 576, 128 S.Ct. 1396, 170 L.Ed.2d 254 (2008) (holding parties could not by agreement expand statutory grounds for judicial review of arbitration award under FAA). However, ENM did not provide any argument on this issue. Moreover, the *Hall Street* opinion itself states that the Court was "deciding nothing about other possible avenues for judicial enforcement of arbitration awards" such as "enforcement under state statutory or common law."552 U.S. at 590;*see also Nafta Traders,* 339 S.W.3d at 91–101 (extensively discussing *Hall Street* opinion and declining to apply its principal holding to case under the TAA). We therefore decline to hold that *Hall Street* forecloses Aspri's common law challenge to the award.

5   Tony Afeef is the son of Maryam Afeef, ENM's owner. Tony Afeef was the manager of ENM's store and had responsibility for its day-to-day operations. In addition, he acted as ENM's corporate representative throughout the proceedings.

**End of Document**
© 2014 Thomson Reuters. No claim to original U.S. Government Works.

249 S.W.3d 34
Court of Appeals of Texas,
Houston (1st Dist.).

BURLINGTON RESOURCES OIL
& GAS COMPANY LP, Appellant,
v.
SAN JUAN BASIN ROYALTY TRUST, Appellee.

No. 01–06–00485–CV.  |  Aug. 16, 2007.

**Synopsis**
**Background:** Operator of oil and gas properties filed application to vacate or modify arbitrator's award to holder of net overriding royalty interest. Holder filed counterclaim for confirmation of award. The 281st District Court, Harris County, David J. Bernal, J., confirmed the award. Operator appealed.

**Holdings:** The Court of Appeals, Terry Jennings, J., held that:

[1] parties did not clearly and unmistakably submit the issue of arbitrability to arbitration, and

[2] parties did not agree to arbitrate holder's claim for share of settlement with third-party gas company.

Reversed and rendered in part; remanded in part.

West Headnotes (8)

**[1]    Alternative Dispute Resolution**



Evidence

When courts decide whether a party has agreed that arbitrators should decide arbitrability, courts should not assume that the parties agreed to arbitrate arbitrability unless there is clear and unmistakable evidence that they did so.

12 Cases that cite this headnote

**[2]    Alternative Dispute Resolution**



of Dispute

Arbitrability

Operator of oil and gas properties, and holder of net overriding royalty interest, in their agreement to arbitrate their audit disputes, did not clearly and unmistakably submit the issue of arbitrability to arbitration, though arbitration agreement stated that arbitration would be conducted in accordance with Commercial Arbitration Rules of American Arbitration Association (AAA), and those Rules provided that arbitrator had power to rule on his or her own jurisdiction, including objections with respect to scope of arbitration agreement; arbitration agreement also stated that terms of arbitration agreement would control in event of any conflict with such Rules, and arbitration agreement stated that audit exceptions identified in attached exhibit were the only items that would be subjected to arbitration.

11 Cases that cite this headnote

**[3]    Alternative Dispute Resolution**



of Dispute

Arbitrability

In determining whether arbitration agreement provides clear and unmistakable language delegating to arbitrators the power to decide arbitrability, Texas courts consider specific language of arbitration agreement and also apply general principles of Texas contract law governing formation of contracts.

9 Cases that cite this headnote

**[4]    Alternative Dispute Resolution**



Disputes

and Matters Arbitrable Under Agreement

Operator of oil and gas properties, and holder of net overriding royalty interest, in their agreement to arbitrate their audit disputes, agreed to arbitrate only holder's complaint that its gross proceeds were understated due to excess royalties charged against it for its share of settlement of other royalty interest holders' claim

for royalty payments on portion of operator's settlement with third-party gas company, which portion of settlement the operator had originally allocated to non-royalty-bearing take-or-pay claims, and its complaint that it was owed interest on the understated gross proceeds, which disputes were identified in arbitration agreement as involving stated "arbitrate amount" of $374,978; operator and holder did not agree to arbitrate holder's claim for share of settlement with third-party gas company, which dispute involved over $6 million.

1 Cases that cite this headnote

**[5]** **Alternative Dispute Resolution**



Favored; Public Policy

There is strong presumption under the Federal Arbitration Act (FAA) of favoring arbitration. 9 U.S.C.A. § 1 et seq.

Cases that cite this headnote

**[6]** **Alternative Dispute Resolution**



in Favor of Arbitration

Any doubt as to whether a party's claim falls within the scope of an arbitration agreement must be resolved in favor of arbitration.

1 Cases that cite this headnote

**[7]** **Alternative Dispute Resolution**



in Favor of Arbitration

A court should not deny arbitration unless it can be said with positive assurance that an arbitration clause is not susceptible to an interpretation that would cover the dispute at issue.

Cases that cite this headnote

**[8]** **Alternative Dispute Resolution**



Construction

in Favor of Arbitration

The policy that favors resolving doubts in favor of arbitration cannot serve to stretch an arbitration clause beyond the scope intended by the parties or authorize an arbiter to disregard or modify the plain and unambiguous provisions of the agreement.

Cases that cite this headnote

**Attorneys and Law Firms**

**\*36** David J. Beck, David M. Gunn, Beck, Redden & Arbitration Secrest, L.L.P., Houston, TX, for Appellant.

Guy S. Lipe, Vinson & Elkins LLP, Houston, TX, for Appellee.

Panel consists of Justices NUCHIA, JENNINGS, and HIGLEY.

**OPINION**

Construction TERRY JENNINGS, Justice.

Appellant, Burlington Resources Oil & Gas Company LP ("Burlington"), challenges the trial court's judgment rendered in favor of appellee, San Juan Basin Royalty Trust (the "Trust"), confirming a portion of an arbitration award in favor of the Trust and ordering that the Trust recover from Burlington damages in the amount of $6,019,370, plus interest, for a total disputed award of $6,243,990. In its first issue, Burlington contends that the parties did not agree, by clear and unmistakable language, to submit questions Construction regarding the scope of arbitrable issues to the arbitrator. In its second issue, Burlington contends that "construing the scope of the arbitration agreement de novo," the parties' dispute is not within the scope of the arbitration agreement.

We reverse and render in part and remand in part.

**Factual and Procedural Background**

Burlington [1] owns and operates several oil and gas properties in New Mexico. The Trust holds a net overriding royalty interest in those properties and, pursuant to the terms of a "Conveyance," is entitled to receive a 75% interest in the net proceeds from those properties. [2] Burlington is required by the Conveyance to issue quarterly accounting statements to the Trust, and the Trust has 180 days to except to those statements.

In October 2004, in order to resolve a number of specific existing "audit disputes," the parties entered into an "Agreement Dealing with the Resolution of Existing Audit Disputes" (the "Arbitration Agreement"). However, the parties ultimately disagreed regarding the arbitrability of one of the Trust's claims ruled upon by the arbitrator. After the arbitrator ruled in favor of the Trust on this claim, Burlington filed its application to vacate, modify, or correct the arbitration award.

The parties' dispute relevant to this appeal originates from Burlington's entry into a settlement agreement in 1990 with the Gas Company of New Mexico ("GCNM") to resolve litigation involving properties covered by the Conveyance (the "GCNM settlement agreement"). Pursuant to the terms of the GCNM settlement agreement, Burlington received $54.5 million in settlement payments. At that time, Burlington allocated $6.7 million of those proceeds to take-or-pay claims, $21 million **\*37** to past-pricing claims, and $26.8 million to future-pricing claims. In accordance with the terms of the Conveyance, in calculating the amount of the GCNM settlement proceeds owed to the Trust for its net overriding royalty interest, Burlington did not include the $6.7 million allocated to the take-or-pay claims. As the Trust notes, however, the Trust also was not burdened with a charge for any royalty payments due to other royalty owners on that portion of the GCNM settlement. At that time, the Trust did not challenge Burlington's allocation of the GCNM settlement proceeds or Burlington's exclusion of the $6.7 million portion of the settlement in calculating the amounts owed to the Trust.

In 2001, Burlington entered into a settlement agreement with the Minerals Management Service of the United States Department of Interior ("MMS") and the Jicarilla Apache Indian Nation ("Jicarilla"), other royalty interest holders in properties covered by the Conveyance (the "MMS/Jicarilla settlement"). Burlington, MMS, and Jicarilla entered into the MMS/Jicarilla settlement in order to resolve MMS's and Jicarilla's complaints regarding the amount of royalty

payments due and owing to them from the proceeds of the GCNM settlement.

The Trust asserts that as part of its MMS/Jicarilla settlement, Burlington agreed to pay MMS and Jicarilla royalties on the $6.7 million portion of the GCNM settlement that had been originally allocated to "non-royalty-bearing take-or-pay claims." Burlington disputes the Trust's claim and asserts, to the contrary, that MMS and Jicarilla expressly acknowledged that they were not entitled to royalty payments on the $6.7 million portion of the GCNM settlement. Although the parties disagree as to the whether MMS and Jicarilla received royalty payments on the $6.7 million portion of the GCNM settlement, the Trust asserts that, following the MMS/Jicarilla settlement, Burlington erroneously charged the Trust with its 75% share of the MMS/Jicarilla settlement payment by deducting this charge from the amount of proceeds due to the Trust for its net overriding royalty interest on the properties. The Trust complained that the charge assessed against it by Burlington had been calculated based on the full amount of the MMS/Jicarilla settlement, including the $6.7 million originally allocated to take-or-pay claims.

The parties entered into the Arbitration Agreement to settle this "audit dispute" and a number of other existing audit disputes, many of which are not relevant to this appeal. The Arbitration Agreement, our focus in resolving the parties' dispute, states, in relevant part,

> 3. Exhibit "C" attached hereto identifies audit exceptions that the parties have identified for submission to binding arbitration pursuant to the procedures set forth hereafter.... [T]he exceptions identified in Exhibit "C" **constitute the only items** that will be subjected to arbitration.
>
> 4. Arbitration Agreement
>
> The existing audit disputes described on attached Exhibit "C," ... shall be finally settled by arbitration pursuant to the provisions hereof. **This agreement to arbitrate applies only to the audit disputes identified on Exhibit "C"** ... all of which shall be collectively referred to as the "Audit Disputes."
>
> > (a) The Audit Disputes shall be heard and determined by one Arbitrator.....
> >
> > (b) The proceeding shall be conducted in accordance with the Commercial Arbitration Rules of the American Arbitration Association, unless otherwise specified herein.... In the event of a conflict **\*38**

between such Commercial Arbitration Rules and this Agreement, this Agreement shall control.

(Emphasis added).

Exhibit C, attached to the Arbitration Agreement, lists a number of audit disputes, and, as Burlington emphasizes, includes a column entitled "Arbitrate Amount," which details specific amounts at issue for each of the identified audit disputes. On the first page of Exhibit C, the sum total "arbitrate amount" for all of the audit disputes listed in Exhibit C, including many of which that are not relevant to the underlying award or this appeal, is identified as $1,528,223. In fact, among the numerous audit disputes identified on Exhibit C, only two specific disputes are relevant to this appeal, and the total "arbitrate amount" for these two disputes is identified as $374,978. The parties identified the first dispute as "Gross Proceeds under stated due to excess royalties charged from MMS/Jicarilla settlement," and the total arbitrate amount for that dispute is identified as $342,477. The parties labeled their second dispute as "Interest Overcharged on MMS/Jicarilla Settlement," and the total arbitrate amount for that dispute is identified as $32,501. There is no mention of the GCNM settlement or any audit issues specifically relating to the GCNM settlement anywhere in the Arbitration Agreement or Exhibit C.

At the conclusion of the arbitration, the arbitrator entered an arbitration award in favor of the Trust, including an award of over $6 million on the two relevant audit disputes for the Trust's "75% share of additional gross proceeds resulting from the reallocation of $6.7 million [of the 1990 GCNM settlement] to past pricing." In its award, the arbitrator conceded that Burlington had objected to consideration of the Trust's claim for its share of the $6.7 million in reallocated proceeds. However, the arbitrator determined that it had jurisdiction to decide its "own jurisdiction" pursuant to the terms of the Arbitration Agreement, which provided that the arbitration would be conducted "in accordance with the Commercial Arbitration Rules of the American Arbitration Association unless otherwise specified." The arbitrator then cited in his opinion Rule 7(a) of the Commercial Rules, which provides, "The Arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope or validity of the Arbitration Agreement." COMMERCIAL RULES OF THE AMERICAN ARBITRATION ASSOCIATION, Rule 7(a).

After determining that it had the power to decide arbitrability, the arbitrator concluded that "the Trust's claim to its

proportionate share of the $6.7 million proceeds [from the 1990 GCNM settlement] is within the scope of the Arbitration Agreement." The arbitrator contended that Exhibit C identified "an exception related to the MMS/Jicarilla settlement" and that the Trust's claim arose from Burlington's charging the Trust for additional royalty payments Burlington made to Jicarilla and MMS to settle their claims even though Burlington had not shared the $6.7 million portion on which the additional royalty payments had been calculated. Based on this, the arbitrator stated,

> From the testimony and documents attached to the Arbitration Agreement, it is clear that the dispute between the parties over the MMS/Jicarilla [settlement] flows directly from Burlington's charge of royalty on the $6.7 million initially attributed to take-or-pay.

The arbitrator further concluded that there was a "nexus between the royalty charge and the excluded $6.7 million" and that "an adjustment to gross proceeds to include the Trust's proportionate share of **\*39** the $6.7 million on which it has been charged royalty is an arbitrable claim."

After determining the scope of its jurisdiction, the arbitrator stated that "[b]y making this reallocation, Burlington characterized the entire $54.5 million GCNM settlement proceeds (including the $6.7 million Burlington originally allocated to take-or-pay) as past pricing in which the Trust is entitled to share." Thus, the arbitrator ruled that the Trust was entitled to a 75% share of additional gross proceeds from the reallocation of the $6.7 million to past-pricing claims.

Following arbitration, Burlington filed an application to vacate or modify the arbitration award. *See* 9 U.S.C. §§ 10, 11; *see also* TEX. CIV. PRAC. & REM.CODE ANN. §§ 171.088(a)(3)(A), 171.091(a)(2) (Vernon 2005). In its application, Burlington asserted that, in awarding the Trust $6,243,990 on its claim for a portion of the allegedly reallocated proceeds from the 1990 GCNM settlement (referred to in the arbitration award as "MMS/Jicarilla— Case A"), the arbitrator rendered an award on a matter not submitted to him and thereby exceeded his powers. Burlington asserted that this portion of the arbitration award should be modified, corrected, or vacated. Burlington also asserted a claim for breach of the Arbitration Agreement on the ground that the Trust's attempt to assert a claim for a portion of the GCNM settlement, i.e., its newly crafted MMS/

Jicarilla–Case A, violated the agreement and caused it to incur substantial unnecessary expenses in defending the arbitration and pursuing relief in the trial court. The Trust filed a counterclaim for confirmation of the arbitration award. The trial court rendered judgment in favor of the Trust, denying Burlington's application and granting the Trust's application to confirm the arbitration award. The trial court denied all other requested relief, including Burlington's claim for breach of the Arbitration Agreement.

### Arbitrability

In its first issue, Burlington argues that the parties did not agree, by clear and unmistakable language, to submit questions regarding the scope of arbitrable issues to the arbitrator because the Arbitration Agreement itself "carefully limited the scope of arbitration to identified audit disputes" and "withheld from the arbitrator [the] power to decide any additional questions, including the question of arbitrability." The Trust counters that the parties' incorporation of the American Arbitration Association ("AAA") rules clearly and unmistakably granted the arbitrator the power to determine Burlington's objection to the scope of the arbitration.

 **[1]**    In *First Options of Chicago, Inc. v. Kaplan,* the United States Supreme Court stated that "[w]hen deciding whether the parties agreed to arbitrate a certain matter (including arbitrability), courts generally [ ] should apply ordinary state-law principles that govern the formation of contracts," with the qualification that, "when courts decide whether a party has agreed that arbitrators should decide arbitrability," courts "should not assume that the parties agreed to arbitrate arbitrability unless there is 'clea [r] and unmistakabl[e]' evidence that they did so." 514 U.S. 938, 944, 115 S.Ct. 1920, 1924, 131 L.Ed.2d 985 (1995) (citations omitted). The Supreme Court noted that "the law treats silence or ambiguity about the question '*who* (primarily) should decide arbitrability' differently from the way it treats silence or ambiguity about the question '*whether* a particular merits-related dispute is arbitrable because it is within the scope of a valid arbitration agreement' " so as to not "force unwilling parties to arbitrate a matter they reasonably would have  **\*40**  thought a judge, not an arbitrator, would decide." *Id.,* 514 U.S. at 944–45, 115 S.Ct. at 1924–25; *see also Gen. Motors Corp. v. Pamela Equities Corp.,* 146 F.3d 242, 249 (5th Cir.1998) ( "[W]hen a party to a dispute contends that he and the other disputant agreed to submit ... the question of whether that arbitrator had authority

to arbitrate their dispute, that party must bear the burden of demonstrating clearly and unmistakably that the parties agreed to have the arbitrator decide that threshold question of arbitrability."); *In re Weekley Homes, L.P.,* 180 S.W.3d 127, 130 (Tex.2005) ("[A]bsent unmistakable evidence that the parties intended the contrary, it is the courts rather than the arbitrators that must decide 'gateway matters' such as whether a valid arbitration agreement exists. Whether an arbitration agreement is binding on a nonparty is one of those gateway matters."); *In re Ford Motor Co.,* 220 S.W.3d 21, 23 (Tex.App.-San Antonio 2006, no pet.) (same).

 **[2]**    Paragraphs 3 and 4 of the Arbitration Agreement expressly state that the audit exceptions identified in Exhibit C "constitute the only items that will be subjected to arbitration" and that the Arbitration Agreement "applies only to the audit disputes identified on Exhibit C." Here, there is no clear and unmistakable statement in the Arbitration Agreement that matters of arbitrability will be submitted to an arbitrator. In fact, Burlington and the Trust purposefully drafted an Arbitration Agreement of very narrow scope.

Although, as the Trust emphasizes, the Arbitration Agreement generally provides that the proceeding "shall be conducted in accordance with the Commercial Arbitration Rules of the [AAA], unless otherwise specified herein," the Arbitration Agreement further provides that the terms of the Arbitration Agreement control in the event of any conflict with the rules. We conclude that there is no conflict because the parties, in their Arbitration Agreement, unambiguously detailed the specific subjects and amounts subject to arbitration, and arbitrability was not one of those matters. Even if we were to conclude, based, in part, on the authority cited below, that some ambiguity was created by the parties' reference to the AAA rules, the parties simply did not clearly and unmistakably submit the issue of arbitrability to arbitration.

We recognize that Rule 7(a) of the Commercial Arbitration Rules of the AAA grants an arbitrator "the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope or validity of the Arbitration Agreement." COMMERCIAL RULES OF THE AMERICAN ARBITRATION ASSOCIATION, Rule 7(a). We further recognize that, "[a]lthough the United States Court of Appeals for the Fifth Circuit has not addressed the effect of a reference to AAA Rules contained in an arbitration clause," [3] other courts have generally concluded that an arbitration agreement's incorporation of rules empowering

an arbitrator to decide arbitrability clearly and unmistakably evidences the parties' intent to allow the arbitrator to decide issues of arbitrability. *See, e.g., Qualcomm Inc. v. Nokia Corp.,* 466 F.3d 1366, 1372–73 (Fed.Cir.2006) (concluding that agreement's incorporation of AAA rules clearly and unmistakably showed parties' intent to delegate issue of determining arbitrability to arbitrator); *Terminix Int'l Co., LP v. Palmer Ranch Ltd. P'ship,* 432 F.3d 1327, 1332–33 (11th Cir.2005) (holding that by incorporating AAA Rules into arbitration agreement, parties clearly and unmistakably agreed that arbitrator should decide whether arbitration **\*41** clause was valid); *Contec Corp. v. Remote Solution, Co.,* 398 F.3d 205, 208 (2d Cir.2005) ("[W]hen ... parties explicitly incorporate rules that empower an arbitrator to decide issues of arbitrability, the incorporation serves as clear and unmistakable evidence of the parties' intent to delegate such issues to an arbitrator."); *Citifinancial, Inc. v. Newton,* 359 F.Supp.2d 545, 549–52 (S.D.Miss.2005) (holding that by agreeing to be bound by procedural rules of AAA, including rule giving arbitrator power to rule on his or her own jurisdiction, defendant agreed to arbitrate questions of jurisdiction before arbitrator); *Sleeper Farms v. Agway, Inc.,* 211 F.Supp.2d 197, 200 (D.Me.2002) (holding arbitration clause stating that arbitration shall proceed according to rules of AAA provides clear and unmistakable delegation of scope-determining authority to arbitrator). We are also mindful that, in certain circumstances, the incorporation of AAA rules may constitute clear and unmistakable evidence of an intent to allow an arbitrator to decide issues of arbitrability.

 **[3]**    However, we conclude, based on the express terms of the Arbitration Agreement before us, that the agreement's mere reference to the AAA's rules does not provide clear and unmistakable evidence of the parties' delegation of issues of arbitrability to an arbitrator. In determining whether an agreement provides clear and unmistakable language of such delegation, we consider the specific language of the Arbitration Agreement. *See Kaplan,* 514 U.S. at 944, 115 S.Ct. at 1924 ("When deciding whether the parties agreed to arbitrate a certain matter (including arbitrability), courts generally [ ] should apply ordinary state-law principles that govern the formation of contracts."). We also apply general principles of Texas contract law governing the formation of contracts. *See In re Dillard Dep't Stores, Inc.,* 186 S.W.3d 514, 515 (Tex.2006) (stating that ordinary principles of "[c]ontract law determine [ ] the validity of arbitration agreements," a "trial court's determination of an arbitration agreement's validity is a legal question," and "[t]he objective intent as expressed in the agreement controls

the construction of an unambiguous contract"). Here, the Arbitration Agreement restricted the arbitrator's reach only to specifically identified "audit disputes," and for specific amounts. There is not a clear and unmistakable indication that the parties authorized an arbitrator to decide the arbitrability of claims or amounts not specifically identified in the Arbitration Agreement. Moreover, the agreement provided that to the extent there was any conflict between the parties' agreement and the AAA rules, any such conflict would be resolved in favor of the agreement.

Although not directly on point, we note that the San Antonio Court of Appeals has recently concluded that an arbitration agreement providing for any dispute to be settled "in accordance with the rules and procedures of the AAA" did not contain unmistakable evidence that the parties intended for an arbitrator to decide whether nonparties were bound by the arbitration agreement. *In re Ford Motor Co.,* 220 S.W.3d at 23–24. In so holding, the court highlighted "the established Texas law [of] placing the initial burden of proving the existence of a valid arbitration agreement and claims within the scope of that agreement on the party seeking to compel arbitration." *Id.*

We also find the opinion of the United States Court of Appeals for the Second Circuit in *Katz v. Feinberg* helpful to our analysis. *See* 290 F.3d 95 (2d Cir.2002). In *Katz,* the court found that the parties did not agree to arbitrate questions of arbitrability. *Id.* at 96–97. The *Katz* court recognized that a "broadly worded **\*42** arbitration clause committing resolution of all disputes to arbitration" would satisfy the clear and unmistakable standard. *Id.* at 97. However, the court could not conclude that "where a single agreement contains both a broadly worded arbitration clause and a specific clause assigning a certain decision to an independent accountant, that the parties intention to arbitrate questions of arbitrability under the broad clause remains clear." *Id.*

Similarly, in *James & Jackson, LLC v. Willie Gary, LLC,* the Delaware Supreme Court recognized the "majority view" that an arbitration agreement's reference to AAA rules might provide clear and unmistakable evidence of the parties' intent to have an arbitrator determine arbitrability. 906 A.2d 76, 78, 80 (Del.2006). However, the court stated that the majority view did not "mandate that arbitrators decide arbitrability in *all* cases where an arbitration clause incorporates the AAA rules." *Id.* at 80. Rather, the court stated, the majority view "applies in those cases where the arbitration clause generally provides for arbitration of all disputes and also

incorporates a set of arbitration rules that empower arbitrators to decide arbitrability." *Id.* The court noted that although the arbitration agreement before it required arbitration of "any controversy arising out of or related to [the agreement]," it also expressly authorized the non-breaching parties to obtain some limited types of relief in the courts. *Id.* at 81. Thus, the court concluded, "despite the broad language" at the outset of the arbitration agreement and the reference in the agreement to the AAA rules, that "[s]ince this arbitration clause does not generally refer all controversies to arbitration, the federal majority rule does not apply, and something other than the incorporation of the AAA rules would be needed to establish that the parties intended to submit arbitrability questions to an arbitrator." *Id.*

We recognize that the arbitration agreements in both *Katz* and *James & Jackson, LLC* are quite different than the Arbitration Agreement before us. For example, the Arbitration Agreement here does not contain any provisions assigning decision-making authority on the specifically identified existing audit disputes to anyone other than the arbitrator. However, both *Katz* and *James & Jackson, LLC* illustrate the application of the principle that a court must carefully consider the language of the specific arbitration agreement before it in determining whether the parties have clearly and unmistakably ceded authority to decide matters of arbitrability to an arbitrator. *See id.; Katz,* 290 F.3d at 97. A court should not blindly apply the majority view regarding the effect of mere reference to AAA rules and ignore the "clear and unmistakable standard" set forth by the Supreme Court in *Kaplan. See Kaplan,* 514 U.S. at 944, 115 S.Ct. at 1924.

Accordingly, we hold that Burlington and the Trust did not agree in the Arbitration Agreement, by clear and unmistakable language, to submit questions regarding the scope of arbitrable issues to the arbitrator. *See id.,* 514 U.S. at 942–44, 115 S.Ct. at 1923–25.

We sustain Burlington's first issue.

### Scope of Arbitration Agreement

In its second issue, Burlington argues that "construing the scope of the arbitration agreement de novo," the Trust's claim for its "75% share of additional gross proceeds resulting from the reallocation of $6.7 million to past pricing" is not within the scope of the Arbitration Agreement. [4]

 **\*43** **[4]** Burlington asserts that the audit disputes identified in Exhibit C to the Arbitration Agreement confirm that (1) the parties agreed to arbitrate only the Trust's complaint that its "gross proceeds were understated due to excess royalties" charged against it based on the full value of the GCNM settlement and (2) the Trust's claim for a 75% share of the $6.7 million portion of the allegedly reallocated GCNM settlement proceeds was never contemplated by the parties to be an arbitrable claim. Rather, Burlington complains that the Trust asserted this new claim only after the commencement of arbitration. Burlington notes that the expressly stated subject matter of the first audit dispute was that Burlington, "in adjusting gross proceeds to reflect the MMS/Jicarilla settlement[,] ... improperly deducted royalties paid supposedly on account of the $6.7 million in take-or-pay claims not covered by the Conveyance."

In fact, the dispute to be arbitrated arose from the Trust's allegation that the MMS/Jicarilla settlement was based upon the full amount of the GCNM settlement, including the $6.7 million take-or-pay portion, that 12.3% of the MMS/Jicarilla settlement, or approximately $500,000, was allocable to production in which the Trust had no interest, and that the Trust should not have been charged for 75% of those payments. Moreover, the Trust's complaint about the second audit dispute simply concerned its claim for interest on the amount at issue in the first audit dispute. In spite of these specifically identified and narrowly limited audit disputes, the arbitrator ruled on a claim by the Trust that its "gross proceeds were understated, *not due to the deduction or charge of royalties* paid to MMS and the Jicarilla tribe, *but, instead, due to the exclusion of $6.7 million of receipts* under gas purchase contracts in the GCNM settlement that [Burlington] has attributed to take-or-pay obligations." Yet, as Burlington highlights, there is absolutely no mention of the GCNM settlement in Exhibit C, nor is there any suggestion that the Trust would be seeking to recover in arbitration approximately $6 million based on its theory that Burlington had reallocated funds from its 1990 settlement. Burlington argues that "the sheer numbers involved" in the Trust's newly asserted claim preclude it "from being shoehorned into the 'excess royalties' concept" identified in Exhibit C.

The Trust, on the other hand, asserts that the audit disputes describe its complaint that Burlington had charged it with excess royalties relating to Burlington's reallocation of the $6.7 million in take-or-pay claims without sharing those proceeds with the Trust. The Trust notes that, despite the specific arbitrate amounts, Exhibit C states that "[a]ll amounts

stated are subject to change." The Trust asserts that this language justifies the arbitration award of over $6 million, even though the relevant "arbitrate amount" for the two audit disputes was $374,978. The Trust, as additional support for its claim for a 75% share of the full value of the GCNM settlement, cites a November 1, 2002 letter from it to Burlington stating,

> The Trust was not paid any royalties on the take-or-pay settlement [of 6.7 million]. The Trust did not pursue a claim for royalties on that amount, and does not now want to be assessed any portion of the current settlement which is attributable to royalties which should **\*44** have been paid to the MMS or Jicarillas on the take-or-pay portion because the Trust did not share in the economic benefits attributable to the take-or-pay settlement in 1990. If the "major portion" settlement took into account the take-or-pay claim, the amount allocated to the Trust should be reduced ...

> If instead the 1990 settlement was "reallocated" such that more or all of the amount received by Burlington's successor [sic] was treated as "past pricing" or "contract buyout," then the Trust is entitled to 75% net overriding royalty interest on the 6.7 [million] no longer allocable to take-or-pay.

Based on this letter, the Trust asserts that it "made clear" throughout its dispute "its complaint that Burlington improperly had charged the Trust with royalty on settlement proceeds without sharing those proceeds with the Trust" and "the alternative remedies that it was seeking ... [to] either eliminate the charge to the Trust of the royalties on the proceeds or give the Trust its share of the proceeds."

The Supreme Court stated in *Kaplan* that if "the parties did not agree to submit the arbitrability question itself to arbitration, then the court should decide that question just as it would decide any other question that the parties did not submit to arbitration, namely, independently." *Kaplan,* 514 U.S. at 943, 115 S.Ct. at 1923–24. The Federal Arbitration Act provides that a court may vacate an arbitration award "where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made" and may modify or correct an arbitration award "[w]here the arbitrators have awarded upon a matter not submitted to them." 9 U.S.C. §§ 10, 11; *see also* TEX. CIV. PRAC. & REM.CODE ANN. §§ 171.088(a)(3)(A) (providing that court shall vacate award if arbitrators exceed their powers), 171.091(a)(2) (providing that court

shall modify or correct award if "the arbitrators have made an award with respect to a matter not submitted to them and the award may be corrected without affecting the merits of the decision made with respect to the issues that were submitted").

[5] [6] [7] [8] In reviewing the arbitrator's decision independently, we recognize the strong presumption under the Federal Arbitration Act of favoring arbitration. *See In re D. Wilson Constr. Co.,* 196 S.W.3d 774, 782–83 (Tex.2006). Furthermore, we note that any doubt as to whether a party's claim falls within the scope of an arbitration agreement must be resolved in favor of arbitration. *Id.* Also, a court should not deny arbitration unless it can be said with positive assurance that an arbitration clause is not susceptible to an interpretation that would cover the dispute at issue. *Id.; see also In re Dillard Dept. Stores, Inc.,* 186 S.W.3d at 516. Of course, "the policy that favors resolving doubts in favor of arbitration cannot serve to stretch a contractual clause beyond the scope intended by the parties or authorize an arbiter to disregard or modify the plain and unambiguous provisions of the agreement." *Smith v. Transp. Workers Union of Am., AFL–CIO Air Transp. Local 556,* 374 F.3d 372, 375 (5th Cir.2004) (citations omitted); *see also Belmont Constructors, Inc. v. Lyondell Petrochemical Co.,* 896 S.W.2d 352, 356 (Tex.App.-Houston [1st Dist.] 1995, no writ) (stating that "federal policy of resolving doubts in favor of arbitration" cannot stretch contractual clause beyond scope intended or allow modification of plain and unambiguous provisions).

With these principles in mind, and reviewing the arbitrator's decision independently, we conclude that the relevant audit disputes describing the Trust's complaint **\*45** about its understated gross proceeds due to Burlington's charge of excess royalties from the MMS/Jicarilla settlement is not susceptible to an interpretation for an alternative claim by the Trust for a 75% interest in the allegedly reallocated proceeds of $6.7 million portion of the 1990 GCNM settlement. We can say, with positive assurance, that by making a claim for reallocated proceeds from the 1990 GCNM settlement, the Trust was making a separate and new claim rather than a claim covered by the "audit disputes" contemplated by the parties in the Arbitration Agreement. The inescapable fact is that the Arbitration Agreement provided specific "arbitrate amounts" for each of the identified audit disputes, and the amount ultimately awarded by the arbitrator on the Trust's newly asserted claim greatly exceeded, beyond any amount that could have reasonably been contemplated by the parties, the amounts identified in the Arbitration Agreement. As the

Trust points out, the Arbitration Agreement did provide that the arbitrate amounts were "subject to change"; however, the inclusion of this language cannot justify the assertion of a wholly separate claim. Again, the 1990 GCNM settlement is not mentioned in the Arbitration Agreement. Allowing the Trust to assert a claim for over $6 million shortly after executing an agreement identifying the arbitration amounts for the relevant audit disputes to be approximately $375,000 stretches the Arbitration Agreement beyond its breaking point. Had the parties intended to arbitrate the Trust's claim for reallocated proceeds from the 1990 GCNM settlement, the parties could have included a reference to this settlement in the Arbitration Agreement and stated the appropriate arbitrate amount.

The Trust contends, in post-submission briefing, that "the parties were not required to include in Exhibit C all sub-issues entailed within that general description of the dispute and the alternative remedies to which the Trust might be entitled, depending on facts that were solely within the control of Burlington and which became known to the Trust only following discovery undertaken in the course of arbitration proceedings." First, one cannot reasonably conclude that a claim for over $6 million for allegedly reallocated proceeds from the 1990 GCNM settlement qualifies as a "sub-issue" of a specific "audit dispute" over understated gross proceeds in the amount of $374,978. Second, the Trust's admission that it did not learn of the underlying facts supporting its newly asserted claim until after the commencement of arbitration establishes that such a claim was not one of the "existing" audit disputes between the parties to be resolved by the Arbitration Agreement. Finally, we cannot, as suggested by the Trust, rely on its November 2002 letter as "clearly" putting Burlington "on notice of the Trust's position" that it was always seeking alternative remedies.

Rather, the unambiguous provisions of the Arbitration Agreement, setting forth detailed descriptions of the relevant audit disputes and the associated arbitrate amounts, control our inquiry. *See In re Dillard Dept. Stores, Inc.,* 186 S.W.3d at 515 (stating that "[t]he objective intent as expressed in the agreement controls the construction of an unambiguous contract").

In sum, the Arbitration Agreement cannot reasonably be interpreted as authorizing the Trust's claim for its 75% share of the full value of the 1990 GCNM settlement proceeds. Accordingly, we hold that the Trust's claim was "clearly beyond the agreed scope of the arbitration," the arbitrator exceeded his powers in ruling on the Trust's claim, and the arbitrator entered an award on a matter not properly submitted to him. We further hold that the trial **\*46** court erred in confirming the arbitration award.

We sustain Burlington's second issue.

### Conclusion

We reverse the portion of the trial court's judgment confirming the portion of the arbitration award awarding the Trust $6,243,990 (labeled in the arbitration award as "MMS/Jicarilla–Case A"), vacate that portion of the arbitration award, and modify the award to reflect that this award has been vacated. We render a take-nothing judgment in Burlington's favor on the Trust's claim giving rise to the arbitration award of $6,243,990. We also reverse the portion of the trial court's judgment denying Burlington's claim for breach of the Arbitration Agreement, and we remand for further proceedings consistent with this opinion.

Footnotes

1     To avoid confusion, we make no distinction between Burlington and its predecessor, Southland Royalty Company ("Southland").

2     The Trust explains that "[t]he overriding royalty interest is a 'net' interest, in the sense that Burlington, in calculating the payments to which the Trust is entitled, includes certain revenues (including proceeds from the sale of production from the properties) and certain expenses incurred in the operation of the properties (including royalties on production paid to royalty owners holding royalty interests in the properties)."

3     *Citifinancial, Inc. v. Newton,* 359 F.Supp.2d 545, 551 (S.D.Miss.2005).

4     Having held that the Arbitration Agreement does not clearly and unmistakably evidence the parties' intent to delegate the issue of determining arbitrability to the arbitrator, we need not consider Burlington's alternative contention in its second issue that even if the arbitrator is afforded "considerable leeway" in construing the scope of the arbitration agreement, the parties' dispute is "clearly beyond the agreed scope of the arbitration." *See Kaplan,* 514 U.S. at 943, 115 S.Ct. at 1923–24.

**End of Document**

© 2014 Thomson Reuters. No claim to original U.S. Government Works.

398 F.3d 205
United States Court of Appeals,
Second Circuit.

CONTEC CORPORATION, Plaintiff-
Counter-Defendant-Appellee,
v.
REMOTE SOLUTION CO., LTD.,
Defendant-Counterclaimant-Appellant.

Docket No. 04-0382-CV.    |    Argued
Dec. 9, 2004.    |    Decided Feb. 14, 2005.

**Synopsis**
**Background:** Corporation/buyer sought to compel arbitration of indemnification dispute with manufacturer pursuant to arbitration clause of sales contract between manufacturer and corporation's predecessor, a limited partnership. Manufacturer counterclaimed, contending that it could not be compelled to arbitrate with non-signatory to contract. The United States District Court for the Northern District of New York, David N. Hurd, J., dismissed action, ruling that issue of arbitrability was for arbitrator. Manufacturer appealed.

**Holdings:** The Court of Appeals, Oakes, Senior Circuit Judge, held that:

[1] arbitration of arbitrability issue was appropriate for indemnification claim, even though corporation was nonsignatory to contract, and

[2] corporation as non-signatory could compel arbitration of indemnification claim, since issue of whether contract's arbitration rights were validly assigned by limited partnership to corporation was issue of arbitrability and thus was within arbitrator's jurisdiction pursuant to arbitration clause's delegation provision.

Affirmed.

West Headnotes (6)

[1]    **Alternative Dispute Resolution**


and Standards of Review

Court of Appeals reviewed de novo district court's decision that issue of arbitrability was for arbitrator, not court.

10 Cases that cite this headnote

Scope

[2]    **Alternative Dispute Resolution**



Under Federal Arbitration Act, there is general presumption that issue of arbitrability is resolved by courts; presumption may be rebutted by clear and unmistakable evidence from arbitration agreement, as construed by relevant state law, that parties intended that question of arbitrability shall be decided by arbitrator. 9 U.S.C.A. § 1 et seq.

90 Cases that cite this headnote

Evidence

[3]    **Alternative Dispute Resolution**



When parties to arbitration agreement explicitly incorporate rules that empower arbitrator to decide issues of arbitrability, incorporation serves as clear and unmistakable evidence of parties' intent to delegate such issues to arbitrator, thus rebutting Federal Arbitration Act's general presumption in favor of courts' deciding arbitrability. 9 U.S.C.A. § 1 et seq.

141 Cases that cite this headnote

Evidence

[4]    **Alternative Dispute Resolution**


Affected or Bound

In determining whether arbitration of arbitrability question is appropriate as between signatory to arbitration agreement and non-signatory, court must first determine whether parties have sufficient relationship to each other and to rights created under agreement. 9 U.S.C.A. § 1 et seq.

Persons



45 Cases that cite this headnote

**[5]** **Alternative Dispute Resolution**



Affected or Bound

**Alternative Dispute Resolution**



Contracts Disputes

Under arbitration clause of sales contract between manufacturer and corporation's predecessor, which contained clear delegation to arbitrator of question of arbitrability, arbitration of arbitrability issue was appropriate for corporation's indemnification claim against manufacturer arising under contract, even though corporation was nonsignatory to contract; there was undisputed relationship between manufacturer and both corporation and predecessor, and dispute arose because parties had continued to conduct themselves as subject to sales contract regardless of any changes in corporate form. 9 U.S.C.A. § 1 et seq.

28 Cases that cite this headnote

**[6]** **Alternative Dispute Resolution**

of Dispute

Under arbitration clause of sales contract between manufacturer and corporation's predecessor, which contained clear delegation to arbitrator of question of arbitrability, corporation could compel arbitration of its indemnification claim against manufacturer arising under contract, even though contract prohibited assignment of rights and excluded third-party rights; whether contract's arbitration rights were validly assigned by predecessor to corporation was issue that pertained directly to continued existence, scope or validity of contract, i.e. was issue of arbitrability, and thus was within jurisdiction of arbitrator pursuant to arbitration clause's delegation provision. 9 U.S.C.A. § 1 et seq.

51 Cases that cite this headnote

Persons

Sales

**Attorneys and Law Firms**

**\*206** David L. Finger, Wilmington, DE (Finger & Slanina, LLC; and Madeline H. Kibrick Kauffman, Nolan & Heller, LLP, Albany, NY, of counsel), for Appellant.

Kenneth L. Stein, New York, N.Y. (Jones Day, of counsel), for Appellee.

Before OAKES, JACOBS, and CABRANES, Circuit Judges.

**Opinion**

**\*207** OAKES, Senior Circuit Judge.

This case originated when Contec Corporation filed suit to compel Remote Solution Co., Ltd. ("Remote Solution") to arbitrate an indemnification dispute. Remote Solution argued that it could not be compelled to participate in arbitration because Contec Corporation was a non-signatory to the arbitration agreement Remote Solution had signed with Contec L.P. in 1999. The United States District Court for the Northern District of New York, David N. Hurd, *Judge,* dismissed the suit, finding that whether a valid arbitration agreement existed between Remote Solution and Contec Corporation was an issue to be decided by the arbitrator. We agree with the district court that Remote Solution is compelled under the agreement it signed with Contec L.P. to arbitrate the question of arbitration with Contec Corporation. Accordingly, we affirm.

Arbitrability

*BACKGROUND*

In 1999, Contec L.P. and Hango Electronics, a Korean electronics company that subsequently changed its name to Remote Solution, entered into an agreement for the manufacturing and purchase of remote control devices ("the 1999 Agreement"). Later in 1999, Contec L.P. was converted to Contec LLC and then, in 2001, merged with Contec Corporation, leaving Contec Corporation as the surviving entity. These changes in corporate form did not alter Contec's address or ownership and allegedly did not impact its business relationship with Remote Solution.

In 2000 and 2002, Contec Corporation was sued for alleged patent infringement. Under an indemnification provision of the 1999 Agreement, Remote Solution was required to defend Contec L.P. in any patent infringement suit and pay any and all costs or damages awarded. Remote Solution did not make any indemnification payments to Contec Corporation for costs Contec Corporation incurred in connection with the suit. Contec Corporation therefore withheld payment on a shipment of remote control units as a setoff against amounts it believed it was owed by Remote Solution.

In June 2003, Remote Solution filed suit against Contec Corporation in Korea. Relying on Paragraph 19 of the 1999 Agreement, which required that all disputes arising under the agreement be arbitrated, Contec Corporation filed a demand for arbitration with the American Arbitration Association. Additionally, it filed suit in the district court seeking to compel arbitration and an order to dismiss or stay Remote Solution's lawsuit in Korea.

In the district court proceedings, Remote Solution contended that Contec Corporation was not a signatory to the 1999 Agreement and was therefore barred from seeking its enforcement. In response, Contec Corporation argued that arbitration, not the court, was the proper forum for determining whether a valid arbitration agreement existed between itself and Remote Solution.

In December 2003, the district court dismissed the suit, finding that "all claims set forth in the complaint and counterclaim are subject to arbitration." The district court explained its reasoning as follows:

> [T]he threshold question is whether Contec Corp.'s purported right to enforce the agreement falls within the scope of the arbitration clause. The agreement clearly provides that any dispute arising under the agreement will be resolved by arbitration in accordance with the Commercial Arbitration Rules of the American Arbitration Association. The Commercial Arbitration Rules provide that issues of jurisdiction, including objections regarding the scope or validity of the arbitration agreement, are subject **\*208** to

> arbitration. This is the agreement that Remote Solution ... agreed to.

This appeal followed.

### DISCUSSION

**[1]** Our review of "whether the issue of arbitrability is for the court or for the arbitrator" is *de novo. Bell v. Cendant Corp., 293 F.3d 563, 565-66 (2d Cir.2002); see also Shaw Group Inc. v. Triplefine Int'l Corp., 322 F.3d 115, 120 (2d Cir.2003).*

**[2]** The 1999 Agreement, as a contract involving international commerce, is governed by the Federal Arbitration Act ("FAA"). *See* 9 U.S.C. §§ 1, 2 (2004); *David L. Threlkeld & Co. v. Metallgesellschaft Ltd., 923 F.2d 245, 249 (2d Cir.1991)* (noting that the Supreme Court held in *Prima Paint Corp. v. Flood & Conklin Mfg. Co., 388 U.S. 395, 402, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967),* that the FAA "applies in federal court to diversity suits which relate to contracts involving interstate or international commerce"). Under the FAA, there is a general presumption that the issue of arbitrability should be resolved by the courts. *See First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 944-45, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995).* Acknowledging this presumption, we have held that "the issue of arbitrability may only be referred to the arbitrator if there is *clear and unmistakable evidence* from the arbitration agreement, as construed by the relevant state law, that the parties intended that the question of arbitrability shall be decided by the arbitrator." *Bell, 293 F.3d at 566* (emphasis in original) (internal quotations omitted). [1]

The arbitration clause at issue here appears in paragraph 19 of the 1999 Agreement and provides:

> In the event of any controversy arising with respect to this Agreement, both parties shall use its best efforts to resolve the controversy. In the event the parties are unable to arrive at a resolution, such controversy shall be determined by arbitration held in the City of Albany, New York in accordance with the Commercial Arbitration Rules of the American Arbitration Association (the "AAA")

or any organization that is the successor thereto ....

Rule 7 of the AAA Commercial Arbitration Rules states with respect to jurisdiction that "[t]he arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope or validity of the arbitration agreement." AAA Rule R-7(a).

[3]    We have held that when, as here, parties explicitly incorporate rules that empower an arbitrator to decide issues of arbitrability, the incorporation serves as clear and unmistakable evidence of the parties' intent to delegate such issues to an arbitrator. *See Shaw Group,* 322 F.3d at 122; *PaineWebber Inc. v. Bybyk,* 81 F.3d 1193, 1202 (2d Cir.1996). There can be no doubt that the 1999 Agreement bound its signatory Remote Solution to arbitrate any disputes with the Agreement's other signatory, namely, Contec L.P. If Contec remained in its original corporate form, Remote Solution would be compelled to arbitrate the indemnification dispute at the heart of this case. Contec L.P., however, has become Contec Corporation. The question, therefore, is whether **\*209** Contec Corporation's ability as a non-signatory to enforce the arbitration clause is an issue pertaining to the "existence, scope or validity of the arbitration agreement" between Remote Solution and Contec L.P.

Remote Solution argues that it cannot be compelled to arbitrate with a stranger to the 1999 Agreement because the contractual language is effective only between the contracting parties. It contends that the 1999 Agreement included both a prohibition on the assignment of rights under the Agreement and an exclusion of third party rights, and that, therefore, there is no contractual evidence of Remote Solution's intent to grant third parties the right to seek arbitration. According to Remote Solution, Contec Corporation's rights under the 1999 Agreement, if any, fall outside the arbitration clause and thus cannot be an issue pertaining to the "existence, scope or validity of the arbitration agreement."

[4]    As an initial matter, we recognize that just because a signatory has agreed to arbitrate issues of arbitrability with another party does not mean that it must arbitrate with any non-signatory. In order to decide whether arbitration of arbitrability is appropriate, a court must first determine whether the parties have a sufficient relationship to each other and to the rights created under the agreement. *See First Options,* 514 U.S. at 944-45, 115 S.Ct. 1920 (discussing the necessity of threshold determination by courts before

referring issues of arbitrability to arbitrators). A useful benchmark for relational sufficiency can be found in our estoppel decision in *Choctaw Generation Ltd. P'ship v. Am. Home Assurance Co.,* where we held that the signatory to an arbitration agreement "is estopped from avoiding arbitration with a non-signatory 'when the issues the non-signatory is seeking to resolve in arbitration are intertwined with the agreement that the estopped party has signed.' " 271 F.3d 403, 404 (2d Cir.2001)(quoting *Smith/Enron Cogeneration Ltd. P'ship v. Smith Cogeneration Int'l Inc.,* 198 F.3d 88, 98 (2d Cir.1999)). In *Choctaw,* we summarized the factors laid out in *Smith/Enron* as "the relationship among the parties, the contracts they signed (or did not), and the issues that ha[ve] arisen." *Id.* at 406.

[5]    In the present case, neither we nor the district court must reach the question whether Remote Solution is estopped from avoiding arbitration with Contec Corporation because, under the 1999 Agreement, the circumstances indicate that arbitration of the issue of arbitrability is appropriate. First, there is or was an undisputed relationship between each corporate form of Contec and Remote Solution. Secondly, Remote Solution signed the 1999 Agreement. Finally, the dispute at issue arose because the parties apparently continued to conduct themselves as subject to the 1999 Agreement regardless of change in corporate form. These factors demonstrate that a sufficient relationship existed between Contec Corporation and Remote Solution to permit Contec Corporation to compel arbitration even if, in the end, an arbitrator were to determine that the dispute itself is not arbitrable because Contec Corporation cannot claim rights under the 1999 Agreement.

[6]    Having determined that a sufficient relationship exists between the parties, we must now address the more precise question presented here: whether a non-signatory can compel a signatory to arbitrate under an agreement where the question of arbitrability is itself subject to arbitration. Although our circuit has not previously considered this question, we are not without guidance in federal law.

**\*210** In *Apollo Computer, Inc. v. Berg,* 886 F.2d 469 (1st Cir.1989),[2] the First Circuit decided a case virtually indistinguishable from this one. The court considered whether Apollo, a signatory to an arbitration agreement with another company called Dico, could be compelled to arbitrate by Dico's trustees in bankruptcy, who were non-signatories to the agreement. As in the instant case, the agreement between Apollo and Dico contained a non-assignment clause.

Rejecting the argument that Apollo could not be compelled to arbitrate because there was no agreement between it and the defendants, the court held:

> The relevant agreement here is the one between Apollo and Dico. The defendants claim that Dico's right to compel arbitration under that agreement has been assigned to them.... Whether the right to compel arbitration ... was validly assigned to the defendants and whether it can be enforced by them against Apollo are issues relating to the continued existence and validity of the agreement.

*Id.* at 473. Similarly, the relevant agreement here is the one Remote Solution signed with Contec L.P., in which Remote Solution agreed to submit all disputes to arbitration. Under the reasoning of *Apollo,* whether the arbitration rights under the 1999 Agreement were validly assigned by Contec L.P. to Contec Corporation is an issue that pertains directly to the continued "existence, scope or validity" of the Agreement. As such, it is within the jurisdiction of the arbitrator pursuant to AAA Rule R-7(a) as incorporated into the 1999 Agreement.

In direct contrast to the holding in *Apollo,* the Federal Circuit held recently in a very similar case that "the question of whether the parties agreed to arbitrate is to be decided by the court, not the arbitrator." *Microchip Tech. Inc. v. U.S. Philips Corp.,* 367 F.3d 1350, 1358 (Fed.Cir.2004). In reaching this conclusion, the Federal Circuit did not examine *Apollo,* but instead relied on Supreme Court cases that either did not address whether there was clear and unmistakable evidence of the parties' intent to submit arbitrability to an arbitrator, *id.* at 1357 (citing *Howsam v. Dean Witter Reynolds, Inc.,* 537 U.S. 79, 83-84, 123 S.Ct. 588, 154 L.Ed.2d 491 (2002) (holding that applicability of a National Association of Securities Dealers time limit provision is not the type of "gateway dispute" presumptively decided by the court)); *AT & T Techs., Inc. v. Communications Workers of Am.,* 475 U.S. 643, 651, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986) (holding that it was court's duty to determine whether layoff provision was expressly excluded from labor agreement arbitration clause), or found that such clear and unmistakable evidence was absent; *id.* (citing *First Options,* 514 U.S. at 944-47, 115 S.Ct. 1920; *John Wiley & Sons, Inc. v. Livingston,* 376 U.S. 543, 84 S.Ct. 909, 11 L.Ed.2d 898 (1964)). In our view, these cases are not determinative when analyzing the factual situation presented by *Microchip, Apollo*, and the instant case, where incorporation of arbitration rules giving jurisdiction to the arbitrator provides clear and unmistakable evidence of the parties' intent to arbitrate issues of arbitrability. Moreover, in *Microchip,* the party that urged arbitration was the signatory to the arbitration agreement and the party that sought to avoid arbitration was **\*211** the non-signatory. *Id.* at 1353. In this case, as in *Apollo,* the party seeking to avoid arbitration was a signatory to the arbitration agreement. Although the *Microchip* court found this distinction irrelevant, *id.* at 1358, we find it an important indicator of Remote Solution's expectation and intent when binding itself to the 1999 Agreement. *See Motorola Credit Corp. v. Uzan,* 388 F.3d 39, 52 (2d Cir.2004) (recognizing the "principle [that] an arbitration clause is binding ... on those parties which have entered into a contractual agreement to submit to arbitration").

After review of *Apollo* and *Microchip,* we find the reasoning of *Apollo* to be more persuasive and explicitly adopt it here. In *Apollo,* the court recognized that the question of arbitrability would ordinarily be subject to judicial determination rather than arbitration. *Id.* (citing *Am. Safety Equip. Corp. v. J.P. Maguire & Co.,* 391 F.2d 821, 828-29 (2d Cir.1968)). However, because Apollo, like Remote Solution, "agreed to be bound" by provisions that "clearly and unmistakably allow the arbitrator to determine her own jurisdiction" over an agreement to arbitrate "whose continued existence and validity is being questioned," it is the province of the arbitrator to "decide whether a valid arbitration agreement exists." *Id.* We therefore conclude that as a signatory to a contract containing an arbitration clause and incorporating by reference the AAA Rules, Remote Solution cannot now disown its agreed-to obligation to arbitrate *all* disputes, including the question of arbitrability.

We agree with the district court that Contec Corporation's purported right to enforce the 1999 Agreement is a matter of the Agreement's continued existence, validity and scope, and is therefore subject to arbitration under the terms of the arbitration clause. Accordingly, we hold that Remote Solution is compelled under the 1999 Agreement to arbitrate the question of arbitrability with Contec Corporation.

### CONCLUSION

For the foregoing reasons, the decision of the district court to dismiss this case in favor of arbitration is affirmed.

Footnotes

1    The 1999 Agreement is governed by New York law, which follows the same standard as federal law with respect to who determines arbitrability: generally, it is a question for the court unless there is "a 'clear and unmistakable' agreement to arbitrate arbitrability." *Shaw Group,* 322 F.3d at 121 (quoting *Smith Barney Shearson Inc. v. Sacharow,* 91 N.Y.2d 39, 45-46, 666 N.Y.S.2d 990, 993, 689 N.E.2d 884 (1997)).

2    We have previously cited *Apollo* with approval for the proposition that parties who contract for arbitration in accordance with arbitration rules such as the AAA Commercial Arbitration Rules have "thereby agreed to submit questions of arbitrability to the arbitrator." *Shaw Group,* 322 F.3d at 122-23.

© 2014 Thomson Reuters. No claim to original U.S. Government Works.

278 S.W.3d 497
Court of Appeals of Texas,
Houston (14th Dist.).

ERNST & YOUNG LLP, Appellant,
v.
J. David MARTIN, Michael Covarrubias,
and Cathy Greenwold, Appellees.
In re Ernst & Young LLP, Relator.

Nos. 14–07–00821–CV, 14–
07–00896–CV. | Feb. 5, 2009.

**Synopsis**
**Background:** Clients brought suit against tax advisors after tax benefits claimed from implementing advisors' advice were disallowed. Advisors moved to compel arbitration under Federal Arbitration Act (FAA) based on clients' engagement letter with advisor. The 113th District Court, Harris County, Patricia Ann Hancock, J., denied motion without explanation. Advisors made consolidated request for writ of mandamus and direct appeal.

**[Holding:]** The Court of Appeals, Leslie B. Yates, J., held that clause of arbitration agreement that reallocated traditional court functions to the arbitrator was enforceable.

Writ granted; direct appeal dismissed as moot.

West Headnotes (7)

**[1]** **Alternative Dispute Resolution**

Law Governs

What

Courts honor agreements to be bound by the Federal Arbitration Act (FAA). 9 U.S.C.A. § 1, et seq.

3 Cases that cite this headnote

**[2]** **Alternative Dispute Resolution**


Validity

**Alternative Dispute Resolution**

and Matters Arbitrable Under Agreement

Disputes

A party seeking to compel arbitration must establish that a valid arbitration agreement exists and that the claims asserted are within the scope of the agreement. 9 U.S.C.A. § 1, et seq.

Cases that cite this headnote

**[3]** **Alternative Dispute Resolution**

to Enforcement and Defenses in General

Right

**Alternative Dispute Resolution**

and Proceedings for Enforcement in General

Remedies

If a valid arbitration agreement exists and the claims asserted are within the scope of the agreement, a challenger must present a valid defense to the agreement; in absence of a valid defense, a trial court has no discretion to exercise and must compel arbitration. 9 U.S.C.A. § 1, et seq.

Cases that cite this headnote

**[4]** **Mandamus**

Proceedings Other Than Actions

Civil

When a trial court improperly denies a motion to compel arbitration under the Federal Arbitration Act (FAA), mandamus relief is appropriate. 9 U.S.C.A. § 1, et seq.

1 Cases that cite this headnote

**[5]** **Alternative Dispute Resolution**

of Dispute

Arbitrability

The Federal Arbitration Act (FAA) allows the parties to determine which issues are arbitrable, and the rule that courts usually decide issues of arbitrability is a default rule that applies unless

the contract provides otherwise. 9 U.S.C.A. § 1, et seq.

2 Cases that cite this headnote

**[6]** **Alternative Dispute Resolution**



of Submission

Parties to a contract can agree to submit any issue to arbitration, including questions of arbitrability.

2 Cases that cite this headnote

**[7]** **Alternative Dispute Resolution**



Ousting Jurisdiction of or Precluding Resort to Courts

**Alternative Dispute Resolution**



and Proceedings for Enforcement in General

Clause of arbitration agreement between tax advisors and clients that reallocated traditional court functions to the arbitrator was enforceable and could not serve as a basis for denying a motion to compel arbitration, absent argument that specific provision of agreement to have the arbitrator decide all arbitrability issues and resolve any contention that any arbitration procedure was unenforceable was itself invalid; clients never argued that they did not knowingly agree to arbitration.

1 Cases that cite this headnote

**Attorneys and Law Firms**

**\*498** J. Brett Busby, Mark Manela, Lee B. Kovarsky, Houston, Seth Farber, New York, NY, Paul Mogin, Washington, DC, for appellant in 14-07-00821-CV.

J. Brett Busby, Mike Stenglein, Mark D. Manela, Lee B. Kovarsky, Houston, Justin Warf, Austin, for relator in 14-07-00896-CV.

John E. Chapoton, Leif Alexander Olson, H. Ronald Welsh, Sarah A. Duckers, Houston, for appellees in 14-07-00821-CV.

Leif Alexander Olson, H. Ronald Welsh, John E. Chapoton, Houston, for real party in interest in 14-07-00896-CV.

Panel consists of Justices YATES, SEYMORE, and BOYCE.

**\*499 OPINION**

LESLIE B. YATES, Justice.

This is a consolidated request for a writ of mandamus and direct appeal by appellant Ernst & Young LLP ("E & Y") arising out of the trial court's denial of its motion to compel arbitration of the claims filed against it by appellees J. David Martin, Michael Covarrubias, and Cathy Greenwold. We conclude the trial court abused its discretion in denying E & Y's motion to compel arbitration. We conditionally grant E & Y's request for a writ of mandamus and dismiss its direct appeal as moot.

**Background**

In 1999, appellees, California residents, hired E & Y in California to provide tax advice. Appellees had anticipated that the actions they took pursuant to this advice would provide tax benefits and potential economic profit. However, the IRS disallowed the tax benefits claimed from implementing E & Y's tax advice, costing appellees millions of dollars in back taxes, penalties, and interest.

Appellees sued E & Y, among other parties, asserting claims for malpractice and various other common law theories, including fraud and unjust enrichment. E & Y filed a motion to compel arbitration under the Federal Arbitration Act ("FAA") and, in the alternative, under the Texas Arbitration Act. This request was based on language in appellees' engagement letters with E & Y agreeing to submit all disputes that could not be solved by mediation to arbitration. Appellees opposed arbitration, arguing that their contract with E & Y was unconscionable. The trial court denied the motion without explanation.

## Analysis

[1] The parties all agree that the FAA controls in this case. Indeed, the arbitration clause provides that disputes regarding the enforceability of any part of the arbitration agreement "shall be governed by the Federal Arbitration Act." Courts honor agreements to be bound by the FAA. *In re Jim Walter Homes, Inc.,* 207 S.W.3d 888, 896 (Tex.App.-Houston [14th Dist.2006], orig. proceeding).

[2] [3] [4] A party seeking to compel arbitration must establish that a valid arbitration agreement exists and that the claims asserted are within the scope of the agreement. *In re D. Wilson Constr. Co.,* 196 S.W.3d 774, 781 (Tex.2006) (orig.proceeding); *In re Igloo Prods. Corp.,* 238 S.W.3d 574, 577 (Tex.App.-Houston [14th Dist.] 2007, orig. proceeding [mand. denied] ). If these showings are made, the burden shifts to the party opposing arbitration to present a valid defense to the agreement. *In re Igloo Prods. Corp.,* 238 S.W.3d at 577. In the absence of a valid defense, the trial court has no discretion to exercise and must compel arbitration. *In re D. Wilson Constr. Co.,* 196 S.W.3d at 781; *In re Igloo Prods. Corp.,* 238 S.W.3d at 577. When a trial court improperly denies a motion to compel arbitration under the FAA, mandamus relief is appropriate. *In re Bank One, N.A.,* 216 S.W.3d 825, 826 (Tex.2007) (orig.proceeding).

Appellees argue that arbitration is improper because the contract is unconscionable under California law, which they contend controls. They claim E & Y fraudulently induced them to enter in to the agreement and that many terms of the agreement, such as limiting their damages to the fees paid to E & Y, render the agreement unconscionable. E & Y argues that California law does not apply, that even if it should, appellees have not properly invoked it, and that the **\*500** agreement is not unconscionable. We need not decide any of these issues because, under the terms of the contract, the arbitrator must make these decisions.

[5] [6] The parties disagree as to whether appellees' unconscionability defense is the type of issue that should be decided by the court or the arbitrator. *Compare Howsam v. Dean Witter Reynolds, Inc.,* 537 U.S. 79, 83, 123 S.Ct. 588, 154 L.Ed.2d 491 (2002) (noting that arbitrability is generally a question for the court), *with Buckeye Check Cashing, Inc. v. Cardegna,* 546 U.S. 440, 446, 126 S.Ct. 1204, 163 L.Ed.2d 1038 (2006) (stating that issue of a contract's validity is to be decided by arbitrator unless challenge is to arbitration clause

itself rather than contract as a whole). Regardless of which analysis would otherwise apply, neither is relevant because the parties' agreement controls. The FAA allows the parties to determine which issues are arbitrable. *See Hall Street Assocs., L.L.C. v. Mattel, Inc.,* ——U.S. ——, 128 S.Ct. 1396, 1404, 170 L.Ed.2d 254 (2008). The rule that courts usually decide issues of arbitrability is a default rule that applies unless the contract provides otherwise. *See Howsam,* 537 U.S. at 83, 123 S.Ct. 588. Parties to a contract can agree to submit any issue to arbitration, including questions of arbitrability. *See First Options of Chicago, Inc. v. Kaplan,* 514 U.S. 938, 943, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995); *see also Forest Oil Corp. v. McAllen,* 268 S.W.3d 51, 61 n. 38 (Tex.2008) (noting general rule that parties can contract as they see fit).

[7] The agreement here states:

> Any issue concerning the extent to which any dispute is subject to arbitration, or concerning the applicability, interpretation, or enforceability of these procedures, including any contention that all or part of these procedures are invalid or unenforceable, shall be governed by the [FAA] and resolved by the arbitrators.

As they acknowledged during oral argument, appellees make no argument that this specific provision—that is, the agreement to have the arbitrator decide all arbitrability issues and resolve any contention that any arbitration procedure is unenforceable—is itself invalid. Absent such an argument, an arbitration clause that reallocates traditional court functions to the arbitrator is enforceable and cannot serve as a basis for denying a motion to compel arbitration. *See Forest Oil Corp.,* 268 S.W.3d at 61 (finding trial court had no discretion but to enforce contract provision "shrinking the court's traditional role and expanding the arbitrators' " when nonmovant did not challenge that provision on any legal or public policy grounds); *Anderson v. Pitney Bowes, Inc.,* No. C 04–4808 SBA, 2005 WL 1048700, at \*2 & n. 4 (N.D.Cal. May 4, 2005) (granting motion to compel arbitration, despite allegation that arbitration was unconscionable, because contract stated arbitrator was to decide arbitrability issues and there was no allegation that the provision giving arbitrator this power was unconscionable); *Carbajal v. Household Bank, FSB,* No. 00 C 0626, 2003 WL 22159473, at \*8 (N.D.Ill. Sept.18, 2003) (same), *aff'd sub nom. Carbajal v. H & R Block Tax. Servs.,* 372 F.3d 903 (7th Cir.2004).

For the first time in post-submission briefing, appellees point to California case law purporting to hold that even when the arbitration agreement states that the arbitrator is to decide arbitrability issues, an allegation of unconscionability effectively shifts that determination to the court. However, unlike here, those cases involved a challenge to the agreement to arbitrate itself. *See Bruni v. Didion,* 160 Cal.App.4th 1272, 73 Cal.Rptr.3d 395, 400, 408 (2008); **\*501** *Murphy v. Check 'N Go,* 156 Cal.App.4th 138, 67 Cal.Rptr.3d 120, 124–25 (2007); *cf. Anderson,* 2005 WL 1048700, at \*2 & n. 4. Appellees have never argued that they did not knowingly agree to arbitration or that the specific agreement to allow the arbitrator to decide the issues of arbitrability and enforceability of the contract is unconscionable or otherwise invalid.

The parties' arbitration clause clearly states that arguments such as those made by appellees are to be decided by the arbitrator. Based on this unchallenged provision, the trial court had no discretion to deny E & Y's motion for arbitration. Therefore, we conditionally grant the writ of mandamus and direct the trial court to (1) vacate its order denying E & Y's motion to compel arbitration and (2) grant E & Y's motion to compel arbitration. The writ will issue only if the trial court fails to comply. Insofar as we have granted full relief pursuant to E & Y's request for a writ of mandamus, we dismiss E & Y's direct appeal as moot. *See In re D. Wilson Constr. Co.,* 196 S.W.3d at 784 (granting mandamus relief for improperly denying arbitration and dismissing related direct appeal as moot).

---

**End of Document**

© 2014 Thomson Reuters. No claim to original U.S. Government Works.

268 S.W.3d 51
Supreme Court of Texas.

FOREST OIL CORPORATION and
Daniel B. Worden, Petitioners,

v.

James Argyle McALLEN, El Rucio Land and Cattle
Company, Inc., San Juanito Land Partnership,
and McAllen Trust Partnership, Respondents.

No. 06–0178. | Argued Oct. 16,
2007. | Decided Aug. 29, 2008.
| Rehearing Denied Nov. 14, 2008.

**Synopsis**
**Background:** After mediated settlement in which parties
released claims relating to oil and gas royalties and mineral
underdevelopment but specifically excluded from the release
claims for environmental liability and personal injury and
provided for arbitration of such unreleased claims, plaintiffs
brought action asserting environmental and personal injury
claims. After an evidentiary hearing, the 206th District Court,
Hidalgo County, Rose Guerra Reyna, J., 2005 WL 6036449,
denied defendants' motion to compel arbitration. Defendants
brought interlocutory appeal. The Corpus Christi–Edinburg
Court of Appeals, 2005 WL 3435061, affirmed. Review was
granted.

**[Holding:]** The Supreme Court, Don R. Willett, J.,
held that waiver-of-reliance provision precluded fraudulent
inducement claim, with respect to arbitration clause.

Reversed and remanded.

Wallace B. Jefferson, C.J., filed a dissenting opinion, in which
Medina, J., joined.

West Headnotes (10)

**[1]** **Alternative Dispute Resolution**

    Scope
and standards of review

When an appeal from a denial of a motion
to compel arbitration turns on a legal
determination, the appellate court applies a de
novo standard of review.

10 Cases that cite this headnote

**[2]** **Alternative Dispute Resolution**

    Arbitration
favored; public policy

Federal law and Texas law strongly favor
arbitration. 9 U.S.C.A. § 1 et seq.; V.T.C.A.,
Civil Practice & Remedies Code § 171.001 et
seq.

3 Cases that cite this headnote

**[3]** **Alternative Dispute Resolution**

    Validity

Arbitration agreements that comport with
traditional principles of contract law are upheld
by the court.

4 Cases that cite this headnote

**[4]** **Alternative Dispute Resolution**

    Validity
of assent

While an arbitration agreement procured by
fraud is unenforceable, the party opposing
arbitration must show that the fraud relates to
the arbitration provision specifically, not to the
broader contract in which it appears.

10 Cases that cite this headnote

**[5]** **Alternative Dispute Resolution**

    Discretion

If a trial court finds that the claim falls within the
scope of a valid arbitration agreement, the court
has no discretion but to compel arbitration and
stay its own proceedings.

25 Cases that cite this headnote

**[6]** **Release**



and Misrepresentation

A disclaimer of reliance on representations, in a release, negates a fraudulent inducement claim, where the parties' intent to waive fraudulent inducement claims is clear and specific.

30 Cases that cite this headnote

**[7]** **Alternative Dispute Resolution**



of assent

Waiver-of-reliance provision in mediated settlement agreement, which agreement released claims relating to oil and gas royalties and mineral underdevelopment but specifically excluded from the release claims for environmental liability and personal injury and provided for arbitration of such unreleased claims, precluded fraudulent inducement claim with respect to arbitration clause; waiver-of-reliance provision constituted all-embracing disclaimer of any and all representations and thereby clearly and specifically expressed parties' intent to waive fraudulent inducement claims with respect to arbitration clause, terms of settlement agreement, including arbitration clause, were negotiated rather than boilerplate, during negotiations the parties specifically discussed arbitration of environmental and personal injury claims, party asserting fraudulent inducement had been represented by counsel, parties had dealt with each other in arm's length transaction, and parties were knowledgeable in business matters.

42 Cases that cite this headnote

**[8]** **Compromise and Settlement**



and Requisites

Settlement agreement are highly favored by the law.

4 Cases that cite this headnote

Fraud

**[9]** **Alternative Dispute Resolution**



Disputes

and Matters Arbitrable Under Agreement

Generally, after finding an arbitration agreement is valid, the court considers the agreement's terms, to determine which issues are arbitrable.

9 Cases that cite this headnote

Validity **[10]** **Alternative Dispute Resolution**



Matters

to Be Determined by Court

Provision of arbitration agreement, taking away court's traditional role of deciding the scope of an arbitration agreement once the court finds the agreement is valid, and instead placing with the arbitration panel the role of deciding the scope of issues subject to arbitration, would be enforced, in absence of a challenge of such provision on legal or public policy grounds.

11 Cases that cite this headnote

**Attorneys and Law Firms**

**\*52** Geoffrey L. Harrison, Johnny W. Carter, Richard Wolf Hess, Susman Godfrey LLP, Houston, TX, Mitchell C. Chaney, Aaron Pena Jr., Rodriguez Colvin Chaney & Saenz, L.L.P., Brownsville, TX, Neil E. Norquest, Rodriguez, Colvin, Chaney & Saenz, L.L.P., Edinburg, TX, for Petitioners.

Jon Christian Amberson, Larissa Janee Hood, Jon Christian Amberson, P.C., John F. Carroll, San Antonio, TX, Rolando Cantu, Rolando Cantu & Associates, P.L.L.C., McAllen, TX, Craig T. Enoch, David Scott Morris, Winstead Sechrest & Minick P.C., Austin, TX, for Respondents.

Nature

Joseph R. Knight, Baker & Botts, L.L.P., Austin, TX, for Amicus Curiae.

## Opinion

Justice WILLETT delivered the opinion of the Court, in which Justice HECHT, Justice O'NEILL, Justice WAINWRIGHT, Justice BRISTER, Justice GREEN, and Justice JOHNSON joined.

This commercial contract case asks whether an unambiguous waiver-of-reliance provision precludes a fraudulent-inducement claim as a matter of law. Here, sophisticated parties represented by counsel in an arm's-length transaction negotiated a settlement agreement that included clear and broad waiver-of-reliance and release-of-claims language. Because that agreement conclusively negates reliance on representations made by either side, any **\*53** fraudulent-inducement claim, lodged here to avoid an arbitration provision, is contractually barred. We enforce the parties' contract as written. Thus, we reverse the court of appeals' judgment and remand to the trial court to compel arbitration in accordance with our opinion.

### 1. Factual and Procedural Background

In 1999, Forest Oil Corporation settled a long-running lawsuit over oil and gas royalties and leasehold development with James McAllen and others with interests in the McAllen Ranch.[1] The settlement agreement resulted from a week-long mediation and released Forest Oil from "any and all" claims "of any type or character known or unknown" that are "in any manner relating to" the McAllen Ranch Leases and the covered lands, whether the claims sound in contract, tort, trespass or any other theory.[2] While this sweeping release resolved the royalty and nondevelopment disputes, the parties reserved the right to arbitrate under the Texas General Arbitration Act (TAA) claims "for environmental liability, surface damages, personal **\*54** injury, or wrongful death occurring at any time and relating to the McAllen Ranch Leases." The parties also incorporated into the settlement agreement a separate surface agreement that detailed ongoing care and remediation of the surface estate.[3]

Importantly, the settlement agreement specifically disclaimed reliance "upon any statement or any representation of any agent of the parties" in executing the releases contained in the agreement.[4] The parties also acknowledged they were "fully advised" by legal counsel as to both the contents and consequences of the release.

In 2004, McAllen sued Forest Oil to recover for environmental damage caused when Forest Oil allegedly "used its access under the leases to the surface estate to bury highly toxic mercury-contaminated" material on the McAllen Ranch. McAllen also alleged environmental and personal injuries caused when Forest Oil moved oilfield drilling pipe contaminated with radioactive material from the McAllen Ranch to a nearby property, the Santillana Ranch, which housed a sanctuary for endangered rhinoceroses.[5]

Forest Oil sought to compel arbitration under the settlement agreement, but **\*55** McAllen argued the arbitration provision was induced by fraud and thus unenforceable. McAllen recounts assurances during the 1999 settlement negotiations that no environmental pollutants or contaminants existed on the property. McAllen claims an unidentified lawyer for one of the four defendants "assured [McAllen] that there was no problem, no issue at all that [he] would be concerned about," and McAllen says he signed the agreement based on that specific representation. McAllen claims that when this assurance of "no environmental issues" was given, Forest Oil knew all about the radioactive-contaminated pipe and the mercury-contaminated material.

After an evidentiary hearing on Forest Oil's motion to compel arbitration, the trial court denied the motion, and the court of appeals affirmed, applying a no-evidence standard of review because the case was "an interlocutory appeal from an order denying a motion to compel arbitration that involves the defense of fraudulent inducement."[6] After examining the testimony of McAllen and a former Forest Oil employee, the court of appeals concluded there was some evidence to support the trial court's determination that the arbitration provision was induced by fraud.[7]

 [1]    This interlocutory appeal followed.[8] Although the court of appeals treated Forest Oil's argument as an evidentiary challenge, this case fundamentally poses a legal question, not a factual one: does McAllen's disclaimer of reliance on Forest Oil's representations negate the fraudulent-inducement claim as a matter of law? We review this legal question de novo.[9]

### 2. Enforcement of the Parties' Arbitration Agreement Under the Texas General Arbitration Act

[2]  [3]  [4]  [5]  We first address application of the TAA, which the parties' settlement **\*56** agreement specifically invoked. Federal and Texas law strongly favor arbitration,[10] and we uphold arbitration agreements that comport with traditional principles of contract law.[11] While an arbitration agreement procured by fraud is unenforceable,[12] the party opposing arbitration must show that the fraud relates to the arbitration provision specifically, not to the broader contract in which it appears.[13] If a trial court finds that the claim falls within the scope of a valid arbitration agreement, the "court has no discretion but to compel arbitration and stay its own proceedings."[14]

Forest Oil challenges the trial court's refusal to compel arbitration on three grounds: (1) the waiver-of-reliance provision in the contract precludes as a matter of law McAllen's ability to show the reliance element of fraudulent inducement; (2) McAllen cannot establish justifiable reliance on oral representations that directly contradict the terms of a signed contract; and (3) McAllen cannot establish justifiable reliance on statements made by an adversary. Because Forest Oil's first argument defeats McAllen's claim, we do not reach the other two.

### 3. *Schlumberger* Controls this Relevantly Similar Case: The Parties' Broad Disclaimer of Reliance is Dispositive

Forest Oil contends the waiver-of-reliance provision in the settlement agreement conclusively defeats McAllen's fraudulent inducement claim. We agree.

[6]  We considered today's question in *Schlumberger Technology Corp. v. Swanson,* holding that a disclaimer of reliance on representations, "where the parties' intent is clear and specific, should be effective to negate a fraudulent inducement claim."[15] In that case—decided eighteen months before the settlement in the instant case and construing virtually identical disclaimer language—Schlumberger and the Swansons agreed to a complete release of claims to settle a dispute involving an underwater diamond-mining project off the South African coast.[16] The Swansons sold their interests in the venture to Schlumberger for roughly $1 million,[17] and **\*57** the parties signed a settlement agreement, which included this waiver-of-reliance provision:

[E]ach of us [the Swansons] expressly warrants and represents and does hereby state ... and represent ... that no promise or agreement which is not herein expressed has been made to him or her in executing this release, and that *none of us is relying upon any statement or representation of any agent of the parties being released hereby. Each of us is relying on his or her own judgment* and each has been represented by Hubert Johnson as legal counsel in this matter. The aforesaid legal counsel has read and explained to each of us the entire contents of this Release in Full, as well as the legal consequences of this Release....[18]

After learning that Schlumberger later sold the interest to DeBeers for about $4 million, the Swansons sued, claiming Schlumberger had fraudulently induced them to accept the low-price buyout.[19] They maintained that when Schlumberger entered into the settlement, it knew that the Swansons' interest had a far higher value.[20]

Our decision in *Schlumberger* assumed that (1) the company knew during negotiations that it was misrepresenting the value of the interest, and (2) the misrepresentations were made with the intent of inducing the Swansons to settle.[21] Despite these assumptions, we held as a matter of law that the Swansons could not show fraudulent inducement.[22]

[7]  McAllen argues that *Schlumberger* is not controlling because we restricted that holding to the record, and today's case involves "notable distinctions" and "material fact differences." McAllen's chief argument to distinguish *Schlumberger* is that *Schlumberger* "focuses on representations that were made regarding the underlying agreement's core subject matter." The dispute in *Schlumberger* concerned the value of the Swansons' interest in the sea-diamond project, and the alleged misrepresentation, as described by McAllen, "pertained to the very thing disputed, which was resolved 'once and for all' in the settlement."[23] This case is different, says McAllen, because the litigation that led to the 1999 settlement concerned royalty underpayments and mineral underdevelopment, issues having nothing to do with the environmental and personal-injury torts that sparked the current litigation and were excepted from the settlement agreement. That is, while the misrepresentation in *Schlumberger* "pertained to the very matter negotiated, settled, and released"—a factor that McAllen terms "the primary basis" for the Court's holding—the misrepresentation here did not concern known disputed matters (which were settled and released) but potential future disputes (which were

set aside and reserved). And the disclaimer applies solely to representations about the former, not the latter. Under this banner, McAllen makes three subsidiary arguments.

First, McAllen stresses that the parties' settlement in *Schlumberger* definitively ended their valuation dispute. McAllen points out that the settled dispute was the only dispute, meaning that the agreed-to disclaimer was sufficiently specific to bar a **\*58** later fraudulent-inducement suit alleging one side misled the other about valuation. [24] By contrast, in this case, ending the royalty underpayment and mineral underdevelopment dispute was not the sole purpose of the settlement agreement, McAllen argues, making the disclaimer insufficiently specific to be applied to every representation made by Forest Oil.

McAllen identifies a valid factual distinction, but we fail to see how the disclaimer's preclusive effect should be different where, as here, the parties agreed to resolve litigated claims and arbitrate future ones. Although we noted in *Schlumberger* that the company's representations about the project's value and feasibility led to "the very dispute that the release was supposed to resolve,"[25] this language is more accurately interpreted as emphatic language, not limiting language. Our analysis in *Schlumberger* rested on the paramount principle that Texas courts should uphold contracts negotiated at arm's length by "knowledgeable and sophisticated business players" represented by "highly competent and able legal counsel," a principle that applies with equal force to contracts that reserve future claims as to contracts that settle all claims. [26] Essentially, *Schlumberger* holds that when knowledgeable parties expressly discuss material issues during contract negotiations but nevertheless elect to include waiver-of-reliance and release-of-claims provisions, the Court will generally uphold the contract. An all-embracing disclaimer of any and all representations, as here, shows the parties' clear intent. A "once and for all" settlement may constitute an *additional* factor urging rejection of fraud-based claims, but a freely negotiated agreement to settle present disputes and arbitrate future ones should also be enforceable. Moreover, contrary to McAllen's assertions, the parties' discussions here *did* in fact address environmental matters. Not only were such matters "very important" to McAllen during settlement negotiations, as he testified, the parties also negotiated the surface agreement, which directly touches on the subject of Forest Oil's alleged fraud: environmental contamination on the McAllen Ranch. The surface agreement, incorporated into the settlement agreement, required Forest Oil to remove hazardous material

and remediate past and future contamination. Therefore, the parties expressly negotiated the treatment of surface issues; environmental issues were an important aspect of the contract. Although the settlement agreement does not preclude all future environmental disputes, it does require arbitration of them.

Second, McAllen contends the settlement language itself compels a different result from *Schlumberger.* McAllen maintains that the disclaimer he signed is limited by its terms to representations about the matters released and settled, not to misrepresentations about matters reserved and excluded from the settlement. Here, the waiver-of-reliance provision states: "Each of the [plaintiffs] expressly warrants and represents and does hereby state and represent that no promise or agreement which is not herein expressed has been made to him, her, or it *in executing the releases* contained in this Agreement...."[27] McAllen claims the isolated **\*59** phrase "in executing the releases" limits the waiver's application only to released claims because the phrase refers to "releases" in the plural. Because an arbitration provision is not a release, he reasons, the parties did not waive reliance with respect to misrepresentations concerning the matters reserved for arbitration. This argument discounts the second half of the same sentence, which makes clear the parties intended an exhaustive waiver unconfined to claims specifically released: "none of them is relying upon *any* statement or *any* representation of *any* agent of the parties being released hereby."[28] Contrary to McAllen's interpretation, a natural and contextual reading, given the repeated and all-encompassing "any" modifier, is not nearly so restrictive. It rather plainly means the parties, "in executing the releases," were not led astray by any representations whatsoever, even representations about nonreleased claims since those, too, can induce someone to release other claims. The disclaimer's words do not say what McAllen construes them to say, that there was "no promise or agreement *concerning the released claims* which is not herein expressed"; those four italicized words do not exist. Waiving reliance on statements made in executing the release provisions encompasses both claims released and reserved because even statements about the latter can nudge assent to settle the former. Notably, in this case, the release *itself* (in a section titled "Releases" no less) specifically requires arbitration, making clear that at the time of the agreement, the parties disclaimed reliance with respect to *all* decisions being made during negotiations, including the decision to resolve future disputes regarding environmental and personal-injury claims via arbitration. It is difficult to argue that Forest Oil's alleged fraud in obtaining

arbitration bears no relation to the release when the arbitration requirement appears in the release. It is similarly difficult to square McAllen's argument with this explicit language from the settlement agreement, which incorporated the surface agreement: "disputes relating to this Agreement ... will be resolved by arbitration." [29]

Third, McAllen argues that fraudulent inducement "is essentially a meeting-of-the-minds argument," and there was no such meeting here regarding the arbitration agreement because Forest Oil knew all along of the potential for environmental claims while simultaneously assuring McAllen "there [were] no issues having to do with the surface." The parties thus had no common understanding of the facts underlying the contract, according to McAllen. But the settlement agreement itself belies this argument. The parties agreed that they might disagree and decided to arbitrate any environmental or personal-injury disputes that might later arise. If they were certain such disagreements would never arise, there would have been no need to reserve future claims for arbitration. The act of specifically carving out this discrete category of contamination claims shows that McAllen in fact placed little trust in Forest Oil's assurances that there were "no issues having to do with the surface" and that both parties recognized the possibility that McAllen might pursue future claims. Moreover, there is an arbitration provision in the environment-focused surface agreement itself, not only in the broader settlement agreement. According to the surface agreement, **\*60** "[s]urface issues which arise in connection with the Leases" must be arbitrated. McAllen knew environmental disputes might arise and agreed to arbitrate these disputes.

It is true that *Schlumberger* noted a disclaimer of reliance "will not always bar a fraudulent inducement claim," [30] but this statement merely acknowledges that facts may exist where the disclaimer lacks "the requisite clear and unequivocal expression of intent necessary to disclaim reliance" on the specific representations at issue. [31] Courts must always examine the contract itself and the totality of the surrounding circumstances when determining if a waiver-of-reliance provision is binding. We did so in *Schlumberger,* but since courts of appeals seem to disagree over which *Schlumberger* facts were most relevant, [32] we now clarify those that guided our reasoning: (1) the terms of the contract were negotiated, rather than boilerplate, and during negotiations the parties specifically discussed the issue which has become the topic of the subsequent dispute; (2) the

complaining party was represented by counsel; (3) the parties dealt with each other in an arm's length transaction; (4) the parties were knowledgeable in business matters; and (5) the release language was clear. These factors were each present in *Schlumberger,* and they are each present in this case.

**[8]** Refusing to honor a settlement agreement—an agreement highly favored by the law [33]—under these facts would invite unfortunate consequences for everyday business transactions and the efficient settlement of disputes. After-the-fact protests of misrepresentation are easily lodged, and parties who contractually promise not to rely on extra-contractual statements—*more than that, promise that they have in fact not relied upon such statements*—should be held to their word. Parties should not sign contracts while crossing their fingers behind their backs. McAllen accuses Forest Oil of deceit, but Forest Oil could make the same allegation against McAllen—who by his own admission and in writing is claiming the opposite now of what he expressly disclaimed then. It is not asking too much that parties not rely on extra-contractual statements that they contract not to rely on (or else set forth the relied-upon representations in the contract or except them from the disclaimer). **\*61** If disclaimers of reliance cannot ensure finality and preclude post-deal claims for fraudulent inducement, then freedom of contract, even among the most knowledgeable parties advised by the most knowledgeable legal counsel, is grievously impaired.

We conclude the arbitration requirement is integral to the overall release and the settlement agreement's waiver-of-reliance language applies by its terms to the parties' commitment to arbitrate. None of McAllen's arguments materially distinguishes our holding in *Schlumberger:* "a release that clearly expresses the parties' intent to waive fraudulent inducement claims, or one that disclaims reliance on representations about specific matters in dispute, can preclude a claim of fraudulent inducement." [34] Today's holding should not be construed to mean that a mere disclaimer standing alone will forgive intentional lies regardless of context. We decline to adopt a *per se* rule that a disclaimer automatically precludes a fraudulent-inducement claim, but we hold today, as in *Schlumberger,* that "on this record," the disclaimer of reliance refutes the required element of reliance.

### 4. Scope of the Arbitration Clause

 **[9]**   **[10]**   Having determined that McAllen's fraudulent-inducement claim cannot defeat the arbitration provision in the 1999 settlement agreement, we now turn to whether McAllen's claims fall within the scope of that arbitration provision.[35] Generally, after finding an agreement valid, a court considers the agreement's terms to determine which issues are arbitrable.[36] This arbitration agreement, however, removes the "scope determination" from the court and places it with the arbitration panel.[37] This provision, shrinking the court's traditional role and expanding the arbitrators', is not challenged on legal or public policy grounds.[38] Accordingly, we have no discretion but to direct the trial court to compel arbitration and stay McAllen's litigation.[39]

The remaining question is what should happen to the claims brought by the nonsignatory plaintiffs who are not parties to the arbitration requirement (or to this appeal). Forest Oil concedes the trial court cannot order the nonsignatory plaintiffs to arbitration. Section 171.025(a) of the Civil Practice and Remedies Code provides that "[t]he court shall stay a proceeding that **\*62** involves an issue subject to arbitration if an order for arbitration or an application for that order is made under this subchapter." Section 171.025(b) expressly allows for the severance of nonarbitrable issues.[40] Because the trial court is better positioned to make that determination in this instance, we remand the severance issue to that court.

However, as noted above, McAllen and Forest Oil agreed to arbitrate disputes over what the agreement covers. In terms of timing, the arbitrators should decide scope before the trial court decides severance. It is impractical (and probably impossible) for the trial court to decide the severability of the nonsignatories' claims before the arbitration panel has decided the scope of the signatories' claims. Accordingly, the trial court, in order to make an informed severance decision, should defer its decision until the arbitrators decide which issues are arbitrable.

### 5. Conclusion

McAllen may be correct that "[t]he facts of this case are not the facts of *Schlumberger* "—every case involves unique facts—but the decisive ones are assuredly close enough that *Schlumberger* binds this relevantly similar case. The unequivocal disclaimer of reliance in the parties' bargained-for settlement agreement conclusively negates as

a matter of law the element of reliance needed to support McAllen's fraudulent-inducement claim. Because Forest Oil has demonstrated that a valid arbitration agreement exists, an agreement that empowers the arbitrators to determine what issues are arbitrable, we reverse the court of appeals' judgment and remand this case to the trial court to compel arbitration in accordance with our opinion.

Chief Justice JEFFERSON filed a dissenting opinion, in which Justice MEDINA joined.

Chief Justice JEFFERSON, joined by Justice MEDINA, dissenting.

According to the Court, the considerations most relevant to our analysis in *Schlumberger Technology Corp. v. Swanson,* 959 S.W.2d 171 (Tex.1997), were:

> (1) the terms of the contract were negotiated, rather than boilerplate, and during negotiations the parties specifically discussed the issue which has become the topic of the subsequent dispute; (2) the complaining party was represented by counsel; (3) the parties dealt with each other in an arm'slength transaction; (4) the parties were knowledgeable in business matters; and (5) the release language was clear.

268 S.W.3d 60. My disagreement with the Court centers on the first point. Under the Court's analysis, a party may intentionally misrepresent facts essential to the bargain to induce the other to sign, as long as the agreement says reliance is waived. This is not sound policy, and *Schlumberger* does not support this result. I would hold that McAllen's fraudulent inducement claim survives the disclaimer of reliance at issue here. Because the Court does not, I respectfully dissent.

### I

#### *Schlumberger*

In *Schlumberger,* we noted that we had previously held "as a matter of policy, that a merger clause can be avoided based on fraud in the inducement and that the parol evidence rule does not bar proof of such fraud," and that "[i]n doing so, we brought **\*63** the law on the subject 'into harmony with

the great weight of authority, with the rule of the Restatement of the Law of Contracts, and with the views of eminent textwriters.' " *Schlumberger,* 959 S.W.2d at 179 (quoting *Dallas Farm Mach. Co. v. Reaves,* 158 Tex. 1, 307 S.W.2d 233, 239 (1957)). This remains the general rule in Texas. *See Prudential Ins. Co. of Am. v. Jefferson Assocs.,* 896 S.W.2d 156, 162 (Tex.1995); *see also Weitzel v. Barnes,* 691 S.W.2d 598, 600 (Tex.1985) (admitting parol evidence to establish misrepresentation in DTPA claim); Restatement (Second) of Contracts, § 214 cmt. c ("What appears to be a complete and binding integrated agreement may be a forgery, a joke, a sham, or an agreement without consideration, or it may be voidable for *fraud,* duress, mistake, or the like, or it may be illegal. Such invalidating causes need not and commonly do not appear on the face of the writing. *They are not affected even by a 'merger' clause.*") (emphasis added). We then noted that "[j]uxtaposed to this authority, we have a competing concern—the ability of parties to fully and finally resolve disputes between them." *Schlumberger,* 959 S.W.2d at 179. The Court reads *Schlumberger* as settling these competing concerns by precluding a fraudulent inducement claim where there is a disclaimer of reliance and the factors listed above are present.

But *Schlumberger* is not so broad. There, we held that, where the four other factors listed by the Court are present, "a release that clearly expresses the parties' intent to waive fraudulent inducement claims, or one that disclaims reliance on representations about specific matters in dispute, can preclude a claim of fraudulent inducement." *Id.* at 181. The release in *Schlumberger* did not contain an express waiver of fraudulent inducement claims, but did disclaim reliance on representations about specific matters in dispute. *Id.* at 180. The release itself noted that " 'there [wa]s considerable doubt, disagreement, dispute and controversy with reference to the validity of the [claim being settled],' " and the "sole purpose of the release was to end [that] dispute." *Id.* The *Schlumberger* Court therefore concluded "that the parties contemplated, by the inclusion of [the disclaimer of reliance], that the Swansons would not rely on any representations of Schlumberger about the commercial feasibility and value of this project, which, after all, was the very dispute that the release was supposed to resolve." *Id.*

That the *Schlumberger* Court limited its holding to a release "that clearly expresses the parties' intent to waive fraudulent inducement claims, or one that disclaims reliance on representations about specific matters in dispute" is clear from the rest of the opinion. *Id.* at 181. Indeed, we "emphasize

[d]" in *Schlumberger* "that a disclaimer of reliance or merger clause will not always bar a fraudulent inducement claim." *Id.* We cited *Prudential Insurance Co. of America v. Jefferson Associates,* in which we said "[a] buyer is not bound by an agreement to purchase something 'as is' that he is induced to make because of a fraudulent representation or concealment of information by the seller." *Prudential,* 896 S.W.2d 156, 162 (Tex.1995). This would be a strange authority to cite if *Schlumberger* were as sweeping as the Court suggests: it is difficult to imagine a party making fraudulent representations on a subject that has not been discussed. And while the Court states that "this statement merely acknowledges that facts may exist where the disclaimer lacks 'the requisite clear and unequivocal expression of intent necessary to disclaim reliance' on the specific representations at issue," it does so without addressing *Prudential,* instead quoting an earlier passage **\*64** from *Schlumberger.* 268 S.W.3d at 55 (quoting *Schlumberger,* 959 S.W.2d at 179).

In sum, in *Schlumberger* we balanced parties' need to settle disputes against our strong aversion to fraud. The result was a narrow exception to the rule that integration clauses do not bar fraudulent inducement claims. By expanding *Schlumberger,* the Court's holding will force courts to honor contracts indisputably induced by fraud on the basis of blanket reliance waivers, like the one at issue here. I would not.

## II

### McAllen's Fraudulent Inducement Claim

As discussed above, under *Schlumberger,* to bar a fraudulent inducement claim, a disclaimer of reliance must either expressly waive the claim or disclaim reliance on representations about the specific disputed matter, *Schlumberger,* 959 S.W.2d at 181; otherwise, the general rule that integration clauses do not bar fraudulent inducement claims applies. The disclaimer in this case does neither. The relevant portion of the disclaimer reads:

> Each of the Plaintiffs and Intervenors expressly warrants and represents and does hereby state and represent that no promise or agreement which is not herein expressed has been made to him, her, or it in executing the releases contained in this Agreement, and that none of them is relying upon

any statement or any representation of any agent of the parties being released hereby.

This disclaimer makes no explicit reference to fraudulent inducement. The question, then, is whether it disclaims reliance on representations about a specific disputed matter in the agreement. While the disclaimers in this case and *Schlumberger* may appear to be "virtually identical," 268 S.W.3d at 60, the factual differences between this case and *Schlumberger* are critical. In *Schlumberger,* there was essentially one dispute—specifically described in the agreement—being settled, and therefore, "[b]ecause courts are to assume that the parties intended every contractual provision to have some meaning," the Court was able to "presume" that the disclaimer of reliance applied specifically to representations about that sole dispute. *Schlumberger, 959 S.W.2d at 180.* In the instant case, in contrast, the settlement agreement covered a number of topics, chiefly royalty underpayment and mineral underdevelopment. Thus, unlike *Schlumberger,* we cannot presume that the disclaimer of reliance referred specifically to environmental issues, and the general rule that fraudulent inducement claims are not barred by integration clauses should apply.

### III

#### Forest Oil's Remaining Issues

Forest Oil argues that McAllen could not have justifiably relied on Forest Oil's representation that there were no existing issues with the surface because that representation was contradicted by the agreement's express terms. Because the surface agreement contains no contrary statement regarding surface conditions, it is not necessary to examine this claim in detail.

Forest Oil also argues that McAllen could not justifiably rely on the representation of his litigation adversary during settlement negotiations. Forest Oil cites *McCamish, Martin, Brown & Loeffler v. F.E. Appling Interests,* for the proposition that "a third party's reliance on an attorney's representation is not justified when the representation takes place in an adversarial context." *McCamish,* 991 S.W.2d 787, 794 (Tex.1999). This statement, however, refers not to whether attorneys' **\*65** statements can provide the grounds for a fraudulent inducement claim, but to individual attorneys' liability for negligent misrepresentation under

the Restatement (Second) of Torts section 552. *Id.* at 795 (concluding "that there is no reason to exempt lawyers from the operation of section 552"). Regardless, there is evidence that McAllen relied not only on the statements of "an unidentified lawyer for one of the four defendants," 268 S.W.3d at 55, but on representations made by the parties themselves:

Q. (By Mr. Mancias) Yes, sir. Were you told in no uncertain terms *by the oil companies,* including Forest Oil Company, that there were no contaminants or pollutants on the surface of your property?

A. (By Mr. McAllen) *Yes.* And all the Forest attorneys were there. I believe Forest Doran himself was there.

Q. Who is Forest Doran?

A. I believe he's the majority stockholder of Forest Oil Company.

Q. Can you tell the Judge whether or not Mr. Doran was present when those representations you just testified about were made to you?

A. That, I can't recall.

Q. All right, sir. But the attorneys were present?

A. The attorneys—his attorneys were present.

* * *

A. But during the process, *the owners for Forest and Conoco and everybody else who was involved in the lawsuit assured me that there was no issues* [sic] *having to do with the surface,* and if I wanted to get this settlement agreement behind us, I had to do that. But they were very convincing.

(Emphasis added.) McAllen's reliance on these statements was not, therefore, unjustifiable as a matter of law.

### IV

#### Conclusion

Today the Court replaces *Schlumberger*'s requirement that a release must "clearly express[ ] the parties' intent to waive fraudulent inducement claims, or ... disclaim[ ] reliance on representations about specific matters in dispute" in order to preclude a fraudulent inducement claim, 959 S.W.2d at

181, with the requirement that the parties merely "specifically discussed the issue which has become the topic of the subsequent dispute" during negotiations, 268 S.W.3d 60. Courts, including this one, have long battled the specter of fraud in contracts; I fear that the Court's opinion may one day be a weapon in the hands of those who profit from it. I respectfully dissent.

**Parallel Citations**

168 Oil & Gas Rep. 450, 51 Tex. Sup. Ct. J. 1309

Footnotes

1    This appeal does not involve every party to the 1999 settlement agreement at issue. The defendants in the litigation that resulted in that settlement were Forest Oil Corporation, Shell Oil Company, Conoco Incorporated, and Fina Oil & Chemical Company, along with divisions of these entities. The plaintiffs included various business entities, individuals, and individual trusts. These parties settled their dispute in June 1999.

Five years later, James McAllen and several others filed suit against Forest Oil, its employee (Daniel B. Worden), and ConocoPhillips Corporation. ConocoPhillips was nonsuited, so only Forest Oil and Worden are petitioners here. They are referred to collectively as "Forest Oil." Four plaintiffs to the pending litigation—James McAllen, El Rucio Land & Cattle Company, San Juanito Land Partnership, and McAllen Trust Partnership—are respondents to this appeal and referred to collectively as "McAllen," unless otherwise noted. These four plaintiffs admit they are bound by the 1999 settlement agreement either as signatories or successors in interest thereto. Several other plaintiffs are not parties to this appeal, and Forest Oil concedes the trial court lacked authority to require these other plaintiffs to arbitrate the current dispute.

2    The release language reads:

[The plaintiffs] generally and unconditionally RELEASE, DISCHARGE, and ACQUIT [the defendants] of and from any and all claims and causes of action of any type or character known or unknown, which they presently have or could assert, including but not limited to all claims and causes of action (i) in any manner relating to, arising out of or connected with the McAllen Ranch Leases, or any of them, (ii) in any manner relating to, arising out of or connected with the Lands covered by the McAllen Ranch Leases, or any of them, (iii) in any manner relating to, arising out of or connected with any implied covenants pertaining to the McAllen Ranch Leases, or any of them, including (without limitation) implied covenants or obligations with respect to drainage, development, unitization, marketing or the administration of the McAllen Ranch Leases ... (vi) all claims and causes of action that the [plaintiffs] asserted or could have asserted in the Lawsuit including (without limitation) matters arising or sounding in contract, in tort (including intentional torts, fraud, conspiracy, and negligence), in trespass, for forfeiture, or under any other theory or doctrine, including any claim for attorneys fees, costs, and sanctions; and the [plaintiffs] hereby declare that all such claims and causes of action have been fully compromised, satisfied, paid and discharged; except that the [plaintiffs] reserve and except from this release only (a) their rights to receive the consideration (monetary and otherwise) provided in this Agreement, (b) their rights to accrued but unpaid royalties ..., (c) any rights and claims arising under the McAllen Ranch Leases ... after the Effective Date of this Agreement, (d) any rights or claims they may have, if any, for environmental liability, surface damages, personal injury, or wrongful death occurring at any time and relating to the McAllen Ranch Leases, (e) the funds held [pursuant to this Agreement], and (f) any intentional act done in contravention of this Agreement or the McAllen Ranch Leases between the date of execution hereof and the Effective Date. Any disputes over any of the above items excepted and reserved from this release shall be resolved in arbitration pursuant to [this Agreement].

3    The surface agreement required that oil companies remove nonnatural materials from the sites of abandoned wells and "not store or dispose of any hazardous materials on the surface of the Leases." In addition, the surface agreement states plainly that surface issues shall be addressed by arbitration: "Surface issues which arise in connection with the Leases shall be subject to that certain Arbitration Agreement set forth and described in the Settlement Agreement. The specific issues addressed below shall become part of the Settlement Agreement and shall be enforceable in accordance with the terms of such Agreement."

4    The waiver-of-reliance provision reads:

[1] Each party acknowledges and confirms that each has had the opportunity to consult with counsel and has been fully advised by counsel prior to the execution of this Agreement.

[2] Each of the Plaintiffs and Intervenors expressly warrants and represents and does hereby state and represent that no promise or agreement which is not herein expressed has been made to him, her, or it in executing the releases contained in this Agreement, and that none of them is relying upon any statement or any representation of any agent of the parties being released hereby. Each of the Plaintiffs and Intervenors is relying on his, her, or its own judgment and each has been represented by his, her, or its own

legal counsel in this matter. The legal counsel for Plaintiffs have read and explained to each of the Plaintiffs the entire contents of the releases contained in this Agreement as well as the legal consequences of the releases....

[3] Defendants expressly represent and warrant and do hereby state and represent that no promise or agreement which is not herein expressed has been made to them in executing the releases contained in this Agreement, and that they are not relying upon any statement or representation of any of the parties being released hereby. Defendants, and each of them are relying upon its own judgment and each has been represented by its own legal counsel in this matter. The legal counsel for Defendants have read and explained to them the entire contents of the releases contained in this Agreement as well as the legal consequences of the releases.

The plaintiffs filed a joint petition asserting negligence, gross negligence, trespass, nuisance, strict liability, negligence per se, misrepresentation, fraud, fraudulent concealment, and intentional battery. The facts giving rise to these causes of action took place on two properties: the Santillana Ranch and the McAllen Ranch. We will refer to the claims arising on the McAllen Ranch as the "McAllen Ranch claims" and claims arising on the Santillana Ranch as the "Santillana Ranch claims."

Forest Oil produces oil on the McAllen Ranch pursuant to the McAllen Ranch Leases; this relationship was the basis of the original 1999 litigation that produced the now-disputed settlement agreement. The Santillana Ranch is owned by John R. Willis Management Partnership; this entity is one of the plaintiffs to the underlying suit that are not parties to this appeal. *See supra* note 1. The Third Amended Petition claims Forest Oil buried radioactive material on the McAllen Ranch, resulting in groundwater and soil contamination. The petition does not assert personal injuries related to the McAllen Ranch. McAllen tried to establish a rhinoceros sanctuary on the Santillana Ranch and asked Forest Oil, which has no lease on that ranch, to donate oilfield pipe to be used as pen enclosures. Forest Oil took pipe from the McAllen Ranch to the Santillana Ranch, where McAllen and his employees worked on the rhinoceros pens. McAllen claims this pipe was radioactive and has produced both environmental and personal injuries.

Forest Oil claims that because the pipe giving rise to the Santillana Ranch claims came from the McAllen Ranch, the Santillana Ranch claims also fall within the settlement agreement's arbitration clause, which requires arbitration of claims "arising out of or relating to the McAllen Ranch Leases." We do not reach this issue.

268 S.W.3d 63.

*Id.* at 64.

We have jurisdiction to hear an appeal from an interlocutory order denying arbitration if the court of appeals' decision conflicts with our precedent. *See* TEX. GOV'T CODE §§ 22.001(a)(2), 22.225(c); TEX. CIV. PRAC. & REM.CODE § 171.098; *Certain Underwriters at Lloyd's of London v. Celebrity, Inc.,* 988 S.W.2d 731, 733 (Tex.1998). As explained below, the court of appeals' decision conflicts with *Schlumberger Technology Corp. v. Swanson,* 959 S.W.2d 171 (Tex.1997).

When an appeal from a denial of a motion to compel arbitration turns on a legal determination—here, the preclusive effect of the contract's disclaimer—we apply a de novo standard. *J.M. Davidson, Inc. v. Webster,* 128 S.W.3d 223, 227 (Tex.2003) ("The trial court's determination of the arbitration agreement's validity is a legal question subject to de novo review."); *see also In re D. Wilson Constr. Co.,* 196 S.W.3d 774, 781 (Tex.2006).

*Prudential Sec. Inc. v. Marshall,* 909 S.W.2d 896, 898 (Tex.1995); *see also In re FirstMerit Bank, N.A.,* 52 S.W.3d 749, 753 (Tex.2001). Whether a case is governed by the Federal Arbitration Act (FAA) or the TAA, many of the underlying substantive principles are the same; where appropriate, this opinion relies interchangeably on cases that discuss the FAA and TAA.

*In re D. Wilson Constr. Co.,* 196 S.W.3d at 781; *Webster,* 128 S.W.3d at 227.

TEX. CIV. PRAC. & REM.CODE § 171.001(b) ("A party may revoke the agreement only on a ground that exists at law or in equity for the revocation of a contract."); *see also Doctor's Assocs., Inc. v. Casarotto,* 517 U.S. 681, 687, 116 S.Ct. 1652, 134 L.Ed.2d 902 (1996); *In re Kellogg Brown & Root, Inc.,* 166 S.W.3d 732, 738 (Tex.2005).

*See Prima Paint Corp. v. Flood & Conklin Mfg. Co.,* 388 U.S. 395, 403–04, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967). If a fraudulent-inducement claim attacks the broader contract, then the arbitrator, not a court, considers the matter. *See In re FirstMerit Bank, N.A.,* 52 S.W.3d at 758. In this case, we assume that the alleged fraud went to the arbitration agreement itself since Forest Oil does not argue otherwise. *See* TEX.R.APP. P. 53.2(f); *Ramos v. Richardson,* 228 S.W.3d 671, 673 (Tex.2007).

*In re FirstMerit Bank, N.A.,* 52 S.W.3d at 753–54; *see also* TEX. CIV. PRAC. & REM.CODE § 171.021.

959 S.W.2d 171, 179 (Tex.1997).

*Id.* at 174.

*Id.*

*Id.* at 180. The disclaimer in today's case is virtually the same. *See supra* note 4.

*Id.* at 174.

*Id.*

*Id.* at 178.

22    *Id.* at 181.

23    *Id.* at 179–81.

24    *Id.* at 180 ("The sole purpose of the release was to end the dispute about the value of this commercial project between Schlumberger and the Swansons once and for all.").

25    *Id.* The reasoning of the case applies broadly to contracts generally, and we see no reason to accept McAllen's restrictive interpretation.

26    *Id.*

27    *See supra* note 4.

28    *Id.*

29    *See also supra* note 3 ("Surface issues which arise in connection with the Leases shall be subject to that certain Arbitration Agreement set forth and described in the Settlement Agreement.").

30    959 S.W.2d at 181.

31    *Id.* at 179.

32    *See, e.g., Warehouse Assocs. Corporate Ctr. II, Inc. v. Celotex Corp.,* 192 S.W.3d 225, 230–34 (Tex.App.–Houston [14th Dist.] 2006, pet. filed) (limiting *Schlumberger* to cases in which the parties resolve a long-running dispute that is also the topic of the alleged fraudulent representation); *Coastal Bank SSB v. Chase Bank of Texas, N.A.,* 135 S.W.3d 840, 844 (Tex.App.–Houston [1st Dist.] 2004, no pet.) (considering the broad language of the waiver-of-reliance provision to be the controlling factor); *IKON Office Solutions, Inc. v. Eifert,* 125 S.W.3d 113, 124–28 (Tex.App.–Houston [14th Dist.] 2003, pet. denied) (applying *Schlumberger* in a factual situation that did not involve a settlement agreement or a contract that terminated the parties' relationship); *John v. Marshall Health Servs., Inc.,* 91 S.W.3d 446, 450 (Tex.App.–Texarkana 2002, pet. denied) (refusing to apply *Schlumberger* because "[h]ere, the contract was the beginning, not the end, of the relationship between" the parties).

33    *See Transp. Ins. Co. v. Faircloth,* 898 S.W.2d 269, 280 (Tex.1995) ("Settlements are favored because they avoid the uncertainties regarding the outcome of litigation, and the often exorbitant amounts of time and money to prosecute or defend claims at trial."); *Bocanegra v. Aetna Life Ins. Co.,* 605 S.W.2d 848, 855 (Tex.1980) (Campbell, J., concurring) ("Settlement agreements are highly favored in the law because they are a means of amicably resolving doubts and preventing lawsuits.").

34    959 S.W.2d at 181.

35    The TAA allows personal-injury claims to be arbitrated when each party, on advice of counsel, has agreed to do so in a writing signed by the parties and their attorneys. TEX. CIV. PRAC. & REM.CODE § 171.002(c). All parties to this appeal—or their predecessors in interest—and their attorneys signed the settlement agreement, which contains the arbitration agreement, so there is no statutory prohibition to arbitrating these claims.

36    *In re FirstMerit Bank, N.A.,* 52 S.W.3d 749, 753 (Tex.2001).

37    The arbitration provision reads: "All disputes arising out of or relating to the McAllen Ranch Leases, including, without in any way limiting the foregoing, disputes relating to this Agreement or disputes over the scope of this arbitration clause, will be resolved by arbitration in Houston, Texas, using three neutral arbitrators." While this provision clearly encompasses the McAllen Ranch claims, it is not clear that it includes the Santillana Ranch claims.

38    *In re Prudential Ins. Co. of Am.,* 148 S.W.3d 124, 129–30 (Tex.2004) ("As a rule, parties have the right to contract as they see fit as long as their agreement does not violate the law or public policy."); *see also Fairfield Ins. Co. v. Stephens Martin Paving, LP,* 246 S.W.3d 653, 663–64 (Tex.2008).

39    TEX. CIV. PRAC. & REM.CODE § 171.021; *In re Oakwood Mobile Homes, Inc.,* 987 S.W.2d 571, 573 (Tex.1999).

40    TEX. CIV. PRAC. & REM.CODE § 171.025(b) ("The stay applies only to the issue subject to arbitration if that issue is severable from the remainder of the proceeding.").

**End of Document**                                    © 2014 Thomson Reuters. No claim to original U.S. Government Works.

**Green Tree Financial Corp.-Alabama v. Randolph, 531 U.S. 79 (2000)**

121 S.Ct. 513, 84 Fair Empl.Prac.Cas. (BNA) 769, 148 L.Ed.2d 373, 69 USLW 4023...

121 S.Ct. 513
Supreme Court of the United States

GREEN TREE FINANCIAL CORP.–ALABAMA
and Green Tree Financial Corporation, Petitioners,
v.
Larketta RANDOLPH.

No. 99–1235.   |   Argued Oct. 3,
2000.   |   Decided Dec. 11, 2000.

Purchaser of mobile home brought purported class action against lender which had financed purchase, asserting claims under Truth in Lending Act (TILA) and Equal Credit Opportunity Act (ECOA). The United States District Court for the Middle District of Alabama, No. CV-96-D-11-N, Ira De Ment, J., 991 F.Supp. 1410, granted motion to compel arbitration and dismissed purchaser's claims with prejudice. Purchaser appealed. The Court of Appeals for the Eleventh Circuit, Carnes, Circuit Judge, 178 F.3d 1149, reversed and remanded. Certiorari was granted. The Supreme Court, Chief Justice Rehnquist, held that: (1) order compelling arbitration and dismissing a party's underlying claims is a "final decision with respect to an arbitration" within meaning of Federal Arbitration Act (FAA), and thus is immediately appealable; abrogating - *Seacoast Motors of Salisbury, Inc. v. Chrysler Corp.*, 143 F.3d 626 (C.A.1 1998); *Altman Nursing, Inc. v. Clay Capital Corp.*, 84 F.3d 769 (C.A.5 1996); *Napleton v. General Motors Corp.*, 138 F.3d 1209 (C.A.7 1998); *Gammaro v. Thorp Consumer Discount Co.*, 15 F.3d 93 (C.A.8 1994); *McCarthy v. Providential Corp.*, 122 F.3d 1242 (C.A.9 1997), and (2) arbitration agreement that does not mention arbitration costs and fees is not per se unenforceable on theory that it fails to affirmatively protect a party from potentially steep arbitration costs.

Affirmed in part and reversed in part.

Justice Ginsburg filed opinion concurring in part and dissenting in part, in which Justices Stevens and Souter joined, and in which Justice Breyer joined in part.

West Headnotes (12)

**[1]** **Alternative Dispute Resolution**



reviewable;  finality

District court order compelling arbitration and dismissing a party's underlying claims is a "final decision with respect to an arbitration" within meaning of Federal Arbitration Act (FAA) provision governing appellate review of arbitration orders, and thus is immediately appealable. 9 U.S.C.A. § 16(a)(3).

252 Cases that cite this headnote

**[2]** **Alternative Dispute Resolution**



reviewable;  finality

Federal Arbitration Act (FAA) provision governing appeal from district court's arbitration order preserves immediate appeal of any "final decision with respect to an arbitration," regardless of whether the decision is favorable or hostile to arbitration. 9 U.S.C.A. § 16(a)(3).

66 Cases that cite this headnote

**[3]** **Federal Courts**



constitutes finality in general

"Final decision" is a decision that ends the litigation on the merits and leaves nothing more for the court to do but execute the judgment.

51 Cases that cite this headnote

**[4]** **Alternative Dispute Resolution**



reviewable;  finality

Because Federal Arbitration Act (FAA) does not define phrase "a final decision with respect to an arbitration," as used in FAA provision governing appeal from district court's arbitration order, nor does FAA otherwise suggest that the ordinary meaning of "final decision" should not apply, court should accord the term its well-established meaning. 9 U.S.C.A. § 16(a)(3).

Decisions

Decisions

What

Decisions

Green Tree Financial Corp.-Alabama v. Randolph, 531 U.S. 79 (2000)

121 S.Ct. 513, 84 Fair Empl.Prac.Cas. (BNA) 769, 148 L.Ed.2d 373, 69 USLW 4023...

95 Cases that cite this headnote

**[5]    Alternative Dispute Resolution**



reviewable;  finality

For purposes of Federal Arbitration Act (FAA) appeal provisions, phrase "final decision" includes an order compelling arbitration and dismissing the other claims in the action even when that order occurs in an "embedded" proceeding involving both a request for arbitration and other claims for relief; abrogating - *Seacoast Motors of Salisbury, Inc. v. Chrysler Corp.*, 143 F.3d 626 (C.A.1 1998); *Altman Nursing, Inc. v. Clay Capital Corp.*, 84 F.3d 769 (C.A.5 1996); *Napleton v. General Motors Corp.*, 138 F.3d 1209 (C.A.7 1998); *Gammaro v. Thorp Consumer Discount Co.*, 15 F.3d 93 (C.A.8 1994); *McCarthy v. Providential Corp.*, 122 F.3d 1242 (C.A.9 1997). 9 U.S.C.A. § 16(a) (3).

58 Cases that cite this headnote

**[6]    Alternative Dispute Resolution**



Review

"Embedded proceedings" are those actions involving both a request for arbitration and other claims for relief, while "independent proceedings" are actions in which a request to order arbitration is the sole issue before the court. 9 U.S.C.A. § 1 et seq.

17 Cases that cite this headnote

**[7]    Alternative Dispute Resolution**



Validity

Arbitration agreement that did not mention arbitration costs and fees was not unenforceable on theory that such an agreement failed to provide Truth in Lending Act (TILA) plaintiff with protection from potentially steep costs of pursuing her federal statutory claims in the arbitral forum, where plaintiff presented no evidence as to likelihood that she would incur prohibitive costs in arbitration; mere "risk" that plaintiff would be saddled with prohibitive costs was too speculative to justify invalidation of arbitration agreement. 9 U.S.C.A. § 2; Truth in Lending Act, § 102 et seq., 15 U.S.C.A. § 1601 et seq.

657 Cases that cite this headnote

**[8]    Alternative Dispute Resolution**



Validity

In considering whether particular agreement to arbitrate is unenforceable, court is mindful of Federal Arbitration Act's (FAA) purpose to reverse the longstanding judicial hostility to arbitration agreements and to place arbitration agreements upon the same footing as other contracts. 9 U.S.C.A. § 2.

313 Cases that cite this headnote

**[9]    Alternative Dispute Resolution**



Statutory

rights and obligations

Even claims arising under a statute designed to further important social policies may be arbitrated because, so long as the prospective litigant effectively may vindicate his or her statutory cause of action in the arbitral forum, the statute serves its functions. 9 U.S.C.A. § 2.

203 Cases that cite this headnote

**[10]    Alternative Dispute Resolution**



Statutory

rights and obligations

In determining whether statutory claims may be arbitrated, court first asks whether the parties agreed to submit their claims to arbitration, and then asks whether Congress has evinced an intention to preclude a waiver of judicial remedies for the statutory rights at issue. 9 U.S.C.A. § 2.

102 Cases that cite this headnote

**Green Tree Financial Corp.-Alabama v. Randolph, 531 U.S. 79 (2000)**

121 S.Ct. 513, 84 Fair Empl.Prac.Cas. (BNA) 769, 148 L.Ed.2d 373, 69 USLW 4023...

**[11]    Alternative Dispute Resolution**



Where party seeks to invalidate an arbitration agreement on the ground that arbitration would be prohibitively expensive, that party bears the burden of showing the likelihood of incurring such costs. 9 U.S.C.A. § 2.

656 Cases that cite this headnote

**[12]    Federal Courts**



and Extent of Review

Supreme Court would not reach respondent's argument that Court of Appeals' conclusion as to unenforceability of arbitration agreement could be affirmed on alternative ground that the agreement precluded respondent from bringing her claims under Truth in Lending Act (TILA) as a class action, where Court of Appeals did not pass on that question. 9 U.S.C.A. § 2; Truth in Lending Act, § 102 et seq., 15 U.S.C.A. § 1601 et seq.

15 Cases that cite this headnote

**\*\*515**  *Syllabus*[*]

Respondent Randolph's mobile home financing agreement with petitioners, financial institutions, required that Randolph buy insurance protecting petitioners from the costs of her default and also provided that all disputes under the contract would be resolved by binding arbitration. Randolph later sued petitioners, alleging that they violated the Truth in Lending Act (TILA) by failing to disclose the insurance requirement as a finance charge and that they violated the Equal Credit Opportunity Act by requiring her to arbitrate her statutory causes of action. Among its rulings, the District Court granted petitioners' motion to compel arbitration, dismissed Randolph's claims with prejudice, and denied her request for reconsideration, which asserted that she lacked the resources to arbitrate, and as a result, would have to forgo her claims against petitioners. The Eleventh Circuit held that it had jurisdiction to review the District Court's order under § 16(a)

(3) of the Federal Arbitration Act (FAA), which \*\*516 allows appeals from "a final decision with respect to an arbitration that is subject to this title." The court determined that a final, appealable order within this provision is one that disposes of all the issues framed by the litigation, leaving nothing to be done but execute the order, and found the District Court's order within that definition. Determining also that the arbitration agreement failed to provide the minimum guarantees that Randolph could vindicate her statutory rights under the TILA, the court observed that the agreement was silent with respect to payment of arbitration expenses, and therefore held the agreement unenforceable because it posed a risk that Randolph's ability to vindicate her statutory rights would be undone by "steep" arbitration costs.

*Held:*

1. Where, as here, the District Court has ordered the parties to proceed to arbitration, and dismissed all the claims before it, the decision is "final" under § 16(a)(3), and therefore appealable. The term "final decision" has a well-developed and longstanding meaning: It is a decision that ends the litigation on the merits and leaves nothing more for the court to do but execute the judgment. *E.g., Digital Equipment Corp. v. Desktop Direct, Inc.,* 511 U.S. 863, 867, 114 S.Ct. 1992, 128 L.Ed.2d 842. Because the FAA does not **\*80** define "a final decision with respect to an arbitration" or otherwise suggest that the ordinary meaning of "final decision" should not apply, this Court accords the term its well-established meaning. See *Evans v. United States,* 504 U.S. 255, 259–260, 112 S.Ct. 1881, 119 L.Ed.2d 57. The District Court's order plainly falls within that meaning because it disposed of the entire case on the merits and left no part of it pending before the court. The fact that the FAA permits parties to arbitration agreements to bring a separate proceeding to enter judgment on an arbitration award once it is made (or to vacate or modify it) does not vitiate the finality of the District Court's resolution of the claims below. Moreover, this Court disagrees with petitioners' contention that the phrase "final decision" does not include an order compelling arbitration and dismissing the other claims in the action when that order occurs in an "embedded" proceeding, such as this one, involving both an arbitration request and other claims for relief, as distinguished from an "independent" proceeding in which a request to order arbitration is the sole issue before the court. It does not appear that, at the time of § 16(a)(3)' s enactment, Court of Appeals decisions attaching significance to this independent/embedded distinction, and its consequences for finality, were so firmly established that this Court should assume Congress

**Green Tree Financial Corp.-Alabama v. Randolph, 531 U.S. 79 (2000)**

121 S.Ct. 513, 84 Fair Empl.Prac.Cas. (BNA) 769, 148 L.Ed.2d 373, 69 USLW 4023...

meant to incorporate them into § 16(a)(3). Certainly the statute's plain language does not suggest such an intent. Pp. 519–521.

2. Randolph's agreement to arbitrate is not rendered unenforceable simply because it says nothing about arbitration costs, and thus fails to provide her protection from potentially substantial costs of pursuing her federal statutory claims in the arbitral forum. In light of the FAA's purpose to reverse longstanding judicial hostility to arbitration agreements and to place them on the same footing as other contracts, *Gilmer v. Interstate/Johnson Lane Corp., 500 U.S. 20, 24, 111 S.Ct. 1647, 114 L.Ed.2d 26,* this Court has recognized that federal statutory claims can be appropriately resolved through arbitration and has enforced agreements involving such claims, see, *e.g., Rodriguez de Quijas v. Shearson/American Express, Inc.,* 490 U.S. 477, 109 S.Ct. 1917, 104 L.Ed.2d 526. In determining whether such claims may be arbitrated, the Court asks whether the parties agreed to submit the claims to arbitration and whether Congress has evinced an intention to preclude a waiver of judicial remedies for the statutory rights at issue. See, *e.g., Gilmer, supra,* at 26, 111 S.Ct. 1647. Here, it is undisputed **\*\*517** that the parties agreed to arbitrate all claims relating to their contract, including claims involving statutory rights, and Randolph does not contend that the TILA evinces an intention to preclude a waiver of judicial remedies. She contends instead that the arbitration agreement's silence with respect to costs creates a "risk" that she will be required to bear prohibitive arbitration **\*81** costs and thereby be unable to vindicate her statutory rights in arbitration. Although the existence of large arbitration costs may well preclude a litigant like Randolph from effectively vindicating such rights, the record does not show that Randolph will bear such costs if she goes to arbitration. Indeed, it contains hardly any information on the matter, revealing only the agreement's silence on the subject. That fact alone is plainly insufficient to render it unenforceable. To invalidate the agreement would undermine the liberal federal policy favoring arbitration agreements, *Moses H. Cone Memorial Hospital v. Mercury Constr. Corp.,* 460 U.S. 1, 24, 103 S.Ct. 927, 74 L.Ed.2d 765, and would conflict with this Court's holdings that the party resisting arbitration bears the burden of proving that Congress intended to preclude arbitration of the statutory claims at issue, see, *e.g., Gilmer, supra,* at 26, 111 S.Ct. 1647. Thus, a party seeking to invalidate an arbitration agreement on the ground that arbitration would be prohibitively expensive bears the burden of showing the likelihood of incurring such costs. Randolph did not meet that burden. The Court need not

discuss how detailed such a showing would have to be, for in this case, there was no timely showing at all on the point. Pp. 521–523.

178 F.3d 1149, affirmed in part and reversed in part.

REHNQUIST, C. J., delivered the opinion of the Court, Part II of which was unanimous and Parts I and III of which were joined by O'CONNOR, SCALIA, KENNEDY, and THOMAS, JJ. GINSBURG, J., filed an opinion concurring in part and dissenting in part, in which STEVENS and SOUTER, JJ., joined, and in which BREYER, J., joined as to Parts I and III, *post,* p. 523.

**Attorneys and Law Firms**

Carter G. Phillips, Washington, DC, Robert A. Huffaker, William H. Webster, Rushton, Stakely, Johnston & Garrett, P.A., Montgomery, AL, Carter G. Phillips, Paul J. Zidlicky, Michael L. Post, Laurel E. Shanks, Sidley & Austin, Washington, D.C., for petitioners.

Joseph M. Sellers, Washington, DC, C. Knox McLaney, III, McLaney & Associates, P.C., Montgomery, AL, Lynn W. Jinks, III, Jinks, Daniel & Crow, L.L.C., Union Springs, AL, Joseph M. Sellers, Suzette M. Malveaux, Deborah J. Vagins, Cohen, Milstein, Hausfeld & Toll, P.L.L.C., Washington, DC, Angela L. Kimbrough, Ford & Kimbrough, Eutaw, AL, for respondent.

**Opinion**

**\*82** Chief Justice REHNQUIST delivered the opinion of the Court.

In this case we first address whether an order compelling arbitration and dismissing a party's underlying claims is a "final decision with respect to an arbitration" within the meaning of § 16(a)(3) of the Federal Arbitration Act, 9 U.S.C. § 16(a)(3), and thus is immediately appealable pursuant to that Act. Because we decide that question in the affirmative, we also address the question whether an arbitration agreement that does not mention arbitration costs and fees is unenforceable because it fails to affirmatively protect a party from potentially steep arbitration costs. We conclude that an arbitration agreement's silence with respect to such matters does not render the agreement unenforceable.

**Green Tree Financial Corp.-Alabama v. Randolph, 531 U.S. 79 (2000)**

121 S.Ct. 513, 84 Fair Empl.Prac.Cas. (BNA) 769, 148 L.Ed.2d 373, 69 USLW 4023...

## I

Respondent Larketta Randolph purchased a mobile home from Better Cents Home Builders, Inc., in Opelika, Alabama. She financed this purchase through petitioners Green Tree Financial Corporation and its wholly owned subsidiary, Green Tree Financial Corp.-Alabama. Petitioners' Manufactured Home Retail Installment Contract and Security Agreement required that Randolph buy Vendor's Single Interest insurance, which protects the vendor or **\*\*518** lienholder against the costs of repossession in the event of default. The agreement also provided that all disputes arising from, **\*83** or relating to, the contract, whether arising under case law or statutory law, would be resolved by binding arbitration. [1]

Randolph later sued petitioners, alleging that they violated the Truth in Lending Act (TILA), 15 U.S.C. § 1601 *et seq.,* by failing to disclose as a finance charge the Vendor's Single Interest insurance requirement. She later amended her complaint to add a claim that petitioners violated the Equal Credit Opportunity Act, 15 U.S.C. §§ 1691–1691f, by requiring her to arbitrate her statutory causes of action. She brought this action on behalf of a similarly situated class. In lieu of an answer, petitioners filed a motion to compel arbitration, to stay the action, or, in the alternative, to dismiss. The District Court granted petitioners' motion to compel arbitration, denied the motion to stay, and dismissed Randolph's claims with prejudice. The District Court also denied her request to certify a class. 991 F.Supp. 1410 (M.D.Ala.1997). She requested reconsideration, asserting that **\*84** she lacked the resources to arbitrate, and as a result, would have to forgo her claims against petitioners. See Plaintiff's Motion for Reconsideration, Record Doc. No. 53, p. 9. The District Court denied reconsideration. 991 F.Supp., at 1425–1426. Randolph appealed.

The Court of Appeals for the Eleventh Circuit first held that it had jurisdiction to review the District Court's order because that order was a final decision. 178 F.3d 1149 (1999). The Court of Appeals looked to § 16 of the Federal Arbitration Act (FAA), 9 U.S.C. § 16, which governs appeal from a district court's arbitration order, and specifically § 16(a)(3), which allows appeal from "a final decision with respect to an arbitration that is subject to this title." The court determined that a final, appealable order within the meaning of the FAA is one that disposes of all the issues framed by the litigation, leaving nothing to be done but execute the order.

The Court of Appeals found the District Court's order within that definition.

The court then determined that the arbitration agreement failed to provide the minimum guarantees that respondent could vindicate her statutory rights under the TILA. Critical to this determination was the court's observation that the arbitration agreement was silent with respect to payment of filing fees, arbitrators' costs, and other arbitration expenses. On that basis, the court held that the agreement to arbitrate posed a risk that respondent's ability to vindicate her statutory rights would be undone by "steep" arbitration costs, and therefore was unenforceable. We granted certiorari, 529 U.S. 1052, 120 S.Ct. 1552, 146 L.Ed.2d 458 (2000), and we now affirm the Court of Appeals with respect **\*\*519** to the first conclusion, and reverse it with respect to the second.

## II

 **[1]**    Section 16 of the Federal Arbitration Act, enacted in 1988, governs appellate review of arbitration orders. 9 U.S.C. § 16. It provides:

 **\*85**   "(a) An appeal may be taken from—

"(1) an order—

"(A) refusing a stay of any action under section 3 of this title,

"(B) denying a petition under section 4 of this title to order arbitration to proceed,

"(C) denying an application under section 206 of this title to compel arbitration,

"(D) confirming or denying confirmation of an award or partial award, or

"(E) modifying, correcting, or vacating an award;

"(2) an interlocutory order granting, continuing, or modifying an injunction against an arbitration that is subject to this title; or

"(3) a final decision with respect to an arbitration that is subject to this title.

"(b) Except as otherwise provided in section 1292(b) of title 28, an appeal may not be taken from an interlocutory order—

**Green Tree Financial Corp.-Alabama v. Randolph, 531 U.S. 79 (2000)**

121 S.Ct. 513, 84 Fair Empl.Prac.Cas. (BNA) 769, 148 L.Ed.2d 373, 69 USLW 4023...

"(1) granting a stay of any action under section 3 of this title;

"(2) directing arbitration to proceed under section 4 of this title;

"(3) compelling arbitration under section 206 of this title; or

"(4) refusing to enjoin an arbitration that is subject to this title."

The District Court's order directed that arbitration proceed and dismissed respondent's claims for relief. The question before us, then, is whether that order can be appealed as "a final decision with respect to an arbitration" within the meaning of § 16(a)(3). Petitioners urge us to hold that it cannot. They rely, in part, on the FAA's policy favoring arbitration agreements and its goal of "mov[ing] the parties to an arbitrable dispute out of court and into arbitration as quickly and easily as possible." *Moses H. Cone Memorial* **\*86** *Hospital v. Mercury Constr. Corp.,* 460 U.S. 1, 22, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983); *id.,* at 24, 103 S.Ct. 927. In accordance with that purpose, petitioners point out, § 16 generally permits immediate appeal of orders hostile to arbitration, whether the orders are final or interlocutory, but bars appeal of interlocutory orders favorable to arbitration.

 **[2]**     **[3]**     **[4]**     Section 16(a)(3), however, preserves immediate appeal of any "final decision with respect to an arbitration," regardless of whether the decision is favorable or hostile to arbitration. And as petitioners and respondent agree, the term "final decision" has a well-developed and longstanding meaning. It is a decision that " 'ends the litigation on the merits and leaves nothing more for the court to do but execute the judgment.' " *Digital Equipment Corp. v. Desktop Direct, Inc.,* 511 U.S. 863, 867, 114 S.Ct. 1992, 128 L.Ed.2d 842 (1994), and *Coopers & Lybrand v. Livesay,* 437 U.S. 463, 467, 98 S.Ct. 2454, 57 L.Ed.2d 351 (1978) (both quoting *Catlin v. United States,* 324 U.S. 229, 233, 65 S.Ct. 631, 89 L.Ed. 911 (1945)). See also *St. Louis, I.M. & S.R. Co. v. Southern Express Co.,* 108 U.S. 24, 28–29, 2 S.Ct. 6, 27 L.Ed. 638 (1883). Because the FAA does not define "a final decision with respect to an arbitration" or otherwise suggest that the ordinary meaning of "final decision" should not apply, we accord the term its well-established meaning. See *Evans v. United States,* 504 U.S. 255, 259–260, 112 S.Ct. 1881, 119 L.Ed.2d 57 (1992).

The District Court's order directed that the dispute be resolved by arbitration and dismissed respondent's claims with prejudice, leaving the court nothing to do but  **\*\*520** execute the judgment. That order plainly disposed of the entire case on the merits and left no part of it pending before the court. The FAA does permit parties to arbitration agreements to bring a separate proceeding in a district court to enter judgment on an arbitration award once it is made (or to vacate or modify it), but the existence of that remedy does not vitiate the finality of the District Court's resolution of the claims in the instant proceeding. 9 U.S.C. §§ 9, 10, 11. The District Court's order was therefore "a final decision with respect to an arbitration" within the meaning of § 16(a)(3), and  **\*87** an appeal may be taken. [2] See *Sears, Roebuck & Co. v. Mackey,* 351 U.S. 427, 431, 76 S.Ct. 895, 100 L.Ed. 1297 (1956) (explaining that had the District Court dismissed all the claims in an action, its decision would be final and appealable); *Catlin, supra,* at 236, 65 S.Ct. 631 (noting that had petitioners' motion to dismiss been granted and a judgment of dismissal entered, "clearly there would have been an end of the litigation and appeal would lie ...").

 **[5]**     **[6]**     Petitioners contend that the phrase "final decision" does not include an order compelling arbitration and dismissing the other claims in the action, when that order occurs in an "embedded" proceeding, such as this one. Brief for Petitioners 26. "Embedded" proceedings are simply those actions involving both a request for arbitration and other claims for relief. "Independent" proceedings, by contrast, are actions in which a request to order arbitration is the sole issue before the court. Those Courts of Appeals attaching significance to this distinction hold that an order compelling arbitration in an "independent" proceeding is final within the meaning of § 16(a)(3), but that such an order in an "embedded" proceeding is not, even if the district court dismisses the remaining claims. [3] Petitioners contend that the distinction **\*88** between independent and embedded proceedings and its consequences for finality were so firmly established at the time of § 16's enactment that we should assume Congress meant to incorporate them into § 16(a)(3). See Brief for Petitioners 23–26.

We disagree. It does not appear that, at the time of § 16(a)(3)'s enactment, the rules of finality were firmly established in cases like this one, where the District Court both ordered arbitration and dismissed the remaining claims. [4] We also note that at that time, Courts of Appeals did not have a uniform approach to finality with respect to orders

Green Tree Financial Corp.-Alabama v. Randolph, 531 U.S. 79 (2000)

121 S.Ct. 513, 84 Fair Empl.Prac.Cas. (BNA) 769, 148 L.Ed.2d 373, 69 USLW 4023...

directing arbitration in "embedded" proceedings.[5] The term **\*\*521** "final decision," by contrast, enjoys a consistent and longstanding interpretation. Certainly the plain language of the statutory text does not suggest that Congress intended to incorporate the rather complex independent/ **\*89** embedded distinction, and its consequences for finality, into § 16(a)(3). We therefore conclude that where, as here, the District Court has ordered the parties to proceed to arbitration, and dismissed all the claims before it, that decision is "final" within the meaning of § 16(a)(3), and therefore appealable.

### III

 **[7]**     **[8]**    We now turn to the question whether Randolph's agreement to arbitrate is unenforceable because it says nothing about the costs of arbitration, and thus fails to provide her protection from potentially substantial costs of pursuing her federal statutory claims in the arbitral forum. Section 2 of the FAA provides that "[a] written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract ... shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. In considering whether respondent's agreement to arbitrate is unenforceable, we are mindful of the FAA's purpose "to reverse the longstanding judicial hostility to arbitration agreements ... and to place arbitration agreements upon the same footing as other contracts." *Gilmer v. Interstate/Johnson Lane Corp.,* 500 U.S. 20, 24, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991).

 **[9]**    In light of that purpose, we have recognized that federal statutory claims can be appropriately resolved through arbitration, and we have enforced agreements to arbitrate that involve such claims. See, *e.g., Rodriguez de Quijas v. Shearson/American Express, Inc.,* 490 U.S. 477, 109 S.Ct. 1917, 104 L.Ed.2d 526 (1989) (Securities Act of 1933); *Shearson/American Express Inc. v. McMahon,* 482 U.S. 220, 107 S.Ct. 2332, 96 L.Ed.2d 185 (1987) (Securities Exchange Act of 1934 and Racketeer Influenced and Corrupt Organizations Act); *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.,* 473 U.S. 614, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985) (Sherman Act). We have likewise rejected generalized attacks on arbitration that rest on "suspicion of arbitration as a method of weakening the protections **\*90** afforded in the substantive law to would-be complainants." *Rodriguez de Quijas, supra,* at 481, 109

S.Ct. 1917. These cases demonstrate that even claims arising under a statute designed to further important social policies may be arbitrated because " 'so long as the prospective litigant effectively may vindicate [his or her] statutory cause of action in the arbitral forum,' " the statute serves its functions. See *Gilmer, supra,* at 28, 111 S.Ct. 1647 (quoting *Mitsubishi, supra,* at 637, 105 S.Ct. 3346).

 **[10]**    In determining whether statutory claims may be arbitrated, we first ask whether the parties agreed to submit their claims to arbitration, and then ask whether Congress has evinced an intention to preclude a waiver of judicial remedies for the statutory rights at issue. See *Gilmer, supra,* at 26, 111 S.Ct. 1647; *Mitsubishi, supra,* at 628, 105 S.Ct. 3346. In this case, **\*\*522** it is undisputed that the parties agreed to arbitrate all claims relating to their contract, including claims involving statutory rights. Nor does Randolph contend that the TILA evinces an intention to preclude a waiver of judicial remedies. She contends instead that the arbitration agreement's silence with respect to costs and fees creates a "risk" that she will be required to bear prohibitive arbitration costs if she pursues her claims in an arbitral forum, and thereby forces her to forgo any claims she may have against petitioners. Therefore, she argues, she is unable to vindicate her statutory rights in arbitration. See Brief for Respondent 29–30.

It may well be that the existence of large arbitration costs could preclude a litigant such as Randolph from effectively vindicating her federal statutory rights in the arbitral forum. But the record does not show that Randolph will bear such costs if she goes to arbitration. Indeed, it contains hardly any information on the matter.[6] As the Court of Appeals **\*91** recognized, "we lack ... information about how claimants fare under Green Tree's arbitration clause." 178 F.3d, at 1158. The record reveals only the arbitration agreement's silence on the subject, and that fact alone is plainly insufficient to render it unenforceable. The "risk" that Randolph will be saddled with prohibitive costs is too speculative to justify the invalidation of an arbitration agreement.

 **[11]**    **[12]**    To invalidate the agreement on that basis would undermine the "liberal federal policy favoring arbitration agreements." *Moses H. Cone Memorial Hospital,* 460 U.S., at 24, 103 S.Ct. 927. It would also conflict with our prior holdings that the party resisting arbitration bears the burden of proving that the claims at issue are unsuitable for arbitration. See *Gilmer, supra,* at 26, 111 S.Ct. 1647; *McMahon, supra,* at 227, 107 S.Ct. 2332. We have **\*92** held

Green Tree Financial Corp.-Alabama v. Randolph, 531 U.S. 79 (2000)

121 S.Ct. 513, 84 Fair Empl.Prac.Cas. (BNA) 769, 148 L.Ed.2d 373, 69 USLW 4023...

that the party seeking to avoid arbitration bears the burden of establishing that Congress intended to preclude arbitration of the statutory claims at issue. See *Gilmer, supra; McMahon, supra.* Similarly, we believe that where, as here, a party seeks to invalidate an arbitration agreement on the ground that arbitration would be prohibitively expensive, that party bears the burden of showing the likelihood of incurring such costs. Randolph did not meet that burden. How detailed the showing of prohibitive expense **\*\*523** must be before the party seeking arbitration must come forward with contrary evidence is a matter we need not discuss; for in this case neither during discovery nor when the case was presented on the merits was there any timely showing at all on the point. The Court of Appeals therefore erred in deciding that the arbitration agreement's silence with respect to costs and fees rendered it unenforceable. [7]

The judgment of the Court of Appeals is affirmed in part and reversed in part.

*It is so ordered.*

Justice GINSBURG, with whom Justice STEVENS and Justice SOUTER join, and with whom Justice BREYER joins as to Parts I and III, concurring in part and dissenting in part.

**I**

I join Part II of the Court's opinion, which holds that the District Court's order, dismissing all the claims before it, was a "final," and therefore immediately appealable, decision. *Ante,* at 519–521. On the matter the Court airs in Part III, **\*93** *ante,* at 521 to this page—allocation of the costs of arbitration —I would not rule definitively. Instead, I would vacate the Eleventh Circuit's decision, which dispositively declared the arbitration clause unenforceable, and remand the case for closer consideration of the arbitral forum's accessibility.

**II**

The Court today deals with a "who pays" question, specifically, who pays for the arbitral forum. The Court holds that Larketta Randolph bears the burden of demonstrating that the arbitral forum is financially inaccessible to her. Essentially, the Court requires a party, situated as Randolph is, either to submit to arbitration without knowing who will pay for the forum or to demonstrate up front that the costs,

if imposed on her, will be prohibitive. *Ante,* at 522–523. As I see it, the case in its current posture is not ripe for such a disposition.

The Court recognizes that "the existence of large arbitration costs could preclude a litigant such as Randolph from effectively vindicating her federal statutory rights in the arbitral forum." *Ante,* at 522. But, the Court next determines, "the party resisting arbitration bears the burden of proving that the claims at issue are unsuitable for arbitration" and "Randolph did not meet that burden." *Ante,* at 522. In so ruling, the Court blends two discrete inquiries: First, is the arbitral forum *adequate* to adjudicate the claims at issue; second, is that forum *accessible* to the party resisting arbitration.

Our past decisions deal with the first question, the *adequacy* of the arbitral forum to adjudicate various statutory claims. See, *e.g., Gilmer v. Interstate/Johnson Lane Corp.,* 500 U.S. 20, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991) (Age Discrimination in Employment Act claims are amenable to arbitration); *Shearson/American Express Inc. v. McMahon,* 482 U.S. 220, 107 S.Ct. 2332, 96 L.Ed.2d 185 (1987) (Claims under Racketeer Influenced and Corrupt Organizations Act and Securities Exchange Act are amenable to arbitration). **\*94** These decisions hold that the party resisting arbitration bears the burden of establishing the inadequacy of the arbitral forum for adjudication of claims of a particular genre. See *Gilmer,* 500 U.S., at 26, 111 S.Ct. 1647; *McMahon,* 482 U.S., at 227, 107 S.Ct. 2332. It does not follow like the night the day, however, that the party resisting arbitration should also bear the **\*\*524** burden of showing that the arbitral forum would be financially inaccessible to her.

The arbitration agreement at issue is contained in a form contract drawn by a commercial party and presented to an individual consumer on a take-it-or-leave-it basis. The case on which the Court dominantly relies, *Gilmer,* also involved a nonnegotiated arbitration clause. But the "who pays" question presented in this case did not arise in *Gilmer.* Under the rules that governed in *Gilmer*—those of the New York Stock Exchange—it was the standard practice for securities industry parties, arbitrating employment disputes, to pay all of the arbitrators' fees. See *Cole v. Burns Int'l Security Servs.,* 105 F.3d 1465, 1483 (C.A.D.C.1997). Regarding that practice, the Court of Appeals for the District of Columbia Circuit recently commented:

"[I]n *Gilmer,* the Supreme Court endorsed a system of arbitration in which employees are not required to pay for

the arbitrator assigned to hear their statutory claims. There is no reason to think that the Court would have approved arbitration in the absence of this arrangement. Indeed, we are unaware of any situation in American jurisprudence in which a beneficiary of a federal statute has been required to pay for the services of the judge assigned to hear her or his case." *Id.,* at 1484.

### III

The form contract in this case provides no indication of the rules under which arbitration will proceed or the costs a **\*95** consumer is likely to incur in arbitration.[1] Green Tree, drafter of the contract, could have filled the void by specifying, for instance, that arbitration would be governed by the rules of the American Arbitration Association (AAA). Under the AAA's Consumer Arbitration Rules, consumers in small-claims arbitration incur no filing fee and pay only $125 of the total fees charged by the arbitrator. All other fees and costs are to be paid by the business party. Brief for American Arbitration Association as *Amicus Curiae* 15–16. Other national arbitration organizations have developed similar models for fair cost and fee allocation.[2] It may be that in this case, as in *Gilmer,* there is a standard practice on arbitrators' fees and expenses, one that fills the blank space in the arbitration agreement. Counsel for Green Tree offered a hint in that direction. See Tr. of Oral Arg. 26 ("Green Tree does pay [arbitration] costs in a lot of instances ...."). But there is no reliable indication in this record that Randolph's claim will be arbitrated under any consumer-protective fee arrangement.

 **\*96**  As a repeat player in the arbitration required by its form contract, Green Tree has superior information about the cost to consumers of pursuing arbitration. Cf. **\*\*525** *Raleigh v. Illinois Dept. of Revenue,* 530 U.S. 15, 21, 120 S.Ct. 1951, 147 L.Ed.2d 13 (2000) ("the very fact that the burden of proof has often been placed on the taxpayer [to disprove tax liability] ... reflects several compelling rationales ... [including] the taxpayer's readier access to the relevant information"); 9 J. Wigmore, Evidence § 2486 (J. Chadbourn rev. ed.1981) (where fairness so requires, burden of proof of

a particular fact may be assigned to "party who presumably has peculiar means of knowledge" of the fact); Restatement (Second) of Contracts § 206 (1979) ( "In choosing among the reasonable meanings of ... [an] agreement or a term thereof, that meaning is generally preferred which operates against the [drafting] party ...."). In these circumstances, it is hardly clear that Randolph should bear the burden of demonstrating up front the arbitral forum's inaccessibility, or that she should be required to submit to arbitration without knowing how much it will cost her.

As I see it, the Court has reached out prematurely to resolve the matter in the lender's favor. If Green Tree's practice under the form contract with retail installment sales purchasers resembles that of the employer in *Gilmer,* Randolph would be insulated from prohibitive costs. And if the arbitral forum were in this case financially accessible to Randolph, there would be no occasion to reach the decision today rendered by the Court. Before writing a term into the form contract, as the District of Columbia Circuit did, see *Cole,* 105 F.3d, at 1485,[3] or leaving cost allocation initially to each arbitrator, as the Court does, I would remand for clarification of Green Tree's practice.

 **\*97**  The Court's opinion, if I comprehend it correctly, does not prevent Randolph from returning to court, postarbitration, if she then has a complaint about cost allocation. If that is so, the issue reduces to when, not whether, she can be spared from payment of excessive costs. Neither certainty nor judicial economy is served by leaving that issue unsettled until the end of the line.

For the reasons stated, I dissent from the Court's reversal of the Eleventh Circuit's decision on the cost question. I would instead vacate and remand for further consideration of the accessibility of the arbitral forum to Randolph.[4]

### Parallel Citations

121 S.Ct. 513, 84 Fair Empl.Prac.Cas. (BNA) 769, 148 L.Ed.2d 373, 69 USLW 4023, 00 Cal. Daily Op. Serv. 9799, 2000 Daily Journal D.A.R. 13,051, 14 Fla. L. Weekly Fed. S 21

Footnotes

\*    The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States v. Detroit Timber & Lumber Co.,* 200 U.S. 321, 337, 26 S.Ct. 282, 50 L.Ed. 499.

**Green Tree Financial Corp.-Alabama v. Randolph, 531 U.S. 79 (2000)**

121 S.Ct. 513, 84 Fair Empl.Prac.Cas. (BNA) 769, 148 L.Ed.2d 373, 69 USLW 4023...

The arbitration provision states in pertinent part: "All disputes, claims, or controversies arising from or relating to this Contract or the relationships which result from this Contract, or the validity of this arbitration clause or the entire contract, shall be resolved by binding arbitration by one arbitrator selected by Assignee with consent of Buyer(s). This arbitration Contract is made pursuant to a transaction in interstate commerce, and shall be governed by the Federal Arbitration Act at 9 U.S.C. Section 1. Judgment upon the award rendered may be entered in any court having jurisdiction. The parties agree and understand that they choose arbitration instead of litigation to resolve disputes. The parties understand that they have a right or opportunity to litigate disputes through a court, but that they prefer to resolve their disputes through arbitration, except as provided herein. THE PARTIES VOLUNTARILY AND KNOWINGLY WAIVE ANY RIGHT THEY HAVE TO A JURY TRIAL EITHER PURSUANT TO ARBITRATION UNDER THIS CLAUSE OR PURSUANT TO A COURT ACTION BY ASSIGNEE (AS PROVIDED HEREIN). The parties agree and understand that all disputes arising under case law, statutory law, and all other laws, including, but not limited to, all contract, tort, and property disputes, will be subject to binding arbitration in accord with this Contract. The parties agree and understand that the arbitrator shall have all powers provided by the law and the Contract." Joint Lodging 37.

Had the District Court entered a stay instead of a dismissal in this case, that order would not be appealable. 9 U.S.C. § 16(b)(1). The question whether the District Court should have taken that course is not before us, and we do not address it.

The majority of Courts of Appeals have so opined, contrary to the instant decision of the Court of Appeals for the Eleventh Circuit. See, *e.g., Seacoast Motors of Salisbury, Inc. v. Chrysler Corp.,* 143 F.3d 626, 628–629 (C.A.1 1998); *Altman Nursing, Inc. v. Clay Capital Corp.,* 84 F.3d 769, 771 (C.A.5 1996); *Napleton v. General Motors Corp.,* 138 F.3d 1209, 1212 (C.A.7 1998); *Gammaro v. Thorp Consumer Discount Co.,* 15 F.3d 93, 95 (C.A.8 1994); *McCarthy v. Providential Corp.,* 122 F.3d 1242, 1244 (C.A.9 1997). But see *Arnold v. Arnold Corp.—Printed Communications for Business,* 920 F.2d 1269, 1276 (C.A.6 1990) (order compelling arbitration in an "embedded" proceeding treated as a final judgment when the District Court dismissed the action in deference to arbitration and had nothing left to do but execute the judgment); *Armijo v. Prudential Insurance Co. of America,* 72 F.3d 793, 797 (C.A.10 1995) (same).

*Seacoast Motors of Salisbury, Inc., supra,* at 628 (noting in 1998 that the Court had not before addressed the question whether a district court order directing arbitration and dismissing the proceedings was a "final decision" within the meaning of § 16(a)(3)); *Napleton,supra,* at 1212 (noting in 1998 that the appeal at issue adds an "unfamiliar ingredient" because the District Court ordered arbitration and dismissed the proceedings).

*Cincinnati Gas & Elec. Co. v. Benjamin F. Shaw Co.,* 706 F.2d 155, 158 (C.A.6 1983) (rejecting the argument that because a declaratory judgment and other relief was sought in suit where arbitration was ordered, order to arbitrate should not be appealable); *Howard Elec. & Mechanical Co. v. Frank Briscoe Co.,* 754 F.2d 847, 849 (C.A.9 1985) (plaintiff brought suit for work performed under contract and then sought arbitration; order compelling arbitration held appealable). Cf. *In re Hops Antitrust Litigation,* 832 F.2d 470, 472–473 (C.A.8 1987) (District Court order requiring arbitration of some claims before it is not a final appealable order because other matters remained pending before the court); *County of Durham v. Richards & Assocs., Inc.,* 742 F.2d 811, 813, n. 3 (C.A.4 1984) (noting that a number of Courts of Appeals have held that an order compelling arbitration may be appealed even when it is entered in the course of a dispute over the underlying claim). See generally 15B C. Wright, A. Miller, & E. Cooper, Federal Practice and Procedure § 3914.17, pp. 19–25 (1992).

In Randolph's motion for reconsideration in the District Court, she asserted that "[a]rbitration costs are high" and that she did not have the resources to arbitrate. But she failed to support this assertion. She first acknowledged that petitioners had not designated a particular arbitration association or arbitrator to resolve their dispute. Her subsequent discussion of costs relied entirely on unfounded assumptions. She stated that "[f]or the purposes of this discussion, we will assume filing with the [American Arbitration Association], the filing fee is $500 for claims under $10,000 and this does not include the cost of the arbitrator or administrative fees." Randolph relied on, and attached as an exhibit, what appears to be informational material from the American Arbitration Association that does not discuss the amount of filing fees. She then noted: "[The American Arbitration Association] further cites $700 per day as the average arbitrator's fee." For this proposition she cited an article in the Daily Labor Report, February 15, 1996, published by the Bureau of National Affairs, entitled Labor Lawyers at ABA Session Debate Role of American Arbitration Association. Plaintiff's Motion for Reconsideration, Record Doc. No. 53, pp. 8–9. The article contains a stray statement by an association executive that the average arbitral fee is $700 per day. Randolph plainly failed to make any factual showing that the American Arbitration Association would conduct the arbitration, or that, if it did, she would be charged the filing fee or arbitrator's fee that she identified. These unsupported statements provide no basis on which to ascertain the actual costs and fees to which she would be subject in arbitration.

In this Court, Randolph's brief lists fees incurred in cases involving other arbitrations as reflected in opinions of other Courts of Appeals, while petitioners' counsel states that arbitration fees are frequently waived by petitioners. None of this information affords a sufficient basis for concluding that Randolph would in fact have incurred substantial costs in the event her claim went to arbitration.

**Green Tree Financial Corp.-Alabama v. Randolph, 531 U.S. 79 (2000)**

121 S.Ct. 513, 84 Fair Empl.Prac.Cas. (BNA) 769, 148 L.Ed.2d 373, 69 USLW 4023...

7    We decline to reach respondent's argument that we may affirm the Court of Appeals' conclusion that the arbitration agreement is unenforceable on the alternative ground that the agreement precludes respondent from bringing her claims under the TILA as a class action. See Brief for Respondent 39–48. The Court of Appeals did not pass on this question, and we need not decide here issues not decided below. *Roberts v. Galen of Va., Inc.,* 525 U.S. 249, 119 S.Ct. 685, 142 L.Ed.2d 648 (1999) *(per curiam)*.

1    In Alabama, as in most States, courts interpret a contract's silence (about arbitration fees and costs) according to "usage or custom." *Green Tree Financial Corp. of Ala. v. Wampler,* 749 So.2d 409, 415 (Ala.1999); see also Restatement (Second) of Contracts § 204, Comment *d* (1979) (where an essential term is missing, "the court should supply a term which comports with community standards of fairness and policy"). Cf. *First Options of Chicago, Inc. v. Kaplan,* 514 U.S. 938, 944, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995) (courts should generally apply state contract law principles when deciding whether parties agreed to arbitrate a certain matter); *Mastrobuono v. Shearson Lehman Hutton, Inc.,* 514 U.S. 52, 62–64, and n. 9, 115 S.Ct. 1212, 131 L.Ed.2d 76 (1995) (interpreting arbitration clause according to New York and Illinois law).

2    They include National Arbitration Forum provisions that limit small-claims consumer costs to between $49 and $175 and a National Consumer Disputes Advisory Committee protocol recommending that consumer costs be limited to a reasonable amount. National Arbitration Forum, Code of Procedure, App. C, Fee Schedule (July 1, 2000); National Consumer Disputes Advisory Committee, Consumer Due Process Protocol, Principle 6, Comment (Apr. 17, 1998), http://www.adr.org/education/education/consumer_ protocol.html.

3    The court interpreted a form contract to arbitrate employment disputes, silent as to costs, to require the employer "to pay all of the arbitrator's fees necessary for a full and fair resolution of [the discharged employee's] statutory claims." 105 F.3d, at 1485.

4    Randolph alternatively urges affirmance on the ground that the arbitration agreement is unenforceable because it precludes pursuit of her statutory claim as a class action. But cf. *Johnson v. West Suburban Bank,* 225 F.3d 366 (C.A.3 2000) (holding arbitration clause in short-term loan agreement enforceable even though it may render class action to pursue statutory claims unavailable). The class-action issue was properly raised in the District Court and the Court of Appeals. I do not read the Court's opinion to preclude resolution of that question now by the Eleventh Circuit. Nothing Randolph has so far done in seeking protection against prohibitive costs forfeits her right to a judicial determination whether her claim may proceed either in court or in arbitration as a class action.

---

**End of Document**
© 2014 Thomson Reuters. No claim to original U.S. Government Works.

---

287 S.W.3d 158
Court of Appeals of Texas,
Fort Worth.

Gerald W. HADDOCK, Appellant,
v.
William F. QUINN, Paul E. Rowsey, III, John Goff,
Terry N. Worrell, Crescent Real Estate Equities
Company, Crescent Real Estate Limited Partnership
and Crescent Real Estate Equities, Ltd., Appellees.
and
In re Gerald W. Haddock, Relator.

Nos. 2–06–472–CV, 2–07–048–CV.
|   Feb. 26, 2009.   |   Rehearing and
Rehearing En Banc   Overruled July 9, 2009.

**Synopsis**
**Background:** Former chief executive officer (CEO) of
real estate investment trust (REIT) filed arbitration claim
alleging that the REIT and limited partnership controlled
by REIT refused to allow him to exercise partnership unit
options and exchange them for REIT stock. REIT, limited
partnership, and members of REIT's board of trustees brought
action seeking a stay of arbitration proceedings and a
judgment declaring that former CEO had repudiated limited
partnership's arbitration agreement. The 67th District Court
of Tarrant County, Donald J. Cosby, J., permanently enjoined
former CEO from pursuing arbitration. Former CEO sought
review by petition for writ of mandamus and interlocutory
appeal.

**Holdings:** The Court of Appeals, Anne Gardner, J., held that:

[1] a party seeking relief from a stay of arbitration had to
pursue relief by way of a petition for writ of mandamus, rather
than interlocutory appeal;

[2] issue of whether CEO waived arbitration by initiating and
pursuing prior litigation was for the trial court, rather than
arbitration panel;

[3] prior litigation initiated by CEO substantially invoked
the judicial process on the same claims that CEO sought to
arbitrate, for purposes of determining whether CEO waived
arbitration; and

[4] prior litigation substantially prejudiced REIT, limited
partnership, and members of REIT's board of trustees, for
purposes of determining whether CEO waived arbitration.

Petition for writ of mandamus denied.

See also 2006 WL 909470.

West Headnotes (46)

[1]     **Mandamus**


                                              Civil

Proceedings Other Than Actions

A party seeking relief pursuant to the Federal
Arbitration Act (FAA) from a denial or stay of
arbitration must pursue relief by way of petition
for writ of mandamus. 9 U.S.C.A. §§ 1–16.

1 Cases that cite this headnote

[2]     **Mandamus**


                                              Remedy

by Appeal or Writ of Error
        **Mandamus**


                                              Nature

of Acts to Be Commanded

Mandamus will issue to correct a clear abuse
of discretion for which the remedy by appeal is
inadequate.

Cases that cite this headnote

[3]     **Mandamus**


                                              Matters

of Discretion

A trial court has no discretion, for purposes of
mandamus relief, in determining what the law is
or in applying the law to the facts, and a clear
failure to analyze or apply the law correctly will
constitute an abuse of discretion.

Cases that cite this headnote

**[4]    Mandamus**



or Vacation of Judgment or Order

**Mandamus**



Proceedings Other Than Actions

When a motion to compel arbitration under the Federal Arbitration Act (FAA) has been erroneously denied or when a motion to stay arbitration is erroneously granted, there is no adequate remedy by appeal, and mandamus will issue. 9 U.S.C.A. §§ 1–16.

1 Cases that cite this headnote

**[5]    Alternative Dispute Resolution**



**Alternative Dispute Resolution**



and Matters Arbitrable Under Agreement

A party seeking to enforce an arbitration agreement must establish the existence of a valid arbitration agreement and show that the claims in dispute fall within the scope of that agreement.

1 Cases that cite this headnote

**[6]    Alternative Dispute Resolution**



Law Governs

In determining the validity of arbitration agreements under the Federal Arbitration Act (FAA), courts generally apply state-law principles governing the formation of contracts. 9 U.S.C.A. §§ 1–16.

Cases that cite this headnote

**[7]    Alternative Dispute Resolution**

Disputes



and Matters Arbitrable Under Agreement

Once the moving party establishes the existence of a valid arbitration agreement, a trial court then determines whether the nonmovant's claims fall within the scope of the arbitration clause.

Modification

Civil

2 Cases that cite this headnote

**[8]    Alternative Dispute Resolution**

Evidence



If a trial court determines that a valid arbitration agreement exists, the burden shifts to the party opposing arbitration to prove its defenses.

Cases that cite this headnote

**[9]    Alternative Dispute Resolution**

Scope



Validity

and Standards of Review

Whether a valid arbitration agreement exists is a legal question subject to de novo review.

Disputes

Cases that cite this headnote

**[10]    Appeal and Error**

Allowance



of Remedy and Matters of Procedure in General

**Trial**

Duty

to Make in General

What

When an abuse of discretion standard of review applies to a trial court's ruling, findings of fact and conclusions of law aid the appellate court in reviewing the propriety of the ruling by providing the reviewing court with an explanation for the ruling, but, while findings of fact and conclusions of law can be helpful in applying the abuse of discretion standard, they are not required.

Cases that cite this headnote

**[11]    Appeal and Error**

 **Abuse**

of Discretion

To determine whether a trial court abused its discretion, an appellate court must decide whether it acted without reference to any guiding rules or principles; in other words, whether the act was arbitrary or unreasonable.

1 Cases that cite this headnote

**[12] Appeal and Error**



of Discretion

Any factual issues decided by a trial court in reaching a decision under review are not reviewed by legal- and factual-sufficiency standards, when the abuse of discretion standard of review applies, although when the decision under review is based on facts determined by the court, those facts must have some support in the evidence.

1 Cases that cite this headnote

**[13] Alternative Dispute Resolution**



or Participating in Suit

When a party files suit on an arbitrable claim, and the defendant elects not to arbitrate, the issue is not whether there was a mutual repudiation of the arbitration agreement, but whether arbitration has been waived.

Cases that cite this headnote

**[14] Courts**



or Concurrent Jurisdiction

Federal and state courts have concurrent jurisdiction to enforce the Federal Arbitration Act (FAA). 9 U.S.C.A. §§ 1–16.

Cases that cite this headnote

**[15] Alternative Dispute Resolution**

 **Arbitrability**

of Dispute

Who decides arbitrability is a matter of contract interpretation regarding the division of labor or responsibility between the court and the arbitrator, not jurisdiction.

Cases that cite this headnote

**[16] Alternative Dispute Resolution**

 **Contractual**

**Abuse** or Consensual Basis

Arbitration is a matter of contract.

Cases that cite this headnote

**[17] Alternative Dispute Resolution**

 **Arbitrability**

of Dispute

The question of who has the primary power to decide arbitrability turns upon what the parties agreed about that matter.

Cases that cite this headnote

**Suing [18] Alternative Dispute Resolution**

 **What**

Law Governs

When applying the Federal Arbitration Act (FAA), both Texas and Delaware courts look to federal law to decide substantive issues. 9 U.S.C.A. §§ 1–16.

Cases that cite this headnote

**[19] Alternative Dispute Resolution**

**Exclusive**

 **Arbitrability**

of Dispute

The question whether the parties have submitted a particular dispute to arbitration, i.e., the question of arbitrability, is an issue for judicial determination, unless the parties clearly and unmistakably provide otherwise.

1 Cases that cite this headnote

**[20]** **Alternative Dispute Resolution**



of Dispute

Issue of whether former chief executive officer (CEO) of real estate investment trust (REIT) waived arbitrability, by instituting and pursuing prior litigation to an adverse decision in court, was for the trial court in which defendants sought a stay of arbitration, rather than arbitration panel, when former CEO filed arbitration claim alleging REIT and limited partnership controlled by REIT refused to allow him to exercise limited partnership unit options and exchange them for REIT stock, as there was not clear and unmistakable evidence that the parties intended the arbitrators to determine arbitrability; though provision in arbitration agreement expressly incorporated rules of arbitration association, provision in current version rules stating that the arbitrator had the power to rule on objections to arbitration was not in association's rules when the parties entered into arbitration agreement.

7 Cases that cite this headnote

**[21]** **Alternative Dispute Resolution**



or Participating in Suit

The presence of a "no waiver" clause in an arbitration agreement, stating that no judicial proceeding by a party relating to the subject matter of an arbitration would be deemed a waiver of a right to arbitrate, does not alter the ordinary analysis undertaken to determine if a party has waived its right to arbitration by litigation conduct.

1 Cases that cite this headnote

**[22]** **Alternative Dispute Resolution**



and Standards of Review

Whether a party has waived its arbitration rights under the Federal Arbitration Act (FAA) by inconsistent litigation conduct is a question of law that reviewed de novo. 9 U.S.C.A. §§ 1–16.

Arbitrability    Cases that cite this headnote

**[23]** **Alternative Dispute Resolution**



Evidence

Because public policy favors arbitration, there is a strong presumption against waiver of arbitration.

Cases that cite this headnote

**[24]** **Alternative Dispute Resolution**



Evidence

A party asserting a waiver of arbitration bears a heavy burden of proof, and the court must resolve all doubts in favor of arbitration.

Cases that cite this headnote

**[25]** **Alternative Dispute Resolution**



Waiver

or Estoppel

Waiver of arbitration may be express or implied from a party's conduct, but that conduct must be unequivocal.

Suing

Cases that cite this headnote

**[26]** **Alternative Dispute Resolution**



Waiver

or Estoppel

Waiver in the context of arbitration agreements subject to the Federal Arbitration Act (FAA) requires more than is required for general waiver; it requires proof that the party asserting waiver as a defense to arbitration has suffered prejudice. 9 U.S.C.A. §§ 1–16.

Scope    Cases that cite this headnote

**[27]** **Alternative Dispute Resolution**



or Participating in Suit

Under the Federal Arbitration Act (FAA), a party waives an arbitration clause by substantially invoking the judicial process to the other party's detriment. 9 U.S.C.A. §§ 1–16.

1 Cases that cite this headnote

**[28] Alternative Dispute Resolution**



or Participating in Suit

To demonstrate waiver of arbitration, the party opposing arbitration must establish both that: (1) the party seeking arbitration substantially invoked the judicial process, and (2) the party opposing arbitration suffered prejudice thereby.

2 Cases that cite this headnote

**[29] Alternative Dispute Resolution**



or Participating in Suit

To invoke the judicial process so as to waive arbitration, a party must, at the very least, engage in some overt act in court that evinces a desire to resolve the arbitrable dispute through litigation rather than arbitration.

3 Cases that cite this headnote

**[30] Alternative Dispute Resolution**



or Participating in Suit

Prior litigation by former chief executive officer (CEO) of real estate investment trust (REIT) substantially invoked the judicial process on the same claims that CEO sought to arbitrate, for purposes of determining whether CEO waived arbitration under the Federal Arbitration Act (FAA) of claims alleging REIT and limited partnership controlled by REIT refused to allow him to exercise partnership unit options and exchange them for REIT stock; both prior litigation claims and CEO's arbitration claims

Suing

arose in connection with the partnership's unit option plan which was expressly subject to the terms of the partnership agreement which contained arbitration agreement, though in prior litigation CEO initially sought to reform unfavorable-comments clause in severance agreement he did so in order to litigate claims of mismanagement which allegedly resulted in devaluation of unit options, and CEO only invoked arbitration after litigating his claims to an unfavorable result. 9 U.S.C.A. §§ 1–16.

Suing    Cases that cite this headnote

**[31] Alternative Dispute Resolution**



or Participating in Suit

Suing

Waiver of arbitration by litigation conduct must be decided under a totality-of-the-circumstances test on a case-by-case basis.

Cases that cite this headnote

Suing    **[32] Alternative Dispute Resolution**



or Participating in Suit

Suing

Waiver of arbitration by litigation conduct may be found where a party has tried and failed to achieve a satisfactory result before turning to arbitration.

3 Cases that cite this headnote

Suing    **[33] Alternative Dispute Resolution**



or Participating in Suit

Suing

Failing to seek arbitration until after proceeding in litigation to an adverse result is the clearest form of inconsistent litigation conduct and constitutes substantial invocation of the litigation process resulting in waiver.

4 Cases that cite this headnote

**[34] Alternative Dispute Resolution**



or Participating in Suit

Participation in litigation to gain an advantage in future litigation can result in waiver of arbitration.

1 Cases that cite this headnote

**[35]    Alternative Dispute Resolution**



or Participating in Suit

Suing

Substantially invoking the judicial process does not waive a party's arbitration rights unless the opposing party also proves that it suffered prejudice as a result.

Cases that cite this headnote

**[36]    Alternative Dispute Resolution**



or Participating in Suit

Suing

Courts will not find that a party has waived its right to enforce an arbitration clause by merely taking part in litigation unless it has substantially invoked the judicial process to its opponent's detriment.

2 Cases that cite this headnote

**[37]    Alternative Dispute Resolution**



or Participating in Suit

Suing

When one party reveals a disinclination to resort to arbitration on any phase of suit involving all parties, those parties are prejudiced by being forced to bear the expense of a trial.

Cases that cite this headnote

**[38]    Alternative Dispute Resolution**



or Participating in Suit

Suing

Substantially invoking the litigation machinery qualifies as the kind of prejudice that is the essence of waiver of arbitration.

Cases that cite this headnote

**[39]    Alternative Dispute Resolution**



or Participating in Suit

Suing

"Prejudice" or detriment in the context of litigation conduct inconsistent with arbitration relates to inherent unfairness caused by a party's attempt to have it both ways by switching between litigation and arbitration to its own advantage.

1 Cases that cite this headnote

**[40]    Alternative Dispute Resolution**



to Enforcement and Defenses in General

Right

A party should not be allowed purposefully and unjustifiably to manipulate the exercise of its arbitral rights simply to gain an unfair tactical advantage over the opposing party.

Cases that cite this headnote

**[41]    Alternative Dispute Resolution**



or Estoppel

Waiver

Suing

Ultimately, what constitutes waiver of the right to arbitrate depends on the facts of each case.

Cases that cite this headnote

**[42]    Alternative Dispute Resolution**



or Participating in Suit

Suing

Three factors are particularly relevant in determining prejudice, for purposes of determining whether a party has waived arbitration by litigation conduct; first, pretrial activity related to all claims including those that are arbitrable may result in prejudice, second,

time and expense incurred in defending against a motion for summary judgment could prejudice the party opposing arbitration, and three, failure to assert the right to demand arbitration is a factor bearing on the question of prejudice along with other considerations.

1 Cases that cite this headnote

**[43]** **Alternative Dispute Resolution**



Suing

or Participating in Suit

Both delay and the extent of the moving party's participation in judicial proceedings are material factors in assessing prejudice, for purposes of determining whether a party has waived arbitration.

Cases that cite this headnote

**[44]** **Alternative Dispute Resolution**



Waiver

or Estoppel

A demand for arbitration puts the other party on notice that arbitration is forthcoming and affords that party the opportunity to avoid compromising its position with regard to arbitrable and nonarbitrable claims, for purposes of determining whether a party has waived arbitration.

1 Cases that cite this headnote

**[45]** **Alternative Dispute Resolution**



Suing

or Participating in Suit

If a party has asserted the right to arbitrate at or before commencement of litigation, the party opposing arbitration will necessarily carry a heavy burden to show waiver; conversely, when a party fails to demand arbitration and also engages in pretrial activity inconsistent with the intent to arbitrate, the opposing party seeking to show waiver may more easily show that its position has been compromised, i.e., prejudiced.

Cases that cite this headnote

**[46]** **Alternative Dispute Resolution**



Suing

or Participating in Suit

Prior litigation initiated by former chief executive officer (CEO) of real estate investment trust (REIT), seeking to reform unfavorable-comments clause in severance agreement in order to litigate claims of mismanagement which allegedly resulted in devaluation of his unit options in limited partnership controlled by REIT, prejudiced REIT, partnership and members of REIT's board of trustees, for purposes of determining whether CEO waived arbitration under the Federal Arbitration Act (FAA) of claims alleging REIT and limited partnership refused to allow him to exercise partnership unit options and exchange them for REIT stock; CEO failed to seek arbitration under partnership agreement before initiating litigation, CEO waited over 14 months before requesting arbitration, during such time he obtained a temporary injunction, filed two motions for summary judgment and litigated his claims to an adverse judgment, and defendants spent a substantial sums defending CEO's claims. 9 U.S.C.A. §§ 1–16.

Cases that cite this headnote

**Attorneys and Law Firms**

**\*163** Wolf Law PC and Jeffrey J. Wolf, Fort Worth, and Beatie and Osborn LLP and **\*164** Russel H. Beatie, New York, NY, for appellant/relator.

Jackson & Walker LLP and Charles L. Babcock, David T. Moran, Patrick R. Cowlishaw, William R. Jenkins, Jr., Amanda L. Bush, Fort Worth, for appellees/real parties in interest.

PANEL: GARDNER and WALKER, JJ.; and DIXON W. HOLMAN, J. (Senior Justice, Retired, Sitting by Assignment).

**OPINION**

ANNE GARDNER, Justice.

## I. Introduction

In this consolidated interlocutory appeal and mandamus proceeding, Relator and Appellant Gerald W. Haddock seeks relief from the trial court's order staying arbitration proceedings that he initiated against Appellees and Real Parties in Interest William F. Quinn, Paul E. Rowsey, III, John Goff, Terry N. Worrell, Crescent Real Estate Equities Company ("CEI"), Crescent Real Estate Equities Limited Partnership ("CREELP"), and Crescent Real Estate Equities, Limited ("CREE").

Haddock raises three issues. In his first issue, Haddock argues that the trial court improperly assumed jurisdiction because the parties contracted to have all issues—including questions of arbitrability—decided by arbitration. Second, Haddock contends that even if the trial court had jurisdiction to decide some issues of arbitrability, the main issue in this case—whether he repudiated or waived arbitration—should be decided by an arbitrator. Third, Haddock argues that the trial court erred and abused its discretion by concluding that he repudiated or waived arbitration by engaging in prior litigation that was inconsistent with arbitration.

Real Parties in Interest contend that the issue of repudiation or waiver was properly for the court to decide and that the trial court correctly determined that Haddock repudiated, or in the alternative waived, arbitration of his claims by substantially invoking the judicial process to their detriment. They argue that the trial court correctly concluded that the remaining claims asserted by Haddock, individually and derivatively on behalf of CEI stockholders and against nonsignatories, are not within the scope of the arbitration agreement.

## II. Factual and Procedural Background

### A. The Parties

#### 1. The Crescent Entities

CEI is a publicly held real estate investment trust (commonly referred to as a "REIT") organized under the laws of the state of Texas. CEI is structured as an Umbrella Partnership Real Estate Investment Trust whereby CEI owns a majority of the limited partnership interests in CREELP, a Delaware limited

partnership. This organizational structure (referred to as an "UPREIT") allows owners of investment real estate to sell their properties to CREELP in exchange for CREELP units, which the seller may later convert into CEI common stock. The real estate owners incur no income tax liability until they sell the stock. CREE, a Delaware corporation, is a wholly owned subsidiary of CEI and serves as CREELP's general partner.

#### 2. The Individuals

In 1994, Haddock and two cofounders created the Crescent Entities and related companies. Prior to 1994, Haddock had served in various capacities in companies formed by one of the cofounders, including serving as lead transactional attorney and chief negotiator. Of the individual Real Parties in Interest, John Goff currently **\*165** serves as CEI's CEO and Vice Chairman. William Quinn, Paul Rowsey III, and Terry Worrell serve as members of CEI's Board of Trust Managers.

### B. The CREELP Partnership Agreement and Arbitration Clause

In February 1994, Haddock, as CEI's President, signed a limited partnership agreement on behalf of CEI, CREE, and several limited partners to form the CREELP limited partnership. CREE was CREELP's general partner. Haddock became a limited partner in CREELP as well as President of CEI, and he became CEO of CEI in 1996. As an officer and senior management employee, Haddock received options to purchase units in CREELP in 1995 and 1996, which were exchangeable for CEI common stock. The options for both the CREELP units and CEI stock were created by incentive plans adopted by those entities' respective governance committees.

The original CREELP limited partnership agreement did not contain an arbitration agreement. However, in May 1994, the limited partnership agreement was amended to add an arbitration agreement that provides, in pertinent part: [1]

Section 16.1 *Arbitration*

Notwithstanding anything to the contrary contained in this Agreement, all claims, disputes and controversies between the parties hereto (including, without limitation, any claims, disputes, and controversies between the Partnership and any one or more of the Partners and any claims, disputes and controversies among any two or more Partners) arising out of or in connection with this

Agreement or the Partnership created hereby, relating to the validity, construction, performance, breach, enforcement or termination thereof, or otherwise, shall be resolved by binding arbitration in the State of Texas, in accordance with this Article 16 and, to the extent not inconsistent herewith, the Expedited Procedures and Commercial Arbitration Rules of the American Arbitration Association.

The arbitration agreement contains additional paragraphs of detailed procedures to be followed in any arbitration proceedings under the agreement, including an expedited schedule for selection of an arbitration panel, for commencement and completion of the arbitration proceeding within sixty days after selection, and for rendition by the panel of its award within thirty days thereafter.

## C. The Severance Agreement

In June 1999, Haddock resigned from his executive positions and entered into a confidential severance agreement with CEI and CREELP, which provided for him to receive certain cash compensation and which, together with simultaneously executed amended unit option and stock option agreements, accelerated the vesting of certain of his CREELP unit options and CEI stock options that he had previously received as part of his compensation. The agreement called for Haddock to relinquish all of his remaining unvested unit options and stock options. Paragraph 13 of the severance agreement (the "unfavorable-comments clause") restricted both Haddock and the Crescent Entities from making unfavorable comments about the other or about Haddock's job performance. The severance agreement did not contain an arbitration clause.

## D. The Prior Lawsuit

In March 2005, Haddock filed a suit for a declaratory judgment and for temporary and permanent injunctions against the Crescent Entities in the 17th District Court of Tarrant County, Texas. Haddock pleaded his prior status as CEO and President of CEI, CREE, and other related entities referred to in his petition as "the Employer Group," that he and the Employer Group had agreed to terminate his employment relationship in June 1999, and that the parties had entered into a confidential severance agreement that he would file under seal with the court. Haddock stated that as consideration for his resignation from all directorships and offices held in the Employer Group, the severance agreement provided that, in addition to stock and units in CEI and CREELP that he already owned, he was promised certain cash

compensation as well as the accelerated vesting of certain stock and partnership unit options and that he thereby became immediately vested in a large number of stock and unit options in both CEI and CREELP.

In his petition, Haddock further explained that he had become "concerned" that the Crescent Entities were being managed and operated adversely to interests of shareholders and unitholders by offering executives excessive compensation packages and risky loans that seriously jeopardized the financial health and stability of the entities. Haddock alleged that he desired to discuss these concerns with fellow shareholders and unitholders and to further investigate but feared that doing so might be construed by the Crescent entities as a breach of the unfavorable comments clause in the severance agreement. Haddock alleged that he had received threats that the Crescent Entities would forfeit his options as a result of his conduct in discussing those matters and exposing their "questionable practices."

Haddock sought to clarify or reform the severance agreement by a declaratory judgment that the unfavorable comments clause of the severance agreement was void or limited to statements rising to the level of actionable defamation. He also sought and obtained a temporary restraining order against the Crescent Entities from "[t]hreatening or taking any action to declare forfeited or interfere with" his rights in any shares of CREE or CREELP, already owned by him or shares or units subject to an unexercised option held by him. The restraining order granted by the trial court also provided that all parties were to abide by the unfavorable-comments clause. The parties later agreed to an order extending the temporary restraining order until the date of trial, originally scheduled for August 29, 2005.

The Crescent Entities filed a counterclaim asserting that Haddock had breached the terms of both the severance agreement and a subsequent 2001 settlement agreement, general release, and covenant not to sue for claims and causes of action in any way connected with his prior employment or termination.

In June 2005, Haddock filed a motion to clarify or modify the temporary restraining order, alleging that he proposed to exercise his rights as a unitholder in CREELP and the right to have the value of his options adjusted in accordance with "relevant agreements and plans" under which the options were created. Haddock alleged in that motion that he had reason to believe he had one or more common law and

statutory causes of action against the Crescent Entities related to management and desired "to assert these claims in this suit, or in another suit." Haddock requested in his motion that the court remove all doubt that filing those lawsuits would not violate the terms of the severance **\*167** agreement and that it either clarify or modify the temporary restraining order to permit him to file the lawsuits.

Haddock subsequently filed two motions for summary judgment, one as to the enforceability of the severance agreement and the other as to the Crescent Entities' counterclaim; the Crescent Entities likewise moved for summary judgment. After a two-day hearing, the trial court signed a final judgment on December 1, 2005, ordering that Haddock and the Crescent Entities take nothing on their respective claims and counterclaims. Haddock appealed to this court from the take-nothing summary judgment against him, but he later moved to dismiss the appeal, and we dismissed it on April 6, 2006. *See Haddock v. Crescent Real Estate Equities Co.,* No. 02–06–00096–CV, 2006 WL 909470, at \*1 (Tex.App.-Fort Worth Apr. 6, 2006, no pet.).

### E. The Arbitration Demand

On December 6, 2005, six days after the trial court signed its final judgment, Haddock wrote to the CEI Compensation Committee, requesting that it adjust the exercise price for his options pursuant to the antidilution provisions of the stock and unit option plans, which request was refused. Thereafter, according to Haddock, CREELP and CEI continually refused to allow him to exercise CREELP unit options and to exchange them for CEI stock.

On July 10, 2006, Haddock filed a forty-three page Statement of Claims with the American Arbitration Association under the arbitration provision contained in the CREELP limited partnership agreement. In his Statement of Claims, Haddock asserted causes of action against all of the Crescent Entities as well as the individual Real Parties in Interest for breach of contract, breach of the duty of good faith and fair dealing, violation of securities laws, and breach of fiduciary duty. As in his prior suit, Haddock set forth the events regarding his resignation as director and officer from the Crescent Entities in 1999, and alleged that since that time, those entities' operations had declined and the entities had begun to liquidate their real estate properties, using the proceeds to continue to award extraordinary dividends to stockholders, thereby diluting the value of his CREELP unit options.

Haddock further alleged that the Entities' Compensation Committee refused to adjust the exercise price of his options as provided by anti-dilution provisions in the option agreements, prevented him from converting his options to CEI common stock, and refused to allow him to exercise his options with a recourse promissory note as provided by the CREELP unit option agreement, resulting in damages of over $8.2 million. Haddock also asserted a claim, in a derivative capacity on behalf of CEI shareholders, asserting that loans to company insiders violated the Sarbanes–Oxley Act, resulting in damages to the shareholders of at least $39.7 million, including lost interest. He named Quinn, Rowsey, and Worrell as parties based upon their service on a Special Litigation Committee for the Crescent Entities that refused his demand regarding the derivative claim.

### F. The Underlying Proceeding

Real Parties in Interest filed this action in the 67th District Court of Tarrant County seeking a stay of the arbitration proceedings and a declaratory judgment that Haddock had repudiated the CREELP arbitration agreement by filing his March 2005 suit and proceeding to a final judgment rather than arbitrating the issues in that case and that the remaining claims were not within the scope of the arbitration agreement. Haddock answered with a general denial and a plea to **\*168** the jurisdiction asserting that the trial court lacked jurisdiction to decide any issues of arbitrability, including waiver or repudiation. Alternatively, he asserted that even if the court had jurisdiction over some arbitrability issues, its jurisdiction was limited in scope and did not allow it to decide the waiver or repudiation issue.

After a hearing on the application to stay arbitration, the trial court—the presiding judge being the same judge who had earlier entered the temporary restraining order in the prior suit, sitting for the regular judge of the 17th District Court—signed an order granting the stay and permanently enjoining Haddock from pursuing his arbitration demand. After Haddock perfected his appeal in this case, the trial court filed findings of fact and conclusions of law, finding that Haddock had repudiated the CREELP arbitration agreement by litigating the March 2005 suit to a final judgment, that he was estopped from relying on the arbitration agreement, that Real Parties in Interest accepted that repudiation by defending against Haddock's claims and filing a counterclaim, and that Real Parties in Interest suffered prejudice.

Haddock seeks review of the trial court's order both by petition for writ of mandamus and by interlocutory

appeal. We have consolidated the two proceedings for a decision disposing of both simultaneously. *See In re Valero Energy Corp.,* 968 S.W.2d 916, 916–17 (Tex.1998) (orig.proceeding). The trial court has stayed all proceedings in this case pending the outcome of the mandamus proceeding and interlocutory appeal.

## III. Discussion

### A. Mandamus or Interlocutory Appeal?

 [1]    The parties agree that the Federal Arbitration Act ("FAA") applies to the arbitration agreement in this case. *See generally* 9 U.S.C. §§ 1–16 (West 2009). A party seeking relief pursuant to the FAA from a denial or stay of arbitration must pursue relief by way of petition for writ of mandamus. *In re D. Wilson Constr. Co.,* 196 S.W.3d 774, 780 (Tex.2006) (orig.proceeding) ( "Mandamus is proper to correct a clear abuse of discretion when there is no adequate remedy by appeal, ... as when a party is denied its contracted-for arbitration rights under the FAA."); *In re Valero Energy Corp.,* 968 S.W.2d at 917 (holding mandamus available for denial of arbitration because party has no remedy by appeal under FAA); *Jack B. Anglin Co. v. Tipps,* 842 S.W.2d 266, 272 (Tex.1992) (orig.proceeding); *see also W. Dow Hamm III Corp. v. Millennium Income Fund, L.L.C.,* 237 S.W.3d 745, 751 (Tex.App.-Houston [1st Dist.] 2007, no pet.) (holding mandamus only means of reviewing order granting stay of arbitration). Therefore, we will dismiss the interlocutory appeal for want of jurisdiction and proceed to determine whether Haddock as Relator is entitled to mandamus relief. *See* Tex.R.App. P. 42.3(a), 43.2(f).

### B. Standard of Review

 [2]    [3]    [4]    Mandamus will issue to correct a clear abuse of discretion for which the remedy by appeal is inadequate. *In re Prudential Ins. Co. of Am.,* 148 S.W.3d 124, 135–36 (Tex.2004). A trial court has no discretion in determining what the law is or in applying the law to the facts, and a clear failure to analyze or apply the law correctly will constitute an abuse of discretion. *Walker v. Packer,* 827 S.W.2d 833, 840 (Tex.1992). When a motion to compel arbitration under the FAA has been erroneously denied or when a motion to stay arbitration is erroneously granted, there is no adequate remedy by appeal, and mandamus will issue. *In re D. Wilson Constr.* **\*169** *Co.,* 196 S.W.3d at 780; *see also In re Nexion Health at Humble, Inc.,* 173 S.W.3d 67, 69 (Tex.2005) (orig.proceeding) (per curiam).

 [5]    [6]    A party seeking to enforce an arbitration agreement must establish the existence of a valid arbitration agreement and show that the claims in dispute fall within the scope of that agreement. *In re Bank One, N.A.,* 216 S.W.3d 825, 826 (Tex.2007) (orig.proceeding) (per curiam); *In re Kellogg Brown & Root, Inc.,* 166 S.W.3d 732, 737 (Tex.2005) (orig.proceeding); *see BWI Cos., Inc. v. Beck,* 910 S.W.2d 620, 621 (Tex.App.-Austin 1995, orig. proceeding). In determining the validity of arbitration agreements under the FAA, we generally apply state-law principles governing the formation of contracts. *In re Palm Harbor Homes, Inc.,* 195 S.W.3d 672, 676 (Tex.2006) (citing *First Options of Chicago, Inc. v. Kaplan,* 514 U.S. 938, 944, 115 S.Ct. 1920, 1924, 131 L.Ed.2d 985 (1995)).

 [7]    [8]    [9]    Once the moving party establishes the existence of a valid arbitration agreement, the trial court then determines whether the nonmovant's claims fall within the scope of the arbitration clause. *In re FirstMerit Bank, N.A.,* 52 S.W.3d 749, 753 (Tex.2001) (orig.proceeding). If the trial court determines that a valid arbitration agreement exists, the burden shifts to the party opposing arbitration to prove its defenses. *J.M. Davidson, Inc. v. Webster,* 128 S.W.3d 223, 227 (Tex.2003). Whether a valid arbitration agreement exists is a legal question subject to de novo review. *In re D. Wilson Constr. Co.,* 196 S.W.3d at 781.

### C. The Arbitration Agreement

Haddock contends by his first issue that repudiation and waiver are matters of substantive arbitrability and that the parties clearly and unmistakably agreed to have all issues, including questions of arbitrability, decided by an arbitrator. Therefore, he asserts, the trial court lacked jurisdiction to decide the issues of repudiation and waiver. Real Parties in Interest contend that no valid arbitration agreement continued to exist because Haddock "repudiated" it by filing the prior lawsuit. They argue that when Haddock commenced the prior lawsuit, the Crescent Entities were put to an "election" to either terminate or insist on performance of the arbitration agreement and that, by filing a counterclaim and allowing the prior lawsuit to go to final judgment, the Crescent Entities and Haddock mutually terminated the arbitration agreement.

### 1. The issue is waiver, not repudiation by election.

 [10]    [11]    [12]    In findings of fact [2] and conclusions of law that it entered after the parties **\*170** filed their briefs in this court and that have not been challenged by either party,

the trial court found in favor of Real Parties in Interest that Haddock

> repudiated the Arbitration Agreement by filing and prosecuting the Prior Lawsuit to a final judgment. The Crescent Entities accepted that repudiation by defending against Haddock's claims ... and by prosecuting a counterclaim. The Arbitration Agreement ceased to exist as between these parties on or before April 6, 2006, the date Haddock dismissed his appeal of the Prior Lawsuit. [3]

To support their argument that Haddock repudiated the arbitration agreement, Real Parties in Interest rely on *Vireo, P.L.L.C. v. Cates,* 953 S.W.2d 489, 491 (Tex.App.-Austin 1997, pet. denied). In *Vireo,* the Austin court held that when a plaintiff filed suit on an arbitrable claim, the defendant had an election to insist or not on arbitration; when the defendant elected not to arbitrate, the parties therefore mutually repudiated the arbitration agreement. *Id.*

[13] Although the Supreme Court of Texas has not spoken on this issue, *Vireo's* approach, that of "mutual repudiation and waiver based on election" when a plaintiff files suit and then seeks arbitration, has been rejected by this court on two occasions as well as by other Texas courts of appeals. *See Grand Homes, 96, LP v. Loudermilk,* 208 S.W.3d 696, 704 (Tex.App.-Fort Worth 2006, pet. denied) (noting that *Vireo* holding would undermine policy promoting arbitration and observing that TGAA was enacted to abrogate common law "right of election" doctrine in arbitration context); *see also Wee Tots Pediatrics v. Morohunfola,* 268 S.W.3d 784, 792 n. 4 (Tex.App.-Fort Worth 2008, no pet.) (again declining to follow *Vireo* ); *Practicehwy.com, Inc. v. Albany IVF Fertility and Gynecology, PLLC,* No. 05–06–00222–CV, 2006 WL 2960838, at \*3 (Tex.App.-Dallas Oct. 18, 2006, no pet.) (mem.op.) (rejecting *Vireo* as conflating repudiation and waiver). We decline to revisit this issue. We hold that the trial court abused its discretion by basing its order staying arbitration on mutual repudiation of the arbitration agreement. However, this is but the beginning of our inquiry.

In addition to asserting repudiation, Real Parties in Interest contend that Haddock waived the arbitration agreement by inconsistent conduct in the prior lawsuit that resulted in prejudice to them. The trial court made additional findings that Haddock's conduct in filing and prosecuting the prior lawsuit to final judgment substantially invoked the litigation process and prejudiced the Crescent Entities. In *Perry Homes v. Cull,* handed down after briefs were filed and

after submission in this court, the Supreme Court of Texas extensively addressed the defense of waiver of arbitration by substantially invoking the judicial process to the other party's detriment or prejudice. 258 S.W.3d 580, 589–90 (Tex.2008), *cert. denied,* ––– U.S. ––––, 129 S.Ct. 952, 173 L.Ed.2d 116 (2009). By postsubmission supplemental briefs, the parties have joined issue on whether Haddock waived his right to arbitration by inconsistent litigation conduct, although Real Parties in Interest still say this is an issue of both waiver and repudiation. [4]

**\*171  2. The trial court has jurisdiction to decide waiver.**

[14] [15] As a threshold issue, Haddock argues that the trial court lacked subject matter jurisdiction to decide the issue of waiver. Federal and state courts have concurrent jurisdiction to enforce the FAA. *In re Palacios,* 221 S.W.3d 564, 565 (Tex.2006) (orig.proceeding); *In re Kellogg Brown & Root, Inc.,* 166 S.W.3d at 739 (citing *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.,* 460 U.S. 1, 26 n. 32, 103 S.Ct. 927, 942 n. 32, 74 L.Ed.2d 765 (1983)). Waiver in the context of this case is a question of arbitrability, and who decides arbitrability is a matter of contract interpretation regarding the division of labor or responsibility between the court and the arbitrator, not jurisdiction. *See Howsam v. Dean Witter Reynolds, Inc.,* 537 U.S. 79, 83, 123 S.Ct. 588, 592, 154 L.Ed.2d 491 (2002) (characterizing presumption that questions of arbitrability are to be presented to court unless parties have clearly and unmistakably agreed otherwise as "interpretive rule"); *Marie v. Allied Home Mtg. Corp.,* 402 F.3d 1, 3 (1st Cir.2005) (noting question of who decides waiver is one of "division of labor" between courts and arbitrators).

We recently decided this very issue against Haddock's position in another case. *Nw. Constr. Co. v. Oak Partners, L.P.,* 248 S.W.3d 837, 847 (Tex.App.-Fort Worth 2008, pet. denied) (holding question of who decides issue of waiver of arbitration not one of subject matter jurisdiction). We hold that the trial court had jurisdiction to decide the issue of waiver. [5]

**3. Who decides the question of waiver by inconsistent conduct?**

[16] [17] [18] Haddock next argues that who decides the question of waiver is a matter of contract and that the parties to this arbitration agreement clearly and unmistakably

referred all questions of arbitrability to an arbitration panel. [6] We agree that "arbitration is a matter of contract." *Howsam,* 537 U.S. at 83, 123 S.Ct. at 591. The question of " 'who has the primary power to decide arbitrability' turns upon what the parties agreed about that matter." *First Options,* 514 U.S. at 944, 115 S.Ct. at 1923.

 [19]    There is a "qualification" to that general rule, which is also an exception to the liberal policy favoring arbitration agreements. *Howsam,* 537 U.S. at 83, 123 S.Ct. at 591. "The question whether the parties have submitted a particular dispute to arbitration, i.e., *the question of arbitrability,* is 'an issue for judicial determination [u]nless the parties clearly and unmistakably provide otherwise.' " *Id.* (quoting *AT & T Techs., Inc. v. Commc'ns Workers,* 475 U.S. 643, 649, 106 S.Ct. 1415, 1418, 89 L.Ed.2d 648 (1986)); *see also First Options,* 514 U.S. at 944, 115 S.Ct. at 1924; *In re Weekley Homes, L.P.,* 180 S.W.3d 127, 130 (Tex.2005) ("[A]bsent unmistakable evidence that the parties intended the contrary, it is the courts rather than the **\*172** arbitrators that must decide 'gateway matters,' such as whether a valid arbitration agreement exists.").

In *First Options,* the Supreme Court noted, in discussing the "clear and unmistakable evidence" requirement, that "the law treats silence or ambiguity about the question '*who* (primarily) should decide arbitrability' differently from the way it treats silence or ambiguity about the question *whether* a particular merits-related dispute is arbitrable because it is within the scope of a valid arbitration agreement,' " so as to not "force unwilling parties to arbitrate a matter they reasonably would have thought a judge, not an arbitrator, would decide." 514 U.S. at 944–45, 115 S.Ct. at 1924–25.

**a. No "clear and unmistakable" evidence of agreement to delegate questions of arbitrability to arbitrator**
Haddock argues that the arbitration agreement of the limited partnership agreement "clearly and unmistakably" delegates arbitrability issues, including waiver, to an arbitration panel by expressly incorporating the Commercial Arbitration Rules of the American Arbitration Association ("AAA"). Specifically, Haddock relies upon Rule 7(a) of those rules, which provides that the arbitrator "shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement." American Arbitration Association, Commercial Arbitration Rules and Mediation Procedures, R7, http://

www.adr.org/sp.asp? id=22440# R7 (last accessed February 25, 2009).

Real Parties in Interest respond that the supreme court in *Perry Homes* has now decided, contrary to Haddock's position, that the issue of waiver in a case governed by the FAA is for the court, not an arbitrator. 258 S.W.3d at 587. Although we agree that this was the holding in *Perry Homes,* the arbitration agreement at issue in that case contained no reference to the AAA rules. And the supreme court in that case noted, albeit in another section of its opinion, that there was no indication in that contract that the parties had "clearly and unmistakably agreed" that the arbitrator should decide arbitrability. *Id.* at 587, n. 15 (citing *First Options,* 514 U.S. at 947–48, 115 S.Ct. at 1924). Therefore, we do not read *Perry Homes* as abandoning the "clear and unmistakable" qualification to the presumption that the court is to decide issues of arbitrability.

The majority of courts have concluded that express incorporation of rules empowering the arbitrator to decide arbitrability (including ruling upon his or her own jurisdiction) clearly and unmistakably evidences the parties' intent to delegate issues of arbitrability to the arbitrator. *See, e.g., Qualcomm Inc. v. Nokia Corp.,* 466 F.3d 1366, 1372–73 (Fed.Cir.2006) (holding incorporation of AAA rules, including Rule 7(a), clearly and unmistakably showed parties' intent to delegate issue of arbitrability to arbitrator); *Contec Corp. v. Remote Solution Co.,* 398 F.3d 205, 208 (2nd Cir.2005) (holding that incorporation of AAA Rules, including Rule 7(a), clearly and unmistakably evinced intent for arbitrator to decide whether nonsignatory party bound by arbitration agreement); *Terminix Int'l Co., L.P. v. Palmer Ranch Ltd. P'ship,* 432 F.3d 1327, 1332–33 (11th Cir.2005) (holding by incorporating AAA Rules into agreement, parties clearly and unmistakably agreed arbitrator should decide whether arbitration clause was valid); *Citifinancial, Inc. v. Newton,* 359 F.Supp.2d 545, 549–52 (S.D.Miss.2005) (same); *see also Burlington Res. Oil & Gas Co. L.P. v. San Juan Basin Royalty Trust,* 249 S.W.3d 34, 40 (Tex.App.-Houston [1st Dist.] 2007, pet. denied) (collecting cases).

 **\*173**   But the majority view does not "mandate that arbitrators decide arbitrability in all cases where an arbitration clause incorporates the AAA rules." *San Juan Basin,* 249 S.W.3d at 42 (quoting *James & Jackson, LLC v. Willie Gary, LLC,* 906 A.2d 76, 78, 80 (Del.2006)). Haddock points out that, in *James & Jackson,* the Delaware Supreme Court adopted the majority federal rule that incorporation

of AAA rules requires submission of issues of arbitrability to the arbitrator rather than the court. 906 A.2d at 80–81. However, the court in that case also held that this rule would only apply in cases where (1) an arbitration clause generally provides for arbitration of *all* disputes and also (2) incorporates a set of arbitration rules that empowers arbitrators to decide arbitrability. *Id.* Because the arbitration agreement there did not generally provide for arbitration of all disputes but expressly allowed the parties to seek injunctive relief and specific performance in the courts, the court held that something other than mere incorporation of AAA rules would be needed in order to establish clear and unmistakable intent to delegate issues of arbitrability to the arbitrator. *Id.* at 81.

In *Marie v. Allied Home Mortgage Corp.,* the arbitration clause referred to binding arbitration "any and all disputes, claims (whether in tort, contract, statutory, or otherwise), and disagreements concerning the interpretation or application of this Agreement ... *including the arbitrability of any such controversy or claim.*" 402 F.3d at 14–15. The First Circuit in that case acknowledged that, while the issue of waiver by litigation conduct is presumptively for the court, the parties may by agreement shift the waiver issue to an arbitrator by clear and unmistakable expression of intent in the agreement. *Id.* at 14 (citing *First Options,* 514 U.S. at 945, 115 S.Ct. at 1925). But the court held in that case that express delegation of "arbitrability" issues to the arbitrator in the arbitration agreement at issue there did not evince "clear and unmistakable" intent for the arbitrator to decide the issue of waiver by litigation conduct. *Id.* at 15. The court in *Marie* noted that the arbitration agreement at issue there also incorporated the AAA rules but that it was silent regarding whether the issue of waiver or any similar issue was intended to be referred to an arbitrator. *Id.*

The court in *Marie* did not expressly decide the effect of the incorporation of the AAA rules but broadly held as follows:

> We cannot say that the use of the term [arbitrability] here evinces a clear and unmistakable intent to have waiver issues decided by the arbitrator. There are no references to waiver or similar terms anywhere in the arbitration agreement. Neither party should be forced to arbitrate the issue of waiver by conduct without a clearer indication in the agreement that they have agreed to do so. The issue of who would

> decide such a question is an 'arcane' one that employees are unlikely to have considered unless clearly spelled out by the employer.

*Id.*

The Third Circuit has followed *Marie* in *Ehleiter v. Grapetree Shores, Inc.,* holding that waiver by litigation conduct inconsistent with arbitration is presumptively an issue for the court. 482 F.3d 207, 222 (3rd Cir.2007). It additionally held that, even though the arbitration agreement there expressly stated that all claims or matters arising out of or relating in any fashion to the agreement "shall be considered arbitrable" including "the issue of arbitrability of any claim or dispute," the agreement did not manifest a clear and unmistakable intent to have an arbitrator decide the **\*174** issue of waiver based on litigation conduct. *Id.* at 221. The court reasoned:

> [W]e do not believe that this provision ... evidences a clear and unmistakable intent to have an arbitrator decide procedural questions of arbitrability that arise only after the parties have bypassed a gateway determination of substantive arbitrability by the arbitrator and actively litigated the underlying dispute in court.

*Id.* at 222. The court in *Ehleiter* also noted that there was no reference to waiver of arbitration in the agreement. *Id.* That court refused to interpret the agreement's "silence regarding who decides the waiver issue" as giving arbitrators that power " 'for doing so ... [would] force [an] unwilling part[y] to arbitrate a matter [he] reasonably would have thought a judge, not an arbitrator, would decide.' " *Id.* (quoting *First Options,* 514 U.S. at 945, 115 S.Ct. 1920, 131 L.Ed.2d 985); *see also San Juan Basin,* 249 S.W.3d at 41–42 (reasoning that, although reference to AAA rules might otherwise be construed as "clear and unmistakable intent" to refer arbitrability issues to arbitrator, language of agreement was silent as to referral of "arbitrability" issues to arbitrator and limiting language of agreement negated such intent); *In re Ford Motor Co.,* 220 S.W.3d 21, 23 (Tex.App.-San Antonio 2006, orig. proceeding) (holding, despite reference to AAA rules, that agreement did not clearly and unmistakably evidence intent that issue of whether a nonparty was bound by arbitration agreement be decided by arbitrator).

[20] Haddock seeks to distinguish *Marie* on the basis that the conduct constituting waiver arose in the same litigation in that case, as contrasted with the prior litigation instituted by Haddock in a different court. [7] We disagree. The conduct found to constitute waiver in *Marie* was in a separate proceeding in a different litigation forum, the EEOC. *Marie,* 402 F.3d. at 14.

Haddock also argues that the First Circuit held that sending the waiver issue to the arbitrator in *Marie* would be "exceptionally inefficient" given that the case started in court, whereas Haddock claims this matter began with a demand for arbitration so that the issue of waiver could more easily be resolved in that forum. To the contrary, the conduct complained of by Real Parties in Interest started when Haddock instituted and pursued his *prior* litigation to an adverse decision in court. As the court in *Marie* recognized, "[i]f the arbitrator were to find that the defendant had waived its right to arbitrat[ion], then the case would inevitably end up back in court." *Id.* at 13. The same would be true here.

Finally, Haddock argues that *Marie* did not address the incorporation of the AAA rules into the arbitration agreement. But the court clearly considered that language, because it specifically pointed out that the agreement so stated; yet the court found no clear and unmistakable evidence of intent in the agreement to shift the issue of waiver to the arbitrator. *Id.* at 14.

Additionally, as in the *San Juan Basin* and *James & Jackson* cases, the arbitration agreement here is not unequivocal but contains limiting language with regard to the incorporation of the AAA rules, incorporating those rules "to the extent not inconsistent" with the remainder of the detailed provisions of the arbitration agreement, which contains five sections **\*175** and ten paragraphs of information prescribing the procedure and scope of any arbitration.

We also note that there is no designation in the arbitration agreement here as to which version of the AAA rules is to apply, the version in existence when the agreement was made or that in existence at the time of the dispute. Haddock acknowledges that the rule now designated as Rule 7(a), upon which he relies, did not exist when the arbitration agreement was added to the limited partnership agreement in 1994. Although, as Haddock points out, the partnership agreement has been amended several times since its inception without change to the arbitration agreement language, we

cannot assume from silence in the agreement as to the issue of arbitrability or as to which version of the AAA rules is to apply, that the parties intended to incorporate Rule 7(a), which did not exist when the arbitration agreement was added. *See Marie,* 402 F.3d at 15; *see also Ehleiter,* 482 F.3d at 222.

Silence is not "clear and unmistakable evidence" of intent. The agreement is silent as to whether the parties intended to incorporate the current rules, silent as to whether the arbitrator is to decide issues of "arbitrability," and silent specifically regarding who is to decide waiver, repudiation, or similar matters. We hold that the general reference in the arbitration agreement to the AAA rules, without more, does not clearly and unmistakably manifest these parties' intent to refer the issue of waiver by litigation conduct to the arbitrator.

**b. Substantial invocation of the litigation process still an issue for the court after *Howsam***

By part of his second issue, Haddock argues that, even if this court concludes that the trial court had power to consider some arbitrability issues, the trial court lacked power specifically to decide the waiver issue, based upon language contained in the United States Supreme Court's decision in *Howsam v. Dean Witter Reynolds Inc.,* which stated that the "presumption is that the arbitrator should decide 'allegation[s] of waiver, delay, or a like defense to arbitrability.' " 537 U.S. at 84, 123 S.Ct. at 592 (quoting *Moses H. Cone Mem'l Hosp.,* 460 U.S. at 24–25, 103 S.Ct. at 941). In *Perry Homes,* the Culls made the identical argument made here by Haddock, asserting that whether a party has waived the right to arbitrate by litigation conduct is an issue to be decided by the arbitrator, rather than the court, based upon the same language from *Howsam.* 258 S.W.3d at 588–90. The supreme court in *Perry Homes* rejected that argument, flatly stating,

> Every federal court that has addressed this issue since *Howsam* has continued to hold that substantial invocation of the litigation process is a question for the court rather than the arbitrator—including the First, Third, Fifth, and Eighth Circuit. Legal commentators appear to agree. So do we.

*Id.* at 589; *see JPD, Inc. v. Chronimed Holdings, Inc.,* 539 F.3d 388, 393–94 (6th Cir.2008) (holding *Howsam* limited to contractually based waiver, not waiver by litigation conduct

inconsistent with arbitration); *Ehleiter, 482 F.3d at 217; Marie,* 402 F.3d at 13–14; *Republic Ins. Co. v. PAICO Receivables, LLC,* 383 F.3d 341, 344–47 (5th Cir.2004); *Tristar Fin. Ins. Agency, Inc. v. Equicredit Corp. of Am.,* 97 Fed.Appx. 462, 464 (5th Cir.2004). We overrule that portion of Haddock's second issue.

### c. The "No–Waiver" Rule

Haddock also argues that Rule 48–(a) of the AAA rules incorporated into the arbitration agreement is a factor to be taken **\*176** into consideration in determining whether he waived the agreement. That rule provides, "No judicial proceeding by a party relating to the subject matter of the arbitration shall be deemed a waiver of a party's right to arbitrate." American Arbitration Association, Commercial Arbitration Rules and Mediation Procedures, R48, http:// www.adr.org/sp.asp?id=22440# R48 (last accessed February 25, 2009). Haddock acknowledges that this rule does not preclude a finding of waiver but argues that this rule, as incorporated into the agreement, is further indication of the parties' intent to favor arbitration, specifically with regard to waiver.

 **[21]** The presence of such a "no waiver" clause in an arbitration agreement does not alter the ordinary analysis undertaken to determine if a party has waived its right to arbitration by litigation conduct. *PAICO,* 383 F.3d at 348. The Fifth Circuit in that case agreed with those courts that have interpreted such a "no waiver" clause as intended to permit parties to seek provisional remedies or other judicial proceedings that would not function to displace arbitration on the underlying dispute. *Id.* Specifically, the court in *PAICO* stated, " '[T]he fact that an arbitration agreement incorporates such a provision would not prevent a court from finding that a party waived arbitration by protracted litigation of an arbitrable dispute.' " *Id.* (quoting *S & R Co. v. Latona Trucking, Inc.,* 159 F.3d 80, 85 (2nd Cir.1998), *cert. dism'd,* 528 U.S. 1058, 120 S.Ct. 629, 145 L.Ed.2d 506 (1999)); *see also Home Gas Corp. v. Walter's of Hadley, Inc.,* 403 Mass. 772, 532 N.E.2d 681, 684–85 (1989) (holding "no waiver" clause did not prevent finding of waiver by litigation conduct); *Seidman & Seidman v. Wolfson,* 50 Cal.App.3d 826, 835, 123 Cal.Rptr. 873 (Cal.Ct.App.1975) (stating purpose behind "no waiver" rule is not to allow a party to seek judicial relief of a controversy "and later to switch course and demand arbitration").

We hold that the trial court properly determined that it, rather than an arbitrator, should decide whether Haddock waived

the arbitration agreement by filing and prosecuting the prior lawsuit. We overrule Haddock's first issue. [8]

### D. Waiver by Prior Litigation Conduct Inconsistent with Arbitration

Having dealt with the preliminary arguments that consumed the vast bulk of the briefing by both sides, we now address the main issue. Haddock contends that the trial court abused its discretion and misapplied the law to the facts by concluding that he waived arbitration by his conduct in initiating and prosecuting the prior lawsuit. Haddock maintains that his prior lawsuit did not assert the same issues raised by his demand for arbitration and that the issue in the prior lawsuit did not "aris[e] out of or in connection with th[e] [Partnership] Agreement or the Partnership" but, instead, arose from an entirely **\*177** separate contract—the severance agreement —which was not subject to arbitration.

Real Parties in Interest do not contest the validity of the arbitration agreement in the limited partnership agreement. Their position is that the severance agreement is subject to the arbitration agreement contained in the limited partnership agreement that Haddock raised and litigated in the prior litigation, that his conduct in the prior litigation was inconsistent with an intent to arbitrate that claim, and that they suffered prejudice; thus, they argue, Haddock waived his right to arbitrate his current claims.

 **[22]** **[23]** Whether a party has waived its arbitration rights under the FAA by inconsistent litigation conduct is a question of law that we review de novo. *Perry Homes,* 258 S.W.3d at 598 & n. 102; *see also In re Citigroup Global Mkts., Inc.,* 258 S.W.3d 623, 625 (Tex.2008) (orig.proceeding) (per curiam); *In re Serv. Corp. Int'l,* 85 S.W.3d 171, 174 (Tex.2002) (orig.proceeding) (per curiam). Because public policy favors arbitration, there is a strong presumption against waiver of arbitration. *Moses H. Cone Mem'l Hosp.,* 460 U.S. at 24–25, 103 S.Ct. at 941; *In re D. Wilson Constr. Co.,* 196 S.W.3d at 783.

 **[24]** **[25]** **[26]** The party asserting waiver bears a heavy burden of proof, and the court must resolve all doubts in favor of arbitration. *In re Bruce Terminix Co.,* 988 S.W.2d 702, 704 (Tex.1998). Waiver must be intentional. *In re Bank One, N.A.,* 216 S.W.3d at 827. Waiver may be express or implied from a party's conduct, but that conduct must be unequivocal. *Id.* Additionally, waiver in the context of arbitration agreements subject to the FAA requires more than is required for general

waiver—it requires proof that the party asserting waiver as a defense to arbitration has suffered prejudice. *Perry Homes,* 258 S.W.3d at 594–95 & n. 80 (reaffirming requirement of prejudice and collecting cases).

 **[27]**    Under the FAA, "[a] party waives an arbitration clause by substantially invoking the judicial process to the other party's detriment." *In re Citigroup Global Mkts., Inc.,* 258 S.W.3d at 625 (quoting *Perry Homes,* 258 S.W.3d at 594).

 **[28]**    **[29]**    To demonstrate waiver, the party opposing arbitration must establish both that (1) the party seeking arbitration substantially invoked the judicial process and (2) the party opposing arbitration suffered prejudice thereby. *In re Bruce Terminix,* 988 S.W.2d at 704. To invoke the judicial process, a party "must, at the very least, engage in some overt act in court that evinces a desire to resolve the arbitrable dispute through litigation rather than arbitration." *PAICO,* 383 F.3d at 344 (quoting *Subway Equip. Leasing Corp. v. Forte,* 169 F.3d 324, 326 (5th Cir.1999)).

## 1. The prior suit substantially invoked the judicial process

 **[30]**    Haddock contends that waiver could not have occurred because the prior suit concerned only the unfavorable-comments clause in the severance agreement, which had no arbitration agreement, and that his current arbitration demand asserts entirely different claims that arise only out of a separate contract, i.e., the partnership agreement. Therefore, we first determine whether—as Real Parties in Interest contend—the prior suit invoked the judicial process regarding the same claims that Haddock now seeks to arbitrate. *See id.* at 344–47 (holding waiver applies only where the same claim sought to be arbitrated was previously litigated but upholding finding of waiver where jurisdiction of court was previously invoked  **\*178**  on all issues). We agree with Real Parties in Interest on this key issue.

Although the severance agreement contains no arbitration clause, the CREELP unit option plan—as amended and attached to the severance agreement—does. Both the prior suit and the arbitration demand concern claims that "aris[e] out of or in connection with" the limited partnership or the limited partnership agreement by virtue of the CREELP unit option plan, which is subject to all terms of the limited partnership agreement. Section 6.26 of the 1996 CREELP Unit Option Incentive Plan, attached as an appendix to Haddock's severance agreement, expressly provides that "the rights granted thereunder are governed by and subject

to each of the terms and conditions of the partnership agreement." That option plan further provides that upon exercising an option thereunder, each participant is "deemed to have accepted and agreed to be bound by each of the terms and conditions of the Partnership Agreement *for all purposes.*" [Emphasis added.] As amended in 1994 and thereafter, the partnership agreement, in turn, contains the arbitration agreement under which Haddock seeks to arbitrate his CREELP unit option and his CEI stock option claims. [9]

While Haddock claims that he initially sought only to reform the unfavorable-comments clause of the severance agreement in the prior lawsuit, he had a stated purpose for doing so— so that he could plead and litigate his claims of risky loans and mismanagement of the Crescent Entities, which allegedly resulted in devaluing his CREELP and CEI options, without fear of violating that clause. Moreover, he also sought and obtained affirmative injunctive relief against the Crescent Entities, preventing them from threatening or taking action to forfeit his rights in the CREELP unit options vested in him by the severance agreement. Haddock expressly stated his intent to file an additional suit to assert his claims against the Crescent Entities or, alternatively, to assert those claims in that same suit, and he sought the protection of the court through a ruling that he would not risk interference or forfeiture of his options by proceeding with his proposed litigation.

Only after ultimately suffering an adverse result in his suit did Haddock turn to arbitration. Haddock alleged in his arbitration demand that the option claims he now asserts in that demand are "covered by the arbitration provision in the Limited Partnership Agreement." [10] The fact is that both his prior suit and his arbitration demand assert the same conduct of Real Parties in Interest, namely, allegedly refusing to honor and reducing in value his CREELP unit options and CEI stock options.

Haddock cannot have it both ways. If, as he says, his claims regarding option rights asserted in his arbitration demand are covered by the arbitration agreement, then so were the claims regarding the  **\*179**  option rights that he sought to protect in the previous lawsuit and planned to litigate once he obtained a declaration that the unfavorable-comments clause of his severance agreement did not preclude such a suit. By his prior lawsuit, Haddock invoked the judicial process with respect to the same claims specifically regarding his options in CREELP that he now seeks to arbitrate.

**[31]** Was his invocation of the judicial process in the prior litigation "substantial"? Waiver by litigation conduct must be decided under a totality-of-the-circumstances test on a case-by-case basis. *Perry Homes,* 258 S.W.3d at 591. Factors listed in that case in considering the totality of the circumstances include whether the party seeking arbitration chose to file in court as plaintiff, how long the party seeking arbitration delayed before seeking that process, whether that party knew of the arbitration clause from the outset, how much discovery was conducted, how much pretrial activity went to the merits, how much time and expense was incurred in litigation, whether the party seeking arbitration filed dispositive motions or sought judgment on the merits, and when the case was to be tried. *Id.* at 591–92.

Real Parties in Interest assert that Haddock "substantially" invoked the judicial process with respect to his claim regarding his rights in the CREELP unit options because

(1) Haddock chose to file the prior lawsuit in court rather than arbitrate ("whether the movant was the plaintiff (who chose to file in court) or the defendant (who merely responded)");

(2) Haddock filed the prior lawsuit in March 2005, pursued it through final judgment, appealed it to this court, and waited until July of 2006 to file his demand for arbitration ("how long the movant delayed before seeking arbitration");

(3) Haddock was "the primary signatory on the First Amended Limited Partnership Agreement" and "intended for the arbitration agreement to be broad and encompass all claims and disputes ("whether the movant knew of the arbitration clause all along")";

(4) Haddock knew of the arbitration agreement in 1994 when he signed the First Amended Limited Partnership Agreement ("when the movant knew of the arbitration clause");

(5) Haddock was the plaintiff in the prior lawsuit and filed two motions for summary judgment ("whether the movant filed affirmative claims and dispositive motions"); and

(6) Haddock pursued the prior lawsuit to a final judgment ("whether the movant sought judgment on the merits").

Haddock does not dispute these facts. Haddock chose to file his prior suit rather than to arbitrate, sought and obtained affirmative relief, and expressed his intent to pursue his claims in that lawsuit or in another suit as to mismanagement and refusal of the Crescent Entities to allow him to exercise his options. Throughout the prior litigation, Haddock never mentioned the arbitration agreement under which he now seeks to arbitrate his option claims. Yet he was clearly aware of it because he admits in his brief in this court that he desired that it be included in the limited partnership agreement in 1994.

**[32]** Further, waiver may be found where a party has tried and failed to achieve a satisfactory result before turning to arbitration. *See, e.g., Oak Partners,* 248 S.W.3d at 848; *Loudermilk,* 208 S.W.3d at 704; *Williams Indus., Inc. v. Earth Dev. Sys. Corp.,* 110 S.W.3d 131, 135 (Tex.App.-Houston [1st Dist.] 2003, no pet.); **\*180** *In re Winter Park Constr. Inc.,* 30 S.W.3d 576, 579 (Tex.App.-Texarkana 2000, orig. proceeding); compare *In re Bruce Terminix Co.,* 988 S.W.2d at 704 (finding no waiver where defendant did not ask court for any judicial decision such as by requesting summary judgment).

**[33]** Indeed, failing to seek arbitration until after proceeding in litigation to an adverse result is the clearest form of inconsistent litigation conduct and is inevitably found to constitute substantial invocation of the litigation process resulting in waiver. *See, e.g., Jones v. Citibank (S.D.), N.A.,* 235 S.W.3d 333, 340–41 (Tex.App.-Fort Worth 2007, no pet.)* (holding defendant waived arbitration of counterclaim by litigating over two years and after summary judgment was rendered against her); *see also Frye v. Paine, Webber, Jackson & Curtis, Inc.,* 877 F.2d 396, 398 (5th Cir.1989) (holding party waived arbitration by participating in litigation that ended in mistrial), *cert. denied,* 494 U.S. 1016, 110 S.Ct. 1318, 108 L.Ed.2d 493 (1990); *Miller Brewing Co. v. Fort Worth Distrib. Co.,* 781 F.2d 494, 497–98 (5th Cir.1986) (finding waiver by filing state court lawsuit and permitting it to be dismissed for want of prosecution); *see also Carbajal v. Household Bank F.S.B.,* No. 00 C 0626, 2003 WL 22159473, at \*10 (N.D.Ill. Sept. 18, 2003) (noting "[p]articipation in litigation raises concerns of forum-shopping. If a party first demands arbitration only after it receives an adverse ruling in the lawsuit, courts inevitably will find waiver" and collecting cases), *aff'd,* 372 F.3d 903 (7th Cir.2004); *Oak Partners,* 248 S.W.3d at 849 (holding trial court's waiver finding based on totality of circumstances including engaging in extensive discovery over nineteen-month period, filing of counterclaim, cross-claims, and motion for partial summary judgment, and seeking arbitration only after failure of mediation).

Haddock filed his arbitration demand after filing suit, obtaining injunctive relief, litigating for some nine months, filing two motions for summary judgment, and finally suffering an adverse result in the prior lawsuit. All of these facts support the trial court's finding that he substantially invoked the litigation process and thereby waived his right to arbitration.

[34] Moreover, participation in litigation to gain an advantage in future litigation can result in waiver. *See In re Christus Spohn Health Sys. Corp.,* 231 S.W.3d 475, 481 (Tex.App.-Corpus Christi 2007, orig. proceeding) (holding hospital's prior litigation conduct in criminal case constituted waiver of right to arbitrate where prior litigation involved developing evidence as part of strategic plan for defense of civil suit for damages). Haddock made clear in his pleadings in his prior suit that his strategy and plan was to obtain an interpretation of the severance agreement that would permit him to assert his claims in a lawsuit without violating the unfavorable-comments clause while preventing Real Parties in Interest from taking any action to interfere with the option rights he sought to protect by injunctive relief and which he now seeks to arbitrate.

Haddock filed his arbitration demand for his option claims over a year and a half after filing suit, prosecuting that suit, suffering an adverse summary judgment in the trial court, and after dismissing his appeal to this court. Considering the totality of the circumstances as articulated in *Perry Homes,* we hold that Haddock substantially invoked the judicial process.

## 2. Prejudice

[35] [36] [37] [38] Substantially invoking the judicial process does not waive a party's arbitration rights unless the opposing party also proves that it suffered prejudice as a result. ***181** *Perry Homes,* 258 S.W.3d at 593–94 (citing *In re Bruce Terminix Co.,* 988 S.W.2d at 704). "Courts will not find that a party has waived its right to enforce an arbitration clause by merely taking part in litigation unless it has substantially invoked the judicial process to its opponent's detriment." *In re Service Corp. Int'l,* 85 S.W.3d at 174. "When one party reveals a disinclination to resort to arbitration on any phase of suit involving all parties, those parties are prejudiced by being forced to bear the expense of a trial.... Substantially invoking the litigation machinery qualifies as the kind of prejudice that is the essence of waiver." *E.C. Ernst, Inc. v. Manhattan Constr. Co.,* 559 F.2d 268, 269 (5th Cir.1977) (holding extensive postsuit actions in all phases

of complex litigation served as waiver of right to arbitrate when opposing parties were prejudiced by being forced to bear expenses of a quite lengthy trial, which is the kind of prejudice arbitration is designed to avoid).

[39] [40] "Prejudice" has many meanings. *Perry Homes,* 258 S.W.3d at 597. However, prejudice or "detriment" in the context of litigation conduct inconsistent with arbitration relates to "inherent unfairness" caused by "a party's attempt to have it both ways by switching between litigation and arbitration to its own advantage." *Id.; see also Subway,* 169 F.3d at 327 (referring to "inherent unfairness—in terms of delay, expense, or damage to a party's legal position—that occurs when the party's opponent forces it to litigate an issue and later seeks to arbitrate that same issue"). "[A] party should not be allowed purposefully and unjustifiably to manipulate the exercise of its arbitral rights simply to gain an unfair tactical advantage over the opposing party." *Id.* (citing *In re Tyco Int'l Ltd. Securities Litigation,* 422 F.3d 41, 46 n. 5 (1st Cir.2005)).

[41] [42] [43] [44] Ultimately, what constitutes waiver of the right to arbitrate depends on the facts of each case. *PAICO,* 383 F.3d at 346 (citing *Tenneco Resins, Inc. v. Davy Int'l, AG,* 770 F.2d 416, 420 (5th Cir.1985)). Three factors are particularly relevant in determining prejudice. *Id.* First, pretrial activity related to all claims including those that are arbitrable may result in prejudice. *Id.* (citing *Price v. Drexel Burnham Lambert, Inc.* 791 F.2d 1156, 1161–62 (5th Cir.1986)). Second, time and expense incurred in defending against a motion for summary judgment could prejudice the party opposing arbitration. *Price,* 791 F.2d at 1162. Thus, both delay and the extent of the moving party's participation in judicial proceedings are material factors in assessing prejudice. *Frye,* 877 F.2d at 398. Third, failure to assert the right to demand arbitration is a factor bearing on the question of prejudice along with other considerations. *Price,* 791 F.2d at 1161–62. A demand for arbitration puts the other party on notice that arbitration is forthcoming and affords that party the opportunity to avoid compromising its position with regard to arbitrable and nonarbitrable claims. *PAICO,* 383 F.3d at 347.

[45] If a party has asserted the right to arbitrate at or before commencement of litigation, the party opposing arbitration will necessarily carry a heavy burden to show waiver. *Id.* Conversely, when a party fails to demand arbitration and also engages in pretrial activity inconsistent with the intent to arbitrate, the opposing party seeking to show

waiver "may more easily show that its position has been compromised, i.e., prejudiced." *Id.; see Oak Partners,* 248 S.W.3d at 851 (concluding that plaintiff showed prejudice when defendant delayed nineteen months before moving to compel arbitration, during which time it actively pursued litigation in the trial court, sought discovery from plaintiff, **\*182** and actively sought relief from the trial court, which forced plaintiff to respond and to incur attorney's fees); *Jones,* 235 S.W.3d at 340–41 (holding appellant waived her right to arbitrate when she waited for over two years after card issuer's first petition was filed before requesting arbitration, and by that time had filed numerous motions including a motion to dismiss, a counterclaim, and opposition to summary judgment); *see also Fraser v. Merrill Lynch Pierce, Fenner & Smith, Inc.,* 817 F.2d 250, 253 (4th Cir.1987) (finding sufficient prejudice to support waiver where brokerage firm delayed four-and-one-half years before seeking arbitration, two trial dates passed, and opposing party was required to respond to two motions for partial summary judgment and three motions to dismiss); *Miller Brewing,* 781 F.2d at 497–98 (finding waiver where plaintiff unconditionally filed suit, waited eight months to assert right to arbitrate, and did not pursue arbitration until after its suit was dismissed three years later for want of prosecution). Likewise, in *Price,* the Fifth Circuit Court of Appeals held that prejudice resulted in waiver when the party opposing arbitration had been put to the expense and time of defending a motion to dismiss and for summary judgment because unlike a perfunctory motion to dismiss before answering, a federal rule 12(b) motion to dismiss and for summary judgment "could not have caused anything but substantial prejudice to the Prices." 791 F.2d at 1162.

[46] Haddock failed to seek arbitration before initiating the prior litigation. Then he waited over fourteen months before requesting arbitration, from March 2005, when he filed the prior lawsuit, until July 2006, when he filed his statement of claims with the AAA. During that time, among other things, he obtained a temporary injunction, filed two motions for summary judgment, litigated his claims to an adverse judgment, and filed and dismissed an appeal from that judgment. The trial court specifically found that the "Crescent Entities were prejudiced by Haddock's invocation of the judicial system in the Prior Lawsuit. In reliance on Haddock's actions, the Crescent Entities spent substantial sums defending Haddock's claims in the Prior Lawsuit and prosecuting a counterclaim." Haddock has not challenged that finding.

We hold that the trial court did not abuse its discretion by staying the arbitration because Haddock made his choice: he substantially invoked the judicial process as to his option claims to the prejudice of Real Parties in Interest in the prior litigation and thereby waived his right to arbitrate those claims. We overrule Haddock's third issue.

## IV. Conclusion

Haddock does not challenge the trial court's ruling that his claims based on his stock options in CEI or his Sarbanes–Oxley claim are beyond the scope of the arbitration agreement. Nor has he raised an issue on appeal as to the trial court's ruling that his claims against Quinn, Rowsey, and Worrell are beyond the scope of the arbitration agreement. Therefore, we need not reach the propriety of the trial court's order as to those claims. Having overruled Haddock's three issues, we deny the petition for writ of mandamus, and we dismiss the interlocutory appeal for want of jurisdiction.

WALKER, J., concurs without opinion.

Footnotes

1    Each of several amended partnership agreements contain the identical arbitration provision.

2    When an abuse of discretion standard of review applies to a trial court's ruling, findings of fact and conclusions of law aid us in reviewing the propriety of the ruling by providing us with an explanation for the ruling. *Chrysler Corp. v. Blackmon,* 841 S.W.2d 844, 852 (Tex.1992); *Samuelson v. United Healthcare of Tex., Inc.,* 79 S.W.3d 706, 710 (Tex.App.-Fort Worth 2002, no pet.). But while findings of fact and conclusions of law can be helpful in applying the abuse of discretion standard, they are not required. *Samuelson,* 79 S.W.3d at 710. To determine whether a trial court abused its discretion, we must decide whether it acted without reference to any guiding rules or principles; in other words, whether the act was arbitrary or unreasonable. *See Downer v. Aquamarine Operators, Inc.,* 701 S.W.2d 238, 241–42 (Tex.1985), *cert. denied,* 476 U.S. 1159, 106 S.Ct. 2279, 90 L.Ed.2d 721 (1986). Any factual issues decided by the court in reaching the decision under review are not reviewed by legal- and factual-sufficiency standards, although when the decision under review is based on facts determined by the court, those facts must have some support in the evidence. *Crouch v.*

*Tenneco, Inc.,* 853 S.W.2d 643, 649 & n. 2 (Tex.App.-Waco 1993, writ denied) (op. on reh'g). However, neither party has challenged the trial court's findings of fact in this case.

The facts in this case are undisputed. Relator's position is that the trial court misapplied the law to the facts and abused its discretion. *See In re Dillard Dep't Stores, Inc.,* 198 S.W.3d 778, 780 (Tex.2006).

Indeed, Haddock has argued from the outset that "repudiation" and "waiver" in the context of a party's litigation conduct that is inconsistent with arbitration have no substantive difference.

Although the trial court did not make an explicit finding or conclusion as to whether it possessed the power to determine the issue of waiver, it implicitly so concluded because it proceeded to determine the essential elements of waiver against Haddock.

The limited partnership agreement requires that Delaware law be used when construing the agreement, specifically including the arbitration agreement. The parties agree that, to the extent that any state substantive law applies, Delaware law "mirrors federal law." When applying the FAA, Texas courts also look to federal law to decide substantive issues. *Jack B. Anglin Co.,* 842 S.W.2d at 271–72. We thus look to federal law to determine this issue.

Haddock does not discuss the differences between or attempt to distinguish *Ehleiter* or *James & Jackson* from this case.

We also overrule the second part of Haddock's second issue, in which he argues that whether the arbitration agreement forbids his Sarbanes–Oxley derivative claim is for the arbitrator to decide, not the court, similar to a like issue regarding class arbitration under *Green Tree Financial Corp. v. Bazzle,* 539 U.S. 444, 449, 123 S.Ct. 2402, 2405, 156 L.Ed.2d 414 (2003) (holding question of whether an arbitration agreement forbade class arbitration was for the arbitrator, not the court, because it involved contract interpretation and arbitration procedures). The trial court did not determine that the derivative claim was forbidden by the arbitration agreement; rather, it determined that the claim was outside the scope of the arbitration agreement because most CEI stockholders were not parties to the partnership agreement. Haddock has not challenged that ruling or the findings of the court to that effect.

The trial court found, and Haddock has not challenged that finding, that he raised some of the same issues in the prior suit that he now seeks to arbitrate, alleging in his petition in that suit that the Crescent Entities "may be acting adversely to the interests of stockholders and unitholders" and that "Haddock further believes the management of the Employer Group is not acting in the best interests of the shareholders and unitholders by providing risky loans to executives which seriously jeopardize the financial health and stability of the Employer Group."

Although Haddock points out that he had and retains to this day a limited partnership interest in CREELP, he has never explained how the arbitration demand involves that limited partnership interest, other than through the identical options that were involved in the prior suit.

---

**End of Document**

© 2014 Thomson Reuters. No claim to original U.S. Government Works.

123 S.Ct. 588
Supreme Court of the United States

Karen HOWSAM, Individually and as Trustee for the E. Richard Howsam, Jr., Irrevocable Life Insurance Trust Dated May 14, 1982, Petitioner,
v.
DEAN WITTER REYNOLDS, INC.

No. 01-800. | Argued Oct. 9, 2002. | Decided Dec. 10, 2002.

Brokerage firm brought suit seeking to enjoin customer from arbitrating dispute with National Association of Securities Dealers (NASD). The United States District Court for the District of Colorado dismissed suit, but the Court of Appeals for the Tenth Circuit, Ebel, Circuit Judge, 261 F.3d 956, reversed. After granting certiorari, the United States Supreme Court, Justice Breyer, held that: (1) interpretation of NASD rule imposing six-year time limit for arbitration was a matter presumptively for the arbitrator, not for the court, abrogating *J.E. Liss & Co. v. Levin*, 201 F.3d 848, and (2) parties' contract did not call for judicial determination of whether arbitration was time-barred.

Reversed.

Justice Thomas filed an opinion concurring in the judgment.

Justice O'Connor did not participate.

West Headnotes (5)

**[1]    Alternative Dispute Resolution**



of Dispute
Arbitrability

The question whether the parties have submitted a particular dispute to arbitration, i.e., the "question of arbitrability," is an issue for judicial determination unless the parties clearly and unmistakably provide otherwise.

544 Cases that cite this headnote

**[2]    Alternative Dispute Resolution**



of Dispute
Arbitrability

A gateway dispute about whether the parties are bound by a given arbitration clause raises a "question of arbitrability" for a court to decide; similarly, a disagreement about whether an arbitration clause in a concededly binding contract applies to a particular type of controversy is for the court.

578 Cases that cite this headnote

**[3]    Alternative Dispute Resolution**



to Be Determined by Court
Matters

**Alternative Dispute Resolution**



Laches, or Estoppel
Waiver,

"Procedural" questions which grow out of the dispute and bear on its final disposition are presumptively not for the judge, but for an arbitrator, to decide; the presumption is that the arbitrator should decide allegations of waiver, delay, or a like defense to arbitrability.

393 Cases that cite this headnote

**[4]    Alternative Dispute Resolution**



Between Customer-Investors and Broker-Dealers
Relations

Issue of whether arbitration of dispute between brokerage firm and its customer was time-barred under the National Association of Securities Dealers (NASD) Code of Arbitration Procedure was a gateway procedural dispute that did not present a "question of arbitrability," and thus interpretation of NASD time limit rule was a matter presumptively for the arbitrator, not for the court; NASD arbitrators were comparatively more expert about meaning of their own rule and better able to interpret and apply it; abrogating *J.E. Liss & Co. v. Levin*, 201 F.3d 848.

247 Cases that cite this headnote

**[5]**    **Alternative Dispute Resolution**



to Arbitrate

Contract between brokerage firm and its customer, which incorporated the National Association of Securities Dealers (NASD) Code of Arbitration Procedure, did not call for judicial determination of whether arbitration was time-barred under NASD arbitration time limit rule, although rule limited arbitration to "eligible" disputes, where rule's use of term "eligible" did not indicate parties' intent for time limit issue to be resolved by court prior to arbitration, since parties to an arbitration contract would normally expect a forum-based decisionmaker to decide forum-specific procedural gateway matters.

372 Cases that cite this headnote

**\*\*589** *Syllabus* [*]

Per respondent Dean Witter Reynolds, Inc.'s standard client agreement, petitioner Howsam chose to arbitrate her dispute with the company before the National Association of Securities Dealers (NASD). NASD's Code of Arbitration Procedure § 10304 states that no dispute "shall be eligible for submission ... where six (6) years have elapsed from the occurrence or event giving rise to the ... dispute." Dean Witter filed this suit, asking the Federal District Court to declare the dispute ineligible for arbitration because it was more than six years old and seeking an injunction to prohibit Howsam from proceeding in arbitration. The court dismissed the action, stating that the NASD arbitrator should interpret and apply the NASD rule. In reversing, the Tenth Circuit found that the rule's application presented a question of the underlying dispute's "arbitrability"; and the presumption is that a court will ordinarily decide an arbitrability question.

*Held:* An NASD arbitrator should apply the time limit rule to the underlying dispute. Pp. 591–593.

(a) "[A]rbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *Steelworkers v. Warrior & Gulf Nav. Co.,* 363 U.S. 574, 582, 80 S.Ct. 1347, 4

L.Ed.2d 1409. The question whether parties have submitted a particular dispute to arbitration, *i.e.,* the "*question of arbitrability,*" is "an issue for judicial determination [u]nless the parties clearly and unmistakably provide otherwise." *AT & T Technologies, Inc. v. Communications Workers,* 475 U.S. 643, 649, 106 S.Ct. 1415, 89 L.Ed.2d 648. The phrase "question of arbitrability" has a limited scope, applicable in the kind of narrow circumstance where contracting parties would likely have expected a court to have decided the gateway matter. But **\*\*590** the phrase is *not* applicable in other kinds of general circumstance where parties would likely expect that an arbitrator would decide the question-" 'procedural' questions which grow out of the dispute and bear on its final disposition," *John Wiley & Sons, Inc. v. Livingston,* 376 U.S. 543, 557, 84 S.Ct. 909, 11 L.Ed.2d 898, and "allegation [s] of waiver, delay, or a like **\*80** defense to arbitrability," *Moses H. Cone Memorial Hospital v. Mercury Constr. Corp.,* 460 U.S. 1, 24–25, 103 S.Ct. 927, 74 L.Ed.2d 765. Following this precedent, the application of the NASD rule is not a "question of arbitrability" but an "aspec[t] of the [controversy] which called the grievance procedures into play." *John Wiley & Sons, Inc., supra,* at 559, 84 S.Ct. 909. NASD arbitrators, comparatively more expert about their own rule's meaning, are comparatively better able to interpret and to apply it. In the absence of any statement to the contrary in the arbitration agreement, it is reasonable to infer that the parties intended the agreement to reflect that understanding. And for the law to assume an expectation that aligns (1) decisionmaker with (2) comparative expertise will help better to secure the underlying controversy's fair and expeditious resolution. Pp. 591–593.

(b) Dean Witter's argument that, even without an antiarbitration presumption, the contracts call for judicial determination is unpersuasive. The word "eligible" in the NASD Code's time limit rule does not, as Dean Witter claims, indicate the parties' intent for the rule to be resolved by the court prior to arbitration. Parties to an arbitration contract would normally expect a forum-based decisionmaker to decide forum-specific procedural gateway matters, and any temptation here to place special antiarbitration weight on the word "eligible" in § 10304 is counterbalanced by the NASD rule that "arbitrators shall be empowered to interpret and determine the applicability" of all code provisions, § 10324. P. 593.

261 F.3d 956, reversed.

BREYER, J., delivered the opinion of the Court, in which REHNQUIST, C.J., and STEVENS, SCALIA, KENNEDY, SOUTER, and GINSBURG, JJ., joined. THOMAS, J., filed an opinion concurring in the judgment, *post,* p. 593. O'CONNOR, J., took no part in the consideration or decision of the case.

**Attorneys and Law Firms**

Alan C. Friedberg, Denver, CO, for petitioners.

Matthew D. Roberts, for the United States as amicus curiae, by special leave of the Court supporting the petitioners.

Kenneth W. Starr, Arlington, VA, for respondent.

**Opinion**

 **\*81**  Justice BREYER delivered the opinion of the Court.

This case focuses upon an arbitration rule of the National Association of Securities Dealers (NASD). The rule states that no dispute "shall be eligible for submission to arbitration ... where six (6) years have elapsed from the occurrence or event giving rise to the ... dispute." NASD Code of Arbitration Procedure § 10304 (1984) (NASD Code or Code). We must decide whether a court or an NASD arbitrator should apply the rule to the underlying controversy. We conclude that the matter is for the arbitrator.

**I**

The underlying controversy arises out of investment advice that Dean Witter Reynolds, Inc. (Dean Witter), provided its client, Karen Howsam, when, some time between 1986 and 1994, it recommended that she buy and hold interests in four limited partnerships. Howsam says that Dean Witter misrepresented the virtues of the partnerships. The resulting controversy **\*\*591**  falls within their standard Client Service Agreement's arbitration clause, which provides:

"[A]ll controversies ... concerning or arising from ... any account ..., any transaction ..., or ... the construction, performance or breach of ... any ... agreement between us ... shall be determined by arbitration before any self-regulatory organization or exchange of which Dean Witter is a member." App. 6-7.

 **\*82**  The agreement also provides that Howsam can select the arbitration forum. And Howsam chose arbitration before the NASD.

To obtain NASD arbitration, Howsam signed the NASD's Uniform Submission Agreement. That agreement specified that the "present matter in controversy" was submitted for arbitration "in accordance with" the NASD's "Code of Arbitration Procedure." *Id.,* at 24. And that Code contains the provision at issue here, a provision stating that no dispute "shall be eligible for submission ... where six (6) years have elapsed from the occurrence or event giving rise to the ... dispute." NASD Code § 10304.

After the Uniform Submission Agreement was executed, Dean Witter filed this lawsuit in Federal District Court. It asked the court to declare that the dispute was "ineligible for arbitration" because it was more than six years old. App. 45. And it sought an injunction that would prohibit Howsam from proceeding in arbitration. The District Court dismissed the action on the ground that the NASD arbitrator, not the court, should interpret and apply the NASD rule. The Court of Appeals for the Tenth Circuit, however, reversed. 261 F.3d 956 (2001). In its view, application of the NASD rule presented a question of the underlying dispute's "arbitrability"; and the presumption is that a court, not an arbitrator, will ordinarily decide an "arbitrability" question. See, *e.g., First Options of Chicago, Inc. v. Kaplan,* 514 U.S. 938, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995).

The Courts of Appeals have reached different conclusions about whether a court or an arbitrator primarily should interpret and apply this particular NASD rule. Compare, *e.g.,* 261 F.3d 956 (C.A.10 2001) (case below) (holding that the question is for the court); *J.E. Liss & Co. v. Levin,* 201 F.3d 848, 851 (C.A.7 2000) (same), with *PaineWebber Inc. v. Elahi,* 87 F.3d 589 (C.A.1 1996) (holding that NASD § 15, currently § 10304, is presumptively for the arbitrator); *Smith Barney Shearson, Inc. v. Boone,* 47 F.3d 750 (C.A.5 1995) (same). We  **\*83**  granted Howsam's petition for certiorari to resolve this disagreement. And we now hold that the matter is for the arbitrator.

**II**

 **[1]**  This Court has determined that "arbitration is a matter of contract and a party cannot be required to submit to

Howsam v. Dean Witter Reynolds, Inc., 537 U.S. 79 (2002)

123 S.Ct. 588, 154 L.Ed.2d 491, 71 USLW 4019, 02 Cal. Daily Op. Serv. 11,847...

arbitration any dispute which he has not agreed so to submit." *Steelworkers v. Warrior & Gulf Nav. Co.,* 363 U.S. 574, 582, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960); see also *First Options, supra,* at 942-943, 115 S.Ct. 1920. Although the Court has also long recognized and enforced a "liberal federal policy favoring arbitration agreements," *Moses H. Cone Memorial Hospital v. Mercury Constr. Corp.,* 460 U.S. 1, 24-25, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983), it has made clear that there is an exception to this policy: The question whether the parties have submitted a particular dispute to arbitration, *i.e.,* the "*question of arbitrability,*" is "an issue for judicial determination [u]nless the parties clearly and unmistakably provide otherwise." *AT & T Technologies, Inc. v. Communications Workers,* 475 U.S. 643, 649, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986) (emphasis added); *First Options, supra,* at 944, 115 S.Ct. 1920. We must decide here whether application of the NASD time limit provision falls into the scope of this last-mentioned interpretive rule.

 **\*\*592** Linguistically speaking, one might call any potentially dispositive gateway question a "question of arbitrability," for its answer will determine whether the underlying controversy will proceed to arbitration on the merits. The Court's case law, however, makes clear that, for purposes of applying the interpretive rule, the phrase "question of arbitrability" has a far more limited scope. See 514 U.S., at 942, 115 S.Ct. 1920. The Court has found the phrase applicable in the kind of narrow circumstance where contracting parties would likely have expected a court to have decided the gateway matter, where they are not likely to have thought that they had agreed that an arbitrator would do so, and, consequently, where reference of the gateway dispute to the court avoids the risk of **\*84** forcing parties to arbitrate a matter that they may well not have agreed to arbitrate.

 **[2]** Thus, a gateway dispute about whether the parties are bound by a given arbitration clause raises a "question of arbitrability" for a court to decide. See *id.,* at 943-946, 115 S.Ct. 1920 (holding that a court should decide whether the arbitration contract bound parties who did not sign the agreement); *John Wiley & Sons, Inc. v. Livingston,* 376 U.S. 543, 546-547, 84 S.Ct. 909, 11 L.Ed.2d 898 (1964) (holding that a court should decide whether an arbitration agreement survived a corporate merger and bound the resulting corporation). Similarly, a disagreement about whether an arbitration clause in a concededly binding contract applies to a particular type of controversy is for the court. See, *e.g., AT & T Technologies, supra,* at 651-652, 106 S.Ct. 1415 (holding that a court should decide whether a labor-

management layoff controversy falls within the arbitration clause of a collective-bargaining agreement); *Atkinson v. Sinclair Refining Co.,* 370 U.S. 238, 241-243, 82 S.Ct. 1318, 8 L.Ed.2d 462 (1962) (holding that a court should decide whether a clause providing for arbitration of various "grievances" covers claims for damages for breach of a no-strike agreement).

 **[3]** At the same time the Court has found the phrase "question of arbitrability" *not* applicable in other kinds of general circumstance where parties would likely expect that an arbitrator would decide the gateway matter. Thus " 'procedural' questions which grow out of the dispute and bear on its final disposition" are presumptively *not* for the judge, but for an arbitrator, to decide. *John Wiley, supra,* at 557, 84 S.Ct. 909 (holding that an arbitrator should decide whether the first two steps of a grievance procedure were completed, where these steps are prerequisites to arbitration). So, too, the presumption is that the arbitrator should decide "allegation[s] of waiver, delay, or a like defense to arbitrability." *Moses H. Cone Memorial Hospital, supra,* at 24-25, 103 S.Ct. 927. Indeed, the Revised Uniform Arbitration Act of 2000 (RUAA), seeking to "incorporate **\*85** the holdings of the vast majority of state courts and the law that has developed under the [Federal Arbitration Act]," states that an "arbitrator shall decide whether a condition precedent to arbitrability has been fulfilled." RUAA § 6(c), and comment 2, 7 U.L.A. 12-13 (Supp.2002). And the comments add that "in the absence of an agreement to the contrary, issues of substantive arbitrability ... are for a court to decide and issues of procedural arbitrability, *i.e.,* whether prerequisites such as *time limits,* notice, laches, estoppel, and other conditions precedent to an obligation to arbitrate have been met, are for the arbitrators to decide." *Id.,* § 6, comment 2, 7 U.L.A., at 13 (emphasis added).

 **[4]** Following this precedent, we find that the applicability of the NASD time limit rule is a matter presumptively for the arbitrator, not for the judge. The time limit rule closely resembles the gateway questions that this Court has found not to be "questions of arbitrability." *E.g.,* **\*\*593** *Moses H. Cone Memorial Hospital, supra,* at 24-25, 103 S.Ct. 927 (referring to "waiver, delay, or a like defense"). Such a dispute seems an "aspec[t] of the [controversy] which called the grievance procedures into play." *John Wiley, supra,* at 559, 84 S.Ct. 909.

Moreover, the NASD arbitrators, comparatively more expert about the meaning of their own rule, are comparatively better able to interpret and to apply it. In the absence of

Howsam v. Dean Witter Reynolds, Inc., 537 U.S. 79 (2002)

123 S.Ct. 588, 154 L.Ed.2d 491, 71 USLW 4019, 02 Cal. Daily Op. Serv. 11,847...

any statement to the contrary in the arbitration agreement, it is reasonable to infer that the parties intended the agreement to reflect that understanding. Cf. *First Options, 514 U.S., at 944-945, 115 S.Ct. 1920.* And for the law to assume an expectation that aligns (1) decisionmaker with (2) comparative expertise will help better to secure a fair and expeditious resolution of the underlying controversy-a goal of arbitration systems and judicial systems alike.

We consequently conclude that the NASD's time limit rule falls within the class of gateway procedural disputes that do not present what our cases have called "questions of arbitrability." **\*86** And the strong pro-court presumption as to the parties' likely intent does not apply.

### III

 **[5]** Dean Witter argues that, in any event, *i.e.,* even without an antiarbitration presumption, we should interpret the contracts between the parties here as calling for judicial determination of the time limit matter. Howsam's execution of a Uniform Submission Agreement with the NASD in 1997 effectively incorporated the NASD Code into the parties' agreement. Dean Witter notes the Code's time limit rule uses the word "eligible." That word, in Dean Witter's view, indicates the parties' intent for the time limit rule to be resolved by the court prior to arbitration.

We do not see how that is so. For the reasons stated in Part II, *supra,* parties to an arbitration contract would normally expect a forum-based decisionmaker to decide forum-specific procedural gateway matters. And any temptation here to place special antiarbitration weight on the appearance of the word "eligible" in the NASD Code rule is counterbalanced by a different NASD rule; that rule states that "arbitrators shall be empowered to interpret and determine the applicability of all provisions under this Code." NASD Code § 10324.

Consequently, without the help of a special arbitration-disfavoring presumption, we cannot conclude that the parties intended to have a court, rather than an arbitrator, interpret and apply the NASD time limit rule. And as we held in Part II, *supra,* that presumption does not apply.

### IV

For these reasons, the judgment of the Tenth Circuit is

*Reversed.*

Justice O'CONNOR took no part in the consideration or decision of this case.

 **\*87** Justice THOMAS, concurring in the judgment.

As our precedents make clear and as the Court notes, arbitration is a matter of contract. *Ante,* at 591. In *Volt Information Sciences, Inc. v. Board of Trustees of Leland Stanford Junior Univ.,* 489 U.S. 468, 109 S.Ct. 1248, 103 L.Ed.2d 488 (1989), we held that under the Federal Arbitration Act courts must enforce private agreements to arbitrate just as they would ordinary contracts: in accordance with their terms. Under *Volt,* when an arbitration agreement contains a choice-of-law provision, that provision must be honored, and a court interpreting the agreement must follow the law of the jurisdiction selected by the parties. See *id.,* at 478-479, 109 S.Ct. 1248 (enforcing a choice-of-law provision that incorporated a state procedural rule concerning arbitration proceedings); see also **\*\*594** *Mastrobuono v. Shearson Lehman Hutton, Inc.,* 514 U.S. 52, 67, 115 S.Ct. 1212, 131 L.Ed.2d 76 (1995) (THOMAS, J., dissenting) (concluding that the choice-of-law provision in question was indistinguishable from the one in *Volt* and, thus, should have been given effect). A straightforward application of these principles easily resolves the question presented in this case.

The agreement now before us provides that it "shall be construed and enforced in accordance with the laws of the State of New York." App. 6. Interpreting two agreements containing provisions virtually identical to the ones in dispute here, the New York Court of Appeals held that issues implicating § 15 (now § 10304) of the National Association of Securities Dealers Code of Arbitration Procedure are for arbitrators to decide. See *Smith Barney Shearson Inc. v. Sacharow,* 91 N.Y.2d 39, 666 N.Y.S.2d 990, 689 N.E.2d 884 (1997). Because the parties agreed to be bound by New York law and because *Volt* requires us to enforce their agreement, I would permit arbitrators to resolve the § 10304 issues that have arisen in this case, just as New York case law provides. The Court follows a different route to reach the same conclusion; accordingly, I concur only in the judgment.

**Howsam v. Dean Witter Reynolds, Inc., 537 U.S. 79 (2002)**

123 S.Ct. 588, 154 L.Ed.2d 491, 71 USLW 4019, 02 Cal. Daily Op. Serv. 11,847...

**Parallel Citations**

123 S.Ct. 588, 154 L.Ed.2d 491, 71 USLW 4019, 02 Cal.
Daily Op. Serv. 11,847, 2002 Daily Journal D.A.R. 13,897,
16 Fla. L. Weekly Fed. S 20

Footnotes

\*    The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience
      of the reader. See *United States v. Detroit Timber & Lumber Co.,* 200 U.S. 321, 337, 26 S.Ct. 282, 50 L.Ed. 499.

---

**End of Document**                                                    © 2014 Thomson Reuters. No claim to original U.S. Government Works.

387 S.W.3d 799
Court of Appeals of Texas,
El Paso.

IHS ACQUISITION NO. 171, INC. d/b/a Mesa Hills
Specialty Hospital, Encore Healthcare, LLC, and
Lyric Health Care Holdings III, Inc., Appellants,
v.
Joann BEATTY–ORTIZ, Appellee.

No. 08–11–00195–CV.   |   May 9, 2012.
|   Rehearing Overruled May 30, 2012.

**Synopsis**
**Background:** Employee sued employer for gender discrimination following her termination. Employer filed a motion to compel arbitration. The County Court at Law, El Paso County, Carlos Villa, J., denied employer's motion, and employer appealed.

**Holdings:** The Court of Appeals, Ann Crawford McClure, C.J., held that:

[1] the arbitration agreement conferred authority of deciding validity and enforceability on the arbitrator and not the court;

[2] issue of whether the arbitration agreement was, as a whole, illusory, was a matter for the arbitrator; and

[3] employer met its burden to show that employee signed the arbitration agreement and intended to be bound by its terms.

Reversed and remanded.

West Headnotes (30)

[1]      **Alternative Dispute Resolution**

                                                      Remedies
and Proceedings for Enforcement in General
A trial court abuses its discretion when it refuses to compel arbitration pursuant to a valid and enforceable arbitration agreement.

Cases that cite this headnote

[2]      **Alternative Dispute Resolution**

                                                      Validity
**Alternative Dispute Resolution**

                                                      Disputes
and Matters Arbitrable Under Agreement
A party seeking to compel arbitration must first satisfy a two-pronged burden of proof: first, it must demonstrate the existence of a valid agreement to arbitrate the dispute, and second, it must prove that the claims asserted are within the scope of the agreement.

Cases that cite this headnote

[3]      **Alternative Dispute Resolution**

                                                      Evidence
If the party seeking arbitration carries its initial burden that there is a valid arbitration agreement, and that the claims asserted are within the scope of the agreement, then the burden shifts to the party opposite to present evidence of an affirmative defense.

Cases that cite this headnote

[4]      **Alternative Dispute Resolution**

                                                      Evidence
While a strong presumption favoring arbitration exists, the presumption arises only after the party seeking to compel arbitration proves that a valid arbitration agreement exists.

1 Cases that cite this headnote

[5]      **Alternative Dispute Resolution**

                                                      Evidence
In deciding whether a party seeking to compel arbitration has met its initial burden, courts do not resolve doubts or indulge a presumption in favor of arbitration; rather, the party attempting to compel arbitration must show that the

arbitration agreement meets all requisite contract requirements.

Cases that cite this headnote

**[6]    Alternative Dispute Resolution**



If the trial court determines that a valid arbitration agreement exists, the burden shifts to the party opposing arbitration to raise an affirmative defense to enforcement of the arbitration agreement.

4 Cases that cite this headnote

**[7]    Alternative Dispute Resolution**



and statutory provisions and rules of court

The Federal Arbitration Act (FAA) places arbitration agreements on an equal footing with other contracts, and requires courts to enforce them according to their terms. 9 U.S.C.A. § 2.

Cases that cite this headnote

**[8]    Alternative Dispute Resolution**



or consensual basis

An agreement to arbitrate is a contract, the relation of the parties is contractual, and the rights and liabilities of the parties are controlled by the law of contracts; as such, a party cannot be required to submit to arbitration any dispute which she has not agreed to submit.

Cases that cite this headnote

**[9]    Alternative Dispute Resolution**



or consensual basis

Because arbitration is based on a contractual relationship, a party who has not consented cannot not be forced to arbitrate a dispute; since arbitration is generally a matter of contract, the

Federal Arbitration Act (FAA) requires courts to honor parties' expectations. 9 U.S.C.A. § 1 et seq.

Cases that cite this headnote

**[10]    Alternative Dispute Resolution**

    Evidence

law governs

When determining the validity of arbitration agreements that are subject to the Federal Arbitration Act (FAA), courts apply ordinary state law contract principles that govern the formation of contracts. 9 U.S.C.A. § 1 et seq.

Cases that cite this headnote

**[11]    Alternative Dispute Resolution**

Constitutional     In

general;  formation of agreement

The party attempting to compel arbitration must show that the arbitration agreement meets all requisite state law contract elements.

Cases that cite this headnote

**[12]    Contracts**

Contractual     Elements

in general

The following elements are required for the formation of a valid and binding contract: (1) an offer; (2) acceptance in strict compliance with the terms of the offer; (3) a meeting of the minds; (4) each party's consent to the term; and (5) execution and delivery of the contract with the intent that it be mutual and binding.

1 Cases that cite this headnote

**[13]    Alternative Dispute Resolution**

Contractual     Consideration

Like other contracts, an agreement to arbitrate must be supported by consideration.

Cases that cite this headnote

**[14]  Contracts**



Promises

Mutual, reciprocal promises which bind both parties may constitute consideration for a contract.

Cases that cite this headnote

**[15]  Alternative Dispute Resolution**



general;  formation of agreement

In the case of a stand-alone arbitration agreement, both sides are required to enter into binding promises to arbitrate.

Cases that cite this headnote

**[16]  Contracts**



of Obligation

A promise which does not bind the promisor, as when the promisor retains the option to discontinue performance, is illusory; consequently, when a purported bilateral contract is supported only by illusory promises, there is no contract.

Cases that cite this headnote

**[17]  Alternative Dispute Resolution**



Where an employer cannot avoid its promise to arbitrate by amending a termination provision or terminating it altogether, the dispute resolution plan is not illusory.

Cases that cite this headnote

**[18]  Alternative Dispute Resolution**



of dispute

Mutual

When a dispute involving an agreement to arbitrate is brought to a court for resolution, it is the court's obligation to determine whether the parties agreed to submit a particular issue to arbitration.

Cases that cite this headnote

**[19]  Alternative Dispute Resolution**



Existence

and validity of agreement

**Alternative Dispute Resolution**

In



Arbitrability

of dispute

An arbitration provision may give the arbitrator the power to resolve gateway issues regarding validity and enforceability of the arbitration agreement, and in that event, the entire matter of arbitrability is transferred from the courts to the arbitrator.

Mutuality

Cases that cite this headnote

**[20]  Alternative Dispute Resolution**



Arbitrability

of dispute

Unless an arbitration agreement clearly demonstrates that the parties intended to confer on the arbitrator the power to determine what disputes are arbitrable, the court retains the duty to decide that issue; arbitration agreements that clearly and unmistakably show intent to assign gateway issues to the arbitrator are fully enforceable.

Consideration

Cases that cite this headnote

**[21]  Alternative Dispute Resolution**



Arbitrability

of dispute

Gateway questions regarding validity and enforceability which are normally decided by a court will be submitted to an arbitrator where the arbitration agreement was clear and unmistakable.

Arbitrability

of delegation, then the court must resolve the challenge.

Cases that cite this headnote

**[22]** **Alternative Dispute Resolution**



and validity of agreement

Issue of whether the arbitration agreement between employer and employee was supported by valid consideration was an issue for the arbitrator to decide, where the agreement conferred authority of deciding gateway issues of validity and enforceability on the arbitrator and not the court, and employee signed the agreement and assented to its terms.

Cases that cite this headnote

**[23]** **Alternative Dispute Resolution**



and validity of agreement

The arbitrator, and not any federal, state, or local court or agency, shall have exclusive authority to resolve any dispute relating to interpretation, applicability, enforceability or formation of an agreement including, but not limited to any claim that all or any part of the agreement is void or voidable.

Cases that cite this headnote

**[24]** **Alternative Dispute Resolution**



and validity of agreement

**Alternative Dispute Resolution**



of dispute

The analysis in situations challenging a standalone arbitration agreement containing a delegation provision depends on the kind of challenge being made, if the challenge relates to the arbitration agreement as a whole, and the agreement contains a provision delegating issues of arbitrability to the arbitrator, then the challenge must be directed to arbitration; however, if the challenge is specific to the issue

Existence

**[25]** **Alternative Dispute Resolution**



and validity of agreement

Existence

Whether term provision of an arbitration agreement between employee and employer rendered the agreement illusory was an issue for the arbitrator and not the court, where agreement contained delegation provision, and employee challenged the entire agreement and not merely the specific delegation provision.

Cases that cite this headnote

**[26]** **Alternative Dispute Resolution**

Existence



Validity

A misnomer does not render an arbitration agreement unenforceable.

Cases that cite this headnote

**[27]** **Alternative Dispute Resolution**



Validity

Employer met its burden to show that it and employee entered into a valid and binding arbitration agreement and intended to be bound by its terms, although, due to a misnomer, the entity named on the arbitration agreement was an associated business of employer, and not the employer itself; employee did not present evidence that she had ever worked for the entity named on the agreement, that she did not intend to be bound by the agreement, and failed to raise any affirmative defenses that would render the arbitration agreement void or voidable.

Existence

Arbitrability

Cases that cite this headnote

**[28]** **Alternative Dispute Resolution**



Construction

In construing an arbitration agreement, the court should attempt to give effect to the parties' intentions, in light of the usual and ordinary meaning of the contractual language and the circumstances under which the agreement was made.

Cases that cite this headnote

**[29]** **Alternative Dispute Resolution**



If the party seeking arbitration carries its initial burden, then the burden shifts to the party opposing arbitration to present evidence on an affirmative defense to the arbitration agreement.

3 Cases that cite this headnote

**[30]** **Alternative Dispute Resolution**



of assent

**Alternative Dispute Resolution**



**Alternative Dispute Resolution**



or termination

**Alternative Dispute Resolution**



In the context of enforcement of an arbitration agreement, defenses refer to unconscionability, duress, fraudulent inducement, and revocation; because the law favors arbitration, the burden of proving a defense to arbitration is on the party opposing it.

4 Cases that cite this headnote

**Attorneys and Law Firms**

**\*803** Shawn R. Oller, Little Mendelson, PC, Phoenix, AZ, for Appellants.

John P. Mobbs, Attorney at Law, El Paso, TX, for Appellee.

Before McCLURE, C.J., RIVERA, and ANTCLIFF, JJ.

***OPINION***

ANN CRAWFORD McCLURE, Chief Justice.

IHS Acquisition No. 171, Inc. d/b/a Mesa Hills Specialty Hospital, Encore Healthcare, L.L.C., and Lyric Healthcare Holdings III, Inc., (collectively Appellants), file this interlocutory appeal challenging the trial court's denial of its motion to compel arbitration. Finding error, we reverse.

**FACTUAL SUMMARY**

IHS Acquisitions No. 171, doing business as Mesa Hills Specialty Hospital, hired Joann Beatty–Ortiz (Beatty) in May 2000. On June 30, 2006, Beatty was promoted to Chief Executive Officer (CEO) where she remained until her termination on February 3, 2010.

On March 31, 2010, Beatty filed a complaint with the Texas Workforce Commission Civil Rights Division against "IHS Acquisitions # 171 d/b/a Mesa Hills Specialty Hospital" alleging continuing gender discrimination from November 2008 until the date of her termination. She claimed constant harassment and belittlement from the Regional Director of Operations, Paul Miller, and that she was not the only female subjected to Miller's demeaning behavior and double standards. Beatty further asserted that prior to her termination, she had not received a single disciplinary action warning that her job was in jeopardy or a negative performance evaluation. She was the only female CEO in her region and upon her termination, the position was filled by a man who was previously the director of environmental services.

On October 28, 2010, Beatty filed suit against Appellants, alleging essentially the same gender discrimination allegations contained in her Texas Workforce Commission Complaint against IHS. The only explanation she was given was that "the hospital was not going in the direction they wanted to." Beatty sought front and back pay benefits, compensatory damages, punitive damages, attorney's fees, costs, and prejudgment and post-judgment interest. Appellants collectively filed a motion to compel arbitration, attaching a copy of a document signed by Beatty on September 23, 2008.

## THE ARBITRATION AGREEMENT

The document, entitled "Mutual Arbitration Agreement" provides in relevant part:

IHS Acquisition *No. 174,* Inc. ('Employer') as an affiliate of Lyric Health Care Holdings, III, Inc. maintains an Employee Injury Benefit Plan (the 'Plan') to pay benefits to Participants due to injuries or illnesses incurred in the course and scope of employment with Company or affiliates of Company who adopt the Plan. The Plan pays defined: (i) disability wage replacement benefits; (ii) death benefits to Participant's beneficiaries; (iii) dismemberment/ loss of use benefits; and (iv) medical benefits.

The Mutual Arbitration Agreement ('Agreement') binds Employer and Employee to arbitrate claims covered by this Agreement. The Effective Date of this Agreement is for employees currently employed by Employer, three (3) business days following the notice date of the Plan (through receipt of the Summary Plan Description) ('Notice Date'). **\*804** The Notice Date is *August 8, 2008.* If an Employee is hired after the Notice Date, the Employee shall be provided a copy of the Summary Plan Description and this Agreement and will be bound by this Agreement and covered by the Plan.

### I. *ARBITRATION*

**(This is our agreement to binding arbitration.)**

The Employer and Employee each agree to binding arbitration of all claims and disputes described hereafter, whether these claims and disputes exist now or arise in the future. All claims subject to arbitration must be submitted to arbitration within one year of the date of the incident giving rise to the claim or is forever barred. The claims, disputes and allegations subject to binding arbitration under this Agreement include my claims involving Employer, as well as Employer's claims against me, for:

1. Employer's negligence, gross negligence, strict liability, intentional act, omission or any other claim or cause of action with respect to any employment-related death, injuries, trauma or illness;

2. tort claims (including, but not limited to, any claims for bodily injury or physical, mental or psychological

injury) for injuries, trauma or illness I may sustain in the course and scope of my employment;

3. claims for wrongful termination, demotion, or discharge under statutory of common law, including retaliatory discharge claims related to workplace injuries, illnesses or trauma;

4. claims for a violation of any federal, state or other government law, statute, regulation or ordinance relating directly or indirectly to my workplace injury, illness or trauma; and

5. any and all claims challenging the validity or enforceability of this Agreement (in whole or in part) or challenging the applicability of this Agreement to a particular dispute or claim.

The appeal of a full or partial denial of benefits under the Plan is not covered by this Agreement.

**BY ARBITRATING THESE CLAIMS, EMPLOYER AND EMPLOYEE UNDERSTAND THAT FOR EACH PARTY ANY CAUSE OF ACTION DESCRIBED IN THIS AGREEMENT WILL BE SUBJECT TO RESOLUTION IN ARBITRATION ACCORDING TO THE PROCEDURES PROVIDED IN THIS AGREEMENT.**

### II. *ARBITRATION PROCEDURES*

**(This is how the arbitration will be conducted)**

...

### III. *TERM*

Employer may modify or terminate this Agreement at any time. Any such change shall be prospective only. No change, amendment, modification or termination shall affect the obligation of both parties to arbitrate, whether the request for arbitration was before or after any modification, amendment, or termination of this Agreement. The Agreement in place at the time of the occurrence of the arbitration event shall govern.

## THE MISNOMER

The agreement binds the "Employer," listed as IHS Acquisition *No. 174* as an affiliate of Lyric Health Care Holdings, **\*805** III, Inc. But Beatty was employed by

IHS Acquisition *No. 171,* filed her complaint against IHS Acquisition *No. 171,* and ultimately sued IHS Acquisition *No. 171.* While Appellants maintain the contract contains a simple scrivener's error, Beatty counters that because IHS does not claim to be the same entity as IHS Acquisition No. 174 and does not claim to be an alter ego of IHS Acquisition No. 174, IHS is not a party to the arbitration policy and cannot enforce it.

#### STANDARD OF REVIEW

 **[1]**    The parties do not dispute that the FAA applies to this proceeding. *See* 9 U.S.C.A. §§ 1–16 (West 2009). Section 51.016 of the Texas Civil Practice and Remedies Code permits the interlocutory appeal of an order denying a motion to compel arbitration under the Federal Arbitration Act. TEX. CIV. PRAC. & REM. CODE ANN.. § 51.016 (West Supp. 2011). A trial court's determination regarding the validity of an agreement to arbitrate is a question of law which we review *de novo. J.M. Davidson, Inc. v. Webster,* 128 S.W.3d 223, 227 (Tex.2003). A trial court abuses its discretion when it refuses to compel arbitration pursuant to a valid and enforceable arbitration agreement. *In re Halliburton Co.,* 80 S.W.3d 566, 573 (Tex.2002)(orig. proceeding).

 **[2]**    **[3]**    A party seeking to compel arbitration must first satisfy a two-pronged burden of proof: first, it must demonstrate the existence of a valid agreement to arbitrate the dispute, and second, it must prove that the claims asserted are within the scope of the agreement. *In re Dillard Dept. Stores, Inc.,* 186 S.W.3d 514, 515 (Tex.2006); *In re AdvancePCS Health L.P.,* 172 S.W.3d 603, 605 (Tex.2005)(orig. proceeding); *Budd v. Max International LLC,* 339 S.W.3d 915, 918 (Tex.App.-Dallas 2011, no pet.). If the party seeking arbitration carries its initial burden, then the burden shifts to the party opposite to present evidence of an affirmative defense. *Id.*

 **[4]**    **[5]**    **[6]**    While a strong presumption favoring arbitration exists, the presumption arises only after the party seeking to compel arbitration proves that a valid arbitration agreement exists. *J.M. Davidson, Inc.,* 128 S.W.3d at 227. In deciding whether a party has met its initial burden, we do not resolve doubts or indulge a presumption in favor of arbitration. *Id.* Rather, the party attempting to compel arbitration must show that the arbitration agreement meets all requisite contract requirements. *Id.* at 228. If the trial court determines that a valid agreement exists, the burden shifts to the party opposing arbitration to raise an affirmative defense to enforcement of the arbitration agreement. *Id.* at 227–28.

#### APPLICABLE LAW

#### *The Federal Arbitration Act (FAA)*

 **[7]**    The FAA provides, in relevant part:

> A written provision in ... a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract ... shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

*See* 9 U.S.C. § 2 (West 2009); *Rent–A–Center West, Inc. v. Jackson,* ——U.S. ——, 130 S.Ct. 2772, 2776, 177 L.Ed.2d 403 (2010), *quoting Moses H. Cone Memorial Hospital v. Mercury Constr. Corp.,* 460 U.S. 1, 24, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983). The above provision has been described as reflecting both a "liberal federal policy favoring arbitration," and the "fundamental principle that arbitration is a matter of contract." *See AT & T Mobility* **\*806** *LLC v. Concepcion,* —— U.S. ——, 131 S.Ct. 1740, 1745, 179 L.Ed.2d 742 (2011) *citing Moses H. Cone Memorial Hospital,* 460 U.S. at 24, 103 S.Ct. at 927 *and Rent–A– Center,* —— U.S. at ——, 130 S.Ct. at 2776. "The FAA thereby places arbitration agreements on an equal footing with other contracts, and requires courts to enforce them according to their terms." *Rent–A–Center,* —— U.S. ——, 130 S.Ct. at 2776 (internal citations omitted); *citing Buckeye Check Cashing, Inc. v. Cardegna,* 546 U.S. 440, 443, 126 S.Ct. 1204, 163 L.Ed.2d 1038 (2006) *and Volt Information Sciences, Inc. v. Board of Trustees of Leland Stanford Junior Univ.,* 489 U.S. 468, 478, 109 S.Ct. 1248, 103 L.Ed.2d 488 (1989).

 **[8]**    **[9]**    An agreement to arbitrate is a contract, the relation of the parties is contractual, and the rights and liabilities of the parties are controlled by the law of contracts. As such, a party cannot be required to submit to arbitration any dispute which she has not agreed to submit. *See AT & T Mobility LLC,* 131 S.Ct. at 1740 (arbitration is a creature of contract; a person can be compelled to arbitrate a dispute only if, to the extent that,

and in the manner which, he has agreed so to do). Because arbitration is based on a contractual relationship, a party who has not consented cannot not be forced to arbitrate a dispute. Since arbitration is generally a matter of contract, the FAA requires courts to honor parties' expectations. *9 U.S.C.A. § 1 et seq.; AT & T Mobility LLC,* 131 S.Ct. at 1740.

### *Texas Law—Formation of Contracts*

 [10]    [11]    [12]    [13]    When determining the validity of arbitration agreements that are subject to the FAA, we apply ordinary state law contract principles that govern the formation of contracts. *In re Palm Harbor Homes, Inc.,* 195 S.W.3d 672, 676 (Tex.2006), *citing First Options of Chicago, Inc. v. Kaplan,* 514 U.S. 938, 944, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995); *In re Kellogg Brown & Root, Inc.,* 166 S.W.3d 732, 738 (Tex.2005). The party attempting to compel arbitration must show that the arbitration agreement meets all requisite contract elements. *J.M. Davidson, Inc.,* 128 S.W.3d at 228. The following elements are required for the formation of a valid and binding contract: (1) an offer; (2) acceptance in strict compliance with the terms of the offer; (3) a meeting of the minds; (4) each party's consent to the term; and (5) execution and delivery of the contract with the intent that it be mutual and binding. *Cessna Aircraft Co. v. Aircraft Network, L.L.C.,* 213 S.W.3d 455, 465 (Tex.App.-Dallas 2006, pet. denied). Like other contracts, an agreement to arbitrate must be supported by consideration. *In re Palm Harbor Homes, Inc.,* 195 S.W.3d at 676; *In re AdvancePCS Health L.P.,* 172 S.W.3d 603, 607 (Tex.2005) (*per curiam* ).

### *Mutual Promises and Consideration*

 [14]    [15]    Mutual, reciprocal promises which bind both parties may constitute consideration for a contract. *Texas Custom Pools, Inc. v. Clayton,* 293 S.W.3d 299, 309 (Tex.App.-El Paso 2009, no pet.). In the case of a stand-alone arbitration agreement, both sides are required to enter into binding promises to arbitrate. *In re AdvancePCS,* 172 S.W.3d at 607; *see also In re 24R, Inc.,* 324 S.W.3d 564, 566 (Tex.2010) (mutual promises to submit a dispute to arbitration are sufficient consideration to support an arbitration agreement); *see also In re Halliburton Co.,* 80 S.W.3d at 569–70 *and J.M. Davidson, Inc.,* 128 S.W.3d at 228 (cases noting that when mutual promises to submit employment disputes to arbitration bind both parties to their promises to arbitrate, sufficient consideration exists

to support an arbitration **\*807** agreement between the employer and the at-will employee).

### *Illusory Promises*

 [16]    A promise which does not bind the promisor, as when the promisor retains the option to discontinue performance, is illusory. *In re 24R, Inc.,* 324 S.W.3d 564, 567 (Tex.2010), *citing Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding,* 289 S.W.3d 844, 849 (Tex.2009); *see also J.M. Davidson, Inc.,* 128 S.W.3d at 228; *Light v. Centel Cellular Co.,* 883 S.W.2d 642, 645 (Tex.1994)(employer's promises were illusory because they were dependent upon at-will employee's period of continued employment; thus, employer could avoid performance by terminating at-will employee's employment while the employee was bound to her promise whether or not she remained employed). Consequently, when a purported bilateral contract is supported only by illusory promises, there is no contract. *In re 24R, Inc.,* 324 S.W.3d at 567, *citing Vanegas v. American Energy Services,* 302 S.W.3d 299, 302 (Tex.2009), *quoting Light,* 883 S.W.2d at 644–45.

 [17]    However, where an employer cannot avoid its promise to arbitrate by amending a termination provision or terminating it altogether, the dispute resolution plan is not illusory. *See J.M. Davidson, Inc.,* 128 S.W.3d at 228; *In re Polymerica, LLC,* 296 S.W.3d 74, 76 (Tex.2009); *see also In re Halliburton Co.,* 80 S.W.3d at 569–70 (when mutual promises to submit employment disputes to arbitration bind both parties to their promises to arbitrate, sufficient consideration exists to support an arbitration agreement between the employer and the at-will employee).

### ANALYSIS

Appellants bring two issues for review. In Issue One, they complain that the trial court erred in denying the motion to compel because pursuant to the contractual language, the arbitrator, not the trial court, should decide gateway issues of validity, enforceability, and arbitrability. Alternatively, in Issue Two, Appellants suggest that even if the trial court had the authority to decide arbitrability, it abused its discretion in denying the motion to compel. The crux of the dispute is the misnomer. Appellants argue that this clerical error is itself a gateway issue and therefore must be arbitrated under the express terms of the Agreement. In contrast, Beatty focuses on two arguments: (1) a court should decide whether

the Agreement is enforceable, not an arbitrator; and (2) no agreement exists between the parties because IHS is not the "Employer" referenced in the Agreement.

### Court Or Arbitrator?

[18] [19] [20] [21] [22] When a dispute involving an agreement to arbitrate is brought to a court for resolution, it is the court's obligation to determine whether the parties agreed to submit a particular issue to arbitration. *See United Steelworkers of America v. American Mfg. Co.,* 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960); *Del E. Webb Const. v. Richardson Hosp. Authority,* 823 F.2d 145 (5th Cir.1987). An arbitration provision may give the arbitrator the power to resolve gateway issues regarding validity and enforceability of the arbitration agreement. In that event, the entire matter of arbitrability is transferred from the courts to the arbitrator. Unless the agreement clearly demonstrates that the parties intended to confer on the arbitrator the power to determine what disputes are arbitrable, the court retains the duty to decide that issue. Arbitration agreements that clearly and unmistakably show intent to assign gateway issues to the arbitrator are fully enforceable. *See ***808** *Rent–A–Center,* ——U.S. ——, 130 S.Ct. at 2777, 177 L.Ed.2d 403; *First Options of Chicago, Inc. v. Kaplan,* 514 U.S. 938, 943, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995) (holding question of primary power to decide arbitrability "turns upon what the parties agreed about that matter"); *AT & T Technologies, Inc. v. Communications Workers,* 475 U.S. 643, 649, 106 S.Ct. 1415, 1418, 89 L.Ed.2d 648 (1986) (holding parties may agree to arbitrate arbitrability). Accordingly, under *First Options,* gateway questions which are normally decided by a court will be submitted to an arbitrator where the agreement was clear and unmistakable. *See First Options,* 514 U.S. at 943, 115 S.Ct. 1920; *AT & T Technologies, Inc.,* 475 U.S. at 649, 106 S.Ct. at 1418.

Here, the Agreement provided that "any and all claims challenging the validity or enforceability of this Agreement ..." are subject to arbitration. It thus clearly and unmistakably provided for issues of validity and enforceability to go to the arbitrator. Beatty argues that whether the contract is supported by adequate consideration is not an issue of validity or enforceability but rather an issue of formation for the court to decide. We disagree. The Agreement bears Beatty's signature evidencing her assent to its terms and clearly provides for an arbitrator to decide all issues of arbitrability.

[23] [24] In *Rent–A–Center,* the Supreme Court clarified how courts must treat challenges to an arbitration agreement's delegation provision. *See Rent–A–Center* ——– U.S. ——–, 130 S.Ct. 2772, 177 L.Ed.2d 403.

> The Arbitrator, and not any federal, state, or local court or agency, shall have exclusive authority to resolve any dispute relating to interpretation, applicability, enforceability or formation of this Agreement including, but not limited to any claim that all or any part of this Agreement is void or voidable.

*Id.* at 2775–76. According to the Supreme Court, the analysis in situations challenging a standalone arbitration agreement containing a delegation provision depends on the kind of challenge being made. *Id.* If the challenge relates to the arbitration agreement as a whole, and the agreement contains a provision delegating issues of arbitrability to the arbitrator, then the challenge must be directed to arbitration. *Id.* If the challenge is specific to the issue of delegation, however, then the court must resolve the challenge. *Id.*

[25] The Agreement presented clearly and unmistakably provides that issues of validity and enforceability go to the arbitrator. Beatty signed the Agreement, manifesting her intent that gateway issues be arbitrated. Additionally, Beatty challenges the entire arbitration agreement based on the assertion that the term provision renders the Agreement illusory. Under *Rent–A–Center,* because there is a specific delegation provision, and Beatty challenges the Agreement as a whole, rather than the specific delegation provision, the issue goes to the arbitrator. Therefore, the determination of whether the agreement is illusory is for the arbitrator and not the court.

### Effect of the Misnomer

[26] [27] We have already highlighted the misnomer in the Agreement. Beatty was employed by IHS Acquisition No. 17*1* d/b/a Mesa Hills Specialty Hospital but the Agreement defines "Employer" to mean "IHS Acquisition No. 17 *4*. Beatty argues that the Appellants failed to demonstrate the existence of an arbitration agreement *between the parties.* A misnomer does not render an arbitration agreement unenforceable. *See Fogal v. Stature Construction, Inc.,* 294

S.W.3d 708, 716 (Tex.App.-Houston [1st Dist.] 2009, pet. denied). In *809 *Fogal,* the arbitration clause was signed by the Fogals and Tremont Homes, and the entity named Stature Construction appeared at first to be a non-signatory to the arbitration agreement. *Fogal,* 294 S.W.3d at 717. However, evidence was produced showing that Stature Construction was doing business as "Tremont Custom Homes" (which was the entity that should have been listed on the earnest-money contract that referred to Tremont Homes). *Id.* Moreover, evidence showed that the deed for the house purchased by the Fogals reflected that Stature was the seller referred to in the earnest-money contract. *Id.* The Fogals did not dispute that Stature was the seller or that Stature was doing business as Tremont Custom Homes. Instead, the *Fogals* built their non-arbitration argument on the technical error mentioning "Tremont Homes" rather than "Tremont Custom Homes," and claimed that since there was not an assumed name certificate filed with the Texas Secretary of State, Stature could not enforce the arbitration agreement. *Id.* The Houston Court noted that:

> Because arbitration is contractual in nature, the FAA generally 'does not require parties to arbitrate when they have not agreed to do so.' Federal and Texas state courts have recognized, however, that " '[i]t does not follow ... that under the [FAA] an obligation to arbitrate attaches only to one who has personally signed the written arbitration provision'; instead, under certain circumstances, principles of contract law and agency may bind a non-signatory to an arbitration agreement."

*Id., citing Kellogg Brown & Root,* 166 S.W.3d at 738. Although that case dealt with whether or not an assumed named certificate was required, the Houston Court of Appeals ultimately held that Stature could enforce the arbitration agreement, despite the technical deficiencies. *Id.* at 717–18.

 [28]    In construing an arbitration agreement, the court should attempt to give effect to the parties' intentions, in light of the usual and ordinary meaning of the contractual language and the circumstances under which the agreement was made. *See In re Kaplan Higher Educ. Corp.,* 235 S.W.3d 206, 210 (Tex.2007) ("Arbitration agreements are enforced according to their terms and according to the intentions of the parties.") (internal quotations and citations omitted). Here, the Agreement clearly evidences an intent for the "Employer" and "Employee" to mutually arbitrate a specific and detailed list of disputes. The parties' intent is ascertained by looking

to the plain language of the agreement. Appellants not only presented the signed Agreement, it is undisputed that Beatty was employed by IHS 171 at the time the Agreement was signed. Beatty did not present evidence that she did not intend to enter into an Agreement with her Employer or that she was not employed by IHS 171 at the time she signed the Agreement. Nor does Beatty present any evidence that she ever worked for IHS 174.

To meet their burden, Appellants must demonstrate the existence of a valid agreement to arbitrate the claimed disputes. Although not always expressly stated, part of this requirement is that the Agreement be between the parties. Even though the Agreement provides that issues of validity and enforceability must go to an arbitrator, Appellants still bear the burden of producing some evidence that they were either a party to the Agreement or otherwise had rights to enforce it. They presented an Agreement which is clearly between an Employer and Employee. Although the Agreement defines the Employer as IHS Acquisition 17*4,* Appellants also produced evidence that at the time the Agreement was signed, Beatty *810 was employed by IHS Acquisitions 17*1* and that Beatty had never been employed by IHS 17*4.*

### *Affirmative Defense*

 [29]    [30]    If the party seeking arbitration carries its initial burden, then the burden shifts to the party opposing arbitration to present evidence on an affirmative defense to the arbitration agreement. *J.M. Davidson, Inc.,* 128 S.W.3d at 227. In the context of enforcement of an arbitration agreement, defenses refer to unconscionability, duress, fraudulent inducement, and revocation. *In re FirstMerit Bank, N.A.,* 52 S.W.3d 749, 756 (Tex.2001). Because the law favors arbitration, the burden of proving a defense to arbitration is on the party opposing it. *See J.M. Davidson, Inc.,* 128 S.W.3d at 227.

Beatty has not offered evidence as to any of the applicable affirmative defenses. Her only claims related to issues of arbitrability which we have already determined must be presented to the arbitrator. We conclude that the trial court erred in refusing to compel arbitration. We sustain both issues for review and reverse and remand for orders compelling arbitration.

**End of Document** © 2014 Thomson Reuters. No claim to original U.S. Government Works.

196 S.W.3d 161
Supreme Court of Texas.

In re DALLAS PETERBILT, LTD., L.L.P., Relator.

No. 05–0706.    |    June 16, 2006.

**Synopsis**

**Background:** Former employee sued employer for race discrimination, retaliation, defamation, and other torts. The 116th Judicial District Court, Dallas County, denied employer's motion to stay proceedings and to compel arbitration, and the Court of Appeals summarily denied mandamus relief. Employer filed petition for writ of mandamus.

**Holdings:** The Supreme Court held that:

[1] former employee received notice of arbitration agreement;

[2] former employee accepted the arbitration agreement as a matter of law; and

[3] former employee's claims were covered by the arbitration agreement.

Mandamus relief conditionally granted.

West Headnotes (5)

**[1]    Alternative Dispute Resolution**

 Writing, signature, and acknowledgment

At-will employee received notice of arbitration agreement, as required for employer to enforce the agreement in employee's action alleging discrimination and other claims arising from his termination, though employee never received a copy of the agreement at time he commenced his employment, where employee received a copy of a six-page summary plan description which outlined the arbitration agreement, and accompanying signed acknowledgment form

notified employee that arbitration would be required for resolving covered claims and specifically described which claims were covered under the plan.

15 Cases that cite this headnote

**[2]    Alternative Dispute Resolution**

 In general; formation of agreement

An employer may enforce an arbitration agreement entered into during an at-will employment relationship if the employee received notice of the employer's arbitration policy and accepted it.

17 Cases that cite this headnote

**[3]    Alternative Dispute Resolution**

 Writing, signature, and acknowledgment

At-will employee accepted arbitration agreement as a matter of law, such that employer could enforce the agreement in employee's action alleging discrimination and other claims arising from his termination, where employee commenced employment after he signed acknowledgment form indicating that he had received summary plan description of arbitration agreement and understood that by accepting his employment, he was relinquishing his right to resolve covered claims by filing lawsuit.

17 Cases that cite this headnote

**[4]    Alternative Dispute Resolution**

 Employment disputes

To compel arbitration of discharged at-will employee's race discrimination, retaliation, and tort claims, employer was required to show that the claims raised fell within the scope of the applicable arbitration agreement.

Cases that cite this headnote

**[5]** **Alternative Dispute Resolution**



disputes

Former employee's claims for race discrimination, retaliation, tortious interference, defamation, and intentional infliction of emotional distress were covered by arbitration agreement containing a list of covered claims that included tort, discrimination, harassment, wrongful termination, and claims for a violation of any federal, state, or other governmental law, and thus employer could compel arbitration of former employee's claims.

3 Cases that cite this headnote

**Attorneys and Law Firms**

**\*161** David Watkins, Kevin Robinowitz, Jenkins & Watkins, Dallas, for Relator.

**\*162** Jeffrey C. Mateer, Randal Craig Shaffer, Mateer & Shaffer, L.L.P., Dallas, for Real Party In Interest.

**Opinion**

PER CURIAM.

In this original proceeding, relator Dallas Peterbilt, Ltd., L.L.P. seeks to compel arbitration of claims filed by its former employee, William Harris. The trial court denied Peterbilt's motion to stay proceedings and to compel arbitration, and the court of appeals summarily denied mandamus relief. 193 S.W.3d 580. Because the parties entered into a binding arbitration agreement that covers Harris's claims, we conclude that the trial court abused its discretion in denying Peterbilt's motion to compel arbitration. We conditionally grant mandamus relief.

On January 1, 1999, American TruckSource, Inc., Peterbilt's holding company, instituted a dispute resolution program. Part of this program required employees to resolve certain work-related disputes via binding arbitration. When Harris commenced his at-will employment with Peterbilt in December 1999, he received a copy of a "Summary Plan Description of Mutual Agreement to Arbitrate Claims" (Summary), which outlined the Mutual Agreement

to Arbitrate Claims. Harris claims he never received the Mutual Agreement to Arbitrate Claims, which is part of the record, but he signed an acknowledgment form indicating that he received the Summary and understood that by accepting employment, he was relinquishing his right to resolve covered claims "by filing a lawsuit or seeking damages in any federal, state, or municipal court of law ...." The Summary's list of covered claims includes tort, discrimination, harassment, wrongful termination, and also "[c]laims for a violation of any federal, state, or other governmental law." In March 2002, Peterbilt terminated Harris's employment, and in 2003, rather than request arbitration, Harris filed suit against Peterbilt in state district court for discrimination, retaliation, defamation, and other torts. Peterbilt then sought to compel arbitration under the Federal Arbitration Act, 9 U.S.C. §§ 1–16.

**[1]** **[2]** An employer may enforce an arbitration agreement entered into during an at-will employment relationship if the employee received notice of the employer's arbitration policy and accepted it. *In re Dillard Dep't Stores, Inc.,* 181 S.W.3d 370, 375 (Tex.App.2005) (per curiam) (citing *In re Halliburton Co.,* 80 S.W.3d 566, 568 (Tex.2002)). In granting mandamus relief in *Halliburton,* we stressed the importance of notice and emphasized that the employee there received a one-page summary of the agreement to arbitrate. 80 S.W.3d at 568–69; *see also Hathaway v. Gen. Mills, Inc.,* 711 S.W.2d 227, 229 (Tex.1986) (holding that notice is provided if the employee has knowledge of the employment terms). Harris argues that the Summary is immaterial and that only the underlying agreement itself, which he says he never received, can provide notice. We disagree. When determining whether an employee received notice of a binding arbitration agreement, our cases do not confine that "notice analysis" to the underlying agreement, but to all communications between the employer and employee. *See In re Halliburton Co.,* 80 S.W.3d at 569 (holding that a notice and summary given to the employee was unequivocal notice); *Hathaway,* 711 S.W.2d at 229 (holding that contradicting written and oral communications did not constitute conclusive proof of unequivocal notice).

The six-page Summary and accompanying signed acknowledgment form notified Harris that arbitration would be required for resolving covered claims and specifically described which claims are covered under **\*163** the plan. Harris contends he did not receive the Summary either. But the acknowledgment form states, right above his signature: "I acknowledge that I have received and carefully read or been given the opportunity to read the [Summary]." Consequently,

we find that Peterbilt's Summary constitutes effective notice because it unequivocally provided Harris with knowledge of the arbitration agreement. *See In re Dillard Dep't Stores, Inc., 181 S.W.3d at 373.*

 **[3]**    Having established that Harris received notice of the binding arbitration agreement, we next determine whether Harris accepted the agreement. An at-will employee who receives notice of an employer's arbitration policy and continues working with knowledge of the policy accepts the terms as a matter of law. *Id.* It is undisputed that Harris was an at-will employee, and his signed acknowledgment form indicates that continuing or accepting employment will result in automatic coverage under the dispute resolution program. Therefore, we find that by signing the acknowledgment form and commencing his employment, Harris accepted the agreement as a matter of law.

 **[4]**    **[5]**    In order to compel arbitration, Peterbilt must also show that the claims raised fall within the scope of the agreement. *In re Oakwood Mobile Homes, Inc.,* 987 S.W.2d 571, 573 (Tex.1999) (per curiam). Harris sued Peterbilt for race discrimination, retaliation, tortious interference, defamation, and intentional infliction of emotional distress. The Summary provides that the agreement covers claims for tort, discrimination, wrongful termination, and violation of law. The Mutual Agreement to Arbitrate Claims confirms that those claims are covered. We hold that the claims covered under the agreement include all claims that Harris brought against Peterbilt.

We conclude that a valid arbitration agreement exists and that Harris's claims fall within the scope of the agreement. The trial court clearly abused its discretion in denying Peterbilt's motion to compel arbitration. *See Jack B. Anglin Co. v. Tipps,* 842 S.W.2d 266, 272–73 (Tex.1992) (noting there is no adequate remedy by appeal for a party denied its contracted-for arbitration right under the FAA). Accordingly, without hearing oral argument, we conditionally grant the writ of mandamus. TEX. R. APP. P. 52.8(c). We order the trial court to vacate its order denying Peterbilt's motion to compel arbitration and to enter a new order compelling arbitration of Harris's claims. The writ will issue only if the trial court fails to comply.

**Parallel Citations**

152 Lab.Cas. P 60,227, 24 IER Cases 1304, 49 Tex. Sup. Ct. J. 759

© 2014 Thomson Reuters. No claim to original U.S. Government Works.

52 S.W.3d 749
Supreme Court of Texas.

In re FIRSTMERIT BANK, N.A. f/k/a Signal
Bank, N.A. and Mobile Consultants, Inc., Relators.

No. 00–0548.  |  Argued Feb. 14,
2001.  |  Decided June 14, 2001.

Mobile home buyers and donees, their child and son-in-law, brought action against lender and its servicing agent to recover for breach of contract, revocation of acceptance, breach of warranty, negligence, and fraud in connection with condition of the home. The trial court denied motion by lender and agent to compel arbitration. Lender and agent petitioned for writ of mandamus. The Supreme Court, Enoch, J., held that: (1) the installment contract related to interstate commerce and, therefore, was subject to the Federal Arbitration Act (FAA); (2) claims by buyers and donees were subject to arbitration; (3) the donees were subject to the arbitration clause; (4) the clause was not unconscionable; (5) sellers' alleged fraud did not invalidate the agreement; and (6) the revocation issue concerning the installment contract was subject to arbitration.

Writ conditionally granted.

West Headnotes (24)

**[1]** **Mandamus**



Nature

and scope of remedy in general

Mandamus is an extraordinary remedy available only in limited circumstances.

5 Cases that cite this headnote

**[2]** **Mandamus**



Remedy

at Law

**Mandamus**



Nature

of acts to be commanded

A court should issue mandamus only to correct a clear abuse of discretion or the violation of a legal duty when there is no other adequate remedy at law.

8 Cases that cite this headnote

**[3]** **Mandamus**



Remedy

at Law

When a trial court erroneously denies a party's motion to compel arbitration under the Federal Arbitration Act (FAA), the movant has no adequate remedy at law and is entitled to a writ of mandamus. 9 U.S.C.A. § 1 et seq.

30 Cases that cite this headnote

**[4]** **Mandamus**



Civil

proceedings other than actions

A party seeking to compel arbitration by mandamus must first establish the existence of an arbitration agreement subject to the Federal Arbitration Act (FAA). 9 U.S.C.A. § 1 et seq.

54 Cases that cite this headnote

**[5]** **Alternative Dispute Resolution**



Disputes

and Matters Arbitrable Under Agreement

Once the movant seeking arbitration establishes an agreement, the court must then determine whether the arbitration agreement covers the nonmovant's claims.

26 Cases that cite this headnote

**[6]** **Alternative Dispute Resolution**



Evidence

A presumption exists favoring agreements to arbitrate under the Federal Arbitration Act (FAA). 9 U.S.C.A. § 1 et seq.

24 Cases that cite this headnote

**[7]** **Alternative Dispute Resolution**



in favor of arbitration

Courts must resolve any doubts about an arbitration agreement's scope in favor of arbitration.

40 Cases that cite this headnote

**[8]** **Alternative Dispute Resolution**



**Alternative Dispute Resolution**



and Proceedings for Enforcement in General

Once the trial court concludes that an arbitration agreement encompasses the claims and that the party opposing arbitration has failed to prove its defenses, the trial court has no discretion but to compel arbitration and stay its own proceedings.

49 Cases that cite this headnote

**[9]** **Commerce**



Installment contract for sale of mobile home related to interstate commerce and, therefore, was subject to the Federal Arbitration Act (FAA); secured lender and its servicing agent were corporations in another state and received installment payments there, and the arbitration addendum stated that the loan involved interstate commerce and was governed by the FAA. 9 U.S.C.A. § 1 et seq.

16 Cases that cite this headnote

**[10]** **Alternative Dispute Resolution**



and Matters Arbitrable Under Agreement

To determine whether a party's claims fall within an arbitration agreement's scope, courts focus on the complaint's factual allegations, rather than the legal causes of action asserted.

59 Cases that cite this headnote

Construction

**[11]** **Alternative Dispute Resolution**



Sales

contracts disputes

Mobile home buyers' claims against lender and its agent to challenge right to repossess the home and to recover for condition of the home and sellers' failure to remedy defects were covered by agreement to arbitrate all disputes, claims, or other matters arising out of or relating to the loan, its interpretation, validity, performance, or breach; the arbitration clause defined "loan" to include the installment contract and all other loan documents and was thus not limited to claims relating directly to financing.

Discretion

Remedies

33 Cases that cite this headnote

**[12]** **Alternative Dispute Resolution**



Sales

contracts disputes

The question whether mobile home sellers made any misrepresentations in the inducement of the underlying contract related to the validity of the contract and, therefore, was subject to arbitration in buyers' suit against lender and its agent; the agreement required arbitration of all disputes, claims, or other matters arising out of or relating to the loan, its interpretation, validity, performance, or breach and defined "loan" to include the installment contract and all other loan documents.

Arbitration

23 Cases that cite this headnote

**[13]** **Alternative Dispute Resolution**



Persons

affected or bound

Disputes

Mobile home donees' suit against lender and its agent based on parents' installment contract as buyers and borrowers subjected residents to the contract's terms, including the arbitration agreement, even though they never signed it.

9 Cases that cite this headnote

**[14]** **Alternative Dispute Resolution**



of assent

**Alternative Dispute Resolution**



Defenses of unconscionability, duress, fraudulent inducement, and revocation needed to specifically relate to the arbitration agreement itself, not the contract as a whole, in order to defeat arbitration; defenses that pertained to the entire installment contract could be arbitrated.

36 Cases that cite this headnote

**[15]** **Alternative Dispute Resolution**



Since the law favors arbitration, the burden of proving a defense to arbitration is on the party opposing arbitration.

29 Cases that cite this headnote

**[16]** **Alternative Dispute Resolution**



The possibility that arbitration could subject mobile home buyers to substantial costs and fees did not make the arbitration agreement unconscionable without specific evidence that the buyers would actually be charged excessive fees to arbitrate claims against lender and its agent.

14 Cases that cite this headnote

**[17]** **Alternative Dispute Resolution**



The party opposing arbitration on the ground that fees and costs make the arbitration clause unconscionable must prove the likelihood of incurring such costs.

23 Cases that cite this headnote

**[18]** **Alternative Dispute Resolution**

Validity



Unconscionabi

Unconscionability

Some specific information of future costs is required in order to show that an arbitration agreement is made unconscionable by subjecting parties to substantial costs and fees.

31 Cases that cite this headnote

**[19]** **Alternative Dispute Resolution**



Unconscionabi

Evidence

Lender's right to seek judicial relief to enforce its security agreement, recover payments from mobile home buyers, and foreclose did not render unconscionable an arbitration agreement covering their claims against the lender to challenge right to repossess the home and to recover for condition of the home and sellers' failure to remedy defects.

10 Cases that cite this headnote

**[20]** **Contracts**



Unconscionabl

Unconscionability Contracts

The basic test for unconscionability is whether, given the parties' general commercial background and the commercial needs of the particular trade or case, the clause involved is so one-sided that it is unconscionable under the circumstances existing when the parties made the contract; the principle is one of preventing oppression and unfair surprise and not of disturbing allocation of risks because of superior bargaining power.

42 Cases that cite this headnote

Unconscionability

**[21]** **Alternative Dispute Resolution**

Validity



of assent

Mobile home sellers did not commit duress by stating only that they would not sell the home if the buyers refused to sign the arbitration agreement; the sellers had a legal right to refuse to sell under that condition.

2 Cases that cite this headnote

**[22]    Alternative Dispute Resolution**



of assent

Mobile home sellers' alleged fraud by representing ownership of the land under the home and the existence of a septic system and driveway, by failing to refer to an arbitration clause in advertisements and pre-sale statements, and by inadequately explaining the consequences of signing the agreement did not invalidate the agreement; nothing indicated that the sellers actually misrepresented the agreement's terms or made any false material representations with regard to the agreement itself.

29 Cases that cite this headnote

**[23]    Fraud**



of Actual Fraud

The elements of fraud are that: (1) a material representation was made; (2) the representation was false; (3) when the representation was made, the speaker knew it was false or made it recklessly without any knowledge of the truth and as a positive assertion; (4) the speaker made the representation with the intent that the other party should act upon it; (5) the party acted in reliance on the representation; and (6) the party thereby suffered injury.

220 Cases that cite this headnote

**[24]    Alternative Dispute Resolution**



and validity of agreement

The issue of whether the underlying installment contract for sale of a mobile home was revoked was subject to arbitration in buyers' suit against lender and its agent; the issue arose from or related to the contract.

8 Cases that cite this headnote

Validity

**Attorneys and Law Firms**

**\*752**  John A. Seib, Jr., The Seib Law Firm, Dallas, Michael Deitch, Law Offices of Michael Deitch, Austin, Steven Marc Reback, Law Offices of Michael Deitch, Austin, for Relator.

F. Terry Callahan, Law Offices of F. Terry Callahan, San Antonio, for Respondent.

**Opinion**

Justice ENOCH delivered the opinion of the Court.

FirstMerit Bank and Mobile Consultants seek mandamus relief after the trial court denied their motion to compel arbitration. Because the Federal Arbitration Act (FAA) requires the trial court to compel arbitration in this case, we conditionally grant their petition and order the trial court to compel arbitration in accordance with the parties' agreement.

Elements

**I. BACKGROUND**

Pete and Janie de los Santos purchased a mobile home for their daughter, Sarah, and her husband, Gary Alvarez. They bought the home from Verde Homes under Verde's retail installment financing agreement. Verde assigned this contract, which Pete and Janie signed, to Signal Bank (now FirstMerit Bank). The agreement contained an Arbitration Addendum, which required binding arbitration for "all disputes, claims, or other matters in question arising out of or relating to this Loan, its interpretation, validity, performance or the breach thereof." The word "Loan" referred to "all manufactured home loan documents, including but not limited to the retail installment contract...." The Addendum further stated that "the scope of arbitrability is broad and includes, without limitation, contractual, tort, statutory, and caselaw claims." The Addendum also permitted the bank to seek judicial relief to enforce its security interest, recover the buyers' monetary loan obligation, and foreclose.  **\*753**  But aside from these three exceptions, the Addendum required

Existence

arbitration for all other disputes relating to the installment contract.

After Verde delivered the home, the de los Santoses tried to revoke their acceptance, claiming that the home was defective and that Verde failed to perform certain promised repairs. Although Verde Homes refused to rescind the sale, the de los Santoses apparently stopped making their monthly loan payments. In response, Signal Bank took possession of the home. The de los Santoses then sued Signal Bank, Mobile Consultants (Signal's servicing agent), Verde Homes, and two Verde employees, alleging breach of contract, revocation of acceptance, breach of warranty, negligence, and fraud. They also alleged violations of the Deceptive Trade Practices Act, Fair Debt Collection Practices Act, Equal Credit Opportunity Act, and Fair Credit Reporting Act. Additionally, the de los Santoses claimed that their successful revocation of acceptance entitled them to a security interest in the home, equal to the amount they had paid on the installment contract. To enforce their security interest, they requested an injunction forcing FirstMerit to return possession of the home until it refunded the de los Santoses' loan payments.

In response, FirstMerit and Mobile moved to compel arbitration.[1] The trial court denied their motion. FirstMerit Bank and Mobile then petitioned the Third Court of Appeals for a writ of mandamus, which the court denied. FirstMerit and Mobile now ask this Court for mandamus relief.

## II. WHETHER TO ORDER ARBITRATION

[1] [2] [3] Mandamus is an extraordinary remedy available only in limited circumstances.[2] A court should issue mandamus only to correct a clear abuse of discretion or the violation of a legal duty when there is no other adequate remedy at law.[3] When a trial court erroneously denies a party's motion to compel arbitration under the FAA, the movant has no adequate remedy at law and is entitled to a writ of mandamus.[4] Thus, we must determine whether the movants established their right to arbitration.

[4] [5] [6] [7] [8] A party seeking to compel arbitration by mandamus must first establish the existence of an arbitration agreement subject to the FAA.[5] Once the movant establishes an agreement, the court must then determine whether the arbitration agreement covers the nonmovant's claims.[6] Because state and federal policies continue to favor

arbitration,[7] a presumption exists favoring agreements to arbitrate under the FAA,[8] and courts must resolve any doubts about an arbitration agreement's scope in favor of arbitration.[9] Once the trial court **\*754** concludes that the arbitration agreement encompasses the claims, and that the party opposing arbitration has failed to prove its defenses,[10] the trial court has no discretion but to compel arbitration and stay its own proceedings.[11]

## A. SCOPE OF ARBITRATION

[9] Here, there is no dispute about the Arbitration Addendum's existence. The de los Santoses instead contend that the installment contract was completed entirely in Texas, did not involve interstate commerce, and, accordingly, was not subject to the FAA. As defined in the FAA, however, "interstate commerce" is not limited to the interstate shipment of goods, but includes all contracts "relating to" interstate commerce.[12] In fact, the United States Supreme Court has construed the FAA to extend as far as the Commerce Clause of the United States Constitution will reach.[13] In this case, the evidence demonstrates that the loan was made in interstate commerce. Signal Bank and Mobile Consultants were Ohio corporations, while the de los Santoses were Texas residents. The installment contract stated that Signal Bank was located in Ohio. The record includes several photocopies of loan payment checks drawn on a Texas bank that Signal Bank had deposited in Ohio. And both Signal and Mobile Consultants corresponded with the de los Santoses from Ohio. The de los Santoses also listed Signal's Ohio address at the top of their revocation of acceptance letter. Moreover, the Arbitration Addendum, which Pete and Janie de los Santos both signed, states that the loan "involves interstate commerce ... and shall be governed by the Federal Arbitration Act...." In light of these facts, we conclude that the installment contract relates to interstate commerce and is subject to the FAA.[14]

[10] [11] Because FirstMerit and Mobile have established the existence of an agreement to arbitrate under the FAA, we must next determine whether the Arbitration Addendum covers the de los Santoses' claims. To determine whether a party's claims fall within an arbitration agreement's scope, we focus on the complaint's factual allegations rather than the legal causes of action asserted.[15] And again, we resolve any doubts about the Arbitration Addendum's factual scope in favor of coverage. Further, we reiterate that the parties'

Arbitration Addendum covers "all disputes, claims, or other matters in question arising out of or relating to this Loan, its interpretation, validity, performance, or the breach thereof" and states that "the scope of arbitrability is broad and includes, without limitation, contractual, tort, statutory, and case law claims."

We now turn to the de los Santoses' factual allegations. The de los Santoses asserted that the sellers misrepresented that they owned the homesite, and that the homesite included a driveway and septic system. They also claimed that the sellers were not properly licensed, misrepresented **\*755** the terms of the loan, failed to provide a credit report to Sarah and Gary Alvarez, and failed to make other disclosures regarding interest rates and credit. The de los Santoses further alleged that the sellers fraudulently double-charged them for insurance that was already paid for in the installment contract. In addition, the de los Santoses asserted that after taking possession of the home, they learned that the home was not yet complete, that it lacked carpeting and air conditioning, and that it was not installed properly. They also charged that the sellers failed to repair these defects in a timely and workmanlike manner, that they never installed an air conditioner, and that the sellers' attempts to repair the septic tank were untimely and defective. Finally, the de los Santoses asserted that the bank wrongfully denied their attempt to revoke the contract, criminally trespassed on their property, and wrongfully repossessed the home.

 **[12]** In light of the Addendum's broad language, all of the de los Santoses' factual allegations fall within the Addendum's scope. The de los Santoses contend that because the Addendum "relat(es) to the Loan," it only covers claims that relate directly to the home's financing, and does not cover their allegations about the home's post-sale condition and repairs. But this interpretation ignores the Addendum's broad definition of "Loan" to include the installment contract and all other loan documents. Further, irrespective of the Addendum's broad language, we also note that the home was the bank's collateral under the Loan. The de los Santoses alleged that the sellers' failure to remedy the home's physical problems entitled them to a security interest in the home, which would prevent the bank from repossessing its collateral. [16] Thus, the home's post-sale condition, and the sellers' post-sale failure to remedy the home's problems, relate to the bank's right to repossess its collateral under the loan. In sum, all of the de los Santoses' factual allegations arise out of or relate to either the sellers' conduct in selling the home and negotiating the installment contract,

or to the performance or alleged breach of the installment contract. Furthermore, while fraud in the inducement of an arbitration agreement is a defense to arbitration, whether the sellers made any misrepresentations in the inducement of the underlying contract relates to the contract's validity and can be arbitrated. [17] As for the de los Santoses' wrongful repossession allegations, the Addendum provides that "any counterclaims in suits brought by Seller/Assignee pursuant to this provision," including complaints about foreclosure, may be arbitrated. Given the Addendum's language on counterclaims, the Arbitration Addendum covers all of the de los Santoses' complaints about the bank's right to repossess the home.

 **[13]** As a specific challenge, Sarah and Gary Alvarez contend that their claims are exempt from the Arbitration Addendum because they did not sign the contract. But a litigant who sues based on a contract subjects him or herself to the contract's terms. [18] Here, the Alvarezes fully joined the de los Santoses' contract claims. In fact, the de los Santoses' original petition **\*756** makes no distinction between the parents' claims and the Alvarezes' claims. Thus, by suing FirstMerit based on the de los Santoses' installment contract, the Alvarezes subjected themselves to the contract's terms, including the Arbitration Addendum.

Accordingly, unless the de los Santoses can prove one of their defenses to the Arbitration Addendum, the FAA requires arbitration. [19]

### B. DEFENSES TO ARBITRATION

 **[14]** **[15]** The de los Santoses assert the defenses of unconscionability, duress, fraudulent inducement, and revocation. We again note that these defenses must specifically relate to the Arbitration Addendum itself, not the contract as a whole, if they are to defeat arbitration. [20] Defenses that pertain to the entire installment contract can be arbitrated. [21] We further note that the de los Santoses' defenses against the Addendum are governed by Texas law. [22] Again, since the law favors arbitration, the burden of proving a defense to arbitration is on the party opposing arbitration. [23]

 **[16]** **[17]** The de los Santoses contend that the Arbitration Addendum is unconscionable because arbitration might

subject them to substantial costs and fees. On this issue, in *Green Tree Financial Corp. v. Randolph,* the United States Supreme Court recognized that "the existence of large arbitration costs could preclude a litigant ... from vindicating her federal statutory rights...."[24] Nonetheless, the Supreme Court concluded that an arbitration agreement's mere silence with respect to costs and fees, by itself, is a "plainly insufficient" basis for invalidating the agreement.[25] Instead, the party opposing arbitration must prove the likelihood of incurring such costs.[26] To hold otherwise would "undermine the liberal federal policy favoring arbitration agreements."[27]

 **[18]** While the Supreme Court did not specify "how detailed the showing of prohibitive expense must be," there is no doubt that *some* specific information of future costs is required.[28] In *Green Tree,* the party resisting arbitration cited what she claimed were American Arbitration Association (AAA) figures on arbitration costs, but she provided no evidence that the AAA would actually conduct the arbitration or charge her the fees she identified.[29] Because of this uncertainty, the Supreme Court deemed the evidence insufficient to defeat arbitration.[30]

Here, the de los Santoses testified, in two sworn affidavits, that the AAA charged a minimum $2,000 filing fee and a $250/day/party hearing fee, along with several other unspecified fees, for hearings before a three-member panel. But we **\*757** need not decide whether these costs would be excessive. As in *Green Tree,* the de los Santoses provided no evidence that the AAA would actually conduct the arbitration or charge the specified fees. The Arbitration Addendum does not state that the AAA will conduct the arbitration, and it makes no mention of arbitration costs. We also note that the most recent AAA commercial arbitration rules provide that "the AAA may, in the event of extreme hardship on the part of any party, defer or reduce the administrative fees."[31] Moreover, in the event the de los Santoses do not avail themselves of FirstMerit Bank's choice of arbitrators, the FAA permits the trial court to choose an alternate set of arbitrators.[32] The de los Santoses also complain that the requirement of three arbitrators is inherently costly. But again, without any specific information on what the costs will be, this requirement is not evidence of unconscionability. Finally, in agreeing to the Addendum, Pete and Janie de los Santos agreed "that arbitration is a less expensive method of dispute resolution that decreases servicing costs of this loan...." Because the record contains no specific evidence

that the de los Santoses will actually be charged excessive arbitration fees, we conclude that there is legally insufficient evidence that the plaintiffs would be denied access to arbitration based on excessive costs.

 **[19]** **[20]** The de los Santoses also argue that the agreement's terms are unconscionable because they force the weaker party to arbitrate their claims, while permitting the stronger party to litigate their claims.[33] They point us to decisions in other jurisdictions that have found this type of clause to be unconscionable.[34] Most federal courts, however, have rejected similar challenges on the grounds that an arbitration clause does not require mutuality of obligation, so long as the underlying contract is supported by adequate consideration.[35] In any event, the basic test for unconscionability is whether, given the parties' general commercial background and the commercial needs of the particular trade or case, the clause involved is so one-sided that it is unconscionable under the circumstances existing when the parties made the contract.[36] The principle is one of preventing oppression and unfair surprise and not of disturbing allocation of risks because of superior bargaining power.[37] Here, the Arbitration Addendum allows the bank to seek judicial relief to enforce its security agreement, recover the buyers' monetary loan obligation, and foreclose. Given the weight of federal precedent and the routine nature of mobile **\*758** home financing agreements,[38] we find that the Arbitration Addendum in this case, by excepting claims essentially protecting the bank's security interest, is not unconscionable.[39] We also recognize that the plaintiffs are free to pursue their unconscionability defense in the arbitral forum.

 **[21]** Moreover, the de los Santoses cannot prevail on their duress defense, since there is no evidence that the sellers threatened to do anything they did not have a legal right to do.[40] At most, the sellers stated only that they would not sell the home if the de los Santoses would not sign the Addendum, which is not evidence of duress.[41]

 **[22]** **[23]** The de los Santoses also alleged fraud in the inducement of the Arbitration Addendum. The elements of fraud are: (1) that a material representation was made; (2) the representation was false; (3) when the representation was made, the speaker knew it was false or made it recklessly without any knowledge of the truth and as a positive assertion; (4) the speaker made the representation with the intent that

the other party should act upon it; (5) the party acted in reliance on the representation; and (6) the party thereby suffered injury.[42] In this case, the de los Santoses alleged that the sellers fraudulently represented that they owned the land under the home, and that the home had a septic system and driveway. They also allege that the sellers' advertisements and pre-sale statements made no reference to an arbitration clause, and that the sellers did not adequately explain the consequences of signing the Addendum. However, there is no evidence that the sellers actually misrepresented the Addendum's terms, or that they made any false material representations with regard to the Arbitration Addendum itself. Accordingly, we decline to invalidate the Arbitration Addendum based on fraud.

 **[24]**  Finally, the de los Santoses argue that their alleged revocation of the installment contract also applies to the Arbitration Addendum, rendering it unenforceable. But this claim really pertains to the entire installment contract and not just the Arbitration Addendum. Again, the Arbitration Addendum's validity is a separate issue from the validity of the whole contract.[43] And given that the FAA's primary objective is to encourage the arbitration of contract-related issues, the issue of whether the underlying contract was revoked is an issue that should be arbitrated, since it "arises from or relates to" the contract.[44]

### III. CONCLUSION

Because the claims in this lawsuit are within the scope of the parties' agreement to arbitrate, we conditionally grant the writ of mandamus and direct the trial court to order that all claims proceed to arbitration. The clerk is instructed to issue **\*759** the writ only if the trial court fails to do so.

### Parallel Citations

44 Tex. Sup. Ct. J. 900

Footnotes

1    The other parties did not answer the suit, and a default judgment was entered against them.

2    *In re Masonite Corp.,* 997 S.W.2d 194, 197 (Tex.1999).

3    *Id.*

4    *EZ Pawn Corp. v. Mancias,* 934 S.W.2d 87, 88 (Tex.1996).

5    *In re Oakwood Mobile Homes,* 987 S.W.2d 571, 573 (Tex.1999).

6    *Cantella & Co. v. Goodwin,* 924 S.W.2d 943, 944 (Tex.1996).

7    *Id.; Green Tree Fin. Corp. v. Randolph,* 531 U.S. 79, 91, 121 S.Ct. 513, 522, 148 L.Ed.2d 373 (2000).

8    *Cantella,* 924 S.W.2d at 944.

9    *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.,* 473 U.S. 614, 626, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985); *Prudential Sec., Inc. v. Marshall,* 909 S.W.2d 896, 899 (Tex.1995).

10    See *In re Oakwood,* 987 S.W.2d at 573.

11    *Cantella,* 924 S.W.2d at 944.

12    See *Lost Creek Mun. Util. Dist. v. Travis Indus. Painters, Inc.,* 827 S.W.2d 103, 105 (Tex.App.—Austin 1992, writ denied).

13    *Allied–Bruce Terminix Cos. v. Dobson,* 513 U.S. 265, 272–74, 276–78, 115 S.Ct. 834, 130 L.Ed.2d 753 (1995).

14    *See, e.g., Mesa Operating Ltd. P'ship v. Louisiana Intrastate Gas Corp.,* 797 F.2d 238, 243 (5th Cir.1986); *Snyder v. Smith,* 736 F.2d 409, 418 (7th Cir.1984), *cert. denied,* 469 U.S. 1037, 105 S.Ct. 513, 83 L.Ed.2d 403 (1984).

15    *Prudential Sec.,* 909 S.W.2d at 900.

16    See TEX. BUS. & COM.CODE § 2.608(a), 2.711(c).

17    See *Pepe Int'l Dev. Co. v. Pub Brewing Co.,* 915 S.W.2d 925, 930 (Tex.App.—Houston [1st Dist.] 1996, no writ); *New Process Steel Corp. v. Titan Indus. Corp.,* 555 F.Supp. 1018, 1022 (S.D.Tex.1983).

18    See *Nationwide of Bryan, Inc. v. Dyer,* 969 S.W.2d 518, 520 (Tex.App.—Austin 1998, no pet.).

19    See *In re Oakwood,* 987 S.W.2d at 573.

20    See *Prima Paint Corp. v. Flood & Conklin Mfg. Co.,* 388 U.S. 395, 403–04, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967).

21    *See id.*

22    *In re Oakwood,* 987 S.W.2d at 574.

23    *Id.* at 573.

531 U.S. 79, 91, 121 S.Ct. at 522, 148 L.Ed.2d 373.

*Id.*

*Id.*

*Id.*

*Id.* at 522–23.

*Id.* at 522 & n. 6.

*See id.*

American Arbitration Association, Arbitration Rules for the Real Estate Industry, Rule 51.

*See* 9 U.S.C. § 5.

*See In re Conseco Fin. Servicing Corp.,* 19 S.W.3d 562, 569 n. 3 (Tex.App.—Waco 2000, pet. dism'd by agr.).

*See, e.g., Armendariz v. Foundation Health Psychcare Servs.,* 24 Cal.4th 83, 99 Cal.Rptr.2d 745, 6 P.3d 669, 691–94 (Cal.2000); *Iwen v. U.S. West Direct,* 293 Mont. 512, 977 P.2d 989, 995–96 (1999).

*See, e.g., Harris v. Green Tree Fin. Corp.,* 183 F.3d 173, 183 (3d Cir.1999); *Doctor's Assoc., Inc. v. Distajo,* 66 F.3d 438, 451–53 (2d Cir.1995); *Wilson Elec. Contractors, Inc. v. Minnotte Contracting Corp.,* 878 F.2d 167, 168–69 (6th Cir.1989); *Young v. Jim Walter Homes, Inc.,* 110 F.Supp.2d 1344, 1350 (M.D.Ala.2000); *Pridgen v. Green Tree Fin. Servicing Corp.,* 88 F.Supp.2d 655, 658–59 (S.D.Miss.2000); *Gray v. Conseco, Inc.,* 2000 WL 1480273, 2000 U.S. Dist. LEXIS 14821, 13–16 (C.D.Cal. Sept. 29, 2000).

TEX. BUS. & COM.CODE § 2.302 cmt. 1.

*Id.*

*See Palm Harbor Homes, Inc. v. McCoy,* 944 S.W.2d 716, 723 n. 8 (Tex.App.—Fort Worth 1997, orig. proceeding).

*See Pridgen,* 88 F.Supp.2d at 658–59; see *also Conseco Fin. Servicing Corp. v. Wilder,* 47 S.W.3d 335 (Ky.App.2001).

*In re Oakwood,* 987 S.W.2d at 574.

*See id.*

*Formosa Plastics Corp. v. Presidio Engrs. & Contractors, Inc.,* 960 S.W.2d 41, 47 (Tex.1998).

*See Miller v. Puritan Fashions Corp.,* 516 S.W.2d 234, 238–39 (Tex.Civ.App.—Waco 1974, writ ref'd n.r.e.).

*See Mewbourne Oil Co. v. Blackburn,* 793 S.W.2d 735, 737 (Tex.App.—Amarillo 1990, orig. proceeding).

**End of Document**  © 2014 Thomson Reuters. No claim to original U.S. Government Works.

80 S.W.3d 566
Supreme Court of Texas.

In re HALLIBURTON COMPANY and
Brown & Root Energy Services, Relators.

No. 00–1206. | Argued Nov. 7, 2001. | Decided May 30, 2002. | Rehearing Denied Aug. 22, 2002.

At-will employee brought action alleging discrimination based on race and age. The trial court denied motion to compel arbitration. Employer petitioned for writ of mandamus. The Court of Appeals denied relief. Employer appealed. The Supreme Court, Phillips, C.J., held that: (1) employer's promise to arbitrate disputes was adequate consideration to support change in terms of employment; (2) disparity in bargaining power between parties did not render arbitration clause unconscionable; and (3) arbitration program was not substantively unconscionable.

Petition for writ of mandamus granted.

Baker, J., concurred in judgment only.

West Headnotes (6)

**[1]** **Alternative Dispute Resolution**



Consideration

Employer's promise to submit all employment disputes to arbitration constituted adequate consideration for change in employment terms resulting from at-will employee's acceptance of dispute resolution program adopted by employer, where participation in dispute resolution program was not dependent on continuing employment, and employer could not avoid its promise to arbitrate by amending arbitration provision or terminating it altogether.

104 Cases that cite this headnote

**[2]** **Alternative Dispute Resolution**



Unconscionability

Courts may consider both procedural and substantive unconscionability of an arbitration clause in evaluating the validity of an arbitration provision.

97 Cases that cite this headnote

**[3]** **Alternative Dispute Resolution**



Unconscionabi

Disparity in bargaining power between employer and at-will employer did not render employer's imposition of new employment term requiring all employment disputes to be resolved in binding arbitration, which was offered on "take it or leave it" basis, unconscionable, as employer had general right to discharge at-will employees.

75 Cases that cite this headnote

**[4]** **Labor and Employment**



cause or reason in general

Termination;

Because an employer has a general right under Texas law to discharge an at-will employee, it cannot be unconscionable, without more, merely to premise continued employment on acceptance of new or additional employment terms.

21 Cases that cite this headnote

**[5]** **Alternative Dispute Resolution**



Unconscionabi

Mandatory arbitration program, which required as condition of continued employment that all disputes arising out of employment be resolved in arbitration, was not substantively unconscionable, where company agreed to pay all expenses of arbitration except filing fee, both parties were to participate in selection of neutral arbitrator, program provided employees with up to $2,500 to consult with attorney, rules provided for pre-arbitration discovery, and all remedies employee could have pursued in court system were available in arbitration.

100 Cases that cite this headnote

**[6]** **Mandamus**



by Appeal or Writ of Error

Employer was entitled to writ of mandamus requiring trial court to grant motion to compel arbitration pursuant to dispute resolution program that was condition of employment, where employer had no adequate remedy by appeal.

13 Cases that cite this headnote

**Attorneys and Law Firms**

**\*567** Russell J. Weintraub, Austin, W. Carl Jordan, Vanessa M. Clem, Vinson & Elkins, Houston, for Relators.

Barbara J. Gardner, Barbara Gardner & Associates, David W. Holman, Holman & Keeling, PC, Houston, for Respondent.

**Opinion**

Chief Justice PHILLIPS delivered the opinion of the Court in which Justice HECHT, Justice ENOCH, Justice OWEN, Justice HANKINSON, Justice O'NEILL, Justice JEFFERSON, and Justice RODRIGUEZ joined.

We are once again asked to decide whether mandamus should issue to enforce an arbitration provision, in this instance between an employer and an at-will employee. The employer sent notice of a new dispute resolution program (the Program) to the employee informing him that continuing employment would constitute acceptance of the new plan. When the employee was later demoted, he filed suit rather than following the Program. The district court denied the employer's motion to compel arbitration under the Federal Arbitration Act and stay or dismiss the trial court proceedings. The court of appeals also denied relief. 80 S.W.3d 611. We conclude that the Program meets the requirements for altering an at-will employment contract, is not unconscionable, and is otherwise enforceable under general contract principles. Because the employer has no adequate remedy on appeal, we conditionally grant the writ.

**\*568  I**

James D. Myers has been an at-will employee of Brown & Root Energy Services, now a subsidiary of Halliburton Company, for approximately thirty years. In November 1997, Halliburton sent notice to all employees of Halliburton companies that it was adopting a Dispute Resolution Program. [1] As part of that program, binding arbitration was designated as the exclusive method for resolving all disputes between the company and its employees. The notice informed employees that by continuing to work after January 1, 1998, they would be accepting the new program. [2]

Myers does not dispute that he received this notice, but he claims that he did not fully understand it. Nevertheless, he continued working for Halliburton after January 1, 1998. Sometime in 1998, Halliburton demoted him from his position as a General Welding Foreman. Although he was told this demotion was due to "a lack of interpersonal skills," Myers alleges that the real reason was discrimination based on his race and age. In October 1999, Myers brought this suit in district court alleging wrongful demotion in violation of the Texas Commission on Human Rights Act, TEX. LAB.CODE § 21.001. Halliburton asked the trial court to compel arbitration under the Program and to either stay or dismiss the lawsuit. The trial court denied the motion, and the court of appeals denied Halliburton's petition for writ of mandamus.

**II**

**[1]** Under the Federal Arbitration Act (FAA), an agreement to arbitrate that is valid under general principles of state contract law and involves interstate commerce is "valid, irrevocable, and enforceable." 9 U.S.C. § 2. The parties here do not dispute that the contract involves interstate commerce. We must determine whether, under state law, the Program's arbitration clause is valid. 9 U.S.C. § 2.

In *Hathaway v. General Mills, Inc.,* 711 S.W.2d 227 (Tex.1986), we outlined the manner in which an employer may change the terms of an at-will employment contract. We held that the party asserting a change to an at-will employment contract must prove two things: (1) notice of the change, and (2) acceptance of the change. *Id.* at 229. We stated that "to prove notice, an employer asserting a modification must prove that he unequivocally notified the employee of definite changes in employment terms." *Id.* Yet we made clear that when an employer notifies an employee of changes to the at-will employment contract and the employee

"continues working with knowledge of the changes, he has accepted the changes as a matter of law." *Id.* (citation omitted).

Here, it is undisputed that Halliburton notified Myers of the proposed changes. The notice explained the Program, stated its effective date, and explained that by working after that date an employee would indicate that he or she accepted the provision. Myers argues that he only briefly **\*569** looked at the documents and that he did not understand them. The materials, however, unequivocally notified him that his employment terms would be changing. A one-page summary included in the materials stated:

> While both you and Halliburton retain all substantive legal rights and remedies under this Program, you and Halliburton are both waiving all rights which either may have with regard to trial by jury for employment related matters in state or federal court.

The accompanying materials set forth that adopting the new Program meant that

> if you accept or continue your employment after January 1, 1998, you will agree to resolve all legal claims against Halliburton through this process instead of through the court system.

After receiving this notice, Myers continued to work for Halliburton after January 1, 1998, thus accepting the changes as a matter of law.

This is not a case in which the written notice was contradicted by other written or oral communications between the employer and the employee. *See Hathaway,* 711 S.W.2d at 229. On this record we conclude that Halliburton's offer was unequivocal and that Myers' conduct was an acceptance of that offer.

The court of appeals held that Halliburton's promises were illusory, and therefore could not constitute consideration for Myers' promise to arbitrate. 80 S.W.3d 611. The court relied on *Light v. Centel Cellular Co.,* 883 S.W.2d 642 (Tex.1994), for the proposition that

> because an at-will employer and employee may not contract to limit

the ability of either to terminate the employment at-will, a promise by either which is dependent on a period of continued employment is illusory and thus insufficient to support a bilateral contract because it would fail to bind the promisor who always retains the option of discontinuing employment in lieu of performance.

*Id.* at 645.

This is a correct statement of the law, but it does not apply to the situation here. In *Light,* we considered the validity of a covenant not to compete between an at-will employee and her employer. *Light,* 883 S.W.2d at 643. We held that certain promises made by the employer in the covenant were illusory because they were dependent on the at-will employee's continued employment. *Id.* at 645–46. The employer could avoid performance simply by terminating the employment relationship, while the employee was bound whether she stayed or left. *Id.* at 645.

By contrast, the Program is not *dependent* on continuing employment. Instead, it was *accepted* by the employee's continuing employment. When Myers reported for work after January 1, 1998, he accepted Halliburton's offer; both Myers and Halliburton became bound to arbitrate any disputes between them. Even if Myers' employment had ended shortly thereafter, the promise to arbitrate would have been binding and enforceable on both parties. In *Light,* the employer was bound only while the employee continued to work. Thus, following Myers' acceptance, the Program was not dependent on continuing employment and was not illusory. *See also In re Jebbia,* 26 S.W.3d 753, 758 (Tex.App.-Houston [14th Dist.] 2000, orig. proceeding) (rejecting the argument that an arbitration provision lacked consideration because the employment relationship was at-will).

Myers also asserts that Halliburton's promises were illusory because the company retained the right to modify or discontinue the Program. But the Program also provided that "no amendment shall apply **\*570** to a Dispute of which the Sponsor [Halliburton] had actual notice on the date of amendment." As to termination, the plan stated that "termination shall not be effective until 10 days after reasonable notice of termination is given to Employees or as to Disputes which arose prior to the date of termination." Therefore, Halliburton cannot avoid its promise to arbitrate

by amending the provision or terminating it altogether. Accordingly, the provision is not illusory.

Myers further asserts that because his statutory rights under the Texas Commission on Human Rights Act are implicated, a higher standard applies in determining if he agreed to binding arbitration. For this proposition, he cites *Prudential Insurance Co. v. Lai,* 42 F.3d 1299 (9th Cir.1994). *Lai* held that the employer must establish at least a "knowing agreement to arbitrate employment disputes" before an employee may be deemed to have waived a judicial determination of his or her rights under Title VII and related state statutes. *Lai,* 42 F.3d at 1304. The court held that because the arbitration agreement did not specifically mention the type of claim the plaintiffs alleged, the plaintiffs could not have "knowingly" agreed to arbitrate those claims. *Id.* at 1305. However, nearly every subsequent decision has rejected Lai's "knowing waiver" standard. *See, e.g., Penn v. Ryan's Family Steak Houses, Inc.,* 269 F.3d 753, 761 (7th Cir.2001); *Haskins v. Prudential Ins. Co. of Am.,* 230 F.3d 231, 239–40 (6th Cir.2000); *Seus v. John Nuveen & Co.,* 146 F.3d 175, 183 n. 2 (3rd Cir.1998); *Battle v. Prudential Ins. Co. of Am.,* 973 F.Supp. 861, 866 (D.Minn.1997); *Cremin v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 957 F.Supp. 1460, 1474–75 (N.D.Ill.1997); *Maye v. Smith Barney, Inc.,* 897 F.Supp. 100, 107 (S.D.N.Y.1995); *Bryant v. American Exp. Fin. Advisors, Inc.,* 595 N.W.2d 482, 486 (Iowa 1999); *DeCaminada v. Coopers & Lybrand, L.L.P.,* 232 Mich.App. 492, 591 N.W.2d 364, 368 (App.1998); *but see Hooters of Am., Inc. v. Phillips,* 39 F.Supp.2d 582, 612 (D.S.C.1998); *Hoffman v. Aaron Kamhi, Inc.,* 927 F.Supp. 640, 645 (S.D.N.Y.1996). Moreover, *Lai's* "knowing waiver" standard is inconsistent with the United States Supreme Court's decisions in *Gilmer v. Interstate/Johnson Lane Corp.,* 500 U.S. 20, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991), and *Circuit City Stores, Inc. v. Adams,* 532 U.S. 105, 121 S.Ct. 1302, 149 L.Ed.2d 234(2001). In *Gilmer,* a suit under the Age Discrimination in Employment Act, the Court noted that under the FAA, arbitration agreements are "valid, irrevocable, and enforceable save upon such grounds as exist at law or in equity for the revocation of any contract." *Gilmer,* 500 U.S. at 24–25, 111 S.Ct. 1647. The Court concluded that such statutory causes of action may be the subject of an arbitration agreement. *Id.* at 26, 111 S.Ct. 1647. In *Circuit City,* an employer brought an action in federal court under the FAA seeking to enjoin a suit in state court under a California employment discrimination statute, because the employee had agreed to arbitration. *Circuit City,* 532 U.S. at 110, 121 S.Ct. 1302. The employee argued that the FAA does not apply to contracts of employment. *Id.* at 113, 121 S.Ct. 1302. The Court stated that it "had been clear in rejecting the supposition that the advantages of the arbitration process somehow disappear when transferred to the employment context," and held for the employer. *Id.* at 123, 121 S.Ct. 1302. Requiring *Lai's* heightened standard would undermine these principles by allowing an arbitration agreement covering statutory claims to be declared unenforceable on some basis other than one required at law or in equity for contract revocation.

 **\*571** Myers also urges this Court to require a heightened standard because a Federal Equal Employment Opportunity Commission policy disfavors compulsory arbitration of discrimination claims. Policy Statement on Mandatory Binding Arbitration of Employment Discrimination Disputes, EEOC Notice No. 915.00 (July 10, 1997). While we may give some deference to the statutory interpretation of the government agency charged with implementing that statute, that cannot trump our deference to a United States Supreme Court decision. *See In re American Homestar of Lancaster, Inc.,* 50 S.W.3d 480, 490–91 (Tex.2001).

Finally, Myers argues that this provision should not be enforced because it is unconscionable. Unconscionability includes two aspects: (1) procedural unconscionability, which refers to the circumstances surrounding the adoption of the arbitration provision, and (2) substantive unconscionability, which refers to the fairness of the arbitration provision itself. *See Southwestern Bell Tel. Co. v. DeLanney,* 809 S.W.2d 493, 498–99 (Tex.1991) (Gonzalez, J., concurring). In *In re Oakwood Mobile Homes, Inc.,* 987 S.W.2d 571, 573 n. 3 (Tex.1999), we observed in dicta that substantive unconscionability of an arbitration clause cannot be asserted to the court as a reason not to compel arbitration, and that such a claim must instead be "submitted to the designated arbitrator." [3]

This proposition first appeared in Texas jurisprudence in *In re Foster Mold, Inc.,* 979 S.W.2d 665, 667 (Tex.App.-El Paso 1998) (orig. proceeding). That case relied on the United States Supreme Court's decision in *Prima Paint Corp. v. Flood & Conklin Manufacturing Co.,* 388 U.S. 395, 403–04, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967), and on two cases from the Fifth Circuit Court of Appeals: *Miller v. Public Storage Management, Inc.,* 121 F.3d 215 (5th Cir.1997), and *R.M. Perez & Associates, Inc. v. Welch,* 960 F.2d 534 (5th Cir.1992).

In *Prima Paint Corp.,* the Supreme Court held that under section 4 of the FAA, "if the claim is fraud in the inducement of the arbitration clause itself ... the federal court may proceed to adjudicate it," but "the statutory language does not permit the federal court to consider claims of fraud in the inducement of the contract generally." *Prima Paint Corp.,* 388 U.S. at 403–04, 87 S.Ct. 1801. The Fifth Circuit cases have similar language. *See Miller,* 121 F.3d at 218–19; *R.M. Perez,* 960 F.2d at 538–39. Neither *Miller* nor *R.M. Perez* addressed the distinction between procedural and substantive unconscionability of an arbitration clause. They each noted that courts may consider claims relating to the arbitration clause itself but not regarding the contract as a whole. These cases simply do not support *Foster Mold's* conclusion that a court may not address claims that the arbitration clause is substantively unconscionable.

 **[2]**    Several federal courts have examined substantive unconscionability of an arbitration clause when ruling on a motion to compel. *See, e.g., Dobbins v. Hawk's Enters.,* 198 F.3d 715, 717 (8th Cir.1999); *Harris v. Green Tree Fin. Corp.,* 183 F.3d 173, 181–84 (3rd.Cir.1999); *We Care Hair Dev., Inc. v. Engen,* 180 F.3d 838, 843 (7th Cir.1999); *Doctor's Assocs., Inc. v. Hamilton,* 150 F.3d 157, 163 (2nd Cir.1998); *Stedor* **\*572** *Enters., Ltd. v. Armtex, Inc.,* 947 F.2d 727, 733 (4th Cir.1991). These cases seem to us clearly correct. *See also In re Conseco Fin. Servicing Corp.,* 19 S.W.3d 562, 568 n. 3 (Tex.App.-Waco 2000, orig. proceeding) (questioning the validity of the dicta in *Oakwood Homes* ). We therefore clarify that courts may consider both procedural and substantive unconscionability of an arbitration clause in evaluating the validity of an arbitration provision.

 **[3]**    **[4]**    Myers first asserts that the provision is procedurally unconscionable as there was gross disparity in bargaining power between the parties because Myers had no opportunity to negotiate; Halliburton told him to accept the Program or leave. But in *Hathaway,* we recognized that an employer may make precisely such a "take it or leave it" offer to its at-will employees. *Hathaway,* 711 S.W.2d at 228–29. Because an employer has a general right under Texas law to discharge an at-will employee, it cannot be unconscionable, without more, merely to premise continued employment on acceptance of new or additional employment terms. *See also Smith v. H.E. Butt Grocery Co.,* 18 S.W.3d 910, 912 (Tex.App.-Beaumont 2000, pet. denied) (rejecting the argument that an arbitration provision is unconscionable merely because the parties did not negotiate its terms).

 **[5]**    Myers also argues that the arbitration plan is so unfair to employees that the Program is substantively unconscionable. But Myers has failed to make such a showing here. The Program has several terms that provide protection to the employee in the process. For example, the company agreed to pay all the expenses of an arbitration except a $50 filing fee. Both parties are to participate in the selection of the neutral arbitrator. The Program provides up to $2,500 for an employee to consult with an attorney. The rules provide for pre-arbitration discovery under the Federal Rules of Civil Procedure. All remedies the employee could have pursued in the court system are available in the arbitration. And the arbitrator may award reasonable attorney's fees to an employee who receives a favorable award regardless of whether such an award would be available in court. On this record, we conclude that Myers has failed to carry his burden to show that the Program is unconscionable.

Several courts have found arbitration provisions with similar terms to be enforceable. *See Cole v. Burns Int'l Sec. Servs.,* 105 F.3d 1465, 1482 (D.C.Cir.1997) (arbitration agreement valid which (1) required a neutral arbitrator, (2) allowed more than minimal discovery, (3) resulted in a written award, (4) allowed all remedies that would be available in court, and (5) did not require the employee to pay either unreasonable costs or any arbitrator's fees or expenses); *Beauchamp v. Great West Life Assurance Co.,* 918 F.Supp. 1091, 1098 (E.D.Mich.1996) (an agreement to arbitrate is not substantively unconscionable because the employee did not waive any substantive rights, the employee simply agreed to have those rights determined in a different forum); *Rembert v. Ryan's Family Steak Houses, Inc.,* 235 Mich.App. 118, 596 N.W.2d 208, 226 (App.1999) (an arbitration agreement covering statutory claims is valid so long as "the arbitration agreement does not waive the substantive rights and remedies of the statute and the arbitration procedures are fair so that the employee may effectively vindicate his statutory rights").

### III

 **[6]**    We conclude that Myers clearly had notice of the proposed changes to his at-will employment contract and accepted them by continuing to work after January **\*573** 1, 1998. We also conclude that Myers has failed to show that the arbitration provision is unconscionable. Because the arbitration provision is otherwise enforceable under general contract principles, a valid arbitration provision exists between Myers and Halliburton, and the trial court should

have granted Halliburton's motion to compel arbitration. Mandamus relief is appropriate because Halliburton has no adequate remedy by appeal. *See Jack B. Anglin Co. v. Tipps,* 842 S.W.2d 266, 271 (Tex.1992). Accordingly, we conditionally grant the petition for writ of mandamus. The writ will issue only if the trial court fails to act promptly.

Justice BAKER concurred in the Court's judgment only.

**Parallel Citations**

18 IER Cases 1121, 45 Tex. Sup. Ct. J. 720

Footnotes

1    Brown & Root apparently adopted the same program in 1993. The parties provided this Court with a cover letter for materials sent to Brown & Root employees in 1993. However, the materials were not provided to us. Even if Myers' at-will employment contract was modified when Brown & Root adopted the program in 1993, it was further modified in 1998 when Halliburton adopted the program for all of its employees.

2    In its motion to compel arbitration, Halliburton also argued that Myers had agreed to arbitration by signing a document entitled "Assignment Authority Supplement," which contained a statement acknowledging the new Dispute Resolution Program and agreeing to submit to binding arbitration. When Myers asserted that the signature on the document was not his, Halliburton abandoned this argument.

3    Several courts of appeals have relied on this language in examining arbitration provisions. *See In re Rangel,* 45 S.W.3d 783, 786 (Tex.App.-Waco 2001, orig. proceeding); *Smith v. H.E. Butt Grocery Co.,* 18 S.W.3d 910, 912 (Tex.App.-Beaumont 2000, pet. denied); *In re H.E. Butt Grocery Co.,* 17 S.W.3d 360, 367 (Tex.App.-Houston [14th Dist.] 2000, orig. proceeding).

**End of Document**                    © 2014 Thomson Reuters. No claim to original U.S. Government Works.

328 S.W.3d 883
Supreme Court of Texas.

In re OLSHAN FOUNDATION REPAIR
COMPANY, LLC and Olshan Foundation
Repair Company of Dallas, Ltd., Relators.

Nos. 09–0432, 09–0433, 09–0474, 09–0703. | Argued March 23, 2010. | Decided Dec. 3, 2010.

**Synopsis**

**Background:** Homeowners brought separate actions against foundation repair company before the 40th District Court, Ellis County, Gene Knize, J., the 44th District Court, Dallas County, Carlos Raul Cortez, J., and the 271st District Court, Wise County, John H. Fostel, J. Foundation repair company's pleas in abatement were denied, and it petitioned for writs of mandamus, seeking order to compel arbitration of homeowners' claims. The Waco Court of Appeals, 2009 WL 1886648, the Dallas Court of Appeals, 277 S.W.3d 124, and the Fort Worth Court of Appeals, 2008 WL 4661815, denied petitions. Foundation repair company filed petitions for writs of mandamus, which were consolidated.

**Holdings:** The Supreme Court, Wainwright, J., held that:

[1] choice of law provision in some homeowners' contracts did not preclude application of Federal Arbitration Act (FAA);

[2] choice of law provision in remaining homeowners' contract precluded application of FAA;

[3] evidence of two invoices from other arbitrations was not some evidence in support of finding that arbitration agreements were unconscionable, and

[4] claim that agreement violated Texas Home Solicitation Act (THSA) was to be determined by arbitrator.

Writs granted in part and denied in part.

Hecht, J., filed concurring opinion in which Medina, J., joined.

West Headnotes (17)

**[1]** **Mandamus**



by Appeal or Writ of Error

Remedy

**Mandamus**



of discretion

Matters

Mandamus will not issue unless: (1) the trial judge has committed a clear abuse of discretion; and (2) there is no adequate remedy on appeal.

31 Cases that cite this headnote

**[2]** **Appeal and Error**



of discretion

Abuse

A trial court abuses its discretion if it reaches a decision so arbitrary and unreasonable it amounts to a clear and prejudicial error of law or it clearly fails to correctly analyze or apply the law.

39 Cases that cite this headnote

**[3]** **Alternative Dispute Resolution**



and statutory provisions and rules of court

Constitutional

The Federal Arbitration Act (FAA) does not confer a right to compel arbitration of any dispute at any time; rather, the FAA policy is simply to ensure that private agreements to arbitrate are enforced according to their terms. 9 U.S.C.A. § 1 et seq.

2 Cases that cite this headnote

**[4]** **Alternative Dispute Resolution**



**Alternative Dispute Resolution**

Preemption



and Effect

**Commerce**



Choice of law provision in contracts between homeowners and foundation repair company, stating that disputes arising out of contracts were to be resolved by mandatory and binding arbitration administered pursuant to arbitration laws in state of homeowners, did not preclude application of Federal Arbitration Act (FAA) provision, which preempted state law that would otherwise render arbitration agreements unenforceable in contract involving interstate commerce, to provision of Texas General Arbitration Act (TAA), which rendered arbitration agreements unenforceable if they contained arbitration clauses for services in which total consideration to be furnished was not more than $50,000 and agreements were not in writing and signed by parties and parties' counsel, in homeowners' action against company, absent any provision specifically excluding federal law. 9 U.S.C.A. § 2; V.T.C.A., Civil Practice & Remedies Code § 171.002(a)(2).

9 Cases that cite this headnote

[5] **Alternative Dispute Resolution**



law governs

**Alternative Dispute Resolution**



and Effect

Choice of law provision in contracts between homeowners and foundation repair company, stating that disputes arising out of contract were to be resolved by mandatory and binding arbitration administered pursuant to Texas General Arbitration Act (TAA), precluded application of Federal Arbitration Act (FAA) provision, which preempted state law that would otherwise render arbitration agreements unenforceable in contract involving interstate commerce, to provision of TAA, which rendered

Operation

Arbitration

arbitration agreements unenforceable if they contained arbitration clauses for services in which total consideration to be furnished was not more than $50,000 and agreements were not in writing and signed by parties and parties' counsel, in homeowners' action against company. 9 U.S.C.A. § 2; V.T.C.A., Civil Practice & Remedies Code § 171.002(a)(2).

8 Cases that cite this headnote

[6] **Alternative Dispute Resolution**



Validity

Arbitration agreements are enforceable under the Federal Arbitration Act (FAA) only if they meet the requirements of the general contract law of the applicable state. 9 U.S.C.A. § 2.

4 Cases that cite this headnote

[7] **Alternative Dispute Resolution**



What

law governs

When determining whether an agreement to arbitrate is valid under the Federal Arbitration Act (FAA), state law, whether of legislative or judicial origin, is applicable if that law arose to govern issues concerning the validity, revocability, and enforceability of contracts generally. 9 U.S.C.A. § 2.

6 Cases that cite this headnote

[8] **Alternative Dispute Resolution**



Unconscionabi

State law renders unconscionable contracts unenforceable, and recognizes both substantive and procedural unconscionability with regard to arbitration agreements: "substantive unconscionability" refers to the fairness of the arbitration provision itself, whereas "procedural unconscionability" refers to the circumstances surrounding adoption of the arbitration provision.

10 Cases that cite this headnote

What

Operation



**[9] Contracts**



Contracts

Generally, a contract is unconscionable if, given the parties general commercial background and the commercial needs of the particular trade or case, the clause involved is so one-sided that it is unconscionable under the circumstances existing when the parties made the contract.

2 Cases that cite this headnote

**[10] Alternative Dispute Resolution**



There is nothing per se unconscionable about arbitration agreements.

4 Cases that cite this headnote

**[11] Alternative Dispute Resolution**



Excessive costs imposed by an arbitration agreement render a contract unconscionable if the costs prevent a litigant from effectively vindicating his or her rights in the arbitral forum.

4 Cases that cite this headnote

**[12] Alternative Dispute Resolution**



In determining whether an arbitration agreement is unconscionable based on the ground that arbitration would be prohibitively expensive, the analysis evaluates whether the arbitral forum in a particular case is an adequate and accessible substitute to litigation, which in turn requires a case-by-case analysis that focuses, among other things, upon the claimant's ability to pay the arbitration fees and costs, the expected cost differential between arbitration and litigation in court, and whether that cost differential is so substantial as to deter the bringing of claims; the key factor is not where the cost to pursue the claim goes, but what the total cost to the claimant to pursue the claim is.

Unconscionable 8 Cases that cite this headnote

**[13] Alternative Dispute Resolution**



Evidence

When a party seeks to invalidate an arbitration agreement on the ground that arbitration would be prohibitively expensive so as to be unconscionable, that party bears the burden of showing the likelihood of incurring such costs; once met, the burden shifts to the party seeking arbitration who must come forward with contrary evidence.

Unconscionability

1 Cases that cite this headnote

**[14] Alternative Dispute Resolution**



Evidence

Validity

Evidence of the risk of possible costs of arbitration is insufficient evidence of the prohibitive cost of the arbitration forum, for purposes of determining whether an arbitration agreement is unconscionable; for evidence to be sufficient, it must show that excessive arbitration fees are likely to be charged.

8 Cases that cite this headnote

**[15] Alternative Dispute Resolution**

Unconscionabil

Evidence

Parties seeking to invalidate an arbitration agreement on the ground of prohibitive cost of arbitration need not actually incur the cost of arbitration in order to demonstrate excessiveness, but must at least provide evidence of the likely cost of their particular arbitration, through invoices, expert testimony, reliable cost estimates, or other comparable evidence.

4 Cases that cite this headnote

**[16] Alternative Dispute Resolution**

Evidence

Evidence of two invoices from similar disputes showing claims worth between approximately $75,000 to $200,000, and arbitration costs between approximately $11,000 to $35,000, did not constitute some evidence to support finding that homeowners would be charged excessive fees to arbitrate their claims against foundation repair company for alleged improper foundation repair, as required to invalidate arbitration agreements between parties on ground of substantive unconscionability; homeowners' respective claims did not exceed $20,000 each, nothing indicated that homeowners sought to reduce any likely arbitration charges through fee waivers, pro bono arbitrators, or single-arbitrator panels, and homeowners did not provide comparison of evidence to their expected costs, amount of claims, or ability to pay such costs.

Cases that cite this headnote

**[17]** **Alternative Dispute Resolution**



and validity of agreement

Claim of homeowners, who entered into arbitration agreement with foundation repair company, that agreement violated Texas Home Solicitation Act (THSA) by failing to include in agreements certain language regarding cancellation and that such violation rendered agreement and arbitration clauses void, was to be determined by arbitrator, rather than trial court, in action by homeowners against company arising out of alleged improper foundation repairs, as trial court could consider only issues relating to making and performance of agreement to arbitrate. V.T.C.A., Bus. & C. §§ 601.002(a), 601.052, 601.053, 601.201.

1 Cases that cite this headnote

**Attorneys and Law Firms**

**\*885** Stephan B. Rogers, Rogers & Moore, Boerne, Duncan Roderick MacRae II, Henslee Schwartz, LLP, Austin, Mark C. Roberts, Henslee Schwartz, LLP, Dallas, Jeffrey D. Janota, Henslee Schwartz, **\*886** LLP, Austin, for Olshan Foundation Repair Company, LLC.

Robert W. Loree, Edwin Todd Lipscomb, Loree, Hernandez & Lipscomb, PLLC, San Antonio, Steven W. Thornton, McCorkle Westerburg & Thornton, P.C., David M. Walsh IV, Chamblee & Ryan, P.C., Dallas, for Real Parties in Interest Kenneth Kilpatrick in No. 09–0432, Charley Tisdale in No. 09–0433, Craig Waggoner in No. 09–0474.

Robert W. Loree, Edwin Todd Lipscomb, Christopher Dean Below, Loree, Hernandez & Lipscomb, PLLC, San Antonio, Steven W. Thornton, McCorkle Westerburg & Thornton, P.C., David M. Walsh IV, Chamblee & Ryan, P.C., Dallas, for Real Party in Interest Robert Tingdale in No. 09–0703.

**Opinion**

Justice WAINWRIGHT delivered the opinion of the Court.

Olshan Foundation Repair Company filed these petitions for writs of mandamus in four different cases in which three separate trial courts denied Olshan's pleas in abatement, refusing to compel arbitration of consumer claims against it. Three different courts of appeals also declined to order the disputes to arbitration. We consolidated these cases for argument and now issue a consolidated opinion. Because the Texas General Arbitration Act (TAA), and not the Federal Arbitration Act (FAA), governs the arbitration dispute in one of the cases (Waggoner, No. 09–0474), we deny Olshan mandamus relief in that case. We conclude that for the other three cases, the trial courts erred in holding that the TAA governs the arbitrations, there is no evidence that the arbitration agreements were unconscionable as a matter of law, and all other disputed issues are questions for the arbitrator. Because the trial court erred by denying Olshan's pleas in abatement in the arbitrations governed by the FAA, we conditionally grant mandamus relief in those three actions.

**I. Factual and Procedural Background**

Olshan is a national company that repairs residential home foundations. In 1998, Craig and Joy Waggoner contracted with Olshan to repair their home's foundation. The Waggoners subsequently discovered new damage to the foundation and hired an engineer, Peter De la Mora, to investigate the problems. In a 2007 report, De la Mora concluded that Olshan had not properly repaired the home. The Waggoners filed suit against Olshan for breach of

contract, breach of warranty, negligence, violations of the Texas Deceptive Trade Practices Act, and violations of the Texas Home Solicitation Act.

In three other cases, similar circumstances unfolded. In 2002, Olshan contracted with Vickie and Kenneth Kilpatrick, who filed suit against Olshan in 2007. The Kilpatricks' case was consolidated at the appellate court level with claims brought by Charley and Gladys Tisdale, again with nearly identical facts. In June 2007, Robert and Marta Tingdale, who initially contracted with Olshan in 2004, filed another similar case. All plaintiffs are represented by the same counsel, and each case includes a report from De la Mora opining that Olshan had not properly repaired each home.

The four repair contracts were in writing, and each contained arbitration clauses. The arbitration clauses in Kilpatrick (No. 09–0432), Tisdale (No. 09–0433), and Tingdale (No. 09–0703) provide:

> Notwithstanding, any provision in this agreement to the contrary, any dispute, controversy, or lawsuit between any of the parties to this agreement about any matter arising out of this agreement, shall be resolved by mandatory and **\*887** binding arbitration administered by the American Arbitration Association ("AAA") **pursuant to the arbitration laws in your state** and in accordance with this arbitration agreement and the commercial arbitration rules of the AAA....

(emphasis added). The arbitration clause in the Waggoner (No. 09–0474) agreement is identical except for the language in bold, which states "**pursuant to the Texas General Arbitration Act.**" (emphasis added). None of the agreements addressed in this opinion was signed by the consumers' attorney or exceeded $50,000 in consideration.

Olshan filed a plea in abatement in each case and sought to compel arbitration under the Federal Arbitration Act (FAA). The homeowners responded to the pleas, arguing that: (1) the TAA applies to the agreements to the exclusion of the FAA, rendering the arbitration agreements unenforceable because the agreements were not signed by the homeowners' attorney; and (2) arbitration with the AAA is substantively unconscionable because of the expense required and because

the contract itself was undisputably unenforceable under the Texas Home Solicitation Act.

The trial court denied Olshan's plea in the Waggoners' action. It held that the TAA applies to the agreement, and thus the arbitration agreement was unenforceable pursuant to Chapter 171 of the Texas Civil Practice and Remedies Code. *See* TEX. CIV. PRAC. & REM.CODE § 171.002(a)(2) (requiring arbitration agreements in service contracts for less than $50,000 be signed by all parties and their attorneys). The trial court alternatively held that the prohibitive cost of arbitration rendered the agreement to arbitrate unconscionable. Olshan petitioned for mandamus relief with the court of appeals, which was denied. The court of appeals held the TAA was not preempted by the FAA, and section 171.002(a)(2) of the TAA rendered the agreement unenforceable. It denied Olshan's writ of mandamus without reaching the other issues. In the remaining three actions, the trial courts denied Olshan's pleas in abatement and the courts of appeals denied Olshan's petitions for writs of mandamus. [1]

## II. Standard for Mandamus

 **[1]**   **[2]**   At the time these petitions were filed, there was no method under Texas procedure for parties to file interlocutory appeals of a trial court's refusal to compel arbitration under the FAA. [2] Olshan sought relief through petitions for writs of mandamus. *See Jack B. Anglin Co. v. Tipps,* 842 S.W.2d 266, 272 (Tex.1992). Mandamus will not issue unless: (1) the trial judge has committed a clear abuse of discretion; and (2) there is no adequate remedy on appeal. *In re Odyssey Healthcare,* **\*888** *Inc.,* 310 S.W.3d 419, 422 (Tex.2010) (per curiam) (citing *In re Prudential Ins. Co. of Am.,* 148 S.W.3d 124, 135–36 (Tex.2004)). A trial court abuses its discretion if it reaches a decision so arbitrary and unreasonable it amounts to a clear and prejudicial error of law or it clearly fails to correctly analyze or apply the law. *Walker v. Packer,* 827 S.W.2d 833, 840 (Tex.1992) (citations omitted). The second requirement for mandamus relief, that the relator has no adequate remedy by appeal, "has no comprehensive definition." *See In re Ford Motor Co.,* 165 S.W.3d 315, 317 (Tex.2005) (citing *Prudential,* 148 S.W.3d at 136). However, we have determined that relators have no adequate remedy by appeal when a trial judge erroneously refuses to compel arbitration under the FAA. *In re FirstMerit Bank, N.A.,* 52 S.W.3d 749, 753 (Tex.2001).

This Court must decide whether the trial courts abused their discretion by not compelling arbitration pursuant to the FAA, as requested in Olshan's pleas in abatement. The trial courts abuse their discretion by refusing to compel arbitration if the FAA preempts the TAA and the arbitration agreements are not unconscionable. However, the trial courts did not err by denying Olshan's pleas in abatement if the TAA applies to the agreements or the agreements are unconscionable.

### III. Federal Preemption

#### A. The FAA and Choice of Law

The TAA renders arbitration agreements unenforceable if the agreements containing the arbitration clauses are agreements for services "in which the total consideration to be furnished by the individual is not more than $50,000" and the agreements are not in writing, signed by each party, and each party's attorney. TEX. CIV. PRAC. & REM.CODE § 171.002(a)(2). The homeowners contend that the arbitration agreements are governed by the TAA and are unenforceable for failure to meet the two identified TAA requirements. Olshan argues that the FAA applies to the agreements and preempts the TAA's exemption from coverage under section 171.002(a)(2), making the arbitration clauses enforceable. See In re Nexion Health at Humble, Inc., 173 S.W.3d 67, 69 (Tex.2005) (per curiam) (addressing a similar exemption under the TAA for personal injury cases).

Section 2 of the FAA preempts state law that would otherwise render arbitration agreements unenforceable in a contract involving interstate commerce. 9 U.S.C. § 2; Southland Corp. v. Keating, 465 U.S. 1, 10–11, 104 S.Ct. 852, 79 L.Ed.2d 1 (1984). "The Act was designed to overrule the judiciary's longstanding refusal to enforce agreements to arbitrate, and place such agreements upon the same footing as other contracts." Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Junior Univ., 489 U.S. 468, 474, 109 S.Ct. 1248, 103 L.Ed.2d 488 (1989) (internal quotations omitted). We have recognized that the FAA preempts parts of the TAA, including section 171.002(a)(2) of the Civil Practice and Remedies Code. See Jack B. Anglin Co., 842 S.W.2d at 271 (discussing FAA's preemption of non-waiver provision of DTPA); Nexion, 173 S.W.3d at 69 (Tex.2005) (discussing FAA's preemption of TAA section 171.002(a)(3)).

[3] But the FAA does not "confer a right to compel arbitration of any dispute at any time." Volt, 489 U.S. at 474, 109 S.Ct. 1248. The FAA policy is simply to "ensur[e] that private agreements to arbitrate are enforced according to their terms." Id. at 479, 109 S.Ct. 1248. In Volt, the Court upheld the application of a California statute that allowed a stay of arbitration proceedings pending resolution of related litigation because the contract *889 also contained a choice-of-law clause providing that "[t]he Contract shall be governed by the law of the place where the Project is located." Id. at 470, 109 S.Ct. 1248. The Court reiterated that "the FAA pre-empts state laws which 'require a judicial forum for the resolution of claims which the contracting parties agreed to resolve by arbitration.' " Id. at 478, 109 S.Ct. 1248 (quoting Southland Corp., 465 U.S. at 10, 104 S.Ct. 852). But the FAA does not prevent

> the enforcement of agreements to arbitrate under different rules than those set forth in the Act itself.... Arbitration under the Act is a matter of consent, not coercion, and parties are generally free to structure their arbitration agreements as they see fit. Just as they may limit by contract the issues which they will arbitrate, so too may they specify by contract the rules under which that arbitration will be conducted.... By permitting the courts to "rigorously enforce" such agreements according to their terms, we give effect to the contractual rights and expectations of the parties, without doing violence to the policies behind by the FAA.

Id. at 479, 104 S.Ct. 852 (citations omitted).

Subsequently, in Mastrobuono v. Shearson Lehman Hutton, Inc., the Court held that the FAA preempted New York's prohibition against arbitral awards of punitive damages despite a choice of law provision in an arbitration agreement that stated the agreement "shall be governed by the laws of the State of New York." 514 U.S. 52, 63–64, 115 S.Ct. 1212, 131 L.Ed.2d 76 (1995). The Court first stressed that the agreement would be enforced as written, stating that "the case before us comes down to what the contract has to say about the arbitrability of petitioners' claim for punitive damages." Id. at 58, 115 S.Ct. 1212. Where the Court in Volt read the choice-of-law provision as definitively choosing state law over federal law, the Court in Mastrobuono read the provision differently:

The choice-of-law provision, when viewed in isolation, may reasonably be read as merely a substitute for the conflict-of-laws analysis that otherwise would determine what law to apply to disputes arising out of the contractual relationship.

...

At most, [it] introduces an ambiguity into an arbitration agreement that would otherwise allow punitive damages awards.

*Id.* at 59, 62, 115 S.Ct. 1212. Then, using FAA mandated rules of contract construction, the Court concluded that the provision should be read "to encompass substantive principles that New York courts would apply, but not to include special rules limiting the authority of arbitrators." *Id.* at 62–64, 115 S.Ct. 1212.

Thus, courts treat arbitration agreements as other contracts in applying the legal rules to interpret them. The goal is to discern the true intentions of the parties, as the FAA's primary purpose is to ensure private agreements to arbitrate are enforced according to their terms, no more, no less. *Volt,* 489 U.S. at 479, 109 S.Ct. 1248; *see also Baravati v. Josephthal, Lyon & Ross, Inc.,* 28 F.3d 704, 709 (7th Cir.1994) (Posner, C.J.) ("[S]hort of authorizing trial by battle or ordeal or, more doubtfully, by a panel of three monkeys, ... parties are as free to specify idiosyncratic terms of arbitration as they are to specify any other terms in their contract.").

### B. This Court's Treatment of Choice–of–Law Provisions Relating to Arbitration Agreements

This Court analyzed contractual language in the context of the relationship **\*890** between an arbitration clause and a general choice-of-law provision in *In re L & L Kempwood Associates, L.P.,* 9 S.W.3d 125, 127–28 (Tex.1999) (per curiam). We held that an agreement containing a general choice-of-law provision stating that the entire contract will be governed by "the law of the place where the Project is located," does not preclude application of the FAA. *Id.* The Court observed that the Project was located in Houston, thus the FAA was part of "the law of the place where the Project is located." *Id.; see also Capital Income Props. v. Blackmon,* 843 S.W.2d 22, 23 (Tex.1992) (per curiam) (stating that "[t]he Federal [Arbitration] Act is part of the substantive law of Texas"). When the language of the provision included federal

law, further language specifically excluding application of the FAA is necessary for a court to apply the TAA to the FAA's exclusion. "The choice-of-law provision did not specifically exclude the application of federal law, and absent such an exclusion we decline to read the choice-of-law clause as having such an effect." *L & L Kempwood,* 9 S.W.3d at 127–28. Rather, a general choice-of-law provision "may reasonably be read as merely a substitute for the conflict-of-laws analysis that otherwise would determine what law to apply to disputes." *Id.* at 127 n. 16 (citing *Mastrobuono,* 514 U.S. at 59–60, 115 S.Ct. 1212). Courts apply the FAA unless language in the arbitration agreement indicates its exclusion.

### C. The Law the Parties Chose

**[4]**    Three of the arbitration agreements state that disputes arising out of the contract "shall be resolved by mandatory and binding arbitration administered ... pursuant to the arbitration laws in your state...." Courts rarely read such general choice-of-law provisions to choose state law to the exclusion of federal law. *See Mastrobuono,* 514 U.S. at 59, 115 S.Ct. 1212; *L & L Kempwood,* 9 S.W.3d at 127 n. 16. Further, just as the FAA is part of the substantive law of Texas, the FAA would be part of the arbitration laws in Texas. *See L & L Kempwood,* 9 S.W.3d at 127 n. 15 (quoting *Capital Income Props.,* 843 S.W.2d at 23). The language of the arbitration clause designating arbitration pursuant to "the arbitrations laws in your state" includes the FAA. *See id.* at 127–28. Thus, the FAA applies to the three agreements that include the "arbitration laws in your state" language, and the FAA preempts the provisions of section 171.002(a)(2) of the TAA that would otherwise render the agreements unenforceable. The trial courts abused their discretion in denying Olshan's requests to compel arbitration based on the unenforceability of the arbitration under section 171.002(a)(2) in the Kilpatrick, Tisdale and Tingdale cases.

**[5]**    In contrast, the Waggoner agreement states that disputes arising out of the contract "shall be resolved by mandatory and binding arbitration ... pursuant to the Texas General Arbitration Act...." This provision distinguishes the Waggoner agreement from the other agreements and the agreements in *L & L Kempwood* and *Mastrobuono.* This is not the same general choice-of-law provision. This provision chooses a state's substantive law, specifically the TAA, to govern disputes under the agreement. A valid choice-of-law provision makes a conflicts-of-law analysis unnecessary; this provision expresses a preference between federal and state

law. *Id.* The FAA is part of the arbitration laws of Texas and can be applied to arbitration administered pursuant to the laws of Texas. However, the FAA is not part of the TAA, at least to the extent the two are inconsistent.

**\*891** The Fifth Circuit has likewise interpreted an arbitration clause specifically invoking the TAA as designating the TAA to govern all aspects of arbitration under the agreement, to the exclusion of the FAA. *Ford v. NYLCare Health Plans of the Gulf Coast, Inc.,* 141 F.3d 243, 246 (5th Cir.1998) (applying Texas law). The court stated the parties may "specify the law governing interpretation of the scope of the arbitration clause." *Id.* at 248. The focus of the determination is on the parties' choice. Thus, the court held that the parties intended the TAA to govern the scope of the arbitration clause. *Id.* at 249.

The language of the Waggoner agreement also indicates the parties' intention that the TAA govern the scope of their arbitration agreement. The plain language clearly indicates that the parties intend their arbitration to be governed by the TAA rather than merely "the law of the state" or "Texas law." The parties' intention that arbitration be administered pursuant to the TAA would be thwarted if the FAA preempted the TAA's specific provisions. Thus, an agreement specifying that arbitration occur "pursuant to the Texas General Arbitration Act" excludes the FAA's preemption of section 171.002(a)(2) of the TAA. [3]

Because the TAA would render the Waggoners' arbitration agreement unenforceable, and because the FAA was not chosen by the parties, the trial court correctly denied Olshan's plea in abatement, seeking to compel arbitration of Waggoner's action against Olshan. However, because the parties in the Kilpatrick, Tisdale, and Tingdale contracts chose to arbitrate pursuant to the laws of Texas, which include the FAA, the FAA preempts section 171.002(a)(2) of the TAA and precludes those requirements from barring arbitration.

## IV. Unconscionability

Even though the FAA governs the arbitration agreements in the Kilpatrick, Tisdale, and Tingdale contracts, if those agreements are unconscionable, they are unenforceable. The homeowners contend that the arbitration agreements are unconscionable because "mandatory binding arbitration administered by the American Arbitration Association ...

in accordance with this arbitration agreement and the commercial arbitration rules of the AAA" is prohibitively expensive, preventing their ability to vindicate their claims. Further, they contend the contracts are clearly void because Olshan violated the Home Solicitation Act, exacerbating the unconscionability of the agreement.

### A. Unconscionability of Arbitration Agreements

[6] [7] Section 2 of the FAA states arbitration agreements "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. A central purpose of the FAA is "to reverse the longstanding judicial hostility to arbitration agreements ... and to place arbitration agreements upon the same footing as other contracts." *Gilmer v. Interstate/Johnson Lane Corp.,* 500 U.S. 20, 24, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991) (citations omitted). Such agreements are enforceable only if they meet "the requirements of the general contract law of the applicable state." *In re Poly–America, L.P.,* 262 S.W.3d 337, 347 (Tex.2008) (citation omitted). When determining whether an agreement to arbitrate is valid, "state law, whether of legislative or judicial origin, is applicable *if* that law arose to govern issues concerning the validity, **\*892** revocability, and enforceability of contracts generally." *Perry v. Thomas,* 482 U.S. 483, 493 n. 9, 107 S.Ct. 2520, 96 L.Ed.2d 426 (1987).

[8] [9] Texas law renders unconscionable contracts unenforceable. *Poly–America,* 262 S.W.3d at 348. Texas further recognizes both substantive and procedural unconscionability. "Substantive unconscionability refers to the fairness of the arbitration provision itself, whereas procedural unconscionability refers to the circumstances surrounding adoption of the arbitration provision." *In re Palm Harbor Homes, Inc.,* 195 S.W.3d 672, 677 (Tex.2006). Because the homeowners complain of the prohibitive cost of arbitration, their claim is grounded in substantive unconscionability. Generally, a contract is unconscionable if, "given the parties' general commercial background and the commercial needs of the particular trade or case, the clause involved is so one-sided that it is unconscionable under the circumstances existing when the parties made the contract." *FirstMerit Bank,* 52 S.W.3d at 757 (citing TEX. BUS. & COM.CODE § 2.302 cmt. 1). "The principle is one of the prevention of oppression and unfair surprise and not of disturbance of allocation of risks because of superior

bargaining power." TEX. BUS. & COM.CODE § 2.302 cmt. 1 (internal citation omitted).

The U.S. Supreme Court has held that statutory claims may be arbitrated "so long as the prospective litigant effectively may vindicate [his or her] statutory cause of action in the arbitral forum." *Green Tree Fin. Corp.-Ala. v. Randolph,* 531 U.S. 79, 90, 121 S.Ct. 513, 148 L.Ed.2d 373 (2000) (citing *Gilmer,* 500 U.S. at 28, 111 S.Ct. 1647). Conversely, an arbitration agreement may render a contract unconscionable if "the existence of large arbitration costs could preclude a litigant ... from effectively vindicating [his or her] federal statutory rights in the arbitral forum." *Id.*; *see also Poly–America,* 262 S.W.3d at 355–57; *FirstMerit Bank,* 52 S.W.3d at 756 (citing *Green Tree,* 531 U.S. at 91, 121 S.Ct. 513).

 **[10]**    **[11]**    We should be wary of setting the bar for holding arbitration clauses unconscionable too low. First, arbitration is favored in both federal and Texas law, and to conclude that an arbitration agreement is unconscionable based merely on the " 'risk' that [the claimant] will be saddled with prohibitive costs" would undermine the " 'liberal federal policy favoring arbitration agreements.' " *Green Tree,* 531 U.S. at 91, 121 S.Ct. 513 (quoting *Moses H. Cone Mem. Hosp. v. Mercury Constr. Corp.,* 460 U.S. 1, 24, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983)); *FirstMerit Bank,* 52 S.W.3d at 756. Second, the theory behind unconscionability in contract law is that courts should not enforce a transaction so one-sided, with so gross a disparity in the values exchanged, that no rational contracting party would have entered the contract. RESTATEMENT (SECOND) OF CONTRACTS § 208 cmt. b (1981). But as we have recognized previously,

> there is nothing *per se* unconscionable about arbitration agreements. In fact, historically, Texas law favors settling disputes by arbitration. Arbitration agreements, like the one here, offer a permissible choice to traditional litigation that does not favor either party. Moreover, assuming unequal bargaining power between [the parties] exists does not establish grounds for defeating an agreement to arbitrate under the FAA.

*EZ Pawn Corp. v. Mancias,* 934 S.W.2d 87, 90–91 (Tex.1996) (per curiam) (citations omitted). Furthermore, arbitration clauses in consumer contracts reduce merchants' operating costs and produce savings passed on to the consumer in the form of lower prices. Thus, a fairly administered **\*893** arbitration should not create a gross disparity in the values exchanged. Stephen J. Ware, *Paying the Price of Process: Judicial Regulation of Consumer Arbitration Agreements,* 2001 J. DISP. RESOL.. 89, 89 (2001); *see generally* Steven Shavell, *Alternative Dispute Resolution: An Economic Analysis,* 24 J. LEGAL STUD. 1 (1995). However, we also recognize that arbitration is intended as a lower cost, efficient alternative to litigation. *See Poly–America,* 262 S.W.3d at 347 ("[A]rbitration is intended to provide a lower-cost, expedited means to resolve disputes...."). Where these justifications are vanquished by excessive arbitration costs that deter individuals from bringing valid claims, the unconscionability doctrine may protect unfairly disadvantaged consumers. We agree, as in *Green Tree,* that excessive costs imposed by an arbitration agreement render a contract unconscionable if the costs prevent a litigant from effectively vindicating his or her rights in the arbitral forum. *See Green Tree,* 531 U.S. at 90, 121 S.Ct. 513.

### B. Application of the Standard

The party opposing arbitration bears the burden to show that the costs of arbitration render it unconscionable. When "a party seeks to invalidate an arbitration agreement on the ground that arbitration would be prohibitively expensive, that party bears the burden of showing the likelihood of incurring such costs." *Green Tree,* 531 U.S. at 92, 121 S.Ct. 513. This Court likewise requires "*some evidence* that a complaining party will likely incur arbitration costs in such an amount as to deter enforcement of statutory rights in the arbitral forum." *Poly–America,* 262 S.W.3d at 356; *accord In re U.S. Home Corp.,* 236 S.W.3d 761, 764 (Tex.2007); *FirstMerit Bank,* 52 S.W.3d at 756–57.

 **[12]**    The Court in *Green Tree* did not explain how detailed the showing of prohibitive expense need be to invalidate an arbitration agreement. *Green Tree,* 531 U.S. at 92, 121 S.Ct. 513 ("How detailed the showing of prohibitive expense must be before the party seeking arbitration must come forward with contrary evidence is a matter we need not discuss...."). However, a number of federal courts of appeals, relying on *Green Tree,* have applied a case-by-case analysis of the effect the arbitration clause has on the particular plaintiff's ability to effectively vindicate his rights.[4] The Fourth Circuit's approach in *Bradford v. Rockwell Semiconductor Systems, Inc.* is particularly instructive. 238 F.3d 549 (4th Cir.2001).

The court noted the proper analysis "evaluates whether the arbitral forum in a particular case is an adequate and accessible substitute to litigation." *Id.* According to the court, that inquiry requires "a case-by-case analysis that focuses, among other things, upon the claimant's ability to pay the arbitration fees and costs, the expected cost differential between arbitration and litigation in court, and whether that cost differential is so substantial as to deter the bringing of claims." *Id.* (quotations omitted). The key factor is not *where* the cost to pursue the claim goes, but *what* the total cost to the claimant to pursue the claim is. The **\*894** court "fail[ed] to see how a claimant could be deterred from pursuing his statutory rights in arbitration simply by the fact that his fees would be paid to the arbitrator where the overall cost of arbitration is otherwise equal to or less than the cost of litigation in court." *Id.*

Likewise, in *Honrubia Properties, Ltd. v. Gilliland,* the Corpus Christi–Edinburg Court of Appeals essentially accepted *Bradford*'s conceptual framework. Nos. 13–07–210–CV, 13–07–249–CV, 2007 WL 2949567 at *6 (Tex.App.-Corpus Christi–Edinburg Oct. 11 2007, no pet.) (mem.op.). It considered the party's ability to pay the arbitration fee, the actual amount of the fee in relation to the amount of the underlying claim, and the cost differential between arbitration and litigation in court. *Id.* (citations omitted). Applying the standard, the court held the arbitration agreement was not substantively unconscionable where evidence showed the arbitration would cost approximately $15,000 to $20,283, plus expenses and other possible fees; the claimant was seeking more than $4,000,000 in compensatory and punitive damages; and arbitration costs would range from 11 percent to 15 percent of the claimant's gross income. *Id.* at *7. The claimant failed to submit any evidence pertaining to the expected cost differential between arbitration and litigation. *Id.*

In applying the unconscionability standard, the crucial inquiry is whether the arbitral forum in a particular case is an adequate and accessible substitute to litigation, a forum where the litigant can effectively vindicate his or her rights. With this in mind, we agree that the approach taken by the Fourth Circuit in *Bradford* effectively pursues this inquiry. We note all of the analyses previously discussed correctly assume that litigation allows claimants to effectively vindicate their rights, despite the expense. The desire to avoid steep litigation expense—including the costs of longer proceedings, more complicated appeals on the merits, discovery, investigations, fees, and expert witnesses—is the purpose of arbitration

in the first place. *See Jack B. Anglin Co.,* 842 S.W.2d at 272–73 ("[T]he purpose of [arbitration is] providing a rapid, inexpensive alternative to traditional litigation...."). In the absence of unusual animus between the parties or external motives, plaintiffs continue to pursue claims when the expected benefits of the lawsuit outweigh the total cost of bringing it. If the total cost of arbitration is comparable to the total cost of litigation, the arbitral forum is equally accessible. [5] Thus, a comparison of the total costs of the two forums is the most important factor in determining **\*895** whether the arbitral forum is an adequate and accessible substitute to litigation. Other factors include the actual cost of arbitration compared to the total amount of damages the claimant is seeking and the claimant's overall ability to pay the arbitration fees and costs. These factors may also show arbitration to be an inadequate and inaccessible forum for the particular claimants to vindicate their rights. However, these considerations are less relevant if litigation costs more than arbitration.

### C. Sufficiency of the Evidence

 **[13]**  *Green Tree* creates a burden-shifting test in which the "party seek[ing] to invalidate an arbitration agreement on the ground that arbitration would be prohibitively expensive ... bears the burden of showing the likelihood of incurring such costs." *Green Tree,* 531 U.S. at 92, 121 S.Ct. 513. Once met, the burden shifts to "the party seeking arbitration [who] must come forward with contrary evidence." *Id.*; *see also Poly–America,* 262 S.W.3d at 348 ("The burden of proving such a ground—such as fraud, unconscionability or voidness under public policy—falls on the party opposing the contract."); *FirstMerit Bank,* 52 S.W.3d at 756 ("Again, since the law favors arbitration, the burden of proving a defense to arbitration is on the party opposing arbitration.").

 **[14]**  Evidence of the "risk" of possible costs of arbitration is insufficient evidence of the prohibitive cost of the arbitration forum. *Green Tree,* 531 U.S. at 91, 121 S.Ct. 513 ("The 'risk' that [the plaintiff] will be saddled with prohibitive costs is too speculative to justify the invalidation of an arbitration agreement."). Rather, "both the United States Supreme Court and this Court require specific evidence that a party will actually be charged excessive arbitration fees." *U.S. Home Corp.,* 236 S.W.3d at 764; *see also FirstMerit Bank,* 52 S.W.3d at 757 ("Because the record contains no specific evidence that the [plaintiffs] will actually be charged excessive arbitration fees, we conclude that there is legally

insufficient evidence that the plaintiffs would be denied access to arbitration based on excessive costs."). The party opposing arbitration must show the likelihood of incurring such costs in her particular case.

[15] Thus, for evidence to be sufficient, it must show that the plaintiffs are likely to be charged excessive arbitration fees. While we do not mandate that claimants actually incur the cost of arbitration before they can show its excessiveness, parties must at least provide evidence of the likely cost of their particular arbitration, through invoices, expert testimony, reliable cost estimates, or other comparable evidence. *See Poly–America,* 262 S.W.3d at 354–55 (concluding that the plaintiff's "own affidavit and that of an expert witness providing detailed estimates of the likely cost of arbitration in [the plaintiff's] case" constituted sufficient evidence); *Olshan Found. Repair Co. v. Ayala,* 180 S.W.3d 212, 215–16 (Tex.App.-San Antonio 2005, pet. denied) (holding invoice for party's share of arbitration expenses sufficient). Evidence that merely speculates about the risk of possible cost is insufficient.

### D. Application to the Facts

[16] In applying this analysis to the facts at hand, we begin with the agreement itself, which states, "any matter arising out of this agreement shall be resolved by mandatory and binding arbitration administered by the American Arbitration Association ... in accordance with this arbitration agreement and the commercial arbitration rules of the AAA." According to the commercial arbitration rules, the AAA:

> **\*896** applies the *Supplementary Procedures for Consumer–Related Disputes* to arbitration clauses in agreements between individual consumers and businesses where the business has a standardized, systematic application of arbitration clauses with customers and where the terms and conditions of the purchase of standardized, consumable goods or services are nonnegotiable or primarily non-negotiable in most or all of its terms, conditions, features, or choices.

AAA Commercial Arbitration Rule R–1 (2007, 2009). The *Supplementary Procedures for Consumer–Related Disputes* have a separate fee schedule for consumer arbitration:

**Administrative Fees**

Administrative fees are based on the size of the claim and counterclaim in a dispute. They are based only on the actual damages and not on any additional damages, such as attorneys' fees or punitive damages. Portions of these fees are refundable pursuant to the Commercial Fee Schedule.

**Arbitrator Fees**

For cases in which no claim exceeds $75,000, arbitrators are paid based on the type of proceeding that is used. The parties make deposits as set forth below. Any unused deposits are returned at the end of the case.

Desk Arbitration or Telephone Hearing $250 for service on the case

In Person Hearing $750 per day of hearing

For cases in which a claim or counterclaim exceeds $75,000, arbitrators are compensated at the rates set forth on their panel biographies.

**Fees and Deposits to be Paid by the Consumer:**

If the consumer's claim or counterclaim does not exceed $10,000, then the consumer is responsible for one-half the arbitrator's fees up to a maximum of $125. This deposit is used to pay the arbitrator. It is refunded if not used.

If the consumer's claim or counterclaim is greater than $10,000, but does not exceed $75,000, then the consumer is responsible for one-half the arbitrator's fees up to a maximum of $375. This deposit is used to pay the arbitrator. It is refunded if not used.

If the consumer's claim or counterclaim exceeds $75,000, or if the consumer's claim or counterclaim is non-monetary, then the consumer must pay an Administrative Fee in accordance with the Commercial Fee Schedule.[6] A portion of this fee is refundable pursuant to the Commercial Fee Schedule. The consumer must also deposit one-half of the arbitrator's compensation. This deposit is used to pay the arbitrator. This deposit is refunded if not used. The arbitrator's compensation rate is set forth on the panel

biography provided to the parties when the arbitrator is appointed.

AAA *Supplementary Procedures for Consumer–Related Disputes,* Administrative Fees, Arbitrator Fees, Fees and Deposits to be Paid by the Consumer (2005, 2010). Thus, for a consumer claim up to $75,000, the most a consumer will have to pay under these rules is $375 for the arbitrator. **\*897** *Id.*; *see also Green Tree,* 531 U.S. at 95, 121 S.Ct. 513 (Ginsburg, J., dissenting) (describing the AAA's Consumer Arbitration Rules as a model "for fair cost and fee allocation").

The homeowners bear the burden to show the likelihood of incurring excessive costs, yet no homeowners provided any concrete idea of the amount of their claims. It is impossible to know how much they will be charged under the AAA rules, even if the fees charged by AAA were excessive. Instead, the homeowners provided two invoices from the AAA for arbitration in, as the homeowners allege, "similar cases" to show the likelihood of excessive litigation costs. The first was a copy of the invoice from the AAA to the Ayalas who were plaintiffs in a different lawsuit against Olshan. It shows that the Ayalas' claim against Olshan was for $200,000, and that the Ayalas' were charged $35,900 to arbitrate that claim. The second was an invoice from the AAA to an anonymous claimant for the arbitration of a construction dispute, a similar type of case using only one arbitrator. [7] The amount of this claim is not stated on this invoice, but based on the administrative fee and case service fee charged by the AAA, we can deduce that it was between $75,000 and $150,000. The anonymous claimants were charged $11,406 to arbitrate.

Merely showing that other claimants have incurred arbitration costs of some amount falls well short of specific evidence that these particular parties will be charged excessive fees. There is no evidence that the homeowners' claims are similar in amount or difficulty as the claims of the Ayalas or the anonymous claimant. In fact, the Ayalas' invoice shows that their claim was for $200,000, while none of the homeowners' claims in this case exceeded $20,000. Moreover, there is no evidence that the homeowners have made any effort to reduce the likely charges through requests for fee waivers, pro bono arbitrators, or even simply requesting a one arbitrator panel. As the court in *In re MHI Partnership, Ltd.* aptly noted, "Substantive unconscionability threatens to become the exception that swallows the rule if all that must be done to avoid arbitration is to assume the most expensive possible scenario." No. 14–07–00851–CV, 2008 WL 2262157 at

\*7 (Tex.App.-Houston [14th Dist.] May 29, 2008, no pet.) (mem.op.).

Even if we took these invoices as evidence of the likely arbitration charges to the homeowners, they have provided no comparison of these charges to the expected cost of litigation, the amount of their claim, or their ability to pay these costs. *See Green Tree,* 531 U.S. at 90 n. 6, 121 S.Ct. 513 (concluding that a party's unsupported statement that she did not have the resources to pay the high costs of arbitration was insufficient); *Bradford,* 238 F.3d at 556 n. 5 ("The cost of arbitration, as far as its deterrent effect, cannot be measured in a vacuum or premised upon a claimant's abstract contention that arbitration costs are 'too high.' "). The record contains no specific evidence that the homeowners will actually be charged excessive arbitration fees, and thus there is no legally sufficient evidence that such fees prevent the homeowners from effectively pursuing their claim in the arbitral forum.

### E. Unconscionability in Light of the Texas Home Solicitation Act

[17]   Finally, the homeowners argue that the arbitration is unconscionable because the parties will expend time, energy, **\*898** and money needlessly going to arbitration when the arbitrator will find the contract—including the arbitration clause—void, sending the case back to court. [8] They assert that their contract with Olshan violated the Texas Home Solicitation Act (THSA), which would render the agreements, including the arbitration clauses, void. The alleged basis for violation of the THSA is Olshan's failure to include in the agreements certain language regarding cancellation in at least 10–point boldfaced type, where the transactions occurred by personal solicitation outside Olshan's place of business. TEX. BUS. & COM.CODE §§ 601.002(a), .052, .053, .201. Further, the homeowners contend that there is no dispute over whether the contract violates the THSA, and the arbitrator will thus certainly find the contract void. [9]

It is tempting to avoid the unnecessary costs that would accompany an allegedly unnecessary arbitration. But to do so requires the trial court to make a determination of issues relating to the contract generally, even if it seems clear that one party or the other will prevail. As the U.S. Supreme Court stated in *Prima Paint Corp. v. Flood & Conklin Manufacturing Co.,* when the parties have contracted for arbitration of their disputes, a trial court "may consider only issues relating to the making and performance of the

agreement to arbitrate." [388 U.S. 395, 404, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967)](); *see also Rent–A–Ctr., W., Inc. v. Jackson,* —— U.S. ——, 130 S.Ct. 2772, 2778, 177 L.Ed.2d 403 (2010); *Buckeye Check Cashing, Inc. v. Cardegna,* 546 U.S. 440, 445–46, 126 S.Ct. 1204, 163 L.Ed.2d 1038 (2006) ( "[U]nless the challenge is to the arbitration clause itself, the issue of the contract's validity is considered by the arbitrator in the first instance."). There is no way to fashion a standard to determine whether arbitration is unnecessary without giving the trial court some discretion over issues relating to the making and performance of the contract generally—exactly what *Prima Paint,* and later *Buckeye* and *Rent–A–Center,* sought to avoid. Allowing courts to make this determination under an unconscionability analysis would provide an end run around the rule. While in some cases this "rule permits a court to enforce an arbitration agreement in a contract that the arbitrator later finds to be void[,] ... it is equally true that [the opposite] approach permits a court to deny effect to an arbitration provision in a contract that the court later finds to be perfectly enforceable." *Buckeye,* 546 U.S. at 448–49, 126 S.Ct. 1204. This conundrum is solved with a rule that allocates such decisions to arbitration, which is consistent with the liberal policy favoring arbitration in the FAA, U.S. Supreme Court decisions, and decisions of this Court. The homeowners failed to provide legally sufficient evidence of the prohibitive cost of arbitration to prove unconscionability, and this failure cannot be remedied by allowing the trial court to determine if it believes the contract itself is void.

### V. Conclusion

This Court endeavors to interpret agreements, including those to arbitrate, as they **\*899** are written. When an agreement specifically states that it is to be governed by the Texas General Arbitration Act, we hold that it will be governed by the Act, which may mean that disputes arising from its terms will be excluded from arbitration. Thus, the TAA applies to the arbitration agreement between the Waggoners (No. 09–0474) and Olshan and renders it unenforceable. *See* TEX. CIV. PRAC. & REM.CODE § 171.002(a)(2). The trial court did not err by denying Olshan's plea in abatement, and the court of appeals denied relief. We also deny mandamus relief in the Waggoner case.

However, where an arbitration agreement states that it is to be governed by the law of this state, that law includes the Federal Arbitration Act. Because it is proper to apply the FAA to the Kilpatrick (No. 09–0432), Tisdale (No. 09–0433), and

Tingdale (No. 09–0703) agreements that use such language, the FAA preempts the provisions of section 171.002(a)(2) that would otherwise render those agreements unenforceable. And the parties opposing arbitration in those three cases did not submit legally sufficient evidence that arbitration of their claims would be unconscionable. Therefore, the trial court erred by denying Olshan's pleas in abatement, and we conditionally grant mandamus relief in the Kilpatrick, Tisdale, and Tingdale cases and remand those cases to the trial court for further proceedings consistent with this opinion. We are confident that the trial courts will comply, and the writs will issue only if they fail to do so.

Justice HECHT filed a concurring opinion, in which Justice MEDINA joined.

Justice HECHT, concurring, in which Justice MEDINA joined.

I join fully in the Court's opinion and write only with this further observation.

The homeowners contend that the contracts at issue violated the Texas Home Solicitation Act [1] because they did not contain the requisite notice of their right to cancellation and are therefore void by express provision of the Act. [2] In response, Olshan tells us in its briefing only that it "will present its defenses ... in the arbitral forum". Asked at oral argument what defenses it has to the homeowners' contention that their contracts, including the arbitration provisions, are void and unenforceable, counsel answered that "there might be an estoppel defense" because the homeowners did not challenge the validity of the contracts until work was completed. Counsel also argued that even if the contracts are void, the arbitration provision is severable and valid, and the homeowners **\*900** must still submit their complaints to arbitration. Olshan has cited no authority for either of these arguments.

The homeowners acknowledge that, as the Court notes, the validity of the contracts is a matter for the arbitrator to decide. [3] But the homeowners argue that the invalidity of the contracts is a foregone conclusion and that "the entire process ... will be a needless waste of time, energy, and money". [4] I agree with the Court that even if this is true, the contracts are not unconscionable. But being led on a wild goose chase, [5] if that is all arbitration comes to, is not without remedy.

If, as the homeowners predict, the arbitrator concludes that the contracts are indeed void, Olshan and its counsel are subject to being sanctioned by the trial court for filing a groundless motion to compel arbitration.[6] The trial court certainly has the authority to sanction frivolous resistance to arbitration, and sanctions are not a one-way ratchet. The court's authority to sanction a frivolous motion to compel is not displaced by the arbitrator's authority to determine the predicate issue—that the contracts are unenforceable. If the dispute returns to the trial court, the homeowners may seek full redress for Olshan's lark.

**Parallel Citations**

54 Tex. Sup. Ct. J. 300

Footnotes

1    The Tingdale, Kilpatrick and Tisdale trial courts issued memorandum opinions, which are addressed by the courts of appeals, respectively, in No. 10–09–00119–CV, 2009 WL 1886648 (Tex.App.-Waco July 1, 2009, orig. proceeding); Nos. 2–08–336–CV, 2–08–342–CV, 2008 WL 4661815 (Tex.App.-Fort Worth Oct. 2, 2008, orig. proceeding).

2    The Legislature recently amended the Texas Civil Practice and Remedies Code to allow an interlocutory appeal "to the court of appeals from the judgment or interlocutory order of a district court ... under the same circumstance that an appeal from a federal district court's order or decision would be permitted by 9 U.S.C. Section 16." TEX. CIV. PRAC. & REM CODE § 51.016. However, this act is not applicable to appeals of an interlocutory order in an action pending as of September 1, 2009. Act of June 19, 2009, 81st Leg., R.S., ch. 820, § 2, 2009 Tex. Gen. Laws 2061. Because all four actions in this consolidated opinion were pending as of September 1, 2009, section 51.016 does not allow an interlocutory appeal of these causes.

3    We do not believe the choice-of-law provision to be ambiguous.

4    See Musnick v. King Motor Co. of Fort Lauderdale, 325 F.3d 1255, 1259 (11th Cir.2003) ("Since Green Tree, all but one of the other Circuits that have reconsidered this issue have applied a similar case-by-case approach."); see also Blair v. Scott Specialty Gases, 283 F.3d 595, 609–10 (3d Cir.2002); Bradford v. Rockwell Semiconductor Sys., Inc., 238 F.3d 549, 556 (4th Cir.2001); LaPrade v. Kidder, Peabody & Co., Inc., 246 F.3d 702, 708 (D.C.Cir.2001). But see Circuit City Stores, Inc. v. Adams, 279 F.3d 889, 895 (9th Cir.2002) (holding that plaintiff employees should not "have to pay either unreasonable costs or any arbitrators' fees or expenses as a condition of access to the arbitration forum").

5    "Total cost" refers to the total cost of pursuing a claim in either forum, notwithstanding who will be financing the claim. Some courts have noted the argument that attorneys will be unwilling to represent plaintiffs on a contingency fee basis in the arbitral forum and that contingent fee arrangements make litigation less expensive for plaintiffs than arbitration. See Morrison v. Circuit City Stores, Inc., 317 F.3d 646, 664 (6th Cir.2003); Poly–America, 262 S.W.3d at 355. But other commentators argue that there is no reason why plaintiffs cannot secure the same financing when arbitration is mandated if both the value of their claim and the cost to pursue it remain constant. See Christopher R. Drahozal, Arbitration Costs and Contingent Fee Contracts, 59 VAND. L.REV. . 729, 768 (2006) ("On the face of it, there is no reason to expect contingent fee contracts to treat arbitration costs differently than they treat other litigation expenses."). We recognize arbitration is not always a lower-cost, efficient litigation alternative. Forcing consumer plaintiffs into an arbitral forum may affect their ability to pursue remedies when small claims are at issue. However, this does not excuse parties opposing arbitration from providing sufficient evidence to demonstrate that excessive costs make arbitration unconscionable in their particular case.

6    "The filing fee shall be advanced by the party or parties making a claim or counterclaim, subject to final apportionment by the arbitrator in the award. The AAA may, in the event of extreme hardship on the part of any party, defer or reduce the administrative fees." AAA Commercial Arbitration Rule R–49 (2007, 2009). In 2008, when Olshan sought to compel arbitration, the total initial filing fee and case service fee ranges from $2,550 for claims between $75,000–$150,000 to $8,500 for claims above $500,000. AAA Commercial Arbitration Administrative Fees, Fees (2007).

7    It is unclear whether this means that the Ayalas requested three arbitrators. That the cost of the arbitrator to the Ayalas per day of hearing was $3,350, compared to $1,250 per day in the anonymous case, leads us to believe they did.

8    The homeowners concede that the arbitrator and not a court decides a contractual defense to the contract as a whole as opposed to a contractual defense to just the arbitration provision. See Buckeye Check Cashing, Inc. v. Cardegna, 546 U.S. 440, 445–46, 126 S.Ct. 1204, 163 L.Ed.2d 1038 (2006); In re Labatt Food Serv., L.P., 279 S.W.3d 640, 647–49 (Tex.2009).

9    Olshan states in its brief and stated at argument to the contrary that it will present certain defenses to this claim. It is neither our province nor the province of the trial court to determine the merits of these defenses when the parties have contracted to arbitrate such disputes.

1    Act of May 18, 1973, 63rd Leg., R.S., ch. 246, § 1, 1973 Tex. Gen. Laws 574, codified as TEX.REV.CIV. STAT. ANN.. art. 5069–13.01, amended by Act of April 4, 1975, 64th Leg., R.S., ch. 59, § 1, 1975 Tex. Gen. Laws 124, and by Act of May 27, 1995, 74th Leg., R.S., ch. 926, § 1, 1995 Tex. Gen. Laws 4649, recodified by Act of May 24, 1997, 75th Leg., R.S., ch. 1008, § 3, 1997 Tex. Gen. Laws 3091, 3583, as TEX. BUS. & COM.CODE §§ 39.001–.009, and by Act of May 15, 2007, 80th Leg., R.S., ch. 885, § 2.01, 2007 Tex. Gen. Laws 1905, 2026, as TEX. BUS. & COM.CODE §§ 601.001–.205.

2    Section 601.201, TEX. BUS. & COM.CODE, provides that "[a] sale or contract entered into under a consumer transaction in violation of ... Subchapter D is void." Section 601.152, in subchapter D, states: "A merchant may not: (1) at the time the consumer signs the contract pertaining to a consumer transaction or purchases the goods, services, or real property, fail to inform the consumer orally of the right to cancel the transaction; or (2) misrepresent in any manner the consumer's right to cancel." The prior versions of the Act contained substantively identical provisions. Former TEX. BUS. & COM.CODE. § 39.008(a)(3)-(4) & (b); TEX.REV.CIV. STAT. ANN. art. 5069–13.03(a)(3)–(4) & (b).

3    *Ante* at 898 (citing *Prima Paint Corp. v. Flood & Conklin Mfg. Co.,* 388 U.S. 395, 404, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967)).

4    *E.g.*, Brief of Real Parties in Interest Kenneth and Vickie Kilpatrick at 21.

5    *See* WILLIAM SHAKESPEARE, ROMEO AND JULIET act 2, sc. 4:
       "Romeo: Switch and spurs, switch and spurs; or I'll cry a match.
       "Mercutio: Nay, if thy wits run the wild-goose chase, I have done; for thou hast more of the wild-goose in one of thy wits than, I am sure, I have in my whole five."

6    TEX.R. CIV. P. 14; TEX. CIV. PRAC. & REM.CODE §§ 9.001–.014, 10.001–.006.

---

**End of Document**          © 2014 Thomson Reuters. No claim to original U.S. Government Works.

195 S.W.3d 672
Supreme Court of Texas.

In re PALM HARBOR HOMES, INC.,
and Palm Harbor Homes I, L.P. d/
b/a Palm Harbor Village, Relator.

No. 04–0490.  |  Argued March
23, 2005.  |  Decided June 9, 2006.

**Synopsis**
**Background:** Manufactured home buyers sued manufacturer and seller for breach of contract, breach of warranty, and statutory violations of the Residential Construction Liability Act. The 239th District Court, Brazoria County, J. Ray Gayle, III, and Sherry Sebesta, JJ., denied defendants' motions to compel arbitration. Defendants petitioned for a writ of mandamus. The Court of Appeals, Frank G. Evans, J., 129 S.W.3d 636, denied petition. Defendants filed another petition for writ of mandamus.

**Holdings:** The Supreme Court, Johnson, J., held that:

[1] consideration provided by seller supported the agreement;

[2] manufacturer was not required to give consideration as a third-party beneficiary;

[3] the agreement was not illusory as to the manufacturer, even though it had right to opt out of arbitration;

[4] the agreement was not substantively unconscionable; and

[5] it was not procedurally unconscionable.

Writ conditionally granted.

O'Neill, J., concurred and filed opinion.

West Headnotes (20)

**[1]    Alternative Dispute Resolution**


of assent

**Validity**

Manufactured home buyers were bound by arbitration agreement with seller in the absence of an assertion of fraud, deceit, or misrepresentation involved in their signing of the agreement.

3 Cases that cite this headnote

**[2]    Alternative Dispute Resolution**



**Presumptions**

Failure of manufactured home seller and manufacturer to present transcripts of hearings did not create a presumption that matters occurring during the hearings would support an implied finding that an arbitration agreement did not exist; the buyers conceded that the transcripts would not show the introduction of evidence, and buyers did not dispute that they had signed arbitration agreement.

1 Cases that cite this headnote

**[3]    Alternative Dispute Resolution**


signature, and acknowledgment

**Writing,**

The existence of an arbitration agreement among manufactured home buyers, seller, and manufacturer was established in proceeding to compel arbitration; the seller and manufacturer presented a signed arbitration agreement along with other documents signed by buyers, and they presented no evidence that they did not sign the agreement.

2 Cases that cite this headnote

**[4]    Alternative Dispute Resolution**


law governs

**What**

In determining validity of agreements to arbitrate which are subject to the Federal Arbitration Act (FAA), courts generally apply state-law

principles governing the formation of contracts. 9 U.S.C.A. § 1 et seq.

35 Cases that cite this headnote

**[5]    Alternative Dispute Resolution**



Arbitration agreements, like other contracts, must be supported by consideration.

15 Cases that cite this headnote

**[6]    Alternative Dispute Resolution**



Consideration may take the form of bilateral promises to arbitrate.

4 Cases that cite this headnote

**[7]    Alternative Dispute Resolution**



When an arbitration clause is part of a larger, underlying contract, the remainder of the contract may suffice as consideration for the arbitration clause.

10 Cases that cite this headnote

**[8]    Alternative Dispute Resolution**



Consideration for manufactured home buyers' agreement to arbitrate disputes with seller was provided by the underlying sales contract and the mutual promises to arbitrate disputes involving the manufactured home or its sale; even though manufacturer had right to opt out of arbitration and even if the agreement were illusory as to manufacturer, consideration was not illusory as between buyers and seller.

19 Cases that cite this headnote

**[9]    Contracts**



Agreement

for Benefit of Third Person

A third-party beneficiary may enforce a contract to which it is not a party if the parties to the contract intended to secure a benefit to that third party and entered into the contract directly for the Consideration third party's benefit.

15 Cases that cite this headnote

**[10]    Alternative Dispute Resolution**



Consideration

Consideration Manufacturer was not required to give consideration for agreement which created its status as third-party beneficiary of contract for sale of manufactured home, and, thus, buyers' obligation to arbitrate with the manufacturer did not fail for lack of consideration, even though manufacturer had right to opt out of arbitration; it was irrelevant that the agreement did not bind the manufacturer to arbitrate since the agreement Consideration was supported by consideration in the form of both the underlying contract and promises of the retailer.

16 Cases that cite this headnote

**[11]    Alternative Dispute Resolution**



Consideration

Manufactured home buyers' agreement to Consideration arbitrate disputes with manufacturer was not illusory as to the manufacturer, even though it had right to opt out of arbitration; consideration supported buyers' contract with seller, and the manufacturer was third-party beneficiary.

13 Cases that cite this headnote

**[12]    Alternative Dispute Resolution**



Unconscionabi

"Substantive unconscionability " refers to the fairness of the arbitration provision itself, whereas "procedural unconscionability" refers to the circumstances surrounding adoption of the arbitration provision.

28 Cases that cite this headnote

**[13]** **Contracts**



unconscionability

The test for "substantive unconscionability" is whether, given the parties' general commercial background and the commercial needs of the particular trade or case, the clause involved is so one-sided that it is unconscionable under the circumstances existing when the parties made the contract.

18 Cases that cite this headnote

**[14]** **Alternative Dispute Resolution**



There is nothing inherently unconscionable about arbitration agreements.

11 Cases that cite this headnote

**[15]** **Contracts**



Contracts

**Contracts**



for Benefit of Third Person

There is nothing unconscionable about contracting to benefit a third party.

10 Cases that cite this headnote

**[16]** **Alternative Dispute Resolution**



Manufacturer's limited right as a third-party beneficiary to refuse to arbitrate dispute with manufactured home buyer did not render the arbitration agreement so one-sided as to be substantively unconscionable.

20 Cases that cite this headnote

**[17]** **Alternative Dispute Resolution**



Unconscionabi

Substantive

The fact that the buyers would not have been able to buy the manufactured home unless they signed the arbitration agreement did not, in and of itself, make the agreement substantively unconscionable.

4 Cases that cite this headnote

**[18]** **Contracts**



Adhesion

contracts; standardized contracts

**Contracts**



Unconscionabl

Contracts

Unconscionability

Adhesion contracts are not per se unconscionable or void.

2 Cases that cite this headnote

**[19]** **Alternative Dispute Resolution**



Unconscionabi

Unconscionable

Agreement

Manufactured home buyers' arbitration agreement was not procedurally unconscionable as to seller or manufacturer, even though it had right to opt out of arbitration and buyers claimed that they would not have signed the agreement if arbitration had been explained to them; the agreement was clearly labeled as arbitration agreement, it was relatively short and specifically provided that it did not constitute a waiver of any substantive rights or remedies except as to the forum for resolving disputes, it highlighted statement on jury trial waiver, and neither unfair surprise nor oppression occurred.

Unconscionability

20 Cases that cite this headnote

**[20]** **Contracts**



Unconscionabl

Contracts

Unconscionability principles are applied to prevent unfair surprise or oppression.

3 Cases that cite this headnote

**Attorneys and Law Firms**

**\*674** Craig Madison Patrick, Michael J. Craddock, Eric L. Lindstrom, Craddock Reneker & Davis, L.L.P., Dallas, for Relator.

Douglas Vance Colvin, Law Offices of Wes Griggs, West Columbia, for Real Party In Interest.

**Opinion**

Justice JOHNSON delivered the opinion of the Court, in which Chief Justice JEFFERSON, Justice HECHT, Justice WAINWRIGHT, Justice BRISTER, Justice MEDINA, Justice GREEN, and Justice WILLETT joined.

This original proceeding presents the issue of whether the purchasers of a manufactured home must arbitrate their claims against both the retailer and manufacturer of the home pursuant to a written arbitration agreement between the purchasers and the retailer. The agreement specified that it inured to the benefit of the manufacturer and gave the manufacturer a twenty-day period during which it could opt out of arbitration. We conclude that the manufacturer's opt-out right did not render the arbitration agreement unenforceable and that the purchasers must arbitrate their claims against both parties.

### I. Background

Raymond and Crystal Ripple contracted with Palm Harbor Village (the retailer) to purchase a manufactured home which was to be, and subsequently was, manufactured by Palm Harbor Homes, Inc. During the process of contracting for and purchasing the home, the Ripples and the retailer entered into several separate agreements. Two of the agreements were arbitration agreements. The first was dated October 1, 1998, and the second was dated December 17, 1998. The Ripples urge that the second agreement is applicable to the issues in this appeal. Relators do not contend otherwise. We will assume, without deciding, that the second agreement governs the issues presented and reference it as "the agreement." [1]

**\*675** The agreement provided that all disputes between the Ripples and the retailer arising out of or relating in any way to the sale, purchase, or occupancy of the home would be resolved through binding arbitration. The agreement is one page long; is labeled "ARBITRATION AGREEMENT" at the top of the page in large bold-face capital letters; sets out in the first paragraph that it inures to the benefit of the manufacturer as well as binds the purchasers and retailer; and provides that it does not constitute a waiver of any substantive rights or remedies available under applicable law, but is an election to resolve claims, disputes and controversies by arbitration rather than the judicial process. The next-to-the-last sentence provides, in all capital letters, that "THE PARTIES KNOWINGLY WAIVE ANY RIGHT TO A JURY TRIAL." The agreement also provides that the manufacturer "in its sole discretion, may opt out of, and elect not to be bound by, the arbitration by giving written notice of the election to all parties within twenty (20) days after receipt of" notice that another party intended to arbitrate a dispute.

After the manufactured home was purchased by the Ripples, they began experiencing problems with it and lodged a series of complaints. They eventually sued both the retailer and the manufacturer, alleging breach of contract, breach of warranty, and statutory liability under the Residential Construction Liability Act.

The retailer and manufacturer moved to compel arbitration under the Federal Arbitration Act (FAA). *See* 9 U.S.C. §§ 1–16. The trial court denied the motion as to both. A divided court of appeals denied mandamus relief. 129 S.W.3d 636, 646.

Both the retailer and manufacturer seek a writ of mandamus directing the trial court to order the Ripples to arbitrate. The Ripples do not dispute applicability of the FAA, but oppose arbitrating any claims because (1) relators have not carried their burden to establish a valid agreement to arbitrate; (2) the signed arbitration agreement lacks consideration; (3) the agreement is substantively and procedurally unconscionable; and (4) the manufacturer was not a signatory to the agreement and has not shown itself to be a third-party beneficiary entitled to enforce the agreement.

### II. Agreement to Arbitrate

The Ripples contend that the retailer and manufacturer have not met their burden to establish an agreement to arbitrate

because they have not presented complete records of the three hearings held by the trial court en route to its final order denying arbitration. They assert that absent such records, the trial court's ruling cannot be determined to have been an abuse of discretion. They do not contend, however, that any evidence contesting validity of the agreement was introduced at any of the three hearings.

Relators' original answer to the Ripples' suit included a plea in abatement seeking dismissal or abatement of the suit based on the arbitration agreement. The arbitration agreement, along with other documents signed by the Ripples, was attached to the pleading. The Ripples do not claim to have at any point disputed that they signed the arbitration agreement as part of the process by which they purchased their manufactured home. Their position as to the arbitration agreement is encapsulated **\*676** by their response to relators' second motion for reconsideration of the motion to compel arbitration and their affidavits attached to that response: (1) in the course of contracting for the purchase of the home they signed several documents, including two documents "purporting" to be arbitration agreements; (2) the documents were not explained to them; (3) they were told that the documents were necessary to complete the purchase; (4) they were unaware that they had signed arbitration agreements; (5) they never were in contact with the manufacturer during the purchase process; (6) the manufacturer did not sign the arbitration agreements; and (7) they were unaware of what arbitration entailed and did not voluntarily waive their right to a jury trial.

**[1]** The Ripples have not asserted that there was fraud, deceit, or misrepresentation involved in their signing of the agreement. Accordingly, they are bound by the agreement. See *In re McKinney,* 167 S.W.3d 833, 835 (Tex.2005) (per curiam) (holding that absent fraud, misrepresentation, or deceit, parties are bound by the terms of the contract signed, regardless of whether they read it).

**[2]** **[3]** Given the Ripples' concession at oral argument that records of the hearings in the trial court would not show that evidence was introduced, and their consistent position taken before the trial court as reflected by the record which is before us, the failure of relators to present transcripts of the hearings does not create a presumption that matters occurring during the hearings would support an implied finding that an arbitration agreement did not exist. See *Michiana Easy Livin' Country, Inc. v. Holten,* 168 S.W.3d 777, 781–84 (Tex.2005) (rejecting a claim that we must presume evidence that supported the trial court's order was presented at a

pretrial hearing when there was no indication evidence was presented at that hearing). Because the relators presented a signed arbitration agreement to the court along with other documents the Ripples signed, and the Ripples have presented no evidence that they did not sign the agreement, we conclude that, as a matter of law, the existence of an arbitration agreement among the parties was established.

### III. Consideration

**[4]** **[5]** **[6]** **[7]** Next, the Ripples claim the arbitration provision lacks consideration. In determining validity of agreements to arbitrate which are subject to the FAA, we generally apply state-law principles governing the formation of contracts. See *First Options of Chicago, Inc. v. Kaplan,* 514 U.S. 938, 944, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995). Arbitration agreements, like other contracts, must be supported by consideration. See *In re AdvancePCS Health L.P.,* 172 S.W.3d 603, 607 (Tex.2005) (per curiam); *In re Halliburton Co.,* 80 S.W.3d 566, 569–70 (Tex.2002). Such consideration may take the form of bilateral promises to arbitrate. See *In re AdvancePCS,* 172 S.W.3d at 607. Further, when an arbitration clause is part of a larger, underlying contract, the remainder of the contract may suffice as consideration for the arbitration clause. *Id.; see also In re FirstMerit Bank, N.A.,* 52 S.W.3d 749, 757 (Tex.2001).

### A. The Retailer

**[8]** The arbitration agreement was part of a larger contractual relationship between the Ripples and the retailer. The underlying contract between the Ripples and the retailer constituted valid consideration for the arbitration agreement as between them, as did their mutual promises to arbitrate disputes involving the manufactured home or its sale. See *In re AdvancePCS,* 172 S.W.3d at 607 (holding **\*677** there was a valid arbitration agreement, as the underlying contract provided adequate consideration). The agreement's provision extending to the manufacturer a right to opt out of arbitration, even if it were illusory because it did not bind the manufacturer to arbitrate, did not make either the consideration of the underlying contract or the promises to arbitrate any disagreements between themselves illusory as between the retailer and the Ripples. *Cf. Light v. Centel Cellular Co.,* 883 S.W.2d 642, 645 (Tex.1994) (noting that a promise is illusory if it fails to bind the promisor).

## B. The Manufacturer

[9] A third-party beneficiary may enforce a contract to which it is not a party if the parties to the contract intended to secure a benefit to that third party and entered into the contract directly for the third party's benefit. *See Stine v. Stewart,* 80 S.W.3d 586, 589 (Tex.2002); *see also MCI Telecomms. Corp. v. Tex. Utils. Elec. Co.,* 995 S.W.2d 647, 651 (Tex.1999). As previously noted, the arbitration agreement provided that it "inure[d] to the benefit of the manufacturer of the Home." By its own terms, the agreement was entered into, in part, directly for the manufacturer's benefit. Because the manufacturer is a third-party beneficiary of the underlying contract and not a first party to it, our analysis as to the Ripples' obligation to arbitrate with the manufacturer is different from our analysis as to the retailer.

[10] As a third-party beneficiary, the manufacturer was not a promisor and therefore was not required to give consideration for the agreement which created its third-party beneficiary status. *See Stine,* 80 S.W.3d at 589. For purposes of determining whether the arbitration agreement was supported by consideration under such circumstances, it is not relevant that the agreement did not bind the manufacturer to arbitrate, for as we have concluded, the agreement was supported by consideration in the form of both the underlying contract and promises of the retailer. It follows that the Ripples' obligation to arbitrate with the manufacturer did not fail for lack of consideration. *See id.*

We have recognized that an arbitration agreement may be illusory if a party can unilaterally avoid the agreement to arbitrate. *See J.M. Davidson, Inc. v. Webster,* 128 S.W.3d 223, 230 & n. 2 (Tex.2003). In *Davidson,* we remanded a case for the trial court to determine whether an ambiguous contract allowed an employer to modify or terminate an arbitration agreement at any time. *Id.* at 230–31. We noted that most courts which have considered the issue have held that if one party retains a unilateral, unrestricted right to terminate an arbitration agreement, the agreement is illusory. *Id.* at 230 & n. 2. Unlike the facts before us in this matter, however, *Davidson* addressed illusoriness in regard to promises between direct parties to an agreement. In this matter the manufacturer was a third-party beneficiary, not a direct party promisor.

[11] We hold that the agreement was not illusory as to the manufacturer.

## IV. Unconscionability

[12] The Ripples also challenge the agreement as being both substantively and procedurally unconscionable. Substantive unconscionability refers to the fairness of the arbitration provision itself, whereas procedural unconscionability refers to the circumstances surrounding adoption of the arbitration provision. *In re Halliburton,* 80 S.W.3d at 571. Such issues are properly considered by courts in determining the validity of an arbitration provision. *Id.* at 572.

## *678 A. Substantive Unconscionability

[13] The Ripples claim the arbitration agreement is substantively unconscionable because it binds them to arbitrate with the manufacturer but does not bind the manufacturer to arbitrate with them. The test for substantive unconscionability is whether, "given the parties' general commercial background and the commercial needs of the particular trade or case, the clause involved is so one-sided that it is unconscionable under the circumstances existing when the parties made the contract." *In re FirstMerit Bank,* 52 S.W.3d at 757.

Even though the Ripples have asserted claims in addition to breach of contract, their agreement to purchase the home and their use of the home underlie all their claims. We have recently held that under certain circumstances a party to an arbitration agreement may be compelled to arbitrate claims with a nonparty if the controversy arises from a contract containing an arbitration clause. *In re Vesta Ins. Group, Inc.,* 192 S.W.3d 759, 761 (Tex.2006) (per curiam); *see Grigson v. Creative Artists Agency, L.L.C.,* 210 F.3d 524, 527–28 (5th Cir.2000) (stating that equitable estoppel allows a nonsignatory to compel arbitration when a signatory must rely on the contract with the arbitration provision in asserting its claims or when the claims against the nonsignatory are interwoven with the claims against a signatory); *see also In re Weekley Homes, L.P.,* 180 S.W.3d 127, 130 (Tex.2005) (holding that equitable estoppel doctrine may in some instances require a nonparty to an arbitration agreement to arbitrate with a party); *In re Kellogg Brown & Root, Inc.,* 166 S.W.3d 732, 738–39 (Tex.2005) (same). Also, the manufacturer had a limited period in which to refuse arbitration. Such a circumstance does not create a different relationship than provisions usually found in third-

party beneficiary situations, because third-party beneficiaries generally have the right to disclaim benefits proffered by a contract. *See Rau v. Modern Sales & Serv., Inc.,* 414 S.W.2d 203, 206 (Tex.Civ.App.—San Antonio 1967, writ ref'd n.r.e.); RESTATEMENT (SECOND) OF CONTRACTS § 306 (1981).

 **[14]**   **[15]**   **[16]**   There is nothing inherently unconscionable about arbitration agreements, *In re AdvancePCS,* 172 S.W.3d at 608, and there is nothing unconscionable about contracting to benefit a third party. *See Stine,* 80 S.W.3d at 589–90. The Ripples have not met their burden to prove the agreement was so one-sided as to be unconscionable when its provisions effectively incorporate established principles of contract law. Considered in light of the remaining provisions of the agreement, the manufacturer's limited right as a third-party beneficiary to refuse to arbitrate does not render the arbitration agreement so one-sided as to be substantively unconscionable.

 **[17]**   The Ripples also contend that the agreement is substantively unconscionable because it is a contract of adhesion: they were required to execute the document in order to purchase the home. But, the fact that the Ripples would not have been able to buy the manufactured home unless they signed the arbitration agreement does not, in and of itself, make the agreement substantively unconscionable. *See In re AdvancePCS,* 172 S.W.3d at 608.

 **[18]**   Furthermore, assuming *arguendo* that the agreement constituted a contract of adhesion, we have held that adhesion contracts are not *per se* unconscionable or void. *Id.* at 608; *see also EZ Pawn Corp. v. Mancias,* 934 S.W.2d 87, 90–91 (Tex.1996) (per curiam).

### B. Procedural Unconscionability

 **[19]**   Finally, the Ripples urge that the agreement is procedurally unconscionable. **\*679** They point to their affidavits as establishing that they did not voluntarily waive their rights to a jury trial and that they are unsophisticated persons who, if the concept of arbitration had been explained to them, would not have signed the arbitration agreements. Such assertions, however, presuming the trial court found them to be true, fail to establish procedural unconscionability as to adoption of the arbitration agreement. *See In re McKinney,* 167 S.W.3d at 835 (holding that absent fraud, misrepresentation, or deceit, parties are bound by terms of

the contract they signed, regardless of whether they read it or thought it had different terms); *EZ Pawn,* 934 S.W.2d at 90 (holding that a party who has the opportunity to read an arbitration agreement and signs it is charged with knowing its contents); *see also In re Halliburton,* 80 S.W.3d at 568–69 (holding an arbitration clause was accepted by an employee despite employee's claim that he did not understand it).

 **[20]**   The principles of unconscionability do not negate a bargain because one party to the agreement may have been in a less advantageous bargaining position. Unconscionability principles are applied to prevent unfair surprise or oppression. *See In re FirstMerit Bank,* 52 S.W.3d at 757. The agreement before us is clearly labeled as an agreement providing that disputes will be settled by arbitration. It is relatively short and specifically provides that it does not constitute a waiver of any substantive rights or remedies except as to the forum for resolving disputes, and it highlights the statement that a jury trial is being waived.

We find neither unfair surprise nor oppression in the agreement as a whole nor in the substance of the manufacturer's opt-out provision. Accordingly, we disagree with the Ripples' contention that the agreement was, as to either the retailer or the manufacturer, procedurally unconscionable.

### V. Conclusion

We conclude that the trial court abused its discretion in failing to order the Ripples to arbitrate their claims against the retailer and manufacturer. We conditionally grant the writ of mandamus and direct the trial court to compel arbitration of the Ripples' claims. The writ will issue only if the trial court fails to comply with our directive.

Justice O'NEILL filed a concurrence.

Justice O'NEILL, concurring.

In my view, the unilateral right that the retail contract conferred on the manufacturer to compel or avoid arbitration with the parties to that contract after the events giving rise to the Ripples' claim arose rendered the contract's arbitration clause unconscionable as to the manufacturer and non-binding on the Ripples. *See J.M. Davidson, Inc. v. Webster,* 128 S.W.3d 223, 230 & n. 2 (Tex.2003). Because I agree with the trial court and the court of appeals on this point, I

do not join part IV, A, of the Court's opinion. Nevertheless, the Ripples' claims against the manufacturer in this case necessarily rely on the terms of the retail contract and raise substantially interdependent and concerted misconduct; accordingly, I believe the Ripples are equitably estopped from seeking to avoid arbitration with the manufacturer. *See, e.g.,*

*Grigson v. Creative Artists Agency, L.L.C.,* 210 F.3d 524 (5th Cir.2000). On this basis, I concur in the Court's judgment.

**Parallel Citations**

49 Tex. Sup. Ct. J. 711

Footnotes

1    The court of appeals construed the two arbitration agreements together in determining that the second agreement's opt-out language applied. *See* 129 S.W.3d 636, 643. Whether we construe the agreements together as the court of appeals construed them, or consider the second agreement as the operative agreement as the Ripples urge, we must address the effect of the opt-out language which is only in the second agreement.

**End of Document**

© 2014 Thomson Reuters. No claim to original U.S. Government Works.

262 S.W.3d 337
Supreme Court of Texas.

In re POLY–AMERICA, L.P., Ind.
and d/b/a Pol–Tex International, and
Poly–America GP, L.L.C., Relators.

No. 04–1049. | Aug. 29, 2008.

**Synopsis**
**Background:** Former employee sought mandamus relief from order of the 344th District Court, Chambers County, Carroll E. Wilborn, Jr., J., granting employer's motion to compel arbitration and to stay employee's action for wrongful discharge and retaliation for filing a workers' compensation claim. The Houston Court of Appeals, First District, 175 S.W.3d 315, conditionally granted a writ. Review was granted.

**Holdings:** The Supreme Court, Harriet O'Neill, J., held that:

[1] provisions of arbitration agreement, eliminating two types of remedies available under anti-retaliation provisions of Texas Workers' Compensation Act, were substantively unconscionable;

[2] fee-splitting provision of arbitration agreement was not substantively unconscionable;

[3] as a matter of first impression, discovery limits in arbitration agreement were not substantively unconscionable; and

[4] substantively unconscionable provisions of arbitration agreement were severable.

Writ conditionally granted.

Scott Brister, J., filed a dissenting opinion.

West Headnotes (47)

[1] **Mandamus**


proceedings other than actions

Civil

Mandamus is the proper means by which to seek review of an order compelling arbitration under the Federal Arbitration Act (FAA). 9 U.S.C.A. § 1 et seq.

9 Cases that cite this headnote

[2] **Mandamus**


and scope of remedy in general

Nature

Although mandamus review is generally available in federal courts to review non-appealable interlocutory rulings, mandamus is granted only in exceptional cases.

1 Cases that cite this headnote

[3] **Mandamus**


and Adequacy of Other Remedy in General

Existence

**Mandamus**


as to grant of writ

Discretion

**Mandamus**


and existence of rights to be protected or enforced

Nature

Federal courts grant mandamus only upon demonstration of clear and indisputable right to issuance of the writ: (1) party seeking issuance of writ must have no other adequate means to attain the relief he desires; (2) such party must satisfy burden of showing that his right to issuance of writ is clear and indisputable; and (3) issuing court, in exercise of its discretion, must be satisfied that the writ is appropriate under the circumstances.

Cases that cite this headnote

[4] **Mandamus**



by Appeal or Writ of Error

**Mandamus**



of discretion

Under Texas law, issuance of writ of mandamus requires a demonstration that trial court clearly abused its discretion by failing to correctly analyze or apply the law, and a determination that benefits of mandamus outweigh detriments, such that an appellate remedy is inadequate.

5 Cases that cite this headnote

[5] **Mandamus**



proceedings other than actions

Because arbitration under the Federal Arbitration Act (FAA) is intended to provide a lower-cost, expedited means to resolve disputes, mandamus proceedings will often, if not always, deprive the parties of an arbitration agreement's intended benefits when a trial court's compel-and-stay order, compelling arbitration and staying the court proceedings while arbitration is pending, is at issue; accordingly, appellate courts should be hesitant to intervene through issuance of a writ of mandamus. 9 U.S.C.A. § 16(b)(1).

8 Cases that cite this headnote

[6] **Alternative Dispute Resolution**



The Federal Arbitration Act's (FAA) strong presumption favoring arbitration does not apply to a state court's assessment of whether parties have entered into a valid and enforceable agreement to arbitrate under state contract law. 9 U.S.C.A. § 2.

11 Cases that cite this headnote

[7] **Alternative Dispute Resolution**



Remedy

Matters

Civil

Evidence

**States**



cases, preemption or supersession

Federal Arbitration Act (FAA) does not preempt Texas public policies that may make contractual provisions generally unenforceable. 9 U.S.C.A. § 2.

1 Cases that cite this headnote

[8] **Alternative Dispute Resolution**



Validity

An agreement to arbitrate is valid under the Federal Arbitration Act (FAA) if it meets the requirements of the general contract law of the applicable state. 9 U.S.C.A. § 2.

5 Cases that cite this headnote

[9] **Alternative Dispute Resolution**



What

law governs

State law, whether of legislative or judicial origin, is applicable to the determination of the validity of an agreement to arbitrate under the Federal Arbitration Act (FAA), if that law arose to govern issues concerning the validity, revocability, and enforceability of contracts generally. 9 U.S.C.A. § 2.

2 Cases that cite this headnote

[10] **Alternative Dispute Resolution**



What

law governs

Under the Federal Arbitration Act (FAA), courts may not invalidate arbitration agreements under state laws applicable only to arbitration provisions. 9 U.S.C.A. § 2.

3 Cases that cite this headnote

[11] **Alternative Dispute Resolution**

Preemption

Particular



and statutory provisions and rules of court

The purpose and language of the Federal Arbitration Act (FAA) require only that agreements to arbitrate be placed upon the same footing as other contracts, with respect to enforceability under state law. 9 U.S.C.A. § 2.

Cases that cite this headnote

**[12]    Alternative Dispute Resolution**



Once an enforceable contract to arbitrate is found, there is a strong federal presumption, under the Federal Arbitration Act (FAA), in favor of arbitration, such that myriad doubts, as to waiver, scope, and other issues not relating to enforceability, must be resolved in favor of arbitration. 9 U.S.C.A. § 2.

4 Cases that cite this headnote

**[13]    Alternative Dispute Resolution**



Under Texas law, as with any other contract, agreements to arbitrate under the Federal Arbitration Act (FAA) are valid unless grounds exist at law or in equity for revocation of the agreement. 9 U.S.C.A. § 2.

9 Cases that cite this headnote

**[14]    Alternative Dispute Resolution**



Under Texas law, the burden of proving a ground, at law or in equity, for revoking an arbitration agreement, such as fraud, unconscionability, or voidness under public policy, falls on the party opposing the agreement.

6 Cases that cite this headnote

**[15]    Alternative Dispute Resolution**

Constitutional  Employment

disputes

**Alternative Dispute Resolution**

 Unconscionabi

Agreements to arbitrate disputes between employers and employees are generally enforceable under Texas law, because there is nothing per se unconscionable about an agreement to arbitrate employment disputes.

6 Cases that cite this headnote

Evidence

**[16]    Alternative Dispute Resolution**

 Unconscionabi

**Contracts**

 Unconscionabl

Contracts

Unconscionable contracts, whether relating to arbitration or not, are unenforceable under Texas law.

14 Cases that cite this headnote

Validity

**[17]    Contracts**

 Unconscionabl

Contracts

A contract is unenforceable if, given the parties' general commercial background and the commercial needs of the particular trade or case, the clause involved is so one-sided that it is unconscionable under the circumstances existing when the parties made the contract.

Evidence

8 Cases that cite this headnote

**[18]    Contracts**

 Unconscionabl

Contracts

Unconscionability of a contract is to be determined in light of a variety of factors, which aim to prevent oppression and unfair surprise.

8 Cases that cite this headnote

**[19]    Contracts**



Contracts

In general, a contract will be found unconscionable if it is grossly one-sided.

10 Cases that cite this headnote

**[20]    Contracts**



for jury

**Contracts**



for jury

Whether a contract is contrary to public policy or unconscionable at the time it is formed is a question of law.

3 Cases that cite this headnote

**[21]    Appeal and Error**



of discretion

Because a trial court has no discretion to determine what the law is or apply the law incorrectly, its clear failure to properly analyze or apply the law of unconscionability of contracts constitutes an abuse of discretion.

5 Cases that cite this headnote

**[22]    Alternative Dispute Resolution**



An arbitration agreement covering an employee's statutory claims is valid so long as the arbitration agreement does not waive the substantive rights and remedies the statute affords and the arbitration procedures are fair, such that the employee may effectively vindicate his statutory rights.

6 Cases that cite this headnote

**[23]    Alternative Dispute Resolution**



Unconscionable

disputes

**Alternative Dispute Resolution**



Questions

Questions

Employment

Validity

In the context of federal statutory claims, either an expression of federal intent to exclude certain categories of claims from arbitration, or the excessive waiver of statutory rights in the arbitration agreement, may render a particular dispute un-arbitrable.

Cases that cite this headnote

**[24]    Alternative Dispute Resolution**



**States**



Abuse

cases, preemption or supersession

Preemption

Particular

In light of the Supremacy Clause, the Federal Arbitration Act (FAA) preempts state laws that specifically disfavor arbitration. U.S.C.A. Const. Art. 6, cl. 2; 9 U.S.C.A. § 2.

Cases that cite this headnote

**[25]    Alternative Dispute Resolution**



**States**



Validity

cases, preemption or supersession

Preemption

Particular

While the Federal Arbitration Act (FAA), in light of the Supremacy Clause, preempts state laws that specifically disfavor arbitration, if a particular waiver of substantive remedies or other provision of a contract is unconscionable under state law, independent of the agreement to arbitrate, it will be unenforceable even though included in an agreement to arbitrate. U.S.C.A. Const. Art. 6, cl. 2; 9 U.S.C.A. § 2.

2 Cases that cite this headnote

**[26] Workers' Compensation**



or negligence as element of liability

**Workers' Compensation**



of Remedies Afforded by Acts

In order to ensure compensation for injured employees while protecting employers from costs of litigation, the Texas legislature provided, through the Texas Workers' Compensation Act, a mechanism by which workers can recover from subscribing employers without regard to the workers' own negligence, while limiting employers' exposure to uncertain and possibly high awards of damages under the common law. V.T.C.A., Labor Code § 401.001 et seq.

1 Cases that cite this headnote

**[27] Workers' Compensation**



or strict construction in general

In light of the purposes of the Texas Workers' Compensation Act as a whole, it is the settled policy of Texas to construe liberally the provisions of the Act, in order to effectuate the purposes for which it was enacted. V.T.C.A., Labor Code § 401.001 et seq.

5 Cases that cite this headnote

**[28] Workers' Compensation**



in favor of employee or beneficiary

Because courts should liberally construe the Texas Workers' Compensation Act in favor of the injured worker, a strained or narrow construction of the Act would be improper, and moreover, it would be injudicious to construe the Act in a manner that supplies by implication restrictions on an employee's rights that are not found in the plain language of the Act. V.T.C.A., Labor Code § 401.001 et seq.

6 Cases that cite this headnote

Fault

**[29] Labor and Employment**



Exclusiveness            Workers'

Compensation

Since recovery of benefits under the Workers' Compensation Act is the exclusive remedy available to injured employees of subscribing employers, the availability of remedies under the Act for retaliatory discharge, for seeking to collect workers' compensation benefits, protects employees' exercise of their statutory rights to compensation under the Act. V.T.C.A., Labor Code §§ 408.001(a), 451.001 et seq.

3 Cases that cite this headnote

**[30] Labor and Employment**



Workers'

Compensation

Liberal

The anti-retaliation provisions of the Workers' Compensation Act must protect employees even before they have actually filed a workers' compensation claim, because otherwise the law would be completely useless and would not accomplish the purpose for which the Act was enacted; all the employer would have to do in order to avoid the consequences of the Act would be to fire the injured employee before he filed the claim. V.T.C.A., Labor Code § 451.001 et seq.

2 Cases that cite this headnote

Construction  **[31] Workers' Compensation**



Express

waiver

Texas courts do not look with favor upon contracts waiving rights arising under the Workers' Compensation Act, because such waivers affect not only the individual employee subject to the waiver, but also the public, which bears the cost of the workers' compensation program. V.T.C.A., Labor Code § 401.001 et seq.

Cases that cite this headnote

**[32]     Labor and Employment**



and subjects

**Labor and Employment**



or punitive damages

"Reasonable damages," for purposes of provision of Workers' Compensation Act making an employer who retaliates against a claimant liable for reasonable damages, are not limited to actual damages, but may include future damages, as well as exemplary or punitive damages, when it is shown that the employer acted with actual malice in retaliating against the employee for filing a workers' compensation claim. V.T.C.A., Labor Code §§ 451.001, 451.002.

1 Cases that cite this headnote

**[33]     Alternative Dispute Resolution**



Provisions of arbitration agreement governed by Federal Arbitration Act (FAA) and executed by employee as condition of employment, which provisions eliminated two types of remedies available under anti-retaliation provisions of Texas Workers' Compensation Act by prohibiting arbitrator from ordering reinstatement or awarding punitive damages, were substantively unconscionable and therefore void under Texas law; such provisions would allow subscribing employer to enjoy Act's limited-liability benefits while exposing employee to exactly the sort of costs, i.e., costs of injuries paid for by employee for fear of retribution for making a workers' compensation claim, that the Act was specifically designed to shift onto employer. 9 U.S.C.A. § 2; V.T.C.A., Labor Code §§ 451.001, 451.002(a, b).

7 Cases that cite this headnote

**[34]     Alternative Dispute Resolution**

Operation and Effect

Grounds

Exemplary

By agreeing to arbitrate a statutory claim, a party does not forgo the substantive rights afforded by the statute; it only submits to their resolution in an arbitral, rather than a judicial, forum.

2 Cases that cite this headnote

**[35]     Alternative Dispute Resolution**



or hearing

Trial

A trial court may summarily decide whether to compel arbitration, on the basis of affidavits, pleadings, discovery, and stipulations; however, if the material facts necessary to determine the issue are controverted by an opposing affidavit or otherwise admissible evidence, the trial court must conduct an evidentiary hearing to determine the disputed material facts.

3 Cases that cite this headnote

**[36]     Mandamus**

Unconscionability

proceedings other than actions

Civil

Court of Appeals, on employee's petition for writ of mandamus relating to trial court's order compelling arbitration of employee's claim against employer under anti-retaliation provisions of Workers' Compensation Act, could consider, when deciding whether fee-splitting provision of arbitration agreement was substantively unconscionable, the detailed estimates, in affidavits of employee and of employee's expert witness which had been presented to trial court in opposition to employer's motion to compel arbitration and which were attached to petition for writ of mandamus, regarding likely cost of arbitration in employee's case and employee's expected share of those costs under agreement's capped fee-splitting provision based on employee's monthly salary; employer did not dispute, in trial court or in Court of Appeals, the facts asserted in the affidavits and instead asserted in both trial court

and Court of Appeals legal arguments that fee-splitting provision was not unconscionable, and affidavits did not present merely subjective and incontrovertible factual allegations. V.T.C.A., Labor Code § 451.001 et seq.

6 Cases that cite this headnote

**[37]    Alternative Dispute Resolution**



Fee-splitting provisions, in an arbitration agreement executed by an employee, that operate to prohibit the employee from fully and effectively vindicating statutory rights, are substantively unconscionable.

2 Cases that cite this headnote

**[38]    Alternative Dispute Resolution**



Fee-splitting provisions, in an arbitration agreement executed by an employee, are not per se substantively unconscionable; the employee must present some evidence that he or she will likely incur arbitration costs in such an amount as to deter enforcement of statutory rights in the arbitral forum.

7 Cases that cite this headnote

**[39]    Alternative Dispute Resolution**



Fee-splitting provision of arbitration agreement executed by employee and governed by Federal Arbitration Act (FAA), stating that all fees related to arbitration, including but not limited to mediation fees, arbitrators' fees, costs of procuring a location for arbitration hearing, and court reporter fees, would be split equally between employer and employee, with employee's contribution capped at amount equal to gross compensation earned by employee in employee's highest earning month in the 12 months prior to issuance of arbitration award, was not substantively unconscionable under Texas law, with respect to employee's

claims under anti-retaliation provisions of Texas Workers' Compensation Act; agreement specifically provided that arbitrator could modify unconscionable terms, and nothing in Texas law would prevent arbitrator from fairly adjusting fee-splitting provisions when necessary to allow full vindication of employee's statutory rights in arbitral forum. 9 U.S.C.A. § 2; V.T.C.A., Labor Code § 451.001 et seq.

Unconscionability 16 Cases that cite this headnote

**[40]    Alternative Dispute Resolution**



Unconscionabi

Discovery limits in arbitration agreement executed by employee and governed by Federal Arbitration Act (FAA) were not substantively unconscionable under Texas law, with respect to employee's claims under anti-retaliation provisions of Texas Workers' Compensation Unconscionability Act, where agreement limited each party to serving on the other a single set of 25 interrogatories including sub-parts and one set of 25 requests for production or inspection of documents or tangible things, limited each party to a single, six-hour deposition, prohibited requests for admission, banned inquiry into employer's finances, and required that parties and their attorneys maintain confidentiality regarding all aspects of arbitration; agreement specifically provided that arbitrator could modify unconscionable terms, and arbitrator would not be required to enforce discovery limits Unconscionability if arbitrator found them to be unconscionable. 9 U.S.C.A. § 2; V.T.C.A., Labor Code § 451.001 et seq.

6 Cases that cite this headnote

**[41]    Alternative Dispute Resolution**



Unconscionabi

Limits on discovery, in an arbitration agreement executed by an employee, that unreasonably impede the employee from effectively vindicating statutory rights, are substantively unconscionable.

1 Cases that cite this headnote

**[42]** **Alternative Dispute Resolution**



Limits on discovery, in an arbitration agreement executed by an employee, are not per se substantively unconscionable; the employee must present some evidence that the discovery limits will deprive the employee of a fair opportunity to present statutory claims in the arbitral forum.

1 Cases that cite this headnote

**[43]** **Alternative Dispute Resolution**



Provision of arbitration agreement executed by employee and governed by Federal Arbitration Act (FAA), prohibiting arbitrator from applying a "just cause" or "good cause" standard to claims relating to the employment or separation therefrom, was not substantively unconscionable under Texas law, with respect to employee's claims under anti-retaliation provisions of Texas Workers' Compensation Act; provision simply emphasized that the arbitration agreement related to at-will employment, and it would not prohibit inquiry into whether employer improperly terminated employee in retaliation for his filing of workers' compensation claim. 9 U.S.C.A. § 2; V.T.C.A., Labor Code § 451.001 et seq.

2 Cases that cite this headnote

**[44]** **Alternative Dispute Resolution**



Substantively unconscionable provisions of arbitration agreement governed by Federal Arbitration Act (FAA) and containing a severability clause, which provisions eliminated two types of remedies available under anti-retaliation provisions of Texas Workers' Compensation Act by prohibiting arbitrator from ordering reinstatement or awarding

punitive damages, were severable from general agreement to arbitrate; arbitration agreement was over five pages long and it contained numerous provisions not challenged by employee as imposing any unconscionable burdens, e.g., Unconscionability procedures for mediation, procedures for selection of neutral arbitrator, procedures for filing of motions, and other general provisions governing arbitration procedures, the intent of the parties, as expressed by the severability clause, was that unconscionable provisions would excised if possible, and the main purpose of the agreement was that the parties would submit their disputes to arbitral forum rather than proceed in court. 9 U.S.C.A. § 2; V.T.C.A., Labor Code § 451.001 et seq.

7 Cases that cite this headnote

Unconscionability

**[45]** **Contracts**



Severability

**Contracts**



Partial

Illegality

An illegal or unconscionable provision of a contract may generally be severed so long as it does not constitute the essential purpose of the agreement.

7 Cases that cite this headnote

**[46]** **Contracts**



Partial

Illegality

Severability Whether the invalidity of a particular provision of a contract affects the rest of the contract, for purposes of determining whether the invalid provision is severable, depends upon whether the remaining provisions are independent or mutually dependent promises, which courts determine by looking to the language of the contract itself.

2 Cases that cite this headnote

**[47]** **Contracts**



**Contracts**



Illegality

With regard to whether illegal or unconscionable provisions of a contract are severable, the relevant inquiry is whether parties would have entered into the agreement absent the unenforceable provisions.

4 Cases that cite this headnote

**Attorneys and Law Firms**

**\*343** Erica W. Harris, Susman Godfrey L.L.P., Houston, Craig T. Enoch, Winstead PC, Austin, Adam Brian Ross, Poly–America, LP, Grand Prairie, TX, for Relator.

Scott Fiddler, Law Office of G. Scott Fiddler, P.C., Houston TX, for Real Party in Interest.

Jeffrey C. Londa, Ogletree Deakins Nash Smoak & Stewart, P.C., Houston, Audrey Elaine Mross, Davis Munck Butrus, P.C., Kirk L. Pittard, Durham & Pattard, LLP, Dallas, Peter M. Kelly, Law Office Of Peter M. Kelly, P.C., Houston TX, for Amicus Curiae.

Justice O'NEILL delivered the opinion of the Court, in which Chief Justice JEFFERSON, Justice HECHT, Justice WAINWRIGHT, Justice MEDINA, Justice GREEN, and Justice JOHNSON joined.

**Opinion**

**\*344** HARRIET O'NEILL, Justice.

In this retaliatory-discharge case, the employee's employment contract contains an arbitration agreement that requires the employee to split arbitration costs up to a capped amount, limits discovery, eliminates punitive damages and reinstatement remedies available under the Workers' Compensation Act, and imposes other conditions on the arbitration process. We must decide whether any or all of these provisions are unconscionable and, if they are, whether the contract's severability clause preserves the arbitration right. We hold that the trial court did not abuse its discretion in allowing the arbitrator to assess the unconscionability of the

Severability

Partial

agreement's fee-splitting and discovery-limitation provisions as applied in the course of arbitration. We further hold that the arbitration agreement's provisions precluding remedies under the Workers' Compensation Act are substantively unconscionable and void under Texas law. However, those provisions are not integral to the parties' overall intended purpose to arbitrate their disputes and, pursuant to the agreement's severability clause, are severable from the remainder of the arbitration agreement, which we conclude is otherwise enforceable. Accordingly, we conditionally grant the petition for mandamus.

**I. Facts**

Johnny Luna began his employment with Pol–Tex International, d/b/a Poly–America, L.P., in October 1998. Upon his hiring, Luna signed an agreement to submit "all claims or disputes" to arbitration. Approximately four years later, Luna signed an amended agreement to arbitrate that contained substantially the same provisions. Both the 1998 and 2002 agreements provide that they are governed by the Federal Arbitration Act (FAA). 9 U.S.C. §§ 1–14. Additionally, both agreements contain a series of requirements for the arbitration between the parties. All claims must be asserted within a maximum of one year from the occurrence of the event from which the claim arises. Fees associated with arbitration—including but not limited to mediation fees, the arbitrators' fees, court reporter fees, and fees to secure a place for a hearing—are to be split between the parties, with the employee's share capped at "the gross compensation earned by the Employee in Employee's highest earning month in the twelve months prior to the time the arbitrator issues his award." Each side is permitted limited forms of discovery: twenty-five interrogatories (including sub-parts), twenty-five requests for production or inspection of documents or tangible things, and one oral deposition of no more than six hours. Parties may not use written depositions or requests for admission; the agreement prohibits discovery of either party's financial information except for the employee's earnings if the employee seeks lost wages, back pay, and/or front pay; and all aspects of the arbitration are deemed confidential. Finally, the arbitrator is stripped of authority to award punitive, exemplary, or liquidated damages, or to order reinstatement of employment.

In December 2002, Luna suffered a work-related neck injury when he accidentally hit his head on a pipe. Poly–America's company doctor examined Luna and diagnosed him with an

acute cervical spine flexion injury. Luna subsequently filed a workers' compensation claim and began receiving physical therapy. Approximately two weeks later, Luna returned to work on a release for light duty; however, Luna continued to suffer pain and utilized previously scheduled vacation time to recover from his injury. After being warned by the company doctor that he needed to return to work and get off of workers' compensation if he wanted to keep his job, **\*345** Luna returned to work without restrictions on January 10, 2003. Upon his return, Luna noticed that another person was already being trained for his position, and he claims that his supervisor began to harass him. One month later, Luna told his supervisor that his neck continued to bother him and that he needed to return to the company doctor; the next day that Luna was scheduled to work, he was fired.

Luna filed this suit asserting claims for unlawful retaliatory discharge under section 451.001 of the Labor Code ("the Workers' Compensation Act"). TEX. LAB.CODE § 451.001–.003. Claiming that Poly–America acted with malice, ill will, spite, or specific intent to cause injury, Luna sought both reinstatement and the imposition of punitive damages. He additionally sought a declaratory judgment that the arbitration agreement was unenforceable because, among other reasons, its provisions violated public policy and were unconscionable. Luna submitted two affidavits—his own, and that of an expert witness—in support of his claims. Poly–America responded with a motion to compel arbitration which, after a hearing, the trial court granted.

Luna sought a writ of mandamus in the court of appeals, reasserting his argument that provisions of the arbitration agreement were substantively unconscionable. The court of appeals held that, in light of the fee-splitting provisions and limitations on remedies, the arbitration agreement as a whole was substantively unconscionable. 175 S.W.3d 315, 318. Poly–America sought review in this Court. We hold that the arbitration agreement's provision that eliminates available remedies under the Workers' Compensation Act is unenforceable, but we find that provision severable from the arbitration agreement as a whole and conditionally grant Poly–America's writ of mandamus.

## II. Standard of Review

 **[1]**   **[2]**   Mandamus is the proper means by which to seek review of an order compelling arbitration under the FAA. *In re Am. Homestar of Lancaster, Inc.,* 50 S.W.3d 480,

483 (Tex.2001). In *In re Palacios,* we recognized that it is "important for federal and state law to be as consistent as possible" in enforcement and review of provisions under the FAA. 221 S.W.3d 564, 565 (Tex.2006) (per curiam) (quoting *In re Kellogg Brown & Root, Inc.,* 166 S.W.3d 732, 739 (Tex.2005)). Federal courts may not review orders compelling arbitration and staying litigation ("compel-and-stay orders") by interlocutory appeal. *See* 9 U.S.C. § 16(b)(1) ("[A]n appeal may not be taken from an interlocutory order ... granting a stay of any action under Section 3 of this title."). Accordingly, as we noted in *Palacios,* it would be inappropriate to exercise our own mandamus power in a manner inconsistent with the federal courts' practice. *See Palacios,* 221 S.W.3d at 565. Although mandamus review is generally available in federal courts to review non-appealable interlocutory rulings, mandamus is granted only in exceptional cases. *See generally Gulfstream Aerospace Corp. v. Mayacamas Corp.,* 485 U.S. 271, 288–90 & n. 13, 108 S.Ct. 1133, 99 L.Ed.2d 296 (1988) (holding that, where a particular order is not appealable, mandamus is available and "will be appropriate in exceptional cases"). As we acknowledged in *Palacios,* federal courts have applied this template to orders that cannot be appealed under the FAA, although they almost never grant mandamus relief. 221 S.W.3d at 565–66 ("Even after *Green Tree [Financial Corp.—Alabama v. Randolph,* 531 U.S. 79, 121 S.Ct. 513, 148 L.Ed.2d 373 (2000)], the Fifth Circuit has held that federal mandamus review of an order staying a case for arbitration may still be available if a party can meet a 'particularly **\*346** heavy' mandamus burden to show 'clearly and indisputably that the district court did not have the discretion to stay the proceedings pending arbitration.' ") (quoting *Apache Bohai Corp. v. Texaco China, B.V.,* 330 F.3d 307, 310–11 (5th Cir.2003)). This general rule has been broadly applied to unappealable ancillary interlocutory orders in proceedings under the FAA, *see, e.g., Georgiou v. Mobil Exploration & Prod. Servs., Inc. U.S.,* 190 F.3d 538, 1999 WL 642871 at \*3 (5th Cir. July 27, 1999) (dismissing appeal of order staying litigation in favor of arbitration proceeding in foreign forum, and denying mandamus because plaintiffs failed to carry the "particularly heavy burden" to warrant mandamus relief from such an order); *Cofab Inc. v. Phila. Joint Bd., Amalgamated Clothing & Textile Workers Union, AFL–CIO–CLC,* 141 F.3d 105, 110 (3d Cir.1998); and appears to also apply to compel-and-stay orders under section 16(b)(1), *see Douglas v. U.S. Dist. Court,* 495 F.3d 1062, 1065 (9th Cir.2007) (granting mandamus relief from compel-and-stay order); *Manion v. Nagin,* 255 F.3d 535, 538–40 & n. 4 (8th Cir.2001) (dismissing appeal of various interlocutory orders, including order compelling

arbitration, and denying mandamus because Manion had not made "any showing that he [was] entitled to such extraordinary relief"); *McDermott Int'l, Inc. v. Underwriters at Lloyds Subscribing to Memorandum of Ins. No. 104207, 981 F.2d 744, 748 (5th Cir.1993)* ("This court has recognized that [mandamus review of an order compelling arbitration] may be available [but] McDermott has failed to satisfy [the] demanding standard."). [1]

 **[3]** **[4]** **[5]** Although federal precedent in this area is not uniformly clear, it appears a federal court would be permitted—albeit not compelled—to address the merits of the mandamus arguments in this case. If such review were categorically unavailable and unconscionability determinations the sole realm of arbitrators, as the dissenting Justice proposes, development of the law as to this threshold issue would be substantially hindered if not precluded altogether. Nevertheless, federal precedent counsels against granting relief unless the stringent requirements for mandamus are met. *See Gulfstream,* 485 U.S. at 289, 108 S.Ct. 1133. Federal courts grant mandamus only upon demonstration of a "clear and indisputable" right to issuance of the writ: "First, the party seeking the issuance of the writ must have no other adequate means to attain the relief he desires.... Second, the petitioner must satisfy the burden of showing that his right to issuance of the writ is clear and indisputable. Third ... the issuing court, in the exercise of its discretion, must be satisfied that the writ is appropriate under the circumstances." *Cheney v. U.S. Dist. Court,* 542 U.S. 367, 380–81, 124 S.Ct. 2576, 159 L.Ed.2d 459 (2004). Our own mandamus standard is similar, requiring a demonstration that **\*347** the trial court clearly abused its discretion by failing to correctly analyze or apply the law and a determination that the benefits of mandamus outweigh the detriments such that an appellate remedy is inadequate. *See In re Prudential Ins. Co. of Am.,* 148 S.W.3d 124, 135–36 (Tex.2004). Because arbitration is intended to provide a lower-cost, expedited means to resolve disputes, mandamus proceedings will often, if not always, deprive the parties of an arbitration agreement's intended benefits when a compel-and-stay order is at issue; accordingly, courts should be hesitant to intervene. With these standards in mind, we turn to the compel-and-stay order in this case.

### III. Unconscionability and the Federal Arbitration Act

 **[6]** **[7]** Poly–America argues that the FAA's "strong presumption" favoring arbitration applies in this case, and

furthermore that the FAA preempts all state public-policy grounds for finding the agreement to arbitrate unenforceable. *See In re R & R Personnel Specialists of Tyler, Inc.,* 146 S.W.3d 699, 705 (Tex.App.—Tyler2004) (holding that the FAA preempts "any public policy underlying the Texas workers' compensation statutes that is contrary to the enforceability of arbitration agreements"). Because neither this presumption nor federal preemption applies in a state court's assessment of whether parties have entered into a valid and enforceable agreement to arbitrate under state contract law, we disagree.

 **[8]** Section 2 of the FAA provides that arbitration agreements "shall be valid, irrevocable, and enforceable, *save upon such grounds as exist at law or in equity for the revocation of any contract.*" 9 U.S.C. § 2 (emphasis added). Thus, an agreement to arbitrate is valid under the FAA if it meets the requirements of the general contract law of the applicable state. *In re AdvancePCS Health L.P.,* 172 S.W.3d 603, 606 (Tex.2005) (citing *First Options of Chicago, Inc. v. Kaplan,* 514 U.S. 938, 944, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995)). In determining the validity of an agreement to arbitrate under the FAA, courts must first apply state law governing contract formation. *See* 9 U.S.C. § 2; *First Options,* 514 U.S. at 944, 115 S.Ct. 1920.

 **[9]** **[10]** The United States Supreme Court has repeatedly emphasized that "state law, whether of legislative or judicial origin, is applicable [to the determination of the validity of an agreement to arbitrate] if that law arose to govern issues concerning the validity, revocability, and enforceability of contracts generally." *Perry v. Thomas,* 482 U.S. 483, 493 n. 9, 107 S.Ct. 2520, 96 L.Ed.2d 426 (1987). Thus, courts "may not ... invalidate arbitration agreements under state laws applicable *only* to arbitration provisions." *Doctor's Assocs., Inc. v. Casarotto,* 517 U.S. 681, 687, 116 S.Ct. 1652, 134 L.Ed.2d 902 (1996); *see also Perry,* 482 U.S. at 493 n. 9, 107 S.Ct. 2520 ("A state-law principle that takes its meaning precisely from the fact that a contract to arbitrate is at issue does not comport with [section 2].").

 **[11]** **[12]** However, the purpose and language of the FAA require only that agreements to arbitrate be placed "upon the *same* footing as other contracts." *Doctor's Assocs.,* 517 U.S. at 687, 116 S.Ct. 1652 (quoting *Scherk v. Alberto– Culver Co.,* 417 U.S. 506, 511, 94 S.Ct. 2449, 41 L.Ed.2d 270 (1974)) (emphasis added); *see also* H.R. REP. NO. 68–96, at 1 (1924) (noting that by enacting section 2, Congress sought to place agreements to arbitrate "upon the same footing as

other contracts, where [they] belong[ ]"). *Perry* makes clear that state courts may not fashion special rules regarding the enforceability **\*348** of arbitration contracts *per se*. *See Perry,* 482 U.S. at 492 n. 9, 107 S.Ct. 2520. Furthermore, once an enforceable contract to arbitrate is found, there is a strong federal presumption in favor of arbitration such that myriad doubts—as to waiver, scope, and other issues not relating to enforceability—must be resolved in favor of arbitration. *See, e.g., In re FirstMerit Bank,* 52 S.W.3d 749, 752 (Tex.2001); *Prudential Sec. Inc. v. Marshall,* 909 S.W.2d 896, 898–99 (Tex.1995). However, a state court must initially determine—through the neutral application of its own contract law—whether an enforceable agreement exists in the first instance, and whether "generally applicable contract defenses ... may be applied to invalidate arbitration agreements without contravening" the policies of the FAA. *Doctor's Assocs.,* 517 U.S. at 687, 116 S.Ct. 1652. Thus, in this case, if a contract limiting damages or restricting other remedies under the Workers' Compensation Act is *generally* unenforceable under Texas law, an arbitration contract with these same limitations will also be unenforceable.

**[13]** **[14]** Nevertheless, under Texas law, as with any other contract, agreements to arbitrate are valid unless grounds exist at law or in equity for revocation of the agreement. The burden of proving such a ground—such as fraud, unconscionability or voidness under public policy—falls on the party opposing the contract. *See FirstMerit Bank,* 52 S.W.3d at 756. Thus, while we reject Poly–America's assertions that we must apply a presumption favoring arbitration in assessing whether the parties entered into an enforceable agreement under Texas law and that the FAA preempts Texas public policies that may make certain contractual provisions generally unenforceable, Luna nevertheless bears the burden to establish that the challenged provisions are unenforceable.

## IV. Arbitration and Unconscionability Under Texas Law

### A. General Standard

**[15]** Agreements to arbitrate disputes between employers and employees are generally enforceable under Texas law; there is nothing *per se* unconscionable about an agreement to arbitrate employment disputes and, in fact, Texas law has historically favored agreements to resolve such disputes by arbitration. *See Advance PCS,* 172 S.W.3d at 608; *EZ Pawn*

*Corp. v. Mancias,* 934 S.W.2d 87, 90 (Tex.1996); *Cantella & Co. v. Goodwin,* 924 S.W.2d 943, 944 (Tex.1996).

**[16]** **[17]** **[18]** **[19]** Unconscionable contracts, however—whether relating to arbitration or not—are unenforceable under Texas law. A contract is unenforceable if, "given the parties' general commercial background and the commercial needs of the particular trade or case, the clause involved is so one-sided that it is unconscionable under the circumstances existing when the parties made the contract." *FirstMerit Bank,* 52 S.W.3d at 757; *see also In re Halliburton Co.,* 80 S.W.3d 566, 571 (Tex.2002) ("[S]ubstantive unconscionability ... refers to the fairness of the arbitration provision itself."). Unconscionability is to be determined in light of a variety of factors, which aim to prevent oppression and unfair surprise; in general, a contract will be found unconscionable if it is grossly one-sided. *See* DAN B. DOBBS, 2 LAW OF REMEDIES 703, 706 (2d ed.1993); *see also* RESTATEMENT (SECOND) OF CONTRACTSS § 208, cmt. a (1979) ("The determination that a contract or term is or is not unconscionable is made in the light of its setting, purpose, and effect. Relevant factors include weaknesses in the contracting process like those involved in more specific rules as to contractual capacity, fraud, and other invalidating causes; the policy also overlaps with rules which render particular **\*349** bargains or terms unenforceable on grounds of public policy."). Although not subject to precise doctrinal definition, *see Sw. Bell Tel. Co. v. DeLanney,* 809 S.W.2d 493, 498 (Tex.1991) (GONZALEZ, J., concurring), unconscionability—as delineated by the above principles—has been recognized and applied by this Court for well over a century. *See, e.g., Flanagan v. Pearson,* 61 Tex. 302, 307 (1884); *Fowler v. Stoneum,* 11 Tex. 478, 493 (1854); *Hemming v. Zimmerschitte,* 4 Tex. 159, 166 (1849); *Luckett v. Townsend,* 3 Tex. 119, 131 (1848).

**[20]** **[21]** Whether a contract is contrary to public policy or unconscionable at the time it is formed is a question of law. *Hoover Slovacek LLP v. Walton,* 206 S.W.3d 557, 562 (Tex.2006). Because a trial court has no discretion to determine what the law is or apply the law incorrectly, its clear failure to properly analyze or apply the law of unconscionability constitutes an abuse of discretion. *See Walker v. Packer,* 827 S.W.2d 833, 840 (Tex.1992).

### B. Arbitration and Statutory Rights

**[22]** **[23]** **[24]** An arbitration agreement covering statutory claims is valid so long as the arbitration agreement does not waive the substantive rights and remedies the statute affords and the arbitration procedures are fair, such that the employee may "effectively vindicate his statutory rights." *In re Halliburton,* 80 S.W.3d at 572. Federal courts, analyzing the enforceability of arbitration provisions relating to federal statutory claims, have noted that such contracts are not enforceable when a party is forced to "forgo the substantive rights afforded by the statute," as opposed to merely "submit[ting] to resolution in an arbitral, rather than a judicial, forum." *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.,* 473 U.S. 614, 628, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985). In the context of federal claims, either an expression of federal intent to exclude certain categories of claims from arbitration, *see Gilmer v. Interstate/Johnson Lane Corp.,* 500 U.S. 20, 26, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991), or the excessive waiver of statutory rights, *see Mitsubishi,* 473 U.S. at 628, 105 S.Ct. 3346, may render a particular dispute un-arbitrable. State courts, bound by the FAA under the supremacy clause, have more limited power, as the FAA preempts state laws that specifically disfavor arbitration. *Perry,* 482 U.S. at 492 n. 9, 107 S.Ct. 2520; *see Jack B. Anglin Co. v. Tipps,* 842 S.W.2d 266, 271 (Tex.1992) (holding that the FAA preempts state statutes to the extent they are inconsistent with the FAA's purpose to require courts to compel arbitration when the parties have so provided in their contracts).

**[25]** However, where a particular waiver of substantive remedies or other provision of a contract is unconscionable —independent of the agreement to arbitrate—it will be unenforceable even though included in an agreement to arbitrate. *See Gilmer,* 500 U.S. at 33, 111 S.Ct. 1647 ("[A]rbitration agreements are enforceable, 'save upon such grounds as exist at law or in equity for the revocation of any contract.' ") (quoting 9 U.S.C. § 2). To determine the permissibility of restrictions on a particular worker's access to statutory rights, we analyze the provisions of the actual statute at issue; thus, to analyze the enforceability of the various restrictions and waivers in the employment contract at issue in this case, we turn to the retaliatory-discharge provisions of the Texas Workers' Compensation Act, TEX. LAB.CODE §§ 451.001–.003.

### C. Purpose and Structure of the Texas Workers' Compensation Act's Anti–Retaliation Provisions

**[26]** **[27]** **[28]** The Texas Workers' Compensation Act was enacted to protect Texas **\*350** workers and employees. *Fid. & Cas. Co. of N.Y. v. McLaughlin,* 134 Tex. 613, 135 S.W.2d 955, 956 (1940). The Texas Legislature enacted the original Workers' Compensation Act in 1913 in response to the needs of workers who, despite a growing incidence of industrial accidents, were increasingly being denied recovery. *Kroger Co. v. Keng,* 23 S.W.3d 347, 350 (Tex.2000); *Tex. Workers' Compensation Comm'n v. Garcia,* 893 S.W.2d 504, 510 (Tex.1995). In order to ensure compensation for injured employees while protecting employers from the costs of litigation, the Legislature provided a mechanism by which workers could recover from subscribing employers without regard to the workers' own negligence, *see Kroger,* 23 S.W.3d at 351, while limiting the employers' exposure to uncertain, possibly high damage awards permitted under the common law, *see Reed Tool Co. v. Copelin,* 689 S.W.2d 404, 407 (Tex.1985). In light of the purposes of the Workers' Compensation Act as a whole, "[i]t is the settled policy of this State to construe liberally the provisions of the ... [l]aw, in order to effectuate the purposes for which it was enacted." *Huffman v. S. Underwriters,* 133 Tex. 354, 128 S.W.2d 4, 6 (1939) (citations omitted). As we have recently noted, "[b]ecause we should liberally construe the Workers' Compensation Act in favor of the injured worker, a strained or narrow construction of [the Act] would be improper. Moreover, it would be injudicious to construe the statute in a manner that supplies by implication restrictions on an employee's rights that are not found in ... [the] plain language." *Kroger,* 23 S.W.3d at 349.

**[29]** **[30]** The Texas Workers' Compensation Act provides that a subscriber to the workers' compensation system may not "discharge or in any other manner discriminate against an employee because the employee has ... filed a workers' compensation claim in good faith." TEX. LAB.CODE § 451.001–.001(1). The Legislature's purpose in enacting section 451.001 was to protect persons entitled to benefits under the Act and to prevent them from being discharged for seeking to collect those benefits. *See Tex. Steel Co. v. Douglas,* 533 S.W.2d 111, 115 (Tex.Civ.App.-Fort Worth 1976, writ ref'd n.r.e.). Since recovery of benefits under the Workers' Compensation Act is the exclusive remedy available to injured employees of subscribing employers, *see* TEX. LAB.CODE § 408.001(a), the availability of remedies for retaliatory discharge protects employees' exercise of their statutory rights to compensation under the Act. *See Padilla v. Carrier Air Conditioning,* 67 F.Supp.2d 650, 664 (E.D.Tex.1999); *Mid–South Bottling Co. v. Cigainero,* 799

S.W.2d 385, 389 (Tex.App.-Texarkana 1990, writ denied). In accordance with these principles, the anti-retaliation provisions of the Act must protect employees even before they have actually filed a claim, because otherwise "the law would be completely useless and would not accomplish the purpose for which it was enacted.... [A]ll the employer would have to do in order to avoid the consequences of the statute would be to fire the injured workman before he filed the claim." *Tex. Steel Co.,* 533 S.W.2d at 115.

 [31]    "The decisions of this State do not look with favor upon contracts waiving rights arising under the Workmen's Compensation Law." *Huffman,* 128 S.W.2d at 6. Such waivers affect not only the individual employee subject to the waiver, but also the public, which bears the cost of the workers' compensation program. *See Holt v. Cont'l Group, Inc.,* 708 F.2d 87, 91 (2d Cir.1983) ("A retaliatory discharge carries with it the distinct risk that other employees may be deterred from protecting their rights under the Act."). Therefore, we  **\*351**  have invalidated contracts that purport to relieve employers of their obligations under the Workers' Compensation Act. *See James v. Vernon Calhoun Packing Co.,* 498 S.W.2d 160, 162 (Tex.1973) (noting that "[w]e are much impressed with the idea that there is a large element of public interest in the administration of [the Workers' Compensation Act]"); *Hazelwood v. Mandrell Indus. Co.,* 596 S.W.2d 204, 206 (Tex.Civ.App.-Houston [1st Dist.] 1990, writ ref'd n.r.e.) ("If ... this balance [established by the Act] is tipped so that the employee's benefits under the statute are substantially reduced, the clear intent of the legislature is thwarted."). We have likewise held unenforceable contracts that explicitly relieve employers of tort liability, relying either on common law prohibitions against such contracts, *see Barnhart v. Kansas City M. & O. Ry. Co. of Tex.,* 107 Tex. 638, 184 S.W. 176, 179 (1916), or upon the Workers' Compensation Act, *see Petroleum Cas. Co. v. Smith,* 274 S.W.2d 150, 151 (Tex.Civ.App.-San Antonio 1954, writ ref'd) (noting that "[t]he right to workmen's compensation is statutory, and cannot be abridged by private agreements or special applications for employment"); *Clevenger v. Burgess,* 31 S.W.2d 675, 678 (Tex.Civ.App.-Beaumont 1930, writ ref'd); *Tex. Employers Ins. Ass'n v. Peppers,* 133 S.W.2d 165, 167 (Tex.Civ.App.-Galveston 1939, writ dism'd) ("[T]he courts will not enforce contracts which are either expressly or impliedly prohibited by the [Workers' Compensation] Act.").

This case concerns the validity of a subscribing employer's use of an agreement that, in the course of requiring arbitration between the parties in work-related disputes, imposes a series of procedural and substantive limits on the employee's rights. We must analyze the challenged limitations in light of the policies underlying the Workers' Compensation Act, and the purposes of its anti-retaliation provisions, to determine whether they improperly shift the cost of injury from a subscribing employer onto its employees in contravention of the Act's provisions. *Cf. Lawrence v. CDB Servs., Inc.,* 44 S.W.3d 544, 550 (Tex.2001) (noting that the agreements did not "shift the risk of on-the-job injuries to the employees"); *see also Gentry v. Superior Court,* 42 Cal.4th 443, 456, 64 Cal.Rptr.3d 773, 782, 165 P.3d 556 (2007), *cert. denied* 552 U.S. 1296, 128 S.Ct. 1743, 170 L.Ed.2d 541 (2008) (noting that under California law, when an employee is bound by a predispute arbitration agreement to adjudicate nonwaivable statutory employment rights, the arbitration agreement may not limit damages, discovery must be sufficient to arbitrate the claim, there must be a written arbitration decision, and the employer must pay all costs "unique to arbitration").

## V. The Challenged Arbitration Provisions

### A. Limitation of Remedies

 [32]    [33]    The Workers' Compensation Act specifies that "[a] person who violates section 451.001 is liable for reasonable damages incurred by the employee as a result of the violation," and that "[a]n employee discharged in violation of section 451.001 is entitled to reinstatement in the former position of employment." TEX. LAB.CODE § 451.002(a)-(b). We have previously explained that "reasonable damages" are not limited to actual damages, *see Azar Nut Co. v. Caille,* 734 S.W.2d 667, 669 (Tex.1987), but may include future damages, as well as exemplary or punitive damages when it is shown that the employer acted with actual malice in retaliating against the employee for filing a workers' compensation claim. *See Cont'l Coffee Prods. v. Cazarez,* 937 S.W.2d 444, 454 (Tex.1996);  **\*352** *Carnation Co. v. Borner,* 610 S.W.2d 450, 454–55 (Tex.1980). The arbitration agreement in this case eliminates two types of remedies available under the anti-retaliation provisions of the Workers' Compensation Act, prohibiting the arbitrator from ordering reinstatement or awarding punitive damages. *See* TEX. LAB.CODE § 451.002 (providing for reinstatement and an award of reasonable damages). Luna contends these limitations render the agreement unconscionable and unenforceable because they prevent him from effectively vindicating his statutory rights in arbitration, thus undercutting the basic assumptions of the FAA. *See*

*Gilmer,* 500 U.S. at 28, 111 S.Ct. 1647 (noting that claims under other federal statutes are appropriate for arbitration so long as the litigant can effectively vindicate any statutory rights). The court of appeals agreed with Luna. 175 S.W.3d at 323–24. Although it noted other courts' decisions upholding punitive-damages waivers, *id.* at 323, and further noted that preclusion of statutory remedies may not always portend unconscionability, *id.,* the court held that the preclusion of remedies here interfered with Luna's ability to bring his retaliatory-discharge claim under the Workers' Compensation Act and thus weighed toward the contract's unconscionability, *id.*

Poly–America argues that the court of appeals' decision conflicts with *Pony Express Courier Corp. v. Morris,* 921 S.W.2d 817, 822 (Tex.App.-San Antonio 1996, no writ), and decisions of other courts indicating that limitations of remedies are permissible, *e.g., Inv. Partners v. Glamour Shots Licensing, Inc.,* 298 F.3d 314, 318 n. 1 (5th Cir.2002). Because we view the anti-retaliation provisions of the Workers' Compensation Act as a non-waivable legislative system for deterrence necessary to the nondiscriminatory and effective operation of the Texas Workers' Compensation system as a whole, we agree with Luna that the provisions eliminating key remedies under the statute are unenforceable.

 **[34]**   An arbitration agreement covering statutory claims is valid so long as "the arbitration agreement does not waive substantive rights and remedies of the statute and the arbitration procedures are fair so that the employee may effectively vindicate his statutory rights." *In re Halliburton,* 80 S.W.3d at 572. " '[B]y agreeing to arbitrate a statutory claim, a party does not forgo the substantive rights afforded by the statute; it only submits to their resolution in an arbitral, rather than a judicial, forum.' " *Gilmer,* 500 U.S. at 26, 111 S.Ct. 1647 (quoting *Mitsubishi,* 473 U.S. at 628, 105 S.Ct. 3346). In this case, Luna contends Poly–America acted with actual malice in unlawfully discharging him, a claim for which the Workers' Compensation Act allows punitive damages. *See* TEX. LAB.CODE § 451.002; *Azar Nut Co.,* 734 S.W.2d at 668. Permitting an employer to contractually absolve itself of this statutory remedy would undermine the deterrent purpose of the Workers' Compensation Act's anti-retaliation provisions. In creating the Texas Workers' Compensation Act, the Legislature carefully balanced competing interests—of employees subject to the risk of injury, employers, and insurance carriers—in an attempt to design a viable compensation system, all within constitutional limitations. *See Garcia,* 893 S.W.2d at 521. Were we to

endorse Poly–America's position and permit enforcement of these remedy limitations, a subscribing employer could avoid the Act's penalties by conditioning employment upon waiver of the very provisions designed to protect employees who have been the subject of wrongful retaliation.

Our decision in *Lawrence,* 44 S.W.3d 544, is fully consistent with this view. There, employees of a non-subscribing employer **\*353** elected, after they were hired, to participate in an employer benefit plan that would provide injured employees with specified benefits in lieu of common law remedies. *Id.* at 545–46. We refused to void the agreement on public-policy grounds, discerning "no clear legislative intent to prohibit agreements such as those presented." *Id.* at 545. We emphasized that participation in the workers' compensation program is voluntary for employers in Texas, and that courts are ill equipped to weigh whether a non-subscribing employer's particular benefits plan would undermine the purposes of the Workers' Compensation Act. *See id.* at 551–53.[2] Our decision was specifically tailored to *non-subscribing* employers who elected *not* to participate in the workers' compensation program. Importantly, we distinguished cases involving contracts imposed as a condition of employment, emphasizing that "[t]he distinction between an employment contract that requires a prospective employee, as a condition of the receipt or retention of employment, to agree to limit the employer's liability ... and a voluntary occupational insurance program, in which the employee has the option to enroll ... is decisive." *Lawrence,* 44 S.W.3d at 550 (quoting *Brito v. Intex Aviation Servs., Inc.,* 879 F.Supp. 650, 654 (N.D.Tex.1995)) (citing *Clevenger,* 31 S.W.2d at 678; *Barnhart,* 184 S.W. at 176)).

This case presents just such a liability-limiting provision, imposed as a condition of employment, which we suggested in *Lawrence* would violate public policy. *See id.* Such waivers would allow subscribing employers to enjoy the Act's limited-liability benefits while exposing workers to exactly the sort of costs—of injuries paid for by the employee for fear of retribution for making a claim—that the Act is specifically designed to shift onto the employer. The balance established by the Act is thus "tipped so that the employee's benefits under the statute are substantially reduced, [and] the clear intent of the legislature is thwarted." *Hazelwood,* 596 S.W.2d at 206. As we have previously refused to enforce private agreements that allow subscribing employers to reap the system's benefits while burdening employees with the cost of injury, so too we find the provisions of the present contract—which substantively limit Poly–America's liability

for wrongful retaliation and thereby undermine the deterrent regime the Legislature specifically designed to protect Texas workers—void under Texas law. *See Tex. Steel,* 533 S.W.2d at 115; *Holt,* 708 F.2d at 91.

### B. Fee–Splitting Provision

The arbitration agreements provide that, in the event of a claim, all fees related to arbitration—including but not limited to mediation fees, the arbitrators' fees, costs of procuring a location for a hearing, and court reporter fees—will be split equally between the employer and the employee, with the employee's contribution capped at an amount equal to "the gross compensation earned by the Employee in Employee's highest earning month in the twelve months prior to the time the arbitrator issues his award." The court of appeals held that this provision "weigh[ed] heavily toward a finding of substantive unconscionability." 175 S.W.3d at 322. Poly–America argues that this was clear error: first, because the court of appeals improperly inferred that Luna could not afford likely arbitration costs based solely on subjective evidence and, second, because it failed to compare such costs to the **\*354** expected costs of litigation.[3] Luna responds that it was Poly–America that failed to present evidence of the comparative cost of litigation and that the evidence presented was sufficient to allow an objective determination that the likely costs of arbitration were beyond Luna's financial means. We begin with the evidentiary challenge.

### 1. Evidentiary Challenge

 [35]    [36]    Poly–America claims that the court of appeals, by crediting Luna's factual allegations concerning his financial inability to share arbitration costs, improperly applied a new evidentiary standard that will require all parties seeking to compel arbitration to engage in expensive discovery whenever a resisting party submits cursory and subjective evidence that arbitration costs are "unaffordable." This evidentiary burden, Poly–America argues, is contrary to Texas law and policy that supports summary disposition of motions to compel arbitration. In response, Luna contends the facts upon which the court of appeals relied could have been controverted by affidavit or cross-examination, which Poly–America failed to do; consequently, the court of appeals based its ruling on the undisputed facts established by Luna's affidavits. Both parties cite *Anglin,* 842 S.W.2d at 269, to support their respective positions. There, we defined the

proper circumstances under which a trial court should hold a full evidentiary hearing on a motion to compel arbitration:

> Because the main benefits of arbitration lie in expedited and less expensive disposition of a dispute, and the legislature has mandated that a motion to compel arbitration be decided summarily, we think it unlikely that the legislature intended the issue to be resolved following a full evidentiary hearing in all cases. We also envision that the hearing at which a motion to compel arbitration is decided would ordinarily involve application of the terms of the arbitration agreement to undisputed facts, amenable to proof by affidavit. With these considerations in mind, we hold that the trial court may summarily decide whether to compel arbitration on the basis of affidavits, pleadings, discovery, and stipulations. However, if the material facts necessary to determine the issue are controverted, by an opposing affidavit or otherwise admissible evidence, the trial court must conduct an evidentiary hearing to determine the disputed material facts.

*Id.* Because the only facts Luna presented on the motion to compel were uncontroverted under this standard—Luna's affidavits accompanying his original petition were neither contradicted nor challenged in Poly–America's response—we believe the court of appeals acted properly in crediting those facts on appeal.

Luna attached to his original petition his own affidavit and that of an expert witness providing detailed estimates of the likely cost of arbitration in Luna's case, and Luna's expected share under the agreement's capped fee-splitting provision based on his monthly salary (approximately $3,300.00) as a Poly–America supervisor. Luna described his anticipated share of the arbitration costs as "way more money than I can afford," and averred that, if he **\*355** had to pay such an amount to have his claim determined, he would be unable to pursue his claim against the company unless he could find an attorney willing to pay those fees. Luna recounted that he had attempted to retain two attorneys, but they had refused

to represent him on a contingent-fee basis because of the arbitration agreement.

Poly–America did not dispute these facts but asserted legal arguments in its pleadings that the cost provisions, as written or as applied, were not unconscionable under Texas law. At the hearing on its motion to compel, Poly–America again asserted only legal arguments in response to Luna's challenge to the cost-splitting provision. There is no indication in the record that the trial court discredited or otherwise viewed the facts recited in Luna's affidavits as insufficient; rather, on the basis of Poly–America's legal arguments, the trial court granted the motion to compel. This disposition was consistent with our statements in *Anglin* in which we indicated that motions to compel should be decided summarily unless disputed issues of fact require a full evidentiary hearing. *See id.*

However, the court of appeals clearly differed from the trial court in its view of the law. It held that the trial court's granting of the motion to compel—in light of Luna's averred inability to afford his likely arbitration costs and the agreement's other limitations—was an abuse of discretion. 175 S.W.3d at 318–20. In doing so, the court of appeals properly credited the undisputed facts contained in Luna's affidavits as to the total expected cost of arbitration and Luna's anticipated share based upon his pre-termination monthly income. *Id.* at 319–20. Poly–America contends the court of appeals improperly ruled based on Luna's subjective, and thus practically incontrovertible, belief that he could not afford arbitration, which does not satisfy this Court's requirements of "specific" evidence to support claims of unconscionably expensive arbitration. *See In re U.S. Home Corp.,* 236 S.W.3d 761, 764 (Tex.2007). However, the court of appeals relied not solely upon Luna's belief but upon his and his expert's specific monetary estimates, which provided objective support for Luna's uncontroverted claim that arbitration costs would preclude his pursuit of the lawsuit. *See* 175 S.W.3d at 319. The court of appeals did not, therefore, rely solely on subjective and incontrovertible allegations.

### 2. Unconscionability of Fee–Splitting Provisions

Poly–America alternatively challenges the court of appeals' conclusion that the agreement's cost-allocation provisions favor a finding of unconscionability because the court did not consider the relative costs that Luna would likely incur if the case were litigated in court—costs that, based on Poly–

America's estimates, would greatly exceed the capped cost of arbitration—and Luna failed to provide any evidence of the actual cost of arbitration that he would bear. Although we have no doubt that some fee-splitting provisions may operate to discourage employees like Luna from seeking vindication of their rights under the Workers' Compensation Act, we must agree with Poly–America that the trial court did not abuse its discretion in ordering arbitration in this case.

Courts across the country have universally condemned the use of fee-splitting agreements in employment contracts that have the effect of deterring potential litigants from vindicating their statutory rights in an arbitral forum. *See Green Tree,* 531 U.S. at 90–91, 121 S.Ct. 513. Some courts have gone so far as to find fee-sharing agreements unenforceable *per se. See, e.g., Cole v. Burns Int'l Sec.* **\*356** *Servs.,* 105 F.3d 1465, 1483–85 (D.C.Cir.1995), *cited in Halliburton,* 80 S.W.3d at 572; *Shankle v. B–G Maint. Mgmt. of Colo., Inc.,* 163 F.3d 1230, 1233–35 (10th Cir.1999); *Paladino v. Avnet Computer Techs., Inc.,* 134 F.3d 1054, 1062 (11th Cir.1998). These courts reason that "an employee can never be required, as a condition of employment, to pay an arbitrator's compensation in order to secure the resolution of statutory claims.... [T]his would surely deter the bringing of arbitration and constitute a *de facto* forfeiture of statutory rights." *Cole,* 105 F.3d at 1468; *accord Shankle,* 163 F.3d at 1235 ("Such a result clearly undermines the remedial and deterrent functions of ... anti-discrimination laws.").

[37] [38] We agree that fee-splitting provisions that operate to prohibit an employee from fully and effectively vindicating statutory rights are not enforceable. *See Halliburton,* 80 S.W.3d at 572. However, this Court joins the majority of other courts which—though recognizing the same policy concerns articulated by courts holding fee-splitting arrangements *per se* unconscionable—require *some evidence* that a complaining party will likely incur arbitration costs in such an amount as to deter enforcement of statutory rights in the arbitral forum. *See U.S. Home Corp.,* 236 S.W.3d at 764; *FirstMerit Bank,* 52 S.W.3d at 756–57. As federal courts have likewise recognized:

> [I]n some cases, the potential of incurring large arbitration costs and fees will deter potential litigants from seeking to vindicate their rights in the arbitral forum.... [I]f the fees and costs of the arbitral forum deter potential litigants, then that forum is clearly not an effective, or even adequate,

substitute for the judicial forum.... [T]he burden of demonstrating that incurring such costs is likely under a given set of circumstances rests, at least initially, with the party opposing arbitration.

*Morrison v. Circuit City Stores, Inc.,* 317 F.3d 646, 659–60 (6th Cir.2003); *accord Bradford v. Rockwell Semiconductor Sys., Inc.,* 238 F.3d 549, 556 (4th Cir.2001); *Rosenberg v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 170 F.3d 1, 16 (1st Cir.1999).

 **[39]**    Luna contends the magnitude of the fee he could incur under the arbitration agreement, which he estimates to be as high as $3,300, will prevent him from pursuing his claim. Poly–America counters that litigation costs would be much higher, and therefore the arbitration agreement's capped cost-splitting provision benefits the employee and cannot be unconscionable. It is true that in evaluating the enforceability of fee-splitting provisions, some courts take into account the relative costs of arbitration versus litigation. *See, e.g., Bradford,* 238 F.3d at 556 n. 5 (focusing upon "a claimant's expected or actual arbitration costs and his ability to pay those costs, measured against a baseline of the claimant's expected costs for litigation and his ability to pay those costs"). However, at this stage of the proceedings, much of this evidence is necessarily speculative, and thus counsels against a court's *ex ante* interference with arbitration.

We do not doubt that arbitration costs might be so high in a given case as to preclude access to the forum. But "the 'risk' that [a claimant] will be saddled with prohibitive costs is too speculative to justify the invalidation of an arbitration agreement." *Green Tree,* 531 U.S. at 91, 121 S.Ct. 513. Luna has not demonstrated that the ability to pursue his claim in the arbitral forum hinges upon his payment of the estimated costs; to the contrary, depending upon the circumstances, Luna may not have to bear any cost at all, and **\*357** Poly–America has presented some evidence that the capped cost-splitting arrangement may even benefit Luna. The fee-splitting provision in Luna's arbitration agreement caps his share of costs at "the gross compensation earned by Employee in Employee's highest earning month in the *twelve months prior to the time the arbitrator issues his award.*" (Emphasis added). Luna, however, presented evidence of his "highest monthly salary *in the year preceding [his] termination from the company,*" a period necessarily earlier than that relevant under the arbitration agreement. The record contains no fact-based estimation of Luna's wages in the relevant time period and, thus, no evidence of his likely share of arbitration costs.

Just as we allow litigants who demonstrate an inability to pay costs to proceed with their claims in court, however, we see nothing that would prevent arbitrators from fairly adjusting employee cost provisions when necessary to allow full vindication of statutory rights in the arbitral forum. *See* TEX.R. CIV. P. 145. The contract presented in this case specifically provides that the arbitrator may modify unconscionable terms; if the cost provisions precluded Luna's enforcement of his non-waivable statutory rights, they would surely be unconscionable for the reasons we have explained and the arbitrator would be free to modify them. The arbitrator is better situated to assess whether the cost provision in this case will hinder effective vindication of Luna's statutory rights and, if so, to modify the contract's terms accordingly. *See Halliburton,* 80 S.W.3d at 572. We conclude the trial court did not abuse its discretion in refusing to declare the contract's cost-splitting provision unconscionable and nullify the arbitration agreement.

### C. Discovery Limitations

 **[40]**    The 2002 agreement provides that each party may serve on the other a single set of twenty-five interrogatories (including sub-parts) and one set of twenty-five requests for production or inspection of documents or tangible things. Additionally, the agreement includes limitations alleged by Luna to be unconscionable: (1) a limitation of each party to a single, six-hour deposition; (2) a prohibition on requests for admission; (3) a ban on inquiry into Poly–America's finances; and (4) a confidentiality provision requiring confidentiality of the parties and their attorneys regarding all aspects of the arbitration. Luna contends these limitations make it virtually impossible for him to prove his claim of retaliatory discharge and render the arbitration agreement unconscionable.

Although an issue of first impression in this Court, several courts around the country have analyzed the enforceability of similar arbitration provisions limiting parties' access to various forms of discovery. Applying a rule functionally equivalent to that used to analyze fee-splitting provisions, these courts refuse to enforce such limitations when adequate evidence is presented that a plaintiff's ability to present his or her claims in an arbitral forum is thereby hindered. *See, e.g., Hulett v. Capitol Auto Group, Inc.,* No. 07–6151–AA, 2007 WL 3232283, at *4–*5 (D.Or. Oct.29,

2007) (holding discovery restrictions that prohibited requests for admission or interrogatories and limited parties to three depositions unconscionable because they "serve to unreasonably withhold information from plaintiff that would otherwise be available through discovery, thus hindering her ability to present her claims in an arbitration forum"); *accord Ostroff v. Alterra Healthcare Corp.,* 433 F.Supp.2d 538, 547 (E.D.Pa.2006). Courts upholding arbitration provisions containing discovery limitations have done so in recognition of the same principle, but determined that a particular **\*358** party failed to provide adequate evidence that the provisions "prove insufficient to allow ... claimants ... a fair opportunity to present their claims." *Gilmer,* 500 U.S. at 31, 111 S.Ct. 1647; *see, e.g., In re Cotton Yarn Antitrust Litig.,* 505 F.3d 274, 286–87 (4th Cir.2007); *Amisil Holdings, Ltd. v. Clarium Capital Mgmt.,* No. C06–05255MJJ, 2007 WL 2768995, at \*4 (N.D.Cal. Sept.20, 2007) ("[Claimant] has not adequately demonstrated why arbitration under the AAA rules would deny it a fair opportunity to present its claims.").

 **[41]** **[42]** We agree with these courts that, where the underlying substantive right is not waivable, *ex ante* limitations on discovery that unreasonably impede effective prosecution of such rights are likewise unenforceable. However, because the relevant inquiry depends upon the facts presented in a given case and the particular discovery limitations' effect upon the relevant statutory regime, we are doubtful that courts—assessing claims and discovery limitations before arbitration begins—are in the best position to accurately determine which limits on discovery will have such impermissible effect.

In this case, Luna's expert witness testified that in most employment-discharge cases the employer only needs to take the plaintiff's deposition, while the plaintiff generally needs testimony from a number of witnesses to disprove the employer's likely defense that termination was based on poor performance. Additionally, the expert stated, the employee will likely wish to depose additional witnesses to show a pattern or practice of discrimination, whereas the employer typically has a ready pool of available employees and managers to assist in preparing for the arbitration. For these reasons, the expert concluded, the arbitration agreement's discovery limitations "significantly reduce the plaintiff's ability to prevail in arbitration, regardless of how strong a plaintiff's case is on the merits."

We agree that if the discovery limitations the arbitration agreement imposes operate to prevent effective presentation of Luna's claim they would be unenforceable. But at this point in the proceedings, without knowing what the particular claims and defenses—and the evidence needed to prove them—will be, discerning the discovery limitations' potential preclusive effect is largely speculative. The assessment of particular discovery needs in a given case and, in turn, the enforceability of limitations thereon, is a determination we believe best suited to the arbitrator as the case unfolds. As with cost-sharing, discovery limitations that prevent vindication of non-waivable rights or "prove insufficient to allow [Luna] a fair opportunity to present [his] claims," *Gilmer,* 500 U.S. at 31, 111 S.Ct. 1647, would be unconscionable and thus not binding on the arbitrator, as the agreement in this case specifically acknowledges. At this point in the proceedings, though, we cannot conclude that the evidence presented to the trial court compelled a finding that the discovery limitations were *per se* unconscionable. Thus, the trial court did not abuse its discretion.

### D. Prohibition on Inquiry into "Good Cause"

 **[43]** Luna claims the arbitration provision that prohibits the arbitrator's ability "to apply a 'just cause' or 'good cause' standard to claims relating to Employee's claims concerning his employment or separation therefrom" is substantively unconscionable because it prohibits, in a retaliatory-discharge case, inquiry into whether the employer had a valid, nondiscriminatory reason for firing the employee. Poly–America contends the contract cannot be read as Luna claims, and in fact does not **\*359** prevent such an inquiry. We agree with Poly–America, and with the court of appeals, that this prohibition does not operate as Luna asserts; rather, the prohibition simply emphasizes that the contract relates to at-will employment. *See Montgomery County Hosp. Dist. v. Brown,* 965 S.W.2d 501, 502 (Tex.1998). Thus, the prohibition prevents the arbitrator from substituting a "good cause" requirement for the "at will" standard. The provision does not, however, prohibit inquiry into whether Poly–America improperly terminated Luna in retaliation for his filing of a workers' compensation claim. Because we read the provision merely to articulate an accepted rule of employment contracts, and not to restrict a necessary inquiry into the motivations behind Poly–America's termination of Luna in this case, we agree with the court of appeals that the provision is not unconscionable. *See In re Palm Harbor Homes, Inc.,* 195 S.W.3d 672, 678 (Tex.2006) (rejecting a claim that an arbitration provision was substantively unconscionable

where the challenged provision "effectively incorporate[d] established provisions of contract law").

### E. One–Year Limitations Period

The arbitration agreement includes a clause that requires written notice of a claim to be filed within a maximum of one year from the events giving rise to an arbitrable claim. Luna contends this provision unconscionably shortens the two-year statute of limitations applicable to claims of retaliatory discharge. See *Johnson & Johnson Med., Inc. v. Sanchez,* 924 S.W.2d 925, 927 (Tex.1996). However, as Luna filed this case well within the one-year period and thus suffered no prejudice from this provision, it is immaterial to Luna's claims of substantive unconscionability.

### F. Lifetime Application

Finally, Luna argues that the arbitration agreement unconscionably applies even to claims that may arise after Luna's employment with Poly–America has ended and which may have nothing to do with Luna's employment. While we can imagine circumstances that might present a closer question, Luna's claims here concern his employment and termination, the central focus of the agreement. We thus agree with the court of appeals that this provision does not render the arbitration agreement *per se* unconscionable. See 175 S.W.3d at 326.

### VI. Severability

 **[44]**    The arbitration agreement in this case contains a severability clause, which provides as follows:

> Should any term of this Agreement be declared illegal, unenforceable, or unconscionable, the remaining terms of the Agreement shall remain in full force and effect. To the extent possible, both Employee and Company desire that the Arbitrator modify the term(s) declared to be illegal, unenforceable, or unconscionable in such a way as to retain the intended meaning of the term(s) as closely as possible.

Poly–America argues that, even if elements of its arbitration agreement with Luna are unconscionable, arbitration is nevertheless required because the unconscionable provisions are severable from the general agreement to arbitrate. [4] Luna **\*360** contends the unconscionable provisions are integral to the entire contract and are therefore not severable. The court of appeals agreed with Luna, stating that the fee-splitting and remedies-limitation provisions "together deprive Luna of his opportunity to vindicate his claim in the arbitral forum" and concluding that "those provisions are integral to the purpose of the agreement and cannot be severed." 175 S.W.3d at 328. The court of appeals came to this conclusion, it appears, by identifying the fee-splitting and remedies-limitation provisions as weighing in favor of unconscionability "as a whole," but the court did not identify any particular provision that, by itself, would defeat the agreement's purpose. See *id.* at 322, 324. We have determined, however, that the remedies-limitation provisions are individually unconscionable and void, and see no reason why they cannot be easily excised from the contract without defeating its underlying purpose.

 **[45]**    **[46]**    **[47]**    An illegal or unconscionable provision of a contract may generally be severed so long as it does not constitute the essential purpose of the agreement. See *Williams v. Williams,* 569 S.W.2d 867, 871 (Tex.1978); *see also Hoover Slovacek,* 206 S.W.3d at 565 (citing RESTATEMENT (SECOND) OF CONTRACTS § 208 (1981)). Whether or not the invalidity of a particular provision affects the rest of the contract depends upon whether the remaining provisions are independent or mutually dependent promises, which courts determine by looking to the language of the contract itself. See *John R. Ray & Sons, Inc. v. Stroman,* 923 S.W.2d 80, 86 (Tex.App.-Houston [14th Dist.] 1996, writ denied) (citing *Hanks v. GAB Bus. Servs., Inc.,* 644 S.W.2d 707, 708 (Tex.1982)). The relevant inquiry is whether or not parties would have entered into the agreement absent the unenforceable provisions. See *Patrizi v. McAninch,* 153 Tex. 389, 269 S.W.2d 343, 348 (1954); *see also City of Beaumont v. Int'l Ass'n of Firefighters, Local Union No. 399,* 241 S.W.3d 208, 215 (Tex.App.-Beaumont 2007, no pet.) (citing *Rogers v. Wolfson,* 763 S.W.2d 922, 925 (Tex.App.-Dallas 1989, writ denied)); *Stroman,* 923 S.W.2d at 86 (citing *Frankiewicz v. Nat'l Comp. Assocs.,* 633 S.W.2d 505, 507–08 (Tex.1982)). We have previously allowed severance of illegal contract provisions where the invalid provisions were "only a part of the many reciprocal promises in the agreement"

and "did not constitute the main or essential purpose of the agreement." *Williams,* 569 S.W.2d at 871.

The 2002 version of the arbitration agreement in this case is over five pages long and contains numerous provisions not challenged by Luna as imposing any unconscionable burdens: procedures for mediation, selection of a neutral arbitrator, filing of motions, and other general provisions governing arbitration procedures. We agree with Poly–America that the intent of the parties, as expressed by the severability clause, is that unconscionable provisions be excised where possible. Furthermore, it is clear by the contract's terms that the main purpose of the agreement is for the parties to submit their disputes to an arbitral forum rather than proceed in court. *See id.* Excising the unconscionable provisions we have identified will not defeat or undermine this purpose, which we have upheld in the context of agreements to arbitrate employment disputes. *See AdvancePCS,* 172 S.W.3d at 608; *EZ Pawn Corp.,* 934 S.W.2d at 90; *Cantella & Co.,* 924 S.W.2d at 944.

### VII. Conclusion

We hold invalid, as substantively unconscionable and void, provisions of the parties' **\*361** contract that prohibit the award of punitive damages or reinstatement and thus inhibit effective vindication of Luna's retaliatory-discharge claim in an arbitral forum. We further hold that the trial court did not abuse its discretion in allowing the arbitrator to determine whether the fee-splitting agreement and discovery limitations —as applied in the course of arbitration—are unconscionable. Because we find the invalid remedies-limitation provisions severable from the agreement to arbitrate, which we conclude is otherwise enforceable, the trial court did not abuse its discretion in compelling arbitration. Accordingly, we conditionally grant the writ of mandamus.

Justice BRISTER filed a dissenting opinion.

Justice WILLETT did not participate in the decision.

Justice BRISTER, dissenting.
The hard thing about granting mandamus relief is knowing when to stop. This Court has tried over the years to set mandamus boundaries through various tests, all of which soon generated exceptions, and most of which were met with objections that the "established" boundaries of mandamus were being ignored.

Only two years ago, we held in *In re Palacios* that mandamus review was available for "orders that *deny* arbitration, *but not* orders that *compel* it."[1] We noted that this was a reversal of previous practice,[2] but was necessitated by the Supreme Court's 2000 opinion in *Green Tree Financial Corp. v. Randolph,* which said that orders compelling arbitration "would not be appealable" unless they included final dismissal of the case.[3] Today the Court comes full circle, saying once again that mandamus review of orders compelling arbitration is "proper," though courts should be "hesitant" about it.[4] Apparently, so long as one expresses qualms, *Palacios* is a dead letter.

Of course, firm rules governing mandamus are made to be broken, as issuance of the writ is primarily a matter of judgment and prudence.[5] As the United States Supreme Court said in 2004, mandamus is appropriate if a party shows a clear right, no alternative remedy, and that mandamus is "appropriate under the circumstances."[6] This test (especially the last prong) defies precise application, but years of judicial effort have failed to produce a better one. As a result, reasonable judges will sometimes **\*362** disagree whether mandamus is "prudent" or "appropriate under the circumstances," and sometimes decide differently in one case than the next. But departing from *Palacios* is neither prudent nor appropriate for at least five reasons.

First, Congress amended the Federal Arbitration Act in 1988 so that it "permits immediate appeal of orders *hostile* to arbitration, ... but bars appeal of interlocutory orders *favorable* to arbitration."[7] Texas law is to the same effect.[8] As the trial court's order here was favorable to arbitration, we should defer to the cost-benefit analysis already conducted by the federal and state legislatures.[9] We cannot simply substitute mandamus when interlocutory appeal is prohibited without running into serious Supremacy Clause problems;[10] "[f]requent pre-arbitration review would inevitably frustrate Congress's intent to move the parties to an arbitrable dispute out of court and into arbitration as quickly and easily as possible."[11]

Second, the trial court ordered these parties to arbitration five years ago. Had mandamus proceedings not intervened, this dispute would have long since been concluded. Surely the time and expense incurred arbitrating this case would have been less than that incurred in mandamus review. And

now that mandamus review is concluded, the parties must go to arbitration anyway. Given our state's strong public policy favoring freedom of contract,[12] claims that a contract is unconscionable are asserted far more often than they are sustained. After today's decision, it is hard to see how any arbitration cannot be stopped in its tracks by alleging unconscionability.

Third, today's opinion is purely advisory; if an arbitrator ignores it, there is little we can do. Both federal and state law require courts to enforce an arbitrator's decision, no matter what it is, with very few exceptions.[13] The allowable exceptions concern extrinsic or procedural matters like corruption, fraud, or refusing to hear evidence;[14] they do not include (as the Supreme Court just held) disregarding the law, even if a legal error is "manifest."[15] What is the benefit of mandamus review if the resulting order can be ignored?

 **\*363**  Fourth, even if most arbitrators would comply with an appellate court's mandamus rulings, issuing them creates a hybrid procedure unknown to the arbitration acts. As already noted, those statutes commit matters concerning the law and the merits to the arbitrators and foreclose judicial review of the details of the result. This also appears to violate the parties' agreement in this case, which authorized the arbitrator to address unconscionability:

> Should any term of this Agreement be declared illegal, unenforceable, or unconscionable, the remaining terms of the Agreement shall remain in full force and effect. To the extent possible, both Employee and Company desire that the Arbitrator modify the term(s) declared to be illegal, unenforceable, or unconscionable in such a way as to retain the intended meaning of the term(s) as closely as possible.

Telling the arbitrators in advance what legal rulings they should make (as the Court does today) is an improper way to circumvent these restrictions.

Fifth and finally, the Court decides an important question in the abstract that the arbitration may render moot. The Court concedes that unconscionability of the fee-splitting and discovery-limiting clauses should be deferred to the arbitrator. But unconscionability of the remedy-stripping

clause is just as fact-based, and just as speculative until all the facts are arbitrated. The fairness of such clauses is not as one-sided as the Court suggests; many employees might actually *prefer* cash for lost wages (and no appellate delays) rather than reinstatement or a long shot at punitive damages. As the Court notes, several courts have held that such "limitations of remedies are permissible."[16] Twice in 2003 the Supreme Court declined to hold that a remedy-stripping arbitration clause violates the FAA—each time deferring the question until after arbitrators had addressed it.[17] We should do the same here.

We have never held (as the Court holds repeatedly today) that an arbitration agreement is invalid unless an employee can "effectively vindicate his statutory rights."[18] We did not say so in *In re Halliburton Co.* (as the Court's citations aver), where that phrase appears only in a parenthetical describing an opinion by an intermediate appellate court in Michigan, an opinion we neither approved nor adopted.[19] Nor does the Court's judgment comply with this new standard. Despite the remedy limits imposed here, an arbitrator could still award Johnny Luna 50 years of future lost wages, which would certainly seem to "effectively vindicate his statutory rights." Even more than the fee-splitting or discovery-limiting provisions, it is simply too early to tell whether the remedy-stripping provisions will be unfair to Luna at all.

Such an important and controversial question should not be decided in such an offhanded and abstract way. We should instead wait to see whether the arbitration **\*364** award makes such a decision necessary; "if it is not necessary to decide more, it is necessary not to decide more."[20]

The Court overlooks all these problems on the ground that mandamus "has been broadly applied" by federal courts to review orders compelling arbitration.[21] But the string citations that follow do not support that claim. Of the five cases cited, three predated *Green Tree,*[22] and a fourth did not involve a trial court order favorable to arbitration.[23] The single case granting mandamus relief from an order favorable to arbitration was by the Ninth Circuit, the court widely recognized as the "most hostile,"[24] "far to the left of center,"[25] and "renegade" court in the country in employment arbitration cases.[26] Even so, mandamus was granted in that case only because arbitrating the single class representative's case could moot the class action he had

brought, wiping it out without appellate review.[27] In short, there is no "broad" consensus for doing precisely the opposite of what Congress and the Texas Legislature intended.

 **\*365** It is certainly true that leaving matters like unconscionability to arbitrators will mean development of the law is "substantially hindered,"[28] but the same could be said of arbitration in *all* cases. It is hard to see the allure of a system in which decision-makers can ignore the law, unless of course one is planning to ignore the law oneself. Based on its popularity, few arbitrators apparently go that far. But even carefully selected judges and jurors make mistakes, and carefully selected arbitrators are surely no less fallible. Nevertheless, these are policy matters that only Congress can address or amend; we cannot disregard the express legislative limits on interlocutory review merely by calling it mandamus when we think the questions are important and the issues well-briefed.

While appeal from arbitration awards is very limited, that appeal is an adequate remedy unless the benefits of mandamus outweigh the costs.[29] Considering the costs expended so far, I doubt Johnny Luna would consider them outweighed by getting the right to seek reinstatement in arbitration (which employees rarely request) and punitive damages (which they rarely get). Accordingly, I agree with the Court that the court of appeals erred in reviewing and reversing the trial court's order compelling arbitration. But I disagree that we have any place reviewing those matters either. To that extent, I respectfully dissent.

**Parallel Citations**

156 Lab.Cas. P 60,669, 28 IER Cases 140, 51 Tex. Sup. Ct. J. 1237

---

Footnotes

1   While it is true that several of these cases pre-date the Supreme Court's decision in *Green Tree,* they do not pre-date the authority on which the Supreme Court relied in noting that an order compelling arbitration and staying rather than dismissing the underlying litigation "would not be *appealable.*" 531 U.S. at 87 n. 2, 121 S.Ct. 513 (citing 9 U.S.C. § 16(b)(1)) (emphasis added). Unlike the present case, the two cases in which the courts denied mandamus relief from compel-and-stay orders did not involve claims that enforcement of the arbitration provisions would prevent the plaintiffs from vindicating important statutory rights. *See Manion,* 255 F.3d 535; *McDermott Int'l, Inc.,* 981 F.2d 744. In *Douglas,* the Ninth Circuit granted mandamus relief, concluding that a choice-of-law provision in the arbitration agreement would not allow enforcement of the agreement under circumstances that the forum state would deem unconscionable. *Douglas,* 495 F.3d at 1068.

2   The Texas Legislature, exercising its policy-making role, responded immediately and outlawed such plans. *See* TEX. LAB.CODE § 406.033(e).

3   The Society for Human Resource Management Texas State Council submitted an *amicus* brief supporting Poly–America's arguments, arguing that the court of appeals wrongfully failed to compare Luna's alleged costs with the prospective cost of litigation. The Texas Trial Lawyers Association likewise submitted an *amicus* brief supporting Luna, arguing that unconscionability should be determined by comparing "the general financial condition of the claimant's peer group" to estimated arbitration costs.

4   The Court received briefs from *amici curiae* the Texas Association of Business and the Society for Human Resource Management Texas State Council, both of which argue that the court of appeals erred in refusing to sever the provisions it deemed unconscionable from the remainder of the arbitration agreement. The brief submitted by *amicus curiae* the Texas Trial Lawyers Association argues that such severance would be improper.

1   221 S.W.3d 564, 566 (Tex.2006) (emphasis added).

2   *Id.* at 565 (noting abrogation of *Freis v. Canales,* 877 S.W.2d 283, 284 (Tex.1994)).

3   531 U.S. 79, 87 n. 2, 121 S.Ct. 513, 148 L.Ed.2d 373 (2000).

4   262 S.W.3d 337, 347.

5   *See, e.g., CSR Ltd. v. Link,* 925 S.W.2d 591, 597 (Tex.1996) ( "Because of the size and complexity of the asbestos litigation, the most *prudent* use of judicial resources in this case is to permit a preliminary resolution of the fundamental issue of personal jurisdiction by writ of mandamus.") (emphasis added); *In re Dean,* 527 F.3d 391, 396 (5th Cir.2008) ("The decision whether to grant mandamus is largely prudential."); *In re Atlantic Pipe Corp.,* 304 F.3d 135, 140 (1st Cir.2002) (concluding mandamus was "prudent under the circumstances"); *In re Chimenti,* 79 F.3d 534, 539 (6th Cir.1996) (noting availability of interlocutory appeal was merely one of several factors affecting court's "prudential considerations" regarding issuance of mandamus).

6   *Cheney v. U.S. Dist. Court for Dist. of Columbia,* 542 U.S. 367, 380–81, 124 S.Ct. 2576, 159 L.Ed.2d 459 (2004) (holding mandamus should issue when there is (1) no other adequate remedy, (2) a "clear and indisputable" right, and (3) "the writ is appropriate under the circumstances").

7   *Green Tree Fin. Corp.-Ala. v. Randolph,* 531 U.S. 79, 86, 121 S.Ct. 513, 148 L.Ed.2d 373 (2000) (construing 9 U.S.C. § 16) (emphasis added).

8   *See* TEX. CIV. PRAC. & REM.CODE § 171.098; *In re Palacios,* 221 S.W.3d 564, 566 (Tex.2006).

9   *In re McAllen Med. Ctr., Inc.,* 275 S.W.3d 458, ——, 2008 WL 4051053, at *1 (Tex.2008) ("Although mandamus review is generally a matter within our discretion, our place in a government of separated powers requires us to consider also the priorities of the other branches of Texas government.").

10  *See* U.S. CONST. art. VI, cl. 2 ("[T]he Laws of the United States ... shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.").

11  *Perry Homes v. Cull,* 258 S.W.3d 580, 599 (Tex.2008) (quoting *Preston v. Ferrer,* 552 U.S. 346, ——, 128 S.Ct. 978, 169 L.Ed.2d 917 (2008) and *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.,* 460 U.S. 1, 22, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983)) (internal quotations omitted).

12  *Fairfield Ins. Co. v. Stephens Martin Paving, LP,* 246 S.W.3d 653, 664 (Tex.2008); *Fortis Benefits v. Cantu,* 234 S.W.3d 642, 649 (Tex.2007); *Lawrence v. CDB Servs., Inc.,* 44 S.W.3d 544, 553 (Tex.2001).

13  *See* 9 U.S.C. §§ 9–11; TEX. CIV. PRAC. & REM.CODE §§ 171.087–171.088, 171.091.

14  *Id.*

15  *Hall St. Assocs., L.L.C. v. Mattel, Inc.,* 552 U.S. 576, ——, 128 S.Ct. 1396, 1404, 170 L.Ed.2d 254 (2008).

16  262 S.W.3d at 352.

17  *See PacifiCare Health Sys., Inc. v. Book,* 538 U.S. 401, 406–07, 123 S.Ct. 1531, 155 L.Ed.2d 578 (2003) (holding that "since we do not know how the arbitrator will construe the remedial limitations" barring treble damages, "the proper course is to compel arbitration"); *Green Tree Fin. Corp. v. Bazzle,* 539 U.S. 444, 454, 123 S.Ct. 2402, 156 L.Ed.2d 414 (2003) (remanding for arbitrator to determine whether contracts prohibited class arbitration).

18  262 S.W.3d at 349, 352, 352, & 356.

19  80 S.W.3d 566, 572 (citing *Rembert v. Ryan's Family Steak Houses, Inc.,* 235 Mich.App. 118, 596 N.W.2d 208, 226 (1999)).

20  *PDK Labs. Inc. v. U.S. D.E.A.,* 362 F.3d 786, 799 (D.C.Cir.2004) (Roberts, J., concurring).

21  262 S.W.3d at 346.

22  *Georgiou v. Mobil Exploration & Prod. Servs., Inc. US,* 190 F.3d 538 (5th Cir.1999); *Cofab Inc. v. Phil. Joint Bd., Amalgamated Clothing & Textile Workers Union,* 141 F.3d 105 (3d Cir.1998); *McDermott Intern., Inc. v. Underwriters at Lloyds Subscribing to Memorandum of Ins. No. 104207,* 981 F.2d 744 (5th Cir.1993).

23  *Manion v. Nagin,* 255 F.3d 535, 540 (8th Cir.2001) (involving injunction to obtain salary payments pending arbitration); *see also Cofab,* 141 F.3d at 110 (involving temporary stay of motion to enforce arbitration award pending NLRB review of related matter).

24  *See* Adam Borstein, *Arbitrary Enforcement: When Arbitration Agreements Contain Unlawful Provisions,* 39 LOY. L.A.L.REV.. 1259, 1275 (2006) ("This combination of finding unconscionability and favoring public policy over enforcement of the FAA has made the Ninth Circuit more hostile towards unlawful arbitration provisions than any other federal circuit."); Michael G. McGuinness & Adam J. Karr, *California's "Unique" Approach to Arbitration: Why This Road Less Traveled Will Make All the Difference on the Issue of Preemption Under the Federal Arbitration Act,* 2005 J. DISP. RESOL. . 61, 91–92 (2005)("[T]he conclusion that California courts—and the Ninth Circuit—are imposing their own biases against arbitration is inescapable."); Steven M. Warshawsky, *Gilmer, the Contractual Exhaustion Doctrine, and Federal Statutory Employment Discrimination Claims,* 19 LAB. LAW. 285, 303 n. 180 (2004) ("The Ninth Circuit continues to be hostile to mandatory arbitration agreements."); Dennis R. Nolan, *Employment Arbitration After Circuit City,* 41 BRANDEIS L.J. 853, 890 (2003) ( "[D]espite Congress's broad endorsement of arbitration in the FAA and the Supreme Court's repeated confirmation of that policy, many judges (not all of them on the Ninth Circuit) remain deeply skeptical if not openly hostile."); *Hai Jiang, Do We Allow Contract Law to Administer Civil Rights Remedies? Casenote on Haskins v. Prudential Insurance Co.,* 2003 L.REV. MICH. ST. U. DET. C.L. 251, 260 (2003) ("The Ninth Circuit is the most hostile to arbitration of employment discrimination claims among the circuit courts....").

25  *See* Earl Greene III, Note, *Armendariz v. Foundation Health Psychcare Services, Inc.: The California Supreme Court Searches For a Middle Ground,* 1 J. AM. ARB. 105, 108–09 (2001) ("On a mandatory arbitration agreement enforcement continuum, the Ninth Circuit would be sitting far to the left of center as it seems to be more concerned with protecting the statutory rights of employees than toeing the line with the Supreme Court.")

26    *See* Jennifer LaFond, Notes, *The Private Enforcement of Public Laws in Armendariz v. Foundation Health Psychcare Servs.,* 29 PEPP. L.REV. . 401, 414 n. 127 (2002) ("The Ninth Circuit is the renegade circuit with respect to ... [whether] employees can be compelled to arbitrate statutory claims.").

27    *Douglas v. U.S. Dist. Court,* 495 F.3d 1062, 1068–69 (9th Cir.2007).

28    262 S.W.3d at 346.

29    *In re BP Products N. Am., Inc.,* 244 S.W.3d 840, 845 (Tex.2008); *In re Prudential Ins. Co. of Am.,* 148 S.W.3d 124, 136 (Tex.2004).

---

**End of Document**

© 2014 Thomson Reuters. No claim to original U.S. Government Works.

334 S.W.3d 220
Supreme Court of Texas.

In re Joseph Charles RUBIOLA et al., Relators.

No. 09–0309.    |    Argued Sept. 16, 2010.    |    Decided March 11, 2011.

**Synopsis**

**Background:** Vendors of home petitioned for writ of mandamus seeking to compel arbitration of underlying claims by purchasers regarding repair of the home based on arbitration agreement signed by purchasers and mortgagee during financing.

**Holdings:** The Supreme Court, Medina, J., held that:

[1] purchasers granted vendors right to enforce arbitration agreement, and

[2] claims fell within arbitration agreement.

Writ conditionally granted.

West Headnotes (11)

**[1]** **Alternative Dispute Resolution**



law governs

What

Parties may expressly agree to arbitrate under the Federal Arbitration Agreement (FAA). 9 U.S.C.A. § 2.

17 Cases that cite this headnote

**[2]** **Mandamus**



or vacation of judgment or order

**Mandamus**



proceedings other than actions

Modification

Civil

A party denied the right to arbitrate pursuant to an agreement subject to the Federal Arbitration Agreement (FAA) does not have an adequate remedy by appeal and is entitled to mandamus relief to correct a clear abuse of discretion. 9 U.S.C.A. § 4.

Cases that cite this headnote

**[3]** **Alternative Dispute Resolution**



**Alternative Dispute Resolution**



and Matters Arbitrable Under Agreement

Validity

Disputes

A party seeking to compel arbitration under the Federal Arbitration Act (FAA) must establish that there is a valid arbitration clause, and that the claims in dispute fall within that agreement's scope. 9 U.S.C.A. § 2.

34 Cases that cite this headnote

**[4]** **Alternative Dispute Resolution**



law governs

What

Under the Federal Arbitration Act (FAA), ordinary principles of state contract law determine whether there is a valid agreement to arbitrate. 9 U.S.C.A. § 2.

17 Cases that cite this headnote

**[5]** **Alternative Dispute Resolution**



affected or bound

Persons

An obligation to arbitrate not only attaches to one who has personally signed the written arbitration agreement but may also bind a non-signatory under principles of contract law and agency.

6 Cases that cite this headnote

**[6]** **Alternative Dispute Resolution**



affected or bound

Generally, parties must sign arbitration agreements before being bound by them.

7 Cases that cite this headnote

**[7]** **Alternative Dispute Resolution**



affected or bound

Although arbitration agreements apply to nonsignatories only in rare circumstances, the question of who is actually bound by an arbitration agreement is ultimately a function of the intent of the parties, as expressed in the terms of the agreement.

4 Cases that cite this headnote

**[8]** **Alternative Dispute Resolution**



entitled to enforce

Purchasers and mortgagee, who were parties to arbitration agreement concerning financing for sale of home, granted vendors right to enforce arbitration agreement, where agreement expressly provided that certain non-signatories were parties to the agreement, including all parties that were part of the transaction.

3 Cases that cite this headnote

**[9]** **Alternative Dispute Resolution**



contracts disputes

Claims by purchasers against vendors and listing agent regarding repairs of home at issue fell within arbitration agreement in financing agreement between purchasers and mortgagee, where listing agent and vendors were non-signatory parties to arbitration agreement, agreement broadly covered all controversies, including real estate sales contract and complaint regarding sale, and sales contract stated that it

Persons

could be amended by later writing and arbitration agreement at issue was executed one month later.

4 Cases that cite this headnote

**[10]** **Alternative Dispute Resolution**



Evidence

When deciding whether claims fall within an arbitration agreement, courts employ a strong presumption in favor of arbitration.

Persons

13 Cases that cite this headnote

**[11]** **Alternative Dispute Resolution**



Disputes and Matters Arbitrable Under Agreement

To determine whether a claim falls within the scope of the arbitration agreement, courts must focus on the factual allegations of the complaint, rather than the legal causes of action asserted.

Persons

5 Cases that cite this headnote

**Attorneys and Law Firms**

**\*221** Bernard Lee Shub, The Law Office of Ben Shub, Elizabeth Conry Davidson, San Antonio TX, for Joseph Charles Rubiola.

**\*222** Bryan A. Woods, Law Office of Bryan A. Woods, San Antonio TX, for Real Party in Interest Brian Salmon.

**Opinion**

Justice MEDINA delivered the opinion of the Court.

In this original mandamus proceeding, Relators seek to compel arbitration under an arbitration agreement they did not sign. The real parties in interest, who are signatories to the arbitration agreement, object to arbitration and contend that Relators cannot compel arbitration because Relators are not parties to the arbitration agreement. The trial court apparently agreed because it denied Relators' motion to compel arbitration. The underlying arbitration agreement, however, designated certain non-signatories as parties to the agreement.

We must decide whether the parties who actually agree to arbitrate may also grant third parties the right to enforce their arbitration agreement and, if so, whether the signatories here intended to grant such rights to these Relators. We conclude that parties to an arbitration agreement may grant non-signatories the right to compel arbitration and that the Relators here were granted that right. The trial court therefore erred in denying the motion to compel arbitration, and we conditionally grant the writ.

## I

The underlying case concerns the sale and financing of a home. Brian and Christina Salmon agreed to purchase the home from Greg Rubiola and his wife Catherine. The transaction was handled by J.C. Rubiola, Greg's brother, who served as the listing broker for the property. The Salmons and Rubiolas signed a standard form Texas real estate sales contract, which did not contain an arbitration clause.

Greg and J.C. Rubiola operate a number of real estate related businesses in San Antonio. The Rubiola brothers buy and sell real estate through Rubiola Management, L.L.C., which is the general partner of Rubiola Realty, Ltd. and Rubiola Properties, Ltd. Greg and J.C. are also president and vice-president, respectively, of Rubiola Mortgage Company, a corporation the brothers use to obtain financing for real estate buyers. The Rubiola brothers' business interests are operated at the same location under the name Rubiola Mortgage and Realty, which they advertise as a one-stop shop for customers' real estate needs: offering the ability to buy, sell, build, finance, and manage real estate through a single company.

After agreeing to purchase Greg Rubiola's home, the Salmons applied for mortgage financing with Rubiola Mortgage Company, using J.C. Rubiola as their mortgage broker and loan officer. As part of the loan process, the Salmons executed an arbitration agreement with the mortgage company. This agreement provided that:

> Arbitrable disputes include any and all controversies or claims between the parties of whatever type or manner, including without limitation, all past, present and/or future credit facilities and/or agreements involving the parties. This arbitration provision shall survive any termination, amendment,

or expiration of the agreement in which this agreement is contained, unless all of the parties expressly agree in writing.

The agreement further defined "parties" to include:

> Rubiola Mortgage Company, and each and all persons and entities signing this agreement or any other agreements between or among any of the parties as part of this transaction. "The parties" shall also include individual partners, affiliates, **\*223** officers, directors, employees, agents, and/or representatives of any party to such documents, and shall include any other owner and holder of this agreement.

J.C. Rubiola signed the agreement on behalf of Rubiola Mortgage Company, and the Salmons signed a form acknowledging J.C.'s dual role as a real estate agent and mortgage broker. The sale closed, and the Salmons moved into their new home.

Several months later, the Salmons sued the Rubiolas and other entities and individuals involved in repairing the home (collectively referred to as the Rubiolas).[1] The Salmons alleged that J.C. Rubiola, acting as both the listing agent and a principal involved in the home's construction and repair, made a series of misrepresentations that induced the Salmons to purchase the home. They also alleged violations of the Deceptive Trade Practices Act and negligent supervision of repairs made to the home. The Salmons sought either to rescind the sale or to collect damages. The Rubiolas answered and moved to compel arbitration, relying on the arbitration agreement signed by the Salmons and Rubiola Mortgage Company during financing.

The trial court denied the Rubiolas' motion to compel, causing the Rubiolas to seek mandamus relief in the court of appeals. The court of appeals also refused to compel arbitration, and the Rubiolas filed the present mandamus proceeding, seeking again to enforce the underlying arbitration agreement as a non-signatory.

## II

**[1]** The Federal Arbitration Act (FAA) generally governs arbitration provisions in contracts involving interstate commerce. *See* 9 U.S.C. § 2; *see also In re L & L Kempwood Assocs., L.P.,* 9 S.W.3d 125, 127 (Tex.1999) (per curiam). Parties may also expressly agree to arbitrate under the FAA. *In re AdvancePCS Health L.P.,* 172 S.W.3d 603, 605–06 & n. 3 (Tex.2005) (per curiam). The arbitration agreement here expressly provides for arbitration under the FAA, and although the Salmons oppose arbitration, generally, they do not contest the application of the FAA.

**[2]** Under Section 4 of the FAA, "[a] party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition ... for an order directing that such arbitration proceed in the manner provided for in such agreement." 9 U.S.C. § 4; *see In re Halliburton Co.,* 80 S.W.3d 566, 573 (Tex.2002). "A party denied the right to arbitrate pursuant to an agreement subject to the FAA does not have an adequate remedy by appeal and is entitled to mandamus relief to correct a clear abuse of discretion." *In re Labatt Food Serv., L.P.,* 279 S.W.3d 640, 642–43 (Tex.2009).

### III

**[3]** A party seeking to compel arbitration under the FAA must establish that (1) there is a valid arbitration clause, and (2) the claims in dispute fall within that agreement's scope. *In re Kellogg Brown & Root, Inc.,* 166 S.W.3d 732, 737 (Tex.2005). The Rubiolas contend that the arbitration agreement, executed during financing, is broad enough to cover all of the Salmon's claims against them. The Salmons argue, however, that the arbitration agreement extends only to disputes under the financing agreement, as opposed to the real estate **\*224** sales agreement, and that its breadth cannot be used by non-signatories to compel arbitration. This disagreement raises two issues: do the Rubiolas, as non-signatories to the arbitration agreement, have authority to compel the Salmons to arbitrate, and, if so, does the arbitration clause cover the Salmons' claims. The first issue questions the validity of the arbitration clause, while the second questions the clause's scope.

### A

**[4]** **[5]** **[6]** **[7]** Whether a non-signatory can compel arbitration pursuant to an arbitration clause questions the existence of a valid arbitration clause between specific parties

and is therefore a gateway matter for the court to decide. *In re Weekley Homes, L.P.,* 180 S.W.3d 127, 130 (Tex.2005); *Sherer v. Green Tree Servicing LLC,* 548 F.3d 379, 381 (5th Cir.2008). Under the FAA, ordinary principles of state contract law determine whether there is a valid agreement to arbitrate. *In re Kellogg Brown & Root, Inc.,* 166 S.W.3d at 738 (citing *First Options of Chi., Inc. v. Kaplan,* 514 U.S. 938, 944, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995)). An obligation to arbitrate not only attaches to one who has personally signed the written arbitration agreement but may also bind a non-signatory under principles of contract law and agency. *Id.* at 738. Generally, however, parties must sign arbitration agreements before being bound by them. *See Grigson v. Creative Artists Agency, L.L.C.,* 210 F.3d 524, 528 (5th Cir.2000) (noting that "arbitration is a matter of contract and cannot, in general, be required for a matter involving an arbitration agreement non-signatory"). Although "[a]rbitration agreements apply to nonsignatories only in rare circumstances [,]" the question of "[w]ho is actually bound by an arbitration agreement is [ultimately] a function of the intent of the parties, as expressed in the terms of the agreement." *Bridas S.A.P.I.C. v. Gov't of Turkmenistan,* 345 F.3d 347, 355, 358 (5th Cir.2003). Here the question is not whether a non-signatory may be compelled to arbitrate but rather whether a non-signatory may compel arbitration.

**[8]** The Salmons argue that because none of the Rubiolas signed the arbitration agreement, except J.C., who signed only as the representative of Rubiola Mortgage Company, that none of them are entitled to compel the Salmons to arbitrate. The Salmons thus equate signing with being a party to the agreement. The arbitration agreement, however, expressly provides that certain non-signatories are to be parties to the agreement. The agreement defines parties to include "Rubiola Mortgage Company, and each and all persons and entities that sign this agreement or any other agreements between or among any of the parties as part of this transaction." Parties further include "individual partners, affiliates, officers, directors, employees, agents, and/or representatives of any party to such documents."

The Rubiolas argue, and we agree, that the arbitration agreement's broad definition of parties, at a minimum, made J.C. and Greg Rubiola parties to the arbitration agreement.[2] Rubiola Mortgage Company signed the arbitration agreement, and the Rubiola brothers are clearly officers and representatives of the mortgage company **\*225** and thus non-signatory parties to the arbitration agreement under the agreement's terms. Because the arbitration

agreement expressly provides that certain non-signatories are considered parties, we conclude that such parties may compel arbitration under the agreement. *See Sherer,* 548 F.3d at 382 (noting that trial court's application of equitable estoppel to determine whether non-signatory might compel arbitration, was unnecessary because the terms of the Loan Agreement clearly identify when a party might be compelled to arbitrate with a non-signatory); *Bridas,* 345 F.3d at 356 (noting that ordinary principles of contract and agency law may be called upon to bind a non-signatory to an agreement whose terms have not clearly done so); *see also* Carolyn Lamm, *Defining The Party—Who is a Proper Party in an International Arbitration Before the American Arbitration Association and Other International Institutions,* 34 GEO. WASH. INT'L L.REV.. 711, 720 (2003) (noting that courts prohibit enforcement by non-signatories "where (1) the contract does not expressly grant third parties the ability to participate in the arbitration; (2) the parties have not contemplated the idea; and (3) non-signatory involvement would constitute an invasion of the consensual nature of arbitration."). But even though the Rubiolas are identified as non-signatories who may compel arbitration, there remains the question whether the Salmons' underlying claims fall within the arbitration agreement's scope.

### B

 **[9]** **[10]** When deciding whether claims fall within an arbitration agreement, courts employ a strong presumption in favor of arbitration. *Cantella & Co., Inc. v. Goodwin,* 924 S.W.2d 943, 944 (Tex.1996) (per curiam) (holding that "[f]ederal and state law strongly favor arbitration," and that "a presumption exists in favor of agreements to arbitrate under the FAA"); *Prudential Sec. Inc. v. Marshall,* 909 S.W.2d 896, 899 (Tex.1995) (holding that under the FAA "any doubts as to whether claims fall within the scope of the agreement must be resolved in favor of arbitration," and that "[t]he policy in favor of enforcing arbitration agreements is so compelling that a court should not deny arbitration '*unless it can be said with positive assurance* that an arbitration clause is *not* susceptible of an interpretation which would cover the dispute at issue' "). The Rubiolas advance three arguments for why the arbitration clause covers the Salmons' claims: (1) the language of the clause covers the claims, (2) J.C.'s alleged actions occurred while he was acting under both the mortgage and real estate contracts, so his alleged actions were factually intertwined with the mortgage agreement, and (3) the two instruments should be read together because they were

executed contemporaneously as part of the same transaction and because the mortgage agreement was essential to the overall deal. The Salmons argue, on the other hand, that the arbitration clause does not cover their claims because those claims relate only to J.C.'s role as the listing agent to the real estate contract. The Salmons further deny that their alleged facts intertwine with the mortgage agreement, or that the contracts should be construed together because they were signed by different parties at different times and without reference to each other.

 **[11]** To determine whether a claim falls within the scope of the agreement, courts must "focus on the factual allegations of the complaint, rather than the legal causes of action asserted." *Marshall,* 909 S.W.2d at 900. The factual allegations in the Salmons' complaint center around a variety of alleged misrepresentations that J.C. Rubiola made in his capacity as the listing agent to the real estate **\*226** transaction. J.C. allegedly promised that certain repairs would be made to the Salmons' satisfaction after closing. When they were not and other serious problems materialized after closing, J.C. allegedly made more promises to fix the problems or to repurchase the home if the repairs were not satisfactory.

The underlying arbitration agreement defines arbitrable disputes to include "any and all controversies between the parties of whatever type or manner, including without limitation, all past, present and/or future credit facilities and/or agreements involving the parties." The Rubiola brothers were, as we have already concluded, non-signatory parties to the arbitration agreement, which broadly covers all controversies between the parties and all past, present or future agreements involving the parties. This language indicates that the arbitration agreement was not limited to the financing part of the transaction but rather extended to the real estate sales contract and the Salmons complaints regarding that sale.

The Salmons argue, however, that including the real estate sales contract as part of the transaction subject to arbitration is contrary to the terms of that contract. The real estate contract stated that it constituted the entire agreement between the parties and further provided that the parties could enforce it in court. The contract, however, also states that it could be amended by a later writing. In the arbitration agreement, executed a month later as part of the process for obtaining financing, the Salmons agreed to arbitrate all controversies between the parties and all past agreements involving the parties.

\* \* \*

We conclude that signatories to an arbitration agreement may identify other parties in their agreement who may enforce arbitration as though they signed the agreement themselves. We further conclude that the underlying arbitration agreement in this case identified the Rubiolas as parties to the agreement and that they accordingly had the right to compel arbitration. Finally, we conclude that the trial court's order denying arbitration is an abuse of discretion for which we conditionally grant Relators' request for mandamus relief. TEX.R.APP. P. 52.8(c). The writ will issue only if the trial court fails to enforce the arbitration agreement.

**Parallel Citations**

54 Tex. Sup. Ct. J. 654

Footnotes

1      J.C. Rubiola, Gregory Rubiola, Catherine Rubiola, JGL–Design Build, L.L.C., Michael Cortez individually and d/b/a The Heights Design and Construction are defendants in the underlying suit and Relators in this Court.

2      J.C. and Greg Rubiola are the President and Vice President of Rubiola Mortgage Company. JGL Design Builders L.L.C. is a Texas limited liability corporation, owned and managed by J.C. and Greg Rubiola. Michael Cortez individually and d/b/a the Heights Design and Construction was the original contractor hired by the Rubiolas to remediate the mold and water damage at the property.

**End of Document**                                                           © 2014 Thomson Reuters. No claim to original U.S. Government Works.

180 S.W.3d 127
Supreme Court of Texas.

In re WEEKLEY HOMES, L.P.

No. 04–0119. | Argued Nov. 30,
2004. | Decided Oct. 28, 2005.

**Synopsis**
**Background:** House purchaser's adult child brought personal injury action against builder to recover for asthma allegedly caused by dust from house repairs. Purchaser and trust that owned the house also sued. The 192nd District Court, Merrill Hartman, J., refused to compel arbitration of personal injury action. Builder petitioned for writ of mandamus.

**[Holding:]** The Supreme Court, Brister, J., held as a matter of first impression that arbitration clause was binding on child, even though she was not party to contract.

Writ conditionally granted.

West Headnotes (19)

**[1]** **Alternative Dispute Resolution**



Persons

affected or bound

Nonparties may be bound to an arbitration clause when the rules of law or equity would bind them to the contract generally.

5 Cases that cite this headnote

**[2]** **Mandamus**



Civil

proceedings other than actions

Mandamus relief is proper to enforce arbitration agreements governed by the Federal Arbitration Act (FAA). 9 U.S.C.A. § 1 et seq.

16 Cases that cite this headnote

**[3]** **Alternative Dispute Resolution**



Existence

and validity of agreement

Under the Federal Arbitration Act (FAA), absent unmistakable evidence that the parties intended the contrary, the courts, rather than arbitrators, must decide gateway matters such as whether a valid arbitration agreement exists and whether an arbitration agreement is binding on a nonparty. 9 U.S.C.A. § 1 et seq.

38 Cases that cite this headnote

**[4]** **Alternative Dispute Resolution**



What

law governs

Texas procedural rules govern gateway matters such as whether a valid arbitration agreement exists and an arbitration agreement is binding on a nonparty. 9 U.S.C.A. § 1 et seq.

15 Cases that cite this headnote

**[5]** **Alternative Dispute Resolution**



Evidence

Party moving to compel arbitration bears burden to show a valid agreement to arbitrate.

14 Cases that cite this headnote

**[6]** **Alternative Dispute Resolution**



What

law governs

Generally, under the Federal Arbitration Act (FAA), state law governs whether a litigant agreed to arbitrate, and federal law governs the scope of an arbitration clause. 9 U.S.C.A. § 1 et seq.

19 Cases that cite this headnote

**[7]** **Alternative Dispute Resolution**



law governs

State law applies to whether a nonparty must arbitrate pursuant to agreement governed by the Federal Arbitration Act (FAA), but courts will endeavor to keep state law as consistent as possible with federal law. 9 U.S.C.A. § 1 et seq.

14 Cases that cite this headnote

**[8]    Alternative Dispute Resolution**



and Matters Arbitrable Under Agreement

Under Texas and federal law, whether a claim seeks a direct benefit from a contract containing an arbitration clause and must be arbitrated turns on the substance of the claim, not artful pleading; thus, claims must be brought on the contract and arbitrated if liability arises solely from the contract or must be determined by reference to it, but claims can be brought in tort and in court if liability arises from general obligations imposed by law.

44 Cases that cite this headnote

**[9]    Alternative Dispute Resolution**



affected or bound

Arbitration clause in house purchaser's contract with builder was binding on purchaser's adult child, even though she was nonparty or nonsignatory to the contract, and the clause required arbitration of her personal injury action to recover for asthma allegedly caused by dust from house repairs; the child resided in the house, directed construction of many features, repeatedly demanded extensive repairs, personally requested and received financial reimbursement for expenses, conducted settlement negotiations with builder, obtained substantial and direct benefits from the contract, and could not equitably object to the arbitration clause, and she was beneficiary and trustee of trust that owned the house and

What

would benefit from suit by trust and purchaser on contract.

28 Cases that cite this headnote

**[10]    Negligence**



Contractors

A contractor performing repairs has an independent duty under tort law not to injure bystanders by its activities or by premises conditions it leaves behind.

Disputes

3 Cases that cite this headnote

**[11]    Alternative Dispute Resolution**



Persons

affected or bound

A nonparty to a contract with an arbitration clause may seek or obtain direct benefits from a contract by means other than a lawsuit, and, therefore, may be bound by the arbitration clause.

12 Cases that cite this headnote

**[12]    Alternative Dispute Resolution**



Persons

affected or bound

In some cases, a nonparty may be compelled to arbitrate if it deliberately seeks and obtains substantial benefits from the contract itself.

11 Cases that cite this headnote

**[13]    Estoppel**



Future

events; promissory estoppel

When a promisor induces substantial action or forbearance by another, "promissory estoppel" prevents any denial of that promise if injustice can be avoided only by enforcement.

20 Cases that cite this headnote

**[14]    Estoppel**



events; promissory estoppel

Promissory estoppel does not create liability where none otherwise exists, but prevents a party from insisting upon his strict legal rights when it would be unjust to allow him to enforce them.

9 Cases that cite this headnote

**[15]** **Trusts**



of trustee to sue and be sued in general

**Trusts**



A suit involving a trust generally must be brought by or against the trustee and can be binding on the beneficiaries whether they join it or not.

Cases that cite this headnote

**[16]** **Alternative Dispute Resolution**



affected or bound

**Alternative Dispute Resolution**



entitled to enforce

Direct-benefits estoppel against a nonparty avoiding arbitration clause requires a nonparty's colorable claim to the benefits of the contract; a meddlesome stranger cannot compel arbitration by merely pleading a claim that quotes someone else's contract.

19 Cases that cite this headnote

**[17]** **Alternative Dispute Resolution**



affected or bound

Direct-benefits estoppel against a nonparty avoiding arbitration clause does not create liability for noncontracting parties that does not otherwise exist.

Future

3 Cases that cite this headnote

**[18]** **Alternative Dispute Resolution**



Persons

affected or bound

Direct-benefits estoppel against a nonparty avoiding arbitration clause after receiving direct benefits from contract does not apply when the benefits alleged are insubstantial or indirect.

Capacity

20 Cases that cite this headnote

**[19]** **Alternative Dispute Resolution**

Parties



Persons

affected or bound

When a nonparty consistently and knowingly insists that others treat it as a party to the contract, it cannot later turn its back on the portions of the contract, such as an arbitration clause, that it finds distasteful.

5 Cases that cite this headnote

Persons

**Attorneys and Law Firms**

Persons

**\*128** Raul A. Gonzalez, Susan Kidwell, Locke Liddell & Sapp, LLP, Austin, and N. Terry Adams, Beirne Maynard & Parsons, L.L.P., Houston, for relator.

James Craig Orr Jr. and Spencer P. Browne, Heygood Orr & Reyes, L.L.P., Irving, for real party in interest.

**Opinion**

**\*129** Justice BRISTER delivered the opinion of the Court.

Persons

We are asked to decide whether Weekley Homes, L.P., a party to a contract containing an arbitration clause, can compel arbitration of a personal injury claim brought by Patricia Von Bargen, a nonparty. We have previously compelled arbitration by nonparties to an arbitration agreement when they brought suit "based on a contract,"[1] which Von Bargen purports to avoid here.

**[1]** But as both state and federal courts have recognized, nonparties may be bound to an arbitration clause when the rules of law or equity would bind them to the contract generally. Because we find those rules applicable here, we conditionally grant mandamus relief.

### I. Background

In the summer of 2000, Vernon Forsting contracted with Weekley for construction of a 4,000 square foot home at a purchase price of $240,000. At the time, Forsting was a seventy-eight year-old widower with an assortment of health problems. His intention in purchasing such a large home was to live with his daughter, Von Bargen (his only child) and her husband and three sons.

Von Bargen and her husband negotiated directly with Weekley on many issues before and after construction— paying a $1,000 deposit, selecting the floor plan, signing a letter of intent as "purchasers," and making custom design choices.

But only Forsting executed the various financing and closing documents on the home, including the Real Estate Purchase Agreement that contained the following arbitration clause:

> Any claim, dispute or cause of action between Purchaser and Seller ..., whether sounding in contract, tort, or otherwise, shall be resolved by binding arbitration.... Such claims, disputes or causes of action include, but are not limited to, those arising out of or relating to ... the design, construction, preparation, maintenance or repair of the Property.

Shortly after closing, Forsting transferred the home to the Forsting Family Trust, a revocable trust established ten years earlier whose sole beneficiary was Von Bargen. At his deposition, Forsting testified that the only reason he signed the Purchase Agreement individually rather than as trustee was because he "forgot to put [the home] in the trust." Forsting and Von Bargen served as the only trustees of the Trust, the purpose of which was to transfer Forsting's property to Von Bargen after his death.

According to the plaintiffs' pleadings, numerous problems arose with the home after completion. When the family moved out of the house briefly so Weekley could perform some of those repairs, it was Von Bargen who requested and received reimbursement. Indeed, Von Bargen admitted handling "almost ... all matters related to the house, the problems and the warranty work and even the negotiations."

Unsatisfied with the home and Weekley's efforts to repair it, Forsting, Von Bargen, and the Trust filed suit against Weekley in December 2002. Forsting and the Trust asserted claims for negligence, breach of contract, statutory violations, and breach of warranty. Von Bargen sued only for personal injuries, alleging Weekley's negligent repairs caused her to develop asthma.

Weekley moved to compel arbitration of all claims under the Federal Arbitration **\*130** Act (FAA).[2] The trial court concluded the FAA applied, and granted the motion as to all claims by Forsting and the Trust. But the trial court refused to compel arbitration of Von Bargen's claim because she did not sign the Purchase Agreement.

**[2]** Mandamus relief is proper to enforce arbitration agreements governed by the FAA.[3] After the Fifth Court of Appeals denied Weekley's request for such relief, Weekley filed a similar request in this Court.

### II. Governing Law

**[3]** Neither party challenges the trial court's conclusion that the FAA governs the arbitration clause here.[4] Under the FAA, absent unmistakable evidence that the parties intended the contrary, it is the courts rather than arbitrators that must decide "gateway matters" such as whether a valid arbitration agreement exists.[5] Whether an arbitration agreement is binding on a nonparty is one of those gateway matters.[6]

**[4]** **[5]** Texas courts apply Texas procedural rules in making that determination.[7] Those rules call for determination by summary proceedings,[8] with the burden on the moving party to show a valid agreement to arbitrate.[9]

**[6]** **[7]** But as we recently noted, it is not entirely clear what substantive law governs whether a nonparty must arbitrate.[10] Generally under the FAA, state law governs whether a litigant

agreed to arbitrate, [11] and federal law governs the scope of an arbitration clause. [12] Whether **\*131** a nonparty must arbitrate can involve aspects of either or both. Pending an answer from the United States Supreme Court, [13] we apply state law while endeavoring to keep it as consistent as possible with federal law. [14]

### III. Estoppel and Nonsignatories

Texas law has long recognized that nonparties may be bound to a contract under various legal principles. [15] Although we have never considered these principles in the context of arbitration, we recently noted that contract and agency law may bind a nonparty to an arbitration agreement. [16] Indeed, if Texas law would bind a nonparty to a contract generally, the FAA would appear to preempt an exception for arbitration clauses alone. [17]

In the one case in which we have compelled nonparties to arbitrate, *In re FirstMerit Bank, N.A.,* 52 S.W.3d 749 (Tex. 2001) we stated that "a litigant who sues based on a contract subjects him or herself to the contract's terms." [18] Because the nonparties there asserted claims identical to the signatories' contract claims, we held all had to be arbitrated. [19]

We did not describe in *FirstMerit* what it means to sue "based on a contract." Von Bargen asserts a narrow interpretation that would apply only to explicit contract claims, and thus not to hers for personal injury; Weekley argues for a broad application to any claim that "arises from or relates to" the contract involved.

We recently adopted an approach between these two extremes, holding that a nonparty may be compelled to arbitrate "if it seeks, through the claim, to derive a direct benefit from the contract containing the arbitration provisions." [20] As we noted, this rule is consistent with federal law of "direct benefits estoppel." [21]

 **[8]**    Under both Texas and federal law, whether a claim seeks a direct benefit from a contract containing an arbitration **\*132** clause turns on the substance of the claim, not artful pleading. [22] Claims must be brought on the contract (and arbitrated) if liability arises solely from the contract or must be determined by reference to it. [23] On the other hand, claims

can be brought in tort (and in court) if liability arises from general obligations imposed by law. [24]

We question Weekley's conclusion that this rule will inevitably drive claimants to plead only noncontractual claims to avoid arbitration. Nonparties face a choice when they may plead in either contract or tort, but pleading the former invokes an arbitration clause broad enough to cover both (as most do). If they pursue a claim "on the contract," then they must pursue all claims—tort and contract—in arbitration. [25] Conversely, if they choose not to sue "on the contract," they may pursue the tort claims in court, but the contract claims will thereby likely be waived under the election-of-remedies doctrine. [26] Given these options, it is not clear at this point that nonparties will always choose to forfeit potentially viable contract claims solely to avoid arbitration.

 **[9]**    **[10]**    In this case, Von Bargen purports to make no claim on the Weekley contract, claiming only that she developed asthma from dust created by Weekley's repairs of the home. While Weekley's duty to perform those repairs arose from the Purchase Agreement, a contractor performing repairs has an independent duty under Texas tort law not to injure bystanders by its activities, [27] or by premises conditions it leaves behind. [28] There is nothing in the sparse record here to suggest Von Bargen's claim is different from what any bystander might assert, or what she might assert if the contractor were not Weekley.

 **[11]**    **[12]**    But a nonparty may seek or obtain direct benefits from a contract by means other than a lawsuit. In some cases, a nonparty may be compelled to arbitrate if it deliberately seeks and obtains substantial benefits from the contract itself. [29] The analysis here focuses on the **\*133** nonparty's conduct during the performance of the contract. [30] Thus, for example, a firm that uses a trade name pursuant to an agreement containing an arbitration clause cannot later avoid arbitration by claiming to have been a nonparty. [31] Nor can nonsignatories who received lower insurance rates and the ability to sail under the French flag due to a contract avoid the arbitration clause in that contract. [32]

 **[13]**    **[14]**    This Court has never addressed such an estoppel claim in the arbitration context. [33] But we have long recognized in other contexts the defensive theory of promissory estoppel. [34] When a promisor induces substantial

action or forbearance by another, promissory estoppel prevents any denial of that promise if injustice can be avoided only by enforcement. [35] Promissory estoppel does not create liability where none otherwise exists, [36] but "prevents a party from insisting upon his strict legal rights when it would be unjust to allow him to enforce them." [37]

Here, Von Bargen has not merely resided in the home. Claiming the authority of the Purchase Agreement, she directed how Weekley should construct many of its features, repeatedly demanded extensive repairs to "our home," [38] personally requested and received financial reimbursement for expenses "I incurred" while those repairs were made, and conducted settlement negotiations with Weekley (apparently never consummated) about moving the family to a new home. Having obtained these substantial actions from Weekley by demanding compliance with provisions of the contract, Von Bargen cannot equitably object to the arbitration clause attached to them.

 **[15]**    In addition to these benefits, Forsting and the Trust have sued Weekley on claims which are explicitly based on the contract. Under Texas law, a suit involving a trust generally must be brought by or against the trustee, and can be binding on the beneficiaries whether they join it or **\*134** not. [39] Although Von Bargen did not purport to sue as either trustee or beneficiary, she was both, and any recovery will inure to her direct benefit as the sole beneficiary and equitable titleholder of the home. [40]  As one Texas court has noted, if a trustee's agreement to arbitrate can be avoided by simply having the beneficiaries bring suit, "the strong state policy favoring arbitration would be effectively thwarted." [41]

 **[16]**    While we based our decision in *FirstMerit Bank* on the nonparties' contract-based claims, more was involved in that case than the format of the pleadings. Direct-benefits estoppel requires a colorable claim to the benefits; a meddlesome stranger cannot compel arbitration by merely pleading a claim that quotes someone else's contract. The nonparties in *FirstMerit Bank* were the daughter and son-in-law of the signatories, the actual occupants of the mobile home, and (according to the briefs) the future owners to whom the signatories planned to transfer title. It is hard to see what direct benefits they expected from that contract that Von Bargen did not expect from this one.

 **[17]**     **[18]**    Like the equitable doctrine of promissory estoppel, we do not understand direct-benefits estoppel to create liability for noncontracting parties that does not otherwise exist. As Von Bargen and Weekley had no contract between them, estoppel alone cannot grant either a right to sue for breach. [42] Nor do we understand the doctrine to apply when the benefits alleged are insubstantial or indirect. But once Von Bargen deliberately sought substantial and direct benefits from the contract, and Weekley agreed to comply, equity prevents her from avoiding the arbitration clause that was part of that agreement.

We recognize that direct-benefits estoppel has yet to be endorsed by the United States Supreme Court, and that its application and boundaries are not entirely clear. [43] For example, while federal courts often state the test as whether a nonsignatory has "embraced the contract," [44] the **\*135** metaphor gives little guidance in deciding what particular conduct embraces or merely shakes hands with it. Indeed, the equitable nature of the doctrine may render firm standards inappropriate, requiring trial courts to exercise some discretion based on the facts of each case. [45]

 **[19]**    But we agree with the federal courts that when a nonparty consistently [46] and knowingly [47] insists that others treat it as a party, it cannot later "turn[ ] its back on the portions of the contract, such as an arbitration clause, that it finds distasteful." [48] A nonparty cannot both have his contract and defeat it too.

While Von Bargen never based her personal injury claim on the contract, her prior exercise of other contractual rights and her equitable entitlement to other contractual benefits prevents her from avoiding the arbitration clause here. Accordingly, the trial court abused its discretion in failing to compel arbitration. We conditionally grant the writ of mandamus and order the trial court to vacate that part of its order denying Weekley's motion, and to enter a new order compelling arbitration of Von Bargen's claim. We are confident the trial court will comply, and our writ will issue only if it does not.

Justice WILLETT did not participate in the decision.

Footnotes

*In re FirstMerit Bank, N.A.*, 52 S.W.3d 749, 755 (Tex.2001).

*See* 9 U.S.C. §§ 1–16.

*In re Oakwood Mobile Homes, Inc.*, 987 S.W.2d 571, 573 n.2 (Tex.1999) (per curiam); *EZ Pawn Corp. v. Mancias*, 934 S.W.2d 87–88 (Tex.1996) (per curiam).

Although Von Bargen asserts that her personal injury claim cannot be arbitrated under the Texas Arbitration Act as it was not signed by an attorney, *see* TEX. CIV. PRAC. & REM. CODE § 171.002((a)(3), (C), she does not challenge the trial court's conclusion that the FAA governs here. The FAA not only contains no such limitation, but also preempts any state requirements that apply only to arbitration clauses. *Doctor's Assocs., Inc. v. Casarotto*, 517 U.S. 681, 686–87, 116 S.Ct. 1652, 134 L.Ed.2d 902 (1996).

*Green Tree Fin. Corp. v. Bazzle*, 539 U.S. 444, 452, 123 S.Ct. 2402, 156 L.Ed.2d 414 (2003); *PacifiCare Health Sys., Inc. v. Book*, 538 U.S. 401, 407, 123 S.Ct. 1531, 155 L.Ed.2d 578 n.2 (2003).

*John Wiley & Sons, Inc. v. Livingston*, 376 U.S. 543, 546–47, 84 S.Ct. 909, 11 L.Ed.2d 898 (1964).

*Jack B. Anglin Co. v. Tipps*, 842 S.W.2d 266, 268 (Tex.1992).

*Id.* at 269.

*J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 227 (Tex.2003).

*In re Kellogg Brown & Root, Inc.*, 166 S.W.3d 732, 738–39 (Tex.2005); *see also Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 87, 123 S.Ct. 588, 154 L.Ed.2d 491 (2002) (Thomas, J., concurring) (suggesting Supreme Court sometimes looks to federal law and sometimes law chosen by parties); *Wash. Mut. Fin. Group, LLC v. Bailey*, 364 F.3d 260, 267 n.6 (5th Cir. 2004) (noting that whether state or federal law of arbitrability applies "is often an uncertain question").

*Doctor's Assocs.,* 517 U.S. at 686–87, 116 S.Ct. 1652; *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995); *Perry v. Thomas,* 482 U.S. 483, 492, 107 S.Ct. 2520, 96 L.Ed.2d 426, n.9 (1987). Parties may also agree that state law governs their arbitration. *Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Jr. Univ.,* 489 U.S. 468, 476, 109 S.Ct. 1248, 103 L.Ed.2d 488 (1989).

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.,* 460 U.S. 1, 24, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983).

The United State Supreme Court has not answered this question, though it has applied federal substantive law to bind a nonparty to labor-union arbitration, a field in which federal law has traditionally yielded little deference to state labor-law principles. *See John Wiley & Sons*, 376 U.S. at 548, 84 S.Ct. 909 (citing *Textile Workers Union of Am. v. Lincoln Mills*, 353 U.S. 448, 456, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957)).

*Kellogg*, 166 S.W.3d at 739.

*See, e.g.*, TEX. BUS. CORP. Act art. 2.21(A)(2) (holding shareholders may be liable for corporation's contracts under alter ego theory if they cause corporation to perpetrate actual fraud for their direct personal benefit); *Stine v. Stewart*, 80 S.W.3d 586, 590 (Tex.2002) (holding third-party beneficiary could enforce contract); *Biggs v. U.S. Fire Ins. Co.*, 611 S.W.2d 624, 629 (Tex.1981) (holding agent acting within the scope of apparent authority binds the principal).

*Kellogg*, 166 S.W.3d at 738. Accordingly, it is no longer true that "the [Texas] decisions do not even mention the possibility of additional bases for binding non-signatories to arbitration." *Fleetwood Enters., Inc. v. Gaskamp,* 280 F.3d 1069, 1076 (5th Cir. 2002).

*Doctor's Assocs.,* 517 U.S. at 686–87, 116 S.Ct. 1652; *Allied–Bruce Terminix Cos., Inc. v. Dobson,* 513 U.S. 265, 281, 115 S.Ct. 834, 130 L.Ed.2d 753 (1995) ("What States may not do is decide that a contract is fair enough to enforce all its basic terms (price, service, credit), but not fair enough to enforce its arbitration clause. The Act makes any such state policy unlawful, for that kind of policy would place arbitration clauses on an unequal 'footing,' directly contrary to the Act's language and Congress' intent.").

52 S.W.3d at 755.

*Id.* at 755–56.

*Kellogg,* 166 S.W.3d at 741.

*Id.*

*Hughes Masonry Co., Inc. v. Greater Clark County Sch. Bldg. Corp.,* 659 F.2d 836, 838–39 (7th Cir. 1981); *Southwestern Bell Tel. Co. v. DeLanney*, 809 S.W.2d 493, 495 (Tex.1991).

*Int'l Paper Co. v. Schwabedissen Maschinen & Anlagen GMBH*, 206 F.3d 411, 418 (4th Cir. 2000); *DeWitt County Elec. Coop., Inc. v. Parks*, 1 S.W.3d 96, 105 (Tex.1999); *DeLanney*, 809 S.W.2d at 494.

*See, e.g., R.J. Griffin & Co. v. Beach Club II Homeowners Ass'n,* 384 F.3d 157, 163–164 (4th Cir. 2004); *InterGen N.V. v. Grina*, 344 F.3d 134, 145–46 (1st Cir. 2003); *Westmoreland v. Sadoux,* 299 F.3d 462, 467 (5th Cir. 2002); *Fleetwood Enters., Inc. v. Gaskamp,* 280 F.3d 1069, 1076–77 (5th Cir. 2002); *DeLanney*, 809 S.W.2d at 494; *see also Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.,* 960 S.W.2d 41, 47 (Tex.1998).

*See, e.g., Jack B. Anglin Co. v. Tipps,* 842 S.W.2d 266, 271 (Tex.1992) (holding DTPA claim was factually intertwined with contract claim and thus subject to arbitration clause).

26 *Bocanegra v. Aetna Life Ins. Co.,* 605 S.W.2d 848, 851 (Tex.1980) (holding election-of-remedies doctrine prevents pursuit of inconsistent rights or remedies when result would be manifest injustice); *cf. Medina v. Herrera,* 927 S.W.2d 597, 598–99 (Tex.1996) (holding election-of-remedies doctrine barred pursuit of both workers' compensation claim and suit against employer for intentional act).

27 *See Redinger v. Living, Inc.,* 689 S.W.2d 415, 417 (Tex.1985) (noting general contractor on a construction site in control of the premises may be subject to direct liability for negligence arising from: (1) a premises defect, or (2) an activity or instrumentality).

28 *Strakos v. Gehring,* 360 S.W.2d 787, 790 (Tex.1962).

29 *Astra Oil Co., Inc. v. Rover Navigation, Ltd.,* 344 F.3d 276, 281 (2d Cir. 2003) (holding affiliate of signatories could enforce arbitration clause as opposing party treated affiliate as part of charter contract during occurrence involved); *Am. Bureau of Shipping v. Tencara Shipyard S.P.A.,* 170 F.3d 349, 353 (2d Cir. 1999) (holding nonsignatories who received lower insurance rates and ability to sail under French flag due to contract were bound by arbitration clause in it); *see also Matter of VMS Ltd. P'ship Sec. Litig.,* 26 F.3d 50, 52 (7th Cir. 1994) (holding wife bound by settlement agreement related to investment services contract signed only by her husband, but under which she had accepted services as well); *see also InterGen,* 344 F.3d at 146 (holding equitable estoppel inapplicable as nonsignatory never sought to derive direct benefits from contracts during their currency).

30 *E.I. DuPont de Nemours & Co. v. Rhone Poulenc Fiber & Resin Intermediates, S.A.S.,* 269 F.3d 187, 200 n.7 (3d Cir. 2001).

31 *Deloitte Noraudit A/S v. Deloitte Haskins & Sells, U.S.,* 9 F.3d 1060, 1064 (2d Cir. 1993).

32 *Tencara Shipyard,* 170 F.3d at 353.

33 *See Kellogg,* 166 S.W.3d at 741 n.9 (reserving question of whether to apply direct-benefits estoppel to benefits obtained from contract rather than subsequent litigation).

34 *See, e.g., 'Moore' Burger, Inc. v. Phillips Petroleum Co.,* 492 S.W.2d 934 (Tex.1972).

35 *Trammell Crow Co. No. 60 v. Harkinson,* 944 S.W.2d 631, 636 (Tex.1997).

36 *Hruska v. First State Bank of Deanville,* 747 S.W.2d 783, 785 (Tex.1988).

37 *Wheeler v. White,* 398 S.W.2d 93, 96 (Tex.1965).

38 In various lists submitted in the months after the sale, Von Bargen demanded repairs to sagging floors, buckling walls and windows, cracking brick work, as well as replacing the front door, repainting the back door and the kitchen cabinets, regrouting the bathrooms and entry way, replacing the fireplace screen, closing gaps at carpet seams, removing drainage problems in the yard, and a noisy garage door.

39 *See* TEX. PROP. CODEE §§ 111.004(7), 115.011, 115.015; *Huie v. DeShazo,* 922 S.W.2d 920, 926 (Tex.1996)(holding trusts are not legal entities); *Transamerican Leasing Co. v. Three Bears, Inc.,* 586 S.W.2d 472, 476–77 (Tex.1979) (holding beneficiaries were bound by judgment against trust and trustees, as some participated in trial in their capacity as trustees, and remainder showed neither prejudice, conflict of interest, nor inadequate representation by trustees).

40 *Perfect Union Lodge No. 10 v. Interfirst Bank of San Antonio, N.A.,* 748 S.W.2d 218, 220 (Tex.1988) (holding trust beneficiaries hold equitable title to trust property); *cf. Javitch v. First Union Sec., Inc.,* 315 F.3d 619, 627 (6th Cir. 2003) (holding arbitration agreements were binding on receiver who succeeded to interests of entities that signed them); *Hays & Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 885 F.2d 1149, 1153–54 (3d Cir. 1989) (holding arbitration agreements were binding on successor trustee in bankruptcy).

41 *Merrill Lynch, Pierce, Fenner & Smith v. Eddings,* 838 S.W.2d 874, 879 (Tex.App.-Waco 1992, writ denied).

42 *See Sun Oil Co. v. Madeley,* 626 S.W.2d 726, 734 (Tex.1981) (holding estoppel based on division orders could not permanently amend underlying lease).

43 See e.g., J. Douglas Uloth & J. Hamilton Rial, III, *Equitable Estoppel as a Basis for Compelling Nonsignatories to Arbitrate—A Bride Too Far?,* 21 REV. LITIG. 593 (2002).

44 *See, e.g. InterGen,* 344 F.3d at 145; *DuPont,* 269 F.3d at 200; *Peltz ex rel. Peltz v. Sears, Roebuck & Co.,* 367 F.Supp.2d 711, 721 (E.D.Pa. 2005); *In re Universal Serv. Fund Tel. Billing Practices Litig.,* 300 F.Supp.2d 1107, 1138 (D.Kan. 2003); *Amkor Tech., Inc. v. Alcatel Bus. Sys.,* 278 F.Supp.2d 519, 521–22 (E.D.Pa. 2003); *Cherry Creek Card & Party Shop, Inc. v. Hallmark Mktg. Corp.,* 176 F.Supp.2d 1091, 1098 (D.Colo. 2001).

45 *See, e.g., Bridas S.A.P.I.C. v. Turkmenistan,* 345 F.3d 347, 360 (5th Cir. 2003) ("The use of equitable estoppel is within a district court's discretion."); *accord, Hill v. G.E. Power Sys., Inc.,* 282 F.3d 343, 348 (5th Cir. 2002); *Grigson v. Creative Artists Agency, L.L.C.,* 210 F.3d 524, 528 (5th Cir. 2000).

46 *See Int'l Paper,* 206 F.3d at 418 (estopping nonsignatory from denying agreement to arbitrate "when he has *consistently* maintained that other provisions of the same contract should be enforced to benefit him.") (emphasis added).

47 *See Bridas,* 345 F.3d at 361–62 ("Direct[-]benefits estoppel applies when a nonsignatory '*knowingly* exploits the agreement containing the arbitration clause.' ") (emphasis added) (citing *DuPont,* 269 F.3d at 199); *Tencara Shipyard,* 170 F.3d at 353 (requiring

nonsignatories to arbitrate pursuant to provision in contract they neither requested nor executed, as they had duty to obtain that contract and received copies of it).

48    *DuPont,* 269 F.3d at 200; *accord Astra Oil Co.,* 344 F.3d at 281.

**End of Document**                                               © 2014 Thomson Reuters. No claim to original U.S. Government Works.

687 F.3d 671
United States Court of Appeals,
Fifth Circuit.

PETROFAC, INCORPORATED, Plaintiff–Appellee,
v.
DYNMcDERMOTT PETROLEUM OPERATIONS
COMPANY, Defendant–Appellant.

No. 11–20141. | July 17, 2012.

**Synopsis**
**Background:** Subcontractor for design and installation of transportable degas plant sought confirmation of arbitration award against contractor for operation of Strategic Petroleum Reserve for Department of Energy. The United States District Court for the Southern District of Texas, Lynn N. Hughes, J., 2011 WL 675353, confirmed the award. Contractor appealed.

**Holdings:** The Court of Appeals, Jennifer Walker Elrod, Circuit Judge, held that:

[1] arbitration agreement, by incorporating the rules of the American Arbitration Association (AAA), clearly and unmistakably expressed parties' intent to leave the question of arbitrability to an arbitrator;

[2] record did not support contractor's allegation that subcontractor procured the award through fraud; and

[3] running of prejudgment interest on arbitration award recommenced when contractor failed to pay the award within required 30-day period.

Affirmed.

West Headnotes (8)

[1] **Alternative Dispute Resolution**

Scope and Standards of Review
The court of appeals reviews a district court's confirmation of an arbitration award de novo,

but the review of the underlying award is exceedingly deferential.

3 Cases that cite this headnote

[2] **Alternative Dispute Resolution**

Disputes and Matters Arbitrable Under Agreement
**Alternative Dispute Resolution**

Arbitrability of dispute
Just as the arbitrability of the merits of a dispute depends upon whether the parties agreed to arbitrate that dispute, so the question of who has the primary power to decide arbitrability turns upon what the parties agreed about that matter.

2 Cases that cite this headnote

[3] **Alternative Dispute Resolution**

Evidence
The court will not assume that the parties agreed to arbitrate arbitrability unless the parties clearly and unmistakably provide otherwise.

25 Cases that cite this headnote

[4] **Alternative Dispute Resolution**

Arbitrability of dispute
Arbitration agreement between contractor for operation of Strategic Petroleum Reserve for Department of Energy and subcontractor for design and installation of transportable degas plant, by incorporating the rules of the American Arbitration Association (AAA), clearly and unmistakably expressed parties' intent to leave the question of arbitrability to an arbitrator; AAA rules provided that arbitrator had the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement.

24 Cases that cite this headnote

**[5]** **Alternative Dispute Resolution**



of dispute

Express adoption, in an arbitration agreement, of the rules of the American Arbitration Association (AAA) presents clear and unmistakable evidence that the parties agreed to arbitrate arbitrability.

26 Cases that cite this headnote

**[6]** **Alternative Dispute Resolution**



fraud or misconduct

Record from arbitration proceeding did not support allegation of contractor for operation of Strategic Petroleum Reserve for Department of Energy that subcontractor for design and installation of transportable degas plant procured the overtime premium portion of arbitration award through fraud, as basis under Federal Arbitration Act (FAA) for vacating the award, based on subcontractor allegedly pulling a bait-and-switch by representing that it had abandoned its "impact on other jobs" claim but then slipping those damages back in through its overtime premium claim. 9 U.S.C.A. § 10(a)(1).

Cases that cite this headnote

**[7]** **Federal Courts**



dispute resolution

**Federal Courts**



**Interest**



cases and issues

Texas law governs the award of prejudgment interest on an arbitration award under the Federal Arbitration Act (FAA), and under Texas law, prevailing parties receive prejudgment interest as a matter of course. 9 U.S.C.A. § 1 et seq.

Cases that cite this headnote

Arbitrability

**[8]** **Interest**



cases and issues

Running of prejudgment interest on arbitration award, which award ordered payment of damages and prejudgment interest within 30 days of award, recommenced when losing party failed to pay the award within the required 30-day period.

Cases that cite this headnote

Parties'

Particular

Alternative

Interest

Particular

**Attorneys and Law Firms**

**\*673** Robert Anthony Plessala, Sr. Counsel (argued), Andrews Myers, P.C., Houston, TX, David James Bush, Kent, Good Anderson & Bush, P.C., Tyler, TX, for Plaintiff–Appellee.

Henry A. King (argued), John A. Cangelosi, Timothy S. Madden, King, Krebs & Jurgens, P.L.L.C., New Orleans, LA, for Defendant–Appellant.

Appeal from the United States District Court for the Southern District of Texas.

Before DeMOSS, CLEMENT and ELROD, Circuit Judges.

**Opinion**

JENNIFER WALKER ELROD, Circuit Judge:

DynMcDermott Petroleum Operations Company (DM) appeals the district court's confirmation of an arbitration award in favor of Petrofac, Incorporated. Because DM fails to show any reversible error, we AFFIRM.

**I.**

DM operates the Strategic Petroleum Reserve for the Department of Energy. DM subcontracted with Petrofac to design and install a transportable degas plant to service the reserve. On July 30, 2003, DM and Petrofac agreed to resolve

WestlawNext® © 2014 Thomson Reuters. No claim to original U.S. Government Works.

any claim under the subcontract through binding arbitration. The contract stated:

> Petrofac and DM agree to enter into binding arbitration for any Request for Equitable Adjustment or claim submitted against the referenced subcontract, in lieu of litigation, in the event that a mutually agreeable resolution cannot be bilaterally achieved between DM and Petrofac through negotiations.

In May 2004, Petrofac sent DM a multi-volume Request for Equitable Adjustment (REA). There, Petrofac asserted that DM disrupted Petrofac's ability to perform its work and sought damages for differing site conditions, delays, disruption costs, lost productivity, and acceleration costs.

On December 6, 2005, Petrofac agreed to release DM from all but a few specifically preserved claims. Among these preserved claims, the release included Petrofac's REA "as may be amended or supplemented." [1]

By July 2006, the parties had failed to resolve the REA dispute via negotiation. **\*674** Pursuant to the 2003 arbitration agreement, DM and Petrofac entered into an "Agreement for Arbitration and for Location and Methodology of Arbitration." There, the parties agreed that "[t]hey shall submit to binding arbitration the [REA] and all claims and disputes between them arising out of or relating to the Subcontract." In addition, the parties agreed that the arbitration would be conducted by the American Arbitration Association under its Construction Industry Arbitration Rules (AAA Rules).

Petrofac subsequently filed its demand for arbitration. In June 2008, Petrofac provided DM the report of its damages expert, Frank Adams. The Adams report calculated Petrofac's damages using a different methodology and reached a different amount than the original REA. The arbitration began in March 2009. After five days of hearings, however, the arbitration panel recessed for seven months. When the arbitration reconvened, DM objected to the arbitration panel hearing any claims stemming from the different damages methodology used in the Adams report, claiming that it effectively created a new constructive change claim outside the parties' agreement to arbitrate.

The arbitration panel dismissed DM's objection because "the arbitration agreement is clear and encompasses all of the issues between the parties arising out of this contract. It is also clear that DM waived any objection it had to the arbitration of a constructive change claim." The arbitration panel subsequently awarded Petrofac damages for the "contract balance, damages for a constructive change to the contract, an award for the benefit of Womack, and interest from August 24, 2006 to July 26, 2010" to be paid "within thirty days of the Award."

The district court confirmed the award. The district court rejected DM's argument that the REA and the Adams report represented different claims. Therefore, the district court ruled that the arbitration panel did not exceed its authority by awarding damages as presented in the Adams report. The court also determined that the award was not procured through fraud or undue means under 9 U.S.C. § 10(a)(1). Finally, the district court ordered prejudgment interest after August 26, 2010, ruling that prejudgment interest recommenced after DM failed to pay the award within the thirty-day period.

## II.

[1] This court reviews "a district court's confirmation of an award *de novo,* but the review of the underlying award is exceedingly deferential." *Apache Bohai Corp. LDC v. Texaco China BV,* 480 F.3d 397, 401 (5th Cir.2007) (internal quotation marks omitted).

## A.

On appeal, DM argues that the arbitration panel exceeded its powers by issuing an award on a claim not covered by the parties' arbitration agreement. 9 U.S.C. § 10(a)(4) (allowing a district court to vacate an award "where the arbitrators exceeded their powers"). Specifically, DM contends that the calculations in the expert report were extinguished by the 2005 release and therefore fall outside the parties' agreement to arbitrate. Petrofac responds that the parties contracted for the arbitration panel (and not the courts) to decide this question of arbitrability, and even if the arbitration panel did not have the power to decide arbitrability, the district court properly determined that the claims at issue were within the arbitration agreement.

 **[2]** **[3]** We first consider if the arbitration panel properly determined the initial **\*675** question of arbitrability, i.e. whether the claim is within the parties' agreement to arbitrate. "Just as the arbitrability of the merits of a dispute depends upon whether the parties agreed to arbitrate that dispute, so the question 'who has the primary power to decide arbitrability' turns upon what the parties agreed about *that* matter." *First Options of Chi., Inc. v. Kaplan,* 514 U.S. 938, 943, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995) (internal citations omitted). We will not assume that the parties agreed to arbitrate arbitrability "[u]nless the parties clearly and unmistakably provide otherwise." *AT & T Techs., Inc. v. Commc'ns Workers of Am.,* 475 U.S. 643, 649, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986). Accordingly, we must decide if DM and Petrofac "clearly and unmistakably" provided for the arbitration panel to decide arbitrability.

 **[4]** **[5]** Here, the parties expressly incorporated into their arbitration agreement the AAA Rules. These rules state that "[t]he arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope or validity of the arbitration agreement." We agree with most of our sister circuits that the express adoption of these rules presents clear and unmistakable evidence that the parties agreed to arbitrate arbitrability. *See Fallo v. High– Tech Inst.,* 559 F.3d 874, 878 (8th Cir.2009) ("[W]e conclude that the arbitration provision's incorporation of the AAA Rules ... constitutes a clear and unmistakable expression of the parties' intent to leave the question of arbitrability to an arbitrator."); *Qualcomm Inc. v. Nokia Corp.,* 466 F.3d 1366, 1372–73 (Fed.Cir.2006) (same); *Terminix Int'l Co., LP v. Palmer Ranch Ltd. P'ship,* 432 F.3d 1327, 1332–33 (11th Cir.2005) (same); *Contec Corp. v. Remote Solution Co.,* 398 F.3d 205, 208 (2d Cir.2005) (same); *Apollo Computer, Inc. v. Berg,* 886 F.2d 469, 473 (1st Cir.1989) (same result under the similar ICC Rules). *But see Riley Mfg. Co. v. Anchor Glass Container Corp.,* 157 F.3d 775, 780 (10th Cir.1998).[2] Therefore, the arbitration panel properly made the decision that the damages calculations in the Adams report fell within the agreement to arbitrate.[3]

### B.

 **[6]** Next, DM contends that Petrofac procured the overtime premium portion of the award through fraud or undue means. 9 U.S.C. § 10(a)(1) (permitting the district court to vacate an award "where the award was procured by corruption, fraud, or undue means"). Among the many claims brought in the original REA, Petrofac brought two distinct claims for damages: (1) an overtime premium claim for the additional overtime on the degas project; and (2) a claim for DM's impact on other projects.[4] Petrofac made a strategic decision to abandon the latter claim, while **\*676** maintaining the former. DM argues that Petrofac pulled a bait-and-switch by representing that it had abandoned its impact on other jobs claim, but then slipped those damages back in through its overtime premium claim. Rather than a covert legerdemain hidden from the arbitration panel, DM thoroughly advocated these arguments to the arbitration panel (both before and during the arbitration) and to the district court. In each case, the arbitration panel or court rejected DM's arguments. *See Forsythe Int'l, S.A. v. Gibbs Oil Co. of Tex.,* 915 F.2d 1017, 1022–23 (5th Cir.1990) (reversing a district court's vacatur of award where the arbitration panel heard evidence of the fraud and ruled it immaterial). Having examined the record, we conclude that DM's allegation of fraud misunderstands the distinct nature of Petrofac's claims.

### C.

 **[7]** **[8]** Finally, DM argues the district court committed reversible error by ordering prejudgment interest. "Texas law governs the award of prejudgment interest on the [arbitration] award," and "[u]nder Texas law, prevailing parties receive prejudgment interest as a matter of course." *Executone Info. Sys., Inc. v. Davis,* 26 F.3d 1314, 1329 (5th Cir.1994). On July 26, 2010, the arbitration panel ruled that Petrofac was entitled to interest, calculated the amount of interest as of the date of the award, and ordered payment of "interest from August 24, 2006 to July 26, 2010, within thirty days of the Award." DM did not pay within the required thirty-day period. The district court ordered that DM pay additional interest, reasoning that by ordering payment by August 25, 2010, the arbitration panel created "a thirty-day interest-free window from the date of the award," and DM "is not permitted to discount the arbitration panel's award by recalcitrantly delaying payment." We agree. The district court properly reinstated the arbitration panel's interest award after DM refused to pay within the required period.[5]

### III.

The district court properly confirmed the arbitration panel's arbitration award. On appeal, DM has failed to demonstrate

reversible error. Consequently, the judgment of the district court is AFFIRMED.

Footnotes

1    The release stated that:

> In consideration of payments made heretofore, or to be made, by DM ... [Petrofac] hereby unconditionally releases DM ... from any and all liens and claims whatsoever arising out of or during the performance of said Subcontract other than such claims, if any, that may ... be specifically excepted from the terms of this Release and Certificate, stated below:
>
>> 1. Request for Equitable Adjustment submitted by Petrofac, Inc. as may be amended or supplemented;
>>
>> 2. Invoice No. 2004–79–855 in the amount of $995,718.00 ...;
>>
>> 3. Invoice No. 2005–01–855 in the amount of $338,400.00;
>>
>> 4. All rights and claims of [Petrofac] in connection with its disputes and objections to DM's Unilateral Change Orders 17, 18, and 22;
>>
>> 5. Claim for Equitable Adjustment in the amount of $536,128.08 submitted by L.S. Womack, Inc. a subcontractor of Petrofac, Inc.; and
>>
>> 6. Specified claims in full and precise amounts to be received by the Subcontract Manager within ninety (90) calendar days from the issuance of final acceptance by the Subcontract Manager.

2    Today's holding complies with our own prior suggestions that the incorporation of the AAA Rules "may be sufficient to show that the parties to those agreements intended to confer that power on the arbitration panel." *DK Joint Venture 1 v. Weyand,* 649 F.3d 310, 317 n. 9 (5th Cir.2011) (emphasis omitted). Also, while the Texas Supreme Court has not weighed in on the issue, Texas appellate courts have adopted the same approach. *See Schlumberger Tech. Corp. v. Baker Hughes, Inc.,* 355 S.W.3d 791, 802–03 (Tex.App. —Houston [1st Dist.] Oct. 12, 2011).

3    Although DM characterizes its contracts as narrow arbitration agreements for only a few preserved disputes, nothing limits the parties' broad agreement to arbitrate "all claims and disputes" that related to the subcontract. Indeed, the 2006 arbitration agreement covered all disputes "including but not limited to" those preserved in the 2005 release.

4    Under the overtime claim, Petrofac sought to recover the amount of overtime paid to employees who were billed on other projects but, because of DM's disruption, needed to work overtime *on the degas project.* Under the impact on other projects claim, Petrofac demanded damages because DM's disruption of the degas project required Petrofac to hire additional subcontractors and pay overtime for work *on two other projects* to keep them on schedule.

5    The arbitration panel's award of interest—and order that it be paid within thirty days—distinguishes this case from others where the arbitration panel decided not to award interest to the prevailing party. *See Glover v. IBP, Inc.,* 334 F.3d 471, 477 (5th Cir.2003).

**End of Document**

© 2014 Thomson Reuters. No claim to original U.S. Government Works.

**Rent-A-Center, West, Inc. v. Jackson, 561 U.S. 63 (2010)**

130 S.Ct. 2772, 109 Fair Empl.Prac.Cas. (BNA) 897, 93 Empl. Prac. Dec. P 43,916...

130 S.Ct. 2772
Supreme Court of the United States

RENT–A–CENTER, WEST, INC., Petitioner,
v.
Antonio JACKSON.

No. 09–497.  |  Argued April 26, 2010.  |  Decided June 21, 2010.

**Synopsis**

**Background:** In former employee's § 1981 action alleging race discrimination and retaliation by his former employer, employer moved to dismiss and to compel arbitration pursuant to the Federal Arbitration Act (FAA). The United States District Court for the District of Nevada, Larry R. Hicks, J., granted the motion, and employee appealed. The United States Court of Appeals for the Ninth Circuit, Sidney R. Thomas, Circuit Judge, 581 F.3d 912, reversed in part and remanded. Certiorari was granted.

**[Holding:]** The Supreme Court, Justice Scalia, held that provision of employment agreement which delegated to an arbitrator exclusive authority to resolve any dispute relating to the agreement's enforceability was a valid delegation under the FAA.

Reversed.

Justice Stevens filed dissenting opinion, in which Justices Ginsburg, Breyer, and Sotomayor joined.

West Headnotes (6)

**[1]** **Alternative Dispute Resolution**



or consensual basis

Federal Arbitration Act (FAA) reflects fundamental principle that arbitration is a matter of contract. 9 U.S.C.A. § 1 et seq.

128 Cases that cite this headnote

**[2]** **Alternative Dispute Resolution**



Validity

of assent

**Alternative Dispute Resolution**



Unconscionabi

Like other contracts, arbitration agreements may be invalidated by generally applicable contract defenses, such as fraud, duress, or unconscionability.

119 Cases that cite this headnote

**[3]** **Alternative Dispute Resolution**



Severability

Under the Federal Arbitration Act (FAA), a party's challenge to another provision of the contract, or to the contract as a whole, does not prevent a court from enforcing a specific agreement to arbitrate; as a matter of substantive federal arbitration law, an arbitration provision is severable from the remainder of the contract. 9 U.S.C.A. § 2.

455 Cases that cite this headnote

**[4]** **Alternative Dispute Resolution**



Existence

and validity of agreement

Under the Federal Arbitration Act (FAA), if a party challenges the validity of the precise agreement to arbitrate at issue, federal court must consider the challenge before ordering compliance with that agreement, but if a party challenges the enforceability of the agreement as a whole, the challenge is for the arbitrator. 9 U.S.C.A. §§ 2, 4.

295 Cases that cite this headnote

**[5]** **Alternative Dispute Resolution**



Existence

and validity of agreement

Provision of employment agreement which delegated to an arbitrator the exclusive authority

Rent-A-Center, West, Inc. v. Jackson, 561 U.S. 63 (2010)

130 S.Ct. 2772, 109 Fair Empl.Prac.Cas. (BNA) 897, 93 Empl. Prac. Dec. P 43,916...

to resolve any dispute relating to the agreement's enforceability, including any claim that all or any part of the agreement was void or voidable, was a valid delegation under the Federal Arbitration Act (FAA), where employee challenged only the agreement as a whole and did not specifically challenge the delegation clause. 9 U.S.C.A. § 2.

190 Cases that cite this headnote

**[6]    Federal Courts**



of Questions Below or on Review;  Record;  Waiver

Former employee forfeited argument that delegation provision of arbitration agreement with employer was unconscionable because benefit employee received for such provision was negated by subsequently-issued Supreme Court decision; although decision was issued after employee submitted his brief to Court of Appeals on his initial appeal, employee could have submitted supplemental brief during year and a half between the decision and the Court of Appeals' judgment, and Supreme Court decision affirmed a rule that had already been in place in that circuit.

5 Cases that cite this headnote

**\*\*2773  *Syllabus* \***

**\*63**    Respondent Jackson filed an employment-discrimination suit against petitioner Rent–A–Center, his former employer, in a Nevada Federal District Court. Rent–A–Center filed a motion, under the Federal Arbitration Act (FAA), to dismiss or stay the proceedings, 9 U.S.C. § 3, and to compel arbitration, § 4, based on the arbitration agreement (Agreement) Jackson signed as a condition of his employment. Jackson opposed the motion on the ground **\*\*2774**  that the Agreement was unenforceable in that it was unconscionable under Nevada law. The District Court granted Rent–A–Center's motion. The Ninth Circuit reversed in relevant part.

*Held:* Under the FAA, where an agreement to arbitrate includes an agreement that the arbitrator will determine the enforceability of the agreement, if a party challenges specifically the enforceability of that particular agreement, the district court considers the challenge, but if a party challenges the enforceability of the agreement as a whole, the challenge is for the arbitrator. Pp. 2776 – 2781.

(a) Section 2 of the FAA places arbitration agreements on an equal footing with other contracts, *Buckeye Check Cashing, Inc. v. Cardegna,* 546 U.S. 440, 443, 126 S.Ct. 1204, 163 L.Ed.2d 1038, and requires courts to enforce them according to their terms, *Volt Information Sciences, Inc. v. Board of Trustees of Leland Stanford Junior Univ.,* 489 U.S. 468, 478, 109 S.Ct. 1248, 103 L.Ed.2d 488, "save upon such grounds as exist under law or in equity for the revocation of any contract," § 2. Here, the Agreement included two relevant arbitration provisions: it provided for arbitration of all disputes arising out of Jackson's employment, including discrimination claims, and it gave the "Arbitrator ... exclusive authority to resolve any dispute relating to the [Agreement's] enforceability ... including ... any claim that all or any part of this Agreement is void or voidable." Rent–A–Center seeks enforcement of the second provision, which delegates to the arbitrator the "gateway" question of enforceability. See, *e.g., Howsam v. Dean Witter Reynolds, Inc.,* 537 U.S. 79, 83–85, 123 S.Ct. 588, 154 L.Ed.2d 491. The court must enforce the delegation provision under §§ 3 and 4 unless it is unenforceable under § 2. Pp. 2776 – 2778.

(b) There are two types of validity challenges under § 2: one "challenges specifically the validity of the agreement to arbitrate," and "[t]he other challenges the contract as a whole," *Buckeye, supra,* at 444, 126 S.Ct. 1204. Only the first is relevant to a court's determination of an arbitration agreement's **\*64** enforceability, see, *e.g., Prima Paint Corp. v. Flood & Conklin Mfg. Co.,* 388 U.S. 395, 403–404, 87 S.Ct. 1801, 18 L.Ed.2d 1270, because under § 2 "an arbitration provision is severable from the remainder of the contract," *Buckeye, supra,* at 445, 126 S.Ct. 1204. That does not mean that agreements to arbitrate are unassailable. If a party challenges the validity under § 2 of the precise agreement to arbitrate at issue, the federal court must consider the challenge before ordering compliance with the agreement under § 4. That is no less true when the precise agreement to arbitrate is itself part of a larger arbitration agreement. Because here the agreement to arbitrate enforceability (the delegation provision) is severable from the remainder of the Agreement, unless Jackson challenged the delegation

**Rent-A-Center, West, Inc. v. Jackson, 561 U.S. 63 (2010)**

130 S.Ct. 2772, 109 Fair Empl.Prac.Cas. (BNA) 897, 93 Empl. Prac. Dec. P 43,916...

provision specifically, it must be treated as valid under § 2 and enforced under §§ 3 and 4. Pp. 2778 – 2779.

(c) The District Court correctly concluded that Jackson challenged only the validity of the contract as a whole. In his brief to this Court he raised a challenge to the delegation provision for the first time, but that is too late and will not be considered. See *14 Penn Plaza LLC v. Pyett,* 556 U.S. 247, ——, 129 S.Ct. 1456, ——, 173 L.Ed.2d 398. Pp. 2729 – 2781.

581 F.3d 912, reversed.

SCALIA, J., delivered the opinion of the Court, in which ROBERTS, C.J., and KENNEDY, THOMAS, and ALITO, JJ., joined. STEVENS, J., filed a dissenting opinion, in which GINSBURG, BREYER, and SOTOMAYOR, JJ., joined.

**Attorneys and Law Firms**

**\*\*2775** Robert F. Friedman, Dallas, TX, for Petitioner.

Ian E. Silverberg, Reno, NV, for Respondent.

Michael T. Garone, Schwabe, Williamson & Wyatt, P.C., Portland, OR, Ronald D. DeMoss, Andrew Trusevich, Mary Harokopus, Plano, TX, Robert F. Friedman, Edward F. Berbarie, Littler Mendelson, P.C., Dallas, TX, Henry D. Lederman, Littler Mendelson, P.C., Walnut Creek, CA, Carter G. Phillips, Sidley Austin LLP, Washington, DC, for Petitioner.

Ian E. Silverberg, Del Hardy, Hardy & Associates, Reno, NV, Scott L. Nelson, Deepak Gupta Public Citizen Litigation Group, Washington, D.C., F. Paul Bland, Jr., Matthew Wessler, Amy Radon, Melanie Hirsch, Public Justice, P.C., Washington, D.C., Arthur H. Bryant, Leslie A. Bailey, Leslie N. Brueckner, Public Justice, P.C., Oakland, CA, for Respondent.

**Opinion**

Justice SCALIA delivered the opinion of the Court.

**\*65** We consider whether, under the Federal Arbitration Act (FAA or Act), 9 U.S.C. §§ 1–16, a district court may decide a claim that an arbitration agreement is unconscionable, where the agreement explicitly assigns that decision to the arbitrator.

**I**

On February 1, 2007, the respondent here, Antonio Jackson, filed an employment-discrimination suit under Rev. Stat. § 1977, 42 U.S.C. § 1981, against his former employer in the United States District Court for the District of Nevada. The defendant and petitioner here, Rent–A–Center, West, Inc., filed a motion under the FAA to dismiss or stay the proceedings, 9 U.S.C. § 3, and to compel arbitration, § 4. Rent–A–Center argued that the Mutual Agreement to Arbitrate Claims (Agreement), which Jackson signed on February 24, 2003 as a condition of his employment there, precluded Jackson from pursuing his claims in court. The Agreement provided for arbitration of all "past, present or future" disputes arising out of Jackson's employment with Rent–A–Center, including "claims for discrimination" and **\*66** "claims for violation of any federal ... law." App. 29–30. It also provided that "[t]he Arbitrator, and not any federal, state, or local court or agency, shall have exclusive authority to resolve any dispute relating to the interpretation, applicability, enforceability or formation of this Agreement including, but not limited to any claim that all or any part of this Agreement is void or voidable." *Id.,* at 34.

Jackson opposed the motion on the ground that "the arbitration agreement in question is clearly unenforceable in that it is unconscionable" under Nevada law. *Id.,* at 40. Rent–A–Center responded that Jackson's unconscionability claim was not properly before the court because Jackson had expressly agreed that the arbitrator would have exclusive authority to resolve any dispute about the enforceability of the Agreement. It also disputed the merits of Jackson's unconscionability claims.

The District Court granted Rent–A–Center's motion to dismiss the proceedings and to compel arbitration. The court found that the Agreement " ' "clearly and unmistakenly *[sic]* " ' " gives the arbitrator exclusive authority to decide whether the Agreement is enforceable, App. to Pet. for Cert. 4a. (quoting *Howsam v. Dean Witter Reynolds, Inc.,* 537 U.S. 79, 83, 123 S.Ct. 588, 154 L.Ed.2d 491 (2002)), and, because Jackson challenged the validity of the Agreement *as a whole,* the issue was for **\*\*2776** the arbitrator, App. to Pet. for Cert. 4a (citing *Buckeye Check Cashing, Inc. v. Cardegna,* 546 U.S. 440, 444–445, 126 S.Ct. 1204, 163 L.Ed.2d 1038 (2006)). The court noted that even if it were to examine the merits of Jackson's unconscionability claims, it would have rejected the claim that the agreement to split arbitration

fees was substantively unconscionable under Nevada law. It did not address Jackson's procedural or other substantive unconscionability arguments.

Without oral argument, a divided panel of the Court of Appeals for the Ninth Circuit reversed in part, affirmed in part, and remanded. 581 F.3d 912 (2009). The court reversed on the question of who (the court or arbitrator) had **\*67** the authority to decide whether the Agreement is enforceable. It noted that "Jackson does not dispute that the language of the Agreement clearly assigns the arbitrability determination to the arbitrator," but held that where "a party challenges an arbitration agreement as unconscionable, and thus asserts that he could not meaningfully assent to the agreement, the threshold question of unconscionability is for the court." *Id.,* at 917. The Ninth Circuit affirmed the District Court's alternative conclusion that the fee-sharing provision was not substantively unconscionable and remanded for consideration of Jackson's other unconscionability arguments. *Id.,* at 919–920, and n. 3. Judge Hall dissented on the ground that "the question of the arbitration agreement's validity should have gone to the arbitrator, as the parties 'clearly and unmistakably provide[d]' in their agreement." *Id.,* at 921.

We granted certiorari, 558 U.S. 1142, 130 S.Ct. 1133, 175 L.Ed.2d 941 (2010).

## II

### A

**[1]** **[2]** The FAA reflects the fundamental principle that arbitration is a matter of contract. Section 2, the "primary substantive provision of the Act," *Moses H. Cone Memorial Hospital v. Mercury Constr. Corp.,* 460 U.S. 1, 24, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983), provides:

> "A written provision in ... a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract ... shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2.

The FAA thereby places arbitration agreements on an equal footing with other contracts, *Buckeye, supra,* at 443, 126 S.Ct. 1204, and requires courts to enforce them according to their terms, *Volt Information Sciences, Inc. v. Board*

*of Trustees of Leland* **\*68** *Stanford Junior Univ.,* 489 U.S. 468, 478, 109 S.Ct. 1248, 103 L.Ed.2d 488 (1989). Like other contracts, however, they may be invalidated by "generally applicable contract defenses, such as fraud, duress, or unconscionability." *Doctor's Associates, Inc. v. Casarotto,* 517 U.S. 681, 687, 116 S.Ct. 1652, 134 L.Ed.2d 902 (1996).

The Act also establishes procedures by which federal courts implement § 2's substantive rule. Under § 3, a party may apply to a federal court for a stay of the trial of an action "upon any issue referable to arbitration under an agreement in writing for such arbitration." Under § 4, a party "aggrieved" by the failure of another party "to arbitrate under a written agreement for arbitration" may petition a federal court "for an order directing that such arbitration proceed in the manner provided for in such agreement." The court "shall" order arbitration "upon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue." *Ibid*.

**\*\*2777** The Agreement here contains multiple "written provision[s]" to "settle by arbitration a controversy," § 2. Two are relevant to our discussion. First, the section titled "Claims Covered By The Agreement" provides for arbitration of all "past, present or future" disputes arising out of Jackson's employment with Rent–A–Center. App. 29. Second, the section titled "Arbitration Procedures" provides that "[t]he Arbitrator ... shall have exclusive authority to resolve any dispute relating to the ... enforceability ... of this Agreement including, but not limited to any claim that all or any part of this Agreement is void or voidable." *Id.,* at 32, 34. The current "controversy" between the parties is whether the Agreement is unconscionable. It is the second provision, which delegates resolution of that controversy to the arbitrator, that Rent–A–Center seeks to enforce. Adopting the terminology used by the parties, we will refer to it as the delegation provision.

The delegation provision is an agreement to arbitrate threshold issues concerning the arbitration agreement. We have recognized that parties can agree to arbitrate "gateway **\*69** " questions of "arbitrability," such as whether the parties have agreed to arbitrate or whether their agreement covers a particular controversy. See, *e.g., Howsam,* 537 U.S., at 83–85, 123 S.Ct. 588; *Green Tree Financial Corp. v. Bazzle,* 539 U.S. 444, 452, 123 S.Ct. 2402, 156 L.Ed.2d 414 (2003) (plurality opinion). This line of cases merely reflects the principle that arbitration is a matter of contract. [1] SEE **\*70** *FIrst options of ChicaGO, inc. v. Kaplan,* 514 U.s. 938, 943, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995). An

Rent-A-Center, West, Inc. v. Jackson, 561 U.S. 63 (2010)

130 S.Ct. 2772, 109 Fair Empl.Prac.Cas. (BNA) 897, 93 Empl. Prac. Dec. P 43,916...

agreement to arbitrate a gateway issue is simply an additional, antecedent agreement the party seeking arbitration asks the federal **\*\*2778** court to enforce, and the FAA operates on this additional arbitration agreement just as it does on any other. The additional agreement is valid under § 2 "save upon such grounds as exist at law or in equity for the revocation of any contract," and federal courts can enforce the agreement by staying federal litigation under § 3 and compelling arbitration under § 4. The question before us, then, is whether the delegation provision is valid under § 2.

**B**

 **[3]**    There are two types of validity challenges under § 2: "One type challenges specifically the validity of the agreement to arbitrate," and "[t]he other challenges the contract as a whole, either on a ground that directly affects the entire agreement (*e.g.,* the agreement was fraudulently induced), or on the ground that the illegality of one of the contract's provisions renders the whole contract invalid." *Buckeye,* 546 U.S., at 444, 126 S.Ct. 1204. In a line of cases neither party has asked us to overrule, we held that only the first type of challenge is relevant to a court's determination whether the arbitration agreement at issue is enforceable.[2] See *Prima Paint Corp. v. Flood & Conklin Mfg. Co.,* 388 U.S. 395, 403–404, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967); *Buckeye, supra,* at 444–446, 126 S.Ct. 1204; *Preston v. Ferrer,* 552 U.S. 346, 353–354, 128 S.Ct. 978, 169 L.Ed.2d 917 (2008). That is because § 2 states that a "written provision" "to settle by arbitration a controversy" is "valid, irrevocable, and enforceable" *without mention* of the validity of the contract in which it is contained. Thus, a party's challenge to another provision of the contract, or to the contract as a whole, does not prevent a court from enforcing a specific agreement to arbitrate. "[A]s a matter of substantive federal **\*71** arbitration law, an arbitration provision is severable from the remainder of the contract." *Buckeye,* 546 U.S., at 445, 126 S.Ct. 1204; see also *id.,* at 447, 126 S.Ct. 1204 (the severability rule is based on § 2).

 **[4]**    But that agreements to arbitrate are severable does not mean that they are unassailable. If a party challenges the validity under § 2 of the precise agreement to arbitrate at issue, the federal court must consider the challenge before ordering compliance with that agreement under § 4. In *Prima Paint,* for example, if the claim had been "fraud in the inducement of the arbitration clause itself," then the court would have considered it. 388 U.S., at 403–404, 87 S.Ct.

1801. "To immunize an arbitration agreement from judicial challenge on the ground of fraud in the inducement would be to elevate it over other forms of contract," *id.,* at 404, n. 12, 87 S.Ct. 1801. In some cases the claimed basis of invalidity for the contract as a whole will be much easier to establish than the same basis as applied only to the severable agreement to arbitrate. Thus, in an employment contract many elements of alleged unconscionability applicable to the entire contract (outrageously low wages, for example) would not affect the agreement to arbitrate alone. But even where that is not the case—as in *Prima Paint* itself, where the alleged fraud that induced the whole contract equally induced the agreement to arbitrate which was part of that contract—we nonetheless require the basis of challenge to be directed specifically to the agreement to arbitrate before the court will intervene.

 **\*\*2779**   Here, the "written provision ... to settle by arbitration a controversy," 9 U.S.C. § 2, that Rent–A–Center asks us to enforce is the delegation provision—the provision that gave the arbitrator "exclusive authority to resolve any dispute relating to the ... enforceability ... of this Agreement," App. 34. The "remainder of the contract," *Buckeye, supra,* at 445, 126 S.Ct. 1204, is the rest of the agreement to arbitrate claims arising out of Jackson's employment with Rent–A–Center. To be sure this case differs from *Prima Paint, Buckeye,* and *Preston,* **\*72**  in that the arbitration provisions sought to be enforced in those cases were contained in contracts unrelated to arbitration—contracts for consulting services, see *Prima Paint, supra,* at 397, 87 S.Ct. 1801, check-cashing services, see *Buckeye, supra,* at 442, 126 S.Ct. 1204, and "personal management" or "talent agent" services, see *Preston, supra,* at 352, 128 S.Ct. 978. In this case, the underlying contract is itself an arbitration agreement. But that makes no difference.[3] Application of the severability rule does not depend on the substance of the remainder of the contract. Section 2 operates on the specific "written provision" to "settle by arbitration a controversy" that the party seeks to enforce. Accordingly, unless Jackson challenged the delegation provision specifically, we must treat it as valid under § 2, and must enforce it under §§ 3 and 4, leaving any challenge to the validity of the Agreement as a whole for the arbitrator.

**C**

 **[5]**    The District Court correctly concluded that Jackson challenged only the validity of the contract as a whole. Nowhere in his opposition to Rent–A–Center's motion to

Rent-A-Center, West, Inc. v. Jackson, 561 U.S. 63 (2010)

130 S.Ct. 2772, 109 Fair Empl.Prac.Cas. (BNA) 897, 93 Empl. Prac. Dec. P 43,916...

compel arbitration did he even mention the delegation provision. See App. 39–47. Rent–A–Center noted this fact in its reply: **\*73** "[Jackson's response] fails to rebut or otherwise address in any way [Rent–A–Center's] argument that the Arbitrator must decide [Jackson's] challenge to the enforceability of the Agreement. *Thus, [Rent–A–Center's] argument is uncontested.*" *Id.,* at 50 (emphasis in original).

The arguments Jackson made in his response to Rent–A–Center's motion to compel arbitration support this conclusion. Jackson stated that "the *entire agreement* seems drawn to provide [Rent–A–Center] with undue advantages should an employment-related dispute arise." *Id.,* at 44 (emphasis added). At one point, he argued that the limitations on discovery "further suppor[t][his] contention that the *arbitration agreement as a whole* is substantively unconscionable." *Ibid.* (emphasis added). And before this Court, Jackson describes his challenge in the District Court as follows: He "opposed the motion to compel on the ground that the *entire arbitration agreement,* including the delegation clause, was unconscionable." Brief for Respondent 55 (emphasis added). **\*\*2780** That is an accurate description of his filings.

As required to make out a claim of unconscionability under Nevada law, see 581 F.3d, at 919, he contended that the Agreement was both procedurally and substantively unconscionable. It was procedurally unconscionable, he argued, because it "was imposed as a condition of employment and was non-negotiable." App. 41. But we need not consider that claim because none of Jackson's substantive unconscionability challenges was specific to the delegation provision. First, he argued that the Agreement's coverage was one sided in that it required arbitration of claims an employee was likely to bring—contract, tort, discrimination, and statutory claims—but did not require arbitration of claims Rent–A–Center was likely to bring—intellectual property, unfair competition, and trade secrets claims. *Id.,* at 42–43. This one-sided-coverage argument clearly did not go to the validity of the delegation provision.

 **\*74** Jackson's other two substantive unconscionability arguments assailed arbitration procedures called for by the contract—the fee-splitting arrangement and the limitations on discovery—procedures that were to be used during arbitration under *both* the agreement to arbitrate employment-related disputes *and* the delegation provision. It may be that had Jackson challenged the delegation provision by arguing that these common procedures *as applied* to the

delegation provision rendered *that provision* unconscionable, the challenge should have been considered by the court. To make such a claim based on the discovery procedures, Jackson would have had to argue that the limitation upon the number of depositions causes the arbitration of his claim that the Agreement is unenforceable to be unconscionable. That would be, of course, a much more difficult argument to sustain than the argument that the same limitation renders arbitration of his factbound employment-discrimination claim unconscionable. Likewise, the unfairness of the fee-splitting arrangement may be more difficult to establish for the arbitration of enforceability than for arbitration of more complex and fact-related aspects of the alleged employment discrimination. Jackson, however, did not make any arguments specific to the delegation provision; he argued that the fee-sharing and discovery procedures rendered the *entire* Agreement invalid.

Jackson's appeal to the Ninth Circuit confirms that he did not contest the validity of the delegation provision in particular. His brief noted the existence of the delegation provision, Brief for Appellant in No. 07–16164, p. 3, but his unconscionability arguments made no mention of it, *id.,* at 3–7. He also repeated the arguments he had made before the District Court, see *supra,* at 2779, that the "entire agreement" favors Rent–A–Center and that the limitations on discovery further his "contention that the arbitration agreement as a whole is substantively unconscionable," Brief for Appellant **\*75** 7–8. Finally, he repeated the argument made in his District Court filings, that under state law the unconscionable clauses could not be severed from the arbitration agreement, see *id.,* at 8–9.[4] The **\*\*2781** point of this argument, of course, is that the Agreement *as a whole* is unconscionable under state law.

Jackson repeated that argument before this Court. At oral argument, counsel stated: "There are certain elements of the arbitration agreement that are unconscionable and, under Nevada law, which would render the *entire arbitration agreement* unconscionable." Tr. of Oral Arg. 43 (emphasis added). And again, he stated, "we've got both certain provisions that are unconscionable, that under Nevada law render the *entire agreement* unconscionable ..., and that's what the Court is to rely on." *Id.,* at 43–44 (emphasis added).

 **[6]** In his brief to this Court, Jackson made the contention, not mentioned below, that the delegation provision itself is substantively unconscionable because the *quid pro quo* he was supposed to receive for it—that "in exchange for initially allowing an arbitrator to decide certain gateway questions,"

he would receive "plenary post-arbitration judicial review"—was eliminated by the Court's subsequent holding in *Hall Street Associates, L.L.C. v. Mattel, Inc.,* 552 U.S. 576, 128 S.Ct. 1396, 170 L.Ed.2d 254 (2008), that the nonplenary grounds for judicial review in § 10 of the FAA are exclusive. Brief for Respondent 59–60. He brought this challenge to the delegation provision too late, **\*76** and we will not consider it. [5] See *14 Penn Plaza LLC v. Pyett,* 556 U.S. 247, ——, 129 S.Ct. 1456, 1473–74, 173 L.Ed.2d 398 (2009).

\* \* \*

We reverse the judgment of the Court of Appeals for the Ninth Circuit.

*It is so ordered.*

Justice STEVENS, with whom Justice GINSBURG, Justice BREYER, and Justice SOTOMAYOR join, dissenting.
Neither petitioner nor respondent has urged us to adopt the rule the Court does today: Even when a litigant has specifically challenged the validity of an agreement to arbitrate he must submit that challenge *to the arbitrator* unless he has lodged an objection to the particular line in the agreement that purports to assign such challenges to the arbitrator—the so-called "delegation clause."

The Court asserts that its holding flows logically from *Prima Paint Corp. v. Flood & Conklin Mfg. Co.,* 388 U.S. 395, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967), in which the Court held that consideration of a contract revocation defense is generally a matter for the arbitrator, unless the defense is specifically directed at the arbitration clause, *id.,* at 404, 87 S.Ct. 1801. We have treated this holding as a severability rule: When a party challenges a contract, "but not specifically its arbitration provisions, those provisions are enforceable apart from the remainder of the contract." *Buckeye Check Cashing, Inc. v. Cardegna,* 546 U.S. 440, 446, 126 S.Ct. 1204, 163 L.Ed.2d 1038 (2006). The Court's decision today goes beyond *Prima* **\*77** *Paint.* Its breezy assertion that the subject matter of the contract at issue—in this case, an arbitration **\*\*2782** agreement and nothing more—" makes no difference," *ante,* at 2779, is simply wrong. This written arbitration agreement is but one part of a broader employment agreement between the parties, just as the arbitration clause in *Prima Paint* was but one part of a broader contract for services between those parties. Thus, that the subject matter of the agreement is

exclusively arbitration makes *all* the difference in the *Prima Paint* analysis.

**I**

Under the Federal Arbitration Act (FAA), 9 U.S.C. §§ 1–16, parties generally have substantial leeway to define the terms and scope of their agreement to settle disputes in an arbitral forum. "[A]rbitration is," after all, "simply a matter of contract between the parties; it is a way to resolve those disputes—but only those disputes—that the parties have agreed to submit to arbitration." *First Options of Chicago, Inc. v. Kaplan,* 514 U.S. 938, 943, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995). The FAA, therefore, envisions a limited role for courts asked to stay litigation and refer disputes to arbitration.

Certain issues—the kind that "contracting parties would likely have expected a court to have decided"—remain within the province of judicial review. *Howsam v. Dean Witter Reynolds, Inc.,* 537 U.S. 79, 83, 123 S.Ct. 588, 154 L.Ed.2d 491 (2002); see also *Green Tree Financial Corp. v. Bazzle,* 539 U.S. 444, 452, 123 S.Ct. 2402, 156 L.Ed.2d 414 (2003) (plurality opinion); *AT & T Technologies, Inc. v. Communications Workers,* 475 U.S. 643, 649, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986). These issues are "gateway matter[s]" because they are necessary antecedents to enforcement of an arbitration agreement; they raise questions the parties "are not likely to have thought that they had agreed that an arbitrator would" decide. *Howsam,* 537 U.S., at 83, 123 S.Ct. 588. Quintessential gateway matters include "whether the parties have a valid arbitration agreement at all," *Bazzle,* 539 U.S., at 452, 123 S.Ct. 2402 (plurality opinion); "whether the parties are bound by a given arbitration clause," *Howsam,* **\*78** 537 U.S., at 84, 123 S.Ct. 588; and "whether an arbitration clause in a concededly binding contract applies to a particular type of controversy," *ibid.* It would be bizarre to send these types of gateway matters to the arbitrator as a matter of course, because they raise a " 'question of arbitrability.' " [1] See, *e.g., ibid.; First Options,* 514 U.S., at 947, 115 S.Ct. 1920.

"[Q]uestion[s] of arbitrability" thus include questions regarding the existence of a legally binding and valid arbitration agreement, as well as questions regarding the scope of a concededly binding arbitration agreement. In this case we are concerned with the first of these categories: whether the parties have a valid arbitration agreement. This is an issue the FAA assigns to the courts. [2] Section 2 of the

Rent-A-Center, West, Inc. v. Jackson, 561 U.S. 63 (2010)

130 S.Ct. 2772, 109 Fair Empl.Prac.Cas. (BNA) 897, 93 Empl. Prac. Dec. P 43,916...

FAA dictates that covered arbitration agreements "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. **2783 "[S]uch grounds," which relate to contract validity and formation, include the claim at issue in this case, unconscionability. See *Doctor's Associates, Inc. v. Casarotto,* 517 U.S. 681, 687, 116 S.Ct. 1652, 134 L.Ed.2d 902 (1996).

Two different lines of cases bear on the issue of *who* decides a question of arbitrability respecting validity, such as whether an arbitration agreement is unconscionable. Although this issue, as a gateway matter, is typically for the court, we have explained that such an issue can be delegated to the arbitrator in some circumstances. When the parties have purportedly done so, courts must examine two distinct rules to decide whether the delegation is valid.

 **79** The first line of cases looks to the parties' intent. In *AT & T Technologies,* we stated that "question[s] of arbitrability" may be delegated to the arbitrator, so long as the delegation is clear and unmistakable. 475 U.S., at 649, 106 S.Ct. 1415. We reaffirmed this rule, and added some nuance, in *First Options.* Against the background presumption that questions of arbitrability go to the court, we stated that federal courts should "generally" apply "ordinary state-law principles that govern the formation of contracts" to assess "whether the parties agreed to arbitrate a certain matter (including arbitrability)." 514 U.S., at 944, 115 S.Ct. 1920. But, we added, a more rigorous standard applies when the inquiry is whether the parties have "agreed to arbitrate arbitrability": " Courts should not assume that the parties agreed to arbitrate arbitrability unless there is clear and unmistakable evidence that they did so." [3] *Ibid.* (internal quotation marks and brackets omitted). Justice BREYER's unanimous opinion for the Court described this standard as a type of "revers [e]" "presumption" [4]—one in favor of a judicial, rather than an arbitral, forum. *Id.,* at 945, 115 S.Ct. 1920. Clear and unmistakable " evidence" of agreement to arbitrate arbitrability might include, as was urged in *First Options,* a course of conduct demonstrating assent, [5] *id.,* at 946, 115 S.Ct. 1920, or, as is urged in this case, an express **80** agreement to do so. In any event, whether such evidence exists is a matter for the court to determine.

The second line of cases bearing on who decides the validity of an arbitration agreement, as the Court explains, involves the *Prima Paint* rule. See *ante,* at 2777 – 2778. That rule recognizes two types of validity challenges. One type

challenges the validity of the arbitration agreement itself, on a ground arising from an infirmity in that agreement. The other challenges the validity of the arbitration agreement tangentially—via a claim that the entire contract (of which the arbitration agreement is but a part) is invalid for **2784 some reason. See *Buckeye,* 546 U.S., at 444, 126 S.Ct. 1204. Under *Prima Paint,* a challenge of the first type goes to the court; a challenge of the second type goes to the arbitrator. See 388 U.S., at 403–404, 87 S.Ct. 1801; see also *Buckeye,* 546 U.S., at 444–445, 126 S.Ct. 1204. The *Prima Paint* rule is akin to a pleading standard, whereby a party seeking to challenge the validity of an arbitration agreement must expressly say so in order to get his dispute into court.

In sum, questions related to the validity of an arbitration agreement are usually matters for a court to resolve before it refers a dispute to arbitration. But questions of arbitrability may go to the arbitrator in two instances: (1) when the parties have demonstrated, clearly and unmistakably, that it is their intent to do so; or (2) when the validity of an arbitration agreement depends exclusively on the validity of the substantive contract of which it is a part.

## II

We might have resolved this case by simply applying the *First Options* rule: Does the arbitration agreement at issue "clearly and unmistakably" evince petitioner's and respondent's intent to submit questions of arbitrability to the arbitrator? [6] The answer to that question is no. Respondent's **81** claim that the arbitration agreement is unconscionable undermines any suggestion that he "clearly" and "unmistakably" assented to submit questions of arbitrability to the arbitrator. See Restatement (Second) of Contracts § 208, Comment *d* (1979) ("[G]ross inequality of bargaining power, together with terms unreasonably favorable to the stronger party, may confirm indications that the transaction involved elements of deception or compulsion, or may show that the weaker party had no meaningful choice, no real alternative, or did not in fact assent or appear to assent to the unfair terms"); *American Airlines, Inc. v. Wolens,* 513 U.S. 219, 249, 115 S.Ct. 817, 130 L.Ed.2d 715 (1995) (O'Connor, J., concurring in judgment and dissenting in part) ("[A] determination that a contract is 'unconscionable' may in fact be a determination that one party did not intend to agree to the terms of the contract"). [7] The **82** fact that the **2785 agreement's "delegation" provision suggests assent is beside the point, because the

Rent-A-Center, West, Inc. v. Jackson, 561 U.S. 63 (2010)

130 S.Ct. 2772, 109 Fair Empl.Prac.Cas. (BNA) 897, 93 Empl. Prac. Dec. P 43,916...

gravamen of respondent's claim is that he never consented to the terms in his agreement.

In other words, when a party raises a good-faith validity challenge to the arbitration agreement itself, that issue must be resolved before a court can say that he clearly and unmistakably intended to *arbitrate* that very validity question. This case well illustrates the point: If respondent's unconscionability claim is correct—*i.e.,* if the terms of the agreement are so one-sided and the process of its making so unfair—it would contravene the existence of clear and unmistakable assent to arbitrate the very question petitioner now seeks to arbitrate. Accordingly, it is necessary for the court to resolve the merits of respondent's unconscionability claim in order to decide whether the parties have a valid arbitration agreement under § 2. Otherwise, that section's preservation of revocation issues for the Court would be meaningless.

This is, in essence, how I understand the Court of Appeals to have decided the issue below. See 581 F.3d 912, 917 (C.A.9 2009) ("[W]e hold that where, as here, a party challenges an arbitration agreement as unconscionable, and thus asserts that he could not meaningfully assent to the agreement, the threshold question of unconscionability is for the court"). I would therefore affirm its judgment, leaving, as it did, the merits of respondent's unconscionability claim for the District Court to resolve on remand.

**\*83 III**

Rather than apply *First Options,* the Court takes us down a different path, one neither briefed by the parties nor relied upon by the Court of Appeals. In applying *Prima Paint,* the Court has unwisely extended a "fantastic" and likely erroneous decision. 388 U.S., at 407, 87 S.Ct. 1801 (Black, J., dissenting). [8]

As explained at the outset, see *supra,* at 2783 – 2785, this case lies at a seeming crossroads in our arbitration jurisprudence. It implicates cases such as *First Options,* which address whether the parties intended to delegate questions of arbitrability, and also those cases, such as *Prima Paint,* which address the severability of a presumptively valid arbitration agreement from a potentially invalid contract. The question of "Who decides?"—arbitrator or court—animates both lines of cases, but they are driven by different concerns. In cases like *First Options,* we are concerned with the parties' intentions. In

cases like *Prima Paint,* we are concerned with *how* the parties challenge the validity of the agreement.

Under the *Prima Paint* inquiry, recall, we consider whether the parties are actually challenging the validity of the arbitration agreement, or whether they are challenging, **\*\*2786** more generally, the contract within which an arbitration clause is nested. In the latter circumstance, we assume there is no infirmity *per se* with the arbitration agreement, *i.e.,* there are no grounds for revocation of the arbitration agreement itself under § 2 of the FAA. Accordingly, we **\*84** commit the parties' general contract dispute to the arbitrator, as agreed.

The claim in *Prima Paint* was that one party would not have agreed to contract with the other for services had it known the second party was insolvent (a fact known but not disclosed at the time of contracting). 388 U.S., at 398, 87 S.Ct. 1801. There was, therefore, allegedly fraud in the inducement of the contract—a contract which also delegated disputes to an arbitrator. Despite the fact that the claim raised would have, if successful, rendered the embedded arbitration clause void, the Court held that the merits of the dispute were for the arbitrator, so long as the claim of "fraud in the inducement" did not go to validity of "*the arbitration clause* itself." *Id.,* at 403, 87 S.Ct. 1801 (emphasis added). Because, in *Prima Paint,* "no claim ha[d] been advanced by Prima Paint that [respondent] fraudulently induced it to enter into the agreement to arbitrate," and because the arbitration agreement was broad enough to cover the dispute, the arbitration agreement was enforceable with respect to the controversy at hand. *Id.,* at 406, 87 S.Ct. 1801.

The *Prima Paint* rule has been denominated as one related to severability. Our opinion in *Buckeye,* set out these guidelines:

"First, as a matter of substantive federal arbitration law, an arbitration provision is severable from the remainder of the contract. Second, unless the challenge is to the arbitration clause itself, the issue of the contract's validity is considered by the arbitrator in the first instance." 546 U.S., at 445–446, 126 S.Ct. 1204.

Whether the general contract defense renders the entire agreement void or voidable is irrelevant. *Id.,* at 446, 126 S.Ct. 1204. All that matters is whether the party seeking to present the issue to a court has brought a "discrete challenge," *Preston v. Ferrer,* 552 U.S. 346, 354, 128 S.Ct. 978, 169 L.Ed.2d 917 (2008), "to the validity of the ... arbitration clause." *Buckeye,* 546 U.S., at 449, 126 S.Ct. 1204.

**\*85** *Prima Paint* and its progeny allow a court to pluck from a potentially invalid *contract* a potentially valid *arbitration agreement*. Today the Court adds a new layer of severability —something akin to Russian nesting dolls—into the mix: Courts may now pluck from a potentially invalid *arbitration agreement* even narrower provisions that refer particular arbitrability disputes to an arbitrator. See *ante,* at 2777 – 2778. I do not think an agreement to arbitrate can ever manifest a clear and unmistakable intent to arbitrate its own validity. But even assuming otherwise, I certainly would not hold that the *Prima Paint* rule extends this far.

In my view, a general revocation challenge to a standalone arbitration agreement is, invariably, a challenge to the " 'making' " of the arbitration agreement itself, *Prima Paint,* 388 U.S., at 403, 87 S.Ct. 1801, and therefore, under *Prima Paint,* must be decided by the court. A claim of procedural unconscionability aims to undermine the formation of the arbitration agreement, much like a claim of unconscionability aims to undermine the clear-and-unmistakable-intent requirement necessary for a valid delegation of a "discrete" challenge to the validity of the arbitration agreement itself, *Preston,* 552 U.S., at 354, 128 S.Ct. 978. Moreover, because we are dealing in this case with a challenge **\*\*2787** to an independently executed arbitration agreement—rather than a clause contained in a contract related to another subject matter—any challenge to the contract itself is also, necessarily, a challenge to the arbitration agreement. [9] They are one and the same.

The Court, however, reads the delegation clause as a distinct mini-arbitration agreement divisible from the contract in which it resides—which just so happens also to be an arbitration agreement. *Ante,* at 2777 – 2778. Although the Court **\*86** simply declares that it "makes no difference" that the underlying subject matter of the agreement is itself an arbitration agreement, *ante,* at 2777 – 2778, that proposition does not follow from—rather it is at odds with—*Prima Paint* 's severability rule.

Had the parties in this case executed only one contract, on two sheets of paper—one sheet with employment terms, and a second with arbitration terms—the contract would look much like the one in *Buckeye.* There would be some substantive terms, followed by some arbitration terms, including what we now call a delegation clause—*i.e.,* a sentence or two assigning to the arbitrator any disputes related to the validity of the arbitration provision. See *Buckeye,* 546 U.S., at 442, 126 S.Ct.

1204. If respondent then came into court claiming that the contract was illegal as a whole for some reason unrelated to the arbitration provision, the *Prima Paint* rule would apply, and such a general challenge to the subject matter of the contract would go to the arbitrator. Such a challenge would not call into question the making of the arbitration agreement or its invalidity *per se.*

Before today, however, if respondent instead raised a challenge specific to "the validity of the agreement to arbitrate"—for example, that the agreement to arbitrate was void under state law—the challenge would have gone to the court. That is what *Buckeye* says. See 546 U.S., at 444, 126 S.Ct. 1204. But the Court now declares that *Prima Paint*'s pleading rule requires more: A party must lodge a challenge with even greater specificity than what would have satisfied the *Prima Paint* Court. A claim that an *entire* arbitration agreement is invalid will not go to the court unless the party challenges the *particular sentences* that delegate such claims to the arbitrator, on some contract ground that is particular and unique to those sentences. See *ante,* at 2779 – 2780.

It would seem the Court reads *Prima Paint* to require, as a matter of course, infinite layers of severability: We must always pluck from an arbitration agreement the specific delegation **\*87** mechanism that would—but for present judicial review—commend the matter to arbitration, even if this delegation clause is but one sentence within one paragraph within a standalone agreement. And, most importantly, the party must identify this one sentence and lodge a specific challenge to its validity. Otherwise, he will be bound to pursue his validity claim in arbitration.

Even if limited to separately executed arbitration agreements, however, such an infinite severability rule is divorced from the underlying rationale of *Prima Paint.* The notion that a party may be bound by an arbitration clause in a contract that is nevertheless invalid may be difficult for any lawyer—or any person—to accept, but this is the law of *Prima Paint.* It reflects **\*\*2788** a judgment that the " 'national policy favoring arbitration,' " *Preston,* 552 U.S., at 353, 128 S.Ct. 978, outweighs the interest in preserving a judicial forum for questions of arbitrability—*but only when questions of arbitrability are bound up in an underlying dispute. Prima Paint,* 388 U.S., at 404, 87 S.Ct. 1801. When the two are so bound up, there is actually no gateway matter at all: The question "Who decides" is the entire ball game. Were a court to decide the fraudulent inducement question in *Prima Paint,* in order to decide the antecedent question of the

Rent-A-Center, West, Inc. v. Jackson, 561 U.S. 63 (2010)

130 S.Ct. 2772, 109 Fair Empl.Prac.Cas. (BNA) 897, 93 Empl. Prac. Dec. P 43,916...

validity of the included arbitration agreement, then it would also, necessarily, decide the merits of the underlying dispute. Same, too, for the question of illegality in *Buckeye;* on its way to deciding the arbitration agreement's validity, the court would have to decide whether the contract was illegal, and in so doing, it would decide the merits of the entire dispute.

In this case, however, resolution of the unconscionability question will have no bearing on the merits of the underlying employment dispute. It will only, as a preliminary matter, resolve who should decide the merits of that dispute. Resolution of the unconscionability question will, however, decide whether the arbitration agreement *itself* is "valid" under "such grounds as exist at law or in equity for the revocation **\*88** of any contract." 9 U.S.C. § 2. As *Prima Paint* recognizes, the FAA commits those gateway matters, specific to the arbitration agreement, to the court. 388 U.S., at 403–404, 87 S.Ct. 1801. Indeed, it is clear that the present controversy over whether the arbitration agreement is unconscionable is *itself severable* from the merits of the

underlying dispute, which involves a claim of employment discrimination. This is true for all gateway matters, and for this reason *Prima Paint* has no application in this case.

## IV

While I may have to accept the "fantastic" holding in *Prima Paint, id.,* at 407, 87 S.Ct. 1801 (Black, J., dissenting), I most certainly do not accept the Court's even more fantastic reasoning today. I would affirm the judgment of the Court of Appeals, and therefore respectfully dissent.

## Parallel Citations

130 S.Ct. 2772, 109 Fair Empl.Prac.Cas. (BNA) 897, 93 Empl. Prac. Dec. P 43,916, 177 L.Ed.2d 403, 78 USLW 4643, 10 Cal. Daily Op. Serv. 7707, 2010 Daily Journal D.A.R. 9338, 22 Fla. L. Weekly Fed. S 518

## Footnotes

\*      The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States v. Detroit Timber & Lumber Co.,* 200 U.S. 321, 337, 26 S.Ct. 282, 50 L.Ed. 499.

1      There is one caveat. *First Options of Chicago, Inc. v. Kaplan,* 514 U.S. 938, 944, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995), held that "[c]ourts should not assume that the parties agreed to arbitrate arbitrability unless there is 'clea[r] and unmistakabl[e]' evidence that they did so." The parties agree the heightened standard applies here. See Brief for Petitioner 21; Brief for Respondent 54. The District Court concluded the "Agreement to Arbitrate clearly and unmistakenly *[sic]* provides the arbitrator with the exclusive authority to decide whether the Agreement to Arbitrate is enforceable." App. to Pet. for Cert. 4a. The Ninth Circuit noted that Jackson did not dispute that the text of the Agreement was clear and unmistakable on this point. 581 F.3d 912, 917 (2009). He also does not dispute it here. What he argues now, however, is that it is not "clear and unmistakable" that his *agreement* to that text was valid, because of the unconscionability claims he raises. See Brief for Respondent 54–55. The dissent makes the same argument. See *post,* at 2783 – 2785 (opinion of STEVENS, J.).

This mistakes the subject of the *First Options* "clear and unmistakable" requirement. It pertains to the parties' *manifestation of intent,* not the agreement's *validity.* As explained in *Howsam v. Dean Witter Reynolds, Inc.,* 537 U.S. 79, 83, 123 S.Ct. 588, 154 L.Ed.2d 491 (2002), it is an "interpretive rule," based on an assumption about the parties' expectations. In "circumstance[s] where contracting parties would likely have expected a court to have decided the gateway matter," *ibid.,* we assume that is what they agreed to. Thus, "[u]nless the parties clearly and unmistakably provide otherwise, the question of whether the parties agreed to arbitrate is to be decided by the court, not the arbitrator." *AT & T Technologies, Inc. v. Communications Workers,* 475 U.S. 643, 649, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986).

The *validity* of a written agreement to arbitrate (whether it is legally binding, as opposed to whether it was in fact agreed to— including, of course, whether it was void for unconscionability) is governed by § 2's provision that it shall be valid "save upon such grounds as exist at law or equity for the revocation of any contract." Those grounds do not include, of course, any requirement that its lack of unconscionability must be "clear and unmistakable." And they are not grounds that *First Options* added for agreements to arbitrate gateway issues; § 2 applies to all written agreements to arbitrate.

2      The issue of the agreement's "validity" is different from the issue whether any agreement between the parties "was ever concluded," and, as in *Buckeye Check Cashing, Inc. v. Cardegna,* 546 U.S. 440, 126 S.Ct. 1204, 163 L.Ed.2d 1038 (2006), we address only the former. *Id.,* at 444, n. 1, 126 S.Ct. 1204.

3      The dissent calls this a "breezy assertion," *post,* at 2781, but it seems to us self-evident. When the dissent comes to discussing the point, *post,* at 2787, it gives no logical reason why an agreement to arbitrate one controversy (an employment-discrimination claim)

Rent-A-Center, West, Inc. v. Jackson, 561 U.S. 63 (2010)

130 S.Ct. 2772, 109 Fair Empl.Prac.Cas. (BNA) 897, 93 Empl. Prac. Dec. P 43,916...

is not severable from an agreement to arbitrate a different controversy (enforceability). There is none. Since the dissent accepts that the invalidity of one provision *within an arbitration agreement* does not necessarily invalidate its other provisions, *post,* at 2784 – 2785, n. 7, it cannot believe in some sort of magic bond between arbitration provisions that prevents them from being severed from each other. According to the dissent, it is fine to sever an invalid provision within an arbitration agreement when severability is a matter of state law, but severability is not allowed when it comes to applying *Prima Paint Corp. v. Flood & Conklin Mfg. Co.,* 388 U.S. 395, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967).

4   Jackson's argument fails. The severability rule is a "matter of substantive federal arbitration law," and we have repeatedly "rejected the view that the question of 'severability' was one of state law, so that if state law held the arbitration provision not to be severable a challenge to the contract as a whole would be decided by the court." *Buckeye,* 546 U.S., at 445, 126 S.Ct. 1204 (citing *Prima Paint,* 388 U.S., at 400, 402–403, 87 S.Ct. 1801; *Southland Corp. v. Keating,* 465 U.S. 1, 10–14, 104 S.Ct. 852, 79 L.Ed.2d 1 (1984); *Allied–Bruce Terminix Cos. v. Dobson,* 513 U.S. 265, 270–273, 115 S.Ct. 834, 130 L.Ed.2d 753 (1995)). For the same reason, the Agreement's statement that its provisions are severable, see App. 37, does not affect our analysis.

5   *Hall Street Associates, L.L.C. v. Mattel, Inc.,* 552 U.S. 576, 128 S.Ct. 1396, 170 L.Ed.2d 254 (2008), was decided after Jackson submitted his brief to the Ninth Circuit, but that does not change our conclusion that he forfeited the argument. Jackson could have submitted a supplemental brief during the *year and a half* between this Court's decision of *Hall Street* on March 25, 2008 and the Ninth Circuit's judgment on September 9, 2009. Moreover, *Hall Street* affirmed a rule that had been in place in the Ninth Circuit since 2003. *Id.,* at 583–584, and n. 5, 128 S.Ct. 1396.

1   Although it is not clear from our precedents, I understand "gateway matters" and "questions of arbitrability" to be roughly synonymous, if not exactly so. At the very least, the former includes all of the latter.

2   Gateway issues involving the scope of an otherwise valid arbitration agreement also have a statutory origin. Section 3 of the FAA provides that "upon being satisfied that the issue involved in such suit ... is referable to arbitration under such an agreement," a court "shall ... stay the trial of the action until such arbitration has been had." 9 U.S.C. § 3.

3   We have not expressly decided whether the *First Options* delegation principle would apply to questions of arbitrability that implicate § 2 concerns, *i.e.,* grounds for contract revocation. I do not need to weigh in on this issue in order to resolve the present case.

4   It is a "revers[e]" presumption because it is counter to the presumption we usually apply in favor of arbitration when the question concerns whether a particular dispute falls within the scope of a concededly binding arbitration agreement. *First Options,* 514 U.S., at 944–945, 115 S.Ct. 1920.

5   In *First Options* we found no clear and unmistakable assent to delegate to the arbitrator questions of arbitrability, given the parties' conduct. Respondents in that case had participated in the arbitration, but only to object to proceeding in arbitration and to challenge the arbitrators' jurisdiction. That kind of participation—in protest, to preserve legal claims—did not constitute unmistakable assent to be bound by the result. *Id.,* at 946–947, 115 S.Ct. 1920.

6   Respondent has challenged whether he "meaningfully agreed to the terms of the form Agreement to Arbitrate, which he contends is procedurally and substantively unconscionable." 581 F.3d 912, 917 (C.A.9 2009). Even if *First Options* relates only to "manifestations of intent," as the Court states, see *ante,* at 2777, n. 1 (emphasis deleted), whether there has been meaningful agreement surely bears some relation to whether one party has manifested intent to be bound to an agreement.

7   The question of unconscionability in this case is one of state law. See, *e.g., Perry v. Thomas,* 482 U.S. 483, 492, n. 9, 107 S.Ct. 2520, 96 L.Ed.2d 426 (1987). Under Nevada law, unconscionability requires a showing of " 'both procedural and substantive unconscionability,' " but "less evidence of substantive unconscionability is required in cases involving great procedural unconscionability." *D.R. Horton, Inc. v. Green,* 120 Nev. 549, 553–554, 96 P.3d 1159, 1162 (2004). I understand respondent to have claimed, in accord with Nevada law, that the arbitration agreement contained substantively unconscionable provisions, and was also the product of procedural unconscionability as a whole. See Brief for Respondent 3 ("[Respondent] argued that the clause is procedurally unconscionable because he was in a position of unequal bargaining power when it was imposed as a condition of employment"); *id.,* at 2776 – 2777 (identifying three distinct provisions of the agreement that were substantively unconscionable); accord, 581 F.3d, at 917.

Some of respondent's arguments, however, could be understood as attacks not on the enforceability of the agreement as a whole but merely on the fairness of individual contract terms. Such term-specific challenges would generally be for the arbitrator to resolve (at least so long as they do not go to the identity of the arbitrator or the ability of a party to initiate arbitration). Cf. Restatement (Second) of Contracts § 208 (1979) (providing that "a contract or term thereof [may be] unconscionable" and that in the latter case "the remainder of the contract without the unconscionable term" may be enforced).

8   Justice Black quite reasonably characterized the Court's holding in *Prima Paint* as "fantastic," *id.,* at 407, 87 S.Ct. 1801 (dissenting opinion), because the holding was, in his view, inconsistent with the text of § 2 of the FAA, 388 U.S., at 412, 87 S.Ct. 1801, as well as the intent of the draftsmen of the legislation, *id.,* at 413–416, 87 S.Ct. 1801. Nevertheless, the narrow holding in that case has been followed numerous times, see *Buckeye Check Cashing, Inc. v. Cardegna,* 546 U.S. 440, 126 S.Ct. 1204, 163 L.Ed.2d 1038 (2006),

**Rent-A-Center, West, Inc. v. Jackson, 561 U.S. 63 (2010)**

130 S.Ct. 2772, 109 Fair Empl.Prac.Cas. (BNA) 897, 93 Empl. Prac. Dec. P 43,916...

and *Preston v. Ferrer,* 552 U.S. 346, 128 S.Ct. 978, 169 L.Ed.2d 917 (2008), and, as the Court correctly notes today, neither party has asked us to revisit those cases, *ante,* at 2777 – 2778.

9    As respondent asserted in his opposition to petitioner's motion to compel arbitration, "the lack of mutuality regarding the type of claims that must be arbitrated, the fee provision, and the discovery provision, so permeate the Defendant's arbitration agreement that it would be impossible to sever the offending provisions." App. 45.

---

**End of Document**                              © 2014 Thomson Reuters. No claim to original U.S. Government Works.

312 S.W.3d 224
Court of Appeals of Texas,
Dallas.

SAXA INC., Las Colinas Office
Investors L.P., and Las Colinas Office
Condominium Association Inc., Appellants,
v.
DFD ARCHITECTURE INC., Appellee.

No. 05–09–01245–CV. | April 29, 2010.

**Synopsis**
**Background:** Professional office condominium complex owner initiated arbitration proceedings against construction contractor that designed complex for owner, after buildings in complex were damaged by water penetration. Owner's purported successors sought to join arbitration. Contractor filed petition for declaratory judgment, request for injunctive relief, and motion to stay arbitration under the Texas Arbitration Act (TAA), asserting that owner's purported successors were not proper parties to arbitration. The 134th Judicial District Court, Dallas County, James M. Stanton, J., ruled that owner's purported successors were not proper parties to arbitration. Contractor filed interlocutory appeal.

**Holdings:** The Court of Appeals, Fillmore, J., held that:

[1] Court of Appeals had jurisdiction under the TAA over interlocutory appeal, and

[2] contract between owner and contractor delegated authority to determine substantive arbitrability, including joinder of parties, to arbitrator.

Reversed and remanded.

West Headnotes (13)

**[1]** **Alternative Dispute Resolution**



Decisions

reviewable; finality

Court of Appeals had jurisdiction under the Texas Arbitration Act (TAA) over interlocutory appeal of order denying request of purported successors of professional office condominium complex owner to join arbitration between owner and construction contractor, as effect of order was to stay or deny arbitration between contractor and owner's purported successors on basis that there was no agreement to arbitrate, and TAA allowed a party to appeal an order granting an application to stay arbitration commenced or threatened on application and a showing that there is not an agreement to arbitrate. V.T.C.A., Civil Practice & Remedies Code §§ 171.023, 171.098(a)(2).

Cases that cite this headnote

**[2]** **Appeal and Error**



Necessity

of final determination

**Appeal and Error**



Interlocutory

and Intermediate Decisions

Appellate courts have jurisdiction over final judgments and such interlocutory orders as the legislature deems appealable.

1 Cases that cite this headnote

**[3]** **Appeal and Error**



Jurisdiction

Appellate jurisdiction is never presumed.

1 Cases that cite this headnote

**[4]** **Appeal and Error**



Want

of jurisdiction

Unless the record affirmatively shows the propriety of appellate jurisdiction, the appellate court must dismiss.

Cases that cite this headnote

**[5]** **Alternative Dispute Resolution**



of dispute

Contract between professional office condominium complex owner and construction contractor delegated authority to determine substantive arbitrability, including the joinder of parties, to arbitrator, and, thus, issue of whether owner's purported successors were proper parties to join arbitration between owner and contractor was for arbitrator; parties agreed that any claim, dispute, or other matter in question arising out of or related to contract was subject to arbitration, and that agreement extended to owner's partners, successors, assigns, and legal representatives, and they incorporated construction industry arbitration rules of the American Arbitration Association (AAA) into their contract, giving arbitration panel the power to rule on its own jurisdiction, including any objections to existence, scope, or validity of arbitration agreement.

Cases that cite this headnote

**[6]** **Alternative Dispute Resolution**



of dispute

Generally, the question of arbitrability is a gateway issue to be decided by a court rather than an arbitrator.

2 Cases that cite this headnote

**[7]** **Alternative Dispute Resolution**



and validity of agreement

**Alternative Dispute Resolution**



of dispute

Gateway matters to be decided by a court rather than an arbitrator include whether the parties agreed to arbitrate and whether a claim or dispute is encompassed in the agreement to arbitrate.

3 Cases that cite this headnote

Arbitrability

**[8]** **Alternative Dispute Resolution**



Constitutional

and statutory provisions and rules of court

The issue of arbitrability is subject to a virtually identical analysis under either the Federal Arbitration Act (FAA) or the Texas Arbitration Act (TAA). 9 U.S.C.A. § 1 et seq.; V.T.C.A., Civil Practice & Remedies Code § 171.001 et seq.

Cases that cite this headnote

**[9]** **Alternative Dispute Resolution**



Arbitrability

of dispute

Parties to an arbitration agreement may agree to submit matters of substantive arbitrability to arbitration.

1 Cases that cite this headnote

**[10]** **Alternative Dispute Resolution**



Evidence

Arbitrability

Courts should not assume that the parties agreed to arbitrate the issue of arbitrability unless there is clear and unmistakable evidence that they did so.

4 Cases that cite this headnote

**[11]** **Alternative Dispute Resolution**



Evidence

Existence

Arbitrability

In determining whether parties have agreed to submit issue of arbitrability of matter to arbitration, silence or ambiguity about who should decide the arbitrability issue should not lead a court to presume the parties intended for the issue to be decided by the arbitrator.

2 Cases that cite this headnote

**[12]** **Alternative Dispute Resolution**



A broad arbitration clause, purporting to cover all claims, disputes, and other matters arising out of or relating to the contract, creates a presumption of arbitrability.

Cases that cite this headnote

**[13]**    **Alternative Dispute Resolution**



of dispute

When the parties agree to a broad arbitration clause and explicitly incorporate rules that empower an arbitrator to decide issues of arbitrability, the incorporation serves as clear and unmistakable evidence of the parties' intent to delegate such issues to an arbitrator.

2 Cases that cite this headnote

**Attorneys and Law Firms**

**\*225** Jason Clay Spencer, R. Carson Fisk, Ford Nassen & Baldwin P.C., Austin, TX, for Appellants.

Gregory N. Ziegler, Bryan Rutherford, Alexander George Blue, MacDonald Devin, P.C., Dallas, TX, for Appellee.

Before Justices MORRIS, FRANCIS, and FILLMORE.

**OPINION**

Opinion By Justice FILLMORE.

Saxa Inc. initiated an arbitration proceeding against DFD Architecture Inc. (DFD) based on a written contract containing an arbitration clause. Las Colinas Office Investors L.P. (Office Investors)[1] **\*226** and the Las Colinas Office Condominium Association Inc. (Condominium Association)[2] sought to join the arbitration. DFD filed this action, requesting declaratory and injunctive relief from the trial court to prevent the joinder. DFD also requested that the trial court stay the arbitration pursuant to the Texas General Arbitration Act (TAA).

The trial court granted DFD's motion for summary judgment on its request for declaratory relief and found Office Investors and the Condominium Association are not proper parties to the arbitration. Appellants perfected this interlocutory appeal asserting (1) the trial court did not have authority to determine whether Office Investors and the Condominium Association are proper parties to the arbitration, (2) the trial court erred by admitting portions of DFD's summary judgment evidence, (3) Office Investors and the Condominium Association are proper parties to the arbitration, and (4) Saxa may assign its rights and claims under its contract with DFD. We conclude the contract between Saxa and DFD delegated the authority to determine substantive arbitrability to the arbitrator. Because the trial court erred by granting summary judgment on the issue of whether Office Investors and the Condominium Association are proper parties to the arbitration, we reverse the trial court's judgment and remand to the trial court for further proceedings.

**Background**

Pursuant to a written contract, DFD agreed to design a professional office condominium complex for Saxa. Saxa and DFD agreed that "[a]ny claim, dispute or other matter in question arising out of or related to" the contract "shall be subject to arbitration." The parties further agreed any arbitration would be conducted "in accordance with the Construction Industry Arbitration Rules of the American Arbitration Association currently in effect." The contract bound Saxa and DFD, as well as their partners, successors, assigns, and legal representatives "with respect to all covenants of this Agreement," but also provided it did not "create a contractual relationship with or a cause of action in favor of a third party" against either Saxa or DFD. Finally, the parties agreed:

> No arbitration arising out of or relating to this Agreement shall include, by consolidation or joinder or in any other manner, an additional person or entity not a party to this Agreement, except by written consent containing a specific reference to this Agreement and signed by [Saxa], [DFD], and any other person or entity sought to be joined.... The foregoing agreement to arbitrate and other agreements to arbitrate with an additional person

or entity duly consented to by the parties to this Agreement shall be specifically enforceable in accordance with applicable law in any court having jurisdiction thereof.

Saxa alleges that after the office complex was completed, the buildings were damaged by water penetration. Saxa filed an arbitration proceeding against **\*227** DFD and the construction contractor. Over DFD's objection, the arbitration panel allowed Office Investors to join the arbitration. The Condominium Association subsequently also sought to join the arbitration.

DFD filed a petition for declaratory judgment, request for injunctive relief, and motion to stay the arbitration under the TAA in the trial court asserting Office Investors and the Condominium Association are not proper parties to the arbitration because neither Office Investors nor the Condominium Association "has a valid or enforceable agreement to arbitrate with any other party." DFD filed a motion for summary judgment on its claim for declaratory relief on grounds Saxa and DFD were the only parties to the contract and the contract prohibited (1) joinder of third-parties to the arbitration without DFD's consent, (2) assignment of Saxa's claims under the contract, and (3) the creation of third-party beneficiaries of the contract. Saxa responded that the trial court did not have the authority to decide the issue because Saxa and DFD agreed issues of substantive arbitrability would be decided by the arbitration panel. Saxa also filed a motion for summary judgment on grounds Office Investors and the Condominium Association are proper parties to the arbitration as legal representatives or successors to Saxa or as third-party beneficiaries of the contract. The trial court denied appellants' motion for summary judgment and granted DFD's motion for summary judgment. The trial court specifically found (1) Office Investors and the Condominium Association are not proper parties to the arbitration based on the anti-joinder clause in the contract between Saxa and DFD; (2) Saxa and DFD are proper parties to the arbitration; and (3) the anti-assignment clause in the contract between Saxa and DFD prevented Saxa from assigning its rights or claims against DFD.

Appellants sought review of the trial court's judgment by interlocutory appeal. DFD filed a motion to dismiss the appeal, asserting this Court does not have jurisdiction over a non-appealable, interlocutory order.

## Jurisdiction

**[1]** We turn first to DFD's contention this Court does not have jurisdiction over this interlocutory appeal under the TAA. [3] DFD asserts the TAA does not provide a right to interlocutory appeal and, even if there is a right to interlocutory appeal under the TAA, the declaratory judgment signed by the trial court does not stay arbitration and, therefore, is not subject to interlocutory appeal.

**[2]** **[3]** **[4]** Appellate courts have jurisdiction over final judgments and such interlocutory orders as the legislature deems appealable. *Bally Total Fitness Corp. v. Jackson,* 53 S.W.3d 352, 352 (Tex.2001) ("A party may not appeal an interlocutory order unless authorized by statute."); *Lehmann v. Har–Con Corp.,* 39 S.W.3d 191, 195 (Tex.2001). Appellate jurisdiction is never presumed. *Brashear v. Victoria Gardens of McKinney, L.L.C.,* 302 S.W.3d 542, 546 (Tex.App.-Dallas 2009, no pet.) (op. on reh'g). Unless the record affirmatively shows the propriety of appellate jurisdiction, we must dismiss. *Id.*

DFD first argues the only jurisdictional basis asserted by appellants is section 171.098(a)(2) of the TAA and that statute, on its face, does not provide for an interlocutory appeal. Section 171.098(a)(2) of the TAA allows a party to appeal an order granting an application to stay arbitration made under Section 171.023. TEX. CIV. **\*228** PRAC. & REM.CODE ANN. § 171.098(a)(2) (Vernon 2005). Section 171.023 provides a trial court may "stay an arbitration commenced or threatened on application and a showing that there is not an agreement to arbitrate." *Id.* § 171.023. The Texas Supreme Court has concluded section 171.098(a)(2) provides for an interlocutory appeal of the denial of arbitration. *Chambers v. O'Quinn,* 242 S.W.3d 30, 31 (Tex.2007) (per curiam); *Jack B. Anglin Co. v. Tipps,* 842 S.W.2d 266, 271–72 & n. 10 (Tex.1992) (orig.proceeding); *see also In re Hawthorne Townhomes, L.P.,* 282 S.W.3d 131, 137 (Tex.App.-Dallas 2009, orig. proceeding) ("A denial of arbitration under the Texas Arbitration Act may be appealed through an interlocutory appeal.").

DFD concedes Texas appellate courts have recognized that section 171.098(a)(2) of the TAA provides a right to an interlocutory appeal of an order denying arbitration, but argues those courts relied on "older versions" of the TAA. However, the relevant substantive language of the current version of the TAA is virtually identical to older versions. *See*

Act of May 29, 1965, 59th Leg., R.S., ch. 689, § 1, art. 238–2, 1965 Tex. Gen. Laws 1593, 1600 (providing for an appeal of an "order granting an application to stay arbitration"). We, therefore, decline DFD's invitation to revisit the issue of whether an interlocutory appeal is available under the TAA for an appropriate order denying arbitration.

DFD next argues the order in this case does not stay arbitration but only declares Saxa's and DFD's rights under a contract that includes an arbitration clause. However, DFD sought declaratory and injunctive relief and filed a motion to stay the arbitration under the TAA on grounds it had not agreed to arbitrate with Office Investors or the Condominium Association. The trial court declared Office Investors and the Condominium Association are not proper parties to the arbitration. It is the "substance and function of the order viewed in the context of the record that controls our interlocutory jurisdiction, not [the party's] characterization of the order." *Walker Sand, Inc. v. Baytown Asphalt Materials,* 95 S.W.3d 511, 515 (Tex.App.-Houston [1st Dist.] 2002, no pet.). The effect of the trial court's order was to stay or deny arbitration between DFD and Office Investors and the Condominium Association because there was no agreement to arbitrate. Therefore, the trial court's order falls within section 171.023 of the TAA, and we have jurisdiction to consider this interlocutory appeal pursuant to section 171.098(a)(2) of the TAA.

### Substantive Arbitrability

 [5]    In their first issue, appellants assert the trial court erred by granting DFD's motion for summary judgment requesting a declaration that Office Investors and the Condominium Association are not proper parties to the arbitration because Saxa and DFD agreed that issues of substantive arbitrability would be determined by the arbitration panel. We review the trial court's decision to grant summary judgment de novo. *Valence Operating Co. v. Dorsett,* 164 S.W.3d 656, 661 (Tex.2005). To prevail on a summary judgment motion, the movant must demonstrate that there are no genuine issues of material fact and that it is entitled to judgment as a matter of law. *See* TEX.R. CIV. P. 166a(c).

Saxa and DFD agreed any arbitration under the contract would be conducted in accordance with the Construction Industry Arbitration Rules of the American Arbitration Association (the Rules). The Rules provide the arbitrator has the power "to rule on his or her own jurisdiction, including

 **\*229**  any objections with respect to the existence, scope or validity of the arbitration agreement" and "to determine the existence or validity of a contract of which an arbitration clause forms a part." Appellants assert Saxa and DFD clearly and unmistakably delegated the issue of substantive arbitrability, including the joinder of parties, to the arbitration panel. DFD responds the issue is whether Office Investors and the Condominium Association are parties to the contract with standing to invoke the arbitration clause and the trial court had authority over this issue of contract interpretation.

 [6]    [7]    [8]    Generally, the question of arbitrability is a gateway issue to be decided by a court rather than an arbitrator. *AT & T Techs., Inc. v. Commc'ns Workers of Am.,* 475 U.S. 643, 649, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986). [4] These "gateway matters" include whether the parties agreed to arbitrate and whether a claim or dispute is encompassed in the agreement to arbitrate. *In re Labatt Food Serv., L.P.,* 279 S.W.3d 640, 643 (Tex.2009) (orig.proceeding); *In re Weekley Homes,* 180 S.W.3d 127, 130 (Tex.2005) (orig.proceeding); *P. McGregor Enters., Inc. v. Denman Bldg. Prods., Ltd.,* 279 S.W.3d 717, 722 n. 9 (Tex.App.-Amarillo 2007, pet. denied) ("The question of [substantive] arbitrability has two aspects: first, whether the parties agreed to arbitration (or are bound by another's agreement to arbitrate); and second, whether a particular claim or dispute is within the scope of the agreement.").

 [9]    [10]    [11]    The parties, however, may agree to submit matters of substantive arbitrability to arbitration. *Howsam v. Dean Witter Reynolds, Inc.,* 537 U.S. 79, 83, 123 S.Ct. 588, 154 L.Ed.2d 491 (2002); *Ernst & Young LLP v. Martin,* 278 S.W.3d 497, 500 (Tex.App.-Houston [14th Dist.] 2009, no pet.) ("[A]n arbitration clause that reallocates traditional court functions to the arbitrator is enforceable...."); *ODL Servs., Inc. v. ConocoPhillips Co.,* 264 S.W.3d 399, 413 (Tex.App.-Houston [1st Dist.] 2008, no pet.). But, "[c]ourts should not assume that the parties agreed to arbitrate arbitrability unless there is 'clear and unmistakable' evidence that they did so." *First Options of Chicago, Inc. v. Kaplan,* 514 U.S. 938, 944, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995) (citing *AT & T,* 475 U.S. at 649, 106 S.Ct. 1415); *see ODL Servs.,* 264 S.W.3d at 413. Silence or ambiguity about who should decide the arbitrability issue should not lead a court to presume the parties intended for the issue to be decided by the arbitrator. *First Options,* 514 U.S. at 944–45, 115 S.Ct. 1920; *ODL Servs.,* 264 S.W.3d at 413. Rather, a court must examine the arbitration agreement to decide if, when construed under the relevant state law, the agreement evidences a clear and

unmistakable intention that the arbitrators will have the authority to determine the scope of arbitration. *ODL Servs.,* 264 S.W.3d at 413.

 [12]    [13]    Here, DFD and Saxa agreed that "[a]ny claim, dispute or other matter in question arising out of or related to" the contract "shall be subject to arbitration." "A broad arbitration clause, purporting to cover all claims, disputes, and other matters arising out of or relating to the contract, **\*230**  creates a presumption of arbitrability." *Am. Realty Trust, Inc. v. JDN Real Estate–McKinney, L.P.,* 74 S.W.3d 527, 531 (Tex.App.-Dallas 2002, pet. denied).  Further, Saxa and DFD incorporated the Rules into their contract, giving the arbitration panel the power to rule on its own jurisdiction, including any objections to the existence, scope or validity of the arbitration agreement. When, as here, the parties agree to a broad arbitration clause and explicitly incorporate rules that empower an arbitrator to decide issues of arbitrability, the incorporation serves as clear and unmistakable evidence of the parties' intent to delegate such issues to an arbitrator. *See Haddock v. Quinn,* 287 S.W.3d 158, 172 (Tex.App.-Fort Worth 2009, pet. denied) ("The majority of courts have concluded that express incorporation of rules empowering the arbitrator to decide arbitrability (including ruling upon his or her own jurisdiction) clearly and unmistakably evidences the parties' intent to delegate issues of arbitrability to the arbitrator."); *Burlington Res. Oil & Gas Co. LP v. San Juan Basin Royalty Trust,* 249 S.W.3d 34, 41 (Tex.App.-Houston [1st Dist.] 2007, pet. denied) ("We are also mindful that, in certain circumstances, the incorporation of AAA rules may constitute clear and unmistakable evidence of an intent to allow an arbitrator to decide issues of arbitrability."); *Qualcomm Inc. v. Nokia Corp.,* 466 F.3d 1366, 1368, 1373 (Fed.Cir.2006) (concluding arbitration agreement containing broad arbitration clause and incorporating American Arbitration Rules allowing arbitrator to rule on own jurisdiction "clearly and unmistakably shows the parties' intent to delegate the issue of determining arbitrability to an arbitrator"); *Contec Corp. v. Remote Solution Co. Ltd.,* 398 F.3d 205, 208 (2d Cir.2005).

Relying on *ODL Services,* DFD argues the trial court had the authority to make the initial determination of whether there was an agreement to arbitrate. In *ODL Services,* the parties entered into a master agreement that contained an arbitration clause. The agreement also provided that if ConocoPhillips needed technical and support services from ODL under the master agreement, it would send a request for services. ODL subsequently performed services for a subsidiary of ConocoPhillips without receiving a request for services. ODL was not paid for its services and initiated an arbitration against ConocoPhillips.

On appeal, ODL argued it was entitled to arbitrate its claim based on the master agreement and that, by incorporating the AAA International Arbitration Rules into the master agreement, the parties had agreed the arbitrator would decide all issues of substantive arbitrability, including whether an agreement to arbitrate existed. The Houston First Court of Appeals disagreed, noting the master agreement was triggered only by a request for services. *ODL Servs.,* 264 S.W.3d at 415. The trial court had the authority to decide the threshold issue of whether the master agreement had been triggered because if "no underlying request for ODL's services existed to trigger the contractually separate arbitration agreement, or that itself contained its own arbitration agreement, then there is no issue of substantive arbitrability to send to an arbitrator." *Id.*

Unlike ConocoPhillips in *ODL,* DFD does not dispute it entered into a written agreement to arbitrate with Saxa or that the agreement extends to partners, successors, assigns and legal representatives of Saxa. Further, this dispute does not involve a third-party attempting to join in the arbitration a claim that is unrelated to the contract between Saxa and DFD. Nor are we confronted with a non-signatory to the arbitration agreement contesting whether it is bound by a signatory's agreement **\*231**  to arbitrate. Rather, Office Investors and the Condominium Association are attempting to assert a claim under the contract between Saxa and DFD as partners, successors, assigns and legal representatives of Saxa while DFD disputes that Office Investors and the Condominium Association are entities with which it agreed to arbitrate under the arbitration agreement. The scope of the arbitration agreement and the claims and parties it encompasses are questions of substantive arbitrability that DFD and Saxa agreed would be decided by the arbitration panel. *Contec,* 398 F.3d at 209, 211 (signatory to contract "containing an arbitration clause and incorporating by reference the AAA Rules" cannot disown obligation to arbitrate all disputes, including question of arbitrability of non-signatory's claims). Accordingly, the trial court erred by granting DFD's motion for summary judgment on the issue of whether Office Investors and the Condominium Association are proper parties to the arbitration. [5]

We sustain appellants' first issue. Because of our disposition of appellants' first issue, we need not consider appellants' remaining issues. TEX.R.APP. P. 47.1. We reverse the trial

court's judgment and remand this case to the trial court for further proceedings.

Footnotes

1    Saxa was the sole owner of Shea Partners, Inc. Saxa also owned ninety-nine percent of Shea Commercial Properties, L.L.C. Shea Partners owned the remaining one percent of Shea Commercial. Shea Commercial was the sole owner of Shea Dallas Properties, L.L.C. Shea Commercial also owned ninety-nine percent of Office Investors. Shea Dallas Properties owned the remaining one percent of Office Investors. Shea Commercial entered into the contract to purchase the real property on which the project that forms the basis of Saxa's claims against DFD was built. Shea Commercial assigned that contract to Office Investors, and Office Investors closed on the purchase of the land. Saxa entered into a contract with DFD for design services for the project. Office Investors paid a number of the invoices submitted by DFD to Saxa.

2    Office Investors recorded the condominium declaration for the project. The Condominium Association became responsible for the management, maintenance, and repair of the common areas of the condominiums.

3    *See* TEX. CIV. PRAC. & REM.CODE ANN. §§ 171.001–.098 (Vernon 2005).

4    Although this case is brought under the TAA, the parties rely on a number of cases interpreting the Federal Arbitration Act (FAA). *See* 9 U.S.C.A. §§ 1–16 (West 2009). The issue of arbitrability is subject to a virtually identical analysis under either the FAA or the TAA. *See ODL Servs., Inc. v. ConocoPhillips Co.,* 264 S.W.3d 399, 418 (Tex.App.-Houston [1st Dist.] 2008, no pet.) (applying same analysis of arbitrability under the FAA and the TAA).

5    Saxa argued in its response to DFD's motion for summary judgment that the trial court did not have the authority to rule on the motion because the parties had agreed the arbitration panel would determine issues of substantive arbitrability. However, Saxa did not move for summary judgment on the ground the trial court did not have authority to rule on the issue. Accordingly, we remand this case to the trial court rather than rendering the judgment the trial court should have rendered. *See Valence Operating Co.,* 164 S.W.3d at 661 ("When both parties move for partial summary judgment on the same issues and the trial court grants one motion and denies the other, as here, the reviewing court considers the summary judgment evidence presented by both sides, determines all questions presented, and if the reviewing court determines that the trial court erred, renders the judgment the trial court should have rendered.").

---

**End of Document**

© 2014 Thomson Reuters. No claim to original U.S. Government Works.

167 S.W.3d 121
Court of Appeals of Texas,
Waco.

SKI RIVER DEVELOPMENT, INC., Stephen
R. Davis and Karen Davis, Appellants,
v.
Anthony L. McCALLA, Cheryl A.
McCalla, and Walter Baker, Appellees.

No. 10–03–00316–CV.    |    April 20,
2005.    |    Rehearing Overruled June 7, 2005.

**Synopsis**
**Background:** Sublessees brought action against landlord and developers, seeking specific performance of their exercised option to purchase land, tortious interference damages, and a declaratory judgment. Landlord cross-claimed against developers for damages for tortious interference with use and enjoyment of his land and prospective contractual relations, civil conspiracy, a declaratory judgment that 99-year lease with developers was void, and for attorney's fees. Developers counterclaimed for a declaratory judgment that sublessee's option to purchase was void and unenforceable and for attorney's fees. The 249th District Court, Johnson County, D. Wayne Bridewell, J., entered judgment against developers, declared that sublessees had exercised option to purchase, and declared that 99-year lease was void. Developers appealed.

**Holdings:** The Court of Appeals, Bill Vance, J., held that:

[1] developers' newly discovered evidence of landlord's alleged perjury was cumulative;

[2] sublease's option to purchase was void due to lack of material terms;

[3] 99-year lease was procedurally unconscionable;

[4] 99-year lease was substantively unconscionable;

[5] allegation that developers tortiously interfered with use and enjoyment of property was separate cause of action;

[6] evidence was sufficient to support award of damages against developer's wife; and

[7] landlord was not required to segregate attorney's fees in order to recover them under the Declaratory Judgments Act.

Affirmed in part, reversed in part, reformed in part, and remanded.

Gray, C.J., concurred with opinion.

West Headnotes (57)

**[1]**      **New Trial**



of action or issue and character of evidence                    Nature

**New Trial**



of witness                    Impeachment

Developers' alleged newly discovered evidence that landlord allegedly committed perjury, which included disclosures made to landlord, was cumulative of other evidence and would only have served to impeach landlord's trial testimony, and thus did not entitle developers to new trial on issued of fraud, undue influence, and unconscionability in connection with 99-year lease.

2 Cases that cite this headnote

**[2]**      **New Trial**



and duty of court in general                    Power

**New Trial**



as to Newly Discovered Evidence                    Affidavits

It is incumbent upon a party who seeks a new trial on the ground of newly discovered evidence to show that (1) the evidence has come to his knowledge since the trial, (2) it was not owing to the want of due diligence that it did not come sooner, (3) it is not cumulative, and (4) it is so material that it would probably produce a different result if a new trial were granted.

2 Cases that cite this headnote

**[3]** **Appeal and Error**



Trial or Rehearing

The trial court's ruling on a new trial motion will not be disturbed on appeal unless an abuse of discretion occurred.

Cases that cite this headnote

**[4]** **New Trial**



and duty of court in general

A new trial will not be granted on the ground of newly-discovered evidence, unless it is made to appear that it has come to the knowledge of the applicant since the trial, that it could not have been sooner discovered by the exercise of diligence, that it is not merely cumulative, and that it is not for the purpose of impeachment.

1 Cases that cite this headnote

**[5]** **Declaratory Judgment**



and extent of review in general

The Court of Appeals reviews declaratory judgments under the same standards as other judgments and decrees; the court looks to the procedure used to resolve the issue at trial to determine the standard of review on appeal. V.T.C.A., Civil Practice & Remedies Code § 37.010.

4 Cases that cite this headnote

**[6]** **Contracts**



as to Subject-Matter

The rules regarding indefiniteness of material terms of a contract are based on the concept that a party cannot accept an offer to form a contract unless the terms of that contract are reasonably certain. Restatement (Second) of Contracts § 33(1).

3 Cases that cite this headnote

New **[7]** **Contracts**



Intent

of parties

**Contracts**



Agreement

to make contract in future

The actions of the contracting parties may conclusively establish their intention to enter a Power binding agreement even if some terms are left for future agreement. Restatement (Second) of Contracts § 33(1).

2 Cases that cite this headnote

**[8]** **Contracts**



Construction

to give validity and effect to contract

Texas courts prefer to validate transactions rather than void them.

Cases that cite this headnote

Scope

**[9]** **Contracts**



Rewriting,

remaking, or revising contract

A court may not create a contract where none exists and generally may not interpolate or eliminate material terms.

2 Cases that cite this headnote

**[10]** **Contracts**



Agreement

Certainty    to make contract in future

Contracting parties may agree on some terms sufficient to create a contract, leaving other provisions for later negotiation.

5 Cases that cite this headnote

**[11] Contracts**



as to Subject-Matter

**Contracts**



implied as part of contract

In certain situations, a court may uphold an agreement by supplying missing terms, such as implying a reasonable price.

2 Cases that cite this headnote

**[12] Contracts**



as to Subject-Matter

Contract terms are reasonably certain if they provide a basis for determining the existence of a breach and for giving an appropriate remedy. Restatement (Second) of Contracts § 33(2).

1 Cases that cite this headnote

**[13] Contracts**



and Essentials in General

Parties, and not the courts, should make contracts.

Cases that cite this headnote

**[14] Contracts**



as to Subject-Matter

Where the parties intended to make an agreement and there is a certain basis for granting a remedy, courts should find the contract terms definite enough to provide a remedy. Restatement (Second) of Contracts § 33(2).

1 Cases that cite this headnote

**[15] Contracts**

Certainty

Terms



as to Subject-Matter

Uncertainty of contract terms can preclude one remedy without affecting others.

Cases that cite this headnote

**[16] Landlord and Tenant**



scope, and validity

Sublease's option to purchase "said property" or a portion of it at "market value" upon lessor's "election to sell" was void due to lack of material terms, including definition of "said Property," "portion" of property, "market value," and "election to sell," and the failure to state the length of time that the option remained open after lessor's notification of the election to sell.

1 Cases that cite this headnote

Nature

Certainty

**[17] Contracts**



to make contract in future

An agreement leaving material terms to be agreed upon later is not definite and specific as to material and essential terms and is, therefore, unenforceable.

5 Cases that cite this headnote

Certainty

**[18] Contracts**



to make contract in future

When essential contract terms are missing, the court may find no more than an agreement to agree.

2 Cases that cite this headnote

**[19] Contracts**



to make contract in future

Certainty

Existence,

Agreement

Agreement

Agreement

A contract providing for an agreement to be negotiated in the future is void.

3 Cases that cite this headnote

**[20] Action**



entitled to sue

The general test for standing in Texas requires that there shall be a real controversy between the parties, which will be actually determined by the judicial declaration sought.

Cases that cite this headnote

**[21] Declaratory Judgment**



of relief in general

Landlord, who was signatory to 99-year lease with developer and the lease amendments, had standing to request declaratory judgment that lease and its amendments were void, although developer had assigned lease, as landlord was in privity of contract with developer and assignee and thus controversy among them would be affected by the declaratory judgment sought. V.T.C.A., Civil Practice & Remedies Code § 37.006(a).

Cases that cite this headnote

**[22] Contracts**



Contracts

If a contract is unconscionable, it is unenforceable.

2 Cases that cite this headnote

**[23] Contracts**



unconscionability

**Contracts**

Substantive



unconscionability

Persons

Proof of unconscionability begins with two broad questions: (1) the procedural aspect, i.e., how did the parties arrive at the terms in controversy, and (2) the substantive aspect, i.e., are there legitimate commercial reasons justifying the terms of the contract.

2 Cases that cite this headnote

**[24] Contracts**

Procedural



unconscionability

**Contracts**

Substantive

Subjects



unconscionability

In deciding the fairness of a contract's substantive terms, the court must also consider whether there were procedural abuses, such as an unfair bargaining position between the parties at the time the agreement was made.

Cases that cite this headnote

**[25] Contracts**

Procedural



unconscionability

**Contracts**

Substantive

Unconscionable

unconscionability

The party asserting unconscionability of a contract bears the burden of proving both procedural and substantive unconscionability.

12 Cases that cite this headnote

**[26] Contracts**

Procedural



Contracts

Unconscionabl

In determining whether a contract is unconscionable, the court must examine (1) the "entire atmosphere" in which the agreement was

made, (2) the alternatives, if any, available to the parties at the time the contract was made, (3) the "non-bargaining ability" of one party, (4) whether the contract was illegal or against public policy, and (5) whether the contract is oppressive or unreasonable.

4 Cases that cite this headnote

**[27]    Contracts**



Contracts

In determining whether a contract is unconscionable, the totality of the circumstances must be assessed as of the time the contract was formed.

2 Cases that cite this headnote

**[28]    Contracts**



Contracts

In determining whether a contract is unconscionable, it is important to consider whether there is any gross disparity in the values exchanged.

2 Cases that cite this headnote

**[29]    Contracts**



Contracts

Gross inequality of bargaining power, together with terms unreasonably favorable to the stronger party may show that the weaker party had no meaningful choice, no real alternative, or did not in fact assent or appear to assent to the unfair terms, such that a contract is unconscionable.

3 Cases that cite this headnote

**[30]    Contracts**



Contracts

Factors that may contribute to an unconscionable bargaining process include: (1) knowledge of the stronger party that the weaker party will be unable to receive substantial benefits from the contract, and (2) knowledge of the stronger party that the weaker party is unable reasonably to protect his interests by reason of physical or mental infirmities, ignorance, illiteracy or inability to understand the language of the agreement.

Unconscionable 4 Cases that cite this headnote

**[31]    Contracts**



unconscionability

**Contracts**



unconscionability

The grounds for substantive abuse must be Unconscionable sufficiently shocking or gross to compel the court to intercede and declare a contract unconscionable, and the same is true for procedural abuse; the circumstances surrounding the negotiations must be shocking.

Procedural

Substantive

13 Cases that cite this headnote

**[32]    Contracts**



Unconscionable for jury

The ultimate question of unconscionability of a contract is one of law, to be decided by the court.

Questions

3 Cases that cite this headnote

**[33]    Landlord and Tenant**



adhesion contracts

Evidence was sufficient to support finding that 99-year lease between landlord and developer was procedurally unconscionable; there was evidence that developer knew landlords were Unconscionable desperate for money, that developer's attorney drafted the lease, that landlords did not see lease

Unconscionabi

until day they signed it, that landlords felt they could not change anything in the lease and had to sign it, that landlords did not review lease or understand its terms, that landlords were not experienced with formal contracting, and that developer did not provide landlord with copy of business plan, which could have affected real estate taxes.

1 Cases that cite this headnote

**[34]  Landlord and Tenant**



 adhesion contracts

Evidence was sufficient to support finding that 99-year lease between landlord and developer was substantively unconscionable; there was evidence that developer only had to pay $3,000 per month rent for 12.5 years, after which rent would decrease to less than the estimated monthly tax payment on the property, that all sublease income would be assigned to developer, that developer could terminate lease at any time, that landlord lost his possessory rights, that landlord was prohibited from discussing lease, and that landlord could not sell land under current listing agreement with real estate agent or while lease was in effect.

1 Cases that cite this headnote

**[35]  Declaratory Judgment**



and disposition of cause

Court of Appeals would reform declaratory judgment in order to reflect that finding that lease was unconscionable did not make lease void but rather merely unenforceable.

2 Cases that cite this headnote

**[36]  Torts**



and tenant

Developer who leased land under 99-year lease and developer's assignee did not intentionally interfere with other lease between landlord and sublessees which contained option to purchase, as option to purchase was void due to lack of material terms.

Cases that cite this headnote

**[37]  Pleading**



Particular

causes or grounds of action

Allegation that developer who entered into unconscionable 99-year lease, and lease assignee, tortiously interfered with landlord's use and enjoyment of his property was a separate cause of action and was not duplicative of landlord's other claims, including claim for tortious interference with prospective contractual relations.

1 Cases that cite this headnote

**[38]  Torts**



Interference

with property or property rights, in general

**Torts**



Prospective

advantage, contract or relations;  expectancy

A cause of action for tortious interference with the right to dispose of property is, in essence, a claim for tortious interference with a prospective contract or prospective business relation.

1 Cases that cite this headnote

**[39]  Torts**



Prospective

advantage, contract or relations;  expectancy

Texas law protects prospective contracts from interference.

Cases that cite this headnote

**[40]  Torts**



**with property or property rights, in general**

A cause of action for tortious interference with peaceful use and enjoyment of property is, in essence, a claim for intentional invasion of, or interference with, property rights; this cause of action exists under Texas law.

3 Cases that cite this headnote

**[41]** **Torts**



A party bringing suit for tortious interference with a contract must prove four elements: (1) a contract subject to interference exists, (2) the act of interference was willful and intentional, (3) the intentional act proximately caused the plaintiff's damage, and (4) actual damage or loss occurred.

2 Cases that cite this headnote

**[42]** **Torts**



of valid or identifiable contract, relationship or expectancy

A suit for tortious interference with a contract requires the existence of a valid contract; a void contract cannot serve as the basis for a tortious interference claim.

2 Cases that cite this headnote

**[43]** **Appeal and Error**



verdict, findings, or judgment

Developer and lease assignee waived claim that evidence was insufficient to support award of damages to landlord for tortious interference with landlord's the use and enjoyment of his land in connection with unconscionable 99-year lease; jury question allowed damages for lost profits and/or damages for loss of use and enjoyment, but developer and assignee alleged on appeal only that the evidence was insufficient

Interference

to support any award of any lost profits and failed to challenge the sufficiency of the evidence of lost use and enjoyment.

Cases that cite this headnote

**[44]** **Appeal and Error**



Insufficient

discussion of objections

To successfully challenge a multi-element damages award (one dollar amount for multiple elements of damages) on appeal, an appellant must address all of the elements and show that the evidence is factually insufficient to support the entire damages award; a failure to address an element of damages results in waiver of the sufficiency challenge.

1 Cases that cite this headnote

**[45]** **Appeal and Error**



Insufficient

discussion of objections

Existence

Developer and lease assignee waived argument that evidence was legally and factually insufficient to support finding that harm to landlord resulted from fraud or malice, and thus did not support award of exemplary damages for tortious interference with landlord's use and enjoyment of his property in connection with unconscionable 99-year lease, as their appellate brief did not contain a clear and concise argument for the contentions made, with appropriate citations to authority and to the record; argument was one sentence in their 50-page brief and did not cite to the reporter's record. Rules App.Proc., Rule 38.2(a)(1).

To

4 Cases that cite this headnote

**[46]** **Damages**



Actual

damage or compensatory damages; relationship and ratio

Exemplary damages must be reasonably proportioned to compensatory damages.

Contracts

Cases that cite this headnote

**[47] Damages**



damage or compensatory damages; relationship and ratio

There is no set rule between the amount of actual and exemplary damages that will be considered reasonable; that determination is dependent upon the facts of a particular case.

Cases that cite this headnote

**[48] Damages**



and Amount of Exemplary Damages

Factors to consider in determining whether an award of exemplary damages is reasonable include: (1) the nature of the wrong, (2) the character of the conduct involved, (3) the degree of culpability of the wrongdoer, (4) the situation and sensibilities of the parties concerned, and (5) the extent to which such conduct offends a public sense of justice and propriety.

Cases that cite this headnote

**[49] Damages**



Awarded in Particular Cases

Ratio of $20,000 in exemplary damages, which was 0.40 of the amount of the $50,000 in compensatory damages awarded for landlord, was not excessive for landlord's claim against developer and lease assignee for tortious interference with the use and enjoyment of property, which involved an unconscionable 99-year lease.

Cases that cite this headnote

**[50] Appeal and Error**



failure of proof

Actual

A no-evidence point must and can only be sustained on appeal when the record reveals: (1) a complete absence of evidence of a vital fact, (2) rules of law or rules of evidence bar the appellate court from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a mere scintilla, and (4) the evidence conclusively establishes the opposite of a vital fact.

Cases that cite this headnote

**[51] Torts**



Landlord

and tenant

Measure

Evidence was sufficient to support finding that, due to her conduct, developer's wife was liable for share of tortious interference damages awarded to landlord who had entered into unconscionable 99-year lease with developer, even though wife did not sign lease or its amendments; wife testified that she very familiar with the landmarks on the property, had an emotional attachment to the property, first approached landlords about leasing the property with her husband, was involved in the negotiation process, took the final draft to the landlords with her husband, and was present when everyone signed the lease.

Cases that cite this headnote

Amount

**[52] Specific Performance**



Costs

Sublessees were not entitled to attorney's fees in action for specific performance of option to purchase, as option to purchase had been declared void on appeal. V.T.C.A., Civil Practice & Remedies Code § 37.009.

Cases that cite this headnote

**[53] Costs**



Form

Total

and requisites of application in general

Landlord's cross-claims for declaratory judgment that 99-year lease with resort developer and company was void due to fraud, undue influence, and unconscionability were so intertwined with cross-claims for tortious interference, fraud, breach of contract, and civil conspiracy that segregation of attorney's fees was not required in order for landlord to recover fees under the Declaratory Judgment Act. V.T.C.A., Civil Practice & Remedies Code § 37.009.

Cases that cite this headnote

**[54]  Costs**



and amount; hours; rate

To show the reasonableness and necessity of attorney's fees, the plaintiff is required to show that the fees were incurred while suing the defendant sought to be charged with the fees on a claim which allows recovery of such fees.

Cases that cite this headnote

**[55]  Costs**



and requisites of application in general

A recognized exception to the duty to segregate arises when the attorney's fees rendered are in connection with claims arising out of the same transaction and are so interrelated that their prosecution or defense entails proof or denial of essentially the same facts.

1 Cases that cite this headnote

**[56]  Costs**



and amount; hours; rate

When the causes of action involved in a suit are dependent upon the same set of facts or circumstances and thus are intertwined to the point of being inseparable, the party suing for attorney's fees may recover the entire amount covering all claims.

1 Cases that cite this headnote

**[57]  Declaratory Judgment**



Determination

and disposition of cause

Remand was required for determination of whether developer and company were entitled to "equitable and just" attorney's fees from sublessees, as developer and company prevailed on declaratory judgment claim that sublessees' option to purchase land on which developer and company wished to put marina and golf course was void. V.T.C.A., Civil Practice & Remedies Code § 37.009.

2 Cases that cite this headnote

**Attorneys and Law Firms**

**\*127** David P. Lein, George & Donaldson, L.L.P., Austin, Christopher C. Cooke, The Cooke Law Firm, Cleburne, for appellants.

Peter J. Harry, Brown McCarroll, L.L.P., Charles R. Nichols, John H. Carney & Associates, Dallas, for appellees.

Before Chief Justice GRAY, Justice VANCE, and Justice REYNA.

**OPINION**

BILL VANCE, Justice.

This case concerns a 380–acre piece of property along the Brazos River in Johnson **\*128** County. Appellees Anthony L. McCalla ("McCalla") and Cheryl A. McCalla are lessees of Appellee Walter Baker ("Baker") under a 1992 lease, known as the "Glazier lease." Appellants, Ski River Development, Inc. ("Ski River"), Stephen R. Davis ("Davis"), and Karen Davis, are also lessees of Appellee Walter Baker under a 1996 lease, called the "Baker–Davis lease." In 1996, the McCallas sued the Davises, Ski River, [1] and Baker claiming they had a right to purchase the property under the Glazier lease. The McCallas sought specific performance of their exercised option, tortious interference damages (including

exemplary), a declaratory judgment that: (1) Mary Baker elected to sell the property; (2) the McCalla's offer to purchase was sufficient to exercise an option; (3) the Baker–Davis lease is void because it violated the McCalla's option contract, and for attorney's fees under the Declaratory Judgment Act. [2] Baker cross-claimed against Ski River and the Davises for damages (including exemplary) for tortious interference with use and enjoyment of his land and prospective contractual relations with the McCallas, civil conspiracy, a declaratory judgment that the Baker–Davis lease is void because it was procured by fraud, undue influence, and unconscionability, and for attorney's fees under the Declaratory Judgment Act. [3] Ski River and the Davises counterclaimed for a declaratory judgment that the McCalla's option is void and unenforceable and for attorney's fees under the Declaratory Judgment Act. [4] A jury awarded damages and attorney's fees to the McCallas and Baker against the Davises and Ski River and made other findings. The court entered judgment on the jury's verdict for tortious interference and declared that (1) the McCallas properly exercised their option to purchase and (2) the Baker–Davis lease and its amendments are void and unenforceable. Ski River and the Davises appeal in twelve issues.

We will reverse that part of the judgment that states (1) the Davises and Ski River take nothing against the McCallas and (2) the declaratory judgment that the McCallas properly exercised their option to purchase the Property. We will render judgment that the McCalla's option to purchase is void. We will further reform the declaratory judgment to provide that the Baker–Davis lease is unconscionable and unenforceable, not void. We will reverse the tortious interference damages, exemplary damages, and all attorney's fees awarded to the McCallas against the Davises and Ski River. We will affirm the **\*129** tortious interference damages, exemplary damages, and all attorney's fees awarded to Baker against the Davises and Ski River. We will remand this cause to the trial court to determine whether to award attorney's fees for the Davises and Ski River under the Declaratory Judgment Act. We will overrule or not address all other issues.

## BACKGROUND

Arthur William Glazier, Jr. owned 380 acres of land. In 1992, Glazier entered into a 99–year lease covering the entire property with Appellee Walter Baker and his mother, Mary Baker (the "Glazier lease"). In the Glazier lease, the Bakers

sub-leased a two-acre tract to the McCallas. This sub-lease states in part:

> That, in the event Lessees [Bakers] shall purchase or otherwise obtain legal ownership of said Property from Lessor [Glazier] and later elect to sell, Lessees [Bakers] hereby grant Sub–Lessees [McCallas] the First Option to Purchase all, or a portion of said Property from Lessees [Bakers] at market value.

In 1993, Glazier died, leaving the property to Walter and Mary Baker. Soon thereafter, Walter Baker deeded his undivided interest to Mary Baker making her the 100% owner of the property.

In June 1994, Mary Baker signed an exclusive one-year listing agreement with Glenna Calahan to sell the entire 380 acres for $2,500 per acre. The listing agreement stated that Baker "shall not rent or lease the Property during the term of this Listing without the prior written approval of [Calahan]" and "shall not negotiate with any prospective buyer who may contact [Mary Baker] directly, but refer all prospective buyers to [Calahan]." In August 1994, Calahan wrote to McCalla notifying him of the listing of the property at $2,500 per acre and giving him 72 hours to exercise his option to purchase. Four days later, McCalla responded that he desired to pursue his rights under the Glazier lease, including but not limited to, his "option to purchase all, or a portion, of said Property at market value." He also objected to the insertion of a 72–hour deadline to exercise his option. He further stated:

> the option cannot be evaluated until market value of the property has been determined and, as a result, does not have to be exercised until such time that either market value has been determined or a bonafide offer to purchase executed by a third party, has been received by me.

McCalla also requested any information Calahan may have regarding the sale of the property, including any information to establish market value. Seven days later, McCalla again requested the same property information from Calahan. Eight days later, Calahan sent him the MLS information sheet, title commitment, and other information.

In October 1994, the McCalla's appraisal was completed, which stated the value to be $1,200 per acre. This value was not disclosed to the Bakers or Calahan. Later in October, Coyt Randal Johnston, on behalf of McCalla, sent a letter to Calahan stating that they were working on a proposal to purchase the property and had secured an appraisal to help evaluate the "current offer of $2,500.00 per acre." He further stated:

... [McCalla] and I have determined that it is in our best interest not to make an offer for the property at this time, since we do not want to run the risk of offending you or the Bakers with an offer that is unacceptably low.

I want to emphasize that we continue to be interested in the property and will continue to evaluate our position as time **\*130** goes on. We believe, however, that Walt and Mary should have the opportunity to try to sell this property to someone who is willing to pay their purchase price.

Should another buyer submit a contract on the property, [McCalla] will, of course, review the matter in connection with his right of first refusal at that time. In that regard, you should be aware that nothing in this letter is intended to waive or alter any of the rights or obligations between the Bakers and [McCalla] in connection with their various contractual and lease agreements.

In April 1995, Mary Baker reduced her asking price to $1,950 per acre. Later in 1995, Davis contacted Calahan to inquire about purchasing 25 acres of the property at $1,800 per acre, but Mary Baker declined this offer because she wanted to sell the entire 380 acres. In October 1995, Mary Baker increased her asking price to $2,100 per acre.

As early as December 15, 1995, Walter Baker was referring to Stephen Davis as his "money man." In 1996, the Davises friendship with the Bakers increased, and they visited them on a weekly basis.

On January 29, 1996, the Davises presented a "general business plan" for development of the property to a potential investor. This included a preliminary sketch of "The Ski Ranch," including the repair of the boat ramp and roads, establishment of dump stations, building new boat ramp and ski lake sites, establishing river front leases, building a runway, building a store and club, installing a fuel farm, and continuing property studies for new phases.

In February 1996, McCalla wrote to Calahan acknowledging the change in the listing price to $2,100 per acre, but stated that his position had not changed since 1994. He stated that he continued "to be interested in the property, in connection with my Right of First Refusal" and asked to be kept informed.

A few days later on February 12, 1996, Davis entered into a 99–year lease of the entire property with the Bakers (the "Baker–Davis lease"). The Davises told the Bakers that they intended to put in a boat marina, landing strip, and golf course. The Davises did not provide a copy of the general business plan to the Bakers nor did they discuss the plan with the Bakers. The Baker–Davis lease states:

...

2.3 For the term of the lease, BAKER will pay real estate taxes on said Property and DAVIS will be responsible for liability insurance.

2.4 All subleases (including but not limited to the sublease with ANTHONY MCCALLA and CHERYL A. MCCALLA d/b/a C.A.M. PROPERTIES [for two acres] ) and their income are assigned to DAVIS by BAKER by the execution of this Agreement.

The lease sets the rent at $3,000 per month for 12–1/2 years, then at $75 per month until the lease ends. The lease also contains a non-disclosure clause that does not allow Baker, or any member of his family, to discuss with anyone the Baker–Davis lease or any of its subleases. The First Addendum to this lease provides for an additional rent payment of $1,000 per month to pay for a house for the Bakers.

In March 1996, a First Amendment to the Baker–Davis lease was executed, which assigned the lease from Davis to Ski River. It contains a provision that, if the property is ever sold to anyone, Ski River would retain a leasehold interest for $75 per month in 25 acres of the property.

In April 1996, McCalla made an offer to purchase the 380 acres at $1,200 per acre. Sixteen days later, McCalla's attorney **\*131** threatened to file suit. Two days later, Mary Baker died of a heart attack. Following Mary Baker's death: (1) the Davises executed affidavits of heirship for Walter Baker; (2) Walter Baker's attorney drew up a will naming the Davis children as his heirs, Stephen Davis as his executor, and Karen Davis as his trustee; and (3) Walter Baker's attorney drew up a statutory power of attorney naming Stephen Davis as his attorney-in-fact.

In August 1996, a Second Amendment to the Baker–Davis lease was executed, which required the Davis's approval before Baker could sell any of the property's mineral rights. The Second Amendment stated that if Baker elected to sell, Davis had a right of first refusal to buy the property for $600,000 minus any prior lease payments.

In September 1996, the McCallas filed the lawsuit against Walter Baker, Ski River, and the Davises.

## JUDGMENT

The judgment awards tortious interference damages to the McCallas against Stephen Davis, Karen Davis, and Ski River in the amount of $69,000, exemplary damages in the amount of $75,000, attorney's fees in the amount of $247,000, and pre-judgment interest. In addition, attorney's fees were awarded of $25,000 in the event the case is appealed to the Court of Appeals and $15,000 in the event the case is appealed to the Supreme Court of Texas.

The judgment awards tortious interference damages to Walter Baker against Stephen Davis, Karen Davis, and Ski River in the amount of $50,000, exemplary damages in the amount of $20,000, attorney's fees in the amount of $37,000, and pre-judgment interest. In addition, attorney's fees were awarded of $15,000 in the event the case is appealed to the Court of Appeals and $15,000 in the event the case is appealed to the Supreme Court of Texas.

The judgment orders that the Davises and Ski River take nothing by their suit against the McCallas, and contains a declaratory judgment that:

Based on the evidence presented to the Court and the jury's findings, the Court ENTERS a Declaratory Judgment that Plaintiffs Anthony L. McCalla and Cheryl A. McCalla properly exercised their option to purchase the Property.

Based on the evidence presented to the Court and the jury's findings, the Court ENTERS a Declaratory Judgment that the 99 year Davis lease executed on or about February 12, 1996 filed for record on February 15, 1996 at BK 1940PG0011, the First Amendment to Lease executed on or about March 12, 1996 and filed for record on March 11, 1996 at BK 1945PG0915, and the Second Amendment to Lease executed on or about August 28, 1996 and

all amendments are void from their inception and are unenforceable.

## ISSUES

We will address the Davises' and Ski River's issues in the following order:

# Error in denying the motion for new trial filed by the Davises and Ski River (issue eleven);

# Whether McCalla's option to purchase the entire property is void and/or was waived (issue three);

# Whether Baker has standing to request the declaratory judgment that the Baker–Davis lease and its amendments are void (issue seven);

# Whether Baker's claims against the Davises and Ski River were brought in breach of a tolling agreement (issue six);

**\*132** # Error in entering declaratory judgment that the Baker–Davis lease and its amendments are void and unenforceable (issue one);

# Whether the McCallas had standing to request the declaratory judgment that the Baker–Davis lease and its amendments are void (issue four);

# Error in submitting the issue of tortious interference to the jury (issue two);

# Whether the evidence is factually sufficient to support award of lost profits to the McCallas and Baker (issue ten);

# Whether the evidence is legally and factually sufficient to support award of exemplary damages to the McCallas and Baker and whether the exemplary damages were excessive (issue twelve);

# Whether the evidence is legally and factually sufficient to support the award of damages against Karen Davis (issue nine);

# Error in awarding attorney's fees to the McCallas and Baker because they failed to segregate fees between claims (issue five); and

# Whether the evidence is legally sufficient to support jury finding of civil conspiracy (issue eight).

**ISSUE ELEVEN: Error in denying motion for new trial filed by the Davises and Ski River**

**[1]** The Davises and Ski River filed a motion for new trial asserting newly discovered evidence, *i.e.,* that Walter Baker allegedly committed perjury during the trial regarding disclosures made by the Davises to the Bakers. They argue that had the jury known this, the outcome of the trial would have been different because Baker was the central witness on the issues of fraud, undue influence, and unconscionability. In an affidavit filed in response, Walter Baker contradicts Karen Davis's assertion that he told her his attorney asked him "to forget some things."

**[2]** **[3]** **[4]** It is incumbent upon a party who seeks a new trial on the ground of newly discovered evidence to show that (1) the evidence has come to his knowledge since the trial; (2) it was not owing to the want of due diligence that it did not come sooner; (3) it is not cumulative; and (4) it is so material that it would probably produce a different result if a new trial were granted. *Jackson v. Van Winkle,* 660 S.W.2d 807, 809 (Tex.1983). The trial court's ruling on such a motion will not be disturbed on appeal unless an abuse of discretion occurred. *Id.* "A new trial will not be granted on the ground of newly-discovered evidence, unless it is made to appear that it has come to the knowledge of the applicant since the trial; that it could not have been sooner discovered by the exercise of diligence; that it is not merely cumulative; that it is not for the purpose of impeachment." *New Amsterdam Cas. Co. v. Jordan,* 359 S.W.2d 864, 866 (Tex.1962) (quoting *Conwill v. Gulf, C. & S.F. Ry. Co.,* 85 Tex. 96, 19 S.W. 1017 (1892)).

We find the evidence submitted by the Davises and Ski River was cumulative and would only have served to impeach Baker's trial testimony. We cannot say that any impeachment would have probably produced a different result. *See Jackson,* 660 S.W.2d at 809; *New Amsterdam,* 359 S.W.2d at 866. The trial court did not abuse its discretion in denying the motion for new trial on these grounds. *See Jackson,* 660 S.W.2d at 809. We overrule issue eleven.

**ISSUE THREE: Error in denying the Davises' and Ski River's request for declaratory judgment that the McCallas' "first option to purchase" is void and unenforceable, and/or was waived**

**\*133** Ski River argues that the trial court erred in denying its request for declaratory judgment that the McCalla's purported "first option to purchase," provided in the Glazier lease,

is void and unenforceable because it is too indefinite and violates the rule against perpetuities. In the alternative, they argue that it was not exercised or was waived.

The pertinent part of the Glazier lease provides:

> That, in the event Lessees [Bakers] shall purchase or otherwise obtain legal ownership of said Property from Lessor [Glazier] and later elect to sell, Lessees [Bakers] hereby grant Sub–Lessees [McCallas] the First Option to Purchase all, or a portion of said Property from Lessees [Bakers] at market value.

**[5]** We review declaratory judgments under the same standards as other judgments and decrees. *Lidawi v. Progressive County Mut. Ins. Co.,* 112 S.W.3d 725, 730 (Tex.App.-Houston [14th Dist.] 2003, no pet.); *see also* TEX. CIV. PRAC. & REM.CODE ANN. § 37.010 (Vernon 1997). We look to the procedure used to resolve the issue at trial to determine the standard of review on appeal. *Lidawi,* 112 S.W.3d at 730. Here, the trial court asked the jury whether McCalla had a first option to purchase and whether he exercised the option. In a second jury question, the jury found that the McCallas exercised their option in accordance with the terms of the first option under the Glazier Lease. However, the Davises and Ski River attack the option provision as void as a matter of law.

**[6]** **[7]** **[8]** **[9]** **[10]** **[11]** The rules regarding indefiniteness of material terms of a contract are based on the concept that a party cannot accept an offer to form a contract unless the terms of that contract are reasonably certain. RESTATEMENT (SECOND) OF CONTRACTS § 33(1) (1981). Thus, the actions of the parties may conclusively establish their intention to enter a binding agreement even if some terms are left for future agreement. *Id.* at cmt. a. To that end, Texas courts prefer to validate transactions rather than void them. *Dahlberg v. Holden,* 150 Tex. 179, 238 S.W.2d 699, 701 (1951). A court may not create a contract where none exists and they generally may not interpolate or eliminate material terms. *Id.* However, parties may agree on some terms sufficient to create a contract, leaving other provisions for later negotiation. *See Scott v. Ingle Bros. Pacific, Inc.,* 489 S.W.2d 554, 555 (Tex.1972). In certain situations, a court may uphold an agreement by supplying missing terms, such

as implying a reasonable price. *Bendalin v. Delgado,* 406 S.W.2d 897, 900 (Tex.1966).

 **[12]** **[13]** **[14]** **[15]** The Restatement asserts that contract terms are reasonably certain "if they provide a basis for determining the existence of a breach and for giving an appropriate remedy." RESTATEMENT (SECOND) OF CONTRACTS § 33(2) (1981). This conforms to the policy that parties, and not the courts, should make contracts. Where the parties intended to make an agreement and there is a certain basis for granting a remedy, courts should find the contract terms definite enough to provide a remedy. *Id.* at cmt. b. Uncertainty of terms can, however, preclude one remedy without affecting others. For example, less certainty is necessary in a suit for damages than one for specific performance. *See Kirkwood & Morgan, Inc. v. Roach,* 360 S.W.2d 173, 176 (Tex.Civ.App.-San Antonio 1962, writ ref'd n.r.e.); *but see Bendalin,* 406 S.W.2d at 900 (the Supreme Court held that lack of an express agreement on price was not fatal to maintenance of a suit for specific performance of an oral agreement to purchase stock).

When essential terms are missing, courts often find no more than an agreement **\*134** to agree. *See Pine v. Gibraltar Sav. Ass'n,* 519 S.W.2d 238, 244 (Tex.Civ.App.-Houston [1st Dist.] 1975, writ ref'd n.r.e.). Courts have, however, implied terms when the surrounding circumstances left little doubt as to the parties' intentions. *See Morgan v. Young,* 203 S.W.2d 837, 846 (Tex.Civ.App.-Beaumont 1947, writ ref'd n.r.e.).

 **[16]** Here, the contract clause sets out with certainty the term that the Bakers must obtain legal ownership as a prerequisite to validity of any obligation. However, the contract clause leaves many terms for future negotiation and agreement. These include:

(1) What is the definition of "said Property" (the entire 380–acre tract or the two acres being subleased by the McCallas);

(2) What is the definition of a "portion" of said Property;

(3) Whether listing property on the market (*i.e.,* solicitation for offers) is an election to sell;

(4) Whether a listing agreement is an election to sell;

(5) Whether a bona fide offer from a third party purchaser was required before the option could be exercised;

(6) Whether an election to sell a portion of the property was sufficient for McCalla to exercise the option;

(7) When market value is to be determined;

(8) What is the method to determine market value;

(9) How long does McCalla have to exercise his option after notification of Baker's election to sell;

(10) Whether the McCallas can ever compel a sale of all or a portion of the Property;

(11) Whether Baker can change her mind after an election to sell the property if she is dissatisfied with an offer from McCalla in comparison with either a bona fide purchaser offer or retaining the property; and

(12) For how long is the option valid?

 **[17]** **[18]** **[19]** These provisions requiring future negotiation suggest that the parties are only agreeing to make a future contract. An agreement leaving material terms to be agreed upon later is not definite and specific as to material and essential terms and is, therefore, unenforceable. *See Parker Chiropractic Research Foundation v. Fairmont Dallas Hotel Co.,* 500 S.W.2d 196, 201 (Tex.Civ.App.-Dallas 1973, no writ). When essential terms are missing, we may find no more than an agreement to agree. *See Pine,* 519 S.W.2d at 244. Furthermore, a contract providing for an agreement to be negotiated in the future is void. *See, e.g., Texas State Optical v. Caylor,* 387 S.W.2d 461, 464 (Tex.Civ.App.-Beaumont 1965, writ ref'd n.r.e.). Therefore, we find the "first option to purchase" is a void provision of the Glazier lease. Thus, the jury findings are immaterial.

It was error for the trial court to deny entering a declaratory judgment that the McCalla's first option to purchase is indefinite and void. In addition, it was error to enter a declaratory judgment that the McCallas exercised their option. We need not address whether the option was waived because we have found the option void.

We sustain issue three. We will reverse that part of the judgment that states (1) the Davises and Ski River take nothing against the McCallas and (2) the declaratory judgment that the McCallas properly exercised their option to purchase the Property. We will render judgment as follows:

**\*135** Based on the evidence presented to the Court, the Court RENDERS a Declaratory Judgment that Plaintiffs Anthony L. McCalla's and Cheryl A. McCalla's option to purchase the Property is void as a matter of law.

**ISSUE SEVEN: Baker's standing to request declaratory judgment to declare Baker–Davis lease and its amendments are void.**

 [20]    The general test for standing in Texas requires that there "(a) shall be a real controversy between the parties, which (b) will be actually determined by the judicial declaration sought." *Texas Ass'n of Bus. v. Texas Air Control Bd.,* 852 S.W.2d 440, 446 (Tex.1993) (citing *Board of Water Engineers v. City of San Antonio,* 155 Tex. 111, 114, 283 S.W.2d 722, 724 (1955)). The Declaratory Judgment Act provides that "all persons who have or claim any interest that would be affected by the declaration must be made parties." TEX. CIV. PRAC. & REM.CODE ANN. § 37.006(a) (Vernon 1997).

The Baker–Davis lease states:

The Parties of this Agreement ("Agreement") are as follows:

1.1 MARY BAKER and her son, WALT BAKER (collectively referred to as "BAKER")....

The first amendment to the Baker–Davis lease states:

THIS FIRST AMENDMENT TO LEASE (this "First Amendment") is dated to be effective as of the 12th day of March, 1996, by and between MARY BAKER and her son, WALT BAKER (collectively referred to herein as "BAKER")....

At the time of the second amendment, Walter Baker was the owner of the property and the second amendment states:

THIS SECOND AMENDMENT TO LEASE (this "Second Amendment") is dated to be effective as of the 28th day of August, 1996, by and between WALT BAKER ("Walt Baker") and SKI RIVER DEVELOPMENT[S], INC., a Texas Corporation ("Ski River").

 [21]    As signatory of the lease and its amendments, Walter Baker was in privity of contract with the Davises and Ski River. Thus, the controversy that exists between Baker, the Davises, and Ski River will be affected by the declaratory judgment sought. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 37.006(a); *Texas Ass'n of Bus.,* 852 S.W.2d at 446. We find that Walter Baker has standing. We overrule issue seven.

**ISSUE SIX: Baker's claims against the Davises were brought in breach of a tolling agreement**

On September 4, 2001, Baker, the Davises, and Ski River entered a "tolling agreement" that prohibited the Davises and Baker from asserting any cross-claims against each other until the McCalla claims were resolved. In violation of this tolling agreement, Baker asserted cross-claims against the Davises and Ski River on October 23, 2002. However, on November 21, 2002, the parties signed a Rule 11 agreement that "Walt Baker will maintain his cross claims in this case." Thus, any violation of the tolling agreement was cured by the Rule 11 agreement. We overrule issue six.

**ISSUE ONE: Error by entering declaratory judgment voiding the Baker–Davis lease and its amendments**

The trial court entered a declaratory judgment that the Baker–Davis lease and its amendments are void based on the jury findings that the Baker–Davis lease and its amendments were procured by fraud, undue influence, and unconscionability.

 [22]    [23]    [24]    [25]    If a contract is unconscionable, it is unenforceable. *See In re Turner* **\*136** *Bros. Trucking Co.,* 8 S.W.3d 370, 375 (Tex.App.-Texarkana 1999, no pet.) (referring to an arbitration agreement); *El Paso Natural Gas Co. v. Minco Oil & Gas Co.,* 964 S.W.2d 54, 60 (Tex.App.-Amarillo 1997), *rev'd on other grounds,* 8 S.W.3d 309 (Tex.1999) (referring to gas purchase agreement under the Texas Business and Commerce Code § 2.302(a)); *Tri–Continental Leasing Corp. v. Law Office of Richard W. Burns,* 710 S.W.2d 604, 609 (Tex.App.–Houston [1st Dist.] 1986, writ ref'd n.r.e.) (referring to disclaimer provisions in a lease); RESTATEMENT (SECOND) OF CONTRACTSSSSS § 208. Proof of unconscionability begins with two broad questions: (1) the procedural aspect, *i.e.,* how did the parties arrive at the terms in controversy; and (2) the substantive aspect, *i.e.,* are there legitimate commercial reasons justifying the terms of the contract. *Pony Express Courier Corp. v.*

*Morris,* 921 S.W.2d 817, 821 (Tex.App.-San Antonio 1996, no pet.). In other words, in deciding the fairness of a contract's substantive terms, the court must also consider whether there were "procedural abuses," such as an unfair bargaining position between the parties at the time the agreement was made. *Tri–Continental,* 710 S.W.2d at 609. Under Texas law, the party asserting unconscionability of a contract bears the burden of proving *both* procedural and substantive unconscionability. *In re Turner,* 8 S.W.3d at 375; *Wade v. Austin,* 524 S.W.2d 79, 86 (Tex.Civ.App.-Texarkana 1975, no writ.).

 **[26] [27] [28] [29] [30] [31]** In determining whether a contract is unconscionable, we must examine (1) the "entire atmosphere" in which the agreement was made; (2) the alternatives, if any, available to the parties at the time the contract was made; (3) the "non-bargaining ability" of one party; (4) whether the contract was illegal or against public policy; and (5) whether the contract is oppressive or unreasonable. *Wade,* 524 S.W.2d at 86. The totality of the circumstances must be assessed as of the time the contract was formed. *El Paso,* 964 S.W.2d at 61. It is important to consider whether there is any gross disparity in the values exchanged. RESTATEMENT (SECOND) OF CONTRACTS, § 208, cmt. c. Gross inequality of bargaining power, together with terms unreasonably favorable to the stronger party may show that the weaker party had no meaningful choice, no real alternative, or did not in fact assent or appear to assent to the unfair terms. *Id.* at cmt. d. Factors that may contribute to an unconscionable bargaining process include: (1) knowledge of the stronger party that the weaker party will be unable to receive substantial benefits from the contract; and (2) knowledge of the stronger party that the weaker party is unable reasonably to protect his interests by reason of physical or mental infirmities, ignorance, illiteracy or inability to understand the language of the agreement. *Id.* The grounds for substantive abuse must be sufficiently shocking or gross to compel the court to intercede, and the same is true for procedural abuse—the circumstances surrounding the negotiations must be shocking. *El Paso,* 964 S.W.2d at 62.

 **[32]** The ultimate question of unconscionability of a contract is one of law, to be decided by the court. *El Paso,* 964 S.W.2d at 60; *see also In re Turner,* 8 S.W.3d at 375; *Tri–Continental,* 710 S.W.2d at 609. In *El Paso,* the court stated:

> This suggests that our review of the matter is *de novo.* Yet, it cannot be forgotten that the decision of whether some agreement is or is not unconscionable is dependent upon the existence of facts which allegedly illustrate

unconscionability. And, as to the existence of those facts, our review is not *de novo.* In other words, we cannot review the **\*137** record, divine our own inferences from the evidence contained therein, resolve conflicts in same, or decide what evidence to believe and what not to believe. The power to do those things, that is, to find facts, lies with the trial court. Once it has exercised that power, we must then defer to the findings made. And, as long as the findings enjoy sufficient evidentiary support, they cannot be disturbed, even though we may have construed the evidence differently. Nevertheless, this does not prevent us from assessing whether the findings made illustrate unconscionability for, again, that is a question of law. Nor does it prevent us from deciding whether the evidence of record, when viewed in a light most favorable to the court's findings and regardless of its potential inferences, illustrates unconscionability, for that too is a question of law.

Interestingly, at least one court has likened the mental gymnastics in which we must partake to the standard of abused discretion. *See, e.g., Pony Express Courier Corp. v. Morris,* 921 S.W.2d at 820. Use of the latter is helpful in situations involving mixed questions of law and fact, according to the *Pony Express* court. *Id.* It enables the reviewing court to reassess *de novo* that part of the decision involving the law and its application while recognizing the trial court's authority to weigh and interpret the evidence. *Pony Express Courier Corp. v. Morris,* 921 S.W.2d at 820; *accord, Walker v. Packer,* 827 S.W.2d 833, 839–40 (Tex.1992); *see* RESTATEMENT (SECOND) OF CONTRACTS § 208, cmt. f (stating that the appellate court will consider whether the proper standards were applied). Given this, we too adopt it as indicative of the framework in which the reviewing court must act.

*El Paso,* 964 S.W.2d at 60–61.

Here, the trial court submitted the issue of unconscionability to the jury, and the jury found the lease, its first addendum, first amendment, and second amendment were the result of unconscionability. The declaratory judgment entered stated that the lease and its first and second amendments are void from their inception and are unenforceable. Because an unconscionable contract is unenforceable, we will determine if this declaratory judgment resulted from a proper determination of unconscionability. The trial court did not make any separate factual findings regarding unconscionability.

**[33]** We find the following evidence supports procedural unconscionability of the Baker–Davis lease:

(1) The Davises were aware that the Bakers were in desperate need for money at the time they signed the lease—the Bakers were living in a trailer home heated by a stove and were so far in debt that they needed money to survive;

(2) The Davises told the Bakers that Mary Baker would be able to get Medicaid if she entered the lease;

(3) Ms. Calahan met with the Bakers and told them that the sale of the property would be better in terms of long-term income and the tax consequences; the Davises convinced the Bakers that the lease was better because it would give them steady monthly income;

(4) Walter Baker testified that he and Mary felt they had to enter the lease;

(5) The Bakers did not see the final draft of the lease until the day they signed it;

(6) Walter Baker testified that he and Mary felt they could not change anything in the lease before signing it;

**\*138** (7) Walter Baker testified that he spoke to his CPA in general terms after his first meeting with Davis regarding whether it would be easier to sell it in one lump sum or lease it and get a monthly payment—the CPA said he needed more details to run the numbers (Baker never went back to the CPA);

(8) Walter Baker testified that he and Mary were the only ones to review the terms of the lease;

(9) The Davises did not explain any of the terms to the Bakers before they signed the lease;

(10) Walter Baker testified that he did not understand the legal language and did not know what the terms meant (*e.g.,* severability, specific performance, release, warranty, assignment, termination, possessory rights);

(11) The Davises never told the Bakers that they had tried to purchase 25 acres of this property the previous summer;

(12) When Davis was asked how he expected the Bakers to survive after the 12–1/2 years, he testified that they could have survived, Walter Baker could work, and "[i]t was a window of opportunity for both of us."

(13) The Davises told the Bakers that they planned to put in a boat marina, landing strip and golf course. However, the Davises did not provide a copy of their general business plan and did not mention the contents of this plan, which could have affected the real estate taxes. These plans included development of dump stations for trailer waste, a new boat area, an engineered ski lake, electricity, excavation of new channels, installation of a fuel farm, and marketing of ski lake site lots as long-leasehold property;

(14) Walter Baker testified that he did not think he was selling his property to the Davises;

(15) Walter Baker testified that Davis brought so many papers to him that he was confused as to what was what;

(16) The Bakers were not experienced with formal contracting—they had about 35–40 current lake-lot subleases but they were informal agreements without any property descriptions;

(17) The Bakers did not keep any accounting books for their store;

(18) The Bakers filed tax returns for their farm, but never filed tax returns for anything else; and

(19) The Davises' attorney drafted the lease.

**[34]** We find the following terms support substantive unconscionability of the Baker–Davis lease:

(1) The Bakers were required to pay all real estate taxes for the 99–year term of the lease, which were estimated by Calahan at $132.92 per month for the next 12–1/2 years ($1,595 per year);

(2) The Davises had to pay $3,000 per month for only 12–1/2 years; after that period, their rent would decrease to $75 per month, which is less than the estimated tax payment;

(3) All current sublease income would be assigned to the Davises (this was estimated at $1,668 per month based on testimony); thus, the Bakers were already entitled to this amount and would only get $1,332 more per month than they were currently entitled to and substantially less after 12–1/2 years;

**\*139** (4) The Davises could terminate the lease at any time by simply giving written notice;

(5) The Bakers lost all possessory rights (except the right to have a small store through December 1996);

(6) The Bakers could not discuss or be a party to any communication about this lease and/or any subleases that the Davises may enter under this lease;

(7) The release clause prevented the Bakers from selling the land under their current listing agreement with Calahan, and if the Bakers did sell the land, they would owe the Davises $10,000 plus all rent payments made to that point; and

(8) The release clause prevented the Bakers from selling the land while the lease was in effect.

 **[35]**   This evidence illustrates unfair bargaining positions, unfair terms, gross disparity in the value exchanged, no substantial benefit to the Bakers, shocking circumstances of the procurement of the lease, and shocking/gross lease terms. *See Wade,* 524 S.W.2d at 86; *El Paso,* 964 S.W.2d at 61; RESTATEMENT (SECOND) OF CONTRACTS, § 208. Evidence of both procedural and substantive unconscionability of the Baker–Davis lease also supports a determination that the first addendum and the first and second amendments to the lease are unconscionable. We find that the trial court did not abuse its discretion in entering a declaratory judgment finding the Baker–Davis lease and its amendments unenforceable. *See El Paso,* 964 S.W.2d at 60–61. However, the finding of unconscionability would not make the Baker–Davis lease void.[5]

We sustain issue one in part and overrule in part. We will reform the declaratory judgment to read:

> Based on the evidence presented, the Court RENDERS a Declaratory Judgment that the 99–year Davis lease executed on or about February 12, 1996, filed for record on February 15, 1996, at BK 1940PG0011, the First Amendment to Lease executed on or about March 12, 1996, and filed for record on March 11, 1996, at BK 1945PG0915, and the Second Amendment to Lease executed on or about August 28, 1996, and all amendments thereto are unconscionable and thus unenforceable from their inception.

### ISSUE FOUR: McCalla's standing to request declaratory judgment to void Baker–Davis lease

Because we found in issues one and seven that Baker has standing to request the declaratory judgment to void the Baker–Davis lease and that the lease and all its amendments unenforceable, we need not address whether the McCallas have standing to do the same.

### ISSUE TWO: Error in submitting issues of tortious interference to jury

 **[36]**   It is unclear which tortious interference jury questions are at issue here. Thus, we will review the three jury questions relating to tortious interference. In question 5, the jury found that Ski River **\*140** and the Davises intentionally interfered with the Glazier lease between the McCallas and Baker. In question 24, the jury found that Ski River and the Davises wrongfully interfered with the McCallas' prospective contractual relation with Baker. Because we have found that McCallas' option is void, we find that the trial court erred in submitting these two jury questions as a matter of law. There is no evidence that the Davises and Ski River interfered with the McCallas' valid lease rights.

 **[37]**   In question 25, the jury found that Ski River and the Davises tortiously interfered with Baker's use and enjoyment of his property. Ski River objected that this is not a cause of action upon which relief can be based and it is duplicative of other relief requested.

 **[38]**   **[39]**   **[40]**   Under the general rule, there are at least two causes of action for tortious interference: (1) tortious interference with the right to dispose of property; and (2) tortious interference with the peaceful use and enjoyment of property rights. *Suprise v. DeKock,* 84 S.W.3d 378, 380 (Tex.App.-Corpus Christi 2002, no pet.). A cause of action for tortious interference with the right to dispose of property is, in essence, a claim for tortious interference with a prospective contract or prospective business relation. *Id.* at 381. Texas law protects prospective contracts from interference. *Id.* A cause of action for tortious interference with peaceful use and enjoyment of property is, in essence, a claim for intentional invasion of, or interference with, property rights. *Id.* at 382. This cause of action also exists under Texas law. *Id.* at 383. Thus, tortious interference with Baker's use and enjoyment of his land is a separate cause of action and is not cumulative. *See id.* at 380–83.

We sustain issue two as to questions 5 and 24 and overrule it as to question 25. We turn to the tortious interference damages in issue ten.

### ISSUE TEN: Factual sufficiency of lost profits awarded to the McCallas and Baker

 [41]    [42]    In Texas, a party bringing suit for tortious interference with a contract must prove four elements: (1) a contract subject to interference exists; (2) the act of interference was willful and intentional; (3) the intentional act proximately caused the plaintiff's damage; and (4) actual damage or loss occurred. *Juliette Fowler Homes v. Welch Assocs.,* 793 S.W.2d 660, 665 (Tex.1990). The first element requires the existence of a valid contract; a void contract cannot serve as the basis for a tortious interference claim. *See id.; Clements v. Withers,* 437 S.W.2d 818, 821 (Tex.1969).

As to the tortious interference in jury question 5, because there can be no tortious interference with a void contract, we reverse the McCallas' tortious interference damages award of $69,000 against Ski River and the Davises. We sustain issue ten as to the McCallas' tortious interference damages award.

 [43]    According to question 26, the damages awarded to Baker for tortious interference with use and enjoyment of his land were either lost profits and/or damages for loss of use and enjoyment of his property. Ski River and the Davises argue only that there was insufficient evidence to support any lost profits awarded to Baker.

 [44]    To successfully challenge a multi-element damages award (one dollar amount for multiple elements of damages) on appeal, an appellant must address all of the elements and show that the evidence is factually insufficient to support the entire damages award. **\*141** *Price v. Short,* 931 S.W.2d 677, 688 (Tex.App.-Dallas 1996, no writ); *Greater Houston Transp. Co. v. Zrubeck,* 850 S.W.2d 579, 589 (Tex.App.-Corpus Christi 1993, writ denied). A failure to address an element of damages results in waiver of the sufficiency challenge. *Price,* 931 S.W.2d at 688.

Thus, by failing to challenge the sufficiency of the evidence of lost use and enjoyment, Ski River and the Davises have waived their factual sufficiency challenge on the damages awarded to Baker. *See id.*

We overrule issue ten as to Baker's tortious interference damages award.

### ISSUE TWELVE: Legal and factual sufficiency of evidence of exemplary damages awarded to the McCallas and Baker and whether the exemplary damages were excessive

Because we have reversed the McCallas' tortious interference damages in issue ten, we must also reverse the McCallas' accompanying exemplary damages of $75,000 against Ski River and the Davises. We sustain issue twelve as to the McCallas' exemplary damages.

As to Baker, Ski River and the Davises first argue legal and factual sufficiency of the evidence to support a finding that the harm to Baker resulted from fraud or malice. The argument in their appellate brief consists of: "There was no evidence to support the jury's findings that the harm to the McCallas and Baker resulted from fraud or malice (Questions 8 and 28); in the alternative, the findings were against the great weight and preponderance of the evidence." Second, they argue that if the evidence supporting an award of exemplary damages is sufficient, the exemplary damages awarded are excessive ($50,000 in actual damages and $20,000 [6] in exemplary damages).

### *Legal and factual sufficiency*

 [45]    Ski River and the Davises' legal and factual sufficiency argument is one sentence in their 50 page brief and contains no citations to the reporter's record. The Rules of Appellate Procedure require that "[t]he brief must contain a clear and concise argument for the contentions made, with appropriate citations to authority and to the record." TEX.R.APP. P. 38.1(h), 38.2(a)(1). This is especially important in a case such as this with a voluminous appellate record. By their failure, Ski River and the Davises have waived their legal and factual sufficiency complaints about the jury findings. *E.g. Franklin v. Enserch, Inc.,* 961 S.W.2d 704, 711 (Tex.App.-Amarillo 1998, no pet.); *Sisters of Charity of the Incarnate Word v. Gobert,* 992 S.W.2d 25, 31 (Tex.App.-Houston [1st Dist.] 1997, no pet.); *Leyva v. Leyva,* 960 S.W.2d 732, 734 (Tex.App.-El Paso 1997, no writ).

### *Excessive*

 [46]    [47]    [48]    Exemplary damages must be reasonably proportioned to compensatory damages. *Alamo Nat'l Bank v. Kraus,* 616 S.W.2d 908, 910 (Tex.1981). There is no set rule between the amount of actual and exemplary damages that will be considered reasonable. *Id.* That determination

is dependent upon the facts of a particular case. *Id.* Factors to consider in determining whether an award of exemplary damages is reasonable include: (1) the nature of the wrong, (2) the character of the conduct involved, (3) the degree of culpability of the wrongdoer, (4) the situation and sensibilities of the parties concerned, **\*142** and (5) the extent to which such conduct offends a public sense of justice and propriety. *Id.*

**[49]** The ratio of exemplary damages is approximately 0.40 the amount of compensatory damages for Baker. Considering the *Kraus* factors, we find this ratio is not excessive. *See id.*

We overrule issue twelve as to Baker's exemplary damages.

### ISSUE NINE: Legal sufficiency of evidence to support judgment against Karen Davis

The tortious interference damages awarded to the McCallas against Karen Davis have been reversed under issue ten. Ski River and the Davises argue that there is no evidence to support the tortious interference damages awarded to Baker against Karen Davis. They argue she was only occasionally present, married to Stephen Davis, and did not sign the lease or its amendments.

We review no-evidence points by considering only the evidence and all reasonable inferences that support the jury's finding while disregarding all evidence and inferences to the contrary. *Orozco v. Sander,* 824 S.W.2d 555, 556 (Tex.1992). If there is more than a scintilla of evidence to support the finding, the no-evidence challenge must fail. *Id.* There is "some evidence" when the proof furnishes a reasonable basis for reasonable minds to reach differing conclusions as to the existence of a crucial fact. *Id.* If the evidence is so weak as to do no more than create a mere surmise or suspicion of its existence, its legal effect is that it is no evidence. *Haynes & Boone v. Bowser Bouldin, Ltd.,* 896 S.W.2d 179, 182 (Tex.1995). Generally, if the court of appeals sustains a "no evidence" point, it is the court's duty to render judgment for appellant. *Vista Chevrolet, Inc. v. Lewis,* 709 S.W.2d 176, 176 (Tex.1986) (quoting *Nat'l Life Accident Ins. Co. v. Blagg,* 438 S.W.2d 905, 909 (Tex.1969)).

**[50]** A no-evidence point must and can only be sustained when the record reveals: (1) a complete absence of evidence of a vital fact; (2) rules of law or rules of evidence bar the appellate court from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; and (4) the evidence

conclusively establishes the opposite of a vital fact. *Juliette Fowler Homes, Inc. v. Welch Assocs., Inc.,* 793 S.W.2d 660, 666 n. 9 (Tex.1990) (citing Calvert, *"No Evidence" and "Insufficient Evidence" Points of Error,* 38 TEX. L.REV. 361, 362–63 (1960)).

**[51]** We have recited the evidence about procedural unconscionability. Karen Davis also testified that she (1) was very familiar with the landmarks on the property; (2) had an emotional attachment to the property; (3) first approached the Bakers about leasing the property in January 1996 with Mr. Davis; (4) was involved in the negotiation process with the Bakers; (5) took the final draft to the Bakers with Mr. Davis; and (6) was present when everyone signed the lease.

Considering only the evidence and all reasonable inferences that support the jury's finding of tortious interference of use and enjoyment of his property by Karen Davis, we find legally sufficient evidence to support this finding, *i.e.,* more than a scintilla of evidence to support the finding. *See Orozco,* 824 S.W.2d at 556; *Juliette Fowler,* 793 S.W.2d at 666 n. 9. We overrule issue nine.

### ISSUE FIVE: Error in awarding attorney's fees to McCallas and Bakers because they failed to segregate fees between claims

**\*143** Both the Bakers and the McCallas requested attorney's fees under the Declaratory Judgment Act. *See* TEX. CIV. PRAC. & REM.CODE ANN. §§ 37.001, 38.001 (Vernon 1997). In a declaratory judgment action, a court "may award ... reasonable and necessary attorney's fees as are equitable and just." *Id.* § 37.009. (Vernon 1997).

**[52]** An award of attorney's fees to the McCallas would not be "equitable and just" after finding that their option is void. *See id.* Thus, we sustain issue five as to the McCallas' attorney's fees and reverse all attorney's fees awarded to the McCallas.

**[53] [54] [55] [56]** Because we reformed the declaratory judgment that the Baker–Davis lease is unenforceable, we must assess whether Baker is entitled to attorney's fees for this declaratory judgment. To show the reasonableness and necessity of attorney's fees, the plaintiff is required to show that the fees were incurred while suing the defendant sought to be charged with the fees on a claim which allows recovery of such fees. *Stewart Title Guaranty Co. v. Sterling,* 822 S.W.2d 1, 10 (Tex.1991). A recognized exception to this duty to segregate arises when the attorney's fees rendered are in

connection with claims arising out of the same transaction and are so interrelated that their "prosecution or defense entails proof or denial of essentially the same facts." *Id.* at 11. Therefore, when the causes of action involved in the suit are dependent upon the same set of facts or circumstances and thus are "intertwined to the point of being inseparable," the party suing for attorney's fees may recover the entire amount covering all claims. *Id.* We find that Baker's cross-claims were so intertwined with his declaratory judgment cross-claims that segregation of attorney's fees was not required. *See id.* at 10–11.

Thus, we overrule issue five as to the attorney's fees awarded to Baker.

 **[57]**    In addition, the jury found the reasonable and necessary attorney's fees for the Davises and Ski River are $100,000 for preparation and trial, $15,000 for an appeal to the Court of Appeals, and $15,000 for an appeal to the Supreme Court of Texas. We must remand this cause to the trial court to determine whether to award "equitable and just" attorney's fees to Ski River and the Davises and against the McCallas under the Declaratory Judgment Act, based on our holding under issue one. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 37.009.

### ISSUE EIGHT: Legal sufficiency of civil conspiracy finding.

Because the trial court did not enter a judgment on this jury finding, we need not address this issue.

### CONCLUSION

We have sustained issue three, overruled issues six, seven, nine, and eleven, and overruled in part and sustained in part issues one, two, five, ten, and twelve. We did not need to address issues four and eight. Thus, we reverse that part of the judgment that states (1) the Davises and Ski River take nothing against the McCallas and (2) the declaratory judgment that the McCallas properly exercised their option to purchase the Property. We render judgment as follows:

> Based on the evidence presented to the Court, the Court RENDERS a Declaratory Judgment that Plaintiffs Anthony L. McCalla's and Cheryl

A. McCalla's option to purchase the Property is void as a matter of law.

We will reform the declaratory judgment to read:

> Based on the evidence presented, the Court RENDERS a Declaratory Judgment **\*144** that the 99–year Davis lease executed on or about February 12, 1996, filed for record on February 15, 1996, at BK 1940PG0011, the First Amendment to Lease executed on or about March 12, 1996, and filed for record on March 11, 1996, at BK 1945PG0915, and the Second Amendment to Lease executed on or about August 28, 1996, and all amendments thereto are unconscionable and thus unenforceable from their inception.

We reverse and delete from the judgment the tortious interference damages, exemplary damages, and all attorney's fees awarded to the McCallas against the Davises and Ski River. We affirm the judgment awarding tortious interference damages, exemplary damages, and all attorney's fees to Baker against the Davises and Ski River. We remand this cause to the trial court to determine whether to award attorney's fees to the Davises and Ski River and against the McCallas under the Declaratory Judgment Act.

Chief Justice GRAY concurring.

TOM GRAY, Chief Justice, concurring.
If it is within our job description to come up with a laundry list of questions that could pose a problem in the subsequent enforcement of a contract, I assure you that only the wealthiest of clients could afford to have enforceable contracts drafted. Fortunately that is not the law. That is, however, what the majority has done to determine McCalla's contract is "void." I would not.

In June 1994, Mary Baker took the necessary steps to list the property with a broker. At this point, she had affirmatively triggered the provisions of her contract with McCalla that if she decided to sell, McCalla had certain rights. I agree with McCalla that Mary's effort to include a 72 hour response time for McCalla to act on the rights was not effective because it

was not part of that contract. If time to act in a contract is not specified, a reasonable time is implied.

By October of 1994, McCalla had an appraisal of the fair market value completed. It would have been a jury issue of whether this was a reasonable time to obtain such an appraisal and then immediately act on the contract. We need not decide that issue, however, because McCalla did not attempt or endeavor to act on his rights under the contract at that time. In fact, McCalla did not act on this appraisal of the fair market value, by attempting to exercise his rights under the contract, until April 1996, almost two years after Mary decided to sell the property, and well over a year after the appraisal was received by McCalla. Many events occurred during this extended delay. The length of the delay alone would raise the issue of whether the appraised value had changed, and the jury did make such findings.

Under these circumstances, I have no problem in determining, as a matter of law, that McCalla failed to exercise his rights under the contract in a timely manner. His efforts to delay the exercise, for whatever reason, are ineffective because, like the 72 hour provision, they are not in the contract.

I do not, however, find any reason to interfere with an agreement freely entered into by these parties by declaring the provision void as the majority has done. I would sustain issue three on the basis that McCalla waived his rights under the agreement by failing to timely exercise them.

It does not appear that my disagreement with the majority on resolving this issue would substantively impact the disposition of the appeal. I concur.

## Footnotes

1    Appellant Stephen R. Davis is the principal of Ski River, and Appellant Karen Davis is his wife.

2    The McCallas also sued for fraud and breach of warranty of merchantability.

3    Baker also cross-claimed for breach of contract, fraud, waste, and declaratory judgment that (1) the right of first refusal in the Baker–Davis lease is void; and (2) the Baker–Davis lease is void for lack of consideration. Baker counterclaimed against the McCallas for tortious interference with use and enjoyment of his land, a declaratory judgment that (1) the McCalla's option is void and unenforceable; (2) the McCallas refused to exercise their option and specific performance for the McCallas to sell the boat storage business to Baker; (3) the Glazier lease is void and unenforceable because McCalla intentionally placed Baker under duress to induce him to sign the Glazier lease, and attorney's fees under the Declaratory Judgment Act. The McCallas and Baker settled their claims prior to the judgment now on appeal.

4    Ski River and the Davises also counterclaimed for tortious interference with Baker–Davis relations and lease and a declaratory judgment that: (1) the McCallas did not exercise their option; (2) specific performance for the McCallas to sell the boat storage business to Baker; and (3) the Baker–Davis lease is legal and binding.

5    We note that even if we were to address the findings of fraud and undue influence, we would not find the lease and its amendments void, and at most, we would find the lease voidable based on undue influence. *See* RESTATEMENT (SECOND) OF CONTRACTS, § 177 (1981) ("Undue influence is unfair persuasion of a party who is under the domination of the person exercising the persuasion or who by virtue of the relation between them is justified in assuming that that person will not act in a manner inconsistent with his welfare;" "If a party's manifestation of assent is induced by undue influence by the other party, the contract is voidable by the victim.").

6    Ski River and the Davises' brief states $75,000 in exemplary damages; however, the answer to jury question 29 is $20,000 in exemplary damages, and the judgment awarded $20,000.

**End of Document**

© 2014 Thomson Reuters. No claim to original U.S. Government Works.

435 S.W.3d 222
Supreme Court of Texas.

VENTURE COTTON COOPERATIVE
and Noble Americas Corp., Petitioners,
v.
Shelby Alan FREEMAN, et al., Respondents.

No. 13–0122. | Argued Jan. 9,
2014. | Delivered June 13, 2014.

**Synopsis**
**Background:** Cotton growers who entered into contract with cooperative marketing pool brought action against cooperative pool. Cooperative pool moved to compel arbitration pursuant to an arbitration agreement contained in the contracts between growers and cooperative pool. The 106th District Court, Gaines County, Kelly Moore, J., denied motion, finding the arbitration agreement to be unconscionable. Cooperative pool appealed, and the Eastland Court of Appeals, 395 S.W.3d 272, Jim R. Wright, C.J., affirmed. Cooperative pool filed petition for review.

**Holdings:** The Supreme Court, Devine, J., held that:

[1] any implied waiver of growers' statutory right to recover attorney fees was invalid as contrary to public policy;

[2] unenforceable limitation on growers' right to recover attorney fees was severable from the remainder of the arbitration agreement; and

[3] one-sided attorney fee provision of the arbitration agreement was insufficient to invalidate agreement as unconscionable.

Reversed and remanded.

West Headnotes (17)

**[1]** **Alternative Dispute Resolution**



reviewable; finality

Decisions

**Courts**



by or certificate to Supreme Court by Court of Civil Appeals of questions where its decision conflicts with or overrules that of another Court of Civil Appeals or that of the Supreme Court

Review

Supreme Court has jurisdiction to hear an appeal from an interlocutory order denying arbitration when the court of appeals' decision conflicts with prior precedent.

Cases that cite this headnote

**[2]** **Alternative Dispute Resolution**



Preemption

**States**



Particular

cases, preemption or supersession

Although the Federal Arbitration Act (FAA) preempts state law that conflicts with its objectives, state law remains relevant to declare an arbitration agreement itself unenforceable on such grounds as exist in law or in equity for the revocation of any contract. 9 U.S.C.A. § 2.

Cases that cite this headnote

**[3]** **Alternative Dispute Resolution**



Validity

**Alternative Dispute Resolution**



Validity

of assent

**Alternative Dispute Resolution**



Unconscionabi

The "saving clause" of the Federal Arbitration Act (FAA) permits agreements to arbitrate to be invalidated by generally applicable contract defenses, such as fraud, duress, or unconscionability, but not by defenses that apply only to arbitration or that derive their meaning from the fact that an agreement to arbitrate is at issue. 9 U.S.C.A. § 2.

Cases that cite this headnote

**[4]** **Alternative Dispute Resolution**



**Alternative Dispute Resolution**



In determining an arbitration agreement's validity, a court may not construe the agreement differently from how it would construe contracts generally under state law, nor may a court rely on the uniqueness of an arbitration agreement as a basis for a state-law holding that enforcement would be unconscionable; but if the circumstances would render any contract unconscionable under Texas law, they are appropriate to invalidate the agreement to arbitrate as well. 9 U.S.C.A. § 2.

1 Cases that cite this headnote

**[5]** **Alternative Dispute Resolution**



**States**



cases, preemption or supersession

Special state rules for interpreting arbitration agreements cannot coexist with the Federal Arbitration Act (FAA) because Congress intended the act as its response to a longstanding judicial hostility to arbitration agreements. 9 U.S.C.A. § 1 et seq.

Cases that cite this headnote

**[6]** **Alternative Dispute Resolution**



A party seeking to compel arbitration under the Federal Arbitration Act (FAA) must establish that the dispute falls within the scope of an existing agreement to arbitrate; upon such proof, the burden shifts to the party opposing arbitration to raise an affirmative defense to the agreement's enforcement. 9 U.S.C.A. §§ 3, 4.

Cases that cite this headnote

**[7]** **Contracts**

Unconscionability  Unreasonable or Oppressive Contracts

**Contracts**

Construction  Presumptions and burden of proof

Unambiguous contracts are presumed to reflect the intent of the contracting parties and are generally enforced as written regardless of whether one or more of the parties contracted wisely or foolishly, or created a hardship for himself; courts therefore do not ordinarily inquire into the reasons for the contract or the relative fairness of its terms.

Cases that cite this headnote

**[8]** **Contracts**

 Unconscionability

Preemption **Contracts**

Particular

Unconscionable bargains are an exception to the freedom that generally pervades contract law.

Cases that cite this headnote

**[9]** **Alternative Dispute Resolution**

 Statutory

rights and obligations

When parties agree to arbitrate a statutory claim, a party does not forego the substantive rights afforded by the statute; it only submits to their resolution in an arbitral, rather than a judicial, forum.

Evidence Cases that cite this headnote

**[10]** **Alternative Dispute Resolution**

 Writing,

signature, and acknowledgment

**Alternative Dispute Resolution**



Any implied waiver of cotton growers' right to recover attorney fees under the Consumer Protection-Deceptive Trade Practices Act arising out of their execution of arbitration agreement that incorporated arbitration rules limiting recovery of attorney fees was invalid as contrary to public policy; arbitration rules did not comply with the statutory requirements for waiver of rights under the Consumer Protection-Deceptive Trade Practices Act, including that the waiver be conspicuous and in bold-face type of at least 10 points in size, and that it include language substantially similar to the form provided by the statute. V.T.C.A., Bus. & C. § 17.42(c)(1–3).

Cases that cite this headnote

**[11]** **Alternative Dispute Resolution**



Arbitration agreement's unenforceable limitation on cotton growers' right to recover attorney fees on their claim against cooperative marketing pool under the Consumer Protection-Deceptive Trade Practices Act was severable from the remainder of the arbitration agreement; essential purpose of the arbitration agreement was to provide for speedy and efficient resolution of disputes to ensure timely performance under the contract, and agreement's collateral effect on statutory rights and remedies appeared to be a peripheral concern.

Cases that cite this headnote

**[12]** **Contracts**



Illegality

In determining an agreement's essential purpose, for purposes of severability of unenforceable provisions, the issue is whether or not parties would have entered into the agreement absent the unenforceable provisions.

Cases that cite this headnote

Validity **[13]** **Alternative Dispute Resolution**



Unconscionabi

Provision of arbitration agreement between cotton growers and cooperative marketing pool that entitled pool, but not growers, to recover attorney fees for any breach of contract was insufficient to invalidate the arbitration agreement as unconscionable, despite contention that it deprived growers of their statutory right to recover attorney fees on a breach of contract claim. V.T.C.A., Civil Practice & Remedies Code § 38.001.

1 Cases that cite this headnote

**[14]** **Costs**



Contracts

Severability Parties are generally free to contract for attorney's fees as they see fit; thus, a contract that expressly provides for one party's attorney fees, but not another's, is not unconscionable per se.

Cases that cite this headnote

**[15]** **Alternative Dispute Resolution**



Matters

to Be Determined by Court

**Alternative Dispute Resolution**



Existence

and validity of agreement

**Alternative Dispute Resolution**



Waiver,

laches, or estoppel

Partial Questions of waiver, illegality, remedies, and attorney fees often relate to the broader, container contract, rather than the separable agreement to arbitrate, and, as such, are matters entrusted to the arbitrators.

Cases that cite this headnote

**[16]** **Alternative Dispute Resolution**



Evidence

When authority over the matters of waiver, illegality, remedies, and attorney fees is unclear, a strong federal presumption favors arbitration. 9 U.S.C.A. § 1 et seq.

1 Cases that cite this headnote

**[17]    Contracts**



Contracts

Courts usually analyze unconscionability issues in light of a variety of factors, which aim to prevent oppression and unfair surprise.

Cases that cite this headnote

**Attorneys and Law Firms**

**\*224** R. Carson Fisk, Ford Nassen & Baldwin P.C., Austin, TX, for Amicus Curiae Fisk R. Carson.

Amber S. Miller, ZS Brady & Co., Lubbock, TX, for Amicus Curiae Plains Cotton Growers, Inc.

Zachary S. Brady, ZS Brady & Co., Lubbock, TX, for Amicus Curiae Texans for Lawsuit Reform.

Danica Lynn Milios, Kent C. Sullivan, Sean D. Jordan, Sutherland Asbill & Brennan LLP, Austin, H. Grady Terrill III, Craig Terrill Hale & Grantham LLP, Lubbock, TX, for Petitioner.

Don David Martinson, McCleskey Harriger Brazill & Graf, L.L.P., Lubbock, Dustin Slade, Fernando Manuel Bustos, Bustos Law Firm, P.C., Lubbock, Jennifer Lea Kelley, Fanning Harper Martinson Brandt & Kutchin PC, Dallas, TX, for Respondent Freeman, Shelby Alan.

Dennis R. Burrows, William P. Lane, McCleskey Harriger Brazill & Graf, L.L.P., Lubbock, Don Martinson, Fanning Harper Martinson Brandt & Kutchin, P.C., Dallas, Jennifer Lea Kelley, Texans for Lawsuit Reform, Austin, TX, for Respondent Neitsch, Roger.

H. Alan Carmichael, Wetsel & Carmichael, LLP, Sweetwater, TX, for Respondent OCHO Gin Company, Ltd.

**Opinion**

Justice DEVINE delivered the opinion of the Court.

 **[1]**    Two groups of cotton farmers sue to rescind contracts in which they agreed to sell cotton through a cooperative marketing pool. The farmers allege that they were fraudulently induced to join the cooperative and seek damages, declaratory relief, and attorney's fees under various statutes. Because the agreements provide for arbitration of all disputes under the Federal Arbitration Act, 9 U.S.C §§ 1–16, the cotton cooperative moved to stay the litigation and compel arbitration. This appeal is from the trial court's interlocutory order, denying those motions. *See* TEX. CIV. PRAC. & REM.CODE § 51.016 (permitting interlocutory appeals of orders denying arbitration under the FAA). [1]

 **\*225**    The trial court has concluded that the parties' agreement to arbitrate should not be enforced because it is unconscionable, and the court of appeals has affirmed the trial court's order denying arbitration. 395 S.W.3d 272, 275–76 (Tex.App.–Eastland 2013). The court of appeals reasons that the arbitration agreement is unconscionable because it prevents the farmers from pursuing the statutory remedies and attorney's fees alleged in their pleadings. *Id.* at 277. We conclude that this limitation of statutory remedies is insufficient to defeat arbitration under the FAA and accordingly reverse the court of appeals' judgment. We conclude further that, because the court has not fully considered the parties' arguments on the issue of unconscionability, the case should be remanded to the court of appeals.

**I. Background**

Venture Cotton Cooperative is a cotton cooperative-marketing association, incorporated in Texas, and managed by Noble Americas Corp., a foreign corporation. In 2010, Venture operated a pool for the exclusive sale and marketing of its members' cotton production. Venture promoted this pool through various cotton-gin companies, which arranged meetings with local farmers. Venture would explain the pool's terms and solicit membership at these meetings. One such meeting was arranged by Ocho Gin Company in Seminole, Texas.

Farmers, who agreed to join the 2010 pool, signed Venture's Membership and Marketing Agreement and other related

documents. These documents asked each farmer to designate the acreage committed to the pool and to estimate the production Venture might expect to market. After the meeting in Seminole, Venture left copies of these documents with Ocho for farmers to execute, should they decide to join the cooperative. Several farmers decided to join the pool.

During the growing season, the price of cotton rose significantly. By harvest, Venture had become concerned that members of the pool might be tempted to sell their committed production on the open market. This concern blossomed into a dispute with some member-farmers over the quantity of cotton committed to the pool and ultimately led to a lawsuit by Alan Freeman and Perry Brewer, two prominent cotton farmers in Gaines County, Texas. [2]

In their lawsuit, Freeman and Brewer asserted claims for fraud, negligent misrepresentation, breach of fiduciary duty, mutual mistake, civil conspiracy and violations of the Texas Consumer Protection—Deceptive Trade Practices Act, and the Texas Free Enterprise and Antitrust Act of 1983. Freeman and Brewer also sought declaratory and injunctive relief and attorney's fees under Civil Practice and Remedies Code section 38.001. Shortly after filing this suit, another group of farmers filed a second suit against Venture and the other defendants in Gaines County, asserting similar claims. [3]

**\*226** Venture generally denied the allegations in both suits and moved to stay the litigation and compel arbitration under the United States Arbitration Act (also known as the Federal Arbitration Act or FAA). 9 U.S.C §§ 1–16. The farmers' membership and marketing agreements with the cooperative provided for the arbitration of all disputes under the FAA and the arbitration rules of the American Cotton Shippers Association (ACSA). The arbitration provision referred to the farmers as "producers" and provided in pertinent part:

- All disputes will be resolved pursuant to binding arbitration pursuant to the arbitration rules of the American Cotton Shippers Association.

- The site of the arbitration shall be either Houston, Texas, or Memphis, Tennessee, as chosen by Venture, unless otherwise directed by the arbitrator(s).

- The cotton sold herein is purchased for shipment out of state of origin in interstate or foreign commerce.

- Any court having or claiming jurisdiction, whether state or federal, shall apply the substantive provisions of the United States Arbitration Act....

- In the event of a breach of this Agreement by Producer, Producer agrees to pay all arbitration and court costs, if any, and the reasonable attorney's fees and litigation and arbitration expenses of Venture.

The farmers opposed Venture's motions, asserting a number of reasons why the arbitration agreement was unconscionable and should not be enforced. The trial court scheduled an evidentiary hearing.

At this hearing, Freeman and Brewer testified about their decisions to join the pool. According to their testimony, they had a question about "overages" a few days after Venture's marketing presentation. "Overages" refers to cotton produced on designated land in excess of the estimate given by a farmer at the time of land's commitment to the pool. Freeman and Brewer's question, which they directed to Ocho, was whether overages were included in the pool under Venture's contracts. An Ocho representative called Venture with this question and allegedly learned that the disposition of overages was at the farmer's discretion, that is, the farmer could elect to sell overages under the agreement or not.

Venture denies making any such representations. It also argues that its contract clearly calls for the commitment of acres, not bales, making overages subject to the agreement. In any event, Freeman and Brewer maintain that they signed with the cooperative after being led to believe that they would control overages.

After considering the parties' pleadings, motions, responses, and briefs, as well as evidence presented at the hearing, the trial court refused to stay the litigation or compel arbitration, finding the arbitration agreements unconscionable. Findings of fact and conclusions of law were requested and filed, but these findings and conclusions shed no light on the court's reasoning. [4]

Venture filed interlocutory appeals in both cases, and the court of appeals consolidated them for decision. *See* TEX. CIV. PRAC. & REM.CODE § 51.016 (permitting interlocutory **\*227** appeals of orders denying arbitration under the FAA). Agreeing that the arbitration agreements were unconscionable, the court affirmed the trial court's order denying Venture's motion to compel. 395 S.W.3d at 275–76.

The court reasoned that the agreements were unconscionable in two respects: (1) they forced the farmers "to forego substantive rights and remedies afforded by statute," *id.* at 275, and (2) they were one-sided because they allowed Venture to recover its attorney's fees, if the farmers breached the contract, but did not provide reciprocal rights to the farmers, *id.* at 276.

## II. The FAA and State Law

 **[2]** **[3]** **[4]** Although the Federal Arbitration Act preempts state law that conflicts with its objectives, *Southland Corp. v. Keating,* 465 U.S. 1, 10–17, 104 S.Ct. 852, 79 L.Ed.2d 1 (1984), state law remains relevant to declare an arbitration agreement itself unenforceable on "such grounds as exist in law or in equity for the revocation of any contract." 9 U.S.C. § 2 (the saving clause). "This saving clause permits agreements to arbitrate to be invalidated by 'generally applicable contract defenses, such as fraud, duress, or unconscionability,' but not by defenses that apply only to arbitration or that derive their meaning from the fact that an agreement to arbitrate is at issue." *AT & T Mobility LLC v. Concepcion,* ––– U.S. ––––, ––––, 131 S.Ct. 1740, 1746, 179 L.Ed.2d 742 (2011) (quoting *Doctor's Associates, Inc. v. Casarotto,* 517 U.S. 681, 687, 116 S.Ct. 1652, 134 L.Ed.2d 902 (1996)). In determining the arbitration agreement's validity then, a court may not construe the agreement differently from how it would construe contracts generally under state law, nor may a court rely on the uniqueness of an arbitration agreement as a basis for a state-law holding that enforcement would be unconscionable. *Perry v. Thomas,* 482 U.S. 483, 492, 107 S.Ct. 2520, 96 L.Ed.2d 426 (1987). But if the circumstances would render any contract unconscionable under Texas law, they are appropriate to invalidate the agreement to arbitrate as well. *In re Poly–America,* 262 S.W.3d 337, 348 (Tex.2008).

 **[5]** **[6]** Special state rules for interpreting arbitration agreements cannot coexist with the FAA because Congress intended the act as its response to a "longstanding judicial hostility to arbitration agreements." *Green Tree Fin. Corp.– Ala. v. Randolph,* 531 U.S. 79, 89, 121 S.Ct. 513, 148 L.Ed.2d 373 (2000). Under the FAA, an agreement to arbitrate that is valid under general state law principles and involves interstate commerce is "valid, irrevocable, and enforceable." 9 U.S.C. § 2. A party seeking to compel arbitration under the FAA, however, must establish that the dispute falls within the scope of an existing agreement to arbitrate. *In re Rubiola,* 334 S.W.3d 220, 223 (Tex.2011). Upon such proof, the burden shifts to the party opposing arbitration to raise an affirmative defense to the agreement's enforcement. *J.M. Davidson, Inc. v. Webster,* 128 S.W.3d 223, 227 (Tex.2003). The FAA thus requires a court to make at least a threshold determination of arbitrability—that the dispute is subject to an enforceable agreement to arbitrate—before enforcing the arbitration agreement by compelling arbitration or staying litigation. 9 U.S.C. §§ 3–4. [5]

### *228 A. Unconscionability

 **[7]** **[8]** The farmers do not dispute that their claims are covered by the agreements with Venture and subject to arbitration under the FAA, if their arbitration agreement itself is valid and enforceable. They contend, of course, that it cannot be enforced because the agreement is one-sided and grossly unfair in several respects. Unambiguous contracts, however, are presumed to reflect the intent of the contracting parties and are generally enforced as written "regardless of whether one or more of the parties contracted wisely or foolishly, or created a hardship for himself." *Wooten Props., Inc. v. Smith,* 368 S.W.2d 707, 709 (Tex.Civ.App.–El Paso 1963, writ ref'd). Texas courts therefore do not ordinarily inquire into the reasons for the contract or the relative fairness of its terms. *El Paso Field Services, L.P. v. MasTec N. Am., Inc.,* 389 S.W.3d 802, 810–11 (Tex.2012) (observing that a court's role "is not to protect parties from their own agreements"). But this notion that parties are free to negotiate their own bargains conflicts with the equally compelling notion that grossly unfair bargains should not be enforced. 49 DAVID R. DOW & CRAIG SMYSER, TEXAS PRACTICE SERIES: CONTRACT LAW § 3.9 (2005). Unconscionable bargains are therefore an exception to the freedom that generally pervades contract law.

Unconscionability, however, is not easily defined. The term defies a precise legal definition because "it is not a concept, but a determination to be made in light of a variety of factors not unifiable into a formula." 27 STEPHEN COCHRAN, TEXAS PRACTICE SERIES: CONSUMER RIGHTS AND REMEDIES § 4.2 at 394 (3d ed.2002); *see also* 1 JAMES J. WHITE & ROBERT S. SUMMERS, UNIFORM COMMERCIAL CODE § 4–3 at 294 (5th ed.2006). Although difficult to define, the defense has a long history. One of the earliest decisions to apply the defense described an unconscionable contract as one that "no man in his senses and not under delusion would make on the one hand, and as no honest and fair man would accept on the

other." *Earl of Chesterfield v. Janssen,* 28 Eng. Rep. 82, 100, 2 Ves. Sr. 125, 155 (1751); *see also Saunders v. Guinn,* 1 S.W.2d 363, 366 (Tex.Civ.App.–Eastland 1927, writ ref'd) (noting this "definition"); *Shumway v. Horizon Credit Corp.,* 801 S.W.2d 890, 896 (Tex.1991) (Mauzy, J. concurring and quoting *Janssen* ). Modern uniform laws add context to the defense but again do not attempt to define it.

The Uniform Commercial Code provides that a court should afford the parties a reasonable opportunity to present evidence as to a contract's commercial setting, purpose and effect to aid the court in evaluating the defense. TEX. BUS. & COMM.CODE § 2.302(b); *see also* RESTATEMENT (SECOND) OF CONTRACTS § 208, cmt. a (stating that unconscionability determinations are made in "light of [a contract's] setting, purpose, and effect"). Under the UCC, an unconscionability defense is a question of law that involves a highly fact-specific inquiry into the circumstances of the bargain, such as the commercial atmosphere in which the agreement was made, the alternatives available to the parties at the time and their ability to bargain, any illegality or public-policy concerns, and the agreement's oppressive or shocking nature. 49 TEXAS PRACTICE SERIES: CONTRACT LAW § 3.11.

In the court of appeals, the cotton farmers argued that the arbitration agreement was unconscionable in several respects. They complained that the American Cotton Shippers Association (ACSA) Arbitration Rules, adopted by the agreement, were one-sided and designed to foster arbitrator bias and that the rules' summary procedures further denied them adequate discovery and preparation time. They also **\*229** contended that the arbitration was too expensive and that its prospective cost would prevent them from vindicating their rights in the arbitral forum. Finally, they argued that the agreement and ACSA rules violated the state's public policy by illegally eliminating their statutory right to attorney's fees and other remedies under the Texas Consumer Protection—Deceptive Trade Practices Act (DTPA).

## B. Invalidity

The court of appeals' decision focuses solely on this last argument, concluding that the arbitration agreement is unconscionable because it forces the farmers "to forego substantive rights and remedies afforded by statute." 395 S.W.3d at 275. The court's application of public policy here is premised on our decision in *In re Poly–America, L.P.,* 262

S.W.3d 337 (Tex.2008). There, we indicated that it would be unconscionable for an arbitration agreement to mandate arbitration of a statutory claim and at the same time eliminate the rights and remedies afforded by the statute. *Id.* at 349. The court of appeals concludes that such a possibility exists here because the arbitration agreement applies to "all disputes," while the ACSA Arbitration Rules, incorporated into the parties' agreement, foreclose the farmers' statutory claims for attorney's fees and enhanced damages under the DTPA. Specifically, section 8(k) of the ACSA rules limits the arbitral award "to the monetary damages arising out of the failure of either party to perform its obligations pursuant to the contract as determined by the Arbitration Committee and shall not include attorney's fees unless provided for in the contract."

**[9]** When parties agree to arbitrate a statutory claim, "a party does not forego the substantive rights afforded by the statute; it only submits to their resolution in an arbitral, rather than a judicial, forum." *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.,* 473 U.S. 614, 628, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985). Thus, in *Poly–America,* we observed that arbitration agreements typically function simply as forum-selection clauses rather than statutory waivers and generalized that "[a]n arbitration agreement covering statutory claims is valid so long as 'the arbitration agreement does not waive substantive rights and remedies of the statute and the arbitration procedures are fair so that the employee may effectively vindicate his statutory rights.' " *Poly–America,* 262 S.W.3d at 352 (quoting *In re Halliburton,* 80 S.W.3d at 572).

An asserted waiver of the anti-retaliation provisions of the Workers' Compensation Act was at issue in *Poly–America.* The employee in that case sued his employer, seeking statutory remedies of reinstatement and punitive damages after being allegedly terminated for filing a workers' compensation claim. *Id.* at 345. Because the employee had agreed to arbitrate all disputes under the FAA, the trial court granted the employer's motion to compel arbitration. *Id.* at 344.

The employee sought mandamus relief from this order, arguing that the arbitration agreement was unconscionable because it eliminated his rights and remedies under the Workers Compensation Act. *Id.* at 352, 359. We agreed. *Id.* at 353, 360. After reviewing the statutory remedies at issue, we held the anti-retaliation provisions to be "a non-waivable legislative system" necessary to the Act's function. *Id.* at 352. We further concluded that their elimination under

the arbitration agreement undermined a key purpose of the Workers' Compensation Act, was contrary to public policy, and could not be enforced. *Id.* at 353. We did not, however, hold the arbitration agreement invalid. Instead, **\*230** we severed the offending limitation from the agreement and permitted the arbitration to proceed. *See id.* at 344 (noting that severance was proper because the limitation of statutory remedies was "not integral to the parties' overall intended purpose to arbitrate").

 **[10]**   In contrast to *Poly–America* 's anti-retaliation provision, the DTPA remedies at issue here can be contractually waived. TEX. BUS. & COM.CODE § 17.42. The DTPA provides detailed instructions on how to accomplish this. *See id.* (detailing requirements for a valid waiver). Among other requirements, the waiver must be "conspicuous and in bold-face type of at least 10 points in size," identified by a specific heading indicating the waiver, and include language substantially similar to the form the statute provides. *Id.* § 17.42(c)(1), (2) and (3). The contracts here do not comply with the statutory requirements. We accordingly agree with the court of appeals that any implied waiver under ACSA Rule 8(k), which likewise does not conform to the DTPA's requirements, is contrary to public policy and therefore invalid.

### C. Severability

 **[11]**   Venture argues, however, that even if ACSA Rule 8(k) and the arbitration clause are deemed unconscionable and incapable of limiting the farmers' statutory rights under the DTPA, the court of appeals nevertheless erred when it refused to sever the offending rule and require arbitration under the remainder of the agreement. Venture submits that the unconscionability defense, which is codified in the Texas Business and Commerce Code and applicable to the cotton sales at issue here, allows courts to consider severance whenever they are confronted with an unconscionable contract term. TEX. BUS. & COM.CODE § 2.302. Similarly, the Restatement provides that "[w]here a term rather than the entire contract is unconscionable, the appropriate remedy is ordinarily to deny effect to the unconscionable term." RESTATEMENT (SECOND) OF CONTRACTS § 208 cmt. g.

The court of appeals concludes, however, that Venture waived its right to enforce the remainder of the arbitration clause by not asking the trial court to sever the offending

limitation of statutory remedies. 395 S.W.3d at 277. But this is an interlocutory appeal, and the case remains pending in the trial court. We are therefore unsure about what Venture has waived. If the court merely means to suggest that Venture waived the right to complain about severance in this interlocutory appeal, the waiver argument serves only to delay a decision in the case. Conservation of time and resources recommend that we consider the issue now because nothing prevents Venture from urging severance in the trial court and, if denied, from renewing its complaint in yet another interlocutory appeal.

 **[12]**   In *Poly–America* we noted that "[a]n illegal or unconscionable provision of a contract may generally be severed so long as it does not constitute the essential purpose of the agreement." *Poly–America,* 262 S.W.3d at 360. In determining an agreement's essential purpose, the issue is "whether or not parties would have entered into the agreement absent the unenforceable provisions." *Id.* Quite clearly, the arbitration agreement's essential purpose here was to provide for a speedy and efficient resolution of disputes to ensure timely performance under the contract. The agreement's collateral effect on statutory rights and remedies appears to be a peripheral concern to this essential purpose. We accordingly conclude that the court of appeals erred in declining to sever  **\*231**  the objectionable limitation on the farmers' statutory rights.

### D. Attorney's Fees

In addition to the agreement's unconscionable limitation on potential statutory rights, the court of appeals concludes that the arbitration agreement is also unconscionably one-sided because it provides for only Venture to recover attorney's fees. 395 S.W.3d at 276. The court's opinion further indicates that this provision together with an ACSA rule, limiting the award of attorney's fees to those expressed in the contract, violates the farmers' statutory right to attorney's fees under Civil Practice and Remedies Code section 38.001.

That section provides, in relevant part, that "[a] person may recover reasonable attorney's fees from an individual or corporation, in addition to the amount of a valid claim and costs, if the claim is for ... an oral or written contract." TEX. CIV. PRAC. & REM.CODE 38.001. The court of appeals ultimately decides, however, that the arbitration agreement fails effectively to waive the farmers' rights under section 38.001 because the agreement and ACSA rules do

not reference the statute or otherwise specifically inform the farmers of the intended waiver of such rights. *See* 395 S.W.3d at 276 (concluding that waiver of these statutory rights cannot occur absent specific notice and reference to § 38.001).

Venture, on the other hand, argues that whether the agreement waives these rights is irrelevant because the statute simply does not apply to the farmers' circumstances. The statute does not apply, according to Venture, because the farmers seek to cancel the contract rather than recover under its terms. In short, Venture contends that the farmers' pleadings do not assert contractual rights and therefore do no invoke a right to attorney's fees under section 38.001.

 [13]    The farmers respond that they have pled a breach of contact claim. Their pleadings are not clear on the subject, but even were we to recognize some deficiency in the present pleadings, the result would be merely to postpone the issue, much the same as the court of appeals has done with the severance question. The appeal is interlocutory, and the farmers are free to amend their pleadings to clarify the matter. For purposes of this appeal then, we accept that the farmers intended to plead an alternative breach of contract claim, as they assert. We conclude, however, that neither the contract's attorney's fee provision nor its effect on attorney's fees under section 38.001 is sufficient to invalidate the arbitration agreement as unconscionable.

 [14]    Parties are generally free to contract for attorney's fees as they see fit. *Intercontinental Group P'ship v. KB Home Lone Star L.P.,* 295 S.W.3d 650, 653 (Tex.2009). Thus, a contract that expressly provides for one party's attorney's fees, but not another's, is not unconscionable per se. Although perhaps relevant to a broader inquiry into contractual oppression or an imbalance in bargaining power, the attorney's fee provision here is not, standing alone, decisive proof of an unconscionable bargain. Moreover, the court of appeals itself concludes that the arbitration agreement did not waive the farmers' statutory right to attorney's fees under section 38.001 and so its relevancy to the court's unconscionability analysis is unclear.

In *Olshan,* we observed that the "crucial inquiry" in determining unconscionability was "whether the arbitral forum in a particular case is an adequate and accessible substitute to litigation, a forum where the litigant can effectively vindicate his or her rights." *In re Olshan Found. Repair Co.,* **\*232** *LLC,* 328 S.W.3d 883, 894 (Tex.2010). That inquiry is not satisfied by speculation but by specific

proof in the particular case of the arbitral forum's inadequacy. *Id.* at 896. If speculation about possible harm was insufficient to establish unconscionability in *Olshan,* then clearly the court's determination here that no harm has been done will not suffice. *See* 395 S.W.3d at 276 (concluding that arbitration agreement did not waive cotton farmers' right to attorney's fees under section 38.001).

In *Olshan,* we cautioned that courts "should be wary of setting the bar for holding arbitration clauses unconscionable too low" as that would undermine the "liberal federal policy favoring arbitration agreements." *Olshan,* 328 S.W.3d at 893. Courts should also use care not to intrude upon arbitral jurisdiction under the guise of an unconscionability defense.

 [15]    [16]    Questions of waiver, illegality, remedies, and attorney's fees often relate to the broader, container contract, rather than the separable agreement to arbitrate, and, as such, are matters entrusted to the arbitrators. [6] And, when authority over the matter is unclear, "a strong federal presumption" favors arbitration. *Poly–America,* 262 S.W.3d at 348. Thus, the United States Supreme Court has indicated that arbitration provisions should not be held unconscionable based on speculation about their potential effect. *See PacifiCare Health Sys., Inc. v. Book,* 538 U.S. 401, 407 n. 2, 123 S.Ct. 1531, 155 L.Ed.2d 578 (2003) (noting that "the preliminary question [of] whether the remedial limitations at issue ... prohibit[ed] an award of RICO treble damages [was] not a question of arbitrability").

In *PacifiCare,* several physicians filed suit against managed healthcare organizations, including PacifiCare and UnitedHealth, alleging breach of contract, unjust enrichment, and violations of several federal and state statutes, including RICO. *Id.* at 402, 123 S.Ct. 1531. Because the arbitration agreements prohibited awarding punitive damages, the physicians argued that arbitration would prevent them from obtaining "meaningful relief" under RICO's treble-damages provision. *Id.* at 403, 123 S.Ct. 1531. The lower courts agreed, holding the arbitration clauses to **\*233** be unenforceable with respect to the RICO claims. *Id.*

The Supreme Court reversed and remanded, concluding that it was "premature" to conclude that the contractual ban on punitive damages acted as a bar to statutory damages and that the arbitrator should decide the issue as an initial matter. *Id.* at 404, 123 S.Ct. 1531. The Court thus deferred consideration of whether public policy might taint the arbitration agreement's enforceability until the award-enforcement stage, but implicit

in the Court's analysis was the notion that the arbitration clause was prima facie enforceable, notwithstanding the contractual prohibition on punitive damages.

In summary, we conclude that a contract that fails to provide reciprocal rights to attorney's fees is not unconscionable per se. We further disagree with the court of appeals' opinion to the extent it uses the contract's "one-sided" attorney's fees provision as an independent reason to hold the arbitration agreement unconscionable. *See* 395 S.W.3d at 276.

### III. Unaddressed Arguments

Although the court of appeals' refusal to compel arbitration in this case rests solely on public-policy grounds, unconscionability typically involves a broader inquiry, and, indeed, the farmers presented a broader case in the trial court. In addition to their complaint about the agreement's limitation of remedies, the farmers contended they could not effectively vindicate their rights through arbitration because of arbitrator bias, the lack of adequate discovery under the arbitration's summary procedures, the exorbitant cost of the arbitration itself, and other inequities in the arbitral process. The court of appeals did not consider these additional concerns once it determined the arbitration agreement to be "substantively unconscionable" because it prevented the farmers from pursuing statutory remedies. *See* 395 S.W.3d at 277 (concluding that the court did not need to consider "remaining arguments attacking appellees' other substantive unconscionability and procedural unconscionability defenses").

 **[17]**   Texas courts usually analyze unconscionability issues "in light of a variety of factors, which aim to prevent oppression and unfair surprise ..." *Poly–America,* 262 S.W.3d

at 348. Unconscionability determinations are not isolated inquiries but rather are made in "light of [a contract's] setting, purpose, and effect." RESTATEMENT (SECOND) OF CONTRACTS § 208, cmt. a.

Thus, in *Olshan* we observed that a court should consider "the parties' general commercial background and the commercial needs of the particular trade or case" when determining whether "the clause involved is so one-sided that it is unconscionable under the circumstances existing when the parties made the contract." *Olshan,* 328 S.W.3d at 892 (quoting *FirstMerit Bank,* 52 S.W.3d at 757).

In the court of appeals, Venture has argued the commercial reasonableness and necessity for the arbitration agreement, while the farmers have emphasized potential abuses and unequal treatment under the arbitral process. In this Court, the parties have not briefed or argued these broader concerns. They have instead focused solely on the court of appeals' rationale for affirming the trial court's order. Because the court's public-policy analysis is insufficient to defeat arbitration, the arguments left unaddressed in the court of appeals should be considered as they are "necessary to the final disposition of the appeal." TEX.R.APP. P. 47.1.

* * *

The court of appeals' judgment, affirming the trial court's order denying arbitration, is reversed, and the case is remanded **\*234**  to the court of appeals for consideration of the remaining arguments.

**Parallel Citations**

57 Tex. Sup. Ct. J. 730

Footnotes

1   We have jurisdiction to hear an appeal from an interlocutory order denying arbitration when the court of appeals' decision conflicts with prior precedent. *See Forest Oil Corp. v. McAllen,* 268 S.W.3d 51, 55 n. 8 (Tex.2008) (noting that our jurisdiction over the interlocutory appeal depends on a dissent or decisional conflict); *Certain Underwriters at Lloyd's of London v. Celebrity, Inc.,* 988 S.W.2d 731, 733 (Tex.1998) (per curiam) (same).

2   The lawsuit was styled *Alan and Christine Freeman d/b/a Alan Freeman Farms, J.V., and Perry and Kathy Brewer d/b/a PDB Joint Venture v. Venture Cotton Cooperative, Noble Americas, Corp., Ocho Gin Co. and Ocho Management Corp.*

3   The second lawsuit was styled *Roger Neitsch, Gregory Upton, Wayne Upton, Anderson Upton, Jud Cheuvront d/b/a L & ME, Inc. and JDC Farms, Max McGuire, Raymond McPherson, Abe Froese d/b/a BAC Farms, Gerardo Froese d/b/a Gerardo Froese Farms, George P. Froese d/b/a George P. Froese Farms, Neil Enns, David Bergen, Bradley Peters, Peter Neustaeter Jr., Wilhelm Friesen, Cornelius Banman, Gerard Neustaeter, Peter Friesen, Heinrich Friesen, Abe S. Peters, Isaak T. Fehr, Jacob Peters, Abe Loewen,*

*Isaak Wiebe, Ben Neudorf, and Rudolph Peters v. Venture Cotton Cooperative, Noble Americas, Corp., Ocho Gin Co. and Ocho Management Corp.*

The trial court's finding of fact stated: "The arbitration clause sought to be enforced is unconscionable." Its conclusion of law stated: "The arbitration clause sought to be enforced is unenforceable because it is unconscionable."

Under FAA § 3, when a party moves to stay litigation pending arbitration, the court shall grant the motion "upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement." 9 U.S.C. § 3. Section 4 requires a court to grant a motion to compel arbitration "upon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue." *Id.* § 4.

Professor Rau explains:

Suppose that the issue—"whether the plaintiff can recover statutory damages or attorneys' fees"—*is treated as one more claim or dispute within the scope of the arbitration clause;* suppose further that in pursuing this inquiry the decisionmaker is presented with some more precise questions:

. For openers, is the contractual limitation of remedies properly interpreted as a "waiver" by the plaintiff of the recovery otherwise made available by statute?

. If so, is the plaintiff able to waive this recovery? More precisely: Are, say, "sophisticated groups of doctors" who contract with a managed care company the sort of plaintiffs who in these circumstances need the protection of an unwaivable rule? For commercial parties in high-stakes cases, the appropriate trade-off between litigation and informal justice may sometimes take the form of choosing a more intensive form of judicial review; an alternative bargain might call for reducing the risk of excessive damage awards.

And in any event, is it sensible to address either of these concerns in the form of an interim decision preceding the merits? Might they not instead be the focus of attention at a later point-once the predicate of liability has been established, and an appropriate remedy needs to be crafted?

Framed in this way, all these questions begin very much to look as if they belonged *to the realms of interpretation and appreciation of context*—that is, to the matters of substance that have been routinely entrusted to arbitrators.

Alan Scott Rau, *Everything You Really Need to Know About "Separability" in Seventeen Simple Propositions,* 14 AM. REV. INT'L ARB. 1, 65–66 (2003) (emphasis in original) (footnotes omitted).

---

**End of Document**

© 2014 Thomson Reuters. No claim to original U.S. Government Works.

Vernon's Texas Statutes and Codes Annotated
  Civil Practice and Remedies Code (Refs & Annos)
    Title 7. Alternate Methods of Dispute Resolution (Refs & Annos)
      Chapter 171. General Arbitration (Refs & Annos)
        Subchapter A. General Provisions (Refs & Annos)

V.T.C.A., Civil Practice & Remedies Code § 171.002

§ 171.002. Scope of Chapter

Currentness

(a) This chapter does not apply to:

(1) a collective bargaining agreement between an employer and a labor union;

(2) an agreement for the acquisition by one or more individuals of property, services, money, or credit in which the total consideration to be furnished by the individual is not more than $50,000, except as provided by Subsection (b);

(3) a claim for personal injury, except as provided by Subsection (c);

(4) a claim for workers' compensation benefits; or

(5) an agreement made before January 1, 1966.

(b) An agreement described by Subsection (a)(2) is subject to this chapter if:

(1) the parties to the agreement agree in writing to arbitrate; and

(2) the agreement is signed by each party and each party's attorney.

(c) A claim described by Subsection (a)(3) is subject to this chapter if:

(1) each party to the claim, on the advice of counsel, agrees in writing to arbitrate; and

(2) the agreement is signed by each party and each party's attorney.

**Credits**
Amended by Acts 1997, 75th Leg., ch. 165, § 5.01, eff. Sept. 1, 1997.

Notes of Decisions (42)

V. T. C. A., Civil Practice & Remedies Code § 171.002, TX CIV PRAC & REM § 171.002
Current through the end of the 2013 Third Called Session of the 83rd Legislature

**End of Document**                                                                          © 2014 Thomson Reuters. No claim to original U.S. Government Works.

Vernon's Texas Statutes and Codes Annotated
  Civil Practice and Remedies Code (Refs & Annos)
    Title 7. Alternate Methods of Dispute Resolution (Refs & Annos)
      Chapter 171. General Arbitration (Refs & Annos)
        Subchapter A. General Provisions (Refs & Annos)

V.T.C.A., Civil Practice & Remedies Code § 171.002

§ 171.002. Scope of Chapter

Currentness

(a) This chapter does not apply to:

(1) a collective bargaining agreement between an employer and a labor union;

(2) an agreement for the acquisition by one or more individuals of property, services, money, or credit in which the total consideration to be furnished by the individual is not more than $50,000, except as provided by Subsection (b);

(3) a claim for personal injury, except as provided by Subsection (c);

(4) a claim for workers' compensation benefits; or

(5) an agreement made before January 1, 1966.

(b) An agreement described by Subsection (a)(2) is subject to this chapter if:

(1) the parties to the agreement agree in writing to arbitrate; and

(2) the agreement is signed by each party and each party's attorney.

(c) A claim described by Subsection (a)(3) is subject to this chapter if:

(1) each party to the claim, on the advice of counsel, agrees in writing to arbitrate; and

(2) the agreement is signed by each party and each party's attorney.

**Credits**
Amended by Acts 1997, 75th Leg., ch. 165, § 5.01, eff. Sept. 1, 1997.

Notes of Decisions (42)

V. T. C. A., Civil Practice & Remedies Code § 171.002, TX CIV PRAC & REM § 171.002
Current through the end of the 2013 Third Called Session of the 83rd Legislature

**End of Document**                                      © 2014 Thomson Reuters. No claim to original U.S. Government Works.